## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RHODIUM ENCORE LLC, *et al.*,[1] | § | Case No. 24-90448 (ARP) |
| | § | |
| Debtors. | § | |
| | § | (Joint Administration Pending) |
| | § | |

### DEBTORS' MOTION TO ASSUME
### CERTAIN EXECUTORY CONTRACTS WITH WHINSTONE US, INC.

> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Rhodium Encore LLC and its debtor affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors") respectfully represent as follows in support of this motion (the "Motion"):

### RELIEF REQUESTED

1.      By this Motion, pursuant to sections 365(a) and 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and rules 6004(h) and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors request entry of an order (i)

---

[1]    The Debtors in these chapter 11 cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), and Rhodium 30 MW LLC (0263).  The mailing and service address of the Debtors in these chapter 11 cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005.

approving the Debtors' assumption of certain executory contracts with Whinstone US, Inc. ("Whinstone") set forth on **Exhibit 1**, the Schedule of Contracts (the "Whinstone Contracts"), and (ii) granting related relief.

## JURISDICTION AND VENUE

2.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The basis for the relief requested herein are sections 365(a) and 105(a) of the Bankruptcy Code, and rules 6004(h) and 6006 of the Bankruptcy Rules.

## BACKGROUND

5.     The Debtors and their non-Debtor affiliates (collectively, "Rhodium" or the "Company") are an industrial-scale digital asset technology company that uses proprietary technologies to mine Bitcoin.  Bitcoin mining is the process by which new Bitcoins are generated, and transactions are verified on blockchain.  Essentially, this is done by solving extremely complicated mathematical problems on high-power computers.  Bitcoin mining requires massive processing power that consumes equally massive amounts of energy.  The circuits also create a lot of heat, and thus even more energy is needed in order to cool them.

6.     Rhodium is unlike other Bitcoin-mining companies.  It has been able to achieve sustainability and cost-effectiveness through the use of a fully-integrated infrastructure platform, access to low-cost power, and by directly owning and operating a majority of the components of

its customized mining sites.  The Company's fully integrated infrastructure platform includes a proprietary liquid-cooling technology system, efficiency optimization software, and end-to-end management software allowing the Company to maintain low operating costs and manage energy consumption.

7.     Rhodium conducts its operations at two strategically chosen sites in Texas.  The Company's principal operations are conducted at a facility in Rockdale, Texas (the "Rockdale Site").  Although this site is owned by Whinstone, Rhodium invested approximately $150 million dollars building out the infrastructure at this site.  The Rockdale Site represents more than half of Rhodium's total Bitcoin mining capacity.   Rhodium operates in two buildings at the Rockdale Site: Building B, which accounts for about 20% of Rhodium's Rockdale operations, and Building C, which accounts for the other 80%.  Debtor Rhodium JV holds interests in and receives dividends from Rhodium 30MW LLC, Rhodium Encore LLC, Rhodium 2.0 LLC and Rhodium 10MW LLC, each of which operate within Building C of the Rockdale Site.  Jordan HPC LLC conducts mining operations in Building B of the Rockdale.  Non-Debtor Rhodium Renewables LLC operates the additional Bitcoin mining operations at a second facility in Temple, Texas (the "Temple Site").

8.     On the date hereof (the "Petition Date"), the Debtors each commenced these voluntary cases under chapter 11 of title 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## THE EXECUTORY CONTRACTS

### A.  Rhodium Enters Into Favorable Whinstone Contracts In Exchange For Developing Rockdale Site

9.     The Rockdale Site, owned by Whinstone, was undeveloped.  In 2020, Rhodium

agreed to invest approximately $150 million to develop the facility in exchange for entering into a series of favorable contracts (the "Whinstone Contracts") which are crucial for Rhodium's Bitcoin mining operations at the Rockdale Site.  As further described below, the Whinstone Contracts consist of (i) multiple power agreements between Whinstone and individual Debtors providing Debtors with electric power and certain maintenance services at the Rockdale Site that facilitate the Debtors' Bitcoin mining operations (the "Hosting Agreements"), (ii) a profit sharing agreement between Rhodium JV and Whinstone (the "Profit Sharing Agreement"), and (iii) water supply agreements between Whinstone and multiple Debtors to provide industrial water needed to cool the Debtors' miners (the "Water Supply Agreements").

10.     ***Hosting Agreements***.  Rhodium's electricity-intensive Bitcoin mining operations depend on one thing—power.  Therefore, as a condition of investing $150 million in the development of Whinstone's Rockdale Site facility, Whinstone agreed to enter into Hosting Agreements and agreed to provide Rhodium with uninterrupted space and energy over a ten-year period.  Under these agreements, Rhodium locked in a heavily-negotiated price for electricity that, given today's market conditions, favors Rhodium.  But for the Hosting Agreements and the fixed power prices they embody, Rhodium would not have invested in Whinstone's facility.

11.     Specifically, in July 2020, Whinstone and Rhodium JV entered into twenty identical Hosting Agreements, each providing for Rhodium JV to receive 5MW of electricity from Whinstone (the "5MW Agreements") at a fixed price for at least ten years.  Also in July 2020, Whinstone and Rhodium 30 MW LLC entered into a nearly identical Hosting Agreement for Rhodium 30MW LLC to receive 30MW of power from Whinstone at a fixed price (the "30MW Agreement").   On September 30, 2021, Rhodium JV assigned fourteen of the 5MW Agreements to Rhodium Encore LLC, Rhodium 2.0 LLC, and Rhodium 10MW LLC.  More

recently, Rhodium JV assigned the remaining six 5MW Agreements to Rhodium 30MW, but these agreements remain dormant.

12.     ***Profit Sharing Agreement.*** As part of Rhodium's investment in the then-undeveloped Rockdale Site, Rhodium and Whinstone initially created a joint venture, pursuant to which Whinstone initially held a 12.5% ownership interest in Rhodium JV.  On December 31, 2020, Whinstone redeemed its ownership interest in Rhodium JV in exchange for 12.5% of Rhodium JV's profits under the Profit Sharing Agreement, effectively giving Whinstone a "synthetic dividend."  The Profit Sharing Agreement did not give Whinstone an interest in any other entity's profits, nor does it incorporate or reference any of the other contracts among the parties.  On the other hand, the accompanying Redemption Agreement provided that the duties and obligations of the parties to each other under any existing hosting or power agreements would continue as set forth in such agreements.

13.     Consistent with the Profit Sharing Agreements, Rhodium JV has regularly passed on the designated percentage of its after-tax cash profits (as defined in the Profit Sharing Agreement) to Whinstone.  The profit sharing payments only attach to the operations at the Rockdale Site, are specifically defined in Annex 2 to the Profit Sharing Agreement, and are separate from the electricity payments due to Whinstone under the Hosting Agreements.  The profit sharing payments did not start accruing until 2021.

14.     ***Water Supply Agreement***.  Separately,  Debtors Rhodium JV, Rhodium Encore, Rhodium 2.0, Rhodium 10MW, Rhodium 30 MW and Jordan HPC and non-Debtor affiliate Rhodium Industries entered into a Water Supply Agreement with Whinstone for the provision of industrial water to assist with cooling of the Debtors' mining infrastructure.  Cooling is a critical part of a mining operation and contributes substantially to the efficiency and profitability of the

operation.  Rhodium uses for its Rhodium JV subsidiaries a liquid coolant technology employing a dielectric fluid, which is nonconductive, meaning that the mining infrastructure can be fully submerged in the coolant for maximum heat relief, dramatically increasing its heat efficiency and, consequently, productivity. For this system to work at maximum efficiency, an industrial water supply is necessary for the cooling system and fans to work properly.

15.     Debtor Jordan HPC uses an air cooling system instead of liquid cooling.  To facilitate these operations, Jordan HPC entered into a 25MW power contract with Whinstone.

**B.  In Reliance on Whinstone Contracts, Rhodium Spends Significant Funds Developing Rockdale Site**

16.     In reliance on the Whinstone Contracts, Rhodium invested approximately $150 million in building out the Rockdale Site over two years.  This  involved installing complex and proprietary infrastructure that cannot readily be used anywhere else.  Much of the Rockdale Site investment came through outside investors in the Company, and the Debtors also incurred significant funded debt.

17.     Rhodium and Whinstone operated cooperatively and according to their agreements as Rhodium developed the Rockdale Site and began its Bitcoin mining operations.

**C.  Riot—Rhodium's  Competitor—Acquires  Whinstone  and  Seeks  To  Terminate Whinstone Contracts  and Shut Off Rhodium's Power**

18.     Rhodium's relationship with Whinstone abruptly changed when  Riot Blockchain, Inc., now known as Riot Platforms, Inc. ("Riot")—one of Rhodium's largest competitors— acquired Whinstone in a "strategic acquisition" on May 26, 2021.  Riot competes directly with Rhodium in the Bitcoin mining space where market dominance and control remains up for grabs. Riot saw the acquisition of Whinstone as an opportunity to destroy one of its largest competitors. Shortly after the acquisition, Whinstone (controlled by Riot) set out to oust Rhodium from the Rockdale  Site,  terminate  the  Whinstone  Contracts,  and  take  over  the  valuable  Hosting

Agreements that Rhodium invested $150 million to obtain.  Riot made its intentions clear:  it complains in its SEC filing that "[f]or a number of clients inherited as a result of the Whinstone acquisition, [it] provide[s] data center hosting services pursuant to hosting agreements containing below-market terms, including as to power costs."  Riot even went so far as to inform the public in that same SEC filing that it wants to terminate these contracts and either replace them "on terms more accretive to the Company," or use the capacity "as part of [its own] Bitcoin Mining operations."

19.     Accordingly, in May 2022, Whinstone wrote to a number of Rhodium entities, including Rhodium JV, to notify them that all of these Rhodium entities allegedly breached the Power Sharing Agreement (to which only Rhodium JV was a party), and demanding over $10 million for their alleged failures to pay fees under the Power Sharing Agreement.

20.     By April 2023, Whinstone managed to increase its calculation of alleged underpayment of required fees and demanded over $13.5 million to remedy the underpayments and other alleged contractually owed amounts, threatening that Whinstone would terminate the Power Sharing Agreement if Rhodium did not comply with the demand.

21.     As part of its campaign to oust Rhodium from the Rockdale site  (and ignoring the parties' contractual agreement to arbitrate), on May 2, 2023, Whinstone filed breach of contract claims against certain Debtors in a case captioned *Whinstone US, Inc. v. Rhodium 30 MW LLC, Rhodium JV LLC, Air HPC LLC, and Jordan HPC LLC*,  Cause No. CV41873, pending in the 20th District Court of Milam County, Texas (the "Milam Litigation").  Whinstone amended the petition twice, alleging that Rhodium breached the terms of the Profit Sharing Agreements related to the Rockdale Site where Rhodium conducts Bitcoin mining operations, resulting in an alleged underpayment of now $26 million in hosting and service fees.  Whinstone also sought, among

other things, a declaration that the Profit Sharing Agreements replace or supersede its other agreements with the Debtors.

22.     Rhodium successfully moved to compel arbitration, and, in September 2023, the trial court ordered the parties to arbitrate Whinstone's claims and stayed the suit pending the outcome of the arbitration.  Instead of commencing arbitration, Whinstone (after a lengthy delay) sought mandamus review in the Texas appellate courts. *See In re Whinstone US, Inc.*, No. 03-23-00717-CV (Tex. App.—Austin).  When that effort proved unsuccessful, Whinstone engaged in extralegal, extracontractual self-help: the next business day, it turned off the power, forced Rhodium's staff out of the facility, and declared the contracts terminated.  These actions devastated Rhodium's operations.  Whinstone also violated the clear terms of the Hosting Agreements, which require Whinstone to supply Rhodium with electricity at least 96-97% of the time.

23.     With no other choice, on December 12, 2023 Rhodium sought and obtained against Whinstone a temporary restraining order and a temporary injunction in the district court, which required Whinstone to "restore and maintain the status quo" including "with respect to the provision of electricity, access, and other services" ("Temporary Injunction Order").

24.     In the meantime, and because Whinstone still had not commenced arbitration, Rhodium initiated arbitration against Whinstone on December 11, 2023, relating to the claims and counterclaims at issue in the Milam County case, including Rhodium's claims for energy credits and its damages under the Water Supply Agreement ("Whinstone Arbitration").  Whinstone immediately responded with a letter threatening to sue the AAA if it proceeded.

25.     Despite the Temporary Injunction Order requiring Whinstone to "restore and maintain the status quo … **with respect to the provision of electricity**," Whinstone decided once

again to turn off the power to Rhodium's operations.  Late in the evening on Friday, January 12,

2024, Whinstone abruptly disconnected power to Building C at Rockdale—containing 80% of

Rhodium's operations at the Rockdale Site.  Whinstone attempted to justify cutting off the power

by pointing to a trivial incident earlier that day, in which Rhodium had a minor failure of one of

its over 600 cooling fans, resulting in a small spill of BitCool, a non-toxic, non-hazardous,

biodegradable coolant similar to a mineral oil that was used in Rhodium's immersion cooling

systems.  Seizing on this minor incident, Whinstone had a Riot attorney send Rhodium a "Notice

of Suspension," claiming that Whinstone had a contractual right to suspend power *indefinitely*.

This Notice of Suspension was frivolous.  In it, Whinstone weirdly relied on the inapposite

Rhodium JV Profit Sharing Agreement to unilaterally cut power to all operating subsidiaries of

the Company housed in Building C, even though that contract gave Whinstone no such right.

26.     After this incident, Rhodium filed various motions to compel Whinstone to restore

power to Rhodium's operations at the Rockdale site, and the emergency arbitrator agreed.  After

a two-day evidentiary hearing, the emergency arbitrator agreed with Rhodium and enjoined

Whinstone, unpersuaded by Whinstone's pretextual safety concerns.  The emergency arbitrator

ordered Whinstone to restore Rhodium's power and site access.  This time—and for now—

Whinstone complied.  But all together, Whinstone wrongfully shut off power to Rhodium for

eight weeks, costing Rhodium over nine million dollars in unmined Bitcoin and causing

significant harm to Rhodium's business.

27.     Undeterred, Whinstone subsequently sent a second letter threatening the AAA for

exercising jurisdiction—and this time adding a threat against the emergency arbitrator personally.

Whinstone successfully appealed the earlier Milam County court's Temporary Injunction Order,

and on March 27, 2024, the Texas Third Court of Appeals vacated that Temporary Injunction

Order solely on the ground that certain provisions of the injunction order were vague.  The appellate ruling did not disturb any of the district court's underlying factual or legal conclusions regarding the need for injunctive relief against the Notice of Termination.

28.     Given the risk of irreparable harm, Rhodium immediately sought a further order from the emergency arbitrator.  On April 3, 2024, the emergency arbitrator issued an order confirming that the district court's injunction remained in full force and effect at least until the appeals court issued its mandate in June 2024.

29.     Incredibly, in April 2024, Whinstone tried yet again: it purported to tender to Rhodium JV, Rhodium 30MW, Jordan HPC, and Air HPC a new, broader notice of termination of all Hosting Agreements and Profit Sharing Agreements with any and all Rhodium entities.  The April notice lacked any logical connection or reference to the actual terms of the referenced contracts and therefore lacks legal significance.  However, in response, in June 2024, the arbitrator granted Rhodium interim relief in the arbitration enjoining Whinstone from acting on *any* of its notices of termination or its Notice of Suspension.

30.     Facing its lack of success in the Whinstone Litigation, Whinstone tried another forum and another theory.  On July 19, 2024, Whinstone filed another action in the District Court of Tarrant County, Texas, *Whinstone US, Inc. v. Imperium Investment Holdings LLC, Nathan Nichols, Chase Blackmon, Cameron Blackmon, Nicholas Cerasuolo, Rhodium Enterprises, Inc., Rhodium Technologies, LLC, and Rhodium Renewables, LLC*, Cause No. 153-354718-24 (the "Tarrant County Litigation").  The main allegations paint Whinstone as a defrauded investor that suffered damages as a result of various capital transactions and expenditures by the Debtors and their non-Debtor affiliates, which, Whinstone alleges, decreased its share of profits it expected from the Rhodium JV Profit Sharing Agreement.  Whinstone forgets that Rhodium required

additional investments to supply the needed capital to build out the Rockdale Site for the benefit of both Rhodium and Whinstone, and that without investor contributions, there would be no Rockdale infrastructure or any profits to share in the first place.   By filing an action against the ultimate parent of the Debtors, Imperium Investment Holdings LLC, Whinstone specifically and intentionally interfered with the Debtors' concrete negotiations to attract additional investments and to sell assets.

31.     Currently, Whinstone begrudgingly provides power to Rhodium, but Whinstone continues to evade the injunctive relief Rhodium has obtained, including by filing a new, pending emergency motion in Texas state court.   Rhodium remains at risk that Whinstone will stop providing power, as it had done repeatedly.   Whinstone's unjustified actions have caused extensive damage to Rhodium.   The interruption of electricity supply to Rhodium's Bitcoin miners caused over $9 million in lost revenue alone.   In addition, Rhodium has spent over $1 million in costly repairs of equipment damaged by Whinstone's improper shutdowns.   For its part, Whinstone may have actually profited from the shutdown by selling the unused electric power capacity back to the ERCOT grid.

**D.  Assumption of the Whinstone Contracts**

32.     The Debtors' businesses depend on the Whinstone Contracts for their survival. The Company invested over $150 million building out the Rockdale Site owned by Whinstone, which involved installing complex and proprietary infrastructure that cannot readily be used anywhere else.  The Hosting Agreements provide the Debtors with physical space at the Rockdale Site and guaranteed electricity supply at a locked-in price.  The Water Supply Agreements supply the Debtors with water needed for cooling their Bitcoin mining operations.   Without the Whinstone Contracts, the Debtors simply cannot operate their customized Bitcoin mining

infrastructure at the Rockdale Site, built at Debtors' great expense.  The infrastructure cannot be readily moved and provide the means by which the Debtors make money.

33.     The Debtors have satisfied, and will continue to satisfy, their obligations under the Whinstone Contracts in the ordinary course of business.  In various venues and on multiple fronts, the Debtors proved that Whinstone, and not the Debtors, violated the Whinstone Contracts through anti-competitive tactics to eliminate a competitor in an emerging industry.   No monetary and nonmonetary defaults need be cured by the Debtors under the Whinstone Contracts.

34.     The Debtors seek authorization to assume the Whinstone Contracts on their original terms.

## RELIEF REQUESTED SHOULD BE GRANTED

### A. The Court May Authorize the Debtors to Assume the Whinstone Contracts

35.     The Court should approve the relief requested herein under section 365(a) of the Bankruptcy Code.  Section 365(a) provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521 (1984) (noting that section 365(a) "by its terms includes all executory contracts except those expressly exempted"); *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co*., 83 F.3d 735, 741 (5th Cir. 1996) ("Although the Code does not define 'executory contract,' generally an agreement is considered executory 'if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party.'" (quoting *In re Murexco Petroleum, Inc*., 15 F. 3d 60, 62 (5th Cir. 1994))). This allows the debtor in possession to maximize the value of its estate by assuming executory contracts or unexpired leases that benefit the estate and by rejecting those that do not. *In re Nat'l*

*Gypsum Co.*, 208 F.3d 498, 504–05 (5th Cir. 2000).

36.     Courts apply the "business judgment" standard in evaluating a debtor's decision to assume or reject executory contracts or unexpired leases. *See Matter of J.C. Penney Direct Marketing Servs.*, LLC, 50 F.4th 532, 534 (5th Cir. 2022) ("A bankruptcy court reviews a debtor's decision to assume or reject an executory contract under the deferential 'business judgment' standard" and "as long as assumption of a lease appears to enhance a debtor's estate, a bankruptcy court should only withhold approval when the debtor's judgement is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.") (citing *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019)); *see also Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 524–25, n.5 (5th Cir. 2004) ("The rejection decision under § 365 is generally left to the business judgment of the bankruptcy estate."); *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 422 (Bankr. N.D. Tex. 2009) ("The general rule is that the decision to reject a given contract should be left to the trustee's (or debtor in possession's) sound business judgment."); *In re Pisces Energy, LLC*, No. 09-36591H5-11, 2009 WL 7227880, *6 (Bankr. S.D. Tex. Dec. 21, 2009) ("Courts apply the 'business judgment test,' which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment."); *In re Armstrong World Indus., Inc*., 348 B.R. 136, 162 (D. Del. 2006) ("Under section 365 of the Bankruptcy Code, a debtor may assume an executory contract or unexpired lease if (i) outstanding defaults under the contract or lease have been cured under section 365(b)(1) of the Bankruptcy Code, and (ii) the debtor's decision to assume such executory contract or unexpired lease is supported by valid business justifications.").

37.     The "business judgment" standard requires only a showing that either assumption

or rejection of the executory contract or unexpired lease will benefit the debtor's estate. *See In re Idearc Inc*., 423 B.R. 138, 162 (Bankr. N.D. Tex. 2009) (stating that the business judgment standard only "requires a showing that the proposed course of action will be advantageous to the estate." (citation omitted)). The Fifth Circuit has held that as long as assumption of a lease appears to enhance a debtor's estate, a bankruptcy court should only withhold approval when "the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Matter of J.C. Penney Direct Marketing Servs., LLC*, 50 F.4th at 534. Further, under the business judgment standard, "[a] debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'" *In re Pilgrim's Pride Corp*., 403 B.R. at 422 (citing *Wheeling–Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling–Pittsburgh Steel Corp.)*, 72 B.R. 845, 849–50 (Bankr. W.D. Pa. 1987)).

38.     Assumption of the Whinstone Contracts is a sound exercise of the Debtors' business judgment. The services provided under the Whinstone Contracts serve essential functions for the Debtors' operations and are indispensable to the continued, uninterrupted operation of the Debtors' business. Rejection of the Whinstone Contracts—which provide hosting services including guaranteed electricity supply at a locked-in price at the Rockdale Site—will make it impossible for the Debtors to continue operating their Bitcoin mining infrastructure at the Rockdale Site, severely impacting the Debtors' ability to reorganize and even to recoup its investment in a sale, since the infrastructure is not readily movable and is tied to the provision of services at the location. The cost associated with the rejection of the Whinstone Contracts would far outweigh the costs of assumption and continued performance thereunder. Accordingly, the Debtors are firmly convinced that assuming the Whinstone Contracts is a sound exercise of their business judgment and is in the best interests of their estates.

39.     Furthermore, the Debtors are not in a monetary or non-monetary default under the Whinstone Contracts.  Whinstone cannot prove its spurious theories of damages under the Whitestone Contracts.  Even Whinstone's pretextual reasons to switch off power to Debtors' operations on multiple occasions have been rejected as unconvicting by multiple adjudicators.

40.     Because Rhodium has not defaulted under the Whinstone Contracts, no cure payment nor adequate assurance of future performance is required under section 365(b)(1). Section 365(b)(1) of the Bankruptcy Code establishes certain conditions that must be satisfied before the assumption of an executory contract or unexpired lease:

> (b)(1) *If there has been a default in an executory contract* or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . .
> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> > (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1) (emphasis added).

41.     Only "if there has been a default under the contract, the debtor must 'cure[ ], or provide[ ] adequate assurance that the trustee will promptly cure ... default,' and provide 'adequate assurance of future performance under such contract,' 11 U.S.C. § 365(b)(1), unless the default stems from some exempted origin, *see id*. § 365(b)(2)." *Matter of Thornhill Bros. Fitness, L.L.C*., 85 F.4th 321, 325 (5th Cir. 2023).  Thus, only if there is a default, the debtor must cure the default and provide adequate assurance of ability to perform under the contract.  *Id*.  This approach is in contrast to the stricter requirements for assignees of executory contracts in bankruptcy, where the debtor "may assign an executory contract or unexpired lease of the debtor only if-- (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate

assurance of future performance by the assignee of such contract or lease is provided, ***whether or not there has been a default in such contract*** or lease." 11 U.S.C. § 365(f)(2)(B) (emphasis added). Here, Debtors only seek to assume contracts that they did not breach. Therefore, the Debtors are not required to pay cure or to provide adequate assurance of payment of such cure nor to provide adequate assurance of future performance as a condition to assumption of the Whinstone Contracts. 11 U.S.C. § 365(b)(1)(C); *Matter of Thornhill Bros. Fitness, L.L.C.*, 85 F.4th at 325.

42. But even if the default subsection of section 365 applied here, the Debtors can demonstrate adequate assurance of their future performance. "In determining whether a debtor has offered adequate assurance of future performance, [courts consider] 'the debtor's financial data indicated its ability to generate an income stream sufficient to meet its obligations, the general economic outlook in the debtor's industry, and the presence of a guarantee.'" *In re Senior Care Centers, LLC*, 607 B.R. 580, 596 (Bankr. N.D. Tex. 2019) (quoting *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1310 (5th Cir. 1985)). However, a "debtor does not need to show that it will thrive, make a profit or provide a guarantee of performance," only that it can meet its contractual obligations. *In re Patriot Place, Ltd.*, 486 B.R. 773, 801 (Bankr. W.D. Tex. 2013). To determine whether a debtor can show its ability to perform under the contract in the future, courts also considered a number of factors, including: "(1) the debtor's payment history; (2) presence of a security deposit; (3) evidence of profitability; (4) plan that would earmark money exclusively for the [contractor]; and (5) whether the [executory contract] is at, or below, the prevailing rate." *Id*.

43. Once the Whinstone Contracts are assumed and the Court and the Bankruptcy Code curtail Whinstone's continued campaign to oust Rhodium from the Rockdale Site or

interrupting Rhodium's business operations at the premises by switching off its power supply, the Debtors can profitably operate their business as intended.  Additionally, the Debtors' history of timely payments and timely performance of its prepetition obligations, notwithstanding Whinstone's various baseless attempts to withhold its performance under the Whinstone Contracts, also shows adequate assurance of future performance. Further, the electricity rates under the Whinstone Contracts are, according to Whinstone's parent company, Riot, in its public SEC filings, below market rate, providing yet another assurance of the Debtors' future performance under the Whinstone contracts.

44.     The Debtors easily can satisfy any future obligations that may arise under the Whinstone Contracts following their assumption, including after emergence, since this way the Debtors will be able to conduct their Bitcoin mining operations, for which they built the Rockdale Site infrastructure in the first place.

45.     Accordingly, the Debtors satisfy the requirements for assumption of the Whinstone Contracts set forth in section 365 of the Bankruptcy Code.

**B.  The Court May Waive the Stay Under Bankruptcy Rule 6004(h)**

46.     The Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the relief requested here is essential to prevent irreparable damage to the Debtors' operations, going-concern value, and efforts to pursue a sale or restructuring of its assets and liabilities.

## RESERVATION OF RIGHTS

47.     Except as expressly set forth herein or in the Proposed Order, nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against Whinstone, its affiliates, officers and directors, any creditor or interest holder, or (vi) an admission by the Debtors that any instruments constitute an executory contract, except for the Whinstone Contracts identified on Exhibit 1.  The Debtors reserve all rights to object to or challenge whether any instrument constitutes an executory contract. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## NOTICE

48.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to local rule 9013-1(d).

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

[*Reminder of the page intentionally left blank*]

Respectfully submitted this 24th day of August, 2024.

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

 _/s/  Patricia B. Tomasco_
Patricia B. Tomasco (SBN 01797600)
Joanna D. Caytas (SBN 24127230)
Razmig Izakelian (*pro hac vice* pending)
Alain Jaquet (*pro hac vice* pending)
700 Louisiana Street, Suite 3900
Houston, Texas 77002
Telephone: 713-221-7000
Facsimile: 713-221-7100
Email: pattytomasco@quinnemanuel.com
Email: joannacaytas@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com

*Proposed Counsel for Debtors and Debtors in
Possession*

**<u>Certificate of Accuracy</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/  Patricia B. Tomasco*
Patricia B. Tomasco

**<u>Certificate of Service</u>**

I, Patricia B. Tomasco, hereby certify that on the 24th day of August, 2024, a copy of the foregoing Motion was served by the Electronic Case Filing System for the United State Bankruptcy Court for the Southern District of Texas.

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco

**Exhibit 1**

**Schedule of Contracts**

| Contract | Effective Date | Counterparties | Date Assigned | Assigned to Rhodium Affiliate |
|---|---|---|---|---|
| *Rhodium JV LLC Profit Sharing Agreement* | | | | |
| Hosting Agreement | 12/31/2020 | Rhodium JV LLC and Whinstone US, Inc. | N/A | N/A |
| *Rhodium Encore LLC Hosting Agreements* | | | | |
| New Hosting Service Agreement No. #R-5MW-001 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium Encore LLC |
| New Hosting Service Agreement No. #R-5MW-002 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium Encore LLC |
| New Hosting Service Agreement No. #R-5MW-003 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium Encore LLC |
| New Hosting Service Agreement No. #R-5MW-004 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium Encore LLC |
| New Hosting Service Agreement No. #R-5MW-005 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium Encore LLC |
| *Rhodium 2.0 LLC Hosting Agreements* | | | | |
| Rhodium 2.0 Hosting Agreements | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium 2.0 LLC |
| New Hosting Service Agreement No. #R-5MW-006 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium 2.0 LLC |
| New Hosting Service Agreement No. #R-5MW-007 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium 2.0 LLC |
| New Hosting Service Agreement No. #R-5MW-008 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium 2.0 LLC |
| New Hosting Service Agreement No. #R-5MW-009 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium 2.0 LLC |

| Contract | Effective Date | Counterparties | Date Assigned | Assigned to Rhodium Affiliate |
|---|---|---|---|---|
| New Hosting Service Agreement No. #R-5MW-010 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium 2.0 LLC |
| New Hosting Service Agreement No. #R-5MW-011 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium 2.0 LLC |
| New Hosting Service Agreement No. #R-5MW-012 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium 2.0 LLC |
| *Rhodium 10MW LLC Hosting Agreements* | | | | |
| New Hosting Service Agreement No. #R-5MW-013 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium 10MW LLC |
| New Hosting Service Agreement No. #R-5MW-014 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 9/30/2021 | Rhodium 10MW LLC |
| *Rhodium 30MW LLC Hosting Agreements* | | | | |
| New Hosting Service Agreement | 07/07/2020 | Rhodium 30MW and Whinstone US, Inc. | N/A | N/A |
| New Hosting Service Agreement No. #R-5MW-015 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 4/29/2024 | Rhodium 30MW LLC |
| New Hosting Service Agreement No. #R-5MW-016 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 4/29/2024 | Rhodium 30MW LLC |
| New Hosting Service Agreement No. #R-5MW-017 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 4/29/2024 | Rhodium 30MW LLC |
| New Hosting Service Agreement No. #R-5MW-018 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 4/29/2024 | Rhodium 30MW LLC |
| New Hosting Service Agreement No. #R-5MW-019 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 4/29/2024 | Rhodium 30MW LLC |
| New Hosting Service Agreement No. #R-5MW-020 | 07/09/2020 | Rhodium JV LLC and Whinstone US, Inc. | 4/29/2024 | Rhodium 30MW LLC |
| *Jordan HPC LLC Hosting Agreement* | | | | |
| Colocation Agreement | 11/02/2020 | Jordan HPC LLC and Whinstone US Corporation | N/A | N/A |

| Contract | Effective Date | Counterparties | Date Assigned | Assigned to Rhodium Affiliate |
|---|---|---|---|---|
| *Rhodium Industries LLC Water Supply Services Agreement* | | | | |
| Whinstone Building C Water Supply Services Agreement | 08/12/2021 | Rhodium Industries LLC—together with its affiliates, including Rhodium JV LLC, Rhodium 30MW LLC, Rhodium Encore LLC, Rhodium 2.0 LLC, Jordan HPC LLC, Rhodium 10MW LLC—and Whinstone US, Inc. | N/A | N/A |