**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RHODIUM ENCORE LLC, *et al.*,[1] | § | Case No. 24-90448 (ARP) |
| | § | |
| Debtors. | § | |
| | § | (Joint Administration Pending) |
| | § | |

**DECLARATION OF DAVID M. DUNN
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, David M. Dunn, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am co-Chief Restructuring Officer of debtor Rhodium Enterprises, Inc. ("Rhodium Enterprises"), which is the direct and indirect parent of the remaining debtors (collectively, the "Debtors," or the "Company," or "Rhodium").  I am also a Principal of Province, LLC ("Province"), a nationally recognized financial advisory firm focusing on restructurings, growth opportunities, and fiduciary-related services.

2.      I am a seasoned corporate restructuring professional with over twenty (20) years of experience in high-profile board, buyside, and advisory roles.  My background includes large and complex financial restructurings, operational transformations, mergers and acquisitions, interim management, distressed financings, and litigation-oriented investments.

---

[1]     The Debtors in these chapter 11 cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), Rhodium 30MW LLC (0263), Rhodium Enterprises, Inc. (6290), Rhodium Technologies LLC (3973), Rhodium Renewables LLC (0748), Air HPC LLC (0387), Rhodium Shared Services LLC (5868), Rhodium Ready Ventures LLC (8618), Rhodium Industries LLC (4771), Rhodium Encore Sub LLC (1064), Jordan HPC Sub LLC (0463), Rhodium 2.0 Sub LLC (5319), Rhodium 10MW Sub LLC (3827), Rhodium 30MW Sub LLC (4386), and Rhodium Renewables Sub LLC (9511).  The mailing and service address of the Debtors in these chapter 11 cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005.

3. Over the course of my twenty-year career, I have served as a chief restructuring officer, financial advisor to debtors, advisor to or member of boards of directors, litigation and liquidation trustee, and plan administrator. Before joining Province, I executed principal investments in distressed debt and equity instruments across a diverse range of industries, first at Arrowgrass Capital Partners and then at Cross Sound Management, a corporate distressed investment firm that I co-founded. I began my career practicing law within the financial restructuring departments of Sidley Austin LLP and then Akin Gump Strauss Hauer & Feld LLP.

4. My experience includes global engagements across a broad range of industries, including power, upstream E&P, E&P services, metals and mining, monoline and mortgage insurance, media, gaming, and retail.

5. Based on my work with the Debtors, my oversight of the work that Province has performed for the Debtors, my review of relevant documents, and my discussions with members of the Company's management team, I am generally knowledgeable and familiar with the Company's day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases. I am authorized to submit this declaration ("Declaration") on behalf of the Debtors to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") on the date hereof (the "Petition Date") and the motions filed concurrently herewith (the "First Day Motions").

6. Except as otherwise indicated, I base the facts set forth in this Declaration on my personal knowledge, my review of relevant documents (including the Debtors' books and

records), information provided to me by the Debtors' employees, my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial condition, or my discussions with the Debtors' officers and advisors, including professionals at Province and Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel" and collectively with Province, the "Advisors").  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

7.      I organized this Declaration into four (4) parts.  The first part provides an overview of the Debtors and their chapter 11 cases.   The second part provides a short primer on cryptocurrency and describes the Company's business, its organizational and capital structure, its history, and its current operations.    The third part describes the events leading to the filing of these chapter 11 cases.  The fourth part summarizes the relief requested in the First Day Motions and the legal and factual bases supporting it.

## I.      OVERVIEW

8.      The Company is an industrial scale digital asset technology company utilizing proprietary technologies to mine Bitcoin.  The Company achieves sustainability and cost-effectiveness through the use of a fully integrated infrastructure platform, access to low-cost power, and directly owning and operating a majority of the components of its customized mining sites.   The fully integrated infrastructure platform includes a proprietary liquid-cooling technology system, efficiency optimization software, and end-to-end management software allowing the Company to maintain low operating costs and manage energy consumption. Strategically chosen Texas sites allowed the Company to obtain competitive energy pricing through long-term energy contracts.  The Company owns some of the largest liquid-cooling mining sites in the world, with approximately 227.5 MW of deployed capacity with mostly liquid-

cooled miners across two operational data centers in Texas (the "Data Centers"). The Company's principal operations are conducted at a facility in Rockdale, Texas owned by Whinstone US, Inc. ("Whinstone") with significant infrastructure investment from the Company (the "Rockdale Site"). The Company's additional bitcoin mining operations are located at a second facility in Temple, Texas (the "Temple Site").

9.      The Debtors derive substantially all of their revenue at the Rockdale Site from Bitcoin mining. The fully customized design of the Debtors' mining sites with liquid cooling technology infrastructure extending the lifecycle of mining hardware and reducing energy consumption allows the Debtors to significantly control the costs of mining Bitcoin. Through the use of proprietary software and infrastructure, the Debtors have the flexibility to curtail operations and release energy capacity during emergencies and high-demand periods, allowing their power supplier to sell unused capacity back to the Texas power market. In exchange, the Debtors have a contractual right to recoup from their power suppliers energy credits.

10.     In addition to Bitcoin mining operations similar to those at the Rockdale Site, the Debtors also provide hosting services to third parties at the Temple Site.

11.     Since inception, the Debtors have built a considerable asset base, gained market trust as a low-cost, reliable Bitcoin miner, and demonstrated a multi-year track record of successful management of their businesses.

12.     A confluence of events, however, has significantly affected the Debtors' liquidity position and led to their need to seek chapter 11 protection.

- First, the landlord and power supplier providing colocation and hosting services to Rhodium at the Rockdale Site—Whinstone—was acquired by a direct competitor of Rhodium, publicly-listed Riot Blockchain, Inc. ("Riot"). The acquisition resulted in souring of the relationship and Whinstone's efforts to oust Rhodium from Whinstone's Rockdale Site, which Rhodium developed with a two-year investment of over $150 million in custom infrastructure in exchange for certain favorable long-term contracts.

- Second, Whinstone sued Rhodium to terminate the Rhodium contracts and eject Rhodium from the location Rhodium developed at its own expense, to make space for Rhodium's competitor, Riot, and to give Riot the benefit of existing desirable power agreements necessary to conduct mining operations (the "Whinstone Litigation"). Rhodium was not the only tenant at the Rockdale location, and, on information and belief, Whinstone similarly undertook efforts to oust its other tenants except for Riot at the Rockdale location. Whinstone is currently being sued by its other Rockdale tenants. The Whinstone Litigation is ongoing in multiple forums and is accompanied by escalating litigation costs.

- Third, lacking success in litigation, Whinstone resorted to self-help, switching off power to Rhodium's Bitcoin mining infrastructure on two occasions, one lasting eight weeks, resulting in at least $9 million losses of revenue to Rhodium and unpredictability in Rhodium's operation. The improper shutdown also caused extensive damage to Rhodium's equipment and infrastructure that further reduced the ability to mine Bitcoin and required significant time and expense to repair.

- Fourth, Whinstone refused to credit to Rhodium certain energy credits due to Rhodium for decreasing power usage during periods of scarcity. Such energy credits were to compensate Rhodium for (i) loss of revenue when energy was sold back to Texas power markets during periods of energy scarcity, and (ii) providing capital for deposits so Whinstone could procure power contracts in the first place. The amounts due for the energy credits are approximately $67 million. Without these contractually obligated payments, Rhodium experienced liquidity shortages.

- Fifth, adverse weather events affected the energy supply and infrastructure of Rhodium, resulting in Rhodium's Bitcoin mining operations at the Temple Site being offline and resulting in a loss of revenue.

13.     Taken together, these factors placed a considerable strain on the Debtors' liquidity. As of the Petition Date, the Debtors have only approximately $2,494,703.79 in total liquidity.

14.     Several important events occurred in the months leading up to these cases that bear on the Debtors' position before the Court today. First, in the months leading up to these cases, the Debtors' management actively took steps to decrease operating costs and reduce and delay capital expenditures. These actions, however, were insufficient to enable the Debtors to resolve their liquidity issues caused by interruptions in generating revenue and collecting receivables due to the actions of Whinstone, in addition to escalating litigation costs. Given the Debtors' decreasing liquidity, the Debtors recognized the need to explore alternatives to inject liquidity

and ensure their continuation as a going concern, maximizing value for the benefit of all stakeholders.

15.     To that end, in April 2024, the Debtors engaged Quinn Emanuel to explore restructuring alternatives, and soon thereafter engaged Province.

16.     The Debtors engaged with parties both inside and outside the corporate structure to relieve liquidity pressures, including potential third-party financing providers and potential asset purchasers.  At the same time, the Debtors continued to pursue litigation with Whinstone to resolve service interruptions and collection of receivables.

17.     Over the very recent past, two primary paths emerged: (i) a sale of certain assets of the Company that would provide liquidity to continue servicing Debtors' debt and provide additional capital to operate the Debtors' business as well as fund litigation against Whinstone to resolve it expeditiously, and (ii) a chapter 11 case to consummate a comprehensive restructuring, including debtor-in-possession financing provided by a third-party DIP provider.

18.     Ultimately, the Debtors and their advisors explored both options in parallel in the weeks leading up to the filing of these chapter 11 cases, trying to improve each deal to make it as beneficial as possible for the Company and its stakeholders. The Debtors and the Advisors discussed both options extensively, assessing in detail the advantages and disadvantages of each option and their feasibility.

19.     The Company engaged in marketing efforts to sell one of its mining facilities and has received a preliminary letter of intent for a $105 million cash acquisition.  However, the risks associated with pending litigation caused this deal to not be consummated pre-petition.

20.     After extensive discussions with the Advisors, the Debtors concluded, for the reasons discussed in more detail below, that a chapter 11 case to consummate a comprehensive

restructuring, including debtor-in-possession ("DIP") financing provided by a third-party DIP provider, represented the optimal path forward and best positioned the Debtors for long-term success, while simultaneously continuing to pursue the sale of certain assets to provide additional liquidity to the Debtors.

21.     As discussed further below, the restructuring contemplated by the Debtors will enable the Debtors to continue operating their business.

22.     The Debtors have run the best process possible in light of the facts presented and are confident this path is the best path for the Company and all stakeholders.   By utilizing the chapter 11 process and tools made available by the Bankruptcy Code, the Debtors hope to emerge as a reorganized and stronger enterprise for the benefit of all of their stakeholders.

23.     Accordingly, on August 24, 2024, six affiliates of the Debtors filed in this Court voluntary petitions for chapter 11 relief: Rhodium Encore LLC, Jordan HPC LLC, Rhodium JV LLC, Rhodium 2.0 LLC, Rhodium 10MW LLC, and Rhodium 30 MW LLC (the "Initial Debtors").  The Initial Debtors' cases are jointly administered as *In re Rhodium Encore LLC, et al.*, Case No. 24-90448 (ARP).

24.     On this date, additional affiliates of the Initial Debtors have filed in this Court voluntary petitions for chapter 11 relief: Rhodium Technologies LLC ("Rhodium Technologies"), Rhodium Enterprises Inc. ("Rhodium Enterprises"), Rhodium Renewables LLC ("Rhodium Renewables"), Rhodium Ready Ventures LLC ("Rhodium Ready Ventures"), Rhodium Industries LLC ("Rhodium Industries"), Rhodium Shared Services LLC ("Rhodium Shared Services"), Rhodium Renewables Sub LLC ("Rhodium Renewables Sub"), Rhodium 30MW Sub LLC, Rhodium Encore Sub LLC, Rhodium 10MW Sub LLC, Rhodium 2.0 Sub LLC, Air HPC

LLC ("Air HPC"), and Jordan HPC Sub LLC (the "Additional Debtors," and, together with the Initial Debtors, the "Debtors").

25.     The Additional Debtors requested joint administration of their subsequently filed chapter 11 cases with the cases of the Initial Debtors, *In re Rhodium Encore LLC, et al*., Case No. 24-90448 (ARP).   This declaration and the first day motions filed on the same date by the Additional Debtors are applicable also to the Initial Debtors.

## II.     THE DEBTORS' BUSINESS

### A.     Cryptocurrency and Mining Generally

26.     To better understand the Company's history, business operations, and events leading to these chapter 11 cases, it is helpful to provide a brief primer on cryptocurrency and mining.

#### 1.     Blockchains

27.     Blockchain is the ledger technology that underlies Bitcoin and other cryptocurrencies.  A blockchain is a decentralized and distributed digital public ledger that stores information in a secure, verifiable and permanent way.  One of the advantages of blockchain over other database technologies is that it is completely decentralized, meaning that no entity or computer owns and stores the full database.  Instead, the blockchain ledger is partially distributed across computers that act as nodes in a peer-to-peer network, which requires every transfer or storage of information in the public ledger to be approved by the majority of nodes in the network.

#### 2.     Digital Assets/Cryptocurrency

28.     Cryptocurrency (or, colloquially, "crypto") is a type of decentralized, encrypted digital asset that acts as a medium of exchange or store of value.  Many cryptocurrencies are a popular application of blockchain technology, enabling transactions on the network to be settled, confirmed and stored in a distributed public ledger through a process called mining. Most

cryptocurrencies are not backed by a central bank or governmental entity and have no physical form.

29.     Most cryptocurrencies use encryption techniques to control the creation of units and to verify the transfer of funds. For Bitcoin, every single transaction, and the ownership of every single digital asset in circulation, is recorded on the blockchain, which effectively contains a record of all account balances.  Each Bitcoin account on the blockchain is identified solely by its unique public key, which renders it effectively anonymous, and is secured with its associated private key, which is kept secret, like a password.  The combination of private and public cryptographic keys constitutes a secure digital identity in the form of a digital signature, providing strong control of ownership.  By executing and digitally signing a Bitcoin transaction with a private key, users can send cryptocurrencies to other users around the world.

30.     Because no single entity owns or operates a decentralized network such as the one for Bitcoin, and the infrastructure is collectively maintained by a public user base, the network does not rely on governmental authorities, financial institutions, or any central certifying authority to create, transmit, or determine the value of digital assets.  Instead, the value of a cryptocurrency is determined by supply and demand for the units, with prices—denominated in U.S. dollars or other cryptocurrencies such as Bitcoin—being set at cryptocurrency exchanges.  The prices of digital assets quoted on cryptoexchanges are extremely volatile.

31.     The two most popular cryptocurrencies are Bitcoin and Ether.  Bitcoin was the first cryptocurrency to be created, and as of July 26, 2024, the market value of all Bitcoins in circulation was approximately $1.34 trillion. Ether is the second largest cryptocurrency, with a market capitalization of approximately $392.88 billion as of July 26, 2024.

32.     The market for digital assets has been growing exponentially. Bitcoin's daily exchange volume rose from $92 million in January 2017 to more than $50 billion in May 2021. The initial exchange rate recorded on October 5, 2009 was $0.000764 for every Bitcoin.  It then reached a high of $68,789 on November 10, 2021, declined in December 2022 to approximately $16,800, and subsequently rose to its all-time high on March 14, 2024, when one Bitcoin was worth $73,750.07.  The price of Bitcoin marginally declined since then to the current price of $59,207.40 as of August 16, 2024.

### 3.     Digital Asset Mining

33.     The verification of transactions over the blockchain can occur through one of two processes: (i) proof of work and (ii) proof of stake.  For proof of work systems, such as Bitcoin, a blockchain algorithm uses mining to validate a transaction: the participating computers on the network, called nodes, compete to validate a transaction by solving cryptographic puzzles using computer processing power to confirm and add new blocks to the blockchain.  The first node to validate the transaction receives a reward, generally in the form of more cryptocurrency.  Mining activities require massive amounts of computing power and energy.

34.     More specifically, specialized computers, or "miners," power and secure blockchains by solving complex cryptographic algorithms to validate transactions on specific digital asset networks.  To add blocks to the blockchain, a miner must map an input data set consisting of the existing blockchain, plus a block of the most recent digital asset transactions and an arbitrary number called a "nonce," to an output data set of a predetermined length using the hash algorithm. Solving these algorithms is also known as "solving or completing a block." Solving a block results in a reward of digital assets, such as Bitcoin.  This is called "mining."   The rewards of digital assets can be sold profitably when the sale price of the digital asset exceeds the direct costs of mining, which generally consists of the cost of mining hardware, the cost of the

electrical power to operate the computer, and other facility costs to house and operate the equipment.

35.     Mining processing power is generally referred to as "hashing power."  A "hash" is the computation run by mining hardware in support of the blockchain.   A miner's "hash rate" refers to the rate at which it can solve such computations per second.   Miners with higher rated hash rate, when operating at maximum efficiency, have a higher chance of completing a block in the blockchain and receiving a digital asset reward.   Thus, revenues from digital asset mining are impacted not only by volatility in Bitcoin prices, but also by increases in the Bitcoin blockchain's network hash rate resulting from the growth in the overall quantity and quality of miners working to solve blocks on the Bitcoin blockchain and the difficulty level associated with the secure hashing algorithm employed in solving the blocks.  The difficulty adjusts approximately every two weeks to ensure a consistent block time, which can influence mining profitability.

36.     The likelihood that an individual mining participant acting alone will solve a block and be awarded a digital asset is extremely low.  As a result, to maximize the opportunities to receive a reward, most large-scale miners, including the Debtors, have joined with other miners in "mining pools" where the computing power of each pool participant is coordinated to complete the block on the blockchain and mining rewards are distributed to participants in accordance with the rules of the mining pool.  The Debtors have agreements with their mining pools to pay a negotiated volume rate of below-market fees between 19–20 basis points (0.19%–0.20%) to participate in the pools and receive their pro rata share of the Bitcoins mined with the Debtors' participation.

37.     The method for creating new Bitcoin is mathematically controlled in a manner such that the supply of Bitcoin grows at a limited rate based on a pre-determined schedule.  The

number of Bitcoins awarded for solving a new block is automatically halved every 210,000 blocks. This means every block up to and including block 210,000 produced a reward of 50 Bitcoin, while blocks beginning with 210,001 produced a reward of 25 Bitcoin. Blocks are mined on average every 10 minutes, which means 144 blocks are mined per day on average. This deliberately controlled rate of Bitcoin creation means that the number of Bitcoin in existence will never exceed 21 million and that Bitcoin cannot be devalued through excessive production unless the Bitcoin network's source code (and the underlying protocol for Bitcoin issuance) is altered. The current fixed reward for solving a new block is 3.125 Bitcoin per block. The supply of Bitcoin is limited to 21 million Bitcoin, which is expected to be reached in 2140, after which no additional Bitcoin will be mined. As of the Petition Date, approximately 93.96% or 19.7 million Bitcoins have been mined.

### B.    Company History

#### 1.    Company History

38.    When Rhodium's principals first met Whinstone's then-CEO in 2019, Whinstone's "facility" was nothing more than a large plot of empty land. At the time, Whinstone had few employees, limited prospects, and virtually no money. So, it offered Rhodium a guaranteed 10-year electricity deal—the most important cost input for Bitcoin mining—and in exchange, Rhodium would pay to build out the Rockdale Site. Critical to the deal was a fixed price for electricity for the 10-year term.

39.    The Debtors were then formed variously between March 2020 and June 2021. The parties formed a joint venture, Rhodium JV LLC, to carry out their deal. Rhodium's founders owned 87.5% of Rhodium JV's equity, and Whinstone owned the remaining 12.5%. Rhodium JV serves as a holding company for operating entities actually conducting the Bitcoin mining operation at the Rockdale Site.

###### i.    **The Rockdale Site**

40.    The Company invested over $150 million building out the Rockdale Site over two years, which involved installing complex and proprietary infrastructure that cannot readily be used anywhere else.  Much of the Rockdale Site investment was funded by outside investors of the Company; the Debtors also incurred related funded debt.

41.    In July 2020, Whinstone and Rhodium JV entered into twenty identical hosting agreements, each providing for Rhodium JV to receive 5MW of electricity from Whinstone (the "5MW Agreements") at a fixed price for at least ten years.  Also in July 2020, Whinstone and Rhodium 30 MW LLC entered into a power agreement for Rhodium 30MW LLC to receive 30MW of power from Whinstone at a fixed price (the "30MW Agreement," and, with the 5MW Agreements, the "Hosting Agreements").  The terms of these Hosting Agreements are materially identical.  On September 30, 2021, Rhodium JV assigned fourteen of the 5MW Agreements to Rhodium Encore LLC, Rhodium 2.0 LLC, and Rhodium 10MW LLC.  More recently, Rhodium JV assigned to Rhodium 30MW six of the 5MW Agreements, which are not currently active.

42.    As part of Rhodium's investment in the undeveloped Rockdale Site, Rhodium and Whinstone initially created a joint venture, pursuant to which Whinstone initially had a 12.5% ownership interest in Rhodium JV.  On December 31, 2020, Whinstone redeemed its ownership interest in Rhodium JV in exchange for 12.5% of Rhodium JV's profits under its profit sharing agreement (the "Profit Sharing Agreement"), effectively giving Whinstone a "synthetic dividend" (the "Redemption Agreement").  The Profit Sharing Agreement did not give Whinstone an interest in any other entity's profits, nor did it expressly mention any of the other contracts among the parties.  On the other hand, the accompanying Redemption Agreement provided that the duties

and obligations of the parties to each other under any existing hosting or power agreements will continue as set forth in such agreements.

43.     Separately, Whinstone entered into another profit sharing agreement with Air HPC, where Whinstone was receiving 50% of Air HPC's profits, as defined in the agreement (together with Rhodium JV Profit Sharing Agreement, the "Profit Sharing Agreements").

44.     Rhodium JV and Air HPC are holding companies receiving dividends from their operating subsidiaries.  Air HPC conducts mining operations in Building B of the Rockdale Site through its subsidiary Jordan HPC LLC ("Jordan HPC").  Rhodium JV conducts the operations in Building C of the Rockdale Site through subsidiaries Rhodium 30MW LLC ("Rhodium 30MW"), Rhodium Encore LLC ("Rhodium Encore"), Rhodium 2.0 LLC ("Rhodium 2.0") and Rhodium 10MW LLC ("Rhodium 10MW").  Building C represents about 80% of Rhodium's mining capacity at the Rockdale Site while Building B represents the other 20%.

45.     Consistent with the Profit Sharing Agreements, Rhodium JV and Air HPC have regularly passed on the designated percentage of their after-tax cash profits to Whinstone (the "Profit Sharing Payments").  The Profit Sharing Payments only attach to the operations at the Rockdale Site, are specifically defined in Annex 2 to the Profit Sharing Agreements, and are separate from the electricity payments due to Whinstone under Hosting Agreements.  The Profit Sharing Payments did not start accruing until 2021.

46.     Separately, Debtors Rhodium Industries, Rhodium JV, Rhodium Encore, Rhodium 2.0, Rhodium 10MW, Rhodium 30MW and Jordan HPC entered into a water supply agreement with Whinstone for the provision of industrial water to assist with cooling of the Debtors' miners (the "Water Supply Agreement").  Cooling is a critical part of a mining operation and contributes substantially to the efficiency and profitability of the operation. Rhodium uses for

its Rhodium JV subsidiaries a liquid coolant technology employing a dielectric fluid, which is nonconductive, meaning that the miners can be fully submerged in the coolant for maximum heat relief, dramatically increasing their heat efficiency and, consequently, productivity. The dielectric fluid is then circulated through external cooling systems which are cooled with water. For this system to work at maximum efficiency, an industrial water supply is necessary for the cooling system and fans to work properly. Because Whinstone refused to perform under the Water Supply Agreement and does not currently provide water services to the Company, the cooling system, and thus the miners themselves, work less efficiently, increasing downtime during periods of high heat.

47.     The Air HPC operating subsidiary, Jordan HPC, uses an air cooling system instead of liquid cooling. Whinstone entered into a 25 MW power contract with Jordan HPC.

48.     The Rhodium facility at the Rockdale Site has in place 125 MW worth of infrastructure with a current hash rate of 2.8 EH/s.

### ii.     The Temple Site

49.     On August 31, 2021, the Company entered into a 10-year datacenter lease with Temple Green Data LLC ("Temple Green Data") to receive datacenter site hosting and power supply services at the Temple Site. The Temple Site mining operation is conducted by Rhodium Renewables.

50.     The Debtor's operations at the Temple Site utilize liquid immersion cooling system. The facility has in place 102.5 MW worth of infrastructure with a current hash rate of 2.7 EH/s.

### iii.   **Capital Raises**

51.     The Company conducted several capital raises to fund the investment in its Bitcoin mining infrastructure.  To fund the development of the Rockdale Site, the Debtors issued equity and debt to several groups of investors.  Investors in Rhodium 30MW and Jordan HPC obtained equity and secured debt in those two entities, respectively, but their debt was paid off early. Rhodium Encore and Rhodium 2.0 raised capital in the form of equity and debt in early 2021, and their debt remains outstanding, except as described below.  Rhodium Encore issued secured notes in the amount of $23,100,000, under which approximately $22.155 million is still outstanding with a current interest rate of 8.00%.   Rhodium 2.0 issued secured notes in the amount of $31,500,000, under which approximately $25.114 million is outstanding, of which $20.56 million carries a current interest rate of 8.00% and $4.554 million carries the interest rate of 2.20%.  The respective equity interests of all investors in the Debtors were subsequently rolled up to Rhodium Enterprises in a June 30, 2021 reorganization (the Rollup defined below).

52.     In July 2024, some of the Rhodium Encore and Rhodium 2.0 noteholders exchanged their notes for approximately $6.4 million of secured notes of Rhodium Technologies, with collateral consisting of certain assets of Rhodium 30MW (the "Note Exchange").   The Rhodium Technologies' notes issued pursuant to the Note Exchange carry an interest rate of 5.5%.

53.     Between June 2, 2021 and October 19, 2021, in an effort to raise capital for the Company, Rhodium Enterprises entered into multiple Simple Agreements for Future Equity ("SAFE") with certain investors, issuing rights to receive shares of Rhodium Enterprises Class A common stock upon the occurrence of subsequent financing or public listing, for a total of $87 million in aggregate.

54.     In September 2022, the Debtors issued debt and equity warrants to a group of investors, with secured notes issued by Rhodium Technologies and warrants exercisable for shares of Class A common stock in Rhodium Enterprises. Rhodium Technologies issued secured notes in the amount of $18,899,900.00, under which approximately $10,477,496.24 remains outstanding.

55.     Together with the Note Exchange, Rhodium Technologies' secured liabilities amount to approximately $16,899,496.24.

### iv.     The IPO Attempt

56.     In 2021, in an effort to raise capital for the Company, Rhodium Enterprises underwent a corporate reorganization to become a holding company for the Company in preparation for an Initial Public Offering (the "IPO") on NASDAQ through an Up-C structure.  Rhodium Enterprises filed with the Securities and Exchange Commission ("SEC") a Registration Statement on October 28, 2021, an updated Registration Statement on January 18, 2022, and abandoned plans of an IPO in late 2022, withdrawing its Registration Statement on November 15, 2022.

### v.     The Rollup

57.     Rhodium Enterprises was formed on April 22, 2021 as a Delaware corporation to become a holding corporation for Debtor Rhodium Technologies (formerly named Rhodium Enterprises LLC) and its Debtor subsidiaries upon completion of a corporate reorganization that closed on June 30, 2021 (the "Rollup").

58.     Rhodium Enterprises is the sole managing member of Rhodium Technologies. It controls and is responsible for all operational, management and administrative decisions related to Rhodium Technologies' business and consolidates the financial results of Rhodium Technologies and its subsidiaries.

59.     Pursuant to the Rollup, the Company completed the execution of its corporate reorganization whereby (1) all non-controlling interest unit holders of Rhodium 30MW, Jordan HPC, Rhodium Encore, Rhodium 2.0, and Rhodium 10MW; and (2) all non-controlling interest unit holders of Rhodium Technologies (collectively, the "Rollup Participants") entered into a transaction whereby in-kind contributions of the Rollup Participants' ownership in the respective entities (the "Non-Controlling Membership Interests") were made to Rhodium Enterprises in exchange for 110,593,401 shares of Class A common stock, par value $0.0001 per share, of Rhodium Enterprises (the "Class A Common Stock").  Rhodium Enterprises then transferred the Non-Controlling Membership Interests to Rhodium Technologies in exchange for units of Rhodium Technologies ("Rhodium Units") as a value-for-value in-kind contribution.

60.     Immediately prior to the corporate reorganization, non-Debtor Imperium Investments Holdings LLC ("Imperium"), a limited liability company, directly held 92% of the equity interests in Rhodium Technologies, which held 100% of the equity interests in its subsidiaries, Rhodium Industries, Rhodium Shared Services, Rhodium JV and Air HPC. Rhodium JV held interests in its subsidiaries, Rhodium 30MW, Rhodium Encore, Rhodium 10MW and Rhodium 2.0 (70%, 50%, 50% and 65%, respectively). Air HPC held 50% of the equity of its subsidiary, Jordan HPC.

61.     As a result of the corporate reorganization, (a) Imperium retained 180,835,811 Rhodium Units, or approximately 62.1% of the economic interest in Rhodium Technologies, (b) Rhodium Enterprises acquired 110,593,401 Rhodium Units, or approximately 37.9% of the economic interest in Rhodium Technologies, (c) Rhodium Enterprises became the sole managing member of Rhodium Technologies, is responsible for all operational, management and administrative decisions relating to Rhodium Technologies' business, and consolidates financial

results of Rhodium Technologies and its subsidiaries, (d) Rhodium Enterprises became a holding company whose only material asset consists of membership interests in Rhodium Technologies, (e) Rhodium Enterprises issued 100 shares of its Class B common stock, par value $0.0001 per share, to Imperium, which has 100% of the outstanding voting power of Rhodium Enterprises, (f) Rhodium Enterprises issued 110,593,401 shares of Class A Common Stock to the Rollup Participants, which have no voting power of Rhodium Enterprises, and (g) Rhodium Technologies directly or indirectly owns all of the outstanding equity interests in the subsidiaries through which the Company operates its assets.   As of June 30, 2024, Imperium owned 177,357,448 Rhodium Units and Rhodium Enterprises owned 114,332,113 Rhodium Units.   In other words, Imperium owns 60.670824% of Rhodium Technologies, and Rhodium Enterprises owns 39.329176% of Rhodium Technologies, which in turn owns, directly or indirectly, the operating subsidiaries of the Company.

### 2.    Data Centers and Business Operations

62.    The Company is an operator of dedicated, purpose-built facilities for digital asset mining.   The Company's primary business activities consist of mining digital currency assets utilizing Company-owned computer equipment (the miners) to process transactions conducted on the Bitcoin network in exchange for transaction processing fees awarded in digital currency assets. The Company is an industrial-scale Bitcoin mining infrastructure company in Texas, with approximately 227.5 MW of available power as of the Petition Date, only 25 MW of which are air-cooled, and 53,712 deployed miners. The Company uses two facilities: the co-located Rockdale Site and the leased Temple Site.  The Debtors operating the Rockdale Site own 42,504 miners, of which they lease 8,880 miners to Rhodium Renewables operating the Temple Site, with 33,624 remaining at the Rockdale Site in Buildings B and C.  Rhodium Renewables has 20,088 miners deployed at the Temple Site, of which 8,880 are leased from Debtors operating the

Rockdale Site and 11,208 are owned by Rhodium Renewables. Rhodium Renewables hosts at the Temple Site an additional 5,376 miners owned by a non-Debtor, for a total of 25,464 miners deployed at the Temple Site.  Additionally, Rhodium Renewables keeps at the Temple Site 10,486 miners  that are not deployed but are used as spares or "bench" parts.

63.     Debtor Rhodium Shared Services provides to the Debtors operational services under a Shared Services Agreement (the "SSA").  Under the SSA, Rhodium Shared Services provides the Debtors with employees, utilities, insurance, services related to local taxes, certain other professional services, vendor contracts, and other operational needs of the Debtors.

64.     The Debtors' primary sources of revenue are revenues generated from mining: the sale of Bitcoin mined by Debtors-owned mining computers. Additional revenue is generated from Debtors' miner hosting operations at the Temple Site, pursuant to which a non-debtor pays Rhodium Renewables for the energy consumed by that non-debtor's 5,376 miners hosted at the Temple Site and a profit share depending on performance and market conditions.

### i.     Mining

65.     The Company has focused on Bitcoin mining since its inception.  The Company participates in "mining pools" organized by mining pool operators, in which the Company shares its mining power with the hash rate generated by other miners participating in the pool to earn cryptocurrency rewards.  The mining pool operator provides a service that coordinates the computing power of the independent mining enterprises participating in the mining pool. Revenues from cryptocurrency mining are impacted by volatility in Bitcoin prices, as well as increases in the Bitcoin blockchain's hash rate resulting from the growth in the overall quantity and quality of miners working to solve blocks on the Bitcoin blockchain and the difficulty level associated with the secure hashing algorithm employed in solving the blocks.

66.     Currently, the Debtors convert their mined Bitcoin into U.S. dollars on a regular basis, generally within four days of mining.   Consequently, the Debtors currently do not generally hold large amounts of Bitcoins on their balance sheet at any given time, with amounts recently averaging about 3.3 Bitcoins.   Additionally, as of the Petition Date, the Debtors have approximately 14.93 Bitcoins on deposit with their broker to facilitate transactions related to their mining operations.

### ii.     <u>Other Sources of Revenue</u>

67.     Additional revenue is generated from hosting operations.  Rhodium Renewables hosts at the Temple Site 5,376 miners owned by a non-Debtor.   Under the miner hosting arrangement, the non-Debtor pays Rhodium Renewables for the energy consumed by its miners and a profit share depending on performance and market conditions.

### 3.     Corporate Structure

68.     A chart illustrating the Company's complete organizational structure as of the Petition Date is attached as **<u>Exhibit A</u>** to this Declaration.   The following chart depicts the Company's simplified corporate structure:



69.     All of the Debtors are owned, directly or indirectly, by Debtor Rhodium Enterprises, and are wholly owned, directly or indirectly, by a subsidiary of Rhodium Enterprises, Debtor Rhodium Technologies.

### 4.     Corporate Governance and Management

70.     The Company's governance structure reflects its corporate structure: non-Debtor Imperium owns all of the outstanding voting interests of Debtor Rhodium Enterprises, which has its own board, listed below.  Rhodium Enterprises is the manager of Rhodium Technologies. Rhodium Technologies is the manager of Debtors Rhodium JV.  In turn, Rhodium JV is the manager of Debtors Rhodium Encore, Rhodium 2.0, Rhodium 30MW, and Rhodium 10MW, as well as their subsidiaries and parents.  Rhodium Technologies is also the Manager of Rhodium Renewables, Rhodium Ready Ventures, Rhodium Industries, Rhodium Shared Services, Air HPC

LLC, and their subsidiaries. The governing bodies of the Debtors are included in the table below, beginning with Rhodium Enterprises Inc.'s highly experienced board and management consisting of the following individuals:

| Rhodium Enterprises Inc. | |
| --- | --- |
| Name | Position |
| Chase Blackmon | Director and Co-Chief Executive Officer |
| Nathan Nichols | Director and Co-Chief Executive Officer |
| Cameron Blackmon | Director, President, and Chief Technology Officer |
| Charles Topping | Secretary and General Counsel |
| Kevin Hays | Chief Financial Officer |
| David Eaton | Independent Director |
| Jonas Norr | Independent Director |
| Renata Szkoda | Independent Director |
| Caleb Van Zoeren | Senior Vice President of Operations |
| Alex Peloubet | Vice President of Accounting and Finance |
| Morgan Soule | Vice President and Assistant General Counsel |
| Alicia Catatao | Vice President of Human Resources |
| Matt Smith | Vice President of Strategy, Mining |
| Zach Kerr | Vice President of Technology |
| Ashley Jonson | Controller |
| Rhodium Technologies LLC | |
| Name | Position |
| Rhodium Enterprises LLC | Manager |

| Rhodium Renewables LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium Technologies LLC | Manager |

| Rhodium Renewables Sub LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium Technologies LLC | Manager |

| Rhodium Ready Ventures LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium Technologies LLC | Manager |

| Rhodium Industries LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium Technologies LLC | Manager |

| Rhodium Shared Services LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium Technologies LLC | Manager |

| Rhodium Shared Services PR LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium Technologies LLC | Manager |

| Air HPC LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium Technologies LLC | Manager |

| Jordan HPC LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium Technologies LLC | Manager |

| Rhodium JV LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium Technologies LLC | Manager |

| Rhodium Encore LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium JV LLC | Manager |

| Rhodium Encore Sub LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium JV LLC | Manager |

| Rhodium 2.0 LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium JV LLC | Manager |

| Rhodium 2.0 Sub LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium JV LLC | Manager |

| Rhodium 10MW LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium JV LLC | Manager |

| Rhodium 10MW Sub LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium JV LLC | Manager |

| Rhodium 30 MW Sub LLC | |
|---|---|
| **Name** | **Position** |
| Rhodium JV LLC | Manager |

| Rhodium 30 MW LLC | |
| --- | --- |
| **Name** | **Position** |
| Rhodium JV LLC | Manager |

### 5.       Prepetition Capital Structure

71.      The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of the Debtors' obligations and any related agreements.

#### i.       <u>Rhodium Encore Secured Notes:</u>

72.      In early 2021, Rhodium Encore issued to various investors secured notes in the aggregate amount of $23,100,000.  Rhodium Encore also issued to its investors minority equity interests, which were subsequently exchanged in the Rollup for class A non-voting stock in Rhodium Enterprises.  In August 2024, some of the Rhodium Encore noteholders exchanged their notes for new notes of Rhodium Technologies. Currently, approximately $22.155 million of the Rhodium Encore secured notes is still outstanding with a current interest rate of 8.00%.

#### ii.       <u>Rhodium 2.0 Secured Notes:</u>

73.       In early 2021, Rhodium 2.0 issued to various investors secured notes in the aggregate amount of $31,500,000.  Rhodium 2.0 also issued to its investors minority equity interests, which were subsequently exchanged in the Rollup for class A non-voting stock in Rhodium Enterprises.  In August 2024, some of the Rhodium 2.0 noteholders exchanged their notes for new notes of Rhodium Technologies.  Currently, approximately $25.114 million of the Rhodium 2.0 secured notes is still outstanding, of which $20.56 million carries a current interest rate of 8.00% and $4.554 million carries the interest rate of 2.20%.

### iii.    **Rhodium Technologies Secured Notes:**

74.    In September 2022, the Debtors issued debt and equity warrants to a group of investors, with secured notes issued by Rhodium Technologies and warrants exercisable for shares of Class A common stock in Rhodium Enterprises. Rhodium Technologies issued secured notes in the amount of $18,899,900.00, under which approximately $10,477,496.24 is still outstanding with annual interest rate of 3.05%.

75.    In July 2024, some of the Rhodium Encore and Rhodium 2.0 noteholders exchanged their notes for approximately $6.4 million of new secured notes of Rhodium Technologies, with collateral consisting of certain assets of Rhodium 30MW (i.e., the "Note Exchange"). The Rhodium Technologies' notes issued pursuant to the Note Exchange carry an interest rate of 5.50%. As a result of the Note Exchange together with the September 2022 issuance of secured notes, Rhodium Technologies secured obligations currently amount to $16.899 million.

76.    The Debtors currently have secured debt amounting to approximately $64.168 million, consisting of $16.899 million in secured notes issued by Rhodium Technologies, $25.114 million in secured notes issued by Rhodium 2.0, and $22.155 million in secured notes issued by Rhodium Encore.

### iv.    **Other Unsecured Claims:**

77.    The Debtors have few other unsecured claims outstanding as of the Petition Date, consisting mostly of litigation claims (described in more detail below).

### 6.    **Ongoing Litigation against the Company**

78.    The Company also faces litigation, discussed below.

### i.  <u>The Whinstone Litigation</u>

79.     The dispute with Whinstone appears connected to one of Rhodium's largest competitors, publicly-listed Riot, acquiring Whinstone in a "strategic acquisition" on May 26, 2021.  In its 2021 Form 10-K, Riot discusses its newly acquired business of co-location services for Bitcoin mining companies and an expansion project of the Rockdale Site to add several new buildings for liquid-cooled mining operations.  Riot touted that "the Whinstone Facility provides the critical infrastructure and workforce necessary for institutional-scale miners to deploy and operate their miners." It also stated that "[w]e provide our clients with licensed space in specifically designed buildings to operate large quantities of miners with access to sufficient amounts of electricity to operate those miners under colocation agreements."  There was, however, an obstacle in Riot's way: Rhodium, its miners, and its long-term contracts at competitive energy rates meant to compensate Rhodium for its investment in the very infrastructure Riot was now advertising.

80.     In its public SEC filings, Form 10-Q for 2023 Q2, Riot has acknowledged that the contracts with Rhodium are "Legacy Contracts inherited through the Whinstone acquisition containing below-market terms."  Riot wants to either replace those contracts with "revised hosting agreements on market terms," or, as it has done with other "Legacy Hosting" clients, remove Rhodium from the premises and use Rhodium's infrastructure "as part of [Riot's own] Bitcoin Mining operations." *Id*.

81.     The purported dispute that led to Whinstone filing the Whinstone Litigation concerns the payments due to Whinstone under the contracts described above, specifically the Profit Sharing Agreements.

82.     In April 2023, Whinstone's counsel wrote to Rhodium JV, Air HPC, Rhodium 30MW, and the Rhodium parent company to notify them that certain Rhodium entities had allegedly breached the Profit Sharing Agreements by an alleged failure to pay fees due under those agreements, and demanded over $13.5 million to remedy the underpayments and other alleged contractually owed amounts.  Whinstone's counsel further stated that Whinstone would terminate the Profit Sharing Agreements if Rhodium did not comply with the demand.

83.     Shortly thereafter, on May 2, 2023, Whinstone filed against certain Debtors a breach of contract case captioned *Whinstone US, Inc. v. Rhodium 30 MW LLC, Rhodium JV LLC, Air HPC LLC, and Jordan HPC LLC*, Cause No. CV41873, pending in the 20th District Court of Milam County, Texas (the "Whinstone Litigation").  Whinstone amended the petition twice, alleging that Rhodium breached the terms of the Profit Sharing Agreements related to the Rockdale Site where Rhodium conducts Bitcoin mining operations, resulting in an alleged underpayment of now twice as much as Whinstone previously claimed: $26 million in hosting and service fees.  Whinstone also sought, among other things, a declaration that the Profit Sharing Agreements replace or supersede its other agreements with the Debtors.

84.     Rhodium successfully moved to compel arbitration, and in September 2023 the trial court ordered the parties to arbitrate Whinstone's claims and stayed the suit pending the outcome of the arbitration.

85.     Over six weeks later—and without taking any steps to commence arbitration—Whinstone filed a petition for writ of mandamus in the Third Court of Appeals in Texas. The Court of Appeals denied the petition on Wednesday, November 22, 2023 (the day before Thanksgiving).

86.     Acting without warning late in the evening on Monday, November 27, 2023—the next business day—Whinstone shut off the power supply to all Rhodium operations at the Rockdale Site and had armed security escort a Rhodium employee at the Rockdale Site off of the premises.

87.     While the shutdown was happening, notwithstanding stayed litigation and a court order to arbitrate the dispute, and while refusing to engage in arbitration with Rhodium, on November 27, 2023, Whinstone, through its counsel, sent a Notice of Termination letter to the Rhodium defendants' counsel, notifying the Rhodium defendants that the Profit Sharing Agreements were "terminated effective immediately" because of the failure to pay the amount demanded by the April 2023 letter.   The November 2023 letter stated that because of the termination, "Whinstone immediately ceases providing power and Hosting Services to Rhodium pursuant to" the Profit Sharing Agreements, and effectively threatened to begin removing Rhodium's equipment, because it demanded an address to which the equipment should be sent.

88.     This unlawful shutdown was an existential threat to Rhodium. Accordingly, Rhodium filed an emergency motion for a temporary restraining order and temporary injunction in the district court, asking the court for a temporary injunction requiring Whinstone to reinstate Rhodium's access to the premises, restore power, water, and all other utilities at the site, and in all other respects restore the status quo.  The trial court first entered a temporary restraining order and then, after a five-hour evidentiary hearing, granted the temporary injunction on December 12, 2023.  The trial court explained that Rhodium faced irreparable harm on multiple fronts, including permanent harm to its equipment and custom-built facilities, immeasurable harm to its goodwill and reputation, loss of its highly skilled Rockdale workforce, and the likelihood that Rhodium

would go out of business.  Rhodium gave the required $1,000,000 security, and Whinstone appealed the injunction to the Third Court.

89.     Throughout the course of those proceedings, and despite the district court's order compelling arbitration, Whinstone repeatedly refused to initiate an arbitration.  Thus, on December 11, 2023, Rhodium initiated arbitration against Whinstone relating to the claims and counterclaims at issue in the Whinstone Litigation, including Rhodium's claims for energy credits and its damages under the Water Supply Agreement.  Whinstone's baseless attempts to renege on its deal with Rhodium have materially harmed Rhodium's business, causing Rhodium at least $67 million in damages.  Whinstone sent a letter to the American Arbitration Association ("AAA") threatening to sue it for exercising jurisdiction over the dispute.  Nevertheless, Whinstone filed an answer and counterclaims on December 29, 2023, and the parties began the arbitrator selection process under the rules of the AAA.

90.     But shortly thereafter, Whinstone decided once again to turn off the power to Rhodium's operations.  It abruptly disconnected power to Building C at Rockdale—which houses about 80% of Rhodium's operations at the Rockdale Site—late in the evening on Friday, January 12, 2024.  Earlier that day, Rhodium had a minor failure of one of its over 600 fans, resulting in a small spill of BitCool, a non-toxic, non-hazardous, biodegradable coolant similar to a mineral oil that was used in Rhodium's immersion cooling systems.  The spill was quickly cleaned up.  Citing this incident, Whinstone again shut down Rhodium's power, this time having a Riot attorney send Rhodium a "Notice of Suspension," claiming that Whinstone had a right to contractually suspend power indefinitely.  Whinstone allegedly relied on the Rhodium JV Profit Sharing Agreement to switch off power to all operating subsidiaries of the Company housed in Building C.

91.     The improper shutdown caused extensive damage to Rhodium's equipment and infrastructure that further reduced the ability to mine Bitcoin and required significant time and expense to repair.  It is unclear whether Whinstone was profiting from the shutdown by selling the unused electric power capacity back to the ERCOT market.  But Whinstone was contractually obligated to guarantee the provision of electricity for at least 96-97% of time—which was not happening during its arbitrary power shutdowns.

92.     Rhodium filed various motions seeking to cause Whinstone to restore power to Rhodium's operations at the Rockdale site, and was ultimately successful in obtaining an emergency order from an emergency arbitrator, who, unpersuaded by Whinstone's pretextual safety concerns after a two-day evidentiary hearing, ordered Whinstone to once again restore Rhodium's power and site access.  This time—and for now—Whinstone complied. But all together, Whinstone unjustifiably kept the power off for eight weeks, costing Rhodium over $9 million dollars in unmined Bitcoin and causing significant harm to Rhodium's business.

93.     Undeterred, Whinstone subsequently sent another letter threatening the AAA for exercising jurisdiction—and this time adding a threat against the emergency arbitrator personally.

94.     Whinstone successfully appealed the earlier Milam County court's temporary injunction, and on March 27, 2024, the Texas Third Court of Appeals vacated that temporary injunction solely on the ground that certain provisions of the injunction order were vague.  The appellate ruling did not disturb any of the district court's underlying factual or legal conclusions regarding the need for injunctive relief against the Notice of Termination.

95.     Given the risk of irreparable harm should Whinstone implement its Notice of Termination, Rhodium immediately sought a further order from the emergency arbitrator.  On April 3, 2024, the emergency arbitrator issued an order confirming that the district court's

injunction remained in full force and effect at least until the appeals court issued its mandate in June 2024. Thus, there was no need for the emergency arbitrator to enter a further injunction at that time.

96.     But in April 2024, Whinstone tried again: it purported to tender to Rhodium JV, Rhodium 30MW, Jordan HPC, and Air HPC a new, broader notice of termination of all power agreements and profit sharing agreements with any and all Rhodium entities, which was not sensibly based on any terms of the challenged contracts. In response, in June 2024, Rhodium obtained interim relief in the arbitration enjoining Whinstone from acting on *any* of its notices of termination and its notice of suspension.

97.     Currently, Whinstone is providing power to Rhodium, but it is continuing its attempts to invalidate the injunctive relief Rhodium has obtained, including by filing a new, pending emergency motion in Texas state court. Rhodium remains at risk that Whinstone will stop providing power, as it had done repeatedly.

98.     Defending the Whinstone Litigation in multiple forums is costly, and the costs are escalating as Rhodium continues playing whack-a-mole defending itself against Whinstone's self-help and appeals in various forums. The Whinstone Litigation is, however, a bet-the-company litigation: if Whinstone succeeds, Rhodium will lose not just its damages but, more importantly, its life-blood—the energy supply to its mining site—and also its very access to the Rockdale Site with all the customized infrastructure in which Rhodium invested over $150 million over two years and which is not readily movable to another location. This would leave Whinstone with a windfall of the infrastructure and highly desirable energy contracts necessary to conduct mining operations, which Rhodium's competition and Whinstone's strategic purchaser, Riot, would thus inherit.

### ii. Second Whinstone Litigation

99. Undeterred by its lack of success in the first Whinstone Litigation, Whinstone tried again, but in a different forum: on July 19, 2024, Whinstone filed an action in the District Court of Tarrant County, Texas, *Whinstone US, Inc. v. Imperium Investment Holdings LLC, Nathan Nichols, Chase Blackmon, Cameron Blackmon, Nicholas Cerasuolo, Rhodium Enterprises, Inc., Rhodium Technologies, LLC, and Rhodium Renewables, LLC*, Cause No. 153-354718-24 (the "Second Whinstone Litigation").  The case alleges various causes of action in relation with the Profit Sharing Agreement, including primary and control liability as well as aiding liability under sections 33(B) and 33(F) of the Texas Securities Act, fraud/fraudulent inducement, and conspiracy.  The main allegations appear to claim that Whinstone suffered damages as a result of various capital raises and restructurings of the Debtors, which, Whinstone alleges, decreased its revenues derived from the Profit Sharing Agreement.  In making such allegations, Whinstone conveniently forgets that such capital raises were necessary to provide capital to build out the Rockdale Site for the benefit of both Rhodium and Whinstone, and that without investor contributions, there would be no Rockdale infrastructure or any profits to share in the first place.  By filing an action against the ultimate parent of the Debtors, Imperium, Whinstone attempted to stifle any further attempts at out-of-court restructuring of the Debtors and the Company.  The Debtors-defendants intend to vigorously defend themselves against any such spurious allegations, which appear to be Whinstone's attempt to have yet another bite of an apple.

### iii. The MGT Action

100. On January 13, 2022, Rhodium was named as a defendant in a civil lawsuit alleging infringement of two patents and seeking compensatory and other damages.  The case is captioned *Midas Green Technologies, LLC v. Rhodium Enterprises, Inc. et al.*, Civil Action

Number 6:22-CV-00050-ADA, and is pending in the U.S. District Court for the Western District of Texas (the "MGT Action"). The initial complaint named defendants Rhodium Enterprises, Rhodium Technologies, Rhodium 10MW, Rhodium 2.0, Rhodium 30MW, Rhodium Encore, Rhodium Industries, Rhodium JV, Rhodium Renewables, Rhodium Shared Services, Rhodium Shared Services PR Inc., Chase Blackmon, Cameron Blackmon, and Nathan Nichols. The plaintiff has amended its complaint multiple times, most recently filing a Third Amended Complaint on March 29, 2023, naming defendants Rhodium Enterprises, Rhodium Technologies, Rhodium 10MW, Rhodium 2.0, Rhodium 30MW, Rhodium Encore, Rhodium Renewables, Rhodium Renewables Sub, and Rhodium Ready Ventures.

101.    The Rhodium defendants asserted counterclaims for noninfringement, invalidity, and unenforceability of both asserted patents. The plaintiff subsequently dropped its claims against Rhodium Renewables Sub and Rhodium Ready Ventures, dropped one of the two originally asserted patents, and narrowed the asserted claims as to the remaining patent. The matter is pending at this time with respect to only one asserted patent. Discovery closed on February 9, 2024. The court held a pretrial conference on April 9, 2024. At the conference, the court orally granted defendants' motion for summary judgment of noninfringement. Plaintiff then requested the opportunity to readdress the court's ruling after revising an expert's report. The court expressed that it did not think plaintiff could present additional evidence that would benefit the court, but said that it would let the parties know if that changed. The court has not further responded to or ruled on plaintiff's request. The trial, previously scheduled for April 22, 2024, has been continued without a new trial date set. It is unclear at this time whether plaintiff will be appealing the court order.

### 7.     Recent Financial Performance

102.     Given Whinstone's power shutdowns, contractual breaches, costs and uncertainty caused by escalating legal battles with Whinstone, the Debtors' financial performance has been declining.  The Debtors had a net income of approximately $13,540,000 for the three months ending June 30, 2024.  Since inception, the Debtors in large part relied on debt and equity financing to fund their operations.

103.     As of June 30, 2024, the Debtors reported approximately $225,497,701 in total assets and approximately $209,314,900 in total liabilities.  For the three months ending June 30, 2024, the Debtors reported total revenue of approximately $23,961,000.

### III.     SIGNIFICANT EVENTS LEADING TO CHAPTER 11 FILING

### A.     Challenges Facing Debtors' Business

104.     Although the Debtors' operating performance has been strong, a number of factors have affected Debtors' liquidity.  These primary factors include, among other things: (i) the souring of the relationship between Rhodium and its principal landlord and power supplier, Whinstone, after Riot acquired Whinstone; (ii) ongoing litigation costs, including litigation with Whinstone; (iii) power supply interruptions caused by Whinstone; (iv) weather-related power supply disruptions; and (v) Whinstone's refusal to pay Rhodium energy credits.  These events leading to the chapter 11 filing are discussed in further detail below.

### 1.     Whinstone's Acquisition by Riot

105.     One of the largest competitors of Rhodium, publicly-listed Riot, acquired Whinstone in May 2021 and then attempted to oust Rhodium from the Rockdale Site using both litigation and self-help.  Rhodium developed the Rockdale Site with a two-year investment of over $150 million in custom infrastructure in exchange for certain favorable long-term contracts, which Riot intended to terminate so that it could take over and use the location for its own

purposes (*see* the Whinstone Litigation section above).  These activities of Riot caused significant disruptions in the Debtors' business (*see* Whinstone Litigation above).

### 2.      Ongoing Litigation Costs

106.     The Debtors fight in parallel multiple lawsuits, the most important of which is the Whinstone Litigation.

107.     The Whinstone Litigation is carried on between state courts and arbitration, with interlocutory appeals venued in state courts.  Whinstone filed a breach of contract lawsuit on May 2, 2023, against certain Debtors in the 20th District Court of Milam County, Texas.   After Rhodium successfully compelled arbitration, it ended up having to file an arbitration complaint itself, because Whinstone was refusing to comply with the court's arbitration order and instead engaged in self-help and meritless appeal of the order compelling arbitration.  The various necessary injunctions and temporary restricting orders, along with their appeals and a related arbitration, cause a significant drain of both personnel and financial resources on the Debtors. The unpredictability and constant threat of irregular litigation tactics of Whinstone make budgeting for this litigation difficult and render long-term business planning almost impossible under the circumstances.

108.     As if that was not enough, Whinstone filed yet another suit against certain Debtors and their non-Debtor affiliates in the Tarrant County, Texas, state court on July 19, 2024.  Playing whack-a-mole with Whinstone's actions brought in various fora is not only costly, but also disruptive to the operations of the Company, making planning for business operations and budgeting extremely difficult.

109.     Rhodium also has pending since January 13, 2022 a patent lawsuit in the MGT Action in the Western District of Texas.  *See supra* ¶¶ 100-101.

### 3.      Power Supply Interruptions Caused By Whinstone

110.      Riot, a competitor of the Company, acquired Whinstone in May 2021 and, in unlawful efforts to eject Rhodium from the Rockdale Site that Rhodium had developed, Riot caused Whinstone to engage in self-help, locking out the Debtors from the Rockdale Site and turning off the power supply to the Debtor's Bitcoin mining infrastructure at the Site.  After a state court ordered Whinstone to restore the power supply to the Debtors' infrastructure, Whinstone initially complied, but a few weeks later again switched off power to the facility for weeks before Rhodium was able to obtain an emergency order from an arbitrator for Whinstone to restore power.  These interruptions of electricity supply to Debtors' Bitcoin miners further resulted in significant losses to the Debtors due to both the loss of Bitcoin revenue estimated to be at least $9 million as well as lengthy, costly repairs to the equipment damaged by the improper shutdown, for a total of at least $10 million.

### 4.      Weather-Related Power Supply Disruptions

111.      Both the Rockdale and the Temple Site Data Centers are located in Texas. Although Texas locations have the advantage of lower energy prices, they also come with the unreliability of power supply, which is especially exacerbated during storms.  The Data Centers utilized by the Debtors were affected by multiple storms and adverse weather events.

### 5.      Whinstone's Refusal to Pay Rhodium Earned Energy Credits

112.      The Debtors have agreements with Whinstone to reduce energy use during high energy demand, so Whinstone, as Rhodium's power provider, could sell excess capacity back to the Texas power markets in exchange for energy credits.  But Whinstone did not credit the Debtors with any of the earned energy credits to which the Debtors are contractually entitled, neither for voluntary reduction of energy usage, such as during periods of increased power demand in the ERCOT markets, nor for involuntary reductions, such as during power shutdowns

at the Rockdale Site. This continued pattern of repeated contractual breaches by Whinstone over the last several years has resulted in an uncompensated loss of revenue for the Debtors of at least $67 million.

B.     **Liquidity Constraints**

113.     The aforementioned factors—interruptions in electricity supply and ongoing litigation—have, in turn, placed a significant strain on the Debtors' liquidity. The strain has been compounded by Whinstone's unwillingness to pay the Debtors their earned energy credits. Given that the Debtors' access to the capital markets—like others in the industry—is limited, the Debtors explored various liquidity-enhancing initiatives, including pausing expansion activities and monitoring payables. Despite these efforts, as of the Petition Date, the Debtors' liquidity stands at approximately $2,494,703.79.

C.     **Restructuring Efforts**

114.     Facing the declining liquidity and escalating litigation costs described above, in early 2024 the Debtors began to explore options for a comprehensive restructuring solution and engaged Quinn Emanuel with respect thereto. In summer 2024, the Debtors engaged Province.

115.     The Debtors and their advisors engaged with their creditor constituents about alternative paths forward.

116.     The Debtors need breathing space to stabilize their operations, negotiate with their creditors, stop constant threats of power interruptions and other self-help initiatives of Whinstone, concentrate litigation in one forum to the extent possible, and obtain time to expeditiously resolve the Whinstone Litigation to regain access to liquidity and amounts owed Debtors by Whinstone, such as tens of millions of dollars in energy credits.

117.     The Debtors have secured DIP financing: under the proposed DIP facility, the Debtors will gain critical access to DIP financing in the aggregate amount of up to $30 million or

500 BTC, with an interim DIP borrowing of $15 million or 250 BTC following entry of the interim DIP order.

## IV.   THE FIRST DAY MOTIONS

118.   The Debtors have filed, or expect to file, with the Court First Day Pleadings seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth reorganization.   The First Day Pleadings include the following:

- (i) *Debtors' Supplemental Emergency Motion For An Order (I) Directing Joint Administration Of Chapter 11 Cases;   And (II) Granting Related Relief* (the "Supplemental Joint Administration Motion");

- (ii) *Emergency Motion Of Debtors For Entry Of An Order (I) Authorizing Debtors To (A) File A Consolidated Creditor Matrix And A Consolidated List Of 30 Largest Unsecured Creditors And (B) Redact Certain Personal Identification Information; And (II) Approving Form And Manner Of Notifying Creditors Of Commencement Of Chapter 11 Cases And Other Information* (the "Creditor Matrix Motion");

- (iii) *Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants, LLC DBA Verita Global as Claims, Noticing, and Solicitation Agent* (the "Verita Retention Application");

- (iv) *Emergency Motion Of Debtors For Entry Of Interim And Final Orders (I) Authorizing The Debtors To (A) Continue Their Existing Cash Management System, (B) Honor Certain Pre-Petition Obligations Related Thereto, And (C) Continue To Perform Intercompany Transactions, (II) Granting Superpriority Administrative*

*Expense Status To Post-Petition Intercompany Balances, And (III) Granting Related Relief* (the "Cash Management Motion");

- (v) *Emergency Motion Of The Debtors For Entry Of Interim And Final Orders (I) Authorizing The Debtors' Use Of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying The Automatic Stay, (IV) Scheduling A Final Hearing, And (V) Granting Related Relief* (the "Cash Collateral Motion");

- (vi) *Emergency Motion Of Debtors For Entry Of Interim And Final Orders (I) Authorizing Debtors To (A) Continue Insurance Programs, And (B) Pay Certain Obligations With Respect Thereto; (II) Granting Automatic Stay With Respect To Workers' Compensation Claims; And (III) Granting Related Relief* (the "Insurance Motion");

- (vii) *Debtors' Emergency Motion For An Order (I) Extending The Time To File Schedules Of Assets And Liabilities, Schedules Of Current Income And Expenditures, Schedules Of Executory Contracts And Unexpired Leases, Statements Of Financial Affairs, And Rule 2015.3 Financial Reports, And (II) Granting Related Relief* (the "SOFA and SOAL Extension Motion" and collectively with the Supplemental Joint Administration Motion, the Creditor Matrix Motion, the Verita Retention Application, the Cash Management Motion, the Cash Collateral Motion, and the Insurance Motion, the "First Day Motions").

119.    The First Day Motions seek authority to, among other things, ensure the continuation of the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible on account of the commencement of these chapter 11 cases.   In my capacity as co-Chief Restructuring Officer, and based on my experience

and knowledge, I believe that the relief requested in the First Day Motions is necessary to provide the Debtors an opportunity to work towards a successful restructuring that will inure to the benefit of each stakeholder.

120.     Certain of the First Day Motions request authority to pay certain prepetition claims against the Debtors.  The Debtors have narrowly tailored these requests for immediate authority to pay certain prepetition claims to those instances where the failure to pay would cause immediate and irreparable harm to the Debtors and their estates. The Debtors will defer seeking other relief to subsequent hearings before the Court.

121.     I am familiar with the content and substance of each of the First Day Motions and hereby reference and expressly incorporate into this Declaration the facts in each First Day Motion.  In my capacity as co-Chief Restructuring Officer, and based on my experience and knowledge, I believe approval of the relief sought in each of the First Day Motions is critical to the Debtors' ability to successfully implement their chapter 11 strategy, with minimal disruption to their business operations. Obtaining the relief sought in the First Day Motions will permit the Debtors to preserve and maximize the value of their estates for the benefit of all of their stakeholders.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  August 29, 2024

<div align="right">

Respectfully submitted,

 */s/ David Dunn*
Co-Chief Restructuring Officer

</div>

**EXHIBIT A**

**Organizational Chart**

# Structure Chart

quinn emanuel
bankruptcy & restructuring

