## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RHODIUM ENCORE LLC, *et al.*,[1] | § | Case No. 24-90448 (ARP) |
| | § | |
| Debtors. | § | |
| | § | (Joint Administration Pending) |
| | § | |

**EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL
ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING, (B) GRANTING LIENS AND PROVIDING CLAIMS WITH
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) MODIFYING THE
AUTOMATIC STAY, (D) SCHEDULING A FINAL HEARING, AND
(E) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 10:00 a.m. (Central Prevailing Time) on August 30, 2024.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on Friday, August 30, 2024, at 10:00 a.m. (Central Prevailing Time) in Courtroom 400, 4th Floor, 515 Rusk Avenue, Houston, Texas 77002.**
>
> **Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at 832-917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Perez's conference code number is 282694.**

---

[1]   The Debtors in these chapter 11 cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), Rhodium 30MW LLC (0263), Rhodium Enterprises, Inc. (6290), Rhodium Technologies LLC (3973), Rhodium Renewables LLC (0748), Air HPC LLC (0387), Rhodium Shared Services LLC (5868), Rhodium Ready Ventures LLC (8618), Rhodium Industries LLC (4771), Rhodium Encore Sub LLC (1064), Jordan HPC Sub LLC (0463), Rhodium 2.0 Sub LLC (5319), Rhodium 10MW Sub LLC (3827), Rhodium 30MW Sub LLC (4386), and Rhodium Renewables Sub LLC (9511).  The mailing and service address of the Debtors in these chapter 11 cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005.

> **Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge's home page. The meeting code is "JudgePerez."  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Perez's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**
> **Participation at the hearing will only be permitted by an audio and video connection.**

Rhodium Encore LLC and its debtor affiliates in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), as debtors and debtors in possession (collectively, the "***Debtors***" or "***Borrower***"), respectfully move and represent as follows in support of this motion (the "***Motion***"):

## PRELIMINARY STATEMENT[2]

1.      By this Motion, the Debtors seek authorization to obtain postpetition financing, and approval of their entry into a superpriority secured debtor-in-possession credit facility in an aggregate principal amount of up to either $30 million or 500 Bitcoin (the "***DIP Facility***" and the loans made thereunder, the "***DIP Loans***"), provided by certain funds and accounts under management by Galaxy Digital (solely in such capacity, the "***DIP Lenders***") and agented by Galaxy Digital LLC (solely in such capacity, the "***DIP Agent***").  The DIP Facility consists of (i) upon entry of the Interim DIP Order (the "***Interim DIP Order***"), initial availability of either $15 million or 250 Bitcoin, and (ii) upon entry the final order (the "***Final Order***"), availability of the remaining DIP Facility of either $15 million or 250 Bitcoin.[3]

---

[2]   Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration, DIP Declaration, the DIP Term Sheet, and the Interim DIP Order (each, as defined herein), as applicable.

[3]   The parties are finalizing the DIP Term Sheet (defined below), and will file it in advance of the August 30, 2024 hearing.  This Motion contains a summary of its material terms.

2.     The DIP Facility provides an initial aggregate principal amount of either $15 million or 250 Bitcoin, which shall be borrowed (the "***Interim DIP Borrowing***") in a single borrowing upon entry of the Interim DIP Order.  Following entry of the Final Order (as defined below), the remaining aggregate principal amount under the DIP Facility (either $15 million or 250 Bitcoin) shall be available.

3.     The DIP Facility is the result of extensive marketing and hard-fought negotiations, involving both principals and advisors, in a competitive environment that allowed the Debtors to achieve their strategic goals in obtaining postpetition financing in connection with commencing these Chapter 11 Cases. The result is a DIP Facility with favorable milestones and covenants.  The DIP Facility lays the foundation on which the Debtors will pursue confirmation of a chapter 11 plan to maximize value for all stakeholders.

4.     Approval of the DIP orders (the "***DIP Orders***") on an interim and ultimately final basis, which will enable the Debtors to obtain new capital, is the only source of postpetition financing currently available to the Debtors and thus represents the best source of postpetition financing.  As described herein, the DIP Facility contains terms that are reasonable under the circumstances and provides the Debtors with the urgent liquidity needed to (a) avoid immediate and irreparable harm, (b) pay outstanding prepetition amounts to employees, vendors, taxing authorities, and other critical stakeholders, as requested by the Debtors in the First Day Motions (as defined in the First Day Declaration, defined below), (c) pay their ordinary course operating expenses to continue their Bitcoin mining operations, and (d) provide a stable path forward for the duration of these chapter 11 cases.

5.     Additional information regarding the DIP Facility is set forth in the *Declaration of David M. Dunn in Support of Chapter 11 Petitions and First Day Relief* (the "***First Day***

*Declaration*"), and the *Declaration of Michael Robinson in Support of Debtor-in-Possession Financing* (the "***DIP Declaration***"), which have been filed contemporaneously with this Motion and incorporated by reference herein.

**RELIEF REQUESTED**

6.      By this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, the Bankruptcy Local Rules, and the Complex Case Procedures, the Debtors request entry of the Interim DIP Order:

a.      Authorizing the Debtors to obtain postpetition financing on a superpriority secured basis in the initial amount of $15 million or 250 BTC upon entry of the Interim DIP Order and the remaining aggregate principal amount of $15 million or 250 BTC upon entry of the Final Order, on the terms set forth in the DIP Term Sheet;

b.      Authorizing the DIP Loan Parties to (i) execute, deliver, and perform under the DIP Term Sheet and each of the DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the DIP Loan Documents (collectively, the "***DIP Obligations***"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim DIP Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder;

c.      Authorizing the DIP Borrower to incur all DIP Obligations, in accordance with this Interim DIP Order and the DIP Loan Documents;

d.      Granting to the DIP Agent, for the benefit of itself and the other DIP Lenders, the DIP Liens (as defined below) in all DIP Collateral (as defined below), as set forth in

4

this Interim DIP Order, subject to the Carve Out and subject to the relative priorities set forth in this Interim DIP Order;

      e.    Granting to the DIP Agent, for the benefit of itself and the other DIP Lenders, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve Out, as set forth in this Interim DIP Order;

      f.    Authorizing the Debtors to use the proceeds of the DIP Facility and the DIP Collateral, solely in accordance with the terms and conditions set forth in this Interim DIP Order and the DIP Loan Documents, including the Approved Budget (as defined below), subject to any variances expressly permitted under the DIP Loan Term Sheet (the "***Permitted Variances***");

      g.    Approving certain stipulations, waivers, and releases by the Debtors with respect to the DIP Lenders, the DIP Loan Documents, the DIP Liens, the DIP Obligations, and the DIP Collateral, in each case, subject to the terms and provisions of this Interim DIP Order;

      h.    Modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of this Interim DIP Order and the DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim DIP Order, providing for the immediate effectiveness of this Interim DIP Order, and granting related relief; and

      i.    Scheduling a final hearing (the "***Final Hearing***") on the Motion to consider entry of the Final Order authorizing the relief requested in the Motion on a final basis,

which order shall be in form and substance and on terms and conditions acceptable in all respects to the DIP Lenders, and approving the form of notice with respect to such Final Hearing.

## SUMMARY OF TERMS OF DIP FACILITY[4]

7.      In accordance with Rules 4001(b)-(d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the *Procedures for Complex Cases in the Southern District of Texas* (the "**Complex Case Procedures**"), as incorporated by Rule 1075-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the below chart summarizes the significant terms of the Interim DIP Order and the DIP Term Sheet.[5]

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| **Borrower**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Rhodium Technologies LLC | DIP Loan Term Sheet; Interim DIP Order, Preamble (a). |
| **Guarantors**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Rhodium Enterprises, Inc. and all direct and indirect subsidiaries of the Borrower that are or become debtors and debtors-in-possession in the Bankruptcy Cases. | DIP Loan Term Sheet; Interim DIP Order Preamble (a). |
| **DIP Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The lenders that are signatories to the DIP Term Sheet. | DIP Loan Term Sheet, Signature Pages; Interim DIP Order Preamble (a). |
| **DIP Agent**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Galaxy Digital LLC as administrative agent and collateral agent. | DIP Loan Term Sheet; Interim DIP Order Preamble (a). |

---

[4]   This summary is qualified in its entirety by reference to the applicable provisions of the DIP Documents.  To the extent there exists any inconsistency between this summary and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control.  Any capitalized terms used but not otherwise defined in these summaries shall have the respective meanings ascribed to such terms in the DIP Documents and/or the Interim DIP Order, as applicable.  The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001–2 herein.

[5]   The parties are finalizing the DIP Term Sheet and will file a full version of it in advance of the August 30, 2024 hearing.

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| **DIP Facility and Borrowing Limits**<br><br>Bankruptcy Rule 4001(c)(1)(B) | A new money, senior secured, super priority DIP Facility making available loans (the "***DIP Loans***") thereunder in an aggregate principal amount of up to either $30 million (such DIP Loans, "***USD DIP Loans***") or 500 Bitcoin ("***BTC***" and such DIP Loans, "***BTC DIP Loans***") in commitments from the DIP Lenders (the "***Commitments***").  The DIP Facility shall be ***either*** a DIP Facility making available USD DIP Loans ("***USD DIP Facility***") ***or*** a DIP Facility making available BTC DIP Loans ("***BTC DIP Facility***"). | DIP Loan Term Sheet; Interim DIP Order ¶ 2(b). |
| **Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The use of proceeds of DIP Facility are subject to compliance with the Approved Budget then in effect (subject to Permitted Variances). | DIP Loan Term Sheet, Annex II; Interim DIP Order,¶¶ 2(b), 9 & Ex. 2. |
| **Interest Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B) | If the Borrower elects to borrow USD DIP Loans, then all such USD DIP Loans shall bear interest at a fixed rate *per annum* equal to 14.5%, payable by the Borrower to the DIP Agent (for the account of the DIP Lenders) in cash on the Invoice Due Date (as defined below).<br><br>If the Borrower elects to borrow to BTC DIP Loans, the BTC DIP Loans shall bear interest at a fixed rate *per annum* equal of 9.5%, payable by the Borrower to the DIP Agent (for the account of the DIP Lenders) in cash or in BTC on the Invoice Due Date, subject to the section captioned "**Repayment of BTC DIP Loans and Payment of Interest or other Amounts in U.S. Dollars**" set forth below.<br><br>All interest shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, or if any principal of or interest on any DIP Loan or any fee or other amount payable by the Debtors hereunder or under any other DIP Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, then all DIP Loans outstanding and any past due amounts, shall bear interest, after as well as before judgment, at the interest rates set forth above plus 2.0%, but in no event to exceed the highest lawful rate permitted by applicable law (the "***Default Rate***"). | DIP Loan Term Sheet. |
| **Expenses and Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B) | <u>Unfunded Commitment Fee:</u><br><br>USD DIP Facility: If the Borrower elects to enter into a USD DIP Facility, the Borrower shall pay the DIP Agent, for the account of each DIP Lender, on the Invoice Due Date, a fee *per annum* equal to SOFR, on the daily unused amount of the Commitments of such DIP Lender during the preceding month; *provided* that for purposes of such fee, SOFR shall not be less than 4.5%.<br><br>BTC DIP Facility: If the Borrower elects to enter into a BTC DIP Facility, the Borrower shall pay the DIP Agent, for the | DIP Loan Term Sheet. |

| MATERIAL TERMS | LOCATION |
|---|---|
| account of each DIP Lender, on the Invoice Due Date, a fee equal to 4.0% *per annum* on the daily unused amount of the Commitments of such DIP Lender during the preceding month.<br><br>The unfunded commitment fees described above (the "***Unfunded Commitment Fees***") shall be payable by the Borrower (a) on the first Business Day of each month to the extent of any unused Commitments during the immediately preceding month and (b) on the first borrowing date following the entry of the Final Order, to the extent there are any accrued and unpaid Unfunded Commitment Fees. All Unfunded Commitment Fees shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).<br><br>Up Front Fee: The Borrower shall pay to the DIP Agent, for the account of the DIP Lenders, a fee in an amount equal to 2.0% of the principal amount of the Commitments (including Commitments available following entry of the Final Order) (the "***Up-Front Fee***"). The Up-Front Fee shall be fully earned upon entry of the Interim Order. 50% of the Up-Front Fee shall be payable on the first borrowing date following the entry of the Interim Order in accordance with the conditions set forth under the caption "Conditions to Initial Availability" and 50% of the Up-Front Fee shall be payable on the first borrowing date following the entry of the Final Order in accordance with conditions set forth under the caption "Conditions to Final Availability", or as otherwise required in the event of any prepayment.<br><br>Exit Fee: The Borrower shall pay to the DIP Agent for the account of the DIP Lenders a fee in an amount equal to 2.5% of the principal amount of the Commitments (whether or not such Commitments are ultimately funded), which shall be fully earned upon entry of the Interim Order and payable on the Maturity Date or any other date that the DIP Loans are prepaid or repaid in whole or in part whether as a result of acceleration or otherwise (the "***Exit Fee***"). | |
| **Maturity Date; Duration for Use of DIP Collateral**<br><br>Bankruptcy Rule 4001(c)(1)(B) | On the Maturity Date (as defined below), all DIP Loans and Obligations under the DIP Facility shall be immediately Paid in Full (as defined below) by the Borrower and the Commitments shall terminate.<br><br>The maturity date of the DIP Facility (the "***Maturity Date***") shall be the date that is the earliest of: (a) 12 months after the Petition Date; (b) 30 days after the entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court; (c) the effective date of a Plan (as defined herein); (d) the closing of a sale of substantially all of the equity of the Debtors or of the Debtors' Temple site assets (unless done pursuant to a confirmed Plan); and (e) the termination of the DIP Facility during the continuation of an Event of Default or termination under the DIP Facility or the applicable DIP Order. | DIP Loan Term Sheet. |

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | "***Paid in Full***" shall mean (i) in the case of USD DIP Loans, repayment in full and in cash of all outstanding amounts of principal, and payment of all accrued interest and any other amounts owing under the USD DIP Facility, and (ii) in the case of BTC DIP Loans, (a) repayment in full and in BTC of all outstanding amounts of principal, and payment of all accrued interest and any other amounts owing under the BTC DIP Facility or (b) to the extent that the DIP Lenders and DIP Agent provide prior written consent to the same, repayment in full and in cash (calculated at the Exchange Rate (as defined below)) of all outstanding amounts of principal, and payment of all accrued interest and any other amounts owing under the DIP Facility. | |
| **Prepayments**<br><br>Bankruptcy Rule 4001(c)(1)(B) | <u>Voluntary Prepayments</u><br><br>Upon at least three Business Days' notice, the Borrower may prepay the DIP Loans, in whole or in part, at any time; *provided* that the Borrower shall also pay all accrued and unpaid interest on such principal amount being prepaid together with any unpaid Up-Front Fee and the Exit Fee. Once repaid in connection with any voluntary prepayment, the DIP Loans may not be reborrowed.<br><br><u>Mandatory Prepayments</u><br><br>DIP Loans shall be prepaid with 100% of the net cash proceeds of (a) all non-ordinary course asset sales or other dispositions of property of the Debtors, including insurance proceeds and condemnation proceeds and (b) any Indebtedness for borrowed money incurred by the Debtors (other than the DIP Loans). All mandatory prepayments shall be applied to principal and interest due on the DIP Loans. The Borrower shall also pay all accrued and unpaid interest on such principal amount being prepaid together with any unpaid Up-Front Fee and the Exit Fee. Once repaid in connection with any mandatory prepayment, the DIP Loans may not be reborrowed. | DIP Loan Term Sheet. |
| **Conditions to Closing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | <u>Conditions to Initial Availability</u><br><br>The obligation of the DIP Lenders to make any DIP Loans up to an amount equal to the Initial Availability is subject to satisfaction of the following conditions: (a) commencement of the Bankruptcy Case and entry of "first day orders" reasonably satisfactory to the DIP Lenders; (b) all DIP Loan Documents required by the DIP Agent and the DIP Lenders (other than a definitive credit agreement evidencing the DIP Facility) shall be in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders; (c) entry of the Interim Order consistent with the terms herein within five Business Days following the date that the motion to approve the DIP Facility is filed and which Interim Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed; (d) the DIP Agent shall have received the DIP Budget; (e) the DIP Agent shall have received satisfactory | DIP Loan Term Sheet. |

| **MATERIAL TERMS** | **LOCATION** |
| --- | --- |
| | |

evidence that the Debtors have been duly authorized to execute and deliver the applicable DIP Loan Documents and perform their obligations thereunder; (f) an interim order approving the use of cash collateral shall have been entered and remain in effect and not subject to any challenge and in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders (the "***Interim Cash Collateral Order***"); (g) no material adverse change shall have occurred (other than by virtue of the Bankruptcy Cases); (h) the Rockdale site shall not have lost power for more than 72 hours and shall not be at imminent risk of losing power for more than 72 hours, in each case where (i) power in the surrounding area is not generally affected or (ii) if Whinstone has caused, is generally responsible for, or generally responsible for maintenance of the systems leading to, the loss of power, injunctive relief ceasing the loss of power has not been obtained within 3 Business Days after the date power was first lost; (i) the Borrower shall have paid all fees and expenses (including attorneys' fees) due to the DIP Agent and the DIP Lenders; (j) the Debtors shall be in compliance in all respects with the Interim Order; (k) the DIP Agent shall have received a notice of borrowing (which shall include whether the DIP Loans are USD DIP Loans or BTC DIP Loans and the intended uses of proceeds in accordance with the DIP Budget) substantially in the form of <u>Annex X</u> (a "***Notice of Borrowing***"); (l) the representations and warranties of the Debtors set forth in this Term Sheet and in any other DIP Loan Document shall be true and correct in all material respects; (m) no Default or Event of Default shall have occurred and be continuing; (n) the DIP Agent shall have received the Up-Front Fee, which shall be calculated based on the Initial Availability and paid by the Borrower contemporaneously with the funding of the first DIP Loan as provided; and (o) the applicable DIP Loan Documents shall have been executed by the parties thereto and delivered to the DIP Agent.

<u>Conditions to Full Availability</u>

The obligation of the DIP Lenders to make any DIP Loans up to an amount equal to the Full Availability is subject to satisfaction of the following conditions: (a) entry of the Final Order in substantially the form of the Interim Order, with only such modifications thereto as are reasonably satisfactory in form and substance to the DIP Agent and the DIP Lenders, no later than 30 days following the date of entry of the Interim Order, which Final Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed; (b) all DIP Loan Documents required by the DIP Agent and the DIP Lenders (which shall include a definitive credit agreement evidencing the DIP Facility) shall be in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders; (c) the Debtors shall be in compliance in all respects with the Interim Order and Final Order; (d)subject to application of the Permitted Variance, the Debtors shall be compliance with the DIP Budget; (e) the DIP Agent shall have

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | received a Notice of Borrowing at least three (3) Business Days in advance; (f) a final order approving the use of cash collateral shall have been entered and remain in effect and not subject to any challenge and in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders (the "***Final Cash Collateral Order***"); (g) no material adverse change shall have occurred (other than by virtue of the Bankruptcy Case); (h) the Rockdale site shall not have lost power for more than 72 hours and shall not be at imminent risk of losing power for more than 72 hours, in each case where (i) power in the surrounding area is not generally affected or (ii) if Whinstone has caused, is generally responsible for, or generally responsible for maintenance of the systems leading to, the loss of power, injunctive relief ceasing the loss of power has not been obtained within 3 Business Days after the date power was first lost; (i) no Default or Event of Default shall have occurred and be continuing; (j) the DIP Agent shall have received any accrued and unpaid Unfunded Commitment Fees as provided herein; (k) the DIP Agent shall have received the Up-Front Fee, which shall be calculated on the Full Availability less the Initial Availability, and paid by the Borrower contemporaneously with the funding of the first DIP Loan after entry of the Final Order as provided herein; (l) the Borrower shall have paid all fees and expenses (including attorneys' fees) due to the DIP Agent and the DIP Lenders; and (m) the representations and warranties of the Debtors set forth in this Term Sheet and in any other DIP Loan Document shall be true and correct in all material respects. | |
| **Superpriority Expense Claims**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i) | Subject to the Carve Out, the DIP Agent and DIP Lenders are granted DIP Superpriority Claims on account of all DIP Obligations. | DIP Loan Term Sheet; Interim DIP Order,¶ 7. |
| **Collateral and Priority**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | *DIP Liens.*<br><br>(a)     As security for the prompt and complete payment and performance of all DIP Obligations when due (whether upon stated maturity, prepayment, acceleration, declaration or otherwise), effective and perfected as of the entry of this Interim Order, and without the necessity of the execution, recordation or filing by any of the DIP Loan Parties or the DIP Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title, or any similar document or instrument, or the taking of any other action (including, without limitation, entering into any control agreements or taking any other action to take possession or control of any DIP Collateral), the DIP Agent, for the benefit of itself and the other DIP Secured Parties, is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "***DIP Liens***") in all DIP Collateral, in each case, subject and subordinate to the Carve Out, and subject to the relative priorities set forth in this Interim Order. | DIP Loan Term Sheet; Interim DIP Order,¶¶ 6, 7. |

| MATERIAL TERMS | LOCATION |
|---|---|
| (b)    The term "***DIP Collateral***" means all now owned or hereafter acquired assets and property of the each of the Debtors, including real and personal property, whether existing on the applicable Petition Date or thereafter acquired and wherever located, tangible or intangible, including, without limitation, (i) plant and equipment and the proceeds thereof, (ii) all litigation and other claims and the proceeds thereof including all commercial tort claims and the Whinstone Litigation (as defined in the DIP Term Sheet) and any proceeds thereof, (iii) the Prepetition Notes Collateral (as defined in the DIP Term Sheet), whether existing on the applicable Petition Date or thereafter acquired, (iv) all property of the Debtors subject to Prior Permitted Liens, (v) all property of the Debtors, whether existing on the applicable Petition Date or thereafter acquired that is not subject to valid, perfected, and non-avoidable liens or perfected after the applicable Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code ("***Previously Unencumbered Property***"), and, (vi) upon entry of the Final Order, all proceeds of claims and causes of action under sections 502(d), 506(c), 544, 545, 547, 548, 549, 550, or 724(a) of the Bankruptcy Code.<br><br>(c)    The DIP Liens shall be subject to the priorities set forth below (subject in each case to the Carve Out):<br><br>    (i)   *First Priority Liens on Unencumbered Property.* Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral to the extent that such DIP Collateral is not Prepetition Notes Collateral, including all Previously Unencumbered Property (including, subject to entry of the Final Order, all proceeds of claims and causes of action under sections 502(d), 506(c), 544, 545, 547, 548, 549, 550, or 724(a) of the Bankruptcy Code), subject only to the Carve Out and junior only to the Prior Permitted Liens, if any, on such assets, and senior to all other liens on such assets.<br><br>    (ii)   *Liens Junior to Certain Other Liens.* Pursuant to sections 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral (other than the DIP Collateral described in paragraph 6(c)(i) hereof, as to which DIP Liens are described in such paragraph), subject only to the Carve Out and junior only to the Prepetition Notes Liens and Prior Permitted Liens, if any, on such assets, and senior to all other liens on such assets.<br><br>(d)    Other than as set forth herein or in the DIP Loan Documents (including subject to the Prior Permitted Liens and the Carve Out), the DIP Liens shall not be | |

| **MATERIAL TERMS** | **LOCATION** |
|---|---|
| made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), or upon the dismissal of any of the Chapter 11 Cases or Successor Case.  The DIP Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any of the Debtors' estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.<br><br>    (e)   Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person or entity, in order for any Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any interest therein (including any fee or leasehold interest), any proceeds thereof or other DIP Collateral, shall be deemed inconsistent with the provisions of the Bankruptcy Code and shall have no force or effect with respect to the granting of the DIP Liens in any such interest therein or other DIP collateral, or in the proceeds of any assignment or sale thereof by any Debtor in favor of the DIP Secured Parties in accordance with the DIP Loan Documents and this Interim Order.<br><br>*DIP Superpriority Claims.*<br>Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors, with priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, any and all other administrative expense claims of the kind specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "***DIP Superpriority Claims***"), subject only to the Carve Out.  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The DIP Superpriority Claims shall be payable by each of the Debtors, on a joint and several basis.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise. | |

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| **Covenants**<br><br>Bankruptcy Rule 4001(c)(1)(B) | <u>Affirmative Covenants</u><br>Customary affirmative covenants, to be agreed.<br><br><u>Negative Covenants</u><br>Customary affirmative covenants, to be agreed.<br><br><u>Financial Covenants</u><br>Debtors shall comply with the financial covenants set forth below (collectively, the "***Financial Covenants***"): (a) <u>Minimum Liquidity</u>. The Debtors shall not permit the Debtors to have, at any time, less than the Minimum Liquidity Amount; (b) <u>Permitted Variance</u>: Commencing as of the first Business Day in the week that is the fifth week after date that the first DIP Loan is funded, the Debtors shall not allow, as of the last day of any Variance Testing Period and measured on a rolling four week basis (each such four week period, a "***Cumulative Four-Week Period***"), the Debtors' average of the actual cash expenses and disbursements during such Cumulative Four-Week Period to be more than 110% of the projected cash expenses and disbursements for such Cumulative Four-Week Period, as set forth in the DIP Budget (the "***Permitted Variance***"), *provided* that the cash expenses and disbursements considered for determining compliance with this covenant shall exclude disbursements and expenses in respect of professional fees incurred in the Bankruptcy Cases during such Variance Testing Period and *provided* further, that the Debtors may carry forward budgeted but unused disbursements set forth in the DIP Budget for a Variance Testing Period for use during any succeeding Variance Testing Period; (c) <u>Minimum Miner Availability</u>. At all times, the Debtors shall not have fewer than 19,000 miners operational or available to be operational.<br><br>"***Minimum Liquidity Amount***" shall mean an amount equal to either (a) $5 million of cash or (b) $5 million of BTC (calculated by reference to the Exchange Rate) held in an account in the name of a Debtor acceptable to the DIP Lenders and DIP Agent and that is subject to the dominion and control of the DIP Agent pursuant to an account control and/or custody agreement in form and substance reasonably satisfactory to DIP Lenders and the DIP Agent. | DIP Loan Term Sheet, Annex VII, Annex VIII. |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Each of the following events shall constitute an "***Event of Default***": (a) the DIP Loan Documents shall not have been executed and delivered by the Debtors, the DIP Agent and the DIP Lenders within three Business Days after the date of entry of the Interim Order (or shall not have been filed with, and approved by, the Bankruptcy Court within the times specified and otherwise in accordance with the Interim Order); (b) dismissal of the Bankruptcy Case or conversion of any Bankruptcy Case to a Chapter 7 case; (c) appointment of a Chapter 11 trustee, a responsible officer or an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Debtor in any Bankruptcy Case; (d) subject to | DIP Loan Term Sheet. |

| MATERIAL TERMS | LOCATION |
|---|---|
| the Carve-Out, the Bankruptcy Court's granting of any superpriority claim or lien on the DIP Collateral which is *pari passu* with or senior to the claims or liens of the DIP Lenders in the Bankruptcy Cases; (e) after entry of the Final Order, (i) the entry of any final order in the Bankruptcy Case (A) surcharging any of the DIP Collateral as to the DIP Secured Parties under Section 506(c) of the Bankruptcy Code or otherwise, (B) resulting in the marshalling of any DIP Collateral as to the DIP Secured Parties, (C) precluding the attachment of Liens to any of the DIP Collateral based on the "equities of the case" exception under section 552(b) of the Bankruptcy Code; or (ii) the commencement of other actions by the Debtors adverse to the DIP Lenders or their rights and remedies under the DIP Facility in the Bankruptcy Case; (f) failure of the Final Order to be entered within 30 days after entry of the Interim Order; (g) failure of the Interim Order or Final Order to be in full force and effect, including by the entry of an order reversing, amending, supplementing, staying for a period in excess of five days, vacating or otherwise modifying the Interim Order or Final Order in a manner that is adverse to the DIP Agent or the DIP Lenders; (h) failure of any Debtor to comply with the terms of the applicable DIP Order; (i) entry of an order by the Bankruptcy Court terminating the use of cash collateral; (j) the payment by any Debtor (by way of adequate protection or otherwise) of any principal or interest or other amount on account of any prepetition indebtedness or payables (other than as agreed herein or pursuant to the consent of the DIP Lenders and DIP Agent); (k) the entry of an order or orders granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party or third parties to proceed against any assets of any Debtor having a value, individually or in the aggregate, in excess of $1,000,000 or to permit other actions that would have a material adverse effect on any Debtor or its estate; (l) the filing or confirmation of a chapter 11 plan that does not provide for termination of the Commitments under the DIP Facility and the Debtors' obligations under the DIP Loan Documents be Paid in Full, or if any of the Debtors shall seek, support, or fail to contest in good faith the filing or confirmation of such a chapter 11 plan, unless, in each case, the obligations under the DIP Loan Documents will be Paid in Full from the proceeds of the sale of Debtors' Temple site assets pursuant to section 363 of the Bankruptcy Code; (m) an adverse judgment is entered in the Whinstone Litigation against any of the Debtors; (n) the Rockdale site shall not have lost power for more than 72 hours and shall not be at imminent risk of losing power for more than 72 hours, in each case where (i) power in the surrounding area is not generally affected or (ii) if Whinstone has caused, is generally responsible for, or generally responsible for maintenance of the systems leading to, the loss of power, injunctive relief ceasing the loss of power has not been obtained within 3 Business Days after the date power was first lost; (o) failure to repay or pay any amounts, whether of principal, | |

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | interest or other amounts, when due under the DIP Loan Documents; (p) failure of any Debtor to comply with any Milestones, as applicable; (q) failure of any Debtor to comply with any covenant (including any Financial Covenant) set forth in this Term Sheet or in any other DIP Loan Document; or (r) to be agreed. | |
| **Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vi) | Each of the Debtors shall comply with the following deadlines (each of which may be extended with the prior written consent of the DIP Lenders and DIP Agent without further order of the Bankruptcy Court) (each a "***Milestone***" and collectively, the "***Milestones***"):<br><br>    (a)    Sale-related Milestones to be applicable if the sale of the Debtors' Temple site assets is going to occur pursuant to section 363 of the Bankruptcy Code:<br>    a.  The Bankruptcy Court shall have entered a final order approving bidding procedures (the form and substance of which shall be reasonably satisfactory to the DIP Lenders and the DIP Agent) governing the solicitation of bids for the purchase (and an auction) of the Debtors' Temple site assets within 60 days after the Subsequent Petition Date;<br>    b.  The Bankruptcy Court shall have entered a final order approving the sale of the Debtors' Temple site assets within 90 days after the Subsequent Petition Date.<br>    (b)    Plan-related Milestones to be applicable if the sale of the Debtors' Temple site assets is going to occur pursuant to a chapter 11 plan:<br>    a.  The Debtors shall file a chapter 11 plan in form and substance reasonably satisfactory to the DIP Lenders and DIP Agent, including providing that the DIP Loans will be Paid in Full (the "***Plan***") and a disclosure statement for the Plan in form and substance reasonably satisfactory to the DIP Lenders and DIP Agent (the "***Disclosure Statement***"), in each case, by the date that is no later than 30 days after the Subsequent Petition Date;<br>    b.  The Disclosure Statement shall be approved by the Bankruptcy Court by the date that is no later than 60 days after the filing of a motion seeking approval of the Disclosure Statement; and<br>    c.  The Bankruptcy Court shall have entered an order confirming the Plan by the date that is no later than 90 days after the Subsequent Petition Date. | DIP Loan Term Sheet. |
| **Carve Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | Carve Out<br>    (a)    *Priority of Carve Out*. Each of the DIP Liens, the DIP Superpriority Claims, and the Prepetition Notes Liens shall be subject and subordinate to payment of the Carve Out. The Carve Out shall be senior to all claims and | DIP Loan Term Sheet; Interim DIP Order ¶ 20. |

| MATERIAL TERMS | LOCATION |
|---|---|
| liens over all assets of the Debtors, including any DIP Collateral, as set forth in this Interim Order. For the avoidance of doubt, after the occurrence of the DIP Termination Declaration Date and the date upon which the DIP Obligations are Paid in Full, the Carve Out shall remain in effect as to the obligations under the Prepetition Secured Notes, and the Debtors shall be permitted and required to continue to fund amounts in relation to the Carve Out in accordance with the terms of this Interim Order.<br><br>(b) *Carve Out.* As used in this Interim Order, the term "*Carve Out*" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a), (ii) Court-allowed fees and expenses of a trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000, (iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "*Allowed Professional Fees*") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "*Debtor Professionals*") and the Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "*Committee Professionals*", and together with the Debtor Professionals, the "*Professional Persons*") at any time on or before the date of delivery by the DIP Agent (at the instruction of the DIP Lenders) of a Carve Out Notice, whether allowed by the Court prior to or after delivery of a Carve Out Notice (the amounts set forth in the foregoing clauses (i), (ii) and (iii), the "*Pre-Carve Out Notice Amount*"), and (iv) Allowed Professional Fees of Professional Persons incurred after the date of delivery by the DIP Agent (at the instruction of the DIP Lenders) of the Carve Out Notice, to the extent allowed at any time, whether by interim order, final order, or other court order, in an aggregate amount not to exceed $750,000, consisting of up to $500,000 incurred by the Debtors and up to $250,000 by any statutory committee (the amount set forth in this clause (iii) being the "*Post-Carve Out Notice Amount*", and together with the Pre-Carve Out Notice Amount, the "*Carve Out Amount*"); *provided, however,* that nothing herein shall be construed to impair the ability of any party-in-interest to object to the fees, expenses, reimbursement, or compensation described herein on any grounds. For purposes of this Interim Order, the "*Carve Out Notice*" shall mean a written notice (which may be via electronic mail) delivered by the DIP Agent (acting at the instruction of the DIP Lenders) to the Remedies/Carve Out Notices Parties, which notice may be delivered following the occurrence of a DIP Termination Event, stating that the Post-Carve Out Notice Amount has been invoked.<br><br>(c) *Pre-Carve Out Notice.* Prior to the delivery of a Carve Out Notice, starting with the first full calendar week following the Subsequent Petition Date, each | |

17

| **MATERIAL TERMS** | **LOCATION** |
|---|---|
| Professional Person shall deliver to the Debtors, the DIP Secured Parties and their respective advisors a weekly statement (each, a "***Weekly Statement***") setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the preceding week (the "***Weekly Estimated Fees and Expenses***"), and the Debtors shall, on a weekly basis, transfer cash proceeds from amounts previously drawn under the DIP Facility into a segregated account held in trust for and exclusively available for the payment of fees and expenses of the Professional Persons (the "***Professional Fees Escrow Account***") in an amount equal to the aggregate amount of Weekly Estimated Fees and Expenses based on the Weekly Fee Estimates submitted by each Professional Person (and if no such estimate is provided in a given week, then the amount forecasted for such Professional Person in the Approved Budget) that remain unpaid (and that were not previously funded to the Professional Fees Escrow Account).  The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay  Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, in accordance with any interim or final orders of the Court; *provided, however*, that the Debtors' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account.<br><br>   (d) *Post-Carve Out Notice.* On the date on which a Carve Out Notice is delivered in accordance with this paragraph 20 of this Interim Order, (the "***Carve Out Trigger Date***"), the Carve Out Notice shall constitute a demand to the Debtors to utilize all cash proceeds from amounts previously drawn under the DIP Facility as of such date (net of any retainers) and any available cash proceeds from amounts previously drawn under the DIP Facility thereafter held by any Debtor to fund into the Professional Fees Escrow Account an amount equal to (i) the Pre-Carve Out Notice Amount (to the extent not previously funded to the Professional Fees Escrow Account), and (ii) the Post-Carve Out Notice Amount.  No later than one (1) Business Day after the delivery of a Carve Out Notice, each Professional Person shall deliver one (1) additional statement to the Debtors, the DIP Secured Parties and their respective advisors setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the period following the period covered by the most recent Weekly Statement previously delivered by such Professional Person through and including the Carve Out Trigger Date (as defined below), and the Debtors shall transfer such amounts to the Professional Fees Escrow Account (as defined herein).<br><br>   (e) Notwithstanding anything to the contrary in this Interim Order, the DIP Loan Documents or the Prepetition Notes Documents, following delivery of a Carve Out Notice, the DIP Agent shall not sweep or foreclose on cash | |

| MATERIAL TERMS | LOCATION |
|---|---|
| (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Professional Fees Escrow Account has been fully funded in an amount equal to all respective obligations benefitting from the Carve Out as set forth herein. The Professional Fees Escrow Account shall not be subject to the control of the DIP Secured Parties, and the funds transferred to the Professional Fees Escrow Account shall not be subject to the DIP Liens, nor constitute DIP Collateral; *provided*, however, that the DIP Liens shall automatically attach to any residual interest in the Professional Fees Escrow Account (which liens shall be deemed automatically perfected senior first priority liens as of entry of this Interim Order), with any excess paid to the DIP Agent for application to the DIP Obligations in accordance with the DIP Loan Documents until the DIP Obligations are Paid in Full (unless the DIP Secured Parties have otherwise agreed to in writing), and any excess remaining thereafter shall be applied in accordance with this Interim Order. <br><br> (f)      Notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Professional Fees Escrow Account shall not constitute loans or indebtedness under the DIP Loan Documents or otherwise increase or reduce the DIP Obligations, (ii) the failure of the Professional Fees Escrow Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) nothing contained herein shall constitute a cap or limitation on the amount that the Professional Persons may assert as administrative expense claims against the Debtors on account of Allowed Professional Fees incurred by such Professional Persons. <br><br> (g)      *Payment of Carve Out on or After the Carve Out Trigger Date.* Any payment or reimbursement made on or after the occurrence of the Carve Out Trigger Date in respect of any Allowed Professional Fees incurred after the occurrence of the Carve Out Trigger Date shall permanently reduce the Carve Out Amount on a dollar-for-dollar basis. <br><br> (h)      *No Direct Obligation to Pay Allowed Professional Fees.* None of the DIP Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code, regardless of whether such fees or expenses have been allowed by the Court. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. | |
| **Terms of Use and Purposes for Use of DIP Proceeds** <br><br> Bankruptcy Rule | The proceeds of the DIP Facility shall be used (such uses, the "*Approved Uses*"): (a) to pay related transaction costs, fees and expenses; (b) to provide working capital for the Debtors and for other general corporate purposes of the Debtors; (c); to pay obligations arising from or related to the Carve Out; (d) to pay | DIP Loan Term Sheet. |

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| 4001(c)(1)(B) | restructuring costs incurred in connection with the Bankruptcy Case; and (e) to pay the fees and costs of litigation with Whinstone US (such litigation, the "***Whinstone Litigation***"), in each case of (a)-(e), in accordance with the DIP Budget (as defined below).<br><br>Any cash on the balance sheet from time to time that constitutes Prepetition Notes Collateral shall be used to pay the costs of Approved Uses before using any proceeds of DIP Loans to pay the costs of Prepetition Notes. | |
| **Liens on Avoidance Actions**<br><br>Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of the Final Order, the DIP Agent and the DIP Lenders will receive a lien on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code. | DIP Loan Term Sheet. |
| **Waiver or Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without application to or further order of this Court, to permit: (a) the DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Secured Parties may request to assure the perfection and priority of the DIP Liens, (b) the DIP Loan Parties to incur all liabilities and obligations to the DIP Secured Parties as contemplated under this Interim Order and the DIP Loan Documents, (c) the DIP Loan Parties to pay all amounts required hereunder and under the DIP Loan Documents, (f) the DIP Secured Parties to retain and apply payments made in accordance with the terms of this Interim Order and the DIP Loan Documents, (g) as set forth below, the DIP Secured Parties to exercise, upon the occurrence of any DIP Termination Event (as defined below), all rights and remedies provided for in this Interim Order, the DIP Loan Documents, or applicable law, (h) the DIP Loan Parties to perform under this Interim Order and the DIP Loan Documents, and to take any and all other actions that may be necessary, required or desirable for the performance by the DIP Loan Parties under this Interim Order and the DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder, and (i) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the DIP Loan Documents. | Interim DIP Order,¶ 12. |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | All of the liens described herein shall be effective and valid, enforceable and perfected as of entry of the Interim DIP Order without the necessity of the execution of mortgages, security agreements, pledge agreements, deeds of trust, financing statements or other agreements. | DIP Loan Term Sheet; Interim DIP Order,¶ 6. |

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| **Release, Waivers or Limitation on any Claim or Cause of Action**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii) | Effective as of entry of the Interim Order, each of the DIP Loan Parties and its estate(s), on its own behalf and on behalf of its predecessors, successors and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits each of the DIP Secured Parties and each of their respective representatives (in their capacities as such) from any and all obligations and liabilities to the DIP Loan Parties (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, including, without limitation, any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), or otherwise, (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, in each case, that may be asserted by any of the DIP Loan Parties, their respective estates, predecessors, successors and assigns, in each case, against any of the DIP Secured Parties or their respective representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Interim Order, in connection with, arising under or related to this Interim Order, the DIP Facility, the DIP Liens, the DIP Obligations, the DIP Collateral, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including, without limitation, any claim or cause action with respect to the validity, enforceability, priority, scope, extent or perfection of the DIP Liens, the DIP Obligations or the DIP Loan Documents; *provided*, *however*, that nothing contained in the foregoing shall release the DIP Secured Parties from their obligations under the DIP Facility from and after the date hereof. | Interim DIP Order,¶ 30. |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | he Debtors shall pay (i) all reasonable and documented pre- and post-petition costs and expenses incurred by the DIP Agent and the DIP Lenders and their respective Affiliates, including, without limitation, the fees, charges and disbursements of counsel and other outside consultants for the DIP Agent and the DIP Lenders, the reasonable travel, photocopy, mailing, | DIP Loan Term Sheet. |

| MATERIAL TERMS | LOCATION |
|---|---|
| courier, telephone and other similar expenses and, in connection with the credit facility provided for herein, the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the DIP Agent and the DIP Lenders) of this Term Sheet and any other DIP Loan Document and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all documented out-of-pocket costs, expenses, taxes, assessments and other charges incurred by the DIP Agent and the DIP Lenders in connection with any filing, registration, recording or perfection of any security interest contemplated by this Term Sheet or any other DIP Loan Document or any other document referred to therein, and (iii) all reasonable and documented out-of-pocket expenses incurred by the DIP Agent and the DIP Lenders, including the fees, charges and disbursements of any counsel for the DIP Agent and the DIP Lenders, in connection with the enforcement or protection of its rights in connection with this Term Sheet or any other DIP Loan Document, or in connection with the DIP Loans made hereunder, including, without limitation, all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such DIP Loans.<br><br>The Debtors shall indemnify the DIP Agent and the DIP Lenders, their respective Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates (each such Person being called an "***Indemnitee***") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (a) the execution or delivery of this Term Sheet or any other DIP Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto or the parties to any other DIP Loan Document of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or by any other DIP Loan Document, (b) the failure of any Debtor to comply with the terms of this Term Sheet or any other DIP Loan Document or with any governmental requirement, (c) any inaccuracy of any representation or any breach of any warranty or covenant of any Debtor set forth in this Term Sheet or any other DIP Loan Document any instruments, documents or certifications delivered in connection therewith, (d) any DIP Loan or the use of the proceeds therefrom, (e) any other aspect of this Term Sheet or any other DIP Loan Document, (f) the operations of the business of the Debtors by the Debtors, (g) any assertion that the DIP Agent or the DIP Lenders were not entitled to receive the proceeds received pursuant to this Term | |

| MATERIAL TERMS | LOCATION |
|---|---|
| Sheet, any other DIP Loan Document, the Interim Order or the Final Order, (h) any environmental law applicable to the Debtors or any of their assets, or (i) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, and such indemnity shall extend to each Indemnitee notwithstanding the concurrent negligence of every kind or character whatsoever, whether active or passive, whether an affirmative act or an omission, including without limitation, all types of negligent conduct identified in the restatement (second) of torts of one or more of the Indemnitees or by reason of strict liability imposed without fault on any one or more of the Indemnitees; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.<br><br>All amounts due under this section captioned "**Expenses and Indemnification**" shall be due and payable upon written demand therefor, which shall include written documentation of such amounts, and shall bear interest at the Default Rate if not paid within ten (10) Business Days after the Borrower's receipt of any such written demand.<br><br>To the extent permitted by applicable law, each of the Debtors, DIP Agent, and the DIP Lenders shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Term Sheet, any other DIP Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any DIP Loan or the use of the proceeds thereof. | |

## Statement Regarding Significant Provisions

8.     Pursuant to paragraph 8 of the Complex Case Procedures, the DIP Term Sheet and/or DIP Orders contain the following provisions ("**Significant Provisions**"):

| DIP Facility Term | Relief Requested |
|---|---|
| **Sale or Plan Confirmation Milestones**<br><br>Complex Case Procedures ¶ 8(a) | Each of the Debtors shall comply with the following deadlines (each of which may be extended with the prior written consent of the DIP Lenders and DIP Agent without further order of the Bankruptcy Court) (each a "*Milestone*" and collectively, the "*Milestones*"):<br><br>(a) Sale-related Milestones to be applicable if the sale of the Debtors' Temple site assets is going to occur pursuant to section 363 of the Bankruptcy Code:<br><br>a. The Bankruptcy Court shall have entered a final order approving bidding procedures (the form and substance of which shall be reasonably satisfactory to the DIP Lenders and the DIP Agent) governing the solicitation of bids for the purchase (and an auction) of the Debtors' Temple site assets within 60 days after the Subsequent Petition Date;<br><br>b. The Bankruptcy Court shall have entered a final order approving the sale of the Debtors' Temple site assets within 90 days after the Subsequent Petition Date.<br><br>(b) Plan-related Milestones to be applicable if the sale of the Debtors' Temple site assets is going to occur pursuant to a chapter 11 plan:<br><br>a. The Debtors shall file a chapter 11 plan in form and substance reasonably satisfactory to the DIP Lenders and DIP Agent, including providing that the DIP Loans will be Paid in Full (the "*Plan*") and a disclosure statement for the Plan in form and substance reasonably satisfactory to the DIP Lenders and DIP Agent (the "*Disclosure Statement*"), in each case, by the date that is no later than 30 days after the Subsequent Petition Date;<br><br>b. The Disclosure Statement shall be approved by the Bankruptcy Court by the date that is no later than 60 days after the filing of a motion seeking approval of the Disclosure Statement; and<br><br>c. The Bankruptcy Court shall have entered an order confirming the Plan by the date that is no later than 90 days after the Subsequent Petition Date. |
| **Cross-Collateralization**<br><br>Complex Case Procedures ¶ 8(b) | N/A |
| **Roll-ups**<br><br>Complex Case Procedures ¶ 8(c) | N/A |
| **Liens on Avoidance Actions or Proceeds of Avoidance Actions**<br><br>Complex Case Procedures ¶ 8(d) | Subject to entry of the Final Order, the DIP Agent and the DIP Lenders will receive a lien on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code. |
| **Default Provisions and Remedies**<br><br>Complex Case Procedures ¶ 8(e) | See above. |
| **Releases of Claim Against Lender or Others** | See above. |

24

| DIP Facility Term | Relief Requested |
|---|---|
| Complex Case Procedures ¶ 8(f) | |
| **Limitations on the Use of Cash Collateral**<br><br>Complex Case Procedures ¶ 8(g) | Cash Collateral may not be used for certain enumerated purposes that are contrary to the rights and interests of the DIP Lenders( *e.g.*, for investigations and litigation).   Interim DIP Order ¶ 21.<br><br>Justification.  These limitations are usual and customary.   The Debtors, having engaged in arm's length negotiations with the DIP Lenders, agreed to limit the Debtors' use of Cash Collateral as consideration for, among other things, the provision of new money within the broader context the Debtors' value- maximizing restructuring process.   The limitation is reasonable given the facts and circumstances of these Chapter 11 cases. |
| **Priming Liens**<br><br>Complex Case Procedures ¶ 8(h) | N/A. |

## JURISDICTION

9.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.  General Background

10.     On August 24 and 29, 2024 (the "***Petition Dates***"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").   The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.  The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Local Rules***")

11.     The Debtors and their affiliates (collectively, the "*Group*") are a technology company.  The Group's main activity involves utilizing proprietary technology to self-mine Bitcoin, with the goal of increasing sustainability and cost-efficiency.

12.     Information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the First Day and DIP Declarations, which have been filed contemporaneously with this Motion and incorporated by reference herein.

### B.  Need for DIP Facility and Use of Cash Collateral

13.     As discussed in the First Day and DIP Declarations, the Debtors have an immediate and critical need to obtain DIP financing, among other reasons, to enable the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and hosting customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, and to fund expenses of these Chapter 11 Cases.  The Debtors are entering chapter 11 with approximately $2.49 million of cash on hand and their operating cash flow, as currently projected, is not sufficient to fund both ongoing operations and expenses for the projected duration of the Chapter 11 Cases, as well as the costs associated with these Chapter 11 Cases.  Moreover, the Debtors' available cash on hand may be subject to the liens of Prepetition Secured Parties.

14.     Approval of debtor-in-possession financing will also send a positive message to the market that these Chapter 11 Cases are sufficiently funded, which is critical to address concerns raised by the Debtors' employees, vendors, and other stakeholders.

### C.  Efforts to Obtain Postpetition Financing

15.     As set forth in the DIP Declaration, beginning in August 2024, the Debtors, through Province, launched a broad marketing process designed to maximize competition and

solicit proposals from a wide range of prospective lenders, including (i) creditors already in the Debtors' capital structure, (ii) banks outside of the Debtors' capital structure, (iii) institutional and alternative lenders outside the Debtors' capital structure, and (iv) strategic parties. The Debtors' primary strategic considerations when marketing and financing the opportunity included the following (among others):

 *i.* ***Adequate Sizing*** – adequate sizing to (i) fund the Debtors' contemplated Approved Budget and (ii) maintain optimal liquidity levels for operating the Debtors' business at all times;

 *ii.* ***Competitive Pricing*** – competitive pricing and terms, including interest rate, nature of interest payments (i.e., paid-in-kind vs. cash), and fees; and

 *iii.* ***Operational and Financial Flexibility*** – limited financial covenants and case controls, including milestones.

16. Because some of the Debtors' assets are encumbered, Province's strategy to obtain the best source of financing from the market was reflective of the practical realities of the Debtors' existing capital structure.

17. Province contacted 66 potential lenders that it believed may have been interested in providing the Debtors with postpetition financing.

18. As discussed further in the DIP Declaration, while the Debtors analyzed and negotiated various proposals for postpetition financing, the Debtors ultimately determined that the best path forward would be pursuing the DIP Facility with the DIP Lenders.

19. The negotiations with the DIP Lenders were rigorous, marked by hard bargaining, and resulted in significant concessions by the DIP Lenders and additional benefits to the Debtors. It is unlikely that the Debtors would be able to obtain this level of credit on more attractive terms, taken as a whole, within the timeframe required.

20. Accordingly, the DIP Facility, taken as a whole, is reasonable under the facts and circumstances and is the Debtors' best option.

**Key Benefits of Proposed DIP Facility**

21.     In addition to providing a liquidity infusion necessary to fund various critical expenditures, the proposed DIP Facility contains severable favorable terms and conditions to the Debtors.  Specifically, the proposed DIP Facility does not prime any of the Debtors' existing secured creditors, gives the Debtors flexibility to borrow either USD or Bitcoin, and contains competitive interest rates and fees.

22.     As a result of comprehensive good-faith and arm's-length negotiations and a competitive dynamic, the proposed DIP Facility satisfies the Debtors' primary strategic considerations outlined above.  Based on the foregoing, the Debtors believe that the proposed use of Cash Collateral and the DIP Facility will satisfy the Debtors' postpetition liquidity needs, will provide the Debtors with sufficient flexibility to operate their business in an efficient manner in the ordinary course of business, and is in the best interests of the Debtors and their estates.

**Terms of DIP Facility Are Reasonable Under the Circumstances**

23.     As discussed in the DIP Declaration, the obligations, interest rate, fees, maturity, covenants, and milestones under the DIP Facility are reasonable, taken as a whole, under the circumstances and are generally consistent with market terms for companies facing similar circumstances as the Debtors and provides the best financing option currently available to the Debtors under the circumstances.  Accordingly, the DIP Lenders have acted in good faith and have agreed to provide the DIP Facility to the Debtors on terms, on fair and reasonable under the current circumstances and market conditions.

24.     ***No Priming Liens***.  Priming liens may only be granted (a) with the consent of the affected secured lenders or (b) if adequate protection exists for such priming lien.  Here, the Debtors are not providing priming liens.  Instead, the DIP Lenders will take liens that are junior

to the liens of the Debtors' existing secured creditors, to the extent such prepetition liens are valid.

25.     ***Liens on Unencumbered Assets.***  In addition, the DIP Lenders require a perfected first priority security interest and lien on substantially all of the Debtors' unencumbered assets. Absent such protections, the DIP Lenders would not have agreed to provide the DIP Facility to the Debtors.

<u>**Fees in Connection with DIP Facility Are Fair and Reasonable**</u>

26.     The DIP Lenders have committed to provide a substantial amount of capital to ensure successful execution of the DIP Facility.  As discussed in the DIP Declaration, in view of those commitments and the circumstances of these cases, including the magnitude of the Debtors' Chapter 11 Cases and the tangible benefit to the estates of a substantial committed postpetition financing, the consideration being provided to the DIP Lenders, taken as a whole, in exchange for providing such commitment, is reasonable in amount, appropriately compensates the DIP Lenders for their costs and the assurances they are providing to the process, and is necessary to obtain the DIP Facility, which will permit the Debtors to both (i) continue operating their business and (ii) maximize the value of their estates.

**A.  DIP Fees**

27.     In consideration for the DIP Agent's and DIP Lenders' respective commitments in connection with the DIP facility, the Debtors have agreed to, among other things, (i) pay certain fees (the "***DIP Fees***"), as discussed in the table above, (ii) pay reasonable and documented out-of-pocket fees and expenses for the DIP Lenders (including reasonable and documented fees and expenses of outside counsel) (the "***Out-of-Pocket Expenses***" and, together with the DIP Fees, the "***DIP Fees and Expenses***"), and (iii) indemnify the DIP Lenders in accordance with the DIP Term Sheet.

**B.  DIP Fees Are Reasonable**

28.     The DIP Fees were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing.  As discussed in the DIP Declaration, it is unlikely that a financing commitment with terms similar to those in the DIP Facility was available to the Debtors for lower fees given the existing liens against the Debtors' assets, the Debtors' liquidity position, and the overall depression in Bitcoin prices that has resulted in stress within the cryptocurrency industry.

### Relief Requested Should be Granted

29.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  As set forth in the DIP Declaration, the Debtors were unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 364(a)-(b), 503(b)(1).  Having determined that postpetition financing was only available pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with the DIP Lenders to secure the DIP Facility on the terms described herein.  For these reasons, as discussed further below, the Debtors satisfy the necessary conditions under sections 364(c) and (d) for authority to enter into the DIP Facility.

### Entry into the DIP Facility is an Exercise of the Debtors' Sound Business Judgment

30.     Several reasons justify the relief requested herein:

a.      The Debtors expect that vendors and employees will be highly focused on whether these Chapter 11 Cases are appropriately funded.

b.      The Debtors are entering chapter 11 with limited cash on hand. Immediate access to DIP Facility is therefore critical to ensure sufficient working capital to operate their business and to administer their estates.

c.      The Debtors' proposed interim draw of up to $15 million or 250 Bitcoin necessary for the Debtors to avoid immediate and irreparable harm to their estates.

d.      Negotiations with the proposed DIP Lenders were conducted in good faith and at arms' length.  As confirmed by the Debtors' prepetition process to solicit proposals for third-party debtor-in-possession financing, there is no better alternative financing available to the Debtors in the market. The DIP Facility, taken as a whole, is reasonable under the facts and circumstances and is the Debtors' best—and in fact only—currently available option.

31.     For those reasons and the reasons set forth below, the Debtors respectfully request that the Court grant the relief requested herein.

32.     If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit.  *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (Docket No. 21) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage

the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

33.     Courts generally will not second-guess a debtor's business decisions when those decisions involve the appropriate level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor. *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313.   To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'"   *In re Dura Auto. Sys. Inc*., No. 0611202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855—86 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

34.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a thorough process conducted with the guidance of experienced advisors, and after careful evaluation of alternatives.  The DIP Lenders are the best available financing source that could commit to a facility on the most favorable terms, and enable the Debtors to avoid a potentially costly and protracted priming fight at the outset of these Chapter 11 Cases.  The Debtors negotiated the DIP Term Sheet with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available in an amount sufficient to fund operations and the

costs of these Chapter 11 Cases, and on reasonable terms. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

      **a.**  **Debtors Should Be Authorized to Obtain DIP Financing on a Secured and Superpriority Basis**

      35.    The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances. Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)    secured by a junior lien on property of the estate that is subject to a lien[.] 11 U.S.C. § 364(c).

      36.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, courts will consider whether (a) the debtor made reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (b) the credit transaction benefits the debtor as necessary to preserve estate assets, and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender. *See In re Republic Airways Holdings Inc.*, No. 16-10429(SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40. However, section 364 "imposes no duty to seek credit from every

possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).

37.     First, Province contacted 66 potential lenders, including the Prepetition Secured Parties, to seek proposals for postpetition financing.  Only the DIP Facility was actionable.  The Court should, therefore, authorize the Debtors to provide the DIP Agent and the DIP Lenders with superpriority administrative expense status for any DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code, with (i) first priority senior liens on the Debtors' unencumbered property pursuant to section 364(c)(2) of the Bankruptcy Code, and (ii) junior liens on any property encumbered with an existing lien pursuant to section 364(c)(3) of the Bankruptcy Code.

38.     Second, the DIP Facility is necessary to preserve the Debtors' estates.  The Debtors require access to the DIP Facility and access to Cash Collateral to ensure they have sufficient liquidity to operate their businesses, enter into postpetition agreements, post cash collateral, and administer their estates in the ordinary course for the duration of these Chapter 11 Cases.  The Debtors are entering chapter 11 with approximately $2.49 million of cash on hand.  Therefore, their operating cash flow, as currently projected, is not be sufficient to fund ongoing operations and expenses for the projected duration of the Chapter 11 Cases, including costs associated with these chapter 11 cases.

39.     Third, the terms of the DIP Facility are fair, reasonable, and adequate under the circumstances.  The DIP Facility represents the most favorable source of postpetition financing and is designed to provide the Debtors with sufficient liquidity for the duration of these Chapter 11 Cases.

**b. Debtors Should Be Authorized to Pay Fees Required by DIP Documents**

40.     As described herein, the Debtors have agreed, subject to Court approval, to pay the DIP Fees in exchange for their providing the DIP Facility.  As set forth in the DIP Declaration, taken as a whole, the terms of the DIP Documents, including the fees imposed thereunder, are reasonable under the facts and circumstances and are the Debtors' best—and in fact only—currently available option to maintain their ongoing business operations and to fund their Chapter 11 Cases.

41.     The Debtors considered the DIP Fees when determining in their sound business judgment whether entry into the DIP Facility constituted the best path forward, and the Debtors determined that paying these fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates.  Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

**c. Carve-Out Is Appropriate**

42.     The DIP subjects the DIP Lenders' security interests and superpriority administrative expense claims to the Carve Out.  Without the Carve Out, the Debtors' estates or other parties in interest could be harmed because the services professionals might otherwise provide in these Chapter 11 Cases could be restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on Carve Outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced").  Additionally, the Carve Out protects against administrative insolvency during the pendency of the Chapter 11 Cases by ensuring that assets are available to pay U.S. Trustee's fees and professional fees of the Debtors and any statutory committee.  Accordingly, the Debtors submit that the Carve Out is appropriate.

**d. DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)**

43. Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

44. Here, the Debtors believe the DIP Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing. As described in the DIP Declaration, the negotiations of the terms of the DIP Facility with the DIP Lenders were conducted at arms' length. Under the circumstances, the terms and conditions of the DIP Documents are reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Orders and the DIP Documents and in accordance with the Budget (subject to any Permitted Variance). Further, no consideration is being provided to any party to the DIP Documents other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lenders thus are entitled to all of the protections afforded by that section.

**e. Modification of Automatic Stay is Warranted**

45. The relief requested herein contemplates a modification of the automatic stay (if applicable) to (a) permit the Debtors to grant the security interests, liens, and superpriority claims

described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (b) permit the DIP Agent and DIP Lenders to exercise rights and remedies under certain circumstances.  These provisions were part of the *quid pro quo* for the Debtors' ability to obtain the DIP Facility as provided therein and in the Interim DIP Order.  Notably, the exercise of remedies will be subject to five calendar days' notice to allow the Debtors to cure or seek other relief.  Moreover, following the delivery of such notice, the DIP Agent may file a Stay Relief Motion seeking emergency relief from the automatic stay and until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facilities (to the extent drawn prior to the occurrence of the Event of Default (as defined in the DIP Term Sheet)) to fund operations in accordance with the DIP Term Sheet.  Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Interim DIP Order is reasonable and should be approved.

46.     Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances.  *See, e.g.*, *In re Sheridan Holding Company II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. October 21, 2019) (Docket No. 178) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. April 3, 2019) (Docket No. 118) (same); *In re Southcross Holdings LP*, No. 1620111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (Docket No. 183) (same); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (Docket No. 64) (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 21, 2012) (Docket No. 135) (same).

**f.  Debtors Require Immediate Access to DIP Financing**

47.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, Courts generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

48.     As described in the DIP Declaration, as of the Petition Date, the Debtors only have approximately $2.49 million in cash on hand.  Absent authority to enter into and access the proceeds of the DIP Facility, even for a limited period of time, the Debtors will be unable to continue operating their business, resulting in a deterioration of value and immediate and irreparable harm to the Debtors' estates.  Thus, the Debtors require immediate access to the proceeds of the DIP Facility to finance their operations and continue operating as a going concern during the pendency of these Chapter 11 Cases.  In addition, access to the DIP Facility will provide the Debtors with financial stability in the event of unforeseen circumstances attendant to the uncertain and volatile Bitcoin market.  Accordingly, for the reasons set forth above, prompt entry of the Interim DIP Order is necessary to avoid value-destruction that would lead to immediate and irreparable harm to the Debtors' estates.

<u>**REQUEST FOR FINAL HEARING**</u>

49.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Final Order.  The Debtors request that they be authorized to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of any objections by first class mail upon the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## BANKRUPTCY RULE 6003(B) HAS BEEN SATISFIED

50.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first twenty-one (21) days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm. As described herein and in the DIP Declaration, the relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11. Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

## COMPLIANCE WITH BANKRUPTCY RULE 6004(A) AND WAIVER OF BANKRUPTCY RULE 6004(H)

51.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

52.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vi) an admission as to the validity of any liens satisfied pursuant to this Motion, or (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be

construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## NOTICE

53.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

## NO PREVIOUS REQUEST

54.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE the Debtors respectfully request entry of the Interim DIP Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Respectfully submitted this 29th day of August, 2024.

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/  Patricia B. Tomasco*
Patricia B. Tomasco (SBN 01797600)
Joanna D. Caytas (SBN 24127230)
Cameron Kelly (SBN 24120936)
Alain Jaquet (*pro hac vice*)
700 Louisiana Street, Suite 3900
Houston, Texas 77002
Telephone: 713-221-7000
Facsimile: 713-221-7100
Email: pattytomasco@quinnemanuel.com
Email: joannacaytas@quinnemanuel.com
Email: cameronkelly@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com

- and -

Eric Winston (*pro hac vice*)
Razmig Izakelian (*pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213-443-3000
Facsimile: 213-443-3100
Email: ericwinston@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com

*Proposed Counsel to the Debtors and Debtors-In-Possession*

## <u>Certificate of Service</u>

I hereby certify that on August 29, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco

**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RHODIUM ENCORE LLC, *et al.*,[1] | § | Case No. 24-90448 (ARP) |
| | § | |
| Debtors. | § | |
| | § | (Joint Administration Pending) |
| | § | |

**DECLARATION OF MICHAEL ROBINSON IN SUPPORT OF EMERGENCY
MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (A)
AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B)
GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (C) MODIFYING THE
AUTOMATIC STAY, (D) SCHEDULING A FINAL HEARING, AND
(E) GRANTING RELATED RELIEF**

I, Michael Robinson, pursuant to section 1746 of title 28 of the United States Code,

hereby declare under the penalty of perjury that the following is true to the best of my

knowledge, information, and belief:

1.      I am above 18 years of age, and I am competent to testify.  I am the Co-Chief

Restructuring Officer for the above-captioned debtors and debtors in possession (collectively, the

"***Debtors***"), having served in that role since August 2024.  I am also a Managing Director of the

Debtors' proposed financial advisor, Province, LLC ("***Province***"), a US-based nationally

recognized financial advisory firm focusing on corporate strategy and transformation, transaction

advisory, valuation, dispute resolution, and fiduciary-related services, where I have worked in

---

[1]     The Debtors in these chapter 11 cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), Rhodium 30MW LLC (0263), Rhodium Enterprises, Inc. (6290), Rhodium Technologies LLC (3973), Rhodium Renewables LLC (0748), Air HPC LLC (0387), Rhodium Shared Services LLC (5868), Rhodium Ready Ventures LLC (8618), Rhodium Industries LLC (4771), Rhodium Encore Sub LLC (1064), Jordan HPC Sub LLC (0463), Rhodium 2.0 Sub LLC (5319), Rhodium 10MW Sub LLC (3827), Rhodium 30MW Sub LLC (4386), and Rhodium Renewables Sub LLC (9511).  The mailing and service address of the Debtors in these chapter 11 cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005.

1

various positions since 2019. I have over thirteen (13) years of experience in the financial services sector, initially through my work in investment banking advisory where I advised on a number of significant transactions across diverse industry verticals, and then through my work in restructuring advisory in which I have directly managed many in-court and out-of-court restructurings. Additionally, I am a Certified Insolvency and Restructuring Advisor, awarded from the Association of Insolvency and Restructuring Advisors, of which I am a member.

2.      I submit this declaration in support of the *Emergency Motion of Debtors for Entry of Interim and Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* (the "**DIP Motion**").

3.      Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents, (iii) information provided to me by Province employees working under my supervision, (iv) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, and/or (v) my opinion based upon my experience as a restructuring professional. If called to testify, I could and would testify to each of the statements set forth herein on that basis.

**PROVINCE'S RETENTION**

4.      Effective as of July 16, 2024, Province was retained to advise the Debtors in connection with an evaluation of alternatives with respect to their capital structure and a potential bankruptcy. Since that time, members of my team and I have worked closely with the Debtors' management and their other professionals in the analysis of the Debtors' business affairs, assets,

financial position, contractual arrangements, and various proposed strategic transactions. Pursuant to this work, my team and I have become familiar with the Debtors' capital structure, liquidity needs, and business operations.

5.      During Province's representation of the Debtors, I have, among other things, provided advice on strategic transaction alternatives, restructuring options, and financings.  I have participated in negotiations between the Debtors and their creditors and other parties in interest.  Members of my team and I have also assisted the Debtors in reviewing the terms, conditions, and the potential impact of various proposed transactions, including comparing iterations of debtor-in-possession financing proposals.  Additionally, I have participated in numerous meetings with the Company's board of directors (the "***Board***") to, among other things, address the Debtors' need for postpetition financing generally, and terms of the proposed debtor-in-possession superpriority secured financing facility described herein (the "***DIP Facility***," and the lenders thereunder, the "***DIP Lenders***").

6.      I am not being compensated specifically for this testimony other than through payments received by Province as a professional proposed to be retained by the Debtors.

## SUMMARY OF RELIEF REQUESTED IN DIP MOTION

7.      Pursuant to the DIP Motion, the Debtors request entry of an interim order (the "***Interim DIP Order***"):[2]

   a.      Authorizing the Debtors to obtain postpetition financing on a superpriority secured basis in the initial amount of $15 million or 250 BTC upon entry of the Interim Order and the remaining aggregate principal amount of $15 million or 250 BTC upon entry of the Final Order, on the terms set forth in the DIP Loan Term Sheet;

---

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the DIP Motion, the Declaration of David M. Dunn in Support of Chapter 11 Petitions and First Day Relief, and the Interim DIP Order, (each, as defined herein) as applicable.

b.       Authorizing the DIP Loan Parties to (i) execute, deliver, and perform under the DIP Loan Term Sheet and each of the DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the DIP Loan Documents (collectively, the "***DIP Obligations***"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder;

c.       Authorizing the DIP Borrower to incur all DIP Obligations, in accordance with this Interim Order and the DIP Loan Documents;

d.       Granting to the DIP Agent, for the benefit of itself and the other DIP Lenders, the DIP Liens (as defined below) in all DIP Collateral (as defined below), as set forth in this Interim Order, subject to the Carve Out and subject to the relative priorities set forth in this Interim Order;

e.       Granting to the DIP Agent, for the benefit of itself and the other DIP Lenders, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve Out, as set forth in this Interim Order;

f.       Authorizing the Debtors to use the proceeds of the DIP Facility and the DIP Collateral, solely in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents, including the Approved Budget (as defined below), subject to any variances expressly permitted under the DIP Loan Term Sheet (the "***Permitted Variances***");

g.       Approving certain stipulations, waivers, and releases by the Debtors with respect to the DIP Lenders, the DIP Loan Documents, the DIP Liens, the DIP Obligations, and the DIP Collateral, in each case, subject to the terms and provisions of this Interim Order;

h.       Modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of this Interim Order and the DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, providing for the immediate effectiveness of this Interim Order, and granting related relief; and

i.       Scheduling a final hearing (the "***Final Hearing***") on the Motion to consider entry of a final order (the "***Final Order***") authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and

conditions acceptable in all respects to the DIP Lenders, and approving the form of notice with respect to such Final Hearing.

8.       I have personally observed, and it is therefore my opinion, based on my experience, in my professional judgment, and as a result of the broad marketing process undertaken regarding the DIP financing opportunity, that the proposed DIP Facility is the product of arm's-length negotiations, represents the best postpetition financing alternative available to the Debtors under the circumstances, and is in the best interest of the Debtors, their estates, and all parties in interest in these Chapter 11 Cases.

## DEBTORS' NEED FOR DIP FINANCING

9.       The Debtors have an immediate and critical need to obtain DIP financing, among other reasons, to enable the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and hosting customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, and to fund expenses of these Chapter 11 Cases.   The Debtors are entering chapter 11 with approximately $2.49 million of cash on hand and their operating cash flow, as currently projected, is not sufficient to fund both ongoing operations and expenses for the projected duration of the Chapter 11 Cases, as well as the costs associated with these Chapter 11 Cases.

10.       The Debtors' prepetition capital structure is described in detail in paragraphs 71-77 of the First Day Declaration filed contemporaneously herewith.

11.       As described in the First Day Declaration, the Debtors commenced these Chapter 11 Cases in large part due to liquidity concerns caused by interruptions in generating revenue, collecting receivables, and raising capital due to the actions of Whinstone, in addition to escalating litigation costs.

12.     Beginning in July 2024, Province, with the assistance of the Debtors' management, undertook a detailed analysis of the Debtors' operations and funding needs.  From this review and analysis, it became clear that the Debtors would require an infusion of capital to allow the Debtors to operate their business as they work with their advisors and key stakeholders to achieve their restructuring goals.   Specifically, the Debtors and their advisors have determined that debtor in possession financing is necessary to ensure: (a) sufficient working capital to operate their business and to administer their estates; (b) an appropriate liquidity cushion to account for volatility in Bitcoin pricing and power pricing, as well as the existing and anticipated negative impacts to the Debtors' vendors and other counterparties; (c) the timely payment of administrative expenses to be incurred; and (d) a positive message to the market that these Chapter 11 Cases are sufficiently funded, which is critical to address concerns raised by the Debtors' employees, vendors, and other stakeholders.

13.     Based on this analysis, the Debtors and their advisors concluded that the Debtors would require approximately $30 million of postpetition financing and access to Cash Collateral to finance their operations and maintain sufficient liquidity for these Chapter 11 Cases.  The Debtors and their advisors continued to update the budget leading up to the Petition Date to account for changes in the Debtors' funding needs resulting from, among other things, the estimated timing of the commencement of these Chapter 11 Cases.  The Debtors' current cash flow forecast is attached to the Interim DIP Order as **Exhibit A** (the "***Cash Flow Forecast***").

14.     The Cash Flow Forecast reflects the Debtors' need for DIP financing to fund the Debtors' chapter 11 process, while maintaining minimum required operating liquidity to operate the Debtors' business.  The Cash Flow Forecast, along with previous iterations thereof, has been shared with the DIP Lenders.

15.     Under the proposed DIP Facility, the Debtors will gain critical access to DIP financing in the aggregate amount of up to $30 million or 500 BTC, with an Interim DIP Borrowing of $15 million or 250 BTC following entry of the Interim DIP Order.

16.     In order for the Debtors to have sufficient time to prosecute these Chapter 11 Cases both efficiently and thoroughly, the DIP Lenders have provided a DIP Facility.

17.     The Debtors intend to use funds from the Interim DIP Borrowing to, among other things, (i) avoid irreparable harm, (ii) pay outstanding prepetition amounts to employees, vendors, taxing authorities, and other critical stakeholders, (iii) pay ordinary course operating expenses to continue their bitcoin mining and hosting operations, and (iv) provide a stable path forward for the duration of these Chapter 11 Cases.

18.     I have reviewed the DIP Motion, and it is my belief that the relief sought therein is (a) critical to ensure the uninterrupted operation of the Debtors' business and the success of the Debtors' Chapter 11 Cases, and (b) necessary to avoid immediate and potentially irreparable harm to the Debtors' estates.   Absent the Court's entry of the Interim DIP Order, I believe the continued operation of the Company's business will be at risk, and could result in serious, immediate, and irreparable harm to the Debtors' estates, and their creditors.  Approval of the Interim DIP Order will ensure the uninterrupted operation of the Company's business.

## DEBTORS' EFFORTS TO OBTAIN POSTPETITION FINANCING

19.     Beginning in August 2024, the Debtors, through Province, launched a broad marketing process designed to maximize competition and solicit proposals from a wide range of prospective lenders, including (i) creditors already in the Debtors' capital structure, (ii) institutional and alternative lenders outside the Debtors' capital structure, and (iii) strategic parties.   The Debtors' primary strategic considerations when marketing and financing the opportunity included the following (among others):

i.  ***Adequate Sizing*** – adequate sizing to (i) fund the Debtors' contemplated Approved Budget and (ii) maintain optimal liquidity levels for operating the Debtors' business at all times;

ii. ***Competitive Pricing*** – competitive pricing and terms, including interest rate, nature of interest payments (i.e., paid-in-kind vs. cash), and fees; and

iii. ***Operational and Financial Flexibility*** – limited financial covenants and case controls, including milestones.

20.     Because some of the Debtors' assets are encumbered, Province's strategy to obtain the best source of financing from the market was reflective of the practical realities of the Debtors' existing capital structure.

21.     Province contacted 66 potential lenders that it believed may have been interested in providing the Debtors with postpetition financing.

22.     While the Debtors analyzed and negotiated various proposals for postpetition financing, the Debtors ultimately determined that the best path forward would be pursuing the DIP Facility with the DIP Lenders.

23.     The negotiations with the DIP Lenders were rigorous, marked by hard bargaining, and resulted in significant concessions by the DIP Lenders and additional benefits to the Debtors. I am confident that the Debtors would be unable to obtain this level of credit on more attractive terms, taken as a whole, within the timeframe required. I believe entry into the DIP Facility is a reasonable exercise of the Debtors' business judgment.

## KEY BENEFITS OF PROPOSED DIP FACILITY

24.     It is my belief based on my work with the Debtors and my experience that the proposed DIP Facility is essential to fund these Chapter 11 Cases and provides significant benefit to the Debtors and their estates.  The proposed DIP Facility is critical because, to support their operations, the Debtors require a liquidity infusion to fund various critical expenditures (as detailed above), which is satisfied by the proposed DIP Facility.

25.     In addition to providing a liquidity infusion necessary to fund various critical expenditures, the proposed DIP Facility contains several favorable terms and conditions to the Debtors.  Specifically, the proposed DIP Facility does not prime any of the Debtors' existing secured creditors, which avoids costly priming fights at the outset of the case, gives the Debtors flexibility to borrow either USD or Bitcoin, and contains competitive interest rates and fees.

26.     As a result of comprehensive good-faith and arm's-length negotiations and a competitive dynamic, the proposed DIP Facility satisfies the Debtors' primary strategic considerations outlined above.  Based on the foregoing, it is my belief that the DIP Facility will satisfy the Debtors' postpetition liquidity needs, will provide the Debtors with sufficient flexibility to operate their business in an efficient manner in the ordinary course of business, and is in the best interests of the Debtors and their estates.

## TERMS OF DIP FACILITY ARE REASONABLE UNDER THE CIRCUMSTANCES

27.     Based on my experience as a restructuring professional and my understanding of the Debtors' need for postpetition financing, the obligations, interest rate, fees, maturity, covenants, and milestones under the DIP Facility are reasonable, taken as a whole, under the circumstances.  Further, based on my experience with DIP financing transactions and my involvement in the negotiation of the DIP Loan Agreement and pursuit of alternative postpetition financing proposals, the DIP Facility provides the best financing option currently available to the Debtors under the circumstances.  In my view, the DIP Lenders have acted in good faith and have agreed to provide the DIP Facility to the Debtors on terms, taken as a whole, that I consider to be fair and reasonable under the current circumstances and market conditions.

28.     *Junior Liens*. A portion of the Debtors' assets are encumbered by existing liens. Rather than insisting on a non-consensual priming lien on such encumbered property, the DIP Lenders have agreed to receive junior liens on such assets, with the goal of enhancing the collateral

securing the DIP Facility and avoiding objections from these other secured parties.  The DIP Lenders would not provide capital without receiving liens that are junior to the liens securing these assets, which I believe is reasonable under the circumstances.

29.     ***Liens on Unencumbered Assets.*** In addition, the DIP Lenders require a perfected first priority security interest and lien on substantially all of the Debtors' unencumbered assets. Absent such protections, the DIP Lenders would not have agreed to provide the DIP Facility to the Debtors.  I believe that the request for such liens on unencumbered assets is reasonable under the circumstances.

## FEES IN CONNECTION WITH THE DIP FACILITY ARE FAIR AND REASONABLE

30.     The DIP Lenders have committed to provide a substantial amount of capital to ensure successful execution of the DIP Facility.   In view of those commitments and the circumstances of these cases, including the magnitude of the Debtors' Chapter 11 Cases and the tangible benefit to the estates of a substantial committed postpetition financing, I believe that the consideration being provided to the DIP Lenders, taken as a whole, in exchange for providing such commitment, is reasonable in amount, appropriately compensates the DIP Lenders for their costs and the assurances they are providing to the process, and is necessary to obtain the DIP Facility, which will permit the Debtors to both (i) continue operating their business and (ii) maximize the value of their estates.

### A.  DIP Fees

31.     In consideration for the DIP Agent's and DIP Lenders' respective commitments in connection with the DIP facility, the Debtors have agreed to, among other things, (i) pay certain fees (the "***DIP Fees***"), (ii) pay reasonable and documented out-of-pocket fees and expenses for the DIP Lenders (including reasonable and documented fees and expenses of outside counsel) (the "***Out-of-Pocket Expenses***" and, together with the DIP Fees, the "***DIP Fees***

*and Expenses*"), and (iii) indemnify the DIP Lenders in accordance with the DIP Loan Agreement.

**B. DIP Fees Are Reasonable**

32.     The DIP Fees were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing.  I do not believe that a financing commitment with terms similar to those in the DIP Facility is available to the Debtors for lower fees.  Accordingly, I believe that the DIP Fees are reasonable under the circumstances of these Chapter 11 Cases.

33.     In sum, it is my professional opinion that (i) the terms of the DIP Facility – including the fee structure and applicable interest rates are, taken as a whole, (a) within the range of comparable DIP financing transactions, and (b) are reasonable under the current circumstances and market conditions; (ii) the terms of the DIP Facility were the product of good faith, arm's-length negotiations; (iii) the DIP Facility will benefit all stakeholders in these Chapter 11 Cases; and (iv) absent the Court's entry of the Interim DIP Order, the Debtors' business will likely be immediately and irreparably harmed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 29th day of August, 2024.


*/s/  Michael Robinson*
Michael Robinson
Co-Chief Restructuring Officer