IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: § | | Chapter 11 |
| § | | |
| RHODIUM ENCORE LLC, *et al.*,[1] § | | Case No. 24-90448 (ARP) |
| § | | |
| Debtors. § | | |
| § | | (Joint Administration Pending) |
| § | | |

**DECLARATION OF MICHAEL ROBINSON IN SUPPORT OF EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) MODIFYING THE AUTOMATIC STAY, (D) SCHEDULING A FINAL HEARING, AND (E) GRANTING RELATED RELIEF**

I, Michael Robinson, pursuant to section 1746 of title 28 of the United States Code, hereby declare under the penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.  I am above 18 years of age, and I am competent to testify. I am the Co-Chief Restructuring Officer for the above-captioned debtors and debtors in possession (collectively, the "***Debtors***"), having served in that role since August 2024. I am also a Managing Director of the Debtors' proposed financial advisor, Province, LLC ("***Province***"), a US-based nationally recognized financial advisory firm focusing on corporate strategy and transformation, transaction advisory, valuation, dispute resolution, and fiduciary-related services, where I have worked in

---

[1] The Debtors in these chapter 11 cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), Rhodium 30MW LLC (0263), Rhodium Enterprises, Inc. (6290), Rhodium Technologies LLC (3973), Rhodium Renewables LLC (0748), Air HPC LLC (0387), Rhodium Shared Services LLC (5868), Rhodium Ready Ventures LLC (8618), Rhodium Industries LLC (4771), Rhodium Encore Sub LLC (1064), Jordan HPC Sub LLC (0463), Rhodium 2.0 Sub LLC (5319), Rhodium 10MW Sub LLC (3827), Rhodium 30MW Sub LLC (4386), and Rhodium Renewables Sub LLC (9511). The mailing and service address of the Debtors in these chapter 11 cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005.

1

various positions since 2019. I have over thirteen (13) years of experience in the financial services sector, initially through my work in investment banking advisory where I advised on a number of significant transactions across diverse industry verticals, and then through my work in restructuring advisory in which I have directly managed many in-court and out-of-court restructurings. Additionally, I am a Certified Insolvency and Restructuring Advisor, awarded from the Association of Insolvency and Restructuring Advisors, of which I am a member.

2. I submit this declaration in support of the *Emergency Motion of Debtors for Entry of Interim and Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* (the "**DIP Motion**").

3. Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents, (iii) information provided to me by Province employees working under my supervision, (iv) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, and/or (v) my opinion based upon my experience as a restructuring professional. If called to testify, I could and would testify to each of the statements set forth herein on that basis.

## PROVINCE'S RETENTION

4. Effective as of July 16, 2024, Province was retained to advise the Debtors in connection with an evaluation of alternatives with respect to their capital structure and a potential bankruptcy. Since that time, members of my team and I have worked closely with the Debtors' management and their other professionals in the analysis of the Debtors' business affairs, assets,

financial position, contractual arrangements, and various proposed strategic transactions. Pursuant to this work, my team and I have become familiar with the Debtors' capital structure, liquidity needs, and business operations.

5.      During Province's representation of the Debtors, I have, among other things, provided advice on strategic transaction alternatives, restructuring options, and financings. I have participated in negotiations between the Debtors and their creditors and other parties in interest. Members of my team and I have also assisted the Debtors in reviewing the terms, conditions, and the potential impact of various proposed transactions, including comparing iterations of debtor-in-possession financing proposals. Additionally, I have participated in numerous meetings with the Company's board of directors (the "***Board***") to, among other things, address the Debtors' need for postpetition financing generally, and terms of the proposed debtor-in-possession superpriority secured financing facility described herein (the "***DIP Facility***," and the lenders thereunder, the "***DIP Lenders***").

6.      I am not being compensated specifically for this testimony other than through payments received by Province as a professional proposed to be retained by the Debtors.

## SUMMARY OF RELIEF REQUESTED IN DIP MOTION

7.      Pursuant to the DIP Motion, the Debtors request entry of an interim order (the "***Interim DIP Order***"):[2]

   a.   Authorizing the Debtors to obtain postpetition financing on a superpriority secured basis in the initial amount of $15 million or 250 BTC upon entry of the Interim Order and the remaining aggregate principal amount of $15 million or 250 BTC upon entry of the Final Order, on the terms set forth in the DIP Loan Term Sheet;

---

[2]  Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the DIP Motion, the Declaration of David M. Dunn in Support of Chapter 11 Petitions and First Day Relief, and the Interim DIP Order, (each, as defined herein) as applicable.

3

b. Authorizing the DIP Loan Parties to (i) execute, deliver, and perform under the DIP Loan Term Sheet and each of the DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the DIP Loan Documents (collectively, the "**DIP Obligations**"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder;

c. Authorizing the DIP Borrower to incur all DIP Obligations, in accordance with this Interim Order and the DIP Loan Documents;

d. Granting to the DIP Agent, for the benefit of itself and the other DIP Lenders, the DIP Liens (as defined below) in all DIP Collateral (as defined below), as set forth in this Interim Order, subject to the Carve Out and subject to the relative priorities set forth in this Interim Order;

e. Granting to the DIP Agent, for the benefit of itself and the other DIP Lenders, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve Out, as set forth in this Interim Order;

f. Authorizing the Debtors to use the proceeds of the DIP Facility and the DIP Collateral, solely in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents, including the Approved Budget (as defined below), subject to any variances expressly permitted under the DIP Loan Term Sheet (the "**Permitted Variances**");

g. Approving certain stipulations, waivers, and releases by the Debtors with respect to the DIP Lenders, the DIP Loan Documents, the DIP Liens, the DIP Obligations, and the DIP Collateral, in each case, subject to the terms and provisions of this Interim Order;

h. Modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of this Interim Order and the DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, providing for the immediate effectiveness of this Interim Order, and granting related relief; and

i. Scheduling a final hearing (the "**Final Hearing**") on the Motion to consider entry of a final order (the "**Final Order**") authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and

conditions acceptable in all respects to the DIP Lenders, and approving the form of notice with respect to such Final Hearing.

8. I have personally observed, and it is therefore my opinion, based on my experience, in my professional judgment, and as a result of the broad marketing process undertaken regarding the DIP financing opportunity, that the proposed DIP Facility is the product of arm's-length negotiations, represents the best postpetition financing alternative available to the Debtors under the circumstances, and is in the best interest of the Debtors, their estates, and all parties in interest in these Chapter 11 Cases.

## DEBTORS' NEED FOR DIP FINANCING

9. The Debtors have an immediate and critical need to obtain DIP financing, among other reasons, to enable the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and hosting customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, and to fund expenses of these Chapter 11 Cases. The Debtors are entering chapter 11 with approximately $2.49 million of cash on hand and their operating cash flow, as currently projected, is not sufficient to fund both ongoing operations and expenses for the projected duration of the Chapter 11 Cases, as well as the costs associated with these Chapter 11 Cases.

10. The Debtors' prepetition capital structure is described in detail in paragraphs 71-77 of the First Day Declaration filed contemporaneously herewith.

11. As described in the First Day Declaration, the Debtors commenced these Chapter 11 Cases in large part due to liquidity concerns caused by interruptions in generating revenue, collecting receivables, and raising capital due to the actions of Whinstone, in addition to escalating litigation costs.

12. Beginning in July 2024, Province, with the assistance of the Debtors' management, undertook a detailed analysis of the Debtors' operations and funding needs. From this review and analysis, it became clear that the Debtors would require an infusion of capital to allow the Debtors to operate their business as they work with their advisors and key stakeholders to achieve their restructuring goals. Specifically, the Debtors and their advisors have determined that debtor in possession financing is necessary to ensure: (a) sufficient working capital to operate their business and to administer their estates; (b) an appropriate liquidity cushion to account for volatility in Bitcoin pricing and power pricing, as well as the existing and anticipated negative impacts to the Debtors' vendors and other counterparties; (c) the timely payment of administrative expenses to be incurred; and (d) a positive message to the market that these Chapter 11 Cases are sufficiently funded, which is critical to address concerns raised by the Debtors' employees, vendors, and other stakeholders.

13. Based on this analysis, the Debtors and their advisors concluded that the Debtors would require approximately $30 million of postpetition financing and access to Cash Collateral to finance their operations and maintain sufficient liquidity for these Chapter 11 Cases. The Debtors and their advisors continued to update the budget leading up to the Petition Date to account for changes in the Debtors' funding needs resulting from, among other things, the estimated timing of the commencement of these Chapter 11 Cases. The Debtors' current cash flow forecast is attached to the Interim DIP Order as **Exhibit A** (the "*Cash Flow Forecast*").

14. The Cash Flow Forecast reflects the Debtors' need for DIP financing to fund the Debtors' chapter 11 process, while maintaining minimum required operating liquidity to operate the Debtors' business. The Cash Flow Forecast, along with previous iterations thereof, has been shared with the DIP Lenders.

15. Under the proposed DIP Facility, the Debtors will gain critical access to DIP financing in the aggregate amount of up to $30 million or 500 BTC, with an Interim DIP Borrowing of $15 million or 250 BTC following entry of the Interim DIP Order.

16. In order for the Debtors to have sufficient time to prosecute these Chapter 11 Cases both efficiently and thoroughly, the DIP Lenders have provided a DIP Facility.

17. The Debtors intend to use funds from the Interim DIP Borrowing to, among other things, (i) avoid irreparable harm, (ii) pay outstanding prepetition amounts to employees, vendors, taxing authorities, and other critical stakeholders, (iii) pay ordinary course operating expenses to continue their bitcoin mining and hosting operations, and (iv) provide a stable path forward for the duration of these Chapter 11 Cases.

18. I have reviewed the DIP Motion, and it is my belief that the relief sought therein is (a) critical to ensure the uninterrupted operation of the Debtors' business and the success of the Debtors' Chapter 11 Cases, and (b) necessary to avoid immediate and potentially irreparable harm to the Debtors' estates. Absent the Court's entry of the Interim DIP Order, I believe the continued operation of the Company's business will be at risk, and could result in serious, immediate, and irreparable harm to the Debtors' estates, and their creditors. Approval of the Interim DIP Order will ensure the uninterrupted operation of the Company's business.

### **DEBTORS' EFFORTS TO OBTAIN POSTPETITION FINANCING**

19. Beginning in August 2024, the Debtors, through Province, launched a broad marketing process designed to maximize competition and solicit proposals from a wide range of prospective lenders, including (i) creditors already in the Debtors' capital structure, (ii) institutional and alternative lenders outside the Debtors' capital structure, and (iii) strategic parties. The Debtors' primary strategic considerations when marketing and financing the opportunity included the following (among others):

     i.     ***Adequate Sizing*** – adequate sizing to (i) fund the Debtors' contemplated Approved Budget and (ii) maintain optimal liquidity levels for operating the Debtors' business at all times;

     ii.     ***Competitive Pricing*** – competitive pricing and terms, including interest rate, nature of interest payments (i.e., paid-in-kind vs. cash), and fees; and

     iii.     ***Operational and Financial Flexibility*** – limited financial covenants and case controls, including milestones.

20. Because some of the Debtors' assets are encumbered, Province's strategy to obtain the best source of financing from the market was reflective of the practical realities of the Debtors' existing capital structure.

21. Province contacted 66 potential lenders that it believed may have been interested in providing the Debtors with postpetition financing.

22. While the Debtors analyzed and negotiated various proposals for postpetition financing, the Debtors ultimately determined that the best path forward would be pursuing the DIP Facility with the DIP Lenders.

23. The negotiations with the DIP Lenders were rigorous, marked by hard bargaining, and resulted in significant concessions by the DIP Lenders and additional benefits to the Debtors. I am confident that the Debtors would be unable to obtain this level of credit on more attractive terms, taken as a whole, within the timeframe required. I believe entry into the DIP Facility is a reasonable exercise of the Debtors' business judgment.

## KEY BENEFITS OF PROPOSED DIP FACILITY

24. It is my belief based on my work with the Debtors and my experience that the proposed DIP Facility is essential to fund these Chapter 11 Cases and provides significant benefit to the Debtors and their estates. The proposed DIP Facility is critical because, to support their operations, the Debtors require a liquidity infusion to fund various critical expenditures (as detailed above), which is satisfied by the proposed DIP Facility.

25. In addition to providing a liquidity infusion necessary to fund various critical expenditures, the proposed DIP Facility contains several favorable terms and conditions to the Debtors. Specifically, the proposed DIP Facility does not prime any of the Debtors' existing secured creditors, which avoids costly priming fights at the outset of the case, gives the Debtors flexibility to borrow either USD or Bitcoin, and contains competitive interest rates and fees.

26. As a result of comprehensive good-faith and arm's-length negotiations and a competitive dynamic, the proposed DIP Facility satisfies the Debtors' primary strategic considerations outlined above. Based on the foregoing, it is my belief that the DIP Facility will satisfy the Debtors' postpetition liquidity needs, will provide the Debtors with sufficient flexibility to operate their business in an efficient manner in the ordinary course of business, and is in the best interests of the Debtors and their estates.

**TERMS OF DIP FACILITY ARE REASONABLE UNDER THE CIRCUMSTANCES**

27. Based on my experience as a restructuring professional and my understanding of the Debtors' need for postpetition financing, the obligations, interest rate, fees, maturity, covenants, and milestones under the DIP Facility are reasonable, taken as a whole, under the circumstances. Further, based on my experience with DIP financing transactions and my involvement in the negotiation of the DIP Loan Agreement and pursuit of alternative postpetition financing proposals, the DIP Facility provides the best financing option currently available to the Debtors under the circumstances. In my view, the DIP Lenders have acted in good faith and have agreed to provide the DIP Facility to the Debtors on terms, taken as a whole, that I consider to be fair and reasonable under the current circumstances and market conditions.

28. *Junior Liens*. A portion of the Debtors' assets are encumbered by existing liens. Rather than insisting on a non-consensual priming lien on such encumbered property, the DIP Lenders have agreed to receive junior liens on such assets, with the goal of enhancing the collateral

securing the DIP Facility and avoiding objections from these other secured parties. The DIP Lenders would not provide capital without receiving liens that are junior to the liens securing these assets, which I believe is reasonable under the circumstances.

29. **_Liens on Unencumbered Assets._** In addition, the DIP Lenders require a perfected first priority security interest and lien on substantially all of the Debtors' unencumbered assets. Absent such protections, the DIP Lenders would not have agreed to provide the DIP Facility to the Debtors. I believe that the request for such liens on unencumbered assets is reasonable under the circumstances.

## FEES IN CONNECTION WITH THE DIP FACILITY ARE FAIR AND REASONABLE

30. The DIP Lenders have committed to provide a substantial amount of capital to ensure successful execution of the DIP Facility. In view of those commitments and the circumstances of these cases, including the magnitude of the Debtors' Chapter 11 Cases and the tangible benefit to the estates of a substantial committed postpetition financing, I believe that the consideration being provided to the DIP Lenders, taken as a whole, in exchange for providing such commitment, is reasonable in amount, appropriately compensates the DIP Lenders for their costs and the assurances they are providing to the process, and is necessary to obtain the DIP Facility, which will permit the Debtors to both (i) continue operating their business and (ii) maximize the value of their estates.

### A. DIP Fees

31. In consideration for the DIP Agent's and DIP Lenders' respective commitments in connection with the DIP facility, the Debtors have agreed to, among other things, (i) pay certain fees (the "**_DIP Fees_**"), (ii) pay reasonable and documented out-of-pocket fees and expenses for the DIP Lenders (including reasonable and documented fees and expenses of outside counsel) (the "**_Out-of-Pocket Expenses_**" and, together with the DIP Fees, the "**_DIP Fees_**

*and Expenses*"), and (iii) indemnify the DIP Lenders in accordance with the DIP Loan Agreement.

### B. DIP Fees Are Reasonable

32. The DIP Fees were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing. I do not believe that a financing commitment with terms similar to those in the DIP Facility is available to the Debtors for lower fees. Accordingly, I believe that the DIP Fees are reasonable under the circumstances of these Chapter 11 Cases.

33. In sum, it is my professional opinion that (i) the terms of the DIP Facility – including the fee structure and applicable interest rates are, taken as a whole, (a) within the range of comparable DIP financing transactions, and (b) are reasonable under the current circumstances and market conditions; (ii) the terms of the DIP Facility were the product of good faith, arm's-length negotiations; (iii) the DIP Facility will benefit all stakeholders in these Chapter 11 Cases; and (iv) absent the Court's entry of the Interim DIP Order, the Debtors' business will likely be immediately and irreparably harmed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 29th day of August, 2024.

*/s/ Michael Robinson*
Michael Robinson
Co-Chief Restructuring Officer

11