United States Bankruptcy Court
Southern District of Texas

**ENTERED**

August 30, 2024

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RHODIUM ENCORE LLC, *et al.*,[1] | § | Case No. 24-90448 (ARP) |
| | § | |
| Debtors. | § | |
| | § | (Jointly Administered) |
| | § | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN SECURED SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

(Relates to ECF No. 38)

Upon the motion (the "***Motion***")[2] of Rhodium Encore LLC ("***Rhodium Encore***") and each of its affiliates that are debtors and debtors in possession (collectively, the "***Debtors***") in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), pursuant to sections 105, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rules 2002-1, 4001-1(b), 4002-1 and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas and the Procedures for Complex Chapter 11 Bankruptcy Cases (together, the "***Local Bankruptcy Rules***")

---

[1]  The Debtors in these chapter 11 cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), Rhodium 30MW LLC (0263), Rhodium Enterprises, Inc. (6290), Rhodium Technologies LLC (3973), Rhodium Renewables LLC (0748), Air HPC LLC (0387), Rhodium Shared Services LLC (5868), Rhodium Ready Ventures LLC (8618), Rhodium Industries LLC (4771), Rhodium Encore Sub LLC (1064), Jordan HPC Sub LLC (0463), Rhodium 2.0 Sub LLC (5319), Rhodium 10MW Sub LLC (3827), Rhodium 30MW Sub LLC (4386), and Rhodium Renewables Sub LLC (9511).  The mailing and service address of the Debtors in these chapter 11 cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005.

[2]  Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the Motion or DIP Term Sheet (each as defined below), as applicable.

promulgated by the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Court***"), seeking entry of an interim order (this "***Interim Order***"), among other things:

(a)      authorizing the Debtors to obtain postpetition financing on a superpriority secured basis (the "***DIP Facility***", and the loans made, advanced or deemed advanced thereunder, the "***DIP Loans***") in accordance with and subject to the terms and conditions of that certain *Debtor-in-Possession Facility Terms and Conditions*, substantially in the form attached to this Interim Order as **Exhibit 1** and otherwise in form and substance acceptable to the DIP Agent (acting at the instruction of the DIP Lenders) (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "***DIP Term Sheet***"), the Approved Budget (as defined below), and all other agreements, guarantees, pledge, collateral and security agreements, mortgages, deeds, charges, control agreements, instruments, certificates, notes, any separate fee letter agreements between any of the Debtors, on the one hand, and the DIP Agent (as defined below) or the DIP Lenders, on the other hand, and other documents executed, filed or delivered in connection therewith, including the "DIP Loan Documents" (as defined in the DIP Term Sheet) (each as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the  terms hereof and thereof, together with the DIP Term Sheet and the Approved Budget, collectively, the "***DIP Loan Documents***")), by and among Rhodium Technologies LLC, as borrower (the "***DIP Borrower***"), Rhodium Enterprises, Inc., as a guarantor, and all of the DIP Borrower's direct or indirect subsidiaries that are or become debtors and debtors-in-possession in these Chapter 11 Cases (together with Rhodium Enterprises, Inc., the "**DIP Guarantors**", and together with the DIP Borrower, the "***DIP Loan Parties***"), Galaxy Digital, LLC, as administrative agent and collateral agent (in such capacities, together with its successors and permitted assigns, the "***DIP Agent***"), and the lenders party thereto from time to time (together with their successors and permitted assigns, the "***DIP Lenders***", and together with the DIP Agent, the "***DIP Secured Parties***"), and this Interim Order;

(b)      authorizing the DIP Loan Parties to (i) execute, deliver, and perform under the DIP Term Sheet and each of the other DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the DIP Loan Documents, including without limitation, all "Obligations" (as defined in the DIP Term Sheet) (collectively, the "***DIP Obligations***"), whether or not such obligations arose before or after the applicable Petition Date, whenever the same shall become due or payable, whether at stated maturity, by prepayment, declaration, acceleration or otherwise, in each case, in accordance with the DIP Loan Documents and this Interim Order, and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c)     authorizing the DIP Borrower to incur, and the DIP Guarantors to guarantee on an unconditional joint and several basis, all DIP Obligations, in accordance with this Interim Order and the DIP Loan Documents;

(d)     granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, the DIP Liens (as defined below) in all DIP Collateral (as defined below), as set forth in this Interim Order, subject to the Carve Out and subject to the relative priorities set forth in this Interim Order;

(e)     granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, allowed super-priority administrative expense claims against each of the Debtors in each of the Chapter 11 Cases and any Successor Cases (as defined below), on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve Out, as set forth in this Interim Order;

(f)     authorizing the Debtors to use the proceeds of the DIP Facility and the DIP Collateral, solely in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents, including the Approved Budget, subject to any variances expressly permitted herein and under the DIP Loan Documents (the "***Permitted Variances***");

(g)     approving certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, the DIP Secured Parties, the DIP Loan Documents, the DIP Liens, the DIP Obligations and the DIP Collateral, in each case, subject to the terms and provisions of this Interim Order;

(h)     approving the Debtors' waiver of (a) the right to surcharge the DIP Collateral as to the DIP Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, (b) the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the DIP Secured Parties, and (c) the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the DIP Collateral as to the DIP Secured Parties and the DIP Obligations, in each case, upon the terms set forth in this Interim Order;

(i)     modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of this Interim Order and the DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, providing for the immediate effectiveness of this Interim Order, and granting related relief; and

(j)     scheduling a final hearing (the "***Final Hearing***") on the Motion to consider entry of a final order (the "***Final Order***") authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and conditions acceptable in all respects to the DIP Secured Parties, and approving the form of notice with respect to such Final Hearing.

The Court, having considered the Motion, the DIP Loan Documents, the exhibits attached thereto, the *Declaration of David M. Dunn in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"), the *Declaration of Michael Robinson in Support of Debtor-in-Possession Financing* (the "**DIP Declaration**"), the evidence submitted and arguments proffered or adduced at the interim hearing held before this Court on August 30, 2024 (the "**Interim Hearing**"), and upon the record of the Chapter 11 Cases; and due and proper notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Bankruptcy Rules; and it appearing that no other or further notice need be provided; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; the Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing established just cause for the relief granted herein; and it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, their creditors, and all other parties in interest, represents a sound exercise of the Debtors' business judgment, is necessary for the continued operation of the Debtors' businesses and is necessary to preserve and maximize the value of the Debtors and their estates; and the Debtors

having provided notice of the Motion as set forth in the Motion; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.     *Petition Date.* On August 24, 2024 (the "***Initial Petition Date***") and August 29, 2024 (the "***Subsequent Petition Date***"),[4] each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing these Chapter 11 Cases.

B.     *Debtors in Possession.* The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.     *Committee Formation.* As of the date hereof, the Office of the United States Trustee (the "***U.S. Trustee***") has not appointed an official statutory committee of unsecured creditors in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (to the extent appointed in the Chapter 11 Cases, the "***Official Committee***").

D.     *Jurisdiction and Venue.* This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  This Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for these Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief set forth herein are sections 105, 362,

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

[4]     As used herein, "***Petition Date***" means the Initial Petition Date; provided that with respect to the Debtors which commenced their Chapter 11 Cases subsequent to August 24, 2024, "***Petition Date***" shall refer to the respective dates on which such Chapter 11 Cases were commenced.

363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Bankruptcy Rules 2002-1, 4001-1(b), 4001-2 and 9013-1.

E.      *Findings Regarding Corporate Authority.* Each of the DIP Loan Parties has all requisite power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

F.      *Findings Regarding DIP Facility.*

(a)      *Good Cause.* Good and sufficient cause has been shown for the entry of this Interim Order and for the Debtors to obtain postpetition financing pursuant to the terms hereof and the DIP Loan Documents.

(b)      *Need for Postpetition Financing.* The Debtors have an immediate and critical need to obtain the DIP Facility in order to, among other things, (i) permit the orderly continuation and operation of their businesses, (ii) maintain business relationships with customers, vendors and suppliers, (iii) make payroll, (iv) make capital expenditures, (v) pay the expenses of the Chapter 11 Cases, (vi) satisfy working capital and operational needs of the Debtors, and (v) for general corporate purposes, in each case, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Loan Documents, including the Approved Budget (subject to Permitted Variances).  The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of loans and other financial accommodations under the DIP Facility in order to preserve, maintain and maximize the going concern value of the Debtors and to facilitate an orderly and successful reorganization of the Debtors.  Without access to the DIP Facility upon the terms set forth herein, the Debtors and their estates will be immediately and irreparably harmed.

(c)      *No Credit Available on More Favorable Terms.* The Debtors are unable to obtain financing or other financial accommodations on more favorable terms from sources other than the DIP Secured Parties.   The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.   The Debtors are also unable to obtain adequate secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Secured Parties the rights, benefits, remedies and protections set forth herein and the DIP Loan Documents, including the DIP Liens in all DIP Collateral and the DIP Superpriority Claims (as defined below), in each case, upon the terms set forth herein.

(d)      *Use of Proceeds of DIP Facility.* As a condition to providing the DIP Facility, each of the DIP Secured Parties require, and the Debtors have agreed, that all proceeds of the DIP Loans shall be used or applied solely for the purposes expressly permitted in, and in a manner consistent with, the Approved Budget (subject to Permitted Variances) and the other DIP Loan Documents, including (i) to pay the costs of administration of the Chapter 11 Cases, (ii) for general corporate and working capital purposes, (iii) to pay professional fees and expenses in accordance with this Interim Order, and (iv) other Approved Uses (as defined in the DIP Term Sheet), in each case, subject to the terms and conditions of this Interim Order and the DIP Loan Documents.

(e)      *Approved Budget.*  The Debtors have prepared and delivered to the DIP Secured Parties the initial itemized cash flow forecast set forth on **Exhibit 2** attached hereto, which has been approved by the DIP Secured Parties (the "***Initial Budget***", as amended, supplemented or updated by the Debtors, and approved by the DIP Secured Parties, from time to time in accordance with the terms of this Interim Order and the DIP Term Sheet, the "***Approved Budget***"),

reflecting, on a line item, cumulative and aggregate basis, (i) the Debtors' projected cash receipts expected to be collected, and necessary disbursements and expenditures (including debt service costs) expected to be incurred or made, by the Debtors for each calendar week during the period from the calendar week ending on the Friday of the week in which the Subsequent Petition Date occurs through and including the end of the thirteenth (13th) calendar week thereafter, (ii) the sum of weekly unused availability under the DIP Facility, plus restricted and unrestricted balances of cash on hand, (iii) the weekly outstanding principal balance of amounts outstanding under the DIP Facility, and (iv) a professional fee accrual budget with respect to the anticipated professional fees and expenses to be incurred by each of the Professional Persons (as defined below) during such period.  The Initial Budget is an integral part of this Interim Order, and the DIP Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject to Permitted Variances) in determining to enter into the DIP Facility and to allow the Debtors' use of proceeds of the DIP Facility in accordance with the terms of this Interim Order and the DIP Loan Documents.

(f)      *Section 506(c), Section 552(b), and Marshaling.*  As a material inducement to the DIP Secured Parties' agreement to provide the DIP Facility, and in consideration of (i) the DIP Secured Parties' agreement to subordinate the DIP Liens to the Carve Out, and (ii) the DIP Secured Parties' agreement to pay the expenses of the administration of the Chapter 11 Cases, subject to the Approved Budget, and in accordance with the terms of this Interim DIP Order and the DIP Loan Documents, (a) the Debtors waive their right to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Secured Parties or the DIP Collateral as to the DIP Secured Parties, whether pursuant to section 506(c) of the Bankruptcy Code or otherwise, (b) the DIP Secured Parties shall not be

8

subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral as to the DIP Secured Parties, and (c) the Debtors waive the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the DIP Collateral as to the DIP Secured Parties and the DIP Obligations.

(g)    *Good Faith.* The terms of the DIP Facility and the DIP Loan Documents were negotiated in good faith and at arm's length among the DIP Loan Parties, the DIP Secured Parties, and their respective representatives, and all of the DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility, the DIP Loan Documents and this Interim Order, including, without limitation, all loans, advances, extensions of credit and other financial accommodations made to and guarantees issued by the DIP Loan Parties pursuant to the DIP Loan Documents, shall each be deemed to have been extended by the DIP Secured Parties and each of their respective affiliates, in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by sections 364(e) of the Bankruptcy Code, and each of the claims, liens and security interests, rights, remedies, benefits and protections granted to the DIP Secured Parties (and their successors and assigns) pursuant to this Interim Order and the DIP Loan Documents (including, without limitation, the DIP Liens, the DIP Superpriority Claims, and the DIP Obligations) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(h)    *Proper Exercise of Business Judgment.* Based on the Motion, the First Day Declaration, the DIP Declaration, the record presented to the Court at the Interim Hearing and the Chapter 11 Cases and the terms of the DIP Facility and the DIP Loan Documents, (i) were negotiated in good faith and at arm's length among the DIP Loan Parties and the DIP Secured

Parties, (ii) are fair, reasonable, and the best available to the Debtors under the circumstances, (iii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (iv) are supported by reasonably equivalent value and fair consideration.

(i)     *Notice*. Proper, timely, sufficient and appropriate notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and no other or further notice of the Motion, the Interim Hearing or the entry of this Interim Order shall be required.

(j)     *Immediate Entry; Relief Essential*. The Debtors have requested, and the Court hereby finds that sufficient cause exists for, the immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.  Unless the relief set forth in this Interim Order is granted, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility upon the terms set forth in this Interim Order and the DIP Loan Documents are necessary to preserve and maximize the value of the Debtors, are in the best interests of the Debtors and their estates, and are consistent with the Debtors' exercise of their fiduciary duties.

**NOW THEREFORE**, based upon the foregoing findings and conclusions, the Motion, the First Day Declaration, the DIP Declaration, the evidence adduced at the Interim Hearing and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.     *Motion Granted.* The Motion is hereby granted on an interim basis, and the DIP Facility is hereby authorized and approved on an interim basis, in each case, upon the terms and

conditions set forth in this Interim Order and the DIP Loan Documents.[5]  Any objections to any of the relief set forth in this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights or other statements inconsistent with this Interim Order, are hereby denied and overruled.  This Interim Order shall become effective and enforceable immediately upon its entry.

2.    *Authorization of DIP Facility and DIP Loan Documents.*

(a)    *Authorization of DIP Loan Documents.* The DIP Loan Parties are hereby authorized to (i) execute, deliver, enter into and perform all of their obligations, and to pay all fees, costs, expenses, indemnities and other amounts contemplated, under the DIP Loan Documents and this Interim Order, and (ii) perform all acts, to make, execute, deliver, enter into and perform under any and all other agreements, instruments, certificates, and other documents (including, without limitation, the execution or recordation of any collateral, pledge and security documents, mortgages, deeds of trust, control agreements, financing statements or other  documents), and to perform all such other and further acts, that may be necessary, required or desirable for the DIP Loan Parties to perform their obligations under the DIP Facility, the DIP Loan Documents and this Interim Order and to implement the transactions contemplated thereunder and hereunder.  All provisions of the DIP Loan Documents are incorporated herein and approved in their entirety, whether explicitly referenced or not.

(b)    *Authorization to Borrow.* The DIP Borrower is hereby authorized to borrow, and the DIP Guarantors on an unconditional and joint and several basis are hereby authorized to

---

[5]    Notwithstanding anything contained in this Interim Order to the contrary, the Debtors are not authorized to use any "cash collateral" (within the meaning of section 363(a) of the Bankruptcy Code) of the Prepetition Secured Parties  (as defined in the DIP Term Sheet) ("***Cash Collateral***") pursuant to this Interim Order.

guarantee, and hereby do guarantee, the Payment in Full[6] in either cash or BTC (as set forth in the DIP Loan Documents) of such borrowing with respect to, the principal amount of $15 million or 250 Bitcoin (plus applicable interest (including interest and other amounts payable-in-kind), premiums, payments, fees (including professional fees and expenses and the Unfunded Committee Fee, the Up Front Fee, and the Exit Fee (each as defined in the DIP Term Sheet)), costs, expenses, charges and other amounts payable under this Interim Order and the DIP Loan Documents in connection with such borrowing), under the DIP Facility, subject to the terms and conditions (including any conditions precedent to such borrowing) set forth in the DIP Loan Documents and this Interim Order.  The Debtors are hereby authorized to use the proceeds of the DIP Facility solely in the manner and for the purposes expressly permitted in the Approved Budget (subject to Permitted Variances), the DIP Loan Documents and this Interim Order.

(c)     *DIP Fees and Expenses; Indemnification.*  The DIP Loan Parties are authorized and directed to pay any and all (i) fees, premiums or other payments payable under the DIP Loan Documents including, without limitation, the Unfunded Commitment Fees, the Up Front Fee, the Exit Fee, and other charges, fees or amounts provided therein, (ii) amounts due (or that may become due) to the DIP Secured Parties in in respect of the indemnification obligations under the DIP Loan Documents, and (iii) any other amounts payable in connection with the DIP Facility, including without limitation, the payment of all out of pocket costs, expenses and disbursements of the DIP Secured Parties, including, without limitation, the reasonable and documented fees and

---

[6]     For purposes hereof, the term "***Paid in Full***" or "***Payment in Full***" means (i) in the case of USD DIP Loans (as defined in the DIP Term Sheet), repayment in full and in cash of all outstanding amounts of principal, and payment of all accrued interest and any other amounts owing under the USD DIP Facility (as defined in the DIP Term Sheet), and (ii) in the case of BTC DIP Loans (as defined in the DIP Term Sheet), (a) repayment in full and in Bitcoin ("***BTC***") of all outstanding amounts of principal, and payment of all accrued interest and any other amounts owing under the BTC DIP Facility (as defined in the DIP Term Sheet) or (b) to the extent that the DIP Secured Parties provide prior written consent to the same, repayment in full and in cash (calculated at the Exchange Rate (as defined in the DIP Term Sheet)) of all outstanding amounts of principal, and payment of all accrued interest and any other amounts owing under the DIP Facility.

expenses of (A) Orrick, Herrington & Sutcliffe LLP, as counsel to the DIP Secured Parties and (B) any other professionals that may be retained by the DIP Secured Parties from time to time (in the case of this underline(sub-clause (B)), with the consent of the DIP Borrower, such consent not to be unreasonably withheld or delayed, which consent of the DIP Borrower shall not be required after the occurrence of a DIP Termination Event (as defined below) (collectively, the "**DIP Professional Fees and Expenses**"), in the case of each of the foregoing clauses (i), (ii) or (iii), whether or not such payments, premiums, fees, costs, expenses, disbursements or other amounts arose before, on or after the Initial Petition Date, and whether or not the transactions contemplated herein or in the DIP Loan Documents are consummated.

(d)    *Modification of DIP Loan Documents.* The DIP Loan Parties are hereby authorized to execute, deliver and perform under one or more amendments, waivers, consents, or other modifications (including, for the avoidance of doubt, the payment of any amendment fee, consent fee, waiver fee or similar fee paid or payable in connection therewith) to and under the DIP Loan Documents, in each case, in accordance with the provisions of the DIP Term Sheet governing amendments thereto, each without further application to or order of the Court; *provided, however,* that any amendment to the DIP Term Sheet shall require, at a minimum, the prior written consent of the DIP Secured Parties; *provided, further, however*, that any amendment that (a) shortens the maturity of the DIP Facility, (b) increases the aggregate commitments thereunder, or (c) increases the rate of interest payable with respect thereto (other than the imposition of the default rate to the extent permitted under such DIP Loan Document) (each, a "**Material DIP Amendment**"), shall be provided (which may be by electronic mail) to the U.S. Trustee and lead restructuring counsel to the Official Committee and filed with the Court no later than three (3) Business Days prior to the anticipated date of effectiveness of any such Material DIP Amendment,

and if no objection to the Material DIP Amendment is made by the U.S. Trustee or the Official Committee within such three (3) Business Day period, then, without further application to or order of the Court, such Material DIP Amendment shall automatically be deemed approved and effective; *provided further, however,* if an objection is made by the U.S. Trustee or the Official Committee within such three (3) Business Day period, then such Material DIP Amendment shall be subject to a hearing and approval of the Court.  Updates, modifications, and supplements to the Approved Budget approved in writing by the DIP Secured Parties shall not require any further approval of this Court.

(e)     *DIP Funding Account*. Upon entry of this Interim Order, the DIP Borrower is hereby authorized and directed to establish the a segregated reserve bank account (the "***DIP Funding Account***"), which shall be subject to a control  agreement in form and substance acceptable to the DIP Secured Parties, and the DIP Agent shall be deemed to have "control" over the DIP Funding Account for all purposes of perfection under the Uniform Commercial Code pursuant to such control agreement and this Interim Order.  Subject to the Carve Out, from and after the Initial Petition Date, until all DIP Obligations are Paid in Full (as defined below), the proceeds of all DIP Loans under the DIP Facility shall be deposited into the DIP Funding Account, which amounts may not be withdrawn or used by the DIP Loan Parties other than as expressly permitted under the Approved Budget and in the other DIP Loan Documents, and with all funds held in the DIP Funding Account deemed to be DIP Collateral (provided that the DIP Funding Account shall not be subject to any liens of the Prepetition Secured Parties).

(f)     *Perfection in Cash*. Subject to the Carve Out, all financial institutions with which the DIP Loan Parties maintain accounts containing any cash proceeds of the DIP Loans are authorized and directed to comply with any request of the DIP Secured Parties to turn over to the

DIP Agent all such cash proceeds therein without offset or deduction of any kind.  The DIP Agent shall be entitled to all of the rights and benefits of all deposit account control agreements, blocked account control agreements, securities account control agreements, and similar agreements to which any of the DIP Loan Parties may be a party, without the need to enter into any such agreements.  Notwithstanding (and without limiting) the foregoing, the DIP Loan Parties are authorized to enter into, and cause the financial institutions servicing or maintaining the DIP Loan Parties' deposit accounts (or other accounts) to enter into, such deposit account control agreements and other collateral agreements with the DIP Agent and such financial institutions as the DIP Secured Parties may reasonably request.

3.      *DIP Obligations.*

(a)      Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute valid, binding, enforceable, and non-avoidable obligations of each of the DIP Loan Parties, and shall be fully enforceable against each of the DIP Loan Parties, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing (collectively, the "***Successor Cases***"), or upon the dismissal of any of the Chapter 11 Cases or any such Successor Cases, in each case, in accordance with the terms of the DIP Loan Documents and this Interim Order.

(b)      Upon execution and delivery of the DIP Loan Documents, the DIP Loan Parties shall be jointly and severally liable for all DIP Obligations, including, without limitation, all loans, advances, indebtedness, obligations, extensions of credit, financial accommodations, principal, interest, payments, premiums or similar amounts, fees (including, without limitation, the

Unfunded Commitment Fees, the Up Front Fee, and the Exit Fee), costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other amounts, whether or not such obligations arose before or after the Initial Petition Date, whenever the same shall become due and payable, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, to the DIP Secured Parties under the DIP Loan Documents or this Interim Order. The DIP Obligations shall be due and payable, without notice or demand, on the DIP Termination Declaration Date (as defined below), as set forth below.

(c)    All obligations incurred, payments made, and transfers or grants of liens and security interests set forth in this Interim Order and the DIP Loan Documents by the DIP Loan Parties are granted to or for the benefit of the DIP Loan Parties for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby.  No obligation, payment, transfer, or grant of liens or security interests under this Interim Order or the DIP Loan Documents to the DIP Secured Parties shall be limited, stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any challenge, objection, defense or claim, including, without limitation, avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or other cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise (subject, solely in the case of the

DIP Professional Fees and Expenses (as defined below), only to the procedures set forth in paragraph 10 of this Interim Order).

4.       *No Obligation to Extend Credit/New Money Loan Cap.* The DIP Secured Parties shall have no obligation to make any loan or advance available under the DIP Loan Documents unless all of the conditions precedent to the making of such loan or advance by the DIP Secured Parties have been satisfied in full (or waived) in accordance with the terms of the DIP Loan Documents and this Interim Order.

5.       *No Duty to Monitor Compliance.* None of the DIP Secured Parties shall have any obligation or responsibility to monitor the Debtors' use of DIP Collateral and each of the DIP Secured Parties may rely upon the Debtors' representations that the use of DIP Collateral complies with and is in accordance with the requirements of this Interim Order and the DIP Loan Documents.

6.       *DIP Liens.*

(a)       As security for the prompt and complete payment and performance of all DIP Obligations when due (whether upon stated maturity, prepayment, acceleration, declaration or otherwise), effective and perfected as of the entry of this Interim Order, and without the necessity of the execution, recordation or filing by any of the DIP Loan Parties or the DIP Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title, or any similar document or instrument, or the taking of any other action (including, without limitation, entering into any control agreements or taking any other action to take possession or control of any DIP Collateral), the DIP Agent, for the benefit of itself and the other DIP Secured Parties, is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the

"**DIP Liens**") in all DIP Collateral, in each case, subject and subordinate to the Carve Out, and subject to the relative priorities set forth in this Interim Order.

(b)    The term "**DIP Collateral**" means all now owned or hereafter acquired assets and property of the each of the Debtors, including real and personal property, whether existing on the applicable Petition Date or thereafter acquired and wherever located, tangible or intangible, including, without limitation, (i) plant and equipment and the proceeds thereof, (ii) all litigation and other claims and the proceeds thereof including all commercial tort claims and the Whinstone Litigation (as defined in the DIP Term Sheet) and any proceeds thereof, (iii) the Prepetition Notes Collateral (as defined in the DIP Term Sheet), whether existing on the applicable Petition Date or thereafter acquired, (iv) all property of the Debtors subject to Prior Permitted Liens,[7] (v) all property of the Debtors, whether existing on the applicable Petition Date or thereafter acquired that is not subject to valid, perfected, and non-avoidable liens or perfected after the applicable Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code ("**Previously Unencumbered Property**"), and, (vi) upon entry of the Final Order, all proceeds of claims and causes of action under sections 502(d), 506(c), 544, 545, 547, 548, 549, 550, or 724(a) of the Bankruptcy Code.

(c)    The DIP Liens shall be subject to the priorities set forth below (subject in each case to the Carve Out):

(i)    *First Priority Liens on Unencumbered Property.* Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral to the extent that such DIP Collateral is not Prepetition Notes Collateral, including all Previously Unencumbered Property (including,

---

[7]    "**Prior Permitted Liens**" means valid, perfected and non-avoidable senior liens in existence immediately prior to the applicable Petition Date or valid and non-avoidable liens in existence immediately prior to the applicable Petition Date that are perfected subsequent to such Petition Date as permitted by section 546(b) of the Bankruptcy Code.  For the avoidance of doubt, Prior Permitted Liens shall not include any Prepetition Notes Liens (as defined in the DIP Term Sheet).

subject to entry of the Final Order, all proceeds of claims and causes of action under sections 502(d), 506(c), 544, 545, 547, 548, 549, 550, or 724(a) of the Bankruptcy Code), subject only to the Carve Out and junior only to the Prior Permitted Liens, if any, on such assets, and senior to all other liens on such assets.

(ii)     *Liens Junior to Certain Other Liens.* Pursuant to sections 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral (other than the DIP Collateral described in paragraph 6(c)(i) hereof, as to which DIP Liens are described in such paragraph), subject only to the Carve Out and junior only to the Prepetition Notes Liens and Prior Permitted Liens, if any, on such assets, and senior to all other liens on such assets.

(d)     Other than as set forth herein or in the DIP Loan Documents (including subject to the Prior Permitted Liens and the Carve Out), the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), or upon the dismissal of any of the Chapter 11 Cases or Successor Case.  The DIP Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any of the Debtors' estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

(e)     Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person or entity, in order for any Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any interest therein (including any fee or leasehold interest), any proceeds thereof or other DIP Collateral, shall be deemed inconsistent with the provisions of the Bankruptcy Code and shall have

19

no force or effect with respect to the granting of the DIP Liens in any such interest therein or other DIP collateral, or in the proceeds of any assignment or sale thereof by any Debtor in favor of the DIP Secured Parties in accordance with the DIP Loan Documents and this Interim Order.

7.　　*DIP Superpriority Claims.* Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors, with priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, any and all other administrative expense claims of the kind specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "***DIP Superpriority Claims***"), subject only to the Carve Out.  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The DIP Superpriority Claims shall be payable by each of the Debtors, on a joint and several basis.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

8.　　*Use of DIP Collateral.*

(a)　　The Debtors are hereby authorized to use the proceeds of the DIP Loans solely to the extent expressly permitted under the Approved Budget (subject to Permitted Variances) and subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order.

(b)      Without the prior written consent of the DIP Secured Parties, the DIP Loan Parties shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so), except as may be expressly permitted by the DIP Loan Documents and this Interim Order.  All collection and proceeds of DIP Collateral, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnation, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents.  The Debtors shall not transfer any cash, assets, properties or other DIP Collateral to any DIP Loan Party or other affiliate of the Debtors that is not a Debtor in these Chapter 11 Cases without the prior written consent of the DIP Secured Parties, in their discretion.

(c)      Except as may be provided in the DIP Loan Documents, the Debtors are authorized and directed, upon the closing of a sale of any of the DIP Collateral, to immediately pay all proceeds of any such sale, subject to the relative priorities set forth in this Interim Order, to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, to satisfy the DIP Obligations in accordance with this Interim Order and the DIP Loan Documents until Paid in Full, and any order approving the sale of such DIP Collateral shall provide that the sale is conditioned upon the payment of such DIP Obligations (except to the extent otherwise agreed in writing by the DIP Secured Parties).

9.      *Approved Budget.*  The DIP Loan Parties shall comply at all times with the Approved Budget then in effect (subject to Permitted Variances).  Any amendments, supplements or updates to the Initial Budget (or any subsequent Approved Budget) (each, a "***Budget Supplement***") shall be subject to the prior approval of the DIP Secured Parties in accordance with the DIP Term Sheet, and any such Budget Supplement shall not constitute an "Approved Budget"

unless and until it is so approved by the DIP Secured Parties (and until any such Budget Supplement is approved by the DIP Secured Parties, the prior Approved Budget shall remain in effect).

10.     *Fees and Expenses; Payments.*

(a)     The payment of all DIP Professional Fees and Expenses hereunder shall not be subject to further application to or approval of the Court, and shall not be subject to allowance or review by the Court or subject to the U.S. Trustee's fee guidelines, and no attorney or advisor to the DIP Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

(b)     Notwithstanding anything contained in this paragraph 10 to the contrary, upon the Initial Availability (as defined in the DIP Term Sheet), the DIP Loan Parties are authorized and directed to pay in full in cash all DIP Professional Fees and Expenses arising through and including the Initial Availability.

(c)     Notwithstanding anything contained in this Interim Order to the contrary, any and all payments, premiums, fees, costs, expenses and other amounts paid at any time by any of the DIP Loan Parties to the DIP Secured Parties pursuant to the requirements of this Interim Order or the DIP Loan Documents, whether prior to, on or after the Initial Petition Date, shall be non-refundable and irrevocable, are hereby approved (and to the extent paid prior to entry of the Interim Order, ratified in full), and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including, without limitation, avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization,

subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge or recovery or any other cause of action, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity (subject, solely in the case of the DIP Professional Fees and Expenses, to paragraphs 10(a), (b) and (c) of this Interim Order).

11. *Reservation of Rights.* Except as otherwise expressly provided herein or in the DIP Loan Documents, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Secured Parties to seek any other or supplemental relief in respect of the DIP Loan Parties, (b) the rights of the DIP Secured Parties under the DIP Loan Documents, the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to request modification of the automatic stay of section 362 of the Bankruptcy Code, (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or (d) the rights of the Prepetition Secured Parties.

12. *Modification of Automatic Stay.* The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without application to or further order of this Court, to permit: (a) the DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Secured Parties may request to assure the perfection and priority of the DIP Liens, (b) the DIP Loan Parties to incur all liabilities and obligations to the DIP Secured Parties as contemplated under this Interim Order and the DIP Loan Documents, (c) the DIP Loan Parties to pay all amounts required hereunder and under the DIP Loan Documents, (f) the DIP Secured Parties to retain and apply payments made in accordance with the terms of this Interim Order and the DIP Loan Documents, (g) as set forth below, the DIP Secured Parties to exercise, upon the occurrence of any DIP Termination Event (as defined below), all rights and

remedies provided for in this Interim Order, the DIP Loan Documents, or applicable law, (h) the DIP Loan Parties to perform under this Interim Order and the DIP Loan Documents, and to take any and all other actions that may be necessary, required or desirable for the performance by the DIP Loan Parties under this Interim Order and the DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder, and (i) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the DIP Loan Documents.

13. *Perfection of DIP Liens.*

(a)    This Interim Order shall be sufficient and conclusive evidence of the attachment, validity, perfection, and priority of all liens and security interests granted hereunder and under the DIP Loan Documents, including, without limitation, the DIP Liens, without the necessity of the execution, recordation or filing of any pledge, collateral or security agreements, mortgages, deeds of trust, lockbox or control agreements, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any deposit account control agreement or other act to take possession or control of any DIP Collateral), to attach, validate, perfect or prioritize such liens and security interests, or to entitle the DIP Secured Parties to the priorities granted herein (other than, to the extent applicable, any such filings required under applicable non-U.S. law to attach, validate, perfect or prioritize such liens).

(b)    Without in any way limiting the automatically effective perfection of the liens and security interests granted under this Interim Order and the DIP Loan Documents, the DIP Agent is hereby authorized, but not required, as it in its sole discretion may determine for any reason, to execute, file and record (and to execute in the name of the DIP Loan Parties, as their

24

true and lawful attorneys, with full power of submission, to the maximum extent permitted under applicable law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession or control over cash or securities, or to amend or modify security documents, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to validate, perfect, preserve and enforce the liens and security interests granted to them hereunder or under the DIP Loan Documents or to otherwise evidence such liens and security interests in all DIP Collateral (each, a "**Perfection Action**"); *provided, however,* that, whether or not the DIP Agent determines, in its sole discretion, to take any Perfection Action with respect to any liens or security interests granted hereunder, such liens and security interests shall nonetheless be deemed valid, perfected, allowed, enforceable and non-avoidable as of the entry of this Interim Order.  Upon the request of the DIP Agent, the DIP Loan Parties, without any further consent of any party, are authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the applicable Petition Date.

(c)    A certified copy of this Interim Order may, as the DIP Agent may determine in its discretion, be filed with or recorded in filing or recording offices in addition to or in lieu of any financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent to take all actions, as applicable, referenced in this paragraph 13.

14.     *Maintenance of DIP Collateral.* Until such time as all DIP Obligations are Paid in Full (or as otherwise agreed in writing by the DIP Secured Parties), the DIP Loan Parties shall continue to maintain all property, operational, and other insurance as required and as specified in the DIP Loan Documents.  Upon the entry of this Interim Order, the DIP Agent, for the benefit of itself and the DIP Secured Parties, shall automatically be deemed to be named as additional insured and lender loss payee under each insurance policy maintained by the DIP Loan Parties (including all property damage and business interruption insurance policies of the DIP Loan Parties, whether expired, currently in place, or to be put in place in the future), and the DIP Loan Parties shall act as agent for the DIP Secured Parties in the event that the DIP Loan Parties receive any insurance proceeds directly from the insurance company or any other party, shall hold such payments in trust for the DIP Secured Parties, and shall immediately distribute any such proceeds recovered or received in respect of any such insurance policies in accordance with the terms of this Interim Order and the DIP Loan Documents for application in accordance with the DIP Term Sheet.

15.     *Payments Held in Trust.* Except as expressly permitted in this Interim Order or the DIP Loan Documents, including in respect of the Carve Out, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral (other than any payment made in accordance with the Approved Budget) or any proceeds of the DIP Collateral prior to Payment in Full of all DIP Obligations under the DIP Loan Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral and shall immediately turn over such proceeds to the DIP Secured Parties, for application in accordance with the DIP Term Sheet, other than with respect to the Prepetition Notes Collateral.

16.     *Cash Management.* Until such time as all DIP Obligations are Paid in Full, the DIP Loan Parties shall maintain the cash management system in accordance with the applicable "first day" order, which shall be in form and substance acceptable to the DIP Secured Parties.  Except as expressly provided herein, the DIP Loan Parties shall not open any new deposit or securities account that is not subject to the liens and security interests of the DIP Secured Parties (in which case they shall be subject to the lien priorities and other provisions set forth in this Interim Order).

17.     *Reporting.* Without limiting the requirements contained herein or in the DIP Loan Documents, the DIP Loan Parties and their representatives shall (a) provide the DIP Secured Parties, and the Official Committee (and each of their respective advisors) with (i) all reports, documents, and information required to be delivered under the DIP Loan Documents (contemporaneously when the same is required to be delivered thereunder), and (ii) reasonable access, upon reasonable notice and during regular business hours, to the DIP Loan Parties' books and records, assets and properties, for purposes of monitoring the DIP Loan Parties' businesses and operations and the value of the DIP Collateral, and (b) cooperate and consult with, and provide information reasonably requested by the DIP Secured Parties, or the Official Committee (and their respective advisors) concerning the DIP Loan Parties' businesses, financial condition, properties, business operations and assets, and the DIP Loan Parties hereby authorize their representatives to cooperate and consult with, and promptly provide to the such parties (in each case, together with their respective advisors) such information.

18.     *DIP Termination Event; Exercise of Remedies.*

(a)     *DIP Termination Events.* The occurrence of any of the following shall constitute a "DIP Termination Event" under this Interim Order (each a "***DIP Termination Event***"), unless waived in writing by the DIP Secured Parties: (i) the occurrence of an "Event of Default"

under and as defined in the DIP Term Sheet, (ii) the occurrence of the "Maturity Date" (as defined in the DIP Term Sheet), (iii) 11:59 p.m. New York City time on the date that is 30 calendar days (and if such calendar day is not a Business Day, the first succeeding Business Day thereafter) after entry of this Interim Order (or such later date determined in writing (which may be via electronic mail) by the DIP Secured Parties in their discretion), if the Final Order, in form and substance acceptable to the DIP Secured Parties in their discretion, has not been entered by the Court by such date and time, (iv) the substantial consummation (as defined in 11 U.S.C. § 1101(2) of the Bankruptcy Code) of a chapter 11 plan of any of the Debtors, (v) any of the DIP Loan Parties seeks authorization from the Court for (or the Court enters an order authorizing or approving) any amendment, modification, or extension of this Interim Order or the DIP Loan Documents without the prior written consent of the DIP Secured Parties (and no such consent shall be implied by any other action, inaction, or acquiescence of any of the DIP Secured Parties), (vi) the failure of the DIP Loan Parties to make any payment required under this Interim Order or the DIP Loan Documents to any of the DIP Secured Parties as and when due and payable hereunder or thereunder, or (vii) the failure by any of the DIP Loan Parties to timely perform or comply with any of the other terms, provisions, conditions or other obligations under this Interim Order.

(b)     *DIP Facility Termination.* The DIP Loan Parties shall immediately provide notice to counsel to the DIP Agent and the DIP Lenders of the occurrence of any DIP Termination Event.  Upon the occurrence of a DIP Termination Event, without further application to or order from the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent (acting at the instruction of the DIP Lenders), to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) (the "***Remedies Notice***") to lead restructuring

counsel for the Debtors, the U.S. Trustee, lead restructuring counsel for the Official Committee, and counsel to the Prepetition Secured Parties (collectively, the "***Remedies/Carve Out Notice Parties***")[8] declaring the occurrence of a DIP Termination Event (such date, the "***DIP Termination Declaration Date***") or deliver a Carve Out Notice (as defined below) to the Remedies/Carve Out Notice Parties, (ii) declare the termination, reduction or restriction of the Commitments under the DIP Facility (to the extent any such commitment remains), (iii) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the DIP Loan Parties, (iv) declare the termination of the DIP Facility and the DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims or the DIP Obligations, (v) declare the reduction or restriction on the DIP Facility or the DIP Loan Documents, and (vi) charge interest at the default rate set forth in the DIP Term Sheet.

(c)       *Exercise of Remedies*.  Following the DIP Termination Declaration Date, subject to paragraph 19(d) hereof, the DIP Agent (acting at the instruction of the DIP Lenders), may also (i) set-off or consolidate any amounts then owing by the DIP Secured Parties to a DIP Loan Party against the DIP Obligations, (ii) enforce any and all rights against the DIP Collateral, including, without limitation, disposition of such DIP Collateral; and (ii) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents, or applicable law or equity, including any and all remedies under debtor relief laws and the Uniform Commercial Code and analogous relief; provided that, in the case of the enforcement of DIP Liens or any other remedies with respect to the DIP Collateral as described in this paragraph 19(c), the DIP Agent shall first file a motion with the Court on five (5) calendar days' notice

---

[8]     For the avoidance of doubt, the Carve Out Notice and the Remedies Notice may be included in the same notice.

(subject to the Court's availability) seeking an emergency hearing (the "**Stay Relief Hearing**") to exercise such remedies (and the DIP Loan Parties, the U.S. Trustee, the Prepetition Secured Parties, and the Official Committee shall not object to the shortened notice with respect to such Stay Relief Hearing).  Notwithstanding anything in this Interim Order or the DIP Loan Documents to the contrary, none of the Prepetition Secured Parties shall be permitted to exercise any rights or remedies with respect to any DIP Collateral that is not Prepetition Notes Collateral unless and until the DIP Obligations are indefeasibly Paid in Full.

(d)     *Remedies Notice Period.*  During the period from and after the Termination Declaration Date through the date of the Stay Relief Hearing (the "**Remedies Notice Period**"), the Debtors shall be permitted to use proceeds of the DIP Facility solely (i) with respect to amounts already drawn in accordance with (and subject to) the Approved Budget and only to fund payroll and other expenses that are critically necessary to preserve the value of the Debtors' businesses and the DIP Collateral unless otherwise consented to in writing by the DIP Agent, and (ii) the Professional Fees Escrow Amount; *provided, however*, that any fees or expenses incurred by the DIP Loan Parties or the Official Committee during the Remedies Notice Period shall permanently reduce the Carve Out Amount (as defined below).  For the avoidance of doubt, during the Remedies Notice Period, the DIP Lenders shall not be obligated to provide any DIP Loans or advance any credit at any time from and after the occurrence of a DIP Termination Event.

(e)     *Leased Premises.*  On or after a DIP Termination Declaration Date, the DIP Secured Parties shall be entitled to enter upon any leased premises in accordance with (i) a separate agreement with the landlord by and between the DIP Agent and the applicable landlord, (ii) consent of the landlord, (iii) upon entry of an order of this Court, upon notice to the landlord and a hearing, or (iv) in accordance with the rights of the DIP Agent under applicable non-bankruptcy law.

(f) *Cooperation.* The DIP Loan Parties shall cooperate with the DIP Secured Parties in their efforts to enforce their liens and security interests in the DIP Collateral, as applicable, and (other than the right to contest whether a DIP Termination Event has occurred and is continuing) the DIP Loan Parties shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its rights or remedies in the DIP Collateral, as applicable.

19. *No Waiver by Failure to Seek Relief.* The rights and remedies of the DIP Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties may have under this Interim Order, the DIP Loan Documents, applicable law or otherwise. The failure or delay on the part of any of the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise. Except as expressly set forth herein, none of the rights or remedies of the DIP Secured Parties under this Interim Order and the DIP Loan Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the requisite parties under the DIP Loan Documents, as applicable. No consents required hereunder or under the DIP Loan Documents by any of the DIP Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties.

20. *Carve Out.*

(a) *Priority of Carve Out*. Each of the DIP Liens and the DIP Superpriority Claims shall be subject and subordinate to payment of the Carve Out. The Carve Out shall be

senior to all claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in this Interim Order.

(b)      *Carve Out.* As used in this Interim Order, the term "***Carve Out***" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a), (ii) Court-allowed fees and expenses of a trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000, (iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and the Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***", and together with the Debtor Professionals, the "***Professional Persons***") at any time on or before the date of delivery by the DIP Agent (at the instruction of the DIP Lenders) of a Carve Out Notice, whether allowed by the Court prior to or after delivery of a Carve Out Notice (the amounts set forth in the foregoing clauses (i), (ii) and (iii), the "***Pre-Carve Out Notice Amount***"), and (iv) Allowed Professional Fees of Professional Persons incurred after the date of delivery by the DIP Agent (at the instruction of the DIP Lenders) of the Carve Out Notice, to the extent allowed at any time, whether by interim order, final order, or other court order, in an aggregate amount not to exceed $750,000, consisting of up to $500,000 incurred by the Debtors and up to $250,000 by any statutory committee (the amount set forth in this clause (iii) being the "***Post-Carve Out Notice Amount***", and together with the Pre-Carve Out Notice Amount, the "***Carve Out Amount***"); *provided, however*, that nothing herein shall be construed to impair the ability of any party-in-interest to object to the fees, expenses, reimbursement, or compensation

described herein on any grounds.  For purposes of this Interim Order, the "***Carve Out Notice***" shall mean a written notice (which may be via electronic mail) delivered by the DIP Agent (acting at the instruction of the DIP Lenders) to the Remedies/Carve Out Notices Parties, which notice may be delivered following the occurrence of a DIP Termination Event, stating that the Post-Carve Out Notice Amount has been invoked.

   (c) *Pre-Carve Out Notice.* Prior to the delivery of a Carve Out Notice, starting with the first full calendar week following the Subsequent Petition Date, each Professional Person shall deliver to the Debtors, the DIP Secured Parties and their respective advisors a weekly statement (each, a "***Weekly Statement***") setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the preceding week (the "***Weekly Estimated Fees and Expenses***"), and the Debtors shall, on a weekly basis, transfer cash proceeds from amounts previously drawn under the DIP Facility into a segregated account held in trust for and exclusively available for the payment of fees and expenses of the Professional Persons (the "***Professional Fees Escrow Account***") in an amount equal to the aggregate amount of Weekly Estimated Fees and Expenses based on the Weekly Fee Estimates submitted by each Professional Person (and if no such estimate is provided in a given week, then the amount forecasted for such Professional Person in the Approved Budget) that remain unpaid (and that were not previously funded to the Professional Fees Escrow Account).  The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay  Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, in accordance with any interim or final orders of the Court; *provided, however*, that the Debtors' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account.

(d)     *Post-Carve Out Notice.* On the date on which a Carve Out Notice is delivered in accordance with this paragraph 20 of this Interim Order, (the "**Carve Out Trigger Date**"), the Carve Out Notice shall constitute a demand to the Debtors to utilize all cash proceeds from amounts previously drawn under the DIP Facility as of such date (net of any retainers) and any available cash proceeds from amounts previously drawn under the DIP Facility thereafter held by any Debtor to fund into the Professional Fees Escrow Account an amount equal to (i) the Pre-Carve Out Notice Amount (to the extent not previously funded to the Professional Fees Escrow Account), and (ii) the Post-Carve Out Notice Amount.  No later than one (1) Business Day after the delivery of a Carve Out Notice, each Professional Person shall deliver one (1) additional statement to the Debtors, the DIP Secured Parties and their respective advisors setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the period following the period covered by the most recent Weekly Statement previously delivered by such Professional Person through and including the Carve Out Trigger Date (as defined below), and the Debtors shall transfer such amounts to the Professional Fees Escrow Account (as defined herein).

(e)     Notwithstanding anything to the contrary in this Interim Order or the DIP Loan Documents, following delivery of a Carve Out Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the  Professional Fees Escrow Account has been fully funded in an amount equal to all respective obligations benefitting from the Carve Out as set forth herein.  The Professional Fees Escrow Account shall not be subject to the control of the DIP Secured Parties, and the funds transferred to the Professional Fees Escrow Account shall not be subject to the DIP Liens, nor constitute DIP Collateral; *provided*, however, that the DIP Liens shall automatically

attach to any residual interest in the Professional Fees Escrow Account (which liens shall be deemed automatically perfected senior first priority liens as of entry of this Interim Order), with any excess paid to the DIP Agent for application to the DIP Obligations in accordance with the DIP Loan Documents until the DIP Obligations are Paid in Full (unless the DIP Secured Parties have otherwise agreed to in writing), and any excess remaining thereafter shall be applied in accordance with this Interim Order.

(f)        Notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Professional Fees Escrow Account shall not constitute loans or indebtedness under the DIP Loan Documents or otherwise increase or reduce the DIP Obligations, (ii) the failure of the Professional Fees Escrow Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) nothing contained herein shall constitute a cap or limitation on the amount that the Professional Persons may assert as administrative expense claims against the Debtors on account of Allowed Professional Fees incurred by such Professional Persons.

(g)        *Payment of Carve Out on or After the Carve Out Trigger Date.* Any payment or reimbursement made on or after the occurrence of the Carve Out Trigger Date in respect of any Allowed Professional Fees incurred after the occurrence of the Carve Out Trigger Date shall permanently reduce the Carve Out Amount on a dollar-for-dollar basis.

(h)        *No Direct Obligation to Pay Allowed Professional Fees.* None of the DIP Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code, regardless of whether such fees or expenses have been allowed by the Court.  Nothing in this Interim Order or otherwise shall be

construed to obligate the DIP Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

21.     *Limitations on Use of DIP Collateral, Carve Out or Other Funds.*  Notwithstanding anything contained in this Interim Order or any other order of the Court to the contrary, no DIP Collateral, DIP Loans, proceeds of any of the foregoing, any portion of the Carve Out may be used (including to pay professional fees) by any of the DIP Loan Parties, the Official Committee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any Successor Cases, or any other party-in-interest (including without limitation any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), directly or indirectly, to:

(a)     investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, initiate, commence, support or prosecute (or finance the preparation, initiation, commencement, support or prosecution of) any claim, counterclaim, cross-claim, cause of action, suit, arbitration, application, motion, contested matter, objection, defense, adversary proceeding, litigation or other proceeding of any kind or nature (whether for monetary, injunctive, affirmative relief or otherwise) (i) against any of the DIP Secured Parties or their respective representatives (each in their capacities as such), (ii) objecting to, challenging, contesting, or raising any defense to, the amount, validity, enforceability, perfection, priority, extent or scope of the claims, liens and security interests of the DIP Secured Parties granted under this Interim Order or the DIP Loan Documents, (iii) asserting avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), any so-called "lender liability" claims, or any other any claim or cause of action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharging or recovery, in each case, with respect to the DIP Liens, the DIP Obligations, the DIP Loan Documents, or the DIP Collateral, (vi) any claim or cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against any of the DIP Secured Parties or their respective representatives;

(b)     object to or seek to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections or benefits granted to the DIP Secured Parties under this Interim Order, the DIP Loan Documents (other than to contest whether a DIP

Termination Event has occurred); *provided* that this provision shall not apply to an objection filed in the Court to the relief sought at the Final Hearing;

(c)     object to or seek to prevent, hinder, interfere with or otherwise delay any of the DIP Secured Parties' assertion, enforcement, exercise of remedies or realization upon any DIP Collateral in accordance with this Interim Order or the DIP Loan Documents (other than to contest whether a DIP Termination Event has occurred);

(d)     seek or request authorization from the Court to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code or otherwise, unless such financing is sufficient to cause the Payment in Full of all DIP Obligations contemporaneously with the consummation of such financing (or as otherwise agreed in writing by the DIP Secured Parties);

(e)     seek or request authorization from the Court to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under this Interim Order or the DIP Loan Documents) in any portion of the DIP Collateral unless all DIP Obligations have been Paid in Full (or as otherwise agreed in writing by the DIP Secured Parties);

(f)     use, request authorization to use, or sell or otherwise dispose of DIP Collateral (without the prior written consent of the DIP Secured Parties) other than as expressly permitted in this Interim Order and in the DIP Loan Documents;

(g)     make any payment or distribution, directly or indirectly, to any non-Debtor affiliate unless such payments or distributions are agreed to in writing by the DIP Secured Parties (or are otherwise expressly included in the Approved Budget and do not violate any of the terms of the DIP Loan Documents);

(h)     make any payment or distribution, directly or indirectly, to any insider (as such term is defined in section 101(31) of the Bankruptcy Code) of the Debtors unless such payments or distributions are agreed to in writing by the DIP Secured Parties (or are otherwise expressly included in the Approved Budget and do not violate any of the terms of the DIP Loan Documents), and in no event shall any non-ordinary course management, advisory, consulting or similar fees be paid to or for the benefit of any affiliate that is not a Debtor;

(i)     use or seek to use any insurance proceeds related to the DIP Collateral (without the prior written consent of the DIP Secured Parties); or

(j)     pay or seek to pay any amount on account of any claims arising prior to the applicable Petition Date unless such payments are agreed to in writing by the DIP Secured Parties (or are otherwise expressly included in the Approved Budget and do not violate any of the terms of the DIP Loan Documents).

22.     *Limitation on Charging Expenses.* Except to the extent of the Carve Out, no costs

or expenses of administration of the Chapter 11 Cases or any Successor Cases (or any future

proceedings that may result therefrom) at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties upon the DIP Collateral shall be charged against or recovered from the DIP Collateral as to DIP Secured Parties whether pursuant to section 506(c) of the Bankruptcy Code or other similar legal or equitable doctrine or otherwise, without the prior written consent of the DIP Secured Parties with respect to the DIP Collateral, and no such consent shall be implied, directly or indirectly, from anything contained in this Interim Order (including, without limitation, consent to the Carve Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the DIP Secured Parties to any charge, lien, assessment or claim against the DIP Secured Parties with respect to the DIP Collateral, whether under section 506(c) of the Bankruptcy Code or otherwise.

23.     *No Marshalling; Section 552(b) Waiver.* In no event shall the DIP Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations, and all proceeds of DIP Collateral shall be received and applied in accordance with this Interim Order and the DIP Loan Documents.  The DIP Secured Parties shall be entitled to all of rights and benefits of section 552(b), and the "equities of the case" exception thereunder shall not apply to any of the DIP Secured Parties with respect to proceeds, products, offspring, or profits of any of the DIP Collateral.

24.     *Right to Credit Bid.* The DIP Agent or its designee (in each case, acting at the instruction of the DIP Lenders), shall have the unqualified right to credit bid all or any portion of DIP Collateral in accordance with the DIP Loan Documents up to the full amount of any DIP Obligations, whether in a sale under or pursuant to section 363 of the Bankruptcy Code, a Chapter 11 plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, a sale or

disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code, or otherwise, and shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code.  The DIP Agent (acting at the instruction of the DIP Lenders), shall have the absolute right to assign, transfer, sell, or otherwise dispose of their respective rights to credit bid (subject to this Interim Order) to any acquisition vehicle formed in connection with such bid or other designee.

25.    *Binding Effect; Successors and Assigns*. Immediately upon entry of this Interim Order, the DIP Loan Documents and this Interim Order, including all findings and conclusions of law herein, shall be binding upon all parties-in-interest in the Chapter 11 Cases and any Successor Cases, including without limitation, the DIP Secured Parties, the Prepetition Secured Parties, the Official Committee or any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and any Successor Cases, and their respective successors and assigns (including any chapter 11 trustee or chapter 7 trustee or examiner appointed or elected in the Chapter 11 Cases or any Successor Cases, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of each of the Debtors, the DIP Secured Parties, and their respective successors and assigns; *provided, however,* that, for the avoidance of doubt, the DIP Secured Parties shall have no obligation to make any loan or extend any financing to any chapter 11 trustee or chapter 7 trustee or similar responsible person appointed for the estate of any Debtor in the Chapter 11 Cases or any Successor Cases.

26.    *No Modification of Interim Order.*

(a)      The DIP Loan Parties irrevocably waive the right to seek, and shall not seek or consent to, directly or indirectly without the prior written consent of the DIP Secured Parties (unless and until the DIP Obligations have been Paid in Full), (A) any modification, stay, vacatur or amendment to this Interim Order, (B) the allowance of any claim against any Debtor in the Chapter 11 Cases or any Successor Cases equal or superior to the DIP Superpriority Claims (other than the Carve Out), (C) the grant of any lien or security interest on any DIP Collateral with priority equal to or superior to the DIP Liens, except as expressly permitted hereunder or under the DIP Loan Documents, or (D) the entry of any order authorizing the use of DIP Collateral (including Cash Collateral) that is inconsistent with this Interim Order.

(b)      Without limiting the provisions of the immediately preceding paragraph, if at any time prior to the Payment in Full of all DIP Obligations, either the DIP Loan Parties, the DIP Loan Parties' estates, any chapter 11 trustee, chapter 7 trustee or examiner with enlarged powers, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Interim Order or the DIP Loan Documents, then, unless otherwise agreed in writing by the DIP Secured Parties (with respect to the DIP Obligations), all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent, for further distribution to the applicable DIP Secured Parties on account of their applicable DIP Obligations pursuant to the DIP Loan Documents.

27.      *Preservation of Rights Granted Under Interim Order.*

(a)      *Senior to Other Liens.* Other than the Carve Out, the Prepetition Notes Liens and the Prior Permitted Liens, no claim (including any intercompany claim) or lien having a priority superior to or *pari passu* with those granted by the Interim Order to the DIP Secured shall

be permitted while any of the DIP Obligations remain outstanding, and, except as otherwise expressly provided in this Interim Order, (i) the DIP Superpriority Claims shall not be subject or junior to any intercompany or affiliate claims of the Debtors; and (ii) the DIP Liens shall not be: (A) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (B) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (C) subordinated to or made *pari passu* with any liens arising after the applicable Petition Date, including any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; or (D) subject or junior to any intercompany or affiliate lies or security interests of the Debtors.

        (b)    *Payment in Full.* None of the DIP Loan Parties shall propose or support any chapter 11 plan or sale of all or substantially all of the DIP Loan Parties' equity or assets, or any order confirming such plan or approving such sale, that is not conditioned upon the Payment in Full (unless otherwise agreed in writing by the DIP Secured Parties) of all DIP Obligations and the DIP Superpriority Claims.

        (c)    *Dismissal/Conversion.* Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code: (A) all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the DIP Secured Parties hereunder and under the DIP Loan Documents (including, without limitation, the DIP Superpriority Claims and the DIP Liens), shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP

Obligations shall have been Paid in Full, and all such claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections shall, notwithstanding such dismissal or conversion, remain unaffected and shall remain binding on all parties in interest (and any such order shall, in accordance with sections 105 and 349 of the Bankruptcy Code, so provide), and (B) this Court shall retain jurisdiction, notwithstanding such dismissal or conversion, for the purposes of enforcing all such claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the DIP Secured Parties hereunder and under the DIP Loan Documents.

(d)    *Reversal/Modification.* Based on the findings set forth in this Interim Order and the record presented during the Interim Hearing and the Chapter 11 Cases, and in accordance with section 364(e) of the Bankruptcy Code, in the event that any or all of the provisions of this Interim Order or the DIP Loan Documents are hereafter reversed, modified, vacated or stayed by a subsequent judgment or order of this Court or any other court, any such reversal, stay, modification or vacatur shall not affect (i) the validity or enforceability of advances previously made hereunder or under the DIP Loan Documents by the DIP Secured Parties to the Debtors, (ii) the validity or enforceability of any obligation, indebtedness or liability incurred under this Interim Order or the DIP Loan Documents (including, without limitation, the DIP Obligations) by the DIP Loan Parties to the DIP Secured Parties, (iii) the validity, enforceability, or perfection of any of the claims, liens, security interests, rights, privileges or benefits granted hereunder or under the DIP Loan Documents to the DIP Secured Parties, or (iv) the payment of any fees, costs, expenses or other amounts to the DIP Secured Parties under this Interim Order and the DIP Loan Documents, in each case, prior to the actual receipt of written notice by any DIP Agent of the effective date of such reversal, stay, modification, or vacatur.    Notwithstanding any such reversal, stay,

modification or vacatur, the claims, liens, security interests, rights, privileges, remedies and benefits set forth in the Interim Order shall be governed in all respects by the original provisions of this Interim Order and the DIP Loan Documents.

(e)     *Survival*. Except as expressly provided in this Interim Order, until all of the DIP Obligations have been Paid in Full (unless the DIP Secured Parties have otherwise agreed in writing in respect of the DIP Obligations), all claims, liens and security interests, rights, priorities, privileges, remedies, benefits, and protections granted to the DIP Secured Parties under this Interim Order and the DIP Loan Documents shall survive and shall not be modified, impaired, or discharged by: (i) the entry of an order confirming any chapter 11 plan in any of the Chapter 11 Cases (and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors hereby waive any discharge as to any remaining DIP Obligations), (ii) the entry of an order  converting any or all of the Chapter 11 Cases to a case (or cases) under chapter 7 of the Bankruptcy Code, dismissing any or all of the Chapter 11 Cases or terminating the joint administration of the Chapter 11 Cases or by any other act or omission, or (iii) the entry of an order approving the sale or disposition of any DIP Collateral (except to the extent expressly permitted in the DIP Loan Documents).

28.     *Master Proof of Claim.* To the extent necessary, the DIP Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases or any of the Successor Cases in order to assert claims for payment of the DIP Obligations.  The Debtors' stipulations and acknowledgments and the provisions of this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute timely filed proofs of claim in respect of such claims arising under the DIP Obligations against each of the applicable Debtors.  Any order entered by the Court establishing a bar date in

any of the Chapter 11 Cases or any Successor Cases shall not apply to the DIP Secured Parties or the DIP Obligations.

29.     *Limitation of Liability.*

(a)     Nothing in this Interim Order, the DIP Loan Documents or any documents related thereto shall in any way be construed or interpreted to impose or allow the imposition  upon any of the DIP Secured Parties of any liability for any claim arising from, in connection with or related to the prepetition or postpetition activities of the DIP Loan Parties or their respective affiliates (as defined in section 101(2) of the Bankruptcy Code) in the operation of their businesses, their restructuring efforts or the administration of these Chapter 11 Cases.

(b)     In determining to make any loan or extension of credit under the DIP Loan Documents, or in exercising any rights or remedies under this Interim Order or the DIP Loan Documents, none of the DIP Secured Parties shall (i) have any liability to any third party or be deemed to be in control of the operations of any of the DIP Loan Parties, (ii) owe any fiduciary duty to any of the DIP Loan Parties, their respective creditors, shareholders or estates, or (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of any of the DIP Loan Parties (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42, U.S. §§ 9601 *et seq*., as amended, or any other federal or state statute, including the Internal Revenue Code).

(c)     The DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other

person, and all risk of loss, damage, or destruction of the DIP Collateral shall be borne solely by the DIP Loan Parties; *provided, however,* that nothing contained in this <u>paragraph (c)</u> shall release the DIP Secured Parties from their obligations under the DIP Loan Documents.

30.     *Release of DIP Secured Parties*. Effective as of entry of the Interim Order, each of the DIP Loan Parties and its estate(s), on its own behalf and on behalf of its predecessors, successors and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits each of the DIP Secured Parties and each of their respective representatives (in their capacities as such) from any and all obligations and liabilities to the DIP Loan Parties (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, including, without limitation, any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), or otherwise, (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, in each case, that may be asserted by any of the DIP Loan Parties, their

respective estates, predecessors, successors and assigns, in  each case, against any of the DIP Secured Parties or their respective representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Interim Order, in connection with, arising under or related to this Interim Order, the DIP Facility, the DIP Liens, the DIP Obligations, the DIP Collateral, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including, without limitation, any claim or cause action with respect to the validity, enforceability, priority, scope, extent or perfection of the DIP Liens, the DIP Obligations or the DIP Loan Documents; *provided*, *however*, that nothing contained in the foregoing shall release the DIP Secured Parties from their obligations under the DIP Facility from and after the date hereof.

31.     *Payments Free and Clear.* Any and all payments or proceeds required to be remitted to the DIP Secured Parties pursuant to the DIP Loan Documents, this Interim Order, the Final Order (if and when entered) or any subsequent order of this Court shall be irrevocable (subject, solely in the case of the DIP Professional Fees, only to the procedures set forth in paragraph 10 of this Interim Order), and shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (whether asserted or assessed by, through or on behalf of the DIP Loan Parties) or otherwise.

32.     *Adequate Protection.*  Any orders (collectively, the "***Adequate Protection Orders***") entered by the Court granting any of the Prepetition Secured Parties adequate protection against any post-petition diminution in value of the Prepetition Secured Parties' respective liens and interests in the Prepetition Notes Collateral, including any orders authorizing the Debtors to use Cash Collateral of the Prepetition Secured Parties, if any, shall, in each case, be in form and

substance and on terms and conditions reasonably acceptable to the DIP Secured Parties and otherwise materially consistent with this Interim Order in all respects, and to the extent the Prepetition Secured Parties seek adequate protection with respect to their interests in the Prepetition Notes Collateral, any such adequate protection granted to the Prepetition Secured Parties pursuant to the Adequate Protection Orders shall be limited solely to junior and subordinate security interests in and liens on the DIP Collateral ("*Adequate Protection Liens*").  In respect of any Adequate Protection Liens, the Prepetition Secured Parties may not exercise (or seek relief from the Court to exercise) any remedies against the DIP Collateral so long as there are any DIP Obligations outstanding, and the holders of any such Adequate Protection Liens on such DIP Collateral shall not be entitled to credit bid any diminution in value claims secured by such Adequate Protection Liens for any such DIP Collateral (and any sale of such DIP Collateral shall be free and clear of any Adequate Protection Liens provided that such liens attach to the cash proceeds, if any, of such sale after the DIP Obligations are Paid in Full).

33.    *Joint and Several Liability.* Nothing in this Interim Order shall be construed to constitute or authorize a substantive consolidation of any of the DIP Loan Parties' estates, it being understood, however, that the DIP Loan Parties shall be jointly and severally liable for all obligations (including all DIP Obligations) under this Interim Order and the DIP Loan Documents.

34.    *Third Party Beneficiary.* Except as expressly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor, equity holder, or any direct, indirect or incidental beneficiary.

35.    *Interim Order Controls.* In the event of any conflict or inconsistency between or among the terms or provisions of this Interim Order and any of the DIP Loan Documents, unless such term or provision in this Interim Order is phrased in terms of "defined in" or "as set forth in"

the DIP Term Sheet or DIP Loan Documents, or in the event of any conflict or inconsistency between the terms of this Interim Order and any other order of the Court, the terms and provisions of this Interim Order shall govern and control.  Notwithstanding anything contained in any other order entered by this Court to the contrary, any payment made pursuant to, or authorization contained in, any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Loan Documents, including, without limitation, the Approved Budget (subject to Permitted Variances).

36.     *Effectiveness.* This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the applicable Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014, any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

37.     *Bankruptcy Rules.* The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

38.     *Headings.* Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.  When used in this Interim Order, the word "including" shall not imply limitation.

39.     *Necessary Action.* The DIP Loan Parties and the DIP Secured Parties are authorized to take any and all such actions as are necessary, required or appropriate to implement and effectuate the terms of this Interim Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder.

40.     *Retention of Jurisdiction.* The Court retains jurisdiction to hear, determine and enforce the terms of any and all matters arising from or related to the DIP Facility, the DIP Loan Documents and this Interim Order, and the Court's jurisdiction shall survive confirmation and consummation of any Chapter 11 plan for any of the Debtors notwithstanding the terms or provisions of any such Chapter 11 plan or any order confirming any such Chapter 11 plan.

41.     *Final Hearing.* The Final Hearing shall be held on September 23, 2024, at 9:00 a.m. (prevailing Central Time), and any objections to the final relief sought in the Motion shall be filed with the Court no later than September 17, 2024 at 11:59 p.m. (prevailing Central Time), and served upon the following: (a) the Debtors and (b) Orrick, Herrington & Sutcliffe LLP, counsel to the DIP Secured Parties.

Signed: August 30, 2024

Alfredo R Pérez
United States Bankruptcy Judge

**<u>EXHIBIT A</u>**

**<u>13-Week Budget</u>**

**Rhodium Enterprises**
**Illustrative Forecasted 13-Week Budget - Consolidated**

*$000s*

| Period | Forecast 1 | Forecast 2 | Forecast 3 | Forecast 4 | Forecast 5 | Forecast 6 | Forecast 7 | Forecast 8 | Forecast 9 | Forecast 10 | Forecast 11 | Forecast 12 | Forecast 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Starting: | 8/29/2024 | 9/2/2024 | 9/9/2024 | 9/16/2024 | 9/23/2024 | 9/30/2024 | 10/7/2024 | 10/14/2024 | 10/21/2024 | 10/28/2024 | 11/4/2024 | 11/11/2024 | 11/18/2024 | |
| Week Ending: | 9/1/2024 | 9/8/2024 | 9/15/2024 | 9/22/2024 | 9/29/2024 | 10/6/2024 | 10/13/2024 | 10/20/2024 | 10/27/2024 | 11/3/2024 | 11/10/2024 | 11/17/2024 | 11/24/2024 | Weeks 1 - 13 |
| *Operating Receipts* | | | | | | | | | | | | | | |
| Bitcoin Mining Revenue | 720 | 1,260 | 1,260 | 1,260 | 1,260 | 1,260 | 1,260 | 1,260 | 1,260 | 1,260 | 1,260 | 1,260 | 1,260 | 15,840 |
| Energy Sales | - | - | 628 | - | - | - | - | 709 | - | - | - | 56 | - | 1,392 |
| Sale of Temple Facility | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | 903 | - | - | - | - | - | - | - | - | - | - | - | 903 |
| **Total Receipts** | **720** | **2,163** | **1,888** | **1,260** | **1,260** | **1,260** | **1,260** | **1,969** | **1,260** | **1,260** | **1,260** | **1,316** | **1,260** | **18,135** |
| *Non-Restructuring Disbursements* | | | | | | | | | | | | | | |
| Accounts Payable | (8) | - | (300) | - | - | - | - | (300) | - | - | - | (300) | - | (908) |
| Payroll & Benefits | (357) | - | (362) | - | - | (362) | - | (362) | - | (362) | - | (362) | - | (2,168) |
| Utilities | - | - | (5,159) | - | - | - | (1,200) | (3,225) | - | - | (1,200) | (3,225) | - | (14,008) |
| Lease at Temple Facility | - | (828) | - | (2,216) | - | (828) | - | - | - | - | (828) | - | - | (4,700) |
| Other Disbursements | (124) | (293) | (228) | (209) | - | (393) | - | - | (89) | (393) | (330) | (506) | (89) | (2,653) |
| **Total Non-Restructuring Disbursements** | **(489)** | **(1,121)** | **(6,049)** | **(2,425)** | **-** | **(1,583)** | **(1,200)** | **(3,887)** | **(89)** | **(755)** | **(2,358)** | **(4,393)** | **(89)** | **(24,438)** |
| *Restructuring Disbursements* | | | | | | | | | | | | | | |
| Professional Fees | - | (500) | (150) | - | (120) | (912) | - | (2,419) | (120) | (842) | - | (2,995) | - | (8,058) |
| Independent Director | - | (25) | - | - | - | - | - | (25) | - | - | (25) | - | - | (75) |
| DIP Facility Interest and Fees | - | (600) | - | - | - | (237) | - | - | - | (256) | - | (20) | - | (1,114) |
| United States Trustee | - | - | - | - | - | - | (114) | - | - | - | - | - | - | (114) |
| **Total Restructuring Disbursements** | **-** | **(1,125)** | **(150)** | **-** | **(120)** | **(1,150)** | **(114)** | **(2,444)** | **(120)** | **(1,098)** | **(25)** | **(3,015)** | **-** | **(9,360)** |
| **Total Disbursements** | **(489)** | **(2,246)** | **(6,199)** | **(2,425)** | **(120)** | **(2,733)** | **(1,314)** | **(6,331)** | **(209)** | **(1,853)** | **(2,383)** | **(7,408)** | **(89)** | **(33,798)** |
| **Net Cash Flow** | **231** | **(84)** | **(4,311)** | **(1,165)** | **1,140** | **(1,473)** | **(54)** | **(4,362)** | **1,051** | **(593)** | **(1,123)** | **(6,092)** | **1,171** | **(15,663)** |
| *Cash Schedule* | | | | | | | | | | | | | | |
| Beginning Cash Balance | 2,495 | 2,725 | 17,642 | 13,331 | 12,166 | 13,306 | 11,833 | 11,780 | 7,418 | 8,469 | 7,876 | 6,753 | 15,661 | 2,495 |
| Net Cash Flow | 231 | (84) | (4,311) | (1,165) | 1,140 | (1,473) | (54) | (4,362) | 1,051 | (593) | (1,123) | (6,092) | 1,171 | (15,663) |
| DIP Proceeds | - | 15,000 | - | - | - | - | - | - | - | - | - | 15,000 | - | 30,000 |
| **Ending Cash Balance** | **2,725** | **17,642** | **13,331** | **12,166** | **13,306** | **11,833** | **11,780** | **7,418** | **8,469** | **7,876** | **6,753** | **15,661** | **16,832** | **16,832** |

**EXHIBIT B**

**Term Sheet**

# RHODIUM ENTERPRISES, INC.

## DEBTOR-IN-POSSESSION FACILITY

## SUMMARY OF TERMS AND CONDITIONS

### AUGUST 29, 2024

*Galaxy Digital ("**Galaxy**") is pleased to provide this definitive description of terms and conditions (this "**Term Sheet**") for a senior secured, super-priority debtor-in-possession financing facility (the "**DIP Facility**"). This Term Sheet includes all of the material terms, conditions, covenants, representations, warranties and other provisions needed to implement the DIP Facility and, together with the Interim Order (as defined below), the Final Order (as defined below) and the definitive credit agreement to be entered into as set forth below, will be deemed the definitive documentation required for the DIP Facility on an interim basis. Upon the Bankruptcy Court's entry of the required Interim Order set out below, this Term Sheet is binding and effective and indicates a commitment by the DIP Lender to enter into the transaction for the DIP Facility described herein, and to make loans to the Borrower in the amounts and on the terms and subject to the conditions set forth herein.*

Certain defined terms, rules of construction and other provisions are set forth in <u>Annex V</u> attached hereto, which is incorporated herein as though set forth in full.

| | |
|---|---|
| **BORROWER**: | Rhodium Technologies LLC (the "**Borrower**", and together with the Guarantors (as defined below), the "**Loan Parties**"). The Loan Parties are debtors and debtors-in-possession in the chapter 11 cases (the "**Bankruptcy Cases**") jointly administered under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), styled *In re Rhodium Encore, LLC*, Case No. 24-90448 (ARP). Certain of the Loan Parties commenced Bankruptcy Cases on August 24, 2024 (the "**Initial Petition Date**"), and the Borrower and certain of its affiliates commenced Bankruptcy Cases on August 29, 2024 (the "**Subsequent Petition Date**")[1]. |
| **GUARANTORS**: | The Obligations under the DIP Facility, the definitive credit agreement governing the same, and the other documents, instruments and agreements executed in connection therewith, including without limitation this Term Sheet, the Interim Order |

---

[1] "**Petition Date**" means "the Initial Petition Date; *provided* that with respect to the Debtors which commenced their Bankruptcy Cases subsequent to August 24, 2024, "**Petition Date**" shall refer to the respective dates on which such Bankruptcy Cases were commenced.

| | |
|---|---|
| | and the Final Order (each as defined below) (collectively, the "***DIP Loan Documents***") shall be, and upon the entry of the Interim Order hereby are, unconditionally guaranteed by Rhodium Enterprises, Inc. and all direct and indirect subsidiaries of the Borrower that are or become debtors and debtors-in-possession in the Bankruptcy Cases (together with Rhodium Enterprises, Inc., the "***Guarantors***", and together with the Borrower, the "***Debtors***"). |
| **DIP ADMINISTRATIVE AGENT**: | Galaxy Digital LLC shall act as sole administrative agent and collateral agent for the DIP Facility (in such capacity, the "***DIP Agent***") and shall perform the duties customarily associated with such role. The DIP Agent shall be entitled to the indemnification provisions set forth herein and in the DIP Orders (as defined below) in all respects. Any agency provisions set forth in the definitive credit agreement for the DIP Facility shall be deemed effective as of the date of this Term Sheet. |
| **DIP LENDER(S)**: | Funds and accounts under management by Galaxy (each a "***DIP Lender***" and collectively, the "***DIP Lenders***"). |
| **DIP FACILITY**: | A new money, senior secured, super priority DIP Facility making available loans (the "***DIP Loans***") thereunder in an aggregate principal amount of up to either $30 million (such DIP Loans, "***USD DIP Loans***") or 500 Bitcoin ("***BTC***" and such DIP Loans, "***BTC DIP Loans***") in commitments from the DIP Lenders (the "***Commitments***").  The DIP Facility shall be *either* a DIP Facility making available USD DIP Loans ("***USD DIP Facility***") *or* a DIP Facility making available BTC DIP Loans ("***BTC DIP Facility***"). <br><br> The Commitment of each DIP Lender shall be set forth on Annex I hereto. |
| **INTEREST RATE AND FEES**: | Interest Rate: <br><br> • If the Borrower elects to borrow USD DIP Loans, then all such USD DIP Loans shall bear interest at a fixed rate *per annum* equal to 14.5%, payable by the Borrower to the DIP Agent (for the account of the DIP Lenders) in cash on the Invoice Due Date (as defined below). <br><br> • If the Borrower elects to borrow to BTC DIP Loans, the BTC DIP Loans shall bear interest at a fixed rate *per annum* equal of 9.5%, payable by the Borrower to the DIP Agent (for the account of the DIP Lenders) in cash |

3

or in BTC on the Invoice Due Date, subject to the section captioned "**Repayment of BTC DIP Loans and Payment of Interest or other Amounts in U.S. Dollars**" set forth below.

All interest shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, or if any principal of or interest on any DIP Loan or any fee or other amount payable by the Debtors hereunder or under any other DIP Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, then all DIP Loans outstanding and any past due amounts, shall bear interest, after as well as before judgment, at the interest rates set forth above plus 2.0%, but in no event to exceed the highest lawful rate permitted by applicable law (the "***Default Rate***").

Unfunded Commitment Fee:

- USD DIP Facility: If the Borrower elects to enter into a USD DIP Facility, the Borrower shall pay the DIP Agent, for the account of each DIP Lender, on the Invoice Due Date, a fee *per annum* equal to SOFR, on the daily unused amount of the Commitments of such DIP Lender during the preceding month; *provided* that for purposes of such fee, SOFR shall not be less than 4.5%.

- BTC DIP Facility: If the Borrower elects to enter into a BTC DIP Facility, the Borrower shall pay the DIP Agent, for the account of each DIP Lender, on the Invoice Due Date, a fee equal to 4.0% *per annum* on the daily unused amount of the Commitments of such DIP Lender during the preceding month.

The unfunded commitment fees described above (the "***Unfunded Commitment Fees***") shall be payable by the Borrower (a) on the first Business Day of each month to the extent of any unused Commitments during the immediately preceding month and (b) on the first borrowing date following the entry of the Final Order, to the extent there are any accrued and unpaid Unfunded Commitment Fees. All Unfunded Commitment Fees shall be computed on the basis of a year of

| | |
|---|---|
| | 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). |
| | Up-Front Fee: The Borrower shall pay to the DIP Agent, for the account of the DIP Lenders, a fee in an amount equal to 2.0% of the principal amount of the Commitments (including Commitments available following entry of the Final Order) (the "***Up-Front Fee***"). The Up-Front Fee shall be fully earned upon entry of the Interim Order. 50% of the Up-Front Fee shall be payable on the first borrowing date following the entry of the Interim Order in accordance with the conditions set forth under the caption "Conditions to Initial Availability" and 50% of the Up-Front Fee shall be payable on the first borrowing date following the entry of the Final Order in accordance with the conditions set forth under the caption "Conditions to Final Availability", or as otherwise required in the event of any prepayment. |
| | Exit Fee: The Borrower shall pay to the DIP Agent for the account of the DIP Lenders a fee in an amount equal to 2.5% of the principal amount of the Commitments (whether or not such Commitments are ultimately funded), which shall be fully earned upon entry of the Interim Order and payable on the Maturity Date or any other date that the DIP Loans are prepaid or repaid in whole or in part whether as a result of acceleration or otherwise (the "***Exit Fee***"). |
| | Invoice Due Date: On the first Business Day of each month (the "***Invoice Date***"), the DIP Agent shall deliver an invoice to the Borrower which shall describe all interest and Unfunded Commitment Fees accrued during the immediately preceding month, and any other amounts owing under the DIP Facility (the "***Invoice Amount***"). The Borrower shall pay the Invoice Amount to the DIP Agent no later than 5 Business Days after the Invoice Date (the "***Invoice Due Date***"). |
| **MATURITY DATE:** | On the Maturity Date (as defined below), all DIP Loans and Obligations under the DIP Facility shall be immediately Paid in Full (as defined below) by the Borrower and the Commitments shall terminate.

The maturity date of the DIP Facility (the "***Maturity Date***") shall be the date that is the earliest of: |

| | |
|---|---|
| | (a)      12 months after the Petition Date;<br><br>(b)      30 days after the entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court;<br><br>(c)      the effective date of a Plan (as defined herein);<br><br>(d)      the closing of a sale of substantially all of the equity of the Debtors or of the Debtors' Temple site assets (unless done pursuant to a confirmed Plan); and<br><br>(e)      the termination of the DIP Facility during the continuation of an Event of Default or termination under the DIP Facility or the applicable DIP Order.<br><br>"***Paid in Full***" shall mean (i) in the case of USD DIP Loans, repayment in full and in cash of all outstanding amounts of principal, and payment of all accrued interest and any other amounts owing under the USD DIP Facility, and (ii) in the case of BTC DIP Loans, (a) repayment in full and in BTC of all outstanding amounts of principal, and payment of all accrued interest and any other amounts owing under the BTC DIP Facility or (b) to the extent that the DIP Lenders and DIP Agent provide prior written consent to the same, repayment in full and in cash (calculated at the Exchange Rate (as defined below)) of all outstanding amounts of principal, and payment of all accrued interest and any other amounts owing under the DIP Facility. |
| **CURRENCY:** | In the case of the USD DIP Facility, borrowings shall be made in U.S. Dollars.  In the case of the BTC DIP Facility, borrowings shall be made in BTC. All payments under any DIP Facility shall be indefeasibly made without setoff or counterclaim, and in immediately available funds (i.e., cash or BTC, as applicable). |
| **REPAYMENT OF BTC DIP LOANS AND PAYMENT OF INTEREST OR OTHER AMOUNTS IN U.S. DOLLARS:** | With the prior written consent of the DIP Lenders and DIP Agent, repayments (including mandatory or voluntary prepayments) of borrowings and payment of interest or other amounts payable on or in respect of BTC DIP Loans may be paid in U.S. Dollars.<br><br>Any amount due in BTC but paid, with the prior written consent of the DIP Lenders and DIP Agent, in U.S. Dollars, shall be calculated by multiplying such amount due in BTC by the Exchange Rate. |

| | |
|---|---|
| | "***Exchange Rate***" shall mean a rate determined in the DIP Agent's sole discretion based on reasonable published market spot prices at closing on the date immediately prior to the date of a payment under the DIP Facility based on depth of liquidity across exchanges, trading execution fees, and commission, which calculation shall be shared in writing with the Borrower prior to any applicable payment. |
| **PRIORITY/SECURITY:** | The Debtors shall grant perfected, valid and enforceable liens and security interests on the "DIP Collateral" (as defined in the Interim Order or Final Order, as applicable) to secure the Obligations, and superpriority claims under section 364 of the Bankruptcy Code, in each case, on the terms and conditions set forth in the Interim Order or the Final Order, as applicable. |
| **INITIAL AVAILABILITY:** | Subject to satisfaction of the conditions set forth below under the caption "Conditions to Initial Availability", upon entry of an order by the Bankruptcy Court granting interim approval of the DIP Facility that is substantially in the form attached hereto as <u>Exhibit A</u> and otherwise in form and substance reasonably satisfactory to the DIP Lenders and DIP Agent (the "***Interim Order***"), the DIP Lenders shall make DIP Loans available to the Borrower in a principal amount of up to, in the case of a USD DIP Facility, $15 million, and, in the case of a BTC DIP Facility, 250 BTC (the "***Initial Availability***") for uses consistent with and in accordance with the DIP Budget annexed hereto as Annex II (the "***DIP Budget***") (including amounts required to be paid with respect to the DIP Facility), which DIP Budget shall be reasonably satisfactory in form and substance to the DIP Lenders and the DIP Agent. |
| **FULL AVAILABILITY:** | Subject to satisfaction of the conditions set forth below under the caption "Conditions to Full Availability", upon entry of an order by the Bankruptcy Court granting final approval of the DIP Facility that is in form and substance reasonably satisfactory to the DIP Agent and DIP Lenders (the "***Final Order***" and, together with the Interim Order, the "***DIP Orders***"), the DIP Lenders shall make additional DIP Loans available to the Borrower in a principal amount of up to, in the case of a USD DIP Facility, $15 million, and, in the case of a BTC DIP Facility, 250 BTC (such principal amounts, together with the Initial Availability, collectively, the "***Full Availability***"), for uses consistent with and in accordance with the DIP Budget |

7

| | |
|---|---|
| | (including amounts required to be paid with respect to the DIP Facility). |
| **CONDITIONS TO INITIAL AVAILABILITY:** | The obligation of the DIP Lenders to make any DIP Loans up to an amount equal to the Initial Availability is subject to satisfaction of the following conditions:<br><br>(a)     commencement of the Bankruptcy Case and entry of "first day orders" reasonably satisfactory to the DIP Lenders;<br><br>(b)     all DIP Loan Documents required by the DIP Agent and the DIP Lenders (other than a definitive credit agreement evidencing the DIP Facility) shall be in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders;<br><br>(c)     entry of the Interim Order consistent with the terms herein within five Business Days following the date that the motion to approve the DIP Facility is filed and which Interim Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed;<br><br>(d)     the DIP Agent shall have received the DIP Budget;<br><br>(e)     the DIP Agent shall have received satisfactory evidence that the Debtors have been duly authorized to execute and deliver the applicable DIP Loan Documents and perform their obligations thereunder;<br><br>(f)     an interim order approving the use of cash collateral shall have been entered and remain in effect and not subject to any challenge and in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders (the "***Interim Cash Collateral Order***");<br><br>(g)     no material adverse change shall have occurred (other than by virtue of the Bankruptcy Cases);<br><br>(h)     the Rockdale site shall not have lost power for more than 72 hours and shall not be at imminent risk of losing power for more than 72 hours, *provided* that the foregoing condition shall not be applicable in each case where anyone of the following has occurred: (i) power in the surrounding area is generally affected; or (ii) power is lost during maintenance permitted under the New Hosting Service Agreement No. #R- |

<table>
<tr>
<td></td>
<td>

5MW-006 between Whinstone US, Inc. and Rhodium JV LLC; or (iii) where Whinstone has caused, is generally responsible for, or generally responsible for maintenance of the systems leading to, the loss of power, and injunctive relief ordering the loss of power to cease has been obtained within 3 Business Days after the date power was first lost;

(i)      the Borrower shall have paid all fees and expenses (including attorneys' fees) due to the DIP Agent and the DIP Lenders;

(j)      the Debtors shall be in compliance in all respects with the Interim Order;

(k)      the DIP Agent shall have received a notice of borrowing (which shall include whether the DIP Loans are USD DIP Loans or BTC DIP Loans and the intended uses of proceeds in accordance with the DIP Budget) substantially in the form of Annex X (a "**Notice of Borrowing**");

(l)      the representations and warranties of the Debtors set forth in this Term Sheet and in any other DIP Loan Document shall be true and correct in all material respects;

(m)      no Default or Event of Default shall have occurred and be continuing;

(n)      the DIP Agent shall have received the Up-Front Fee, which shall be calculated based on the Initial Availability and paid by the Borrower contemporaneously with the funding of the first DIP Loan as provided; and

(o)      the applicable DIP Loan Documents shall have been executed by the parties thereto and delivered to the DIP Agent.

</td>
</tr>
<tr>
<td>**CONDITIONS TO FULL AVAILABILITY:**</td>
<td>

The obligation of the DIP Lenders to make any DIP Loans up to an amount equal to the Full Availability is subject to satisfaction of the following conditions:

(a)      entry of the Final Order in substantially the form of the Interim Order, with only such modifications thereto as are reasonably satisfactory in form and substance to the DIP Agent and the DIP Lenders, no later than 30 days following the date of entry of the Interim Order, which Final Order shall be in full

</td>
</tr>
</table>

force and effect and shall not have been vacated, reversed, modified, amended or stayed;

(b)     all DIP Loan Documents required by the DIP Agent and the DIP Lenders (which shall include a definitive credit agreement evidencing the DIP Facility) shall be in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders

(c)     the Debtors shall be in compliance in all respects with the Interim Order and Final Order;

(d)     subject to application of the Permitted Variance, the Debtors shall be compliance with the DIP Budget;

(e)     the DIP Agent shall have received a Notice of Borrowing at least three (3) Business Days in advance;

(f)     a final order approving the use of cash collateral shall have been entered and remain in effect and not subject to any challenge and in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders (the "***Final Cash Collateral Order***");

(g)     no material adverse change shall have occurred (other than by virtue of the Bankruptcy Case);

(h)     the Rockdale site shall not have lost power for more than 72 hours and shall not be at imminent risk of losing power for more than 72 hours, *provided* that the foregoing condition shall not be applicable in each case where anyone of the following has occurred: (i) power in the surrounding area is generally affected; or (ii) power is lost during maintenance permitted under the New Hosting Service Agreement No. #R-5MW-006 between Whinstone US, Inc. and Rhodium JV LLC; or (iii) where Whinstone has caused, is generally responsible for, or generally responsible for maintenance of the systems leading to, the loss of power, and injunctive relief ordering the loss of power to cease has been obtained within 3 Business Days after the date power was first lost;

(i)     no Default or Event of Default shall have occurred and be continuing;

(j)     the DIP Agent shall have received any accrued and unpaid Unfunded Commitment Fees as provided herein;

| | |
|---|---|
| | (k)      the DIP Agent shall have received the Up-Front Fee, which shall be calculated on the Full Availability less the Initial Availability, and paid by the Borrower contemporaneously with the funding of the first DIP Loan after entry of the Final Order as provided herein;<br><br>(l)      the Borrower shall have paid all fees and expenses (including attorneys' fees) due to the DIP Agent and the DIP Lenders; and<br><br>(m)      the representations and warranties of the Debtors set forth in this Term Sheet and in any other DIP Loan Document shall be true and correct in all material respects. |
| **VOLUNTARY PREPAYMENTS AND COMMITMENT REDUCTIONS:** | Upon at least three Business Days' notice, the Borrower may prepay the DIP Loans, in whole or in part, at any time; *provided* that the Borrower shall also pay all accrued and unpaid interest on such principal amount being prepaid together with any unpaid Up-Front Fee and the Exit Fee. Once repaid in connection with any voluntary prepayment, the DIP Loans may not be reborrowed. |
| **MANDATORY PREPAYMENTS:** | DIP Loans shall be prepaid with 100% of the net cash proceeds of (a) all non-ordinary course asset sales or other dispositions of property of the Debtors, including insurance proceeds and condemnation proceeds and (b) any Indebtedness for borrowed money incurred by the Debtors (other than the DIP Loans).<br><br>All mandatory prepayments shall be applied to principal and interest due on the DIP Loans. The Borrower shall also pay all accrued and unpaid interest on such principal amount being prepaid together with any unpaid Up-Front Fee and the Exit Fee. Once repaid in connection with any mandatory prepayment, the DIP Loans may not be reborrowed. |
| **USE OF PROCEEDS:** | The proceeds of the DIP Facility shall be used (such uses, the "***Approved Uses***"): (a) to pay related transaction costs, fees and expenses; (b) to provide working capital for the Debtors and for other general corporate purposes of the Debtors; (c) to pay obligations arising from or related to the Carve Out; (d) to pay restructuring costs incurred in connection with the Bankruptcy Case; and (e) to pay the fees and costs of litigation with Whinstone US (such litigation, the "***Whinstone Litigation***"), |

<table>
<tr><td></td><td>in each case of (a)-(e), in accordance with the DIP Budget (as defined below).<br><br>Any cash on the balance sheet from time to time that constitutes Prepetition Notes Collateral shall be used to pay the costs of Approved Uses before using any proceeds of DIP Loans to pay the costs of Prepetition Notes.</td></tr>
<tr><td>USE OF CASH COLLATERAL:</td><td>The DIP Facility shall not be available unless the Bankruptcy Court shall have authorized the use by the Debtors of proceeds of prepetition collateral that constitutes "cash collateral" (within the meaning of the Bankruptcy Code).</td></tr>
<tr><td>REPRESENTATIONS AND WARRANTIES:</td><td>Each Debtor makes the representations and warranties set forth in <u>Annex VI</u> attached hereto, which is incorporated herein as though set forth in full.</td></tr>
<tr><td>AFFIRMATIVE COVENANTS:</td><td>Each Debtor shall comply with the covenants set forth in <u>Annex VII</u> attached hereto, which is incorporated herein as though set forth in full.</td></tr>
<tr><td>NEGATIVE COVENANTS:</td><td>Each Debtor shall comply with the covenants set forth in <u>Annex VIII</u> attached hereto, which is incorporated herein as though set forth in full.</td></tr>
<tr><td>FINANCIAL COVENANTS:</td><td>The Debtors shall comply with the financial covenants set forth below (collectively, the "**Financial Covenants**").<br><br>(a) <u>Minimum Liquidity</u>. The Debtors shall not permit the Debtors to have, at any time, less than the Minimum Liquidity Amount.<br><br>(b) <u>Permitted Variance</u>: Commencing as of the first Business Day in the week that is the fifth week after date that the first DIP Loan is funded, the Debtors shall not allow, as of the last day of any Variance Testing Period and measured on a rolling four week basis (each such four week period, a "**Cumulative Four-Week Period**"), the Debtors' average of the actual cash expenses and disbursements during such Cumulative Four-Week Period to be more than 110% of the projected cash expenses and disbursements for such Cumulative Four-Week Period, as set forth in the DIP Budget (the "**Permitted Variance**"), *provided* that the cash expenses and disbursements considered for determining compliance with this covenant shall exclude disbursements and expenses in respect of professional fees incurred in the Bankruptcy Cases during such Variance Testing Period and *provided* further, that the Debtors may carry</td></tr>
</table>

<table>
<tr>
<td></td>
<td>

forward budgeted but unused disbursements set forth in the DIP Budget for a Variance Testing Period for use during any succeeding Variance Testing Period.

(c)     <u>Minimum Miner Availability</u>. At all times, the Debtors shall not have fewer than 19,000 miners operational or available to be operational, except if power in the surrounding area is generally affected.

"***Minimum Liquidity Amount***" shall mean an amount equal to either (a) $5 million of cash (including any cash proceeds that will be received from a broker in exchange for BTC that has been traded) or (b) $5 million of BTC (calculated by reference to the Exchange Rate) held in an account in the name of a Debtor acceptable to the DIP Lenders and DIP Agent and that is subject to the dominion and control of the DIP Agent pursuant to an account control and/or custody agreement in form and substance reasonably satisfactory to DIP Lenders and the DIP Agent.

</td>
</tr>
<tr>
<td>**MILESTONES**:</td>
<td>

Each of the Debtors shall comply with the following deadlines (each of which may be extended with the prior written consent of the DIP Lenders and DIP Agent without further order of the Bankruptcy Court) (each a "***Milestone***" and collectively, the "***Milestones***"):

(a)     Sale-related Milestones to be applicable if the sale of the Debtors' Temple site assets is going to occur pursuant to section 363 of the Bankruptcy Code:

    i.     The Bankruptcy Court shall have entered a final order approving bidding procedures (the form and substance of which shall be reasonably satisfactory to the DIP Lenders and the DIP Agent) governing the solicitation of bids for the purchase (and an auction) of the Debtors' Temple site assets within 60 days after the Subsequent Petition Date;

    ii.     The Bankruptcy Court shall have entered a final order approving the sale of the Debtors' Temple site assets within 90 days after the Subsequent Petition Date.

</td>
</tr>
</table>

13

|  | (b)      Plan-related Milestones to be applicable if the sale of the Debtors' Temple site assets is going to occur pursuant to a chapter 11 plan: |
|  | i.     The Debtors shall file a chapter 11 plan in form and substance reasonably satisfactory to the DIP Lenders and DIP Agent, including providing that the DIP Loans will be Paid in Full (the "***Plan***") and a disclosure statement for the Plan in form and substance reasonably satisfactory to the DIP Lenders and DIP Agent (the "***Disclosure Statement***"), in each case, by the date that is no later than 30 days after the Subsequent Petition Date; |
|  | ii.    The Disclosure Statement shall be approved by the Bankruptcy Court by the date that is no later than 60 days after the filing of a motion seeking approval of the Disclosure Statement; and |
|  | iii.   The Bankruptcy Court shall have entered an order confirming the Plan by the date that is no later than 90 days after the Subsequent Petition Date. |
| **EVENTS OF DEFAULT**: | Each of the following events shall constitute an "***Event of Default***": |
|  | (a)      the DIP Loan Documents shall not have been executed and delivered by the Debtors, the DIP Agent and the DIP Lenders within three Business Days after the date of entry of the Interim Order (or shall not have been filed with, and approved by, the Bankruptcy Court within the times specified and otherwise in accordance with the Interim Order); |
|  | (b)      dismissal of the Bankruptcy Case or conversion of any Bankruptcy Case to a Chapter 7 case; |
|  | (c)      appointment of a Chapter 11 trustee, a responsible officer or an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Debtor in any Bankruptcy Case; |
|  | (d)      subject to the Carve Out, the Bankruptcy Court's granting of any superpriority claim or lien on the DIP Collateral |

14

which is *pari passu* with or senior to the claims or liens of the DIP Lenders in the Bankruptcy Cases;

(e)      after entry of the Final Order, (i) the entry of any final order in the Bankruptcy Case (A) surcharging any of the DIP Collateral as to the DIP Secured Parties under Section 506(c) of the Bankruptcy Code or otherwise, (B) resulting in the marshalling of any DIP Collateral as to the DIP Secured Parties, (C) precluding the attachment of Liens to any of the DIP Collateral based on the "equities of the case" exception under section 552(b) of the Bankruptcy Code; or (ii) the commencement of other actions by the Debtors adverse to the DIP Lenders or their rights and remedies under the DIP Facility in the Bankruptcy Case;

(f)      failure of the Final Order to be entered within 30 days after entry of the Interim Order;

(g)      failure of the Interim Order or Final Order to be in full force and effect, including by the entry of an order reversing, amending, supplementing, staying for a period in excess of five days, vacating or otherwise modifying the Interim Order or Final Order in a manner that is adverse to the DIP Agent or the DIP Lenders;

(h)      failure of any Debtor to comply with the terms of the applicable DIP Order;

(i)      entry of an order by the Bankruptcy Court terminating the use of cash collateral;

(j)      the payment by any Debtor (by way of adequate protection or otherwise) of any principal or interest or other amount on account of any prepetition indebtedness or payables (other than as agreed herein or pursuant to the consent of the DIP Lenders and DIP Agent);

(k)      the entry of an order or orders granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party or third parties to proceed against any assets of any Debtor having a value, individually or in the aggregate, in excess of $1,000,000 or to permit other actions that would have a material adverse effect on any Debtor or its estate;

(l)      the filing or confirmation of a chapter 11 plan that does not provide for termination of the Commitments under

15

the DIP Facility and the Debtors' obligations under the DIP Loan Documents be Paid in Full, or if any of the Debtors shall seek, support, or fail to contest in good faith the filing or confirmation of such a chapter 11 plan, unless, in each case, the obligations under the DIP Loan Documents will be Paid in Full from the proceeds of the sale of Debtors' Temple site assets pursuant to section 363 of the Bankruptcy Code;

(m)    an adverse judgment is entered in the Whinstone Litigation against any of the Debtors;

(n)    the Rockdale site shall not have lost power for more than 72 hours and shall not be at imminent risk of losing power for more than 72 hours, *provided* that the foregoing condition shall not constitute and Event of Default in each case where anyone of the following has occurred: (i) power in the surrounding area is generally affected; or (ii) power is lost during maintenance permitted under the New Hosting Service Agreement No. #R-5MW-006 between Whinstone US, Inc. and Rhodium JV LLC; or (iii) where Whinstone has caused, is generally responsible for, or generally responsible for maintenance of the systems leading to, the loss of power, and injunctive relief ordering the loss of power to cease has been obtained within 3 Business Days after the date power was first lost;

(o)    failure to repay or pay any amounts, whether of principal, interest or other amounts, when due under the DIP Loan Documents;

(p)    failure of any Debtor to comply with any Milestones, as applicable;

(q)    failure of any Debtor to comply with any covenant (including any Financial Covenant) set forth in this Term Sheet or in any other DIP Loan Document; or

(r)    any representation, warranty, certificate, information or other statement (financial or otherwise) made, deemed made or furnished by or on behalf of any Debtor to the DIP Agent or the DIP Lenders in or in connection with this Term Sheet or any of the other DIP Loan Documents, or as an inducement to the DIP Agent and the DIP Lenders to enter into this Term Sheet or any other DIP Loan Document, shall be false, incorrect, incomplete or misleading in any material respect (or if such representation, warranty, certificate, information or other

16

| | |
|---|---|
| | statement (financial or otherwise) is qualified by materiality, in any respect) when made, deemed made or furnished. |
| **REMEDIES:** | Upon an Event of Default, or the occurrence of a DIP Termination Order (as defined in the Interim Order or Final Order, as applicable), the DIP Agent and the DIP Lenders shall be permitted to exercise remedies on the terms and conditions set forth in the Interim Order or the Final Order, as applicable. All proceeds realized from the liquidation or other disposition of collateral or otherwise received after maturity of the DIP Loans, whether by acceleration or otherwise, shall be applied:<br><br>*first*, to payment or reimbursement of that portion of the Obligations constituting fees, expenses and indemnities payable to the DIP Secured Parties;<br><br>*second*, to payment of (x) accrued and unpaid interest on the DIP Loans and (y) other accrued and unpaid interest included in the Obligations;<br><br>*third*, to payment of principal outstanding on the DIP Loans;<br><br>*fourth*, to any other Obligations; and<br><br>*fifth*, any excess, after all of the Obligations shall have been indefeasibly paid in full in cash, shall be held as required by the Bankruptcy Court and/or any other applicable law.<br><br>In furtherance of the rights, powers and remedies of the DIP Secured Parties, on and after the occurrence of an Event of Default, and for so long as such Event of Default is uncured and continuing, each Debtor hereby irrevocably appoints the DIP Agent its true and lawful attorney, which appointment is coupled with an interest and is irrevocable, with full power of substitution, in the name of such Borrower, or otherwise, for the sole use and benefit of the DIP Agent, but at the Debtors' expense, to the extent permitted by applicable law, to exercise, at any time and from time to time during the continuance of an Event of Default, all or any of the following powers with respect to all or any of the DIP Collateral: (i) to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due thereon or by virtue thereof, (ii) to settle, compromise, compound, prosecute or defend any action or proceeding with respect thereto, (iii) to sell, transfer, assign, |

| | |
|---|---|
| | seize or otherwise deal in or with the DIP Collateral or the proceeds or avails thereof, as fully and effectually as if the DIP Agent was the absolute owner thereof, and (iv) to extend the time of payment of any or all thereof and to make any allowance and other adjustments with reference thereto; provided that the DIP Agent shall give the Debtors at least ten (10) days' prior written notice of the time and place of any public sale or the time after which any private sale or other intended disposition of any of the DIP Collateral is to be made. Each Borrower agrees that such notice constitutes "reasonable notification" within the meaning of Section 9-611 (or other section of similar content) of the relevant Uniform Commercial Code. |
| **CARVE-OUT:** | The "Carve-Out" shall be as defined in, and have the terms and conditions set forth in the Interim Order or the Final Order, as applicable. |
| **EXPENSES AND INDEMNIFICATION:** | The Debtors shall pay (i) all reasonable and documented pre- and post-petition costs and expenses incurred by the DIP Agent and the DIP Lenders and their respective Affiliates, including, without limitation, the fees, charges and disbursements of counsel and other outside consultants for the DIP Agent and the DIP Lenders, the reasonable travel, photocopy, mailing, courier, telephone and other similar expenses and, in connection with the credit facility provided for herein, the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the DIP Agent and the DIP Lenders) of this Term Sheet and any other DIP Loan Document and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all documented out-of-pocket costs, expenses, taxes, assessments and other charges incurred by the DIP Agent and the DIP Lenders in connection with any filing, registration, recording or perfection of any security interest contemplated by this Term Sheet or any other DIP Loan Document or any other document referred to therein, and (iii) all reasonable and documented out-of-pocket expenses incurred by the DIP Agent and the DIP Lenders, including the fees, charges and disbursements of any counsel for the DIP Agent and the DIP Lenders, in connection with the enforcement or protection of its rights in connection with this Term Sheet or any other DIP Loan Document, or in connection with the DIP Loans made hereunder, including, without limitation, all such out-of-pocket |

18

expenses incurred during any workout, restructuring or negotiations in respect of such DIP Loans.

The Debtors shall indemnify the DIP Agent and the DIP Lenders, their respective Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates (each such Person being called an "***Indemnitee***") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (a) the execution or delivery of this Term Sheet or any other DIP Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto or the parties to any other DIP Loan Document of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or by any other DIP Loan Document, (b) the failure of any Debtor to comply with the terms of this Term Sheet or any other DIP Loan Document or with any governmental requirement, (c) any inaccuracy of any representation or any breach of any warranty or covenant of any Debtor set forth in this Term Sheet or any other DIP Loan Document any instruments, documents or certifications delivered in connection therewith, (d) any DIP Loan or the use of the proceeds therefrom, (e) any other aspect of this Term Sheet or any other DIP Loan Document, (f) the operations of the business of the Debtors by the Debtors, (g) any assertion that the DIP Agent or the DIP Lenders were not entitled to receive the proceeds received pursuant to this Term Sheet, any other DIP Loan Document, the Interim Order or the Final Order, (h) any environmental law applicable to the Debtors or any of their assets, or (i) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, and such indemnity shall extend to each Indemnitee notwithstanding the concurrent negligence of every kind or character whatsoever, whether active or passive, whether an affirmative act or an omission, including without limitation, all types of negligent conduct identified in the restatement (second) of torts of one or more of the Indemnitees or by reason of strict liability imposed without fault on any one or more of the Indemnitees; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or

| | |
|---|---|
| | related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.<br><br>All amounts due under this section captioned "**Expenses and Indemnification**" shall be due and payable upon written demand therefor, which shall include written documentation of such amounts, and shall bear interest at the Default Rate if not paid within ten (10) Business Days after the Borrower's receipt of any such written demand.<br><br>To the extent permitted by applicable law, each of the Debtors, DIP Agent, and the DIP Lenders shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Term Sheet, any other DIP Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any DIP Loan or the use of the proceeds thereof. |
| **RELEASES:** | The DIP Orders shall include a customary release of the DIP Secured Parties, with respect to any and all claims and causes of action arising from or related to the DIP Facility. |
| **AMENDMENTS:** | This Term Sheet may only be amended in writing by the parties hereto. |
| **ASSIGNMENTS AND PARTICIPATIONS:** | The DIP Lenders shall be permitted to assign the DIP Loans, the Commitments and the DIP Loan Documents to Affiliates without the consent of the Debtors, so long as each of such Affiliates has the financial wherewithal to fulfill its obligations under the DIP Loans, the Commitments and the DIP Loan Documents.  No Debtor may assign or transfer any of its obligations or interest in this Term Sheet or any other DIP Loan Document without the prior written consent of the DIP Agent and the DIP Lenders, and any purported assignment or transfer by any Debtor in violation of the foregoing shall be null and void. |
| **GOVERNING LAW:** | New York. |

[Signature Pages Follow]

20

The parties hereto have caused this Term Sheet to be duly executed as of the date first written above.

**DEBTORS**:

**DIP AGENT:**

**DIP LENDERS:**

ANNEX I

Commitments

If a USD DIP Facility

| DIP Lender | Commitment |
|---|---|
| Galaxy Digital Qualified Opportunity Zone Business LLC | $30,000,000 |

If a BTC DIP Facility

| DIP Lender | Commitment |
|---|---|
| Galaxy Digital LLC | 500 BTC |

ANNEX II

DIP Budget

ANNEX III

Initial 13-Week Cash Flow Forecast

ANNEX IV

Prepetition Secured Promissory Notes consist of:

    (a)       Those certain secured promissory notes (the "***Rhodium Encore Notes***") issued by Rhodium Encore LLC ("***Rhodium Encore***") in the original principal amount of $23.1 million and secured by all assets of Rhodium Encore (such assets, the "***Rhodium Encore Notes Collateral***");

    (b)       Those certain secured promissory notes (the "***Rhodium 2.0 Notes***") issued by Rhodium 2.0 LLC ("***Rhodium 2.0***") in the original principal amount of $31.5 million and secured by all assets of Rhodium 2.0 (such assets, the "***Rhodium 2.0 Notes Collateral***");

    (c)       Those certain secured promissory notes (the "***Rhodium Technologies Notes***") issued by the Borrower in the original principal amount of $18.9 million and secured by the certain LLC units of the Borrower (such assets, the "***Rhodium Technologies Notes Collateral***"); and

    (d)       Those certain secured promissory notes (the "***Rhodium Technologies Exchange Notes***" and, together with the Rhodium Encore Note, the Rhodium 2.0 Notes, and the Rhodium Technologies Notes, the "***Prepetition Notes***") issued by the Borrower in the original principal amount of $6.4 million and secured by certain assets of Rhodium 30MW LLC (such assets, the "***Rhodium Technologies Exchange Notes Collateral***" and, together with the Rhodium Encore Notes Collateral, the Rhodium 2.0 Notes Collateral, and the Rhodium Technologies Notes Collateral, the "***Prepetition Notes Collateral***")

ANNEX V

Certain Definitions; Rules of Construction; Other

1.     <u>Certain Defined Terms</u>.  Unless otherwise defined in this Term Sheet, as used in this Term Sheet, the following terms have the meanings specified below:

"***Adverse Claim***" means a Lien, security interest, pledge, charge or encumbrance, or similar right or claim of any Person, other than (a) Liens in favor of the DIP Agent or the DIP Lenders, (b) Liens in favor of the Prepetition Secured Parties and (c) Liens existing on the applicable Petition Date and described on <u>Annex X</u> attached hereto.

"***Affiliate***" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.

"***AML Laws***" means all laws, rules, and regulations of any jurisdiction applicable to the DIP Lenders or any Debtor from time to time concerning or relating to anti-money laundering.

"***Anti-Corruption Laws***" means all laws, rules, and regulations of any jurisdiction applicable to any Debtor from time to time concerning or relating to bribery or corruption.

"***Approved Uses***" has the meaning set forth in the section of this Term Sheet captioned "**Use of Proceeds**".

"***Bankruptcy Cases***" has the meaning set forth in the section of this Term Sheet captioned "**Borrower**".

"***Bankruptcy Code***" has the meaning set forth in the section of this Term Sheet captioned "**Borrower**".

"***Bankruptcy Court***" has the meaning set forth in the section of this Term Sheet captioned "**Borrower**".

"***Borrower***" has the meaning set forth in the section of this Term Sheet captioned "**Borrower**".

"***BTC***" has the meaning set forth in the section of this Term Sheet captioned "**DIP Facility**".

"***BTC DIP Facility***" has the meaning set forth in the section of this Term Sheet captioned "**DIP Facility**".

"***BTC DIP Loans***" has the meaning set forth in the section of this Term Sheet captioned "**DIP Facility**".

"**_Business Day_**" means any day other than a Saturday or Sunday, a day that is a legal holiday under the laws of the State of Texas, or a day on which banking institutions located in such State are authorized or required by law to remain closed.

"**_Carve-Out_**" has the meaning set forth in the section of this Term Sheet captioned "**Carve-Out**" and as may be further defined in the applicable DIP Order.

"**_Commitments_**" has the meaning set forth in the section of this Term Sheet captioned "**DIP Facility**".

"**_Committee_**" means any statutory committee appointed in the Bankruptcy Cases.

"**_Debtors_**" has the meaning set forth in the section of this Term Sheet captioned "**Guarantors**".

"**_Default_**" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived by the DIP Lenders, become an Event of Default.

"**_Default Rate_**" has the meaning set forth in the section of this Term Sheet captioned "**Interest Rate and Fees**".

"**_DIP Agent_**" has the meaning set forth in the section of this Term Sheet captioned "**DIP Administrative Agent**".

"**_DIP Budget_**" has the meaning set forth in the section of this Term Sheet captioned "**Initial Availability**".

"**_DIP Collateral_**" has the meaning set forth in the section of this Term Sheet captioned "**Priority/Security**".

"**_DIP Facility_**" has the meaning set forth in the introductory paragraph of this document.

"**_DIP Lenders_**" has the meaning set forth in the section of this Term Sheet captioned "**DIP Lender(s)**".

"**_DIP Loan Documents_**" has the meaning set forth in the section of this Term Sheet captioned "**Guarantors**".

"**_DIP Loans_**" has the meaning set forth in the section of this Term Sheet captioned "**DIP Facility**".

"**_DIP Orders_**" has the meaning set forth in the section of this Term Sheet captioned "**Full Availability**".

"**_Disclosure Statement_**" has the meaning set forth in the section of this Term Sheet captioned "**Milestones**".

"**_Disqualified Capital Stock_**" means any equity interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other equity interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is convertible or exchangeable for Debt or redeemable for any consideration other than other equity interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part, on or prior to the date that is one year after the earlier of (a) the Maturity Date and (b) the date on which there are no DIP Loans or other Obligations hereunder outstanding and the Commitment is terminated.

"**_ERISA_**" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute.

"**_Event of Default_**" has the meaning set forth in the section of this Summary of Terms captioned "**Events of Default.**"

"**_Exit Fee_**" has the meaning set forth in the section of this Term Sheet captioned "**Interest Rate and Fees**".

"**_Final Cash Collateral Order_**" has the meaning set forth in the section of this Term Sheet captioned "**Conditions to Full Availability**".

"**_Final Order_**" has the meaning set forth in the section of this Term Sheet captioned "**Full Availability**".

"**_Financial Covenants_**" has the meaning set forth in the section of this Term Sheet captioned "**Financial Covenants**".

"**_Full Availability_**" has the meaning set forth in the section of this Term Sheet captioned "**Full Availability**".

"**_GAAP_**" means generally accepted accounting principles in the United States of America as in effect from time to time.

"**_Indebtedness_**" means, for any Person, the sum of the following (without duplication): (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all accounts payable, accrued expenses, liabilities or other obligations of such Person, in each such case to pay the deferred purchase price of assets or services; (d) all obligations under capital leases; (e) all obligations under synthetic leases; (f) all Indebtedness (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on any assets of such Person, whether or not such Indebtedness is assumed by such Person; (g) all Indebtedness (as defined in the other clauses of this definition) of others guaranteed by such Person or in which such Person otherwise assures a creditor against loss of the Indebtedness (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Indebtedness and the

maximum stated amount of such guarantee or assurance against loss; (h) all obligations or undertakings of such Person to maintain or cause to be maintained the financial position or covenants of any other Person or to purchase the Indebtedness or assets of any other Person; (i) all obligations to deliver commodities, goods or services, in consideration of one or more advance payments; (j) all obligations to pay for goods or services whether or not such goods or services are actually received or utilized by such Person; (k) any Indebtedness of a partnership for which such Person is liable either by agreement, by operation of law but only to the extent of such liability; and (l) Disqualified Capital Stock. The Indebtedness of any Person shall include all obligations of such Person of the character described above to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Person under GAAP.

"*Indemnitee*" has the meaning set forth in the section of this Term Sheet captioned "**Indemnification**".

"*Initial Availability*" has the meaning set forth in the section of this Term Sheet captioned "**Initial Availability**".

"*Interim Cash Collateral Order*" has the meaning set forth in the section of this Term Sheet captioned "**Conditions to Initial Availability**".

"*Interim Order*" has the meaning set forth in the section of this Term Sheet captioned "**Initial Availability**".

"*Initial Petition Date*" has the meaning set forth in the section of this Term Sheet captioned "**Borrower**."

"*Investment*" means, for any Person: (a) the acquisition (whether for cash, assets, services or securities or otherwise) of equity interests of any other Person or any agreement to make any such acquisition (including, without limitation, any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale); (b) the making of any deposit with, or advance, loan or capital contribution to, assumption of Debt of, purchase or other acquisition of any other Debt or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of assets from another Person subject to an understanding or agreement, contingent or otherwise, to resell such assets to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory or supplies sold by such Person in the ordinary course of business); (c) the purchase or acquisition (in one or a series of transactions) of assets of another Person that constitutes a business unit; or (d) the entering into of any guarantee of, or other contingent obligation (including the deposit of any equity interests to be sold) with respect to, Debt or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"*Invoice Amount*" has the meaning set forth in the section of this Term Sheet captioned "**Interest Rate and Fees**".

"*Invoice Date*" has the meaning set forth in the section of this Term Sheet captioned "**Interest Rate and Fees**".

"*Invoice Due Date*" has the meaning set forth in the section of this Term Sheet captioned "**Interest Rate and Fees**".

"*Lien*" means any interest in assets securing an obligation owed to, or a claim by, a Person other than the owner of the assets, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including but not limited to the lien or security interest arising from a mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes.  The term "Lien" shall include easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations.  For the purposes of this Term Sheet, the Debtors shall be deemed to be the owner of any assets which they have acquired or hold subject to a conditional sale agreement, or leases under a financing lease or other arrangement pursuant to which title to the assets has been retained by or vested in some other Person in a transaction intended to create a financing.

"*Loan Parties*" has the meaning set forth in the section of this Term Sheet captioned "**Borrower**".

"*Material Adverse Effect*" means a material adverse change in, or material adverse effect on (a) the business, operations, assets, liabilities (actual or contingent) or condition (financial or otherwise) of the Debtors or on their estates, taken as a whole, other than any change, event or occurrence, arising individually or in the aggregate, from events that could reasonably be expected to result from the filing or commencement of the Bankruptcy Case, (b) the ability of any Debtor to perform any of its obligations under any DIP Loan Document to which it is a party (including, without limitation, payment and performance of the Obligations), (c) the validity or enforceability of any DIP Loan Document or the Obligations, (d) the DIP Collateral, (e) the status, existence, perfection or priority of the DIP Lenders' security interest in the DIP Collateral or (f) the rights and remedies of, or benefits available to, the DIP Lenders under any DIP Loan Document.

"*Maturity Date*" has the meaning set forth in the section of this Term Sheet captioned "**Maturity Date**".

"*Milestones*" has the meaning set forth in the section of this Term Sheet captioned "**Milestones**".

"*Notice of Borrowing*" has the meaning set forth in the section of this Term Sheet captioned "**Conditions to Initial Availability**".

"*Obligations*" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed or owing by the Debtors or any one of them to the DIP Agent or the DIP Lenders of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising pursuant to the terms of this Term Sheet or any of the other DIP Loan Documents, including without limitation all interest

(including interest that accrues after the commencement of any bankruptcy or other insolvency proceeding by or against the Debtors, whether or not allowed or allowable), fees, charges, expenses, attorneys' fees and accountants' fees chargeable to and payable by the Debtors hereunder and thereunder.

"*Paid in Full*" has the meaning set forth in the section of this Term Sheet captioned "**Maturity Date**".

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"*Petition Date*" has the meaning set forth in the section of this Term Sheet captioned "**Borrower**."

"*Plan*" has the meaning set forth in the section of this Term Sheet captioned "**Milestones**".

"*Prepetition Notes*" has the meaning set forth in Annex IV of this Term Sheet.

"*Prepetition Notes Collateral*" has the meaning set forth in Annex IV of this Term Sheet.

"*Prepetition Secured Parties*" means the holders under the Prepetition Notes.

"*Prepetition Notes Liens*" means the Liens securing the Prepetition Notes Collateral.

"*Restricted Payment*" means any dividend or other distribution (whether in cash, securities or other assets) with respect to any equity interests in any Debtor, or any payment (whether in cash, securities or other assets), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such equity interests in such Debtor or any option, warrant or other right to acquire any such equity interests in such Debtor.

"*Sanctioned Country*" means, at any time, a country or territory which is itself, or whose government is, the subject or target of any Sanctions broadly restricting or prohibiting dealing with such country, territory or government.

"*Sanctioned Person*" means, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the United States (including by the Office of Foreign Assets control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce), or by the United Nations Security Council, the European Union or any EU member state, or Her Majesty's Treasury, (b) any Person located, operating, organized or resident in a Sanctioned Country or (c) any Person directly or indirectly owned or controlled by any such Person or Persons.

"*Sanctions*" means economic or financial sanctions or trade embargoes or restricted measures imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets control of the U.S. Department of

the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"*SOFR*" means the secured overnight financing rate as administered by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"*Subsequent Petition Date*" has the meaning set forth in the section of this Term Sheet captioned "**Borrower**".

"*Swap Agreement*" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"*Term Sheet*" has the meaning set forth in the introductory paragraph of this document.

"*Transactions*" means, with respect to any Debtor, the execution, delivery and performance by such Debtor of this Term Sheet, and each other DIP Loan Document to which it is a party, the borrowing of DIP Loans, the use of the proceeds thereof, and the grant of Liens by such Debtor on the DIP Collateral and other assets pursuant to the DIP Loan Documents.

"*Unfunded Commitment Fees*" has the meaning set forth in the section of this Term Sheet captioned "**Interest Rate and Fees**".

"*Up-Front Fee*" has the meaning set forth in the section of this Term Sheet captioned "**Interest Rate and Fees**".

"*USA PATRIOT Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56), as amended.

"*USD DIP Facility*" has the meaning set forth in the section of this Term Sheet captioned "**DIP Facility**".

"*USD DIP Loans*" has the meaning set forth in the section of this Term Sheet captioned "**DIP Facility**".

"*Whinstone Litigation*" has the meaning set forth in the section of this Term Sheet captioned "**Use of Proceeds**".

2.      Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context

requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in the DIP Loan Documents herein), (b) any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the DIP Loan Documents herein), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Term Sheet in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including" and (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Term Sheet.  No provision of this Term Sheet or any other DIP Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

3.      <u>Accounting Terms and Determinations</u>.  Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the DIP Agent or the DIP Lenders hereunder shall be prepared fairly, in all material respects, to reflect the financial information contained in such financial statement or certificate.

4.      <u>Divisions</u>.  For all purposes under the DIP Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws):  (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

5.      <u>Due Date Extension</u>. If any payment of principal or interest with respect to any DIP Loan falls due on a day which is not a Business Day, then such due date shall be extended to the next following Business Day, and additional interest shall accrue at the applicable interest rate and be payable for the period of such extension.

ANNEX VI

Representations and Warranties

1.    <u>Reporting</u>.  None of the reports, financial statements, certificates or other information furnished by or on behalf of any Debtor in writing to the DIP Agent or DIP Lenders in connection with the negotiation of this Term Sheet or any other DIP Loan Document contains any material misstatement of fact as of which such information is dated or omits to state any material fact necessary to make the statements therein not misleading; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Debtors represent only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule.

2.    <u>Material Agreements</u>.  Except for that certain notice of default provided by Temple Green Data or any purported notices of default which the Debtors dispute in good faith or the failure to make payment on the maturity date of the Prepetition Note, there are no defaults by any of the Debtors under material agreements entered into as of the Petition Date, except for the purported breaches asserted in the Whinstone Litigation.

3.    <u>Orders</u>.  Any orders of the Bankruptcy Court related to the financing contemplated by the DIP Facility or the use of cash collateral remain in effect.

4.    <u>Material Assumptions</u>.  The Debtors have not failed to disclose any material assumptions with respect to the DIP Budget and affirm the reasonableness of the assumptions in the DIP Budget in all material respects.

5.    <u>Organization; Powers</u>.  Subject to the entry and terms of the Interim Order, and to the extent applicable, the Final Order, each Debtor is duly organized, validly existing and, if applicable, in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every material jurisdiction where such qualification is required.

6.    <u>Authority; Enforceability</u>.  Subject to the entry and terms of the Interim Order, and to the extent applicable, the Final Order, the Transactions are within each Debtor's corporate powers and have been duly authorized by all necessary corporate and, if required, member action (including, without limitation, any action required to be taken by any class of directors of any Debtor or any other Person, whether interested or disinterested, in order to ensure the due authorization of the Transactions).  When executed and delivered, each DIP Loan Document to which any Debtor is a party shall have been duly executed and delivered by such Debtor and, upon entry of the Interim Order, and to the extent applicable, the Final Order, shall constitute a legal, valid and binding obligation of such Debtor, enforceable in accordance with its terms.

7.      Approvals; No Conflicts.  Subject to the entry of the Interim Order and, to the extent applicable, the Final Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any governmental authority or any other third Person (including the members or any class of directors of any Debtor or any other Person, whether interested or disinterested), nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any DIP Loan Document or the consummation of the Transactions, except such as have been obtained or made and are in full force and effect, and except for the filing and recording of applicable DIP Loan Documents to perfect the Liens as required by this Term Sheet and the applicable DIP Order, (b) do not violate any applicable law or regulation or the charter, by-laws or other organizational documents of any Debtor or any order of any governmental authority, (c) other than violations arising as a result of the commencement of the Bankruptcy Cases, do not violate or result in a default under any indenture, agreement or other instrument binding upon any Debtor or its assets, or give rise to a right thereunder to require any payment to be made by such Debtor and (d) do not result in the creation or imposition of any Lien on any assets of any Debtor(other than the Liens and security interests in favor of the DIP Lenders (or any designee) created by the DIP Loan Documents).

8.      Financial Position; No Material Adverse Change.

        (a)      The financial statements or other financial information of the Debtors most recently delivered to the DIP Agent and the DIP Lenders presents fairly, in all material respects, the financial position and results of operations and cash flows of the Debtors and their subsidiaries as of such date and for such period.

        (b)      Since the Petition Date, (i) there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect and (ii) other than as contemplated under this Term Sheet, the business of Debtors has been conducted only in the ordinary course consistent with past business practices.

        (c)      No Debtor has on the date hereof any material Indebtedness (including Disqualified Capital Stock), or any contingent liabilities, off-balance sheet liabilities or partnerships, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments, except as referred to or reflected or provided for in the financial statements provided to the DIP Agent and the DIP Lenders prior to the date of this Term Sheet.

9.      Litigation.  Except as disclosed on Annex IX and the Whinstone Litigation, and other than the Bankruptcy Cases, there are no actions, suits, investigations or proceedings by or before any arbitrator or governmental authority pending by or against or, to the knowledge of the Debtors, threatened by or against or affecting any Debtor.

10.      Environmental Matters.  The Debtors are in material compliance with all environmental laws and do not use hazardous materials in the conduct of their business.

11.      Compliance with Laws and Agreements; No Defaults.

(a)     Each Debtor is in material compliance with all laws applicable to it or its assets and all agreements and other instruments binding upon it or its assets and, subject to any restrictions arising on account of any Debtor's status as a "debtor" under the Bankruptcy Code, and possesses all licenses, permits, franchises, exemptions, approvals and other authorizations granted by governmental authorities necessary for the ownership of its assets.

(b)     Except to the extent subject to the automatic stay under the Bankruptcy Case and excluding any alleged defaults that the Debtors dispute in good faith, no Debtor is (i) in default nor has any event or circumstance occurred which, but for the expiration of any applicable grace period or the giving of notice, or both, would constitute a default or would require any Debtor to redeem or make any offer to redeem all or any portion of any Debt outstanding under any indenture, note, credit agreement or instrument pursuant to which any Debt is outstanding or by which any Debtor or any of such Debtor's assets is bound or (ii) in default under any material contract entered into as of the Petition Date.

(c)     No Default or Event of Default has occurred and is continuing.

12.    <u>Investment Company Act</u>.   No Debtor is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

13.    <u>Taxes</u>.  Each Debtor has timely filed or caused to be filed all tax returns and reports required to have been filed and has paid or caused to be paid all taxes required to have been paid by it, except (a) taxes that are being contested in good faith by appropriate proceedings and for which such Debtor has set aside on its books adequate reserves in accordance with GAAP or (b) to the extent otherwise excused or prohibited by the Bankruptcy Code and not otherwise authorized by the Bankruptcy Court.

14.    <u>ERISA</u>.  No Debtor has any plan that is subject to ERISA (excluding any employee health insurance plans and any 401(k) plans) and is not subject to any liability under ERISA.

15.    <u>Disclosure</u>.  There is no fact peculiar to any Debtor other than as set forth in the Final Order that could reasonably be expected to have a Material Adverse Effect or, to the knowledge of the Debtors, in the future is reasonably likely to have a Material Adverse Effect and which has not been set forth in this Term Sheet or the DIP Loan Documents or the other documents, certificates and statements furnished to the DIP Agent or the DIP Lenders by or on behalf of any Debtor prior to, or on, the date hereof in connection with the transactions contemplated hereby.

16.    <u>Insurance</u>.  The Debtors have, (i) all insurance policies sufficient for the compliance by each of them with all material laws and all material agreements and (ii) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Debtors.

17.    <u>Restriction on Liens</u>.  Subject to entry of the Interim Order and, to the extent applicable, the Final Order, no Debtor is a party to any material agreement or arrangement, or, other than as a

result of the Bankruptcy Case, subject to any order, judgment, writ or decree, which either restricts or purports to restrict its ability to grant liens to the DIP Agent or the DIP Lenders on or in respect of their assets to secure the Obligations.

18.     <u>Subsidiaries</u>.  The Debtors do not have any subsidiaries or own any equity interest in any Person other than another Debtor, other than notes held by Rhodium Technologies LLC convertible into Advanced Crypto Services, Inc.

19.     <u>Assets; Titles, Etc</u>.  Except as a result of the filing of the Bankruptcy Cases:

        (a)     Each Debtor has good and defensible title to its material assets, in each case, free and clear of all Liens except Liens permitted by this Term Sheet and any Liens existing as of the applicable Petition Date and described on <u>Annex X</u>.

        (b)     All agreements necessary for the present conduct of the business of the Debtors are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such agreement.

        (c)     The rights and assets presently owned, leased or licensed by the Debtors including, without limitation, all easements and rights of way, include all rights and assets necessary to permit the Debtors to conduct their business in all material respects in the same manner as its business has been conducted prior to the date hereof.

        (d)     Substantially all of the assets of the Debtors that are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards.

        (e)     Each Debtor owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by such Debtor does not infringe upon the rights of any other Person.

20.     <u>Swap Agreements</u>.  No Debtor is party to a Swap Agreement.

21.     <u>USA PATRIOT; AML Laws; Anti-Corruption Laws and Sanctions</u>.  None of (a) the Debtors or any of their respective directors or officers, or, to the knowledge of the Debtors, any of their respective employees or Affiliates, or (b) to the knowledge of the Debtors, any agent of any Debtor or other Affiliate that will act in any capacity in connection with or benefit from the credit facility established hereby, (i) is a Sanctioned Person or (ii) is in violation of AML Laws, Anti-Corruption Laws, or Sanctions.  No DIP Loans, use of proceeds or other transaction contemplated by this Term Sheet will cause a violation of AML Laws, Anti-Corruption Laws or applicable Sanctions by any Person participating in the transactions contemplated by this Term Sheet, whether as lender, borrower, guarantor, agent, or otherwise.  No Debtor, or, to the knowledge of the Debtors, any other Affiliate has engaged in or intends to engage in any dealings or transactions with, or for the benefit of, any Sanctioned Person or with or in any Sanctioned Country.

22.     <u>DIP Order</u>. Following entry of the Interim Order and, to the extent applicable, the Final Order, by the Bankruptcy Court, the applicable DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the DIP Lenders.

23.     <u>DIP Budget</u>.  The Debtors have not failed to disclose any material assumptions with respect to the DIP Budget and affirm the reasonableness of the assumptions in the DIP Budget in all material respects.

24.     <u>Quality of Title</u>. The DIP Collateral is owned by a Debtor free and clear of any Adverse Claim.

ANNEX VII

Affirmative Covenants

So long as any DIP Loan remains unpaid, or any other Obligation remains unpaid or unperformed, or any portion of any loan commitment hereunder remains in force, the Debtors shall comply, and shall cause compliance by its subsidiaries (if any), with the following affirmative covenants:

1.      Orders. The Debtors shall deliver to the DIP Agent as soon as practicable in advance of filing with the Bankruptcy Court the Interim Order and the Final Order (which must be in form and substance reasonably satisfactory to the DIP Lenders and DIP Agent), other pleadings that materially affect the DIP Lenders, including the Interim Cash Collateral Order or the Final Cash Collateral Order (or similar orders addressing the use of the Prepetition Secured Parties' cash collateral on terms and conditions satisfactory to the DIP Agent and the DIP Lenders).

2.      Cash Flow Forecast.  Beginning on the first Friday after the first full calendar week after the Subsequent Petition Date, and no later than 7 calendar days after the end of each calendar month thereafter (each, a "***Reporting Date***"), the Debtors shall deliver to the DIP Agent an updated 13-Week Cash Flow Forecast and DIP Budget (which shall each be satisfactory to the DIP Lenders and DIP Agent and subject to the DIP Lenders' and DIP Agent's approval in their reasonable discretion (*provided* that the DIP Lenders shall have five Business Days to object to any revised 13-Week Cash Flow Forecast and DIP Budget, *provided* further, that if the DIP Lenders and DIP Agent object to any updated 13-Week Cash Flow Forecast and/or DIP Budget within such five-Business Day period following receipt thereof, the previously delivered 13-Week Cash Flow Forecast and DIP Budget shall remain in effect for purposes of the variance testing covenant and reporting) unless and until a revised DIP Budget is approved by the DIP Lenders, and the 13-Week Cash Flow Forecast shall be consistent with the DIP Budget).

3.      Variance Testing.  On each Reporting Date (such date, the "***Variance Testing Date***"), the Debtors shall deliver to the DIP Agent (in a form reasonably satisfactory to the DIP Lenders and DIP Agent) a variance report tested as of the end of the calendar month immediately prior to the most recent Reporting Date for such calendar month immediately prior to such Reporting Date (each such period, a "***Variance Testing Period***") setting forth: (i) the aggregate disbursements of the Debtors for line items during the applicable Variance Testing Period, and (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements for line items made during such Variance Testing Period by the Debtor against the aggregate disbursements for line items for the Variance Testing Period set forth in the applicable 13-Week Cash Flow Forecast and DIP Budget.

4.      Whinstone Litigation.  The Debtors shall deliver to the DIP Agent, periodic reports on, and make available representatives for conference calls to discuss, not less frequently than every other Friday following the Subsequent Petition Date until the Maturity Date, the status of and any developments in the Whinstone Litigation.

5.      Other Bi-Weekly Reporting.  The Debtors shall deliver to the DIP Agent, periodic reports on, and make available representatives for conference calls to discuss, not less frequently every

other Friday following the Subsequent Petition Date until the Maturity Date, the status of any development in the Bankruptcy Case, including, without limitation, the sale process.

6.      Variance Report.  No later than 7 calendar days after the last calendar day of each month, the Debtors shall deliver to the DIP Agent, a variance report comparing the Debtors' actual receipts and disbursements for the prior four calendar weeks (on a cumulative basis) with the projected receipts and disbursements for such four calendar weeks (on a cumulative basis) as reflected in the applicable DIP Budget for such weeks, which variance report shall include a report from the Debtors identifying and addressing any variance of actual performance to projected performance for the prior week.

7.      Certain Notices; Other Information.  The Debtors shall furnish to the DIP Agent:

        (a)      Notices of Certain Changes.  Without limiting any covenant that does not permit the same, promptly, but in any event within five (5) Business Days after the execution thereof, copies of any amendment, modification or supplement to any of the certificate or articles of incorporation or formation, by-laws, operating agreement, partnership agreement and any other governing document, any preferred stock designation or any other organic document of any Debtor.

        (b)      Other Requested Information.  Promptly following any request therefor, such other information, documents, records or reports regarding the Debtors, their assets, the DIP Collateral, including regarding the operations, business affairs and financial condition of any Debtor, or compliance with the terms of this Term Sheet or any other DIP Loan Document, as the DIP Lenders may reasonably request.

8.      Notices of Material Events.  The Debtors shall furnish to the DIP Lenders, promptly after any Debtor obtains knowledge thereof, written notice of the following:

        (a)      the occurrence of any Default or Event of Default;

        (b)      other than the Bankruptcy Cases, the Whinstone Litigation, or as disclosed on Annex IX, the filing or commencement of, or the threat in writing of, any action, suit, investigation, arbitration or proceeding by or before any arbitrator or governmental authority against or affecting any Debtor, or any material adverse development in any action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the DIP Lenders), that, in either case, if adversely determined, could reasonably be expected to result in liability in excess of $50,000;

        (c)      at least two (2) Business Days prior to filing (or such shorter period as the DIP Lenders may agree), the Debtors shall use commercially reasonable efforts to provide the DIP Lenders copies of all pleadings and motions (other than "first day" motions and proposed orders, but including any pleadings or other documents related to the sale of the Temple site under section 363 or otherwise, the Interim Cash Collateral Order, the Final Cash Collateral Order or any other proposed order relating to the use of the Prepetition Secured Parties' cash collateral, if the sale of the Temple site will not occur under section 363, the Plan and any disclosure statement

related thereto) to be filed by or on behalf of the Debtors with the Bankruptcy Court in the Bankruptcy Case, or to be distributed by or on behalf of the Debtors to any official committee appointed in the Bankruptcy Case, which such pleadings shall include the DIP Agent and the DIP Lenders as a notice party;

   (d) on a timely basis as specified in any DIP Order, all notices required to be given to all parties specified in such DIP Order, in the manner specified therefor therein; and

   (e) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this <u>Section 8</u> shall be accompanied by a statement of a senior officer of the Debtors setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

9. <u>Existence; Conduct of Business</u>.  Each Debtor shall do or cause to be done all things necessary to maintain, preserve, renew and keep in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization and the rights, licenses, permits, privileges, certification, approval and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which the ownership of its assets or conduct of business requires such qualification.

10. <u>Operation and Maintenance of Assets</u>.  Subject to any necessary order or authorization of the Bankruptcy Court, each Debtor shall keep and maintain all assets material to the conduct of its business in good working order and condition, ordinary wear and tear excepted preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its material assets.

11. <u>Insurance</u>.  Each Debtor shall maintain, with financially sound and reputable insurance companies, insurance (a) policies sufficient for the compliance by each of them with all material laws and all material agreements and (b) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Debtors.

12. <u>Books and Records; Inspection and Audit Rights</u>.

   (a) Each Debtor shall keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.

   (b) The Debtors shall permit the DIP Agent or its duly authorized representatives, attorneys or auditors during ordinary business hours and upon one (1) Business Days' prior written notice, to visit the offices thereof and to discuss their affairs, finances and condition with its officers and independent accountants and to examine, inspect and make extracts from the books and records of the Debtors and inspect the DIP Collateral, and the related accounts,

records and computer systems, software and programs used or maintained by the Debtors at such times as the DIP Agent may reasonably request, using auditors, accountants and/or other representatives selected by the DIP Agent in its sole and absolute discretion. Upon instructions from the DIP Agent, the Debtors shall release any document related to any DIP Collateral to the DIP Agent.

14.    <u>Compliance with Laws</u>.  Subject to any necessary order or authorization of the Bankruptcy Court, each Debtor shall comply with all laws, rules, regulations and orders of any governmental authority applicable to such Debtor or such Debtor's assets.  Each Debtor shall maintain in effect and enforce policies and procedures designed to ensure compliance by such Debtor and its respective directors, officers, employees and agents with Anti-Corruption Laws, applicable AML Laws and applicable Sanctions.

15.    <u>Further Assurances</u>.

(a)     Each Debtor at its sole expense shall promptly execute and deliver to the DIP Agent all such other documents, agreements and instruments reasonably requested by the DIP Agent to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of such Debtor, as the case may be, in the DIP Loan Documents or to further evidence and more fully describe the collateral intended as security for the Obligations, or to correct any omissions in this Term Sheet or any other DIP Loan Document, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Term Sheet or any other DIP Loan Document or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the sole discretion of the DIP Agent, in connection therewith.

(b)     Each Debtor hereby authorizes the DIP Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the DIP Collateral without the signature of such Debtor where permitted by law.  A carbon, photographic or other reproduction of any applicable DIP Loan Document or any financing statement covering the DIP Collateral or any part thereof shall be sufficient as a financing statement where permitted by law, and in any financing statement the DIP Agent may described the DIP Collateral as "all assets" or words to similar effect.

16.    <u>ERISA</u>.  The Debtors shall not create or maintain any plan subject to ERISA or incur any liability under ERISA.

17.    <u>Cash Management</u>. Each Debtor shall maintain their cash management system as it existed prior to the Petition Date for the benefit of the entire DIP Facility, with any changes made pursuant to an order of the Bankruptcy Court except for any changes requested by the DIP Lenders or permitted by the DIP Lenders in their sole and absolute discretion.

18.    <u>Additional Assistance</u>. The Debtors shall provide such cooperation, information and assistance, and prepare and supply the DIP Lenders with such data regarding the performance by the Debtors of their obligations under the DIP Loan Documents, as may be reasonably requested by the DIP Lenders from time to time.

ANNEX VIII

Negative Covenants

So long as any DIP Loan remains unpaid, or any other Obligation remains unpaid or unperformed, or any portion of any loan commitment hereunder remains in force, the Debtors shall comply, and shall cause compliance by its subsidiaries (if any), with the following negative covenants:

1       Liens.  No Debtor shall create or permit to exist any Liens or encumbrances on any assets, other than Liens securing the DIP Facility, Liens existing on the applicable Petition Date and described on Annex X attached hereto and Liens granted to the Prepetition Secured Parties to the extent set forth in the any order addressing the use of the Prepetition Secured Parties' cash collateral on terms satisfactory to the DIP Agent and the DIP Lenders, which Liens shall include scheduled Liens in existence on the applicable Petition Date to the extent subordinated pursuant to the DIP Orders.

2.      Indebtedness.  No Debtor shall incur, create or permit to exist any Indebtedness, other than (a) the DIP Facility, (b) accounts payable and other accrued expenses, liabilities or other obligations to pay (for the deferred purchase price of assets or services) from time to time incurred in the ordinary course of business which are not greater than ninety (90) days past the date of invoice or delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, (c) endorsements of negotiable instruments for collection in the ordinary course of business and (d) Indebtedness outstanding on the Petition Date and disclosed to the DIP Agent and the DIP Lenders.

3.      Superpriority Claims.  No Debtor shall create or permit to exist any other superpriority claim which is *pari passu* with or senior to the claims of the DIP Lenders, except for the Carve-Out.

4.      Disposition of Assets.  No Debtor shall sell, transfer, assign or otherwise dispose of any assets outside of the ordinary course of business (including, without limitation, any sale and leaseback transaction or any disposition under Bankruptcy Code section 363) without the prior written consent of the DIP Lenders and the DIP Agent, *provided* that the DIP Lenders and the DIP Agent have already consented to the sale of Debtors' Temple site assets so long as the DIP Obligations are Paid in Full in connection with such sale..

5.      Nature of Business.  No Debtor shall (a) modify or alter in any material manner the nature and type of a Debtor's business or the manner in which such business is conducted or its organizational documents, except as required by the Bankruptcy Code or in a manner that is not materially adverse to the interests of the DIP Lenders in their capacities as such, or (b) make any change (i) to any Debtor's legal name or in any trade name used to identify such Person in the conduct of its business or in the ownership of its assets, (ii) to the location of any Debtor's chief executive office or principal place of business, (iii) to any Debtor's corporate structure or in the jurisdiction in which such Debtor is incorporated or formed, (iv) to any Debtor's jurisdiction of organization or such Debtor's organizational identification number in such jurisdiction of

organization, and (v) to any Debtor's federal taxpayer identification number, in each case without the prior written consent of the DIP Agent and the DIP Lenders.

6.      <u>Prepetition Indebtedness</u>.  No Debtor shall make any payment with respect to prepetition Indebtedness, except as expressly provided in this Term Sheet or pursuant to orders entered upon pleadings in form and substance reasonably satisfactory to the DIP Lenders and DIP Agent.

7.      <u>Subrogation</u>.  No Debtor shall assert any right of subrogation or contribution against any other Debtors until all borrowings under the DIP Facility are paid in full and the Commitments are terminated.

8.      <u>Dividends, Distributions and Redemptions</u>.

        (a)      <u>Dividends and Distributions</u>.  No Debtor shall declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its equity holders or make any distribution of its assets to its equity holders.

        (b)      <u>Certain Amendments</u>.  No Debtor shall consent to any amendment, supplement, waiver or other modification of the terms or provisions contained in any Indebtedness for borrowed money (other than with respect to the Obligations pursuant to the provisions of this Term Sheet).

9.      <u>Investments, Loans and Advances</u>.  No Debtor shall make or permit to remain outstanding any Investments in or to any Person, other than (a) Investments in all of the Debtors in existence on the Petition Date and (b) Investments made with the prior written consent of the DIP Agent and the DIP Lenders.

10.     <u>Proceeds of DIP Loans; OFAC</u>.  No Debtor shall permit the proceeds of the DIP Loans to be used for any purpose other than those permitted by the section of this Term Sheet captioned "Use of Proceeds."  No Debtor nor any Person acting on behalf of any Debtor shall take any action which might cause any of the DIP Loan Documents to violate Regulations T, U or X or any other regulation of the Board of Governors of the Federal Reserve System of the United States of America or any successor governmental authority or to violate Section 7 of the Securities Exchange Act or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect.  No Debtor or its respective directors, officers, employees, Affiliates and agents shall use, directly or indirectly, the proceeds of any DIP Loans, or lend, contribute or otherwise make available such proceeds to any Subsidiary, other Affiliate, joint venture partner or other Person, (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or AML Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or involving any goods originating in or with a Sanctioned Person or Sanctioned Country, or (c) in any manner that would result in the violation of any Sanctions by any Person (including any Person participating in the transactions contemplated hereunder, whether as underwriter, advisor lender, investor or otherwise).

11.     ERISA Compliance.  No Debtor shall create or maintain any plan subject to ERISA.

12.     Sale or Discount of Receivables.  No Debtor shall discount or sell (with or without recourse) any of its notes receivable or accounts receivable.

13.     Mergers, Divisions, Etc.  No Debtor shall merge into or with or consolidate with any other Person, or sell, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to any other Person, or liquidate, consolidate or dissolve or divide.

14.     Environmental Matters.  No Debtor shall violate or permit any of its assets to be in violation of, or do anything or permit anything to be done which will subject any such assets to any remedial work under any environmental laws, assuming disclosure to the applicable governmental authority of all relevant facts, conditions and circumstances, if any, pertaining to such assets.

15.     Transactions with Affiliates.  No Debtor shall enter into any transaction, including, without limitation, any purchase, sale, or lease or exchange of assets, with any Affiliate that is not another Debtor, other than transactions or arrangements in place as of the Petition Date (including contractual obligations in place at such time) or approved by the Bankruptcy Court pursuant to an order in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders.

16.     Subsidiaries.  No Debtor shall create or acquire any subsidiaries or otherwise own the equity interests of any other Person other than another Debtor.

17.     Negative Pledge Agreements; Dividend Restrictions.  No Debtor shall create, incur, assume or suffer to exist any contract, agreement or understanding (other than this Term Sheet or any other DIP Loan Document) that in any way prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its assets in favor of the DIP Agent or to secure the Obligations.

18.     Swap Agreements.  No Debtor shall enter into any Swap Agreements.

19.     Accounting Changes.  No Debtor shall (i) make any change in accounting treatment or reporting practices, except as required by GAAP, or (ii) change the fiscal year of any Debtor.

20.     New Accounts.  No Debtor shall open or otherwise establish, or deposit, credit or otherwise transfer any cash receipts, securities, financial assets or any other property into, any deposit account, securities account or commodity account other than any deposit account, securities account or commodity account in which the DIP Agent has been granted a first-priority perfected Lien and that, in each case, is subject to a DIP Loan Document, and the Debtors shall have notified the DIP Agent and the DIP Lenders in writing no later than one (1) Business Day after the opening or establishment of any such new account.

21.     Key Employee Plans. No Debtor shall (a) enter into any key employee retention plan and incentive plan, other than such plans in effect as of the Petition Date or (b) amend or modify any

existing key employee retention plan and incentive plan, unless such plan, amendment or modification, as applicable, is satisfactory to the DIP Agent and DIP Lenders.

22.     <u>Bankruptcy Orders</u>. No Debtor shall (a) obtain or seek to obtain any stay from the Bankruptcy Court on the exercise of the DIP Lenders' remedies hereunder or under any other DIP Loan Document, except as specifically provided in the DIP Order, (b) seek to change or otherwise modify any DIP Order or other order in the Bankruptcy Court with respect to the DIP Facility or (c) without the consent of the DIP Agent and the DIP Lenders, propose, file, consent, solicit votes with respect to or support any chapter 11 plan or debtor in possession financing unless (i) such plan or financing would, on the date of effectiveness, pay in full in cash all Obligations and the loan commitments hereunder are terminated on such date of effectiveness or (ii) such plan is a Plan.

ANNEX IX

Litigation

On January 13, 2022, Rhodium was named as a defendant in a civil lawsuit alleging infringement of two patents and seeking compensatory and other damages.  The case is captioned *Midas Green Technologies, LLC v. Rhodium Enterprises, Inc. et al*., Civil Action Number 6:22-CV-00050-ADA, and is pending in the U.S. District Court for the Western District of Texas.

Whinstone Litigation

*Trine Mining, LLC, Cross The River, LLC and Elysium Mining, LLC v. Rhodium Enterprises, Inc.* (AAA Case No. 01-24-0005-8373)

ANNEX X

Existing Liens

ANNEX XI

Notice of Borrowing

FORM OF NOTICE OF BORROWING

Date: _____, _____

To:    Galaxy Digital LLC
        [●]
        [●]
        Attn: [●]
        Email: [●]

Ladies and Gentlemen:

Reference is made to the [summary of terms and conditions, dated as of [●], 2024 (as amended, restated, extended, supplemented or otherwise modified from time to time, the "***Term Sheet***"), by and among Rhodium Technologies LLC, a Delaware limited liability company (the "***Borrower***"), the other Debtors party thereto, the lenders party thereto (the "***DIP Lenders***") and Galaxy Digital LLC, as administrative agent and collateral agent for the DIP Lenders (the "***DIP Agent***")][1].  Capitalized terms used but not otherwise defined herein have the meanings assigned to them in the [Term Sheet].

The Borrower hereby requests a borrowing (a "***Borrowing***") of DIP Loans to be made on the terms set forth below:

(A)    Type of Borrowing (e.g. USD DIP Loans or BTC DIP Loans)    _____

(B)    Date of Borrowing, which is a business day (such date, the "***Proposed Borrowing Date***")    _____

(C)    Principal amount of Borrowing    [$]/[BTC] _____

---

[1] Description to be updated (and conforming changes to be made) following the execution of the definitive credit agreement.

(D)      Wire instructions for the Borrower's account:

Bank:
ABA Routing Transit Number:
Account Number:
Account Name:
FFC:
Reference:

The Borrower represents and warrants that the representations and warranties set forth in the [Term Sheet] and in each other DIP Loan Document are true and correct in all material respects on and as of the Proposed Borrowing Date with the same effect as though made on and as of such date.

At the time of and immediately after the Proposed Borrowing Date, no Default or Event of Default has occurred and is continuing.

Immediately after giving effect to such Borrowing, the aggregate amount of all DIP Loans made under the [Term Sheet] (whether or not outstanding), including the DIP Loans made as part of such Borrowing, does not exceed the aggregate used and unused Commitments of the DIP Lenders.

The intended uses of the proceeds of the Borrowing, which shall be in accordance with the DIP Budget, are set forth on Annex I attached hereto.

[The remainder of this page is intentionally left blank.]

**RHODIUM TECHNOLOGIES LLC**, as Borrower


By:

_____
Name:
Title:

*[Signature Page to Notice of Borrowing]*

**ANNEX I**

**Use of Proceeds**