## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RHODIUM ENCORE LLC, *et al.*,[1] | § | Case No. 24-90448 (ARP) |
| | § | |
| Debtors. | § | |
| | § | (Jointly Administered) |
| | § | |

## FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN SECURED SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF

(Relates to ECF Nos. 38 and 84)

Upon the motion (the "***Motion***")[2] of Rhodium Encore LLC ("***Rhodium Encore***") and each

of its affiliates that are debtors and debtors in possession (collectively, the "***Debtors***") in the above-

captioned chapter 11 cases (the "***Chapter 11 Cases***"), pursuant to sections 105, 362, 363, 364, 503,

506, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "***Bankruptcy***

***Code***"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure

(the "***Bankruptcy Rules***"), and Rules 2002-1, 4001-1(b), 4002-1 and 9013-1 of the Bankruptcy

Local Rules of the United States Bankruptcy Court for the Southern District of Texas and the

Procedures for Complex Chapter 11 Bankruptcy Cases (together, the "***Local Bankruptcy Rules***")

---

[1]  The Debtors in these chapter 11 cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), Rhodium 30MW LLC (0263), Rhodium Enterprises, Inc. (6290), Rhodium Technologies LLC (3973), Rhodium Renewables LLC (0748), Air HPC LLC (0387), Rhodium Shared Services LLC (5868), Rhodium Ready Ventures LLC (8618), Rhodium Industries LLC (4771), Rhodium Encore Sub LLC (1064), Jordan HPC Sub LLC (0463), Rhodium 2.0 Sub LLC (5319), Rhodium 10MW Sub LLC (3827), Rhodium 30MW Sub LLC (4386), and Rhodium Renewables Sub LLC (9511).  The mailing and service address of the Debtors in these chapter 11 cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005.

[2]  Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the Motion or DIP Credit Agreement (each as defined below), as applicable.

promulgated by the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Court***"), seeking entry of a final order (this "***Final Order***", and together with the Interim Order (as defined below), the "***DIP Orders***"), among other things:

(a)     authorizing the Debtors to obtain postpetition financing on a superpriority secured basis (the "***DIP Facility***", and the loans made, advanced or deemed advanced thereunder, the "***DIP Loans***") in accordance with and subject to the terms and conditions of (i) that certain [Senior Secured, Superpriority Debtor-in-Possession Loan and Security Agreement], substantially in the form attached to this Final Order as **Exhibit 1** and otherwise in form and substance acceptable to the DIP Agent (acting at the instruction of the DIP Lenders) (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "***DIP Credit Agreement***"), the Approved Budget (as defined below), and all other agreements, guarantees, pledge, collateral and security agreements, mortgages, deeds, charges, control agreements, instruments, certificates, notes, any separate fee letter agreements between any of the Debtors, on the one hand, and the DIP Agent (as defined below) or the DIP Lenders, on the other hand, and other documents executed, filed or delivered in connection therewith, including the "Loan Documents" (as defined in the DIP Credit Agreement) (each as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, together with the DIP Credit Agreement and the Approved Budget, collectively, the "***DIP Loan Documents***")), by and among Rhodium Technologies LLC, as borrower (the "***DIP Borrower***"), Rhodium Enterprises, Inc., as a guarantor, and all of the DIP Borrower's direct or indirect subsidiaries that are or become debtors and debtors-in-possession in these Chapter 11 Cases (together with Rhodium Enterprises, Inc., the "***DIP Guarantors***", and together with the DIP Borrower, the "***DIP Loan Parties***"), Galaxy Digital, LLC, as administrative agent and collateral agent (in such capacities, together with its successors and permitted assigns, the "***DIP Agent***"), and the lenders party thereto from time to time (together with their successors and permitted assigns, the "***DIP Lenders***", and together with the DIP Agent, the "***DIP Secured Parties***"), (ii) the Interim Order, pursuant to which upon satisfaction of all applicable conditions precedent described in the DIP Term Sheet (as defined below), the DIP Lenders made DIP Loans available to the Borrower in the aggregate principal amount of $15 million under the USD DIP Facility (as defined in the DIP Term Sheet) (the "***Initial Availability***"), and (iii) this Final Order, pursuant to which upon satisfaction of all applicable conditions precedent set forth in the DIP Loan Documents, the DIP Lenders shall make DIP Loans available to the Borrower in the aggregate principal amount of an additional $15 million under the USD DIP Facility (such principal amounts, together with the Initial Availability, the "***Full Availability***");

(b)     authorizing the DIP Loan Parties to (i) execute (to the extent not previously executed), deliver, and perform under the DIP Credit Agreement and each of the other DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the DIP Loan Documents, including without limitation, all

2

"Obligations" (as defined in the DIP Credit Agreement) (collectively, the "**DIP Obligations**"), whether or not such obligations arose before or after the applicable Petition Date, whenever the same shall become due or payable, whether at stated maturity, by prepayment, declaration, acceleration or otherwise, in each case, in accordance with the DIP Loan Documents and the DIP Orders, and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of the DIP Orders, the DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c)     authorizing the DIP Borrower to incur, and the DIP Guarantors to guarantee on an unconditional joint and several basis, all DIP Obligations, in accordance with the DIP Orders and the DIP Loan Documents;

(d)     granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, the DIP Liens (as defined below) in all DIP Collateral (as defined below), as set forth in the DIP Orders, subject to the Carve Out and subject to the relative priorities set forth in the DIP Orders and the DIP Loan Documents;

(e)     granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, allowed super-priority administrative expense claims against each of the Debtors in each of the Chapter 11 Cases and any Successor Cases (as defined below), on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve Out, as set forth in the DIP Orders;

(f)     authorizing the Debtors to use the proceeds of the DIP Facility and the DIP Collateral, solely in accordance with the terms and conditions set forth in the DIP Orders and the DIP Loan Documents, including the Approved Budget, subject to any variances expressly permitted herein and under the DIP Loan Documents (the "**Permitted Variances**");

(g)     approving certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, the DIP Secured Parties, the DIP Loan Documents, the DIP Liens, the DIP Obligations and the DIP Collateral, in each case, subject to the terms and provisions of the DIP Orders;

(h)     approving the Debtors' waiver of (a) the right to surcharge the DIP Collateral as to the DIP Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, (b) the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the DIP Secured Parties, and (c) the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the DIP Collateral as to the DIP Secured Parties and the DIP Obligations, in each case, upon the terms set forth in the DIP Orders; and

(i)     modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of the DIP Orders and the DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy

Rule 6004) with respect to the effectiveness and enforceability of this Final Order, providing for the immediate effectiveness of this Final Order, and granting related relief.

The Court, having considered the Motion, the DIP Loan Documents, the exhibits attached thereto, the *Declaration of David M. Dunn in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "***First Day Declaration***"), the *Declaration of Michael Robinson in Support of Debtor-in-Possession Financing* (the "***DIP Declaration***"), and the evidence submitted and arguments proffered or adduced at the interim hearing held before this Court on August 30, 2024 (the "***Interim Hearing***"); and the Court having entered the *Interim Order (i) Authorizing the Debtors to Obtain Secured Superpriority Postpetition Financing, (ii) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (iii) Modifying the Automatic Stay, (iv) Scheduling a Final Hearing, and (v) Granting Related Relief* [Docket No. 84] (the "***Interim Order***") on August 30, 2024; and upon the evidence submitted and arguments proffered or adduced at the final hearing held before this Court on September 23, 2024 (the "***Final Hearing***"); and upon the record of the Chapter 11 Cases; and due and proper notice of the Interim Hearing and the Final Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Bankruptcy Rules; and it appearing that no other or further notice need be provided; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; the Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing and Final Hearing established just cause for the relief granted herein; and it appearing to the Court that granting the final relief requested in the Motion, as provided in and modified by this Final Order, is fair and reasonable and in the best interests of the Debtors, their estates, their creditors, and all other parties in interest, represents a sound exercise of the Debtors' business judgment, is necessary for the continued operation of the Debtors' businesses and is necessary to preserve and maximize the value of the

Debtors and their estates; and the Debtors having provided notice of the Motion as set forth in the Motion; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.     *Petition Date.* On August 24, 2024 (the "***Initial Petition Date***") and August 29, 2024 (the "***Subsequent Petition Date***"),[4] each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing these Chapter 11 Cases.

B.     *Debtors in Possession.* The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.     *Committee Formation.* As of the date hereof, the Office of the United States Trustee (the "***U.S. Trustee***") has not appointed an official statutory committee of unsecured creditors in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (to the extent appointed in the Chapter 11 Cases, the "***Official Committee***").

D.     *Jurisdiction and Venue.* This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  This Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for these Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to

---

[3]  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

[4]  As used herein, "***Petition Date***" means the Initial Petition Date; provided that with respect to the Debtors which commenced their Chapter 11 Cases subsequent to August 24, 2024, "***Petition Date***" shall refer to the respective dates on which such Chapter 11 Cases were commenced.

28 U.S.C. §§ 1408 and 1409.  The predicates for the relief set forth herein are sections 105, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Bankruptcy Rules 2002-1, 4001-1(b), 4001-2 and 9013-1.

E.     *Findings Regarding Corporate Authority.* Each of the DIP Loan Parties has all requisite power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

F.     *Findings Regarding DIP Facility.*

(a)     *Good Cause.* Good and sufficient cause has been shown for the entry of this Final Order and for the Debtors to obtain postpetition financing pursuant to the terms hereof and the DIP Loan Documents.

(b)     *Need for Postpetition Financing.* The Debtors have a critical need to obtain the DIP Facility in order to, among other things, (i) permit the orderly continuation and operation of their businesses, (ii) maintain business relationships with customers, vendors and suppliers, (iii) make payroll, (iv) make capital expenditures, (v) pay the expenses of the Chapter 11 Cases, (vi) satisfy working capital and operational needs of the Debtors, and (v) for general corporate purposes, in each case, in accordance with and subject to the terms and conditions of the DIP Orders and the DIP Loan Documents, including the Approved Budget (subject to Permitted Variances).  The Debtors require access to sufficient working capital and liquidity through the incurrence of loans and other financial accommodations under the DIP Facility in order to preserve, maintain and maximize the going concern value of the Debtors and to facilitate an orderly and successful reorganization of the Debtors.

(c)     *No Credit Available on More Favorable Terms.* The Debtors are unable to obtain financing or other financial accommodations on more favorable terms from sources other

than the DIP Secured Parties. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors are also unable to obtain adequate secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Secured Parties the rights, benefits, remedies and protections set forth herein and the DIP Loan Documents, including the DIP Liens in all DIP Collateral and the DIP Superpriority Claims (as defined below), in each case, upon the terms set forth herein and in the DIP Loan Documents.

(d)     *Use of Proceeds of DIP Facility*. As a condition to providing the DIP Facility, each of the DIP Secured Parties require, and the Debtors have agreed, that all proceeds of the DIP Loans shall be used or applied solely for the purposes expressly permitted in, and in a manner consistent with, the Approved Budget (subject to Permitted Variances) and the other DIP Loan Documents, including (i) to pay the costs of administration of the Chapter 11 Cases, (ii) for general corporate and working capital purposes, (iii) to pay professional fees and expenses in accordance with the DIP Orders, and (iv) other Approved Uses (as defined in the DIP Credit Agreement), in each case, subject to the terms and conditions of the DIP Orders and the DIP Loan Documents.

(e)     *Approved Budget.* The Debtors prepared and delivered to the DIP Secured Parties the initial itemized cash flow forecast set forth on Exhibit 2 to the Interim Order, which was approved by the DIP Secured Parties (the "***Initial Budget***", as amended, supplemented or updated by the Debtors, and approved by the DIP Secured Parties, from time to time in accordance with the terms of the DIP Orders and the DIP Credit Agreement, the "***Approved Budget***") and the current Approved Budget set forth on **<u>Exhibit 2</u>** to this Final Order, which was approved by the DIP Secured Parties, reflecting, on a line item, cumulative and aggregate basis, (i) the Debtors'

projected cash receipts expected to be collected, and necessary disbursements and expenditures (including debt service costs) expected to be incurred or made, by the Debtors for each calendar week during the period from the calendar week ending on the Friday of the week in which the Subsequent Petition Date occurs through and including the end of the thirteenth (13th) calendar week thereafter, (ii) the sum of weekly unused availability under the DIP Facility, plus restricted and unrestricted balances of cash on hand, (iii) the weekly outstanding principal balance of amounts outstanding under the DIP Facility, and (iv) a professional fee accrual budget with respect to the anticipated professional fees and expenses to be incurred by each of the Professional Persons (as defined below) during such period.  The Approved Budget is an integral part of the Interim Order (for purposes of the interim period) and this Final Order, and the DIP Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject to Permitted Variances) in determining to enter into the DIP Facility and to allow the Debtors' use of proceeds of the DIP Facility in accordance with the terms of the DIP Orders and the DIP Loan Documents.

(f)      *Section 506(c), Section 552(b), and Marshaling.*  As a material inducement to the DIP Secured Parties' agreement to provide the DIP Facility, and in consideration of (i) the DIP Secured Parties' agreement to subordinate the DIP Liens to the Carve Out, and (ii) the DIP Secured Parties' agreement to pay the expenses of the administration of the Chapter 11 Cases, subject to the Approved Budget, and in accordance with the terms of the DIP Orders and the DIP Loan Documents, (a) the Debtors waive their right to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Secured Parties or the DIP Collateral as to the DIP Secured Parties, whether pursuant to section 506(c) of the Bankruptcy Code or otherwise, (b) the DIP Secured Parties shall not be subject to the equitable

doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral as to the DIP Secured Parties, and (c) the Debtors waive the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the DIP Collateral as to the DIP Secured Parties and the DIP Obligations.

(g)    *Good Faith.* The terms of the DIP Facility and the DIP Loan Documents were negotiated in good faith and at arm's length among the DIP Loan Parties, the DIP Secured Parties, and their respective representatives, and all of the DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility, the DIP Loan Documents and the DIP Orders, including, without limitation, all loans, advances, extensions of credit and other financial accommodations made to and guarantees issued by the DIP Loan Parties pursuant to the DIP Loan Documents, shall each be deemed to have been extended by the DIP Secured Parties and each of their respective affiliates, in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by sections 364(e) of the Bankruptcy Code, and each of the claims, liens and security interests, rights, remedies, benefits and protections granted to the DIP Secured Parties (and their successors and assigns) pursuant to the DIP Orders and the DIP Loan Documents (including, without limitation, the DIP Liens, the DIP Superpriority Claims, and the DIP Obligations) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order, this Final Order, or any provision thereof or hereof is vacated, reversed, or modified, on appeal or otherwise.

(h)    *Proper Exercise of Business Judgment.* Based on the Motion, the First Day Declaration, the DIP Declaration, the record presented to the Court at the Interim Hearing, the Final Hearing, and the Chapter 11 Cases, the terms of the DIP Facility and the DIP Loan Documents (i) were negotiated in good faith and at arm's length among the DIP Loan Parties and

the DIP Secured Parties, (ii) are fair, reasonable, and the best available to the Debtors under the circumstances, (iii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (iv) are supported by reasonably equivalent value and fair consideration.

(i)      *Notice.* Proper, timely, sufficient and appropriate notice of the Motion, the Interim Hearing, and the Final Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and no other or further notice of the Motion, the Interim Hearing, the Final Hearing, or the entry of this Final Order shall be required.

(j)      *Immediate Entry; Relief Essential.* Consummation of the DIP Facility upon the terms set forth in the DIP Orders and the DIP Loan Documents is necessary to preserve and maximize the value of the Debtors, is in the best interests of the Debtors and their estates, and is consistent with the Debtors' exercise of their fiduciary duties.

**NOW THEREFORE**, based upon the foregoing findings and conclusions, the Motion, the First Day Declaration, the DIP Declaration, the evidence adduced at the Interim Hearing and the Final Hearing, and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      *Motion Granted.* The Motion is hereby granted on a final basis, and the DIP Facility is hereby authorized and approved on a final basis, in each case, upon the terms and conditions set forth in the DIP Orders and the DIP Loan Documents.[5]  Any objections to any of the relief set forth in this Final Order that have not been withdrawn, waived, or settled, and all reservations of

---

[5] Notwithstanding anything contained in this Final Order to the contrary, the Debtors are not authorized to use any "cash collateral" (within the meaning of section 363(a) of the Bankruptcy Code) of the Prepetition Secured Parties (as defined in the DIP Credit Agreement) ("***Cash Collateral***") pursuant to this Final Order.

rights or other statements inconsistent with this Final Order, are hereby denied and overruled.  This Final Order shall become effective and enforceable immediately upon its entry.

2. *Authorization of DIP Facility and DIP Loan Documents.*

(a) *Authorization of DIP Loan Documents.* Upon entry of the Interim Order, the DIP Loan Parties were authorized, and are hereby authorized on a final basis, to (i) execute, deliver, enter into and perform all of their obligations, and to pay all fees, costs, expenses, indemnities and other amounts contemplated, under the DIP Loan Documents and the DIP Orders, and (ii) perform all acts, to make, execute, deliver, enter into and perform under any and all other agreements, instruments, certificates, and other documents (including, without limitation, the execution or recordation of any collateral, pledge and security documents, mortgages, deeds of trust, control agreements, financing statements or other documents), and to perform all such other and further acts, that may be necessary, required or desirable for the DIP Loan Parties to perform their obligations under the DIP Facility, the DIP Loan Documents and the DIP Orders and to implement the transactions contemplated thereunder and hereunder.  All provisions of the DIP Loan Documents are incorporated herein and approved in their entirety, whether explicitly referenced or not.  The DIP Credit Agreement attached to this Final Order as **Exhibit 1** amends and supersedes in its entirety the *Debtor-in-Possession Facility Terms and Conditions* attached as Exhibit 2 to the Interim Order (the "***DIP Term Sheet***"), and is hereby authorized and approved on a final basis.

(b) *Authorization to Borrow.* The DIP Borrower is hereby authorized on a final basis to borrow, and the DIP Guarantors on an unconditional and joint and several basis are hereby

11

authorized on a final basis to guarantee, and hereby do guarantee, the Payment in Full[6] of such borrowing with respect to, the aggregate principal amount of $30 million (plus applicable interest (including interest and other amounts payable-in-kind), premiums, payments, fees (including professional fees and expenses and the Unfunded Committee Fee, the Up Front Fee, and the Exit Fee (each as defined in the DIP Credit Agreement)), costs, expenses, charges and other amounts payable under the DIP Orders and the DIP Loan Documents in connection with such borrowing), under the DIP Facility, subject to the terms and conditions (including any conditions precedent to such borrowing) set forth in the DIP Loan Documents and the DIP Orders.  The Debtors are hereby authorized to use the proceeds of the DIP Facility solely in the manner and for the purposes expressly permitted in the Approved Budget (subject to Permitted Variances), the DIP Loan Documents and the DIPs Order.

(c)     *DIP Fees and Expenses; Indemnification.* The DIP Loan Parties were authorized and directed, pursuant to the Interim Order, and are hereby authorized and directed, on a final basis, to pay any and all (i) fees, premiums or other payments payable under the DIP Loan Documents including, without limitation, the Unfunded Commitment Fees, the Up Front Fee, the Exit Fee, and other charges, fees or amounts provided therein, (ii) amounts due (or that may become due) to the DIP Secured Parties in in respect of the indemnification obligations under the DIP Loan Documents, and (iii) any other amounts payable in connection with the DIP Facility, including without limitation, the payment of all out of pocket costs, expenses and disbursements of the DIP Secured Parties, including, without limitation, the reasonable and documented fees and expenses of (A) Orrick, Herrington & Sutcliffe LLP, as counsel to the DIP Secured Parties and (B)

---

[6] For purposes hereof, the term "***Paid in Full***" or "***Payment in Full***" means repayment in full and in cash of all outstanding amounts of principal, and payment of all accrued interest and any other amounts owing under the USD DIP Facility.

any other professionals that may be retained by the DIP Secured Parties from time to time (in the case of this <u>sub-clause (B)</u>, with the consent of the DIP Borrower, such consent not to be unreasonably withheld or delayed, which consent of the DIP Borrower shall not be required after the occurrence of a DIP Termination Event (as defined below) (collectively, the "***DIP Professional Fees and Expenses***"), in the case of each of the foregoing <u>clauses (i), (ii) or (iii)</u>, whether or not such payments, premiums, fees, costs, expenses, disbursements or other amounts arose before, on or after the Initial Petition Date, and whether or not the transactions contemplated herein or in the DIP Loan Documents are consummated.

(d)      *Modification of DIP Loan Documents.* The DIP Loan Parties are hereby authorized to execute, deliver and perform under one or more amendments, waivers, consents, or other modifications (including, for the avoidance of doubt, the payment of any amendment fee, consent fee, waiver fee or similar fee paid or payable in connection therewith) to and under the DIP Loan Documents, in each case, in accordance with the provisions of the DIP Loan Documents governing amendments thereto, each without further application to or order of the Court; *provided, however,* that any amendment to the DIP Loan Documents shall require, at a minimum, the prior written consent of the DIP Secured Parties; *provided, further, however*, that any amendment that (a) shortens the maturity of the DIP Facility, (b) increases the aggregate commitments thereunder, or (c) increases the rate of interest payable with respect thereto (other than the imposition of the default rate to the extent permitted under such DIP Loan Document) (each, a "***Material DIP Amendment***"), shall be provided (which may be by electronic mail) to the U.S. Trustee, counsel to the Consenting Prepetition Secured Parties,[7] and lead restructuring counsel to the Official

---

[7]  "***Consenting Prepetition Secured Parties***" is defined in the *Final Order (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief* ("***Final Cash Collateral Order***").

Committee and filed with the Court no later than three (3) Business Days prior to the anticipated date of effectiveness of any such Material DIP Amendment, and if no objection to the Material DIP Amendment is made by the U.S. Trustee or the Official Committee within such three (3) Business Day period, then, without further application to or order of the Court, such Material DIP Amendment shall automatically be deemed approved and effective; *provided further, however,* if an objection is made by the U.S. Trustee or the Official Committee within such three (3) Business Day period, then such Material DIP Amendment shall be subject to a hearing and approval of the Court.  Updates, modifications, and supplements to the Approved Budget approved in writing by the DIP Secured Parties shall not require any further approval of this Court.

(e)    *DIP Funding Account*. The DIP Borrower was authorized and directed, pursuant to the Interim Order, and is hereby authorized and directed, on a final basis, to establish a segregated reserve bank account (the "***DIP Funding Account***"), which shall be subject to a control agreement in form and substance acceptable to the DIP Secured Parties, and the DIP Agent shall be deemed to have "control" over the DIP Funding Account for all purposes of perfection under the Uniform Commercial Code pursuant to such control agreement and the DIP Orders. Subject to the Carve Out, from and after the Initial Petition Date, until all DIP Obligations are Paid in Full, the proceeds of all DIP Loans under the DIP Facility shall be deposited into the DIP Funding Account, which amounts may not be withdrawn or used by the DIP Loan Parties other than as expressly permitted under the Approved Budget and in the other DIP Loan Documents, and with all funds held in the DIP Funding Account deemed to be DIP Collateral (provided that the DIP Funding Account shall not be subject to any liens of the Prepetition Secured Parties).

(f)    *Perfection in Cash*. Subject to the Carve Out, all financial institutions with which the DIP Loan Parties maintain accounts containing any cash proceeds of the DIP Loans are

authorized and directed to comply with any request of the DIP Secured Parties to turn over to the DIP Agent all such cash proceeds therein without offset or deduction of any kind. The DIP Agent shall be entitled to all of the rights and benefits of all deposit account control agreements, blocked account control agreements, securities account control agreements, and similar agreements to which any of the DIP Loan Parties may be a party, without the need to enter into any such agreements. Notwithstanding (and without limiting) the foregoing, the DIP Loan Parties are authorized to enter into, and cause the financial institutions servicing or maintaining the DIP Loan Parties' deposit accounts (or other accounts) to enter into, such deposit account control agreements and other collateral agreements with the DIP Agent and such financial institutions as the DIP Secured Parties may reasonably request.

3.    *DIP Obligations.*

(a)    Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents constituted, and shall continue to constitute, valid, binding, enforceable, and non-avoidable obligations of each of the DIP Loan Parties, and shall be fully enforceable against each of the DIP Loan Parties, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing (collectively, the "***Successor Cases***"), or upon the dismissal of any of the Chapter 11 Cases or any such Successor Cases, in each case, in accordance with the terms of the DIP Loan Documents and the DIP Orders.

(b)    Upon execution and delivery of the DIP Loan Documents, the DIP Loan Parties were, and shall continue to be, jointly and severally liable for all DIP Obligations, including, without limitation, all loans, advances, indebtedness, obligations, extensions of credit,

financial accommodations, principal, interest, payments, premiums or similar amounts, fees (including, without limitation, the Unfunded Commitment Fees, the Up Front Fee, and the Exit Fee), costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other amounts, whether or not such obligations arose before or after the Initial Petition Date, whenever the same shall become due and payable, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, to the DIP Secured Parties under the DIP Loan Documents and the DIP Orders. The DIP Obligations shall be due and payable, without notice or demand, on the DIP Termination Declaration Date (as defined below), as set forth below.

(c)     All obligations incurred, payments made, and transfers or grants of liens and security interests set forth in the DIP Orders and the DIP Loan Documents by the DIP Loan Parties were granted, pursuant to the Interim Order, and are hereby granted on a final basis, to or for the benefit of the DIP Loan Parties for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby.  No obligation, payment, transfer, or grant of liens or security interests under the DIP Orders or the DIP Loan Documents to the DIP Secured Parties shall be limited, stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any challenge, objection, defense or claim, including, without limitation, avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or

other cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise.

4.      *No Obligation to Extend Credit/New Money Loan Cap.* The DIP Secured Parties shall have no obligation to make any loan or advance available under the DIP Loan Documents unless all of the conditions precedent to the making of such loan or advance by the DIP Secured Parties have been satisfied in full (or waived) in accordance with the terms of the DIP Loan Documents and the DIP Orders.

5.      *No Duty to Monitor Compliance.* None of the DIP Secured Parties shall have any obligation or responsibility to monitor the Debtors' use of DIP Collateral and each of the DIP Secured Parties may rely upon the Debtors' representations that the use of DIP Collateral complies with and is in accordance with the requirements of the DIP Orders and the DIP Loan Documents.

6.      *DIP Liens.*

(a)      As security for the prompt and complete payment and performance of all DIP Obligations when due (whether upon stated maturity, prepayment, acceleration, declaration or otherwise), effective and perfected as of the entry of the Interim Order, and without the necessity of the execution, recordation or filing by any of the DIP Loan Parties or the DIP Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title, or any similar document or instrument, or the taking of any other action (including, without limitation, entering into any control agreements or taking any other action to take possession or control of any DIP Collateral), the DIP Agent, for the benefit of itself and the other DIP Secured Parties, was granted, pursuant to the Interim Order, and is hereby granted, on a final basis, valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "***DIP Liens***") in all DIP Collateral,

in each case, subject and subordinate to the Carve Out, and subject to the relative priorities set forth in the DIP Orders and the DIP Loan Documents.

(b)     The term "***DIP Collateral***" means all now owned or hereafter acquired assets and property of the each of the Debtors, including real and personal property, whether existing on the applicable Petition Date or thereafter acquired and wherever located, tangible or intangible, including, without limitation, (i) plant and equipment and the proceeds thereof, (ii) all litigation and other claims and the proceeds thereof including all commercial tort claims and the Whinstone Litigation (as defined in the DIP Credit Agreement) and any proceeds thereof, (iii) the Prepetition Notes Collateral (as defined in the DIP Credit Agreement), whether existing on the applicable Petition Date or thereafter acquired, (iv) all property of the Debtors subject to Prior Permitted Liens,[8] (v) all property of the Debtors, whether existing on the applicable Petition Date or thereafter acquired that is not subject to valid, perfected, and non-avoidable liens or perfected after the applicable Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code ("***Previously Unencumbered Property***"), and, (vi) all proceeds of claims and causes of action under sections 502(d), 506(c), 544, 545, 547, 548, 549, 550, or 724(a) of the Bankruptcy Code.[9]

(c)     The DIP Liens shall be subject to the priorities set forth below (subject in each case to the Carve Out):

(i)     *First Priority Liens on Unencumbered Property.* Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral to the extent that such DIP Collateral is not Prepetition Notes Collateral, including all Previously Unencumbered Property (including

---

[8] "***Prior Permitted Liens***" means valid, perfected and non-avoidable senior liens in existence immediately prior to the applicable Petition Date or valid and non-avoidable liens in existence immediately prior to the applicable Petition Date that are perfected subsequent to such Petition Date as permitted by section 546(b) of the Bankruptcy Code.  For the avoidance of doubt, Prior Permitted Liens shall not include any Prepetition Notes Liens (as defined in the Credit Agreement).

[9] The descriptions of DIP Collateral in this Paragraph 6(b)(i)-(vi) are not necessarily exclusive of each other merely by being described as separate categories and some overlap may exist.

all proceeds of claims and causes of action under sections 502(d), 506(c), 544, 545, 547, 548, 549, 550, or 724(a) of the Bankruptcy Code), subject only to the Carve Out and junior only to the Prior Permitted Liens, if any, on such assets, and senior to all other liens on such assets.

(ii)     *Liens Junior to Certain Other Liens.* Pursuant to sections 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral (other than the DIP Collateral described in paragraph 6(c)(i) hereof, as to which DIP Liens are described in such paragraph), subject only to the Carve Out and junior only to the Prepetition Notes Liens and Prior Permitted Liens, if any, on such assets, and senior to all other liens on such assets.

(d)     Other than as set forth herein or in the DIP Loan Documents (including subject to the Prior Permitted Liens and the Carve Out), the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), or upon the dismissal of any of the Chapter 11 Cases or Successor Case.  The DIP Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any of the Debtors' estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

(e)     Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person or entity, in order for any Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any interest therein (including any fee or leasehold interest), any proceeds thereof or other DIP Collateral, shall be deemed inconsistent with the provisions of the Bankruptcy Code and shall have

no force or effect with respect to the granting of the DIP Liens in any such interest therein or other DIP collateral, or in the proceeds of any assignment or sale thereof by any Debtor in favor of the DIP Secured Parties in accordance with the DIP Loan Documents and the DIP Orders.

7.     *DIP Superpriority Claims.* Pursuant to section 364(c)(1) of the Bankruptcy Code, upon entry of the Interim Order and approved on a final basis pursuant to this Final Order, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors, with priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, any and all other administrative expense claims of the kind specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "***DIP Superpriority Claims***"), subject only to the Carve Out.  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The DIP Superpriority Claims shall be payable by each of the Debtors, on a joint and several basis.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including in the event that the Interim Order, this Final Order, or any provision thereof or hereof is vacated, reversed or modified, on appeal or otherwise.

8.     *Use of DIP Collateral.*

(a)     The Debtors, were authorized pursuant to the Interim Order, and are hereby authorized on a final basis pursuant to this Final Order, to use the proceeds of the DIP Loans solely

20

to the extent expressly permitted under the Approved Budget (subject to Permitted Variances) and subject to the terms and conditions set forth in the DIP Loan Documents and the DIP Orders.

(b)     Without the prior written consent of the DIP Secured Parties, the DIP Loan Parties shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so), except as may be expressly permitted by the DIP Loan Documents and the DIP Orders.  All collection and proceeds of DIP Collateral, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnation, or otherwise, will be deposited and applied as required by the DIP Orders and the DIP Loan Documents.  The Debtors shall not transfer any cash, assets, properties or other DIP Collateral to any "Person" (as defined in the DIP Loan Documents) that is not a Debtor in these Chapter 11 Cases without the prior written consent of the DIP Secured Parties, in their discretion[, except as otherwise expressly permitted under the DIP Loan Documents].

(c)     Except as may be provided in the DIP Loan Documents, the Debtors are authorized and directed, upon the closing of a sale of any of the DIP Collateral, to immediately pay all proceeds of any such sale, subject to the relative priorities set forth in the DIP Orders and the DIP Loan Documents, to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, to satisfy the DIP Obligations in accordance with the DIP Orders and the DIP Loan Documents until Paid in Full, and any order approving the sale of such DIP Collateral shall provide that the sale is conditioned upon the payment of such DIP Obligations (except to the extent otherwise agreed in writing by the DIP Secured Parties).

9.     *Approved Budget.*  The DIP Loan Parties shall comply at all times with the Approved Budget then in effect (subject to Permitted Variances).  Any amendments, supplements or updates to any Approved Budget (each, a "***Budget Supplement***") shall be subject to the prior

21

approval of the DIP Secured Parties in accordance with the DIP Credit Agreement, and any such Budget Supplement shall not constitute an "Approved Budget" unless and until it is so approved by the DIP Secured Parties (and until any such Budget Supplement is approved by the DIP Secured Parties, the prior Approved Budget shall remain in effect).

10.     *Fees and Expenses; Payments.*

(a)     The payment of all DIP Professional Fees and Expenses under the DIP Orders shall not be subject to further application to or approval of the Court, and shall not be subject to allowance or review by the Court or subject to the U.S. Trustee's fee guidelines, and no attorney or advisor to the DIP Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

(b)     Notwithstanding anything contained in this paragraph 10 to the contrary, upon the Initial Availability, the DIP Loan Parties were authorized and directed pursuant to the Interim Order to pay in full in cash all DIP Professional Fees and Expenses arising through and including the Initial Availability.

(c)     Notwithstanding anything contained in the DIP Orders to the contrary, any and all payments, premiums, fees, costs, expenses and other amounts paid at any time by any of the DIP Loan Parties to the DIP Secured Parties pursuant to the requirements of the DIP Orders or the DIP Loan Documents, whether prior to, on or after the Initial Petition Date, shall be non-refundable and irrevocable, are hereby approved (and to the extent paid prior to entry of the DIP Orders, ratified in full), and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including, without limitation, avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or

common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge or recovery or any other cause of action, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity.

11.     *Reservation of Rights.* Except as otherwise expressly provided herein or in the DIP Loan Documents, the entry of the DIP Orders is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Secured Parties to seek any other or supplemental relief in respect of the DIP Loan Parties, (b) the rights of the DIP Secured Parties under the DIP Loan Documents, the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to request modification of the automatic stay of section 362 of the Bankruptcy Code, (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or (d) the rights of the Prepetition Secured Parties.

12.     *Modification of Automatic Stay.* The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without application to or further order of this Court, to permit: (a) the DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Secured Parties may request to assure the perfection and priority of the DIP Liens, (b) the DIP Loan Parties to incur all liabilities and obligations to the DIP Secured Parties as contemplated under the DIP Orders and the DIP Loan Documents, (c) the DIP Loan Parties to pay all amounts required under the DIP Orders and under the DIP Loan Documents, (d) the DIP Secured Parties to retain and apply payments made in accordance with the terms of the DIP Orders and the DIP Loan Documents, (e) as set forth below, the DIP Secured Parties to exercise, upon the occurrence of any DIP Termination Event (as defined below), all rights and remedies provided for in the DIP Orders, the DIP Loan Documents, or applicable law,

(f) the DIP Loan Parties to perform under the DIP Orders and the DIP Loan Documents, and to take any and all other actions that may be necessary, required or desirable for the performance by the DIP Loan Parties under the DIP Orders and the DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder, and (g) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of the DIP Orders and the DIP Loan Documents.

13.     *Perfection of DIP Liens.*

(a)     This Final Order shall be sufficient and conclusive evidence of the attachment, validity, perfection, and priority of all liens and security interests granted under the DIP Orders and under the DIP Loan Documents, including, without limitation, the DIP Liens, without the necessity of the execution, recordation or filing of any pledge, collateral or security agreements, mortgages, deeds of trust, lockbox or control agreements, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any deposit account control agreement or other act to take possession or control of any DIP Collateral), to attach, validate, perfect or prioritize such liens and security interests, or to entitle the DIP Secured Parties to the priorities granted herein (other than, to the extent applicable, any such filings required under applicable non-U.S. law to attach, validate, perfect or prioritize such liens).

(b)     Without in any way limiting the automatically effective perfection of the liens and security interests granted under the DIP Orders and the DIP Loan Documents, the DIP Agent is hereby authorized, but not required, as it in its sole discretion may determine for any reason, to execute, file and record (and to execute in the name of the DIP Loan Parties, as their true and lawful attorneys, with full power of submission, to the maximum extent permitted under

applicable law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession or control over cash or securities, or to amend or modify security documents, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to validate, perfect, preserve and enforce the liens and security interests granted to them under the DIP Orders and under the DIP Loan Documents or to otherwise evidence such liens and security interests in all DIP Collateral (each, a "**_Perfection Action_**"); _provided, however,_ that, whether or not the DIP Agent determines, in its sole discretion, to take any Perfection Action with respect to any liens or security interests granted under the DIP Orders and under the DIP Loan Documents, such liens and security interests shall nonetheless be deemed valid, perfected, allowed, enforceable and non-avoidable as of the entry of the Interim Order.  Upon the request of the DIP Agent, the DIP Loan Parties, without any further consent of any party, are authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the applicable Petition Date.

(c)     A certified copy of any DIP Order may, as the DIP Agent may determine in its discretion, be filed with or recorded in filing or recording offices in addition to or in lieu of any financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of any DIP Order for filing or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent to take all actions, as applicable, referenced in this paragraph 13.

14.     *Maintenance of DIP Collateral.* Until such time as all DIP Obligations are Paid in Full (or as otherwise agreed in writing by the DIP Secured Parties), the DIP Loan Parties shall continue to maintain all property, operational, and other insurance as required and as specified in the DIP Loan Documents.  The DIP Agent, for the benefit of itself and the DIP Secured Parties, was, upon the entry of the Interim Order, automatically deemed, and upon entry of this Final Order, shall automatically be deemed, on a final basis, to be named as additional insured and lender loss payee under each insurance policy maintained by the DIP Loan Parties (including all property damage and business interruption insurance policies of the DIP Loan Parties, whether expired, currently in place, or to be put in place in the future), and the DIP Loan Parties shall act as agent for the DIP Secured Parties in the event that the DIP Loan Parties receive any insurance proceeds directly from the insurance company or any other party, shall hold such payments in trust for the DIP Secured Parties, and shall immediately distribute any such proceeds recovered or received in respect of any such insurance policies in accordance with the terms of the DIP Orders and the DIP Loan Documents for application in accordance with the DIP Loan Documents and the DIP Orders.

15.     *Payments Held in Trust.* Except as expressly permitted in the DIP Orders or the DIP Loan Documents, including in respect of the Carve Out, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral (other than any payment made in accordance with the Approved Budget) or any proceeds of the DIP Collateral prior to Payment in Full of all DIP Obligations under the DIP Loan Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral and shall immediately turn over such proceeds to the DIP Secured Parties, for application in accordance with the DIP Loan Documents and the DIP Orders, other than with respect to the Prepetition Notes Collateral.

16.     *Cash Management.* Until such time as all DIP Obligations are Paid in Full, the DIP Loan Parties shall maintain the cash management system in accordance with the applicable "first day" order, which shall be in form and substance acceptable to the DIP Secured Parties.  Except as expressly provided herein, the DIP Loan Parties shall not open any new deposit or securities account that is not subject to the liens and security interests of the DIP Secured Parties (in which case they shall be subject to the lien priorities and other provisions set forth in the DIP Orders).

17.     *Reporting.* Without limiting the requirements contained herein or in the DIP Loan Documents, the DIP Loan Parties and their representatives shall (a) provide the DIP Secured Parties, and the Official Committee (and each of their respective advisors) with (i) all reports, documents, and information required to be delivered under the DIP Loan Documents (contemporaneously when the same is required to be delivered thereunder), and (ii) reasonable access, upon reasonable notice and during regular business hours, to the DIP Loan Parties' books and records, assets and properties, for purposes of monitoring the DIP Loan Parties' businesses and operations and the value of the DIP Collateral, and (b) cooperate and consult with, and provide information reasonably requested by the DIP Secured Parties, or the Official Committee (and their respective advisors) concerning the DIP Loan Parties' businesses, financial condition, properties, business operations and assets, and the DIP Loan Parties hereby authorize their representatives to cooperate and consult with, and promptly provide to the such parties (in each case, together with their respective advisors) such information.

18.     *DIP Termination Event; Exercise of Remedies.*

(a)     *DIP Termination Events.* The occurrence of any of the following shall constitute a "DIP Termination Event" (each a "***DIP Termination Event***"), unless waived in writing by the DIP Secured Parties: (i) the occurrence of an "Event of Default" under and as defined in the

DIP Credit Agreement, (ii) the occurrence of the "Maturity Date" (as defined in the DIP Credit Agreement), (iii) 11:59 p.m. New York City time on the date that is 30 calendar days (and if such calendar day is not a Business Day, the first succeeding Business Day thereafter) after entry of the Interim Order (or such later date determined in writing (which may be via electronic mail) by the DIP Secured Parties in their discretion), if this Final Order, in form and substance acceptable to the DIP Secured Parties in their discretion, has not been entered by the Court by such date and time, (iv) the substantial consummation (as defined in 11 U.S.C. § 1101(2) of the Bankruptcy Code) of a chapter 11 plan of any of the Debtors, (v) any of the DIP Loan Parties seeks authorization from the Court for (or the Court enters an order authorizing or approving) any amendment, modification, or extension of the DIP Orders or the DIP Loan Documents without the prior written consent of the DIP Secured Parties (and no such consent shall be implied by any other action, inaction, or acquiescence of any of the DIP Secured Parties), (vi) the failure of the DIP Loan Parties to make any payment required under the DIP Orders or the DIP Loan Documents to any of the DIP Secured Parties as and when due and payable hereunder or thereunder, or (vii) the failure by any of the DIP Loan Parties to timely perform or comply with any of the other terms, provisions, conditions or other obligations under the DIP Orders.

(b)        *DIP Facility Termination.* The DIP Loan Parties shall immediately provide notice to counsel to the DIP Agent and the DIP Lenders of the occurrence of any DIP Termination Event.  Upon the occurrence of a DIP Termination Event, without further application to or order from the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent (acting at the instruction of the DIP Lenders), to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) (the "**Remedies Notice**") to lead restructuring

counsel for the Debtors, the U.S. Trustee, lead restructuring counsel for the Official Committee, and counsel to the Prepetition Secured Parties (collectively, the "***Remedies/Carve Out Notice Parties***")[10] declaring the occurrence of a DIP Termination Event (such date, the "***DIP Termination Declaration Date***") or deliver a Carve Out Notice (as defined below) to the Remedies/Carve Out Notice Parties, (ii) declare the termination, reduction or restriction of the Commitments under the DIP Facility (to the extent any such commitment remains), (iii) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the DIP Loan Parties, (iv) declare the termination of the DIP Facility and the DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims or the DIP Obligations, (v) declare the reduction or restriction on the DIP Facility or the DIP Loan Documents, and (vi) charge interest at the default rate set forth in the DIP Credit Agreement.

(c)      *Exercise of Remedies*.  Following the DIP Termination Declaration Date, subject to paragraph 18(d) hereof, the DIP Agent (acting at the instruction of the DIP Lenders), may also (i) set-off or consolidate any amounts then owing by the DIP Secured Parties to a DIP Loan Party against the DIP Obligations, (ii) enforce any and all rights against the DIP Collateral, including, without limitation, disposition of such DIP Collateral; and (iii) take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the DIP Loan Documents, or applicable law or equity, including any and all remedies under debtor relief laws and the Uniform Commercial Code and analogous relief; provided that, in the case of the enforcement of DIP Liens or any other remedies with respect to the DIP Collateral as described in this paragraph 18(c), the DIP Agent shall first file a motion with the Court on five (5) calendar days' notice

---

[10]   For the avoidance of doubt, the Carve Out Notice and the Remedies Notice may be included in the same notice.

(subject to the Court's availability) seeking an emergency hearing (the "**Stay Relief Hearing**") to exercise such remedies (and the DIP Loan Parties, the U.S. Trustee, the Prepetition Secured Parties, and the Official Committee shall not object to the shortened notice with respect to such Stay Relief Hearing); *provided further* that at such Stay Relief Hearing, the DIP Agent shall only be required to establish that an uncured Event of Default or other DIP Termination Event exists. Notwithstanding anything in the DIP Orders or the DIP Loan Documents to the contrary, none of the Prepetition Secured Parties shall be permitted to exercise any rights or remedies with respect to any DIP Collateral that is not Prepetition Notes Collateral unless and until the DIP Obligations are indefeasibly Paid in Full.

(d)  *Remedies Notice Period.*  During the period from and after the Termination Declaration Date through the date of the Stay Relief Hearing (the "**Remedies Notice Period**"), the Debtors shall be permitted to use proceeds of the DIP Facility solely (i) with respect to amounts already drawn in accordance with (and subject to) the Approved Budget and only to fund payroll and other expenses that are critically necessary to preserve the value of the Debtors' businesses and the DIP Collateral unless otherwise consented to in writing by the DIP Agent, and (ii) the Professional Fees Escrow Amount; *provided, however*, that any fees or expenses incurred by the DIP Loan Parties or the Official Committee during the Remedies Notice Period shall permanently reduce the Carve Out Amount (as defined below).  For the avoidance of doubt, during the Remedies Notice Period, the DIP Lenders shall not be obligated to provide any DIP Loans or advance any credit at any time from and after the occurrence of a DIP Termination Event.

(e)  *Leased Premises.* On or after a DIP Termination Declaration Date, the DIP Secured Parties shall be entitled to enter upon any leased premises in accordance with (i) a separate agreement with the landlord by and between the DIP Agent and the applicable landlord, (ii) consent

of the landlord, (iii) upon entry of an order of this Court, upon notice to the landlord and a hearing, or (iv) in accordance with the rights of the DIP Agent under applicable non-bankruptcy law.

(f)      *Cooperation.* The DIP Loan Parties shall cooperate with the DIP Secured Parties in their efforts to enforce their liens and security interests in the DIP Collateral, as applicable, and (other than the right to contest whether a DIP Termination Event has occurred and is continuing) the DIP Loan Parties shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its rights or remedies in the DIP Collateral, as applicable.

19.      *No Waiver by Failure to Seek Relief.* The rights and remedies of the DIP Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties may have under the DIP Orders, the DIP Loan Documents, applicable law or otherwise.  The failure or delay on the part of any of the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under the DIP Orders, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise.  Except as expressly set forth herein, none of the rights or remedies of the DIP Secured Parties under the DIP Orders and the DIP Loan Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the requisite parties under the DIP Loan Documents, as applicable.  No consents required under the DIP Orders or under the DIP Loan Documents by any of the DIP Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties.

20.      *Carve Out.*

31

(a)     *Priority of Carve Out*. Each of the DIP Liens, the DIP Superpriority Claims, and the Prepetition Notes Liens shall be subject and subordinate to payment of the Carve Out.  The Carve Out shall be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in this Final Order.

(b)     *Carve Out.* As used in this Final Order, the term "***Carve Out***" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a), (ii) Court-allowed fees and expenses of a trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000, (iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and the Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***", and together with the Debtor Professionals, the "***Professional Persons***") at any time on or before the date of delivery by the DIP Agent (at the instruction of the DIP Lenders) of a Carve Out Notice, whether allowed by the Court prior to or after delivery of a Carve Out Notice (the amounts set forth in the foregoing clauses (i), (ii) and (iii), the "***Pre-Carve Out Notice Amount***"), and (iv) Allowed Professional Fees of Professional Persons incurred after the date of delivery by the DIP Agent (at the instruction of the DIP Lenders) of the Carve Out Notice, to the extent allowed at any time, whether by interim order, final order, or other court order, in an aggregate amount not to exceed $750,000, consisting of up to $500,000 incurred by the Debtors and up to $250,000 by any statutory committee (the amount set forth in this clause (iii) being the "***Post-Carve Out Notice Amount***", and together with the Pre-Carve Out Notice Amount,

the "**Carve Out Amount**"); *provided, however*, that nothing herein shall be construed to impair the ability of any party-in-interest to object to the fees, expenses, reimbursement, or compensation described herein on any grounds. For purposes of this Final Order, the "**Carve Out Notice**" shall mean a written notice (which may be via electronic mail) delivered by the DIP Agent (acting at the instruction of the DIP Lenders) to the Remedies/Carve Out Notices Parties, which notice may be delivered following the occurrence of a DIP Termination Event, stating that the Post-Carve Out Notice Amount has been invoked.

(c)     *Pre-Carve Out Notice.* Prior to the delivery of a Carve Out Notice, starting with the first full calendar week following the Subsequent Petition Date, each Professional Person shall deliver to the Debtors, the DIP Secured Parties and their respective advisors a weekly statement (each, a "**Weekly Statement**") setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the preceding week (the "**Weekly Estimated Fees and Expenses**"), and the Debtors shall, on a weekly basis, transfer cash proceeds from amounts previously drawn under the DIP Facility into a segregated account held in trust for and exclusively available for the payment of fees and expenses of the Professional Persons (the "**Professional Fees Escrow Account**") in an amount equal to the aggregate amount of Weekly Estimated Fees and Expenses based on the Weekly Fee Estimates submitted by each Professional Person (and if no such estimate is provided in a given week, then the amount forecasted for such Professional Person in the Approved Budget) that remain unpaid (and that were not previously funded to the Professional Fees Escrow Account). The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, in accordance with any interim or final orders of the Court; *provided,*

*however*, that the Debtors' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account.

(d)      *Post-Carve Out Notice.* On the date on which a Carve Out Notice is delivered in accordance with this paragraph 20 of this Final Order, (the "***Carve Out Trigger Date***"), the Carve Out Notice shall constitute a demand to the Debtors to utilize all cash proceeds from amounts previously drawn under the DIP Facility as of such date (net of any retainers) and any available cash proceeds from amounts previously drawn under the DIP Facility thereafter held by any Debtor to fund into the Professional Fees Escrow Account an amount equal to (i) the Pre-Carve Out Notice Amount (to the extent not previously funded to the Professional Fees Escrow Account), and (ii) the Post-Carve Out Notice Amount.  No later than one (1) Business Day after the delivery of a Carve Out Notice, each Professional Person shall deliver one (1) additional statement to the Debtors, the DIP Secured Parties and their respective advisors setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the period following the period covered by the most recent Weekly Statement previously delivered by such Professional Person through and including the Carve Out Trigger Date (as defined below), and the Debtors shall transfer such amounts to the Professional Fees Escrow Account (as defined herein).

(e)      Notwithstanding anything to the contrary in the DIP Orders, the DIP Loan Documents or the Prepetition Notes Documents, following delivery of a Carve Out Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the  Professional Fees Escrow Account has been fully funded in an amount equal to all respective obligations benefitting from the Carve Out as set forth herein.  The Professional Fees Escrow Account shall not be subject to the control of

the DIP Secured Parties, and the funds transferred to the Professional Fees Escrow Account shall not be subject to the DIP Liens, nor constitute DIP Collateral; *provided*, however, that the DIP Liens shall automatically attach to any residual interest in the Professional Fees Escrow Account (which liens shall be deemed automatically perfected senior first priority liens as of entry of the Interim Order), with any excess paid to the DIP Agent for application to the DIP Obligations in accordance with the DIP Loan Documents and the DIP Orders until the DIP Obligations are Paid in Full (unless the DIP Secured Parties have otherwise agreed to in writing), and any excess remaining thereafter shall be applied in accordance with the DIP Orders.

(f)      Notwithstanding anything to the contrary in the DIP Orders, (i) disbursements by the Debtors from the Professional Fees Escrow Account shall not constitute loans or indebtedness under the DIP Loan Documents or otherwise increase or reduce the DIP Obligations, (ii) the failure of the Professional Fees Escrow Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) nothing contained herein shall constitute a cap or limitation on the amount that the Professional Persons may assert as administrative expense claims against the Debtors on account of Allowed Professional Fees incurred by such Professional Persons.

(g)      *Payment of Carve Out on or After the Carve Out Trigger Date.* Any payment or reimbursement made on or after the occurrence of the Carve Out Trigger Date in respect of any Allowed Professional Fees incurred after the occurrence of the Carve Out Trigger Date shall permanently reduce the Carve Out Amount on a dollar-for-dollar basis.

(h)      *No Direct Obligation to Pay Allowed Professional Fees.* None of the DIP Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any

Successor Cases under any chapter of the Bankruptcy Code, regardless of whether such fees or expenses have been allowed by the Court.  Nothing in the DIP Orders or otherwise shall be construed to obligate the DIP Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

21.    *Limitations on Use of DIP Collateral, Carve Out or Other Funds.*  Notwithstanding anything contained in the DIP Orders or any other order of the Court to the contrary, no DIP Collateral, DIP Loans, proceeds of any of the foregoing, any portion of the Carve Out may be used (including to pay professional fees) by any of the DIP Loan Parties, the Official Committee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any Successor Cases, or any other party-in-interest (including without limitation any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), directly or indirectly, to:

(a)    investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, initiate, commence, support or prosecute (or finance the preparation, initiation, commencement, support or prosecution of) any claim, counterclaim, cross-claim, cause of action, suit, arbitration, application, motion, contested matter, objection, defense, adversary proceeding, litigation or other proceeding of any kind or nature (whether for monetary, injunctive, affirmative relief or otherwise) (i) against any of the DIP Secured Parties or their respective representatives (each in their capacities as such), (ii) objecting to, challenging, contesting, or raising any defense to, the amount, validity, enforceability, perfection, priority, extent or scope of the claims, liens and security interests of the DIP Secured Parties granted under the DIP Orders or the DIP Loan Documents, (iii) asserting avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), any so-called "lender liability" claims, or any other any claim or cause of action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharging or recovery, in each case, with respect to the DIP Liens, the DIP Obligations, the DIP Loan Documents, or the DIP Collateral, (vi) any claim or cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against any of the DIP Secured Parties or their respective representatives;

(b)     object to or seek to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections or benefits granted to the DIP Secured Parties under the DIP Orders, the DIP Loan Documents (other than to contest whether a DIP Termination Event has occurred); *provided* thatthis provision shall not apply to an objection filed in the Court to the relief sought at the Final Hearing;

(c)     object to or seek to prevent, hinder, interfere with or otherwise delay any of the DIP Secured Parties' assertion, enforcement, exercise of remedies or realization upon any DIP Collateral in accordance with the DIP Orders or the DIP Loan Documents (other than to contest whether a DIP Termination Event has occurred);

(d)     seek or request authorization from the Court to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code or otherwise, unless such financing is sufficient to cause the Payment in Full of all DIP Obligations contemporaneously with the consummation of such financing (or as otherwise agreed in writing by the DIP Secured Parties);

(e)     seek or request authorization from the Court to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under the DIP Orders or the DIP Loan Documents) in any portion of the DIP Collateral unless all DIP Obligations have been Paid in Full (or as otherwise agreed in writing by the DIP Secured Parties);

(f)     use, request authorization to use, or sell or otherwise dispose of DIP Collateral (without the prior written consent of the DIP Secured Parties) other than as expressly permitted in the DIP Orders and in the DIP Loan Documents;

(g)     make any payment or distribution, directly or indirectly, to any non-Debtor affiliate unless such payments or distributions are agreed to in writing by the DIP Secured Parties (or are otherwise expressly included in the Approved Budget and do not violate any of the terms of the DIP Loan Documents);

(h)     make any payment or distribution, directly or indirectly, to any insider (as such term is defined in section 101(31) of the Bankruptcy Code) of the Debtors unless such payments or distributions are agreed to in writing by the DIP Secured Parties (or are otherwise expressly included in the Approved Budget and do not violate any of the terms of the DIP Loan Documents), and in no event shall any non-ordinary course management, advisory, consulting or similar fees be paid to or for the benefit of any affiliate that is not a Debtor;

(i)     use or seek to use any insurance proceeds related to the DIP Collateral (without the prior written consent of the DIP Secured Parties); or

(j)     pay or seek to pay any amount on account of any claims arising prior to the applicable Petition Date unless such payments are agreed to in writing by the DIP Secured Parties (or are otherwise expressly included in the Approved Budget and do not violate any of the terms of the DIP Loan Documents).

22.    *Limitation on Charging Expenses.* Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases (or any future proceedings that may result therefrom) at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties upon the DIP Collateral shall be charged against or recovered from the DIP Collateral as to DIP Secured Parties whether pursuant to section 506(c) of the Bankruptcy Code or other similar legal or equitable doctrine or otherwise, without the prior written consent of the DIP Secured Parties with respect to the DIP Collateral, and no such consent shall be implied, directly or indirectly, from anything contained in the DIP Orders (including, without limitation, consent to the Carve Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the DIP Secured Parties to any charge, lien, assessment or claim against the DIP Secured Parties with respect to the DIP Collateral, whether under section 506(c) of the Bankruptcy Code or otherwise.

23.    *No Marshalling; Section 552(b) Waiver.* In no event shall the DIP Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations, and all proceeds of DIP Collateral shall be received and applied in accordance with the DIP Orders and the DIP Loan Documents.  The DIP Secured Parties shall be entitled to all of rights and benefits of section 552(b), and the "equities of the case" exception thereunder shall not apply to any of the DIP Secured Parties with respect to proceeds, products, offspring, or profits of any of the DIP Collateral.

24.    *Right to Credit Bid.* The DIP Agent or its designee (in each case, acting at the instruction of the DIP Lenders), shall have the unqualified right to credit bid all or any portion of DIP Collateral in accordance with the DIP Loan Documents up to the full amount of any DIP

Obligations, whether in a sale under or pursuant to section 363 of the Bankruptcy Code, a Chapter 11 plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code, or otherwise, and shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code.  The DIP Agent (acting at the instruction of the DIP Lenders), shall have the absolute right to assign, transfer, sell, or otherwise dispose of their respective rights to credit bid (subject to the DIP Orders) to any acquisition vehicle formed in connection with such bid or other designee.

25.    *Binding Effect; Successors and Assigns*. Immediately upon entry of each of the DIP Orders, the DIP Loan Documents and each of the DIP Orders, including all findings and conclusions of law herein, shall be binding upon all parties-in-interest in the Chapter 11 Cases and any Successor Cases, including without limitation, the DIP Secured Parties, the Prepetition Secured Parties, the Official Committee or any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and any Successor Cases, and their respective successors and assigns (including any chapter 11 trustee or chapter 7 trustee or examiner appointed or elected in the Chapter 11 Cases or any Successor Cases, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of each of the Debtors, the DIP Secured Parties, and their respective successors and assigns; *provided, however,* that, for the avoidance of doubt, the DIP Secured Parties shall have no obligation to make any loan or extend any financing to any chapter 11 trustee or chapter 7 trustee or similar responsible person appointed for the estate of any Debtor in the Chapter 11 Cases or any Successor Cases.

26.    *No Modification of Final Order.*

(a)    The DIP Loan Parties irrevocably waive the right to seek, and shall not seek or consent to, directly or indirectly without the prior written consent of the DIP Secured Parties (unless and until the DIP Obligations have been Paid in Full), (A) any modification, stay, vacatur or amendment to the DIP Orders, (B) the allowance of any claim against any Debtor in the Chapter 11 Cases or any Successor Cases equal or superior to the DIP Superpriority Claims (other than the Carve Out), (C) the grant of any lien or security interest on any DIP Collateral with priority equal to or superior to the DIP Liens, except as expressly permitted hereunder or under the DIP Loan Documents, or (D) the entry of any order authorizing the use of DIP Collateral (including Cash Collateral) that is inconsistent with the DIP Orders.

(b)    Without limiting the provisions of the immediately preceding paragraph, if at any time prior to the Payment in Full of all DIP Obligations, either the DIP Loan Parties, the DIP Loan Parties' estates, any chapter 11 trustee, chapter 7 trustee or examiner with enlarged powers, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of the DIP Orders or the DIP Loan Documents, then, unless otherwise agreed in writing by the DIP Secured Parties (with respect to the DIP Obligations), all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent, for further distribution to the applicable DIP Secured Parties on account of their applicable DIP Obligations pursuant to the DIP Loan Documents.

27.    *Preservation of Rights Granted Under Final Order.*

(a)    *Senior to Other Liens.* Other than the Carve Out, the Prepetition Notes Liens and the Prior Permitted Liens, no claim (including any intercompany claim) or lien having a

priority superior to or *pari passu* with those granted by the DIP Orders to the DIP Secured Parties shall be permitted while any of the DIP Obligations remain outstanding, and, except as otherwise expressly provided in the DIP Orders, (i) the DIP Superpriority Claims shall not be subject or junior to any intercompany or affiliate claims of the Debtors; and (ii) the DIP Liens shall not be: (A) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (B) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (C) subordinated to or made *pari passu* with any liens arising after the applicable Petition Date, including any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; or (D) subject or junior to any intercompany or affiliate liens or security interests of the Debtors.

(b)     *Payment in Full.* None of the DIP Loan Parties shall propose or support any chapter 11 plan or sale of all or substantially all of the DIP Loan Parties' equity or assets, or any order confirming such plan or approving such sale, that is not conditioned upon the Payment in Full (unless otherwise agreed in writing by the DIP Secured Parties) of all DIP Obligations and the DIP Superpriority Claims.

(c)     *Dismissal/Conversion.* Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code:  (A) all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the DIP Secured Parties under the DIP Orders and under the DIP Loan Documents (including, without limitation, the DIP Superpriority Claims and the DIP Liens), shall continue in

full force and effect and shall maintain their priorities as provided in the DIP Orders until all DIP

Obligations shall have been Paid in Full, and all such claims, liens and security interests, rights,

priorities, privileges, remedies, benefits and protections shall, notwithstanding such dismissal or

conversion, remain unaffected and shall remain binding on all parties in interest (and any such

order shall, in accordance with sections 105 and 349 of the Bankruptcy Code, so provide), and (B)

this Court shall retain jurisdiction, notwithstanding such dismissal or conversion, for the purposes

of enforcing all such claims, liens and security interests, rights, priorities, privileges, remedies,

benefits and protections granted to the DIP Secured Parties under the DIP orders and under the

DIP Loan Documents.

(d)    *Reversal/Modification.* Based on the findings set forth in the DIP Orders

and the record presented during the Interim Hearing, the Final Hearing, and the Chapter 11 Cases,

and in accordance with section 364(e) of the Bankruptcy Code, in the event that any or all of the

provisions of the DIP Orders or the DIP Loan Documents are hereafter reversed, modified, vacated

or stayed by a subsequent judgment or order of this Court or any other court, any such reversal,

stay, modification or vacatur shall not affect (i) the validity or enforceability of advances

previously made under the DIP Orders or under the DIP Loan Documents by the DIP Secured

Parties to the Debtors, (ii) the validity or enforceability of any obligation, indebtedness or liability

incurred under the DIP Orders or the DIP Loan Documents (including, without limitation, the DIP

Obligations) by the DIP Loan Parties to the DIP Secured Parties, (iii) the validity, enforceability,

or perfection of any of the claims, liens, security interests, rights, privileges or benefits granted

under the DIP Orders or under the DIP Loan Documents to the DIP Secured Parties, or (iv) the

payment of any fees, costs, expenses or other amounts to the DIP Secured Parties under the DIP

Orders and the DIP Loan Documents, in each case, prior to the actual receipt of written notice by

any DIP Agent of the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification or vacatur, the claims, liens, security interests, rights, privileges, remedies and benefits set forth in the DIP Orders shall be governed in all respects by the original provisions of the DIP Orders and the DIP Loan Documents.

(e)     *Survival*. Except as expressly provided in the DIP Orders, until all of the DIP Obligations have been Paid in Full (unless the DIP Secured Parties have otherwise agreed in writing in respect of the DIP Obligations), all claims, liens and security interests, rights, priorities, privileges, remedies, benefits, and protections granted to the DIP Secured Parties under the DIP Orders and the DIP Loan Documents shall survive and shall not be modified, impaired, or discharged by: (i) the entry of an order confirming any chapter 11 plan in any of the Chapter 11 Cases (and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors hereby waive any discharge as to any remaining DIP Obligations), (ii) the entry of an order converting any or all of the Chapter 11 Cases to a case (or cases) under chapter 7 of the Bankruptcy Code, dismissing any or all of the Chapter 11 Cases or terminating the joint administration of the Chapter 11 Cases or by any other act or omission, or (iii) the entry of an order approving the sale or disposition of any DIP Collateral (except to the extent expressly permitted in the DIP Loan Documents).

28.     *Master Proof of Claim.* To the extent necessary, the DIP Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases or any of the Successor Cases in order to assert claims for payment of the DIP Obligations.  The Debtors' stipulations and acknowledgments and the provisions of the DIP Orders, together with the evidence accompanying the Motion and presented at the Interim Hearing and Final Hearing, are deemed sufficient to and do constitute timely filed proofs of claim in respect of such claims arising under the DIP Obligations against each of the applicable Debtors.  Any order entered by the Court establishing a

bar date in any of the Chapter 11 Cases or any Successor Cases shall not apply to the DIP Secured Parties or the DIP Obligations.

29.    *Limitation of Liability.*

(a)    Nothing in the DIP Orders, the DIP Loan Documents or any documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties of any liability for any claim arising from, in connection with or related to the prepetition or postpetition activities of the DIP Loan Parties or their respective affiliates (as defined in section 101(2) of the Bankruptcy Code) in the operation of their businesses, their restructuring efforts or the administration of these Chapter 11 Cases.

(b)    In determining to make any loan or extension of credit under the DIP Loan Documents, or in exercising any rights or remedies under the DIP Orders or the DIP Loan Documents, none of the DIP Secured Parties shall (i) have any liability to any third party or be deemed to be in control of the operations of any of the DIP Loan Parties, (ii) owe any fiduciary duty to any of the DIP Loan Parties, their respective creditors, shareholders or estates, or (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of any of the DIP Loan Parties (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42, U.S. §§ 9601 *et seq*., as amended, or any other federal or state statute, including the Internal Revenue Code).

(c)    The DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other

44

person, and all risk of loss, damage, or destruction of the DIP Collateral shall be borne solely by the DIP Loan Parties; *provided, however,* that nothing contained in this <u>paragraph (c)</u> shall release the DIP Secured Parties from their obligations under the DIP Loan Documents.

30.     *Release of DIP Secured Parties*. Effective as of entry of the Interim Order, and approved on a final basis pursuant to this Final Order, each of the DIP Loan Parties and its estate(s), on its own behalf and on behalf of its predecessors, successors and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits each of the DIP Secured Parties and each of their respective representatives (in their capacities as such) from any and all obligations and liabilities to the DIP Loan Parties (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, including, without limitation, any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), or otherwise, (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, in each case, that may be asserted by any of the

DIP Loan Parties, their respective estates, predecessors, successors and assigns, in each case, against any of the DIP Secured Parties or their respective representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Final Order, in connection with, arising under or related to the DIP Orders, the DIP Facility, the DIP Liens, the DIP Obligations, the DIP Collateral, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including, without limitation, any claim or cause action with respect to the validity, enforceability, priority, scope, extent or perfection of the DIP Liens, the DIP Obligations or the DIP Loan Documents; *provided*, *however*, that nothing contained in the foregoing shall release the DIP Secured Parties from their obligations under the DIP Facility from and after the date hereof.

31. *Payments Free and Clear.* Any and all payments or proceeds required to be remitted to the DIP Secured Parties pursuant to the DIP Loan Documents, the Interim Order, this Final Order or any subsequent order of this Court shall be irrevocable (subject, solely in the case of the DIP Professional Fees, only to the procedures set forth in paragraph 10 of this Final Order), and shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (whether asserted or assessed by, through or on behalf of the DIP Loan Parties) or otherwise.

32. *Adequate Protection*.  Any orders (collectively, the "***Adequate Protection Orders***") entered by the Court granting any of the Prepetition Secured Parties adequate protection against any post-petition diminution in value of the Prepetition Secured Parties' respective liens and interests in the Prepetition Notes Collateral, including any orders authorizing the Debtors to use Cash Collateral of the Prepetition Secured Parties, if any, shall, in each case, be in form and

substance and on terms and conditions reasonably acceptable to the DIP Secured Parties and otherwise materially consistent with the DIP Orders in all respects, and to the extent the Prepetition Secured Parties seek adequate protection with respect to their interests in the Prepetition Notes Collateral, any such adequate protection granted to the Prepetition Secured Parties pursuant to the Adequate Protection Orders shall be limited solely to junior and subordinate security interests in and liens on the DIP Collateral ("***Adequate Protection Liens***") and, any final Adequate Protection Order shall provide that all Adequate Protection Liens shall be subject and subordinate to payment of the Carve Out following entry of such final Adequate Protection Order.[11]  In respect of any Adequate Protection Liens, the Prepetition Secured Parties may not exercise (or seek relief from the Court to exercise) any remedies against the DIP Collateral so long as there are any DIP Obligations outstanding, and the holders of any such Adequate Protection Liens on such DIP Collateral shall not be entitled to credit bid any diminution in value claims secured by such Adequate Protection Liens for any such DIP Collateral (and any sale of such DIP Collateral shall be free and clear of any Adequate Protection Liens provided that such liens attach to the cash proceeds, if any, of such sale after the DIP Obligations are Paid in Full).

33.    *Joint and Several Liability.* Nothing in the DIP Orders shall be construed to constitute or authorize a substantive consolidation of any of the DIP Loan Parties' estates, it being understood, however, that the DIP Loan Parties shall be jointly and severally liable for all obligations (including all DIP Obligations) under the DIP Orders and the DIP Loan Documents.

---

[11]   The DIP Loan Parties acknowledge and agree that the terms of the Final Cash Collateral Order are consistent with the terms of this paragraph and the DIP Orders.

34.     *Third Party Beneficiary.* Except as expressly set forth herein, no rights are created under the DIP Orders for the benefit of any third party, any creditor, equity holder, or any direct, indirect or incidental beneficiary.

35.     *Final Order Controls.* In the event of any conflict or inconsistency between or among the terms or provisions of the DIP Orders and any of the DIP Loan Documents, unless such term or provision in this Final Order is phrased in terms of "defined in" or "as set forth in" the DIP Credit Agreement or the other DIP Loan Documents, or in the event of any conflict or inconsistency between the terms of this Final Order and any other order of the Court, the terms and provisions of this Final Order shall govern and control.  Notwithstanding anything contained in any other order entered by this Court to the contrary, any payment made pursuant to, or authorization contained in, any other order entered by this Court shall be consistent with and subject to the requirements set forth in the DIP Orders and the DIP Loan Documents, including, without limitation, the Approved Budget (subject to Permitted Variances).

36.     *Effectiveness.* This Final Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the applicable Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014, any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

37.     *Bankruptcy Rules.* The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

38. *Headings.* Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.  When used in this Final Order, the word "including" shall not imply limitation.

39. *Necessary Action.* The DIP Loan Parties and the DIP Secured Parties are authorized to take any and all such actions as are necessary, required or appropriate to implement and effectuate the terms of the DIP Orders, the DIP Loan Documents and the transactions contemplated hereunder and thereunder.

40. *Retention of Jurisdiction.* The Court retains jurisdiction to hear, determine and enforce the terms of any and all matters arising from or related to the DIP Facility, the DIP Loan Documents and the DIP Orders, and the Court's jurisdiction shall survive confirmation and consummation of any Chapter 11 plan for any of the Debtors notwithstanding the terms or provisions of any such Chapter 11 plan or any order confirming any such Chapter 11 plan.

Dated: _____, 2024 Houston, Texas

_____

   ALFREDO R. PEREZ
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**DIP Credit Agreement**

[OH&S Draft – 09/19/24]

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT
dated as of

September [●], 2024,

among

RHODIUM TECHNOLOGIES LLC,
as Borrower,

RHODIUM ENTERPRISES, INC.,
as Holdings,

THE LENDERS PARTY HERETO

and

GALAXY DIGITAL LLC,
as Administrative Agent

Table of Contents

Page

ARTICLE I Definitions   2

    SECTION 1.01.  **Defined Terms** ................................................................. 2
    SECTION 1.02.  **Terms Generally** ................................................................. 15
    SECTION 1.03.  **Accounting Terms and Determinations** ........................................ 16
    SECTION 1.04.  **Divisions** ................................................................. 16

ARTICLE II The Credits   16

    SECTION 2.01.  **Commitments** ................................................................. 16
    SECTION 2.02.  **Loans** ................................................................. 17
    SECTION 2.03.  **Borrowing Procedure** ................................................................. 17
    SECTION 2.04.  **Evidence of Debt; Repayment of Loans** ........................................ 18
    SECTION 2.05.  **Fees** ................................................................. 18
    SECTION 2.06.  **Interest on Loans** ................................................................. 20
    SECTION 2.07.  **Default Interest** ................................................................. 20
    SECTION 2.08.  **Termination of Commitments** ................................................................. 20
    SECTION 2.09.  **Repayment of Borrowings** ................................................................. 20
    SECTION 2.10.  **Voluntary Prepayment** ................................................................. 20
    SECTION 2.11.  **Mandatory Prepayments** ................................................................. 21
    SECTION 2.12.  **Reserve Requirements; Change in Circumstances** ........................ 21
    SECTION 2.13.  **Pro Rata Treatment** ................................................................. 22
    SECTION 2.14.  **Sharing of Setoffs** ................................................................. 22
    SECTION 2.15.  **Payments** ................................................................. 23
    SECTION 2.16.  **Taxes** ................................................................. 23
    SECTION 2.17.  **Duty to Mitigate** ................................................................. 26

SECTION 2.18.    .  If (a) any Lender shall request compensation under Section 2.12 or (b) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.16, then such Lender (at the request of the Borrower Representative) shall use commercially reasonable efforts (x) to file any certificate or document reasonably requested in writing by the Borrower Representative or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if, in the opinion of such Lender, such filing or assignment would reduce its claims for compensation under Section 2.12 or would reduce amounts payable pursuant to Section 2.16, as the case may be, in the future; *provided* that, in case of the foregoing clause (x) or (y), such Lender shall not be required to incur any unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden reasonably deemed by it to be significant.  The Borrower hereby agrees to pay all reasonable and documented costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer. ..................................... 26

SECTION 2.18.    **Security Interest** ........................................................................ 26

ARTICLE III Representations and Warranties ............................................................. 27

SECTION 3.01.    **Organization; Powers** ................................................ 27
SECTION 3.02.    **Authorization; Enforceability** .................................. 27
SECTION 3.03.    **Approvals; No Conflicts** ............................................ 27
SECTION 3.04.    **Financial Position; No Material Adverse Change** ........................ 28
SECTION 3.05.    **Disclosure** ..................................................................... 28
SECTION 3.06.    **Assets; Title, Etc.** ........................................................ 28
SECTION 3.07.    **Subsidiaries** .................................................................. 29
SECTION 3.08.    **Litigation; Compliance With Laws** ........................... 29
SECTION 3.09.    **Agreements** .................................................................... 29
SECTION 3.10.    **Restriction on Liens** ................................................... 29
SECTION 3.11.    **Investment Company Act** ........................................... 29
SECTION 3.12.    **Tax Returns** .................................................................. 30
SECTION 3.13.    **No Material Misstatements** ....................................... 30
SECTION 3.14.    **ERISA** ........................................................................... 30
SECTION 3.15.    **Orders** ........................................................................... 30

SECTION 3.16. . (a) Following entry of the Interim Order and, to the extent applicable, the Final Order, by the Bankruptcy Court, the applicable DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Lenders and (b) any orders of the Bankruptcy Court related to the financing contemplated by the DIP Facility or the use of cash collateral remain in effect. .................................................................. 30

SECTION 3.17. **13-Week Cash Flow Forecast** ........................................................ 30

SECTION 3.17. . The Loan Parties have not failed to disclose any material assumptions with respect to the 13-Week Cash Flow Forecast and affirm the reasonableness of the assumptions in the 13-Week Cash Flow Forecast in all material respects. .......................... 30

SECTION 3.18. **Material Assumptions** ...................................................................... 30

SECTION 3.19. . The Loan Parties have not failed to disclose any material assumptions with respect to the 13-Week Cash Flow Forecast and affirm the reasonableness of the assumptions in the 13-Week Cash Flow Forecast in all material respects. .......................... 30

SECTION 3.19. **No Default or Event of Default** ....................................................... 30

SECTION 3.20. . No Default or Event of Default has occurred and is continuing. ....................................................................................... 30

SECTION 3.20. **Swap Agreements** ............................................................................ 30

SECTION 3.21. . No Loan Party is party to a Swap Agreement ................................ 30

SECTION 3.21. **Environmental Matters** .................................................................. 30

SECTION 3.22. **Insurance** .......................................................................................... 30

SECTION 3.23. **USA PATRIOT; AML Laws; Anti-Corruption Laws and Sanctions** ............................................................................................. 31

SECTION 3.24. **Quality of Title** ................................................................................ 31

ARTICLE IV Conditions of Lending .................................................................................... 31

SECTION 4.01. **Initial Term Loan** ............................................................................ 31

SECTION 4.02. **Delayed Draw Term Loan** .............................................................. 32

SECTION 4.03. . On the Delayed Draw Borrowing Date: .......................................... 32

ARTICLE V Affirmative Covenants ..................................................................................... 34

SECTION 5.01. **Existence; Compliance with Laws; Businesses and Properties** ......................................................................................... 34

SECTION 5.02. **Insurance** .......................................................................................... 34

SECTION 5.03. **Reports, Etc.** ..................................................................................... 35

SECTION 5.04. **Orders** ............................................................................................... 36

4135-7274-5555.4

SECTION 5.05.    . The Loan Parties shall deliver to the Administrative Agent as soon as practicable in advance of filing with the Bankruptcy Court the Interim Order and the Final Order (which must be in form and substance reasonably satisfactory to the Administrative Agent and the Lenders), other pleadings that materially affect the Lenders, including the Interim Cash Collateral Order or the Final Cash Collateral Order (or similar orders addressing the use of the Prepetition Secured Parties' cash collateral on terms and conditions satisfactory to the Administrative Agent and the Lenders). ............................................ 36

SECTION 5.06.    **Notices** ........................................................................ 36

SECTION 5.06.    ................................................................................. 36

SECTION 5.07.    **Maintaining Records; Access to Properties and Inspections** ....... 37

SECTION 5.08.    **Use of Proceeds** ........................................................... 37

SECTION 5.09.    **Further Assurances** ...................................................... 37

SECTION 5.10.    **Cash Management** ........................................................ 38

SECTION 5.11.    **Milestones** ................................................................... 38

SECTION 5.12.    **[Post-Closing Requirements** ........................................... 39

SECTION 5.13.    . The Borrower shall, and shall cause each other Loan Party to, satisfy the requirements set forth on Schedule 5.12 in the time periods set forth in said Schedule. The parties acknowledge and agree that notwithstanding anything herein to the contrary, all conditions, representations, warranties and covenants of the Loan Documents with respect to the taking of such actions are qualified by the noncompletion of such actions until such time as they are completed or required to be completed in accordance with this Section 5.12.] ...................................................... 39

ARTICLE VI Negative Covenants ............................................................ 39

SECTION 6.01.    **Indebtedness** ................................................................ 39

SECTION 6.02.    **Liens** ............................................................................ 39

SECTION 6.03.    **Superpriority Claims** ..................................................... 40

SECTION 6.04.    **Investments** .................................................................. 40

SECTION 6.05.    **Mergers, Consolidations, Sales of Assets and Acquisitions** ......... 40

SECTION 6.06.    **Restricted Payments; Restrictive Agreements** ............................. 40

SECTION 6.07.    **Transactions With Affiliates** ............................................ 40

SECTION 6.08.    **Nature of Business; Subsidiaries** ..................................... 41

SECTION 6.09.    **Amendments; Swap Agreements** ...................................... 41

SECTION 6.10.    **Subrogation** ................................................................. 41

SECTION 6.11.    . Assert any right of subrogation or contribution against any other Loan Party until all Paid in Full and the Commitments are terminated. .................................................................................. 41

SECTION 6.11.    **Margin Regulations** ..................................................... 41

iv

SECTION 6.12.   . Take any action which might cause any of the Loan Documents to violate (a) Regulations T, U or X or any other regulation of the Board or any successor Governmental Authority or (b) Section 7 of the Securities Exchange Act or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect.......................................... 41

SECTION 6.12.   **Anti-Corruption and AML Laws** .................................................. 41

SECTION 6.13.   . Use, or cause its respective directors, officers, employees, Affiliates and agents to use, directly or indirectly, the proceeds of any Loans, or lend, contribute or otherwise make available such proceeds to any Subsidiary, other Affiliate, joint venture partner or other Person, (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or AML Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or involving any goods originating in or with a Sanctioned Person or Sanctioned Country, or (c) in any manner that would result in the violation of any Sanctions by any Person (including any Person participating in the transactions contemplated hereunder, whether as underwriter, advisor lender, investor or otherwise)................................................. 41

SECTION 6.13.   **ERISA Compliance**.................................................................... 42

SECTION 6.14.   . Create or maintain any plan subject to ERISA or incur any liability under ERISA. ...................................................................... 42

SECTION 6.14.   **Environmental Matters** .................................................................. 42

SECTION 6.15.   . Violate or permit any of its assets to be in violation of, or do anything or permit anything to be done which will subject any such assets to any remedial work under any Environmental Laws, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to such assets............................................................. 42

SECTION 6.15.   **Accounting Changes** ...................................................................... 42

SECTION 6.16.   . (a) Make or cause any change in the accounting treatment or reporting practices of such Loan Party, except as required by GAAP or (b) change the fiscal year of any Loan Party. .................... 42

SECTION 6.16.   **New Accounts** ................................................................................ 42

SECTION 6.17.    . Open or otherwise establish, or deposit, credit or otherwise transfer any cash receipts, securities, financial assets or any other property into, any deposit account, securities account or commodity account other than any deposit account, securities account or commodity account in which the Administrative Agent has been granted a first-priority perfected Lien and that, in each case, is subject to a Loan Document, and the Loan Parties shall have notified the Administrative Agent and the Lenders in writing no later than one Business Day after the opening or establishment of any such new account. .......................... 42

SECTION 6.17.    **Key Employee Plans** ................................................ 42

SECTION 6.18.    . (a) Enter into any key employee retention plan and incentive plan, other than such plans in effect as of the Petition Date or (b) amend or modify any existing key employee retention plan and incentive plan, unless such plan, amendment or modification, as applicable, is satisfactory to the Administrative Agent and the Lenders. ............................... 42

SECTION 6.18.    **Bankruptcy Orders** ................................................ 42

SECTION 6.19.    . (a) Obtain or seek to obtain any stay from the Bankruptcy Court on the exercise of the Lenders' remedies hereunder or under any other Loan Document, except as specifically provided in the DIP Order, (b) seek to change or otherwise modify any DIP Order or other order in the Bankruptcy Court with respect to the DIP Facility or (c) without the consent of the Administrative Agent and the Lenders, propose, file, consent, solicit votes with respect to or support any chapter 11 plan or debtor in possession financing unless (i) such plan or financing would, on the date of effectiveness, pay in full in cash all Obligations and the loan commitments hereunder are terminated on such date of effectiveness or (ii) such plan is a Plan. ....................................................................... 42

SECTION 6.19.    **Minimum Liquidity** ................................................ 42

SECTION 6.20.    **Variance** .................................................................. 42

SECTION 6.21.    **Minimum Miner Availability** ................................ 43

ARTICLE VII Events of Default ............................................................ 43

ARTICLE VIII The Administrative Agent; Etc. ................................... 46

SECTION 8.01.    **Appointment and Authorization** ........................ 46

SECTION 8.02.    **Delegation of Duties** ............................................ 46

SECTION 8.03.    **Default; Collateral** ................................................ 47

SECTION 8.04.    **Liability of Administrative Agent** ...................... 48

SECTION 8.05.    **Reliance by Administrative Agent** ...................... 49

SECTION 8.06.    **Notice of Default** .................................................. 52

SECTION 8.07.    **Credit Decision; Disclosure of Information by Administrative Agent** ............................................ 52

SECTION 8.08.    **Administrative Agent in Its Individual Capacity** ...... 52

SECTION 8.09.   **Successor Agent**..................................................................... 53
SECTION 8.10.   **Proof of Claim** ....................................................................... 53
SECTION 8.11.   **Modifications to Article VIII** ................................................ 54
SECTION 8.12.   **Effectiveness of Article VIII**.................................................. 54
SECTION 8.13.   .   The parties hereto agree that the provisions of this Article VIII shall be deemed effective as of the Term Sheet Effective Date. Any actions taken or omitted to be taken by the Administrative Agent or the Lenders pursuant to the Term Sheet prior to the date hereof shall be deemed to have been taken or omitted to be taken under this Agreement. ......................... 54

ARTICLE IX Guarantee  54

SECTION 9.01.   **The Guarantee**........................................................................ 54
SECTION 9.02.   **Obligations Unconditional** ................................................... 54
SECTION 9.03.   .   Each of the Guarantors hereby guarantees on a joint and several basis, as a primary obligor and not as a surety to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest on the Loans made by the Lenders to the Borrower, and all other Obligations (including any Fees) from time to time owing to the Secured Parties by any Loan Party under any Loan Document (such obligations being herein collectively called the "***Guaranteed Obligations***"). The Guarantors hereby jointly and severally agree that if the Borrower shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal...................................... 54
SECTION 9.04.   **Reinstatement** ....................................................................... 56
SECTION 9.05.   .   The obligations of the Guarantors under this Article IX shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise................ 56
SECTION 9.04.   **Subrogation** .......................................................................... 56

SECTION 9.05.    .  The Guarantors hereby agree that until the payment and satisfaction in full in cash of all Guaranteed Obligations, it shall not assert any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 9.01 against the Borrower of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. ............................................... 56

SECTION 9.05.    **Remedies** ......................................................................... 57

SECTION 9.06.    .  The Guarantors agree that, as between the Guarantors and the Secured Parties, the obligations of the Borrower under this Agreement may be declared to be forthwith due and payable as provided in Section 7.01 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 7.01) for purposes of Section 9.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 9.01. ...................................................... 57

SECTION 9.06.    **Continuing Guarantee** ...................................................... 57

SECTION 9.07.    .  The guarantee in this Article IX is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising. ...................................................................... 57

ARTICLE X Miscellaneous .......................................................................................... 57

SECTION 10.01.  **Notices; Electronic Communications** ............................. 57
SECTION 10.02.  **Survival of Agreement** ..................................................... 57
SECTION 10.03.  **Binding Effect** ................................................................... 58
SECTION 10.04.  **Successors and Assigns** .................................................... 58
SECTION 10.05.  **Expenses; Indemnity** ........................................................ 61
SECTION 10.06.  **Right of Setoff** ................................................................... 63
SECTION 10.07.  **Applicable Law** ................................................................. 63
SECTION 10.08.  **Waivers; Amendment** ....................................................... 63
SECTION 10.09.  **Interest Rate Limitation** ................................................... 64
SECTION 10.10.  **Entire Agreement** .............................................................. 64
SECTION 10.11.  **WAIVER OF JURY TRIAL** ............................................ 64
SECTION 10.12.  **Severability** ....................................................................... 65
SECTION 10.13.  **Counterparts** ..................................................................... 65
SECTION 10.14.  **Headings** ............................................................................ 65
SECTION 10.15.  **Jurisdiction; Consent to Service of Process** ................... 65
SECTION 10.16.  **Confidentiality** .................................................................. 66
SECTION 10.17.  **Lender Action** ................................................................... 67
SECTION 10.18.  **USA PATRIOT Act Notice** ............................................. 67

ix

SCHEDULES

| | | |
|---|---|---|
| Schedule 2.01 | - | Lenders and Commitments |
| Schedule 3.06 | - | Existing Liens |
| Schedule 3.08 | - | Litigation |
| Schedule 6.01 | - | Existing Indebtedness |

EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Term Sheet |
| Exhibit B | - | Form of Notice of Borrowing |
| Exhibit C | - | Form of Perfection Certificate |
| Exhibit D | - | 13-Week Cash Flow Forecast |

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT dated as of September [●], 2024 (this "***Agreement***"), among RHODIUM TECHNOLOGIES LLC, a Delaware limited liability company (the "***Borrower***"), RHODIUM ENTERPRISES, INC., a Delaware corporation ("***Holdings***"), the Subsidiary Guarantors (such term and each other capitalized term used but not defined in this introductory statement having the meaning given it in <u>Section 1.01</u>), the Lenders and Galaxy Digital LLC, as administrative agent (in such capacity, including any successor thereto, the "***Administrative Agent***") for the Lenders.

The Loan Parties are debtors and debtors-in-possession in the chapter 11 cases (the "***Bankruptcy Cases***") jointly administered under Chapter 11 of the United States Bankruptcy Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***"), styled *In re Rhodium Encore, LLC*, Case No. 24-90448 (ARP). Certain of the Loan Parties commenced Bankruptcy Cases on August 24, 2024 (the "***Initial Petition Date***"), and the Borrower and certain of its affiliates commenced Bankruptcy Cases on August 29, 2024 (the "***Subsequent Petition Date***").

The Loan Parties, the Administrative Agent and the Lenders entered into a definitive description of terms and conditions for a senior secured, super-priority debtor-in-possession financing facility (the "***DIP Facility***") on the Term Sheet Effective Date, attached hereto as <u>Exhibit A</u> (the "***Term Sheet***").

As of the Term Sheet Effective Date, the Lenders provided Commitments to the Borrower in an aggregate principal amount of $30,000,000, consisting of an Initial Term Loan Commitment in an aggregate principal amount of $15,000,000 and a Delayed Draw Commitment in an aggregate principal amount of $15,000,000.

Pursuant to the Term Sheet, the Borrower was given the option to borrow in either Dollars or BTC, and the Borrower elected to borrow Initial Term Loans in Dollars and will elect to borrow Delayed Draw Term Loans in Dollars.

The Lenders extended credit to the Borrower on the Initial Borrowing Date, in an aggregate principal amount of $15,000,000 pursuant to the Term Sheet. On the date hereof, the Loan made by the Lenders to the Borrower pursuant to the Term Sheet shall, on a cash-less basis, be immediately and automatically converted to an Initial Term Loan of the Initial Term Loan Lenders and such Initial Term Loan shall thereafter constitute a Loan and Obligations for all purposes under this Agreement. Upon execution of this Agreement, the Term Sheet shall be superseded by this Agreement for all purposes; *provided* that all representations and warranties, covenants and other agreements made by the Loan Parties in the Term Sheet shall be deemed incorporated herein by reference.

The Borrower has requested the Lenders extend credit in the form of Delayed Draw Term Loans after the date hereof, in an aggregate principal amount of $15,000,000.

The Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

4135-7274-5555.4

## ARTICLE I

### *Definitions*

SECTION 1.01.        **Defined Terms.**  As used in this Agreement, the following terms shall have the meanings specified below:[1]

"*13-Week Cash Flow Forecast*" shall mean the forecast attached hereto as Exhibit D, as amended from time to time in accordance with the Final Order.

"*Administrative Agent*" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"*Administrative Questionnaire*" shall mean an Administrative Questionnaire in a customary form supplied from time to time by the Administrative Agent.

"*Adverse Claim*" shall mean a Lien, security interest, pledge, charge or encumbrance, or similar right or claim of any Person, other than (a) Liens in favor of the Administrative Agent or the Lenders, (b) Liens in favor of the Prepetition Secured Parties and (c) Liens existing on the applicable Petition Date and described on Schedule 6.02 attached hereto.

"*Affiliate*" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"*Agreement*" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"*AML Laws*" shall mean all laws, rules, and regulations of any jurisdiction applicable to the Lenders or any Loan Party from time to time concerning or relating to anti-money laundering.

"*Anti-Corruption Laws*" shall mean all laws, rules, and regulations of any jurisdiction applicable to any Loan Party from time to time concerning or relating to bribery or corruption.

"*Asset Sale*" shall mean the sale, division, transfer or other disposition (by way of merger, casualty, condemnation or otherwise) by a Loan Party to any Person other than Loan Party of any assets of the Loan Parties, other than any of the following:

(a)        inventory, damaged, obsolete or worn out assets or scrap or goods held for sale, in each case disposed of in the ordinary course of business;

(b)        Dispositions permitted by Section 6.05; or

---

[1] NTD: Definitions and provisions related to ERISA, tax and sanctions under further review.

(c)      any conveyance, transfer, exchange or disposition of assets which would constitute a payment permitted under Section 6.06 or an Investment permitted under Section 6.04.

"***Assignment and Acceptance***" shall mean an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent.

"***Bankruptcy Cases***" shall have the meaning assigned to such term in the recitals of this Agreement.

"***Bankruptcy Code***" shall have the meaning assigned to such term in the recitals of this Agreement.

"***Bankruptcy Court***" shall have the meaning assigned to such term in the recitals of this Agreement.

"***Board***" shall mean the Board of Governors of the Federal Reserve System of the United States of America and any successor thereto.

"***Borrower***" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"***Borrowing***" shall mean Loans of the same Class made on the same date.

"***BTC***" shall mean Bitcoin.

"***Business Day***" shall mean any day other than a Saturday or Sunday, a day that is a legal holiday under the laws of the State of Texas, or a day on which banking institutions located in such State are authorized or required by law to remain closed.

"***Carve-Out***" shall have the meaning set forth in the applicable DIP Order.

"***Casualty Event***" shall mean any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of Holdings, the Borrower or any other Loan Party.

"***Change in Law***" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

3

"**_Charges_**" shall have the meaning assigned to such term in <u>Section 10.09</u>.

"**_Class_**", when used in reference to any Loan or Borrowing, refers to whether such Loan comprising such Borrowing, is an Initial Term Loan or a Delayed Draw Term Loan and, when used in reference to any Commitment, refers to whether such Commitment is an Initial Term Loan Commitment or Delayed Draw Term Loan Commitment.

"**_Code_**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**_Collateral_**" shall have the meaning assigned to such term in <u>Section 2.18</u>

"**_Committee_**" shall mean any statutory committee appointed in the Bankruptcy Cases.

"**_Commitment_**" shall mean, with respect to any Lender, such Lender's Initial Term Loan Commitment and Delayed Draw Term Loan Commitment.

"**_Communications_**" shall have the meaning assigned to such term in <u>Section 10.01</u>.

"**_Connection Income Taxes_**" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**_Control_**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**_Controlling_**" and "**_Controlled_**" shall have meanings correlative thereto.

"**_Cumulative Four-Week Period_**" shall have the meaning assigned to such term in <u>Section 6.20</u>.

"**_Debtor Relief Laws_**" shall mean the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"**_Default_**" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"**_Delayed Draw Availability Period_**" shall mean the period from the entry of the Final Order to the Delayed Draw Borrowing Date (immediately following the Borrowing of the Delayed Draw Term Loan).

"**_Delayed Draw Borrowing Date_**" shall mean, with respect to a Delayed Draw Term Loan, the date such Delayed Draw Term Loan is extended by the Lenders.

"**_Delayed Draw Commitment_**" shall mean, with respect to each Lender, the commitment of such Lender to make a Delayed Draw Term Loan hereunder as set forth opposite such Lender's name on <u>Schedule 2.01</u>, or in the Assignment and Acceptance pursuant to which such Lender

4

assumed its Delayed Draw Commitment, and "Delayed Draw Commitment" shall mean, collectively, the sum of each Lender's Delayed Draw Commitments, which as of the Term Sheet Effective Date and as of the date hereof amount to $15,000,000 in the aggregate.

"**Delayed Draw Term Loan**" shall mean the term loan made by the Lenders to the Borrower pursuant to Section 2.01(b).

"**DIP Facility**" shall have the meaning assigned to such term in the recitals of this Agreement.

"**DIP Orders**" shall mean the Interim Order and the Final Order, as the context may require.

"**Disclosure Statement**" shall have the meaning assigned to such term in Section 5.11.

"**Disqualified Capital Stock**" shall mean any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is convertible or exchangeable for Indebtedness or redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part, on or prior to the date that is one year after the earlier of (a) the Maturity Date and (b) the date on which there are no Loans or other Obligations hereunder outstanding and the Commitments are terminated.

"**Dollars**" or "**$**" shall mean lawful money of the United States of America.

"**Eligible Assignee**" shall mean (a) a Lender or (b) an Affiliate of a Lender.

"**Environmental Laws**" shall mean all former, current and future federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"**Equity Interests**" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person, and any option, warrant or other right entitling the holder thereof to purchase or otherwise acquire any such equity interest.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, and the rules and regulations promulgated thereunder, and any successor statute.

"**Events of Default**" shall have the meaning assigned to such term in Article VII.

"***Excluded Taxes***" shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest under the Loan Documents pursuant to a law in effect on the date on which (i) such Lender acquires such interest or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.16, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.16(f) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"***Exit Fee***" shall have the meaning assigned to such term in Section 2.05(c).

"***Exchange Rate***" shall mean a rate determined in the Administrative Agent's sole discretion based on reasonable published market spot prices at closing on the date immediately prior to the date of a payment under the DIP Facility based on depth of liquidity across exchanges, trading execution fees, and commission, which calculation shall be shared in writing with the Borrower prior to any applicable payment.

"***Extraordinary Receipt***" shall mean any cash received by or paid to or for the account of any Loan Party not in the ordinary course of business, including purchase price adjustments, tax refunds, judgments and litigation settlements, pension plan reversions, proceeds of insurance (excluding proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof) and indemnity payments.

"***FATCA***" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"***Fees***" shall mean the Upfront Fees, the Unfunded Commitment Fees and the Exit Fee.

"***Final Cash Collateral Order***" shall mean a final order approving the use of cash collateral.

"***Final Order***" shall mean an order by the Bankruptcy Court granting final approval of the DIP Facility that is in form and substance reasonably satisfactory to the Administrative Agent and the Lenders.

"***Financial Officer***" of any Person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such Person.

"**_Foreign Lender_**" shall mean a Lender that is not a U.S. Person.

"**_GAAP_**" shall mean United States generally accepted accounting principles as in effect from time to time.

"**_Governmental Authority_**" shall mean any federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory body.

"**_Granting Lender_**" shall have the meaning assigned to such term in Section 10.04(i).

"**_Guarantee_**" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "**_primary obligor_**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; _provided_ that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"**_Guaranteed Obligations_**" shall have the meaning assigned to such term in Section 9.01.

"**_Guarantors_**" shall mean Holdings and the Subsidiary Guarantors.

"**_Hazardous Materials_**" shall mean (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and radioactive materials, (b) any chemical, material or substance that is defined in an applicable law as a hazardous or toxic substance, material or waste, and (c) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"**_Holdings_**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**_Indebtedness_**" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all accounts payable, accrued expenses, liabilities or other obligations of such Person, in each such case to pay the deferred purchase price of assets or services; (d) all obligations under capital leases; (e) all obligations under synthetic leases; (f) all Indebtedness (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on any assets of such Person, whether or not such Indebtedness is assumed by such Person; (g) all Indebtedness (as defined in the other clauses of this definition) of others guaranteed by such Person or in which such Person otherwise assures a

7

creditor against loss of the Indebtedness (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Indebtedness and the maximum stated amount of such guarantee or assurance against loss; (h) all obligations or undertakings of such Person to maintain or cause to be maintained the financial position or covenants of any other Person or to purchase the Indebtedness or assets of any other Person; (i) all obligations to deliver commodities, goods or services, in consideration of one or more advance payments (other than advances to officers, members of the board of directors, managers, consultants and employees or other providers of services for moving, entertainment and travel expenses and similar expenditures in the ordinary course of business); (j) all obligations to pay for goods or services whether or not such goods or services are actually received or utilized by such Person; (k) any Indebtedness of a partnership for which such Person is liable either by agreement, by operation of law but only to the extent of such liability; and (l) Disqualified Capital Stock.  The Indebtedness of any Person shall include all obligations of such Person of the character described above to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Person under GAAP.

"*Indemnified Taxes*" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in <u>clause (a)</u>, Other Taxes.

"*Indemnitee*" shall have the meaning assigned to such term in <u>Section 10.05(b)</u>.

"*Information*" shall have the meaning assigned to such term in <u>Section 10.16</u>.

"*Initial Borrowing Date*" shall mean September 5, 2024.

"*Initial Petition Date*" shall have the meaning assigned to such term in the recitals of this Agreement.

"*Initial Term Loan Commitment*" shall mean, with respect to each Lender, the commitment of such Lender to make an Initial Term Loan hereunder as set forth opposite such Lender's name on <u>Schedule 2.01</u>, or in the Assignment and Acceptance pursuant to which such Lender assumed its Initial Term Loan Commitment, and "Initial Term Loan Commitment" shall mean, collectively, the sum of each Lender's Initial Term Loan Commitment, which (i) as of the Term Sheet Effective Date equaled $15,000,000 in the aggregate and (ii) as of the date hereof equals $0.

"*Initial Term Loan*" shall mean the term loan made by the Lenders to the Borrower pursuant to Section <u>2.01(a)</u>.

"*Interest Rate*" shall mean 14.50%.

"*Interim Cash Collateral Order*" shall mean an interim order approving the use of cash collateral.

"*Interim Order*" shall mean the *Interim Order (i) Authorizing the Debtors to Obtain Secured Superpriority Postpetition Financing, (ii) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (iii) Modifying the Automatic Stay, (iv) Scheduling*

*a Final Hearing, and (v) Granting Related Relief* [Docket No. 84] entered by the Bankruptcy Court on the Term Sheet Effective Date.

"***Investment***" shall mean, for any Person, (a) the acquisition (whether for cash, assets, services or securities or otherwise) of Equity Interests of any other Person or any agreement to make any such acquisition (including, without limitation, any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale), (b) the making of any deposit with, or advance, loan or capital contribution to, assumption of Indebtedness of, purchase or other acquisition of any other Indebtedness or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of assets from another Person subject to an understanding or agreement, contingent or otherwise, to resell such assets to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding 90 days representing the purchase price of inventory or supplies sold by such Person in the ordinary course of business), (c) the purchase or acquisition (in one or a series of transactions) of assets of another Person that constitutes a business unit or (d) the entering into of any guarantee of, or other contingent obligation (including the deposit of any equity interests to be sold) with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"***Invoice Amount***" shall have the meaning assigned to such term in Section 2.06(b).

"***Invoice Date***" shall have the meaning assigned to such term in Section 2.06(b).

"***Invoice Due Date***" shall have the meaning assigned to such term in Section 2.06(b).

"***Lenders***" shall mean (a) the Persons listed on Schedule 2.01 (other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any Person that has become a party hereto pursuant to an Assignment and Acceptance.

"***Lien***" means any interest in assets securing an obligation owed to, or a claim by, a Person other than the owner of the assets, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including but not limited to the lien or security interest arising from a mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes.  The term "Lien" shall include easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations.  For the purposes of this Agreement, the Loan Parties shall be deemed to be the owner of any assets which they have acquired or hold subject to a conditional sale agreement, or leases under a financing lease or other arrangement pursuant to which title to the assets has been retained by or vested in some other Person in a transaction intended to create a financing.

"***Loan Documents***" shall mean this Agreement, the Term Sheet, the Perfection Certificate, the DIP Orders, the promissory notes, if any, executed and delivered pursuant to Section 2.04(e), any account control agreement and/or any custody agreement required by this Agreement or the DIP Orders, and any other document executed in connection with the foregoing.

"***Loan Parties***" shall mean Holdings, the Borrower and the Subsidiary Guarantors.

9

"***Loans***" shall mean the Initial Term Loan and the Delayed Draw Term Loan.

"***Material Adverse Effect***" shall mean a material adverse change in, or material adverse effect on (a) the business, operations, assets, liabilities (actual or contingent) or condition (financial or otherwise) of the Loan Parties or on their estates, taken as a whole, other than any change, event or occurrence, arising individually or in the aggregate, from events that could reasonably be expected to result from the filing or commencement of the Bankruptcy Case, (b) the ability of any Loan Party to perform any of its obligations under any Loan Document to which it is a party (including, without limitation, payment and performance of the Obligations), (c) the validity or enforceability of any Loan Document or the Obligations, (d) the Collateral, (e) the status, existence, perfection or priority of the Lenders' security interest in the Collateral or (f) the rights and remedies of, or benefits available to, the Lenders under any Loan Document.

"***Maturity Date***" shall mean the date that is the earliest of (a) 12 months after the Petition Date, (b) 30 days after the entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court, (c) the effective date of a Plan, (d) the closing of a sale of substantially all of the equity of the Loan Parties or of the Loan Parties' Temple Site assets (unless done pursuant to a confirmed Plan) and (e) the termination of the DIP Facility during the continuation of an Event of Default or termination under the DIP Facility or the applicable DIP Order.

"***Maximum Rate***" shall have the meaning assigned to such term in <u>Section 10.09</u>.

"***Milestone***" shall have the meaning assigned to such term in <u>Section 5.11</u>.

"***Minimum Liquidity Amount***" shall mean an amount equal to either (a) $5,000,000 of Unrestricted Cash (including any cash proceeds that will be received from a broker in exchange for BTC that has been traded) or (b) $5,000,000 million of BTC (calculated by reference to the Exchange Rate) held in an account in the name of a Loan Party acceptable to the Administrative Agent and the Lenders and that is subject to the dominion and control of the Administrative Agent pursuant to an account control and/or custody agreement in form and substance reasonably satisfactory to the Administrative Agent and the Lenders.

"***Net Cash Proceeds***" shall mean (a) with respect to any Asset Sale or Casualty Event, the cash proceeds actually received (including cash proceeds subsequently received (as and when received) in respect of noncash consideration initially received), net of (i) reasonable selling expenses (including reasonable legal fees, transfer and similar taxes and income taxes paid or payable in connection with such sale) and reasonable documented out-of-pocket expenses actually incurred and paid to third parties (other than Affiliates) in connection with such event, (ii) amounts provided as a reserve, in accordance with GAAP, against any liabilities under any indemnification obligations or purchase price adjustment associated with such Asset Sale (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds), (iii) in the case of a Casualty Event, duly documented costs of preparing assets for transfer upon a taking or condemnation or similar event, and (iv) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money (other than the Obligations) which is secured by the asset sold in such Asset Sale or subject to such Casualty Event and which is required to be repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such asset), (b) with respect to any issuance or

10

incurrence of Indebtedness, the cash proceeds thereof, net of all taxes and customary fees, commissions, costs and other expenses incurred in connection therewith; and (c) with respect to any Extraordinary Receipt, the cash proceeds received by or paid to or for the account of any Loan Party.

"*Notice of Borrowing*" shall mean a request by the Borrower in accordance with the terms of <u>Section 2.03</u> and substantially in the form of <u>Exhibit B</u>, or such other form as shall be approved by the Administrative Agent.

"*Obligations*" shall mean (a) the due and punctual payment of (i) the principal of and interest on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for payment or prepayment or otherwise, (ii) any Upfront Fee, any Unfunded Commitment Fees and any Exit Fee due under this Agreement, and (iii) all other monetary obligations of the Borrower to any of the Secured Parties under this Agreement and each of the other Loan Documents, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise, (b) the due and punctual performance of all other obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents, and (c) the due and punctual payment and performance of all the obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents.

"*Other Connection Taxes*" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"*Other Taxes*" shall mean all present or future stamp, court or documentary, intangible, recording, filing, excise, property or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"*Paid in Full*" shall mean the repayment in full and in Dollars of all outstanding amounts of principal and the payment of all accrued interest, all fees and any other amounts owing under this Agreement and the other Loan Documents.

"*Participant Register*" shall have the meaning assigned to such term in <u>Section 10.04(f)</u>.

"*Perfection Certificate*" shall mean the Perfection Certificate substantially in the form of <u>Exhibit C</u> attached hereto.

"*Permitted Variance*" shall have the meaning assigned to such term in <u>Section 6.20</u>.

"*Person*" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

"***Petition Date***" shall mean the Initial Petition Date; *provided* that with respect to the Loan Parties which commenced their Bankruptcy Cases subsequent to August 24, 2024, "***Petition Date***" shall refer to the respective dates on which such Bankruptcy Cases were commenced.

"***Plan***" shall have the meaning assigned to such term in <u>Section 5.11</u>.

"***Pledged Collateral***" means, collectively, all notes, stock, partnership interests, limited partnership interests, limited liability company interests, and all other Equity Interests owned or held by a Loan Party, all certificates or other instruments representing any of the foregoing, all security entitlements owned or held by a Loan Party in respect of any of the foregoing, all dividends, distributions, interest, cash, warrants, rights, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing.

"***Premium Event***" shall mean the occurrence of any of the following: (a) the principal balance of any Loans is prepaid or repaid, for any reason, in whole, (b) the Loans are accelerated (whether as a result of an Event of Default, by operation of law or otherwise) or (c) there shall occur any satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any of the Obligations in any bankruptcy, insolvency proceeding, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any bankruptcy or insolvency proceeding to the Administrative Agent or any Lender in full or partial satisfaction of the Obligations.

"***Prepetition Notes***" shall mean (a) those certain secured promissory notes issued by Rhodium Encore LLC in the original principal amount of $23.1 million and secured by all assets of Rhodium Encore LLC, (b) those certain secured promissory notes issued by Rhodium 2.0 LLC in the original principal amount of $31.5 million and secured by all assets of Rhodium 2.0 LLC, (c) those certain secured promissory notes issued by the Borrower in the original principal amount of $18.9 million and secured by the certain LLC units of the Borrower and (d) those certain secured promissory notes issued by the Borrower in the original principal amount of $6.4 million and secured by certain assets of Rhodium 30MW LLC.

"***Prepetition Secured Parties***" shall mean the holders under the Prepetition Notes.

"***Recipient***" shall mean (a) the Administrative Agent or (b) any Lender, as applicable.

"***Register***" shall have the meaning assigned to such term in <u>Section 10.04(d)</u>.

"***Regulation T***" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"***Regulation U***" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"***Regulation X***" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"***Related Parties***" shall mean, with respect to any specified Person, such Person's Affiliates and the respective partners, directors, trustees, officers, employees, members, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"***Release***" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"***Reporting Date***" shall have the meaning assigned to such term in Section 5.03(a).

"***Required Lenders***" shall mean, at any time, Lenders having Loans and Commitments representing more than 50% of the sum of all Loans outstanding and Commitments at such time.

"***Responsible Officer***" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"***Restricted Payment***" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in any Loan Party, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in such Loan Party or any option, warrant or other right to acquire any such Equity Interests in such Loan Party.

"***Rockdale Site***" shall mean the site of operations of certain of the Loan Parties at the data center located at 2721 Charles Martin Hall Road, Rockdale, Texas 76567.

"***Sanctioned Country***" means, at any time, a country or territory which is itself, or whose government is, the subject or target of any Sanctions broadly restricting or prohibiting dealing with such country, territory or government.

"***Sanctioned Person***" means, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the United States (including by the Office of Foreign Assets control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce), or by the United Nations Security Council, the European Union or any EU member state, or Her Majesty's Treasury, (b) any Person located, operating, organized or resident in a Sanctioned Country or (c) any Person directly or indirectly owned or controlled by any such Person or Persons.

"***Sanctions***" means economic or financial sanctions or trade embargoes or restricted measures imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"**Secured Parties**" shall mean (a) the Lenders, (b) the Administrative Agent, (c) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (d) the successors and assigns of each of the foregoing.

"**SOFR**" shall mean, with respect to any day, the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**SPV**" shall have the meaning assigned to such term in Section 10.04(i).

"**Subsequent Petition Date**" shall have the meaning assigned to such term in the recitals of this Agreement.

"**subsidiary**" shall mean, with respect to any Person (herein referred to as the "**parent**"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**Subsidiary**" shall mean any subsidiary of the Borrower or Holdings.

"**Subsidiary Guarantor**" shall mean each Subsidiary party to this Agreement.

"**Swap Agreement**" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"**Taxes**" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Temple Green Data**" shall mean Temple Green Data LLC, a Delaware limited liability company.

"**Temple Site**" shall mean the site of Rhodium Renewables LLC's operations at the data center located at 3505 Lorraine Avenue, Temple, Texas 76501.

"**Term Sheet**" shall have the meaning assigned to such term in the recitals of this Agreement.

14

"***Term Sheet Effective Date***" shall mean August 30, 2024.

"***Transactions***" shall mean, collectively, with respect to any Loan Party, the execution, delivery and performance by such Loan Party of this Agreement and each other Loan Document to which it is a party, the borrowing of Loans, the use of the proceeds thereof, and the grant of Liens by such Loan Party on the Collateral and other assets pursuant to the Loan Documents.

"***Unfunded Commitment Fees***" shall have the meaning assigned to such term in Section 2.05(b).

"***Unrestricted Cash***" shall mean, as of any date of determination, the aggregate amount of cash of the Loan Parties held in accounts owned by the Loan Parties; *provided* that Unrestricted Cash shall not include any cash that is held in any account that is not subject to an account control agreement providing a fully perfected security interest of the Administrative Agent, for the benefit of the Secured Parties.

"***Upfront Fee (First Installment)***" shall have the meaning set forth in Section 2.05(a).

"***Upfront Fee (Second Installment)***" shall have the meaning set forth in Section 2.05(a).

"***Upfront Fees***" shall have the meaning set forth in Section 2.05(a).

"***USA PATRIOT Act***" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended from time to time.

"***U.S. Person***" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"***Variance Testing Date***" shall have the meaning given to such term in Section 5.03(b).

"***Variance Testing Period***" shall have the meaning given to such term in Section 5.03(b).

"***Whinstone Litigation***" shall mean the dispute that is the subject of the action captioned Whinstone US, Inc. vs. Rhodium 30mw LLC, Rhodium JV, LLC, Air HPC LLC, and Jordan HPS LLC, Cause No. CV41873, pending in the 20th Judicial District Court, Milam County, Texas, its appeal to the Third Judicial District, Texas, Case. No. 03-23-00717-CV, and related AAA arbitration, Case No. 01-23-0005-7116.

"***Withholding Agent***" shall mean any Loan Party and the Administrative Agent.

SECTION 1.02.   **Terms Generally**.   The definitions in Section 1.01 shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument

15

or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in the Loan Documents herein), (b) any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Loan Documents herein), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including" and (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement.  No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

SECTION 1.03.    **Accounting Terms and Determinations**.    Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Administrative Agent or the Lenders hereunder shall be prepared fairly, in all material respects, to reflect the financial information contained in such financial statement or certificate.

SECTION 1.04.    **Divisions**.    For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws):  (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

ARTICLE II

*The Credits*

SECTION 2.01.    **Commitments**.  (a)  Subject to the terms and conditions set forth herein and in the Term Sheet and relying upon the representations and warranties set forth in the Term Sheet, the Lenders extended, severally and not jointly, a Loan to the Borrower on the Initial Borrowing Date in a principal amount equaling its Initial Term Loan Commitment. On the date hereof, the Loan made by the Lenders to the Borrower pursuant to the Term Sheet shall, on a cashless basis, be immediately and automatically converted to an Initial Term Loan of the Initial Term Loan Lenders and such Initial Term Loan shall thereafter constitute a Loan and Obligations for all purposes under this Agreement.  Amounts paid or prepaid in respect of the Initial Term Loan may not be re-borrowed.

(b)    Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, to make a Delayed Draw Term Loan to the Borrower during the Delayed Draw Availability Period as the Borrower may

16

request pursuant to <u>Section 2.03</u> in an amount not to exceed its Delayed Draw Commitment in effect at such time. Amounts paid or prepaid in respect of the Delayed Draw Term Loan may not be re-borrowed.

SECTION 2.02.    **Loans**.  (a)  Each Loan shall be made by the Lenders ratably in accordance with their applicable Commitments; *provided* that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).  The Initial Term Loan extended by the Lenders on the Initial Borrowing Date was in an amount equal to the Initial Term Loan Commitment. The Borrowing of the Delayed Draw Term Loan on the Delayed Draw Borrowing Date shall be in an amount equal to the Delayed Draw Term Loan Commitment.

(b)    Each Lender may at its option make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)    Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account as the Administrative Agent may designate not later than 1:00 p.m., New York City time, and upon receipt of all requested funds the Administrative Agent shall promptly wire the amounts so received to an account designated by the Borrower in the applicable Notice of Borrowing or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.

(d)    Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with <u>clause (c)</u> above and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, a rate *per annum* equal to the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error).  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.

SECTION 2.03.    **Borrowing Procedure**.  In order to request a Borrowing, the Borrower shall notify the Administrative Agent of such request in writing not later than 12:00 (noon), New York City time, three Business Days before a proposed Borrowing.  Each such

17

request shall be irrevocable, and shall be confirmed promptly by hand delivery or e-mail to the Administrative Agent of a Notice of Borrowing specifying the following information: (i) the date of such Borrowing (which shall be a Business Day), (ii) the number and location of the account to which funds are to be disbursed, (iii) the amount of such Borrowing and (iv) the intended uses of proceeds in accordance with the 13-Week Cash Flow Forecast; *provided* that, notwithstanding any contrary specification in any Notice of Borrowing, each requested Borrowing shall comply with the requirements set forth in <u>Section 2.02</u>.  The Administrative Agent shall promptly advise the applicable Lenders of any notice given pursuant to this Section (and the contents thereof), and of each Lender's portion of the requested Borrowing.

SECTION 2.04.        **Evidence of Debt; Repayment of Loans**.  (a)  The Borrower unconditionally promises to pay to the Administrative Agent for the account of each Lender the principal amount of each Loan of such Lender as provided in <u>Section 2.09</u>.

(b)        Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)        The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Class thereof, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof.

(d)        The entries made in the accounts maintained pursuant to <u>clauses (b)</u> and <u>(c)</u> above shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms.

(e)        Any Lender may request that Loans made by it hereunder be evidenced by a promissory note.  In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns and in a form and substance reasonably acceptable to the Administrative Agent.

SECTION 2.05.        **Fees**.  (a)  The Borrower agrees to pay to the Administrative Agent, for the account of the Lenders, an upfront fee equal to 1.00% of the stated principal amount of the Lenders' Commitments as of the Term Sheet Effective Date (including Commitments available following entry of the Final Order) (the "***Upfront Fee (First Installment)***"). The Upfront Fee (First Installment) shall be in all respects fully earned upon entry of the Interim Order, and due and payable on the Initial Borrowing Date. The Borrower also agrees to pay to the Administrative Agent, for the account of the Lenders, an upfront fee equal to 1.00% of the Lenders' Commitments as of the Term Sheet Effective Date (including Commitments available following entry of the Final Order) (the "***Upfront Fee (Second Installment)***" and together with the Upfront Fee (First Installment), the "***Upfront Fees***").  The Upfront Fee (Second Installment) shall be fully earned upon entry of the Interim Order, and due and payable on the Delayed Draw Borrowing Date.

18

(b)      Each month, in accordance with <u>Section 2.06(b)</u>, the Borrower agrees to pay to the Administrative Agent, for the account of the Lenders, a fee *per annum* equal to (x) SOFR *multiplied by* (y) the daily unused amount of the Commitments during the preceding month (the "***Unfunded Commitment Fee***"); *provided* that for purposes of the Unfunded Commitment Fee, SOFR shall not be less than 4.50%. The Unfunded Commitment Fees shall be payable by the Borrower, as applicable (a) on the Invoice Due Date to the extent unused Commitments existed during the immediately preceding month and (b) on the Delayed Draw Borrowing Date, to the extent any accrued and unpaid Unfunded Commitment Fees exist on such date. All Unfunded Commitment Fees shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)      In addition to the other obligations contained in this <u>Section 2.05</u>, if any Premium Event occurs, the Borrower shall, in each case, pay to the Administrative Agent, for the account of the Lenders, on the date of such Premium Event, an amount (an "***Exit Fee***") equal to 2.50% of the stated principal amount of the Lenders' Commitments as of the Term Sheet Effective Date (whether or not such Commitments are ultimately funded). The Exit Fee shall constitute an Obligation and shall be fully earned upon entry of the Interim Order. The Exit Fee shall be due and payable by the Borrower immediately prior to and notwithstanding the automatic acceleration of the outstanding principal amount of the Loans and all other accrued liabilities contemplated hereunder and under the other Loan Documents.

(d)      Notwithstanding anything to the contrary in this Agreement or any other Loan Document, it is understood and agreed that if any Loans are accelerated (whether as a result of the occurrence and continuance of any Event of Default, by operation of law or otherwise), any Exit Fee determined as of the date of acceleration, will also be due and payable and will be treated and deemed as though the applicable Loans were repaid as of such date and shall constitute part of the Obligations for all purposes herein.   Any Exit Fee shall also be payable in the event the Obligations, the Loans and this Agreement are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other similar means.  The Loan Parties expressly waive the provisions of any present or future statute or law that prohibits or may prohibit the collection of the applicable premium in connection with any such acceleration.  The parties hereto further acknowledge and agree that any Exit Fee is not intended to act as a penalty or to punish the Loan Parties for any repayment or redemption of the Loans.  The Loan Parties expressly agree that (i) any Exit Fee is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (ii) any Exit Fee shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between the Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay any Exit Fee, (iv) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this Section, (v) the agreement of the Loan Parties to pay any Exit Fee is a material inducement to the Lenders to extend the Loans, and (vi) any Exit Fee represents a good-faith, reasonable estimate and calculation of the lost profits or damages of the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to any Lender or profits lost by such Lender as a result of any Premium Event.

19

(e)     All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders.  Once paid, none of the Fees shall be refundable under any circumstances.

SECTION 2.06.     **Interest on Loans**.  (a)  The Loans shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days and calculated from the date of such Borrowing to the date of repayment thereof) at a rate *per annum* equal to the Interest Rate.

(b)     On the first Business Day of each month (the "***Invoice Date***"), the Administrative Agent shall deliver an invoice to the Borrower which shall describe all interest and Unfunded Commitment Fees accrued during the immediately preceding month, and any other amounts owing under this Agreement and the other Loan Documents (the "***Invoice Amount***"). The Borrower shall pay the Invoice Amount to the Administrative Agent no later than five Business Days after the Invoice Date (the "***Invoice Due Date***"). Interest on each Loan shall be payable in cash.

SECTION 2.07.     **Default Interest**.  Immediately upon the occurrence and during the continuance of any Event of Default under Article VII, then, to the extent permitted by law, all amounts outstanding under this Agreement and the other Loan Documents shall bear interest (after as well as before judgment), payable on demand, at the Interest Rate plus 2.00% *per annum*.

SECTION 2.08.     **Termination of Commitments**.     The Initial Term Loan Commitment automatically terminated upon the making of the Initial Term Loan on the Initial Borrowing Date. The Delayed Draw Term Loan Commitment shall automatically terminate upon the making of the Delayed Draw Term Loan on the Delayed Draw Borrowing Date. Notwithstanding the foregoing, all outstanding Commitments shall automatically terminate on the Maturity Date.

SECTION 2.09.     **Repayment of Borrowings**.  To the extent not previously paid, all Loans shall be due and payable on the Maturity Date, together with (a) any accrued and unpaid Fees and (b) accrued and unpaid interest on the principal amount to be paid to the date of payment.

SECTION 2.10.     **Voluntary Prepayment**.  (a)   Subject to Section 2.05(c), the Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, upon at least three Business Days' prior written notice to the Administrative Agent before 12:00 (noon), New York City time; *provided* that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000.

(b)     Voluntary prepayments of Loans shall be applied *pro rata* against the remaining principal due in respect of the Loans under Section 2.09.

(c)     Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrower to prepay such Borrowing by the amount stated therein on the date stated therein. All prepayments under this Section shall be subject to Section 2.05(c).  All prepayments under this Section shall be accompanied by (i) any accrued and unpaid Fees and (ii) accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.11.        **Mandatory Prepayments**.  (a)  Not later than the third Business Day following the receipt of Net Cash Proceeds in respect of any Asset Sale or Casualty Event, the Borrower shall apply 100% of the Net Cash Proceeds received with respect thereto to prepay outstanding Loans in accordance with Section 2.11(d).

(b)        In the event that any Loan Party or any subsidiary of a Loan Party shall receive Net Cash Proceeds from the issuance or incurrence of Indebtedness for money borrowed of any Loan Party or any subsidiary of a Loan Party (other than any cash proceeds from the issuance of Indebtedness for money borrowed permitted pursuant to Section 6.01), the Borrower shall, substantially simultaneously with (and in any event not later than the third Business Day next following) the receipt of such Net Cash Proceeds by such Loan Party or such subsidiary, apply an amount equal to 100% of such Net Cash Proceeds to prepay outstanding Loans in accordance with Section 2.11(d).

(c)        In the event that any Loan Party shall receive Net Cash Proceeds from any Extraordinary Receipt, such Loan Party shall, substantially simultaneously with (and in any event not later than the third Business Day next following) the receipt of such Net Cash Proceeds by such Loan Party, apply an amount equal to 100% of such Net Cash Proceeds to prepay outstanding Loans in accordance with Section 2.11(d).

(d)        Mandatory prepayments of outstanding Loans under this Agreement shall be applied *pro rata* against the remaining principal due in respect of the Loans.

(e)        The Borrower shall deliver to the Administrative Agent, at the time of each prepayment required under this Section, (i) a certificate signed by a Financial Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (ii) to the extent practicable, at least three days' prior written notice of such prepayment.  Each notice of prepayment shall specify the prepayment date and the principal amount of each Loan (or portion thereof) to be prepaid.  All prepayments of Borrowings under this Section shall be subject to Section 2.05(c), and shall be accompanied by (i) any accrued and unpaid Fees and (ii) accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.12.        **Reserve    Requirements;    Change    in    Circumstances**. (a)  Notwithstanding any other provision of this Agreement, if any Change in Law shall (i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of or credit extended or participated in by any Lender; (ii) subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or (iii) impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender, and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise) by an amount deemed by such Lender to be material, then the Borrower will pay to such Lender upon demand such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

21

(b)　If any Lender shall have determined that any Change in Law affecting such Lender or any lending office of such Lender or such Person's holding company, if any, regarding capital adequacy or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)　A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in clause (a) or (b) above shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate delivered by it within ten Business Days after its receipt of the same.

(d)　Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be under any obligation to compensate any Lender under clause (a) or (b) above with respect to increased costs or reductions with respect to any period prior to the date that is 120 days prior to such request if such Lender knew or could reasonably have been expected to know of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would result in a claim for increased compensation by reason of such increased costs or reductions; *provided further* that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any Change in Law within such 120-day period.  The protection of this Section shall be available to each Lender regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

SECTION 2.13.　**Pro Rata Treatment**.　Each Borrowing, each payment or prepayment of principal of any Loans and each payment of interest on the Loans shall be allocated *pro rata* among the Lenders in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans).  Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.

SECTION 2.14.　**Sharing of Setoffs**.　Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under the Bankruptcy Code or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan or Loans as a result of which the unpaid principal portion of its Loans shall be proportionately less than the unpaid principal portion of the Loans of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans of such other Lender, so that the aggregate unpaid principal amount of

the Loans and participations in Loans held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans then outstanding as the principal amount of its Loans prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; *provided* that (i) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.14 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest, and (ii) the provisions of this Section 2.14 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement.  The Borrower expressly consents to the foregoing arrangements and agree that any Lender holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation.

SECTION 2.15.    **Payments**.  (a)  The Borrower shall make each payment (including principal of or interest on any Borrowing or any Fees or other amounts) under any Loan Document not later than 12:00 (noon), New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim.  Each such payment shall be made to such account as the Administrative Agent may designate.  The Administrative Agent shall promptly distribute to each Lender any payments received by the Administrative Agent on behalf of such Lender.

(b)    Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) under any Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

SECTION 2.16.    **Taxes**.  (a)  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)     The Loan Parties shall jointly and severally indemnify each Recipient, within ten Business Days after receipt of written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of another Recipient, shall be conclusive absent manifest error.

(d)     Each Lender shall severally indemnify the Administrative Agent, within ten Business Days after receipt of written demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.04(f) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this clause (d).

(e)     As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)     (i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.   In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.   Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.16(f)(ii)(A) and 2.16(f)(ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or

24

submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, if the Borrower is a U.S. Person,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     [reserved];

(C)     [reserved]; and

(D)     if a payment made to a Recipient under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this clause (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is

required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this clause (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this clause (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such refund had never been paid. This clause shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Each party's obligations under this Section 2.16 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.17.    **Duty to Mitigate**.  If (a) any Lender shall request compensation under Section 2.12 or (b) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.16, then such Lender (at the request of the Borrower Representative) shall use commercially reasonable efforts (x) to file any certificate or document reasonably requested in writing by the Borrower Representative or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if, in the opinion of such Lender, such filing or assignment would reduce its claims for compensation under Section 2.12 or would reduce amounts payable pursuant to Section 2.16, as the case may be, in the future; *provided* that, in case of the foregoing clause (x) or (y), such Lender shall not be required to incur any unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden reasonably deemed by it to be significant. The Borrower hereby agrees to pay all reasonable and documented costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer.

SECTION 2.18.    **Security Interest**.  To secure the timely repayment of the principal of, and interest on, the Loans, and all other Obligations of the Loan Parties to the Secured Parties, and the prompt performance when due of all covenants of the Loan Parties hereunder and under any other Loan Document, whether existing or arising as of the Term Sheet Effective Date or thereafter (pre- or post-petition), due or to become due, direct or indirect, each Loan Party hereby pledges and grants to the Administrative Agent, for the benefit of the Secured Parties, a continuing, security interest in, and assignment of, all of such Loan Party's rights, titles and interests in, to and under all of the following, whether owned, existing or arising as of the Term Sheet Effective Date or thereafter: all assets of such Loan Party, wherever located, tangible and intangible, real and personal, including but not limited to all rights, titles and interests of such Loan Party in, to and under: all accounts; all chattel paper and electronic chattel paper; all commercial tort claims, including, without limitation, the Whinstone Litigation and all commercial tort claims described on [Schedule 3.08 attached hereto][2]; all Contracts; all deposit accounts and securities accounts; all documents; all equipment; all general intangibles; all instruments; all intellectual property, including copyrights, trademarks and patents; all inventory; all investment property; all letter-of-

---

[2] NTD: Company to please provide a schedule of any commercial tort claims.

credit rights; all Pledged Collateral; all cash and Investments permitted under this Agreement; reserve accounts; escrow agreements; all supporting obligations; all property of such Loan Parties held by any Secured Party; all books and records; and to the extent not otherwise included, all proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing, provided that the Collateral shall not include the Excluded Assets.  All of the rights and assets described in the previous sentence are herein referred to collectively as "***Collateral***"; provided, however, that this definition of "Collateral" does not limit any other collateral that may be pledged to secure the Obligations under any other Loan Document.

ARTICLE III

*Representations and Warranties*

Each of the Loan Parties represents and warrants to the Administrative Agent and each of the Lenders that:

SECTION 3.01.    **Organization; Powers**.  Subject to the entry and terms of the Interim Order, and to the extent applicable, the Final Order, each Loan Party is duly organized, validly existing and, if applicable, in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every material jurisdiction where such qualification is required.

SECTION 3.02.    **Authorization; Enforceability**.  Subject to the entry and terms of the Interim Order, and to the extent applicable, the Final Order, the Transactions are within each Loan Party's corporate powers and have been duly authorized by all necessary corporate and, if required, member action (including, without limitation, any action required to be taken by any class of directors of any Loan Party or any other Person, whether interested or disinterested, in order to ensure the due authorization of the Transactions).  When executed and delivered, each Loan Document to which any Loan Party is a party shall have been duly executed and delivered by such Loan Party and, upon entry of the Interim Order, and to the extent applicable, the Final Order, shall constitute a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms.

SECTION 3.03.    **Approvals; No Conflicts**.  Subject to the entry of the Interim Order and, to the extent applicable, the Final Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person (including the members or any class of directors of any Loan Party or any other Person, whether interested or disinterested), nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the consummation of the Transactions, except such as have been obtained or made and are in full force and effect, and except for the filing and recording of applicable Loan Documents to perfect the Liens as required by this Agreement and the applicable DIP Order, (b) do not violate any applicable law or regulation or the charter, by-laws or other organizational documents of any Loan Party or any order of any Governmental Authority, (c) other than violations arising as a result of

27

the commencement of the Bankruptcy Cases, do not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or its assets, or give rise to a right thereunder to require any payment to be made by such Loan Party and (d) do not result in the creation or imposition of any Lien on any assets of any Loan Party (other than the Liens and security interests in favor of the Lenders (or any designee) created by the Loan Documents).

SECTION 3.04.    **Financial Position; No Material Adverse Change**.   (a)   The financial statements or other financial information of the Loan Parties most recently delivered to the Administrative Agent and the Lenders presents fairly, in all material respects, the financial position and results of operations and cash flows of the Loan Parties and their subsidiaries as of such date and for such period.

(b)    Since the Petition Date, there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect and other than as contemplated under this Agreement, the business of Loan Parties has been conducted only in the ordinary course consistent with past business practices.

(c)    No Loan Party has on the date hereof any material Indebtedness (including Disqualified Capital Stock), or any contingent liabilities, off-balance sheet liabilities or partnerships, liabilities for Taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments, except as referred to or reflected or provided for in the financial statements provided to the Administrative Agent and the Lenders prior to the date of this Agreement.

SECTION 3.05.    **Disclosure**.   There is no fact peculiar to any Loan Party other than as set forth in the Final Order that could reasonably be expected to have a Material Adverse Effect or, to the knowledge of the Loan Parties, in the future is reasonably likely to have a Material Adverse Effect and which has not been set forth in the Loan Documents or the other documents, certificates and statements furnished to the Administrative Agent or the Lenders by or on behalf of any Loan Party prior to, or on, the date hereof in connection with the transactions contemplated hereby.

SECTION 3.06.    **Assets; Title, Etc.**.  Except as a result of the filing of the Bankruptcy Cases:

(a)    Each Loan Party has good and defensible title to its material assets, in each case, free and clear of all Liens except Liens permitted by the Loan Documents and any Liens existing as of the applicable Petition Date and described on Schedule 3.06 attached hereto.

(b)    All agreements necessary for the present conduct of the business of the Loan Parties are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such agreement.

(c)    The rights and assets presently owned, leased or licensed by the Loan Parties including, without limitation, all easements and rights of way, include all rights and assets necessary to permit the Loan Parties to conduct their business in all material respects in the same manner as its business has been conducted prior to the date hereof.

28

(d)    Substantially all of the assets of the Loan Parties that are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards.

(e)    Each Loan Party owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by such Loan Party does not infringe upon the rights of any other Person.

SECTION 3.07.    **Subsidiaries**.  The Loan Parties do not have any Subsidiaries or own any Equity Interest in any Person (other than, in each case, other Loan Parties), other than notes held by the Borrower that are convertible into Equity Interests in Advanced Crypto Services, Inc.

SECTION 3.08.    **Litigation; Compliance With Laws**.  (a)  Except as set forth on Schedule 3.08 attached hereto, and other than the Whinstone Litigation and the Bankruptcy Cases, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending by or against or, to the knowledge of the Loan Parties, threatened by or against or affecting any Loan Party.

(b)    Each Loan Party is in material compliance with all laws applicable to it or its assets and all agreements and other instruments binding upon it or its assets and, subject to any restrictions arising on account of any Loan Party's status as a "debtor" under the Bankruptcy Code, and possesses all licenses, permits, franchises, exemptions, approvals and other authorizations granted by Governmental Authorities necessary for the ownership of its assets.

SECTION 3.09.    **Agreements**.  (a)  Except for that certain notice of default provided by Temple Green Data or any purported notices of default which the Loan Parties dispute in good faith or the failure to make payment on the maturity date of the Prepetition Notes, there are no defaults by any of the Loan Parties under material agreements entered into as of the Petition Date, except for the purported breaches asserted in the Whinstone Litigation.

(b)    Except to the extent subject to the automatic stay under the Bankruptcy Case and excluding any alleged defaults that the Loan Parties dispute in good faith, no Loan Party is (i) in default nor has any event or circumstance occurred which, but for the expiration of any applicable grace period or the giving of notice, or both, would constitute a default or would require any Loan Party to redeem or make any offer to redeem all or any portion of any Indebtedness outstanding under any indenture, note, credit agreement or instrument pursuant to which any Indebtedness is outstanding or by which any Loan Party or any of such Loan Party's assets is bound or (ii) in default under any material contract entered into as of the Petition Date.

SECTION 3.10.    **Restriction on Liens**.  Subject to entry of the Interim Order and, to the extent applicable, the Final Order, no Loan Party is a party to any material agreement or arrangement, or, other than as a result of the Bankruptcy Case, subject to any order, judgment, writ or decree, which either restricts or purports to restrict its ability to grant Liens to the Administrative Agent or the Lenders on or in respect of their assets to secure the Obligations.

SECTION 3.11.    **Investment Company Act**.  No Loan Party is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

SECTION 3.12.     **Tax Returns**.  Each Loan Party has timely filed or caused to be filed all tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party has set aside on its books adequate reserves in accordance with GAAP or (b) to the extent otherwise excused or prohibited by the Bankruptcy Code and not otherwise authorized by the Bankruptcy Court.

SECTION 3.13.     **No Material Misstatements**.    None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party in writing to the Administrative Agent or the Lender Lenders in connection with the negotiation of any Loan Document contains any material misstatement of fact as of which such information is dated or omits to state any material fact necessary to make the statements therein not misleading; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Loan Parties represent only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule.

SECTION 3.14.     **ERISA**.  No Loan Party has any plan that is subject to ERISA (excluding any employee health insurance plans and any 401(k) plans) and is not subject to any liability under ERISA.

SECTION 3.15.     **Orders**.  (a) Following entry of the Interim Order and, to the extent applicable, the Final Order, by the Bankruptcy Court, the applicable DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Lenders and (b) any orders of the Bankruptcy Court related to the financing contemplated by the DIP Facility or the use of cash collateral remain in effect.

SECTION 3.17.     **13-Week Cash Flow Forecast**.  The Loan Parties have not failed to disclose any material assumptions with respect to the 13-Week Cash Flow Forecast and affirm the reasonableness of the assumptions in the 13-Week Cash Flow Forecast in all material respects.

SECTION 3.18.     **Material Assumptions**.   The Loan Parties have not failed to disclose any material assumptions with respect to the 13-Week Cash Flow Forecast and affirm the reasonableness of the assumptions in the 13-Week Cash Flow Forecast in all material respects.

SECTION 3.19.     **No Default or Event of Default**.  No Default or Event of Default has occurred and is continuing.

SECTION 3.20.     **Swap Agreements**.  No Loan Party is party to a Swap Agreement.

SECTION 3.21.     **Environmental Matters**.    The Loan Parties are in material compliance with all Environmental Laws and do not use Hazardous Materials in the conduct of their business.

SECTION 3.22.     **Insurance**.  The Loan Parties have, (i) all insurance policies sufficient for the compliance by each of them with all material laws and all material agreements and (ii) insurance coverage in at least amounts and against such risk (including, without limitation,

public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Loan Parties.

SECTION 3.23.        **USA PATRIOT; AML Laws; Anti-Corruption Laws and Sanctions**.  None of (a) the Loan Parties or any of their respective directors or officers, or, to the knowledge of the Loan Parties, any of their respective employees or Affiliates, or (b) to the knowledge of the Loan Parties, any agent of any Loan Party or other Affiliate that will act in any capacity in connection with or benefit from the credit facility established hereby, (i) is a Sanctioned Person or (ii) is in violation of AML Laws, Anti-Corruption Laws, or Sanctions.  No Loans, use of proceeds or other transaction contemplated by this Agreement will cause a violation of AML Laws, Anti-Corruption Laws or applicable Sanctions by any Person participating in the transactions contemplated by this Agreement, whether as lender, borrower, guarantor, agent, or otherwise.  No Loan Party, or, to the knowledge of the Loan Parties, any other Affiliate has engaged in or intends to engage in any dealings or transactions with, or for the benefit of, any Sanctioned Person or with or in any Sanctioned Country.

SECTION 3.24.        **Quality of Title**.  All of the Collateral is owned by the Loan Parties free and clear of any Adverse Claim.

ARTICLE IV

***Conditions of Lending***

The obligations of the Lenders to make Loans hereunder are subject to the satisfaction of the following conditions:

SECTION 4.01.        **Initial Term Loan**.  On the Initial Borrowing Date:

(a)        The Bankruptcy Case shall have commenced and the "first day orders" shall have been entered to the reasonable satisfaction of the Lenders.

(b)        All Loan Documents required by the Administrative Agent and the Lenders (other than this Agreement) shall be in form and substance reasonably satisfactory to the Administrative Agent and the Lenders.

(c)        The Interim Order shall (i) have been entered consistent with the terms of the Term Sheet within five Business Days following the date that the motion to approve the DIP Facility is filed and (ii) shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed.

(d)        The Administrative Agent shall have received the 13-Week Cash Flow Forecast.

(e)        The Administrative Agent shall have received satisfactory evidence that the Loan Parties have been duly authorized to execute and deliver the applicable Loan Documents and perform their obligations thereunder.

31

(f)      The Interim Cash Collateral Order, in form and substance satisfactory to the Administrative Agent and the Lenders, shall have been entered and remain in effect and not subject to any challenge.

(g)      No material adverse change shall have occurred (other than by virtue of the Bankruptcy Cases).

(h)      The Rockdale Site shall not have lost power for more than 72 hours and shall not be at imminent risk of losing power for more than 72 hours, *provided* that the foregoing condition shall not be applicable in each case where any of the following has occurred: (i) power in the surrounding area is generally affected, (ii) power is lost during maintenance permitted under the New Hosting Service Agreement No. #R-5MW-006 between Whinstone US, Inc. and Rhodium JV LLC or (iii) Whinstone US, Inc. has caused, is generally responsible for, or generally responsible for maintenance of the systems leading to, the loss of power, and injunctive relief ordering the loss of power to cease has been obtained within three Business Days after the date power was first lost.

(i)      The Administrative Agent and the Lenders shall have received all fees and expenses (including attorneys' fees) due and payable on or prior to the Initial Borrowing Date.

(j)      The Loan Parties shall be in compliance in all respects with the Interim Order.

(k)      The Administrative Agent shall have received a Notice of Borrowing (as defined in the Term Sheet).

(l)      The representations and warranties of the Loan Parties set forth in the Term Sheet and in any other Loan Document shall be true and correct in all material respects.

(m)      No Default or Event of Default shall have occurred and be continuing.

(n)      The Administrative Agent shall have received the Upfront Fee (First Installment), which shall be paid by the Borrower contemporaneously with the funding of the Initial Term Loan.

(o)      The applicable Loan Documents shall have been executed by the parties thereto and delivered to the Administrative Agent.

SECTION 4.02.      **Delayed Draw Term Loan**.  On the Delayed Draw Borrowing Date:

(a)      The Final Order shall (i) have been entered in substantially the form of the Interim Order, with only such modifications thereto as are reasonably satisfactory in form and substance to the Administrative Agent and the Lenders, no later than 30 days following the date of entry of the Interim Order and (ii) be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed.

(b)      All Loan Documents required by the Administrative Agent and the Lenders, including this Agreement, the Perfection Certificate and any account control agreement and/or any custody agreement required by this Agreement or the DIP Orders, shall have been executed by the

parties thereto and delivered to the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent and the Lenders.

(c)     The Loan Parties shall be in compliance in all respects with the Interim Order and the Final Order.

(d)     Subject to application of the Permitted Variance, the Debtors shall be in compliance with the 13-Week Cash Flow Forecast.

(e)     The Administrative Agent shall have received a Notice of Borrowing at least three Business Days in advance of the Delayed Draw Borrowing Date.

(f)     The Final Cash Collateral Order, in form and substance satisfactory to the Administrative Agent and the Lenders, shall have been entered and remain in effect and not subject to any challenge.

(g)     No material adverse change shall have occurred (other than by virtue of the Bankruptcy Cases).

(h)     The Rockdale Site shall not have lost power for more than 72 hours and shall not be at imminent risk of losing power for more than 72 hours, *provided* that the foregoing condition shall not be applicable in each case where any of the following has occurred: (i) power in the surrounding area is generally affected, (ii) power is lost during maintenance permitted under the New Hosting Service Agreement No. #R-5MW-006 between Whinstone US, Inc. and Rhodium JV LLC or (iii) Whinstone US, Inc. has caused, is generally responsible for, or generally responsible for maintenance of the systems leading to, the loss of power, and injunctive relief ordering the loss of power to cease has been obtained within three Business Days after the date power was first lost.

(i)     No Default or Event of Default shall have occurred and be continuing.

(j)     The Administrative Agent shall have received any accrued and unpaid Unfunded Commitment Fees.

(k)     The Administrative Agent shall have received the Upfront Fee (Second Installment), which shall be paid by the Borrower contemporaneously with the funding of the Delayed Draw Term Loan.

(l)     The Administrative Agent and the Lenders shall have received all fees and expenses (including attorneys' fees) due and payable on or prior to the Delayed Draw Borrowing Date.

(m)     The representations and warranties of the Loan Parties set forth in this Agreement and in any other Loan Document shall be true and correct in all material respects.

(n)     The Administrative Agent shall have received any other documents from the Loan Parties reasonably required by the Administrative Agent and the Lenders, in form and substance reasonably satisfactory to the Administrative Agent and the Lenders.

ARTICLE V

*Affirmative Covenants*

Each Loan Party covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full, each Loan Party shall, and shall cause each of the Subsidiaries to:

SECTION 5.01.        **Existence; Compliance with Laws; Businesses and Properties**. (a)  Cause to be done all things necessary to maintain, preserve, renew and keep in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization and the rights, licenses, permits, privileges, certification, approval and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which the ownership of its assets or conduct of business requires such qualification.

(b)        Subject to any necessary order or authorization of the Bankruptcy Court, keep and maintain all assets material to the conduct of its business in good working order and condition, ordinary wear and tear excepted preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its material assets.

(c)        Subject to any necessary order or authorization of the Bankruptcy Court, each Loan Party shall comply with all laws, rules, regulations and orders of any Governmental Authority applicable to such Loan Party or such Loan Party's assets.  Each Loan Party shall maintain in effect and enforce policies and procedures designed to ensure compliance by such Loan Party and its respective directors, officers, employees and agents with Anti-Corruption Laws, applicable AML Laws and applicable Sanctions.

SECTION 5.02.        **Insurance**.

(a)        Maintain, with financially sound and reputable insurance companies, insurance (i) policies sufficient for the compliance by each of them with all material laws and all material agreements and (ii) coverage in at least amounts and against such risk (including, without limitation, public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Loan Parties.

(b)        Cause all such policies covering any Collateral to (in each case, unless otherwise agreed to by the Administrative Agent in its sole discretion) (i) name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder, (ii) in the case of each casualty insurance policy, contain a lender's loss payable clause or mortgagee endorsement that names the Administrative Agent, on behalf of the Secured Parties, as the lender's loss payee or mortgagee thereunder and (iii) be endorsed or otherwise amended to provide that, from and after the Term Sheet Effective Date, if the insurance carrier shall have received written notice from the Administrative Agent of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to the Borrower or any other Loan Party under such policies directly to the Administrative Agent, in each case, in form and substance reasonably satisfactory to the

34

Administrative Agent; *provided* that the Borrower shall use commercially reasonable efforts to cause each such policy to provide that it shall not be canceled, modified or not renewed (x) by reason of nonpayment of premium upon not less than ten days' prior written notice thereof by the insurer to the Administrative Agent (giving the Administrative Agent the right to cure defaults in the payment of premiums) or (y) for any other reason upon not less than 30 days' prior written notice thereof by the insurer to the Administrative Agent; *provided*, *further*, that the Borrower shall deliver to the Administrative Agent prior to the cancellation, modification or nonrenewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent) together with evidence satisfactory to the Administrative Agent of payment of the premium therefor.

SECTION 5.03.    **Reports, Etc.**.  Furnish to the Administrative Agent, which shall furnish to each Lender:

(a)    beginning on the first Friday after the first full calendar week after the Subsequent Petition Date, and no later than seven calendar days after the end of each calendar month thereafter (each, a "***Reporting Date***"), an updated 13-Week Cash Flow Forecast (which shall be satisfactory to the Administrative Agent and the Lenders and subject to the Administrative Agent's and the Lenders' approval in their reasonable discretion (*provided* that the Lenders shall have five Business Days to object to any revised 13-Week Cash Flow Forecast, *provided* further, that if the Administrative Agent and the Lenders object to any updated 13-Week Cash Flow Forecast within such five-Business Day period following receipt thereof, the previously delivered 13-Week Cash Flow Forecast shall remain in effect for purposes of the variance testing covenant and reporting) unless and until a revised 13-Week Cash Flow Forecast is approved by the Lenders);

(b)    on each Reporting Date (such date, the "***Variance Testing Date***"), a variance report (in a form reasonably satisfactory to the Administrative Agent and the Lenders) tested as of the end of the calendar month immediately prior to the most recent Reporting Date for such calendar month immediately prior to such Reporting Date (each such period, a "***Variance Testing Period***") setting forth: (i) the aggregate disbursements of the Loan Parties for line items during the applicable Variance Testing Period, (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements for line items made during such Variance Testing Period by the Loan Parties against the aggregate disbursements for line items for the Variance Testing Period set forth in the applicable 13-Week Cash Flow Forecast, (iii) a comparison of the Loan Parties' actual receipts and disbursements for the prior four calendar weeks (on a cumulative basis) with the projected receipts and disbursements for such four calendar weeks (on a cumulative basis) as reflected in the applicable 13-Week Cash Flow Forecast for such weeks and (iv) a report identifying and addressing any variance of actual performance to projected performance for the prior week;

(c)    promptly, from time to time, such other information, documents, records or reports regarding the operations, business affairs and financial condition of the Loan Parties, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request;

(d)     periodic reports on, and make available representatives for conference calls to discuss, not less frequently than every other Friday following the Subsequent Petition Date until the Maturity Date, the status of and any developments in the Whinstone Litigation; and

(e)     periodic reports on, and make available representatives for conference calls to discuss, not less frequently every other Friday following the Subsequent Petition Date until the Maturity Date, the status of any development in the Bankruptcy Case, including, without limitation, the sale process.

SECTION 5.04.     **Orders**.  The Loan Parties shall deliver to the Administrative Agent as soon as practicable in advance of filing with the Bankruptcy Court the Interim Order and the Final Order (which must be in form and substance reasonably satisfactory to the Administrative Agent and the Lenders), other pleadings that materially affect the Lenders, including the Interim Cash Collateral Order or the Final Cash Collateral Order (or similar orders addressing the use of the Prepetition Secured Parties' cash collateral on terms and conditions satisfactory to the Administrative Agent and the Lenders).

SECTION 5.06.     **Notices**.

(a)     Without limiting any covenant that does not permit the same, promptly, but in any event within five Business Days after the execution thereof, deliver to the Administrative Agent copies of any amendment, modification or supplement to any of the certificate or articles of incorporation or formation, by-laws, operating agreement, partnership agreement and any other governing document, any preferred stock designation or any other organic document of any Loan Party.

(b)     Promptly (or in the time periods specified below) after any Loan Party obtains knowledge thereof, furnish to the Administrative Agent and the Lenders written notice of the following:

(i)     the occurrence of any Event of Default or Default;

(ii)     other than the Bankruptcy Cases, the Whinstone Litigation, or as disclosed on Schedule 3.08 attached hereto, the filing or commencement of, or the threat in writing of, any action, suit, investigation, arbitration or proceeding by or before any arbitrator or Governmental Authority against or affecting any Loan Party, or any material adverse development in any action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Lenders), that, in either case, if adversely determined, could reasonably be expected to result in liability in excess of $50,000;

(iii)     at least two Business Days prior to filing (or such shorter period as the Lenders may agree), the Loan Parties shall use commercially reasonable efforts to provide the Lenders copies of all pleadings and motions (other than "first day" motions and proposed orders, but including any pleadings or other documents related to the sale of the Temple Site under section 363 or otherwise, the Interim Cash Collateral Order, the Final Cash Collateral Order or any other proposed order relating to the use of the Prepetition Secured Parties' cash collateral, if the sale of the Temple Site will not occur under section 363, the Plan and any disclosure statement related thereto) to be filed by or on behalf of

36

the Loan Parties with the Bankruptcy Court in the Bankruptcy Case, or to be distributed by or on behalf of the Loan Parties to any official committee appointed in the Bankruptcy Case, which such pleadings shall include the Administrative Agent and the Lenders as a notice party;

(iv)    on a timely basis as specified in any DIP Order, all notices required to be given to all parties specified in such DIP Order, in the manner specified therefor therein; and

(v)    any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 5.06(b) shall be accompanied by a statement of a senior officer of the Loan Parties setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.07.    **Maintaining Records; Access to Properties and Inspections**. Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law are made of all dealings and transactions in relation to its business and activities.  Each Loan Party will, and will cause each of its subsidiaries to, permit the Administrative Agent or its duly authorized representatives, attorneys or auditors during ordinary business hours and upon one Business Day's prior written notice, to visit the offices thereof and to discuss their affairs, finances and condition with its officers and independent accountants and to examine, inspect and make extracts from the books and records of the Loan Parties and inspect the Collateral, and the related accounts, records and computer systems, software and programs used or maintained by the Loan Parties at such times as the Administrative Agent may reasonably request, using auditors, accountants and/or other representatives selected by the Administrative Agent in its sole and absolute discretion.  Upon instructions from the Administrative Agent, the Loan Parties shall release any document related to any Collateral to the Administrative Agent.

SECTION 5.08.    **Use of Proceeds**.  Use the proceeds of the Loans only to (a) pay related transaction costs, fees and expenses, (b) provide working capital for the Loan Parties and for other general corporate purposes of the Loan Parties, (c) to pay obligations arising from or related to the Carve Out, (d) to pay restructuring costs incurred in connection with the Bankruptcy Cases and (e) to pay the fees and costs of the Whinstone Litigation, in each case in accordance with the 13-Week Cash Flow Forecast.

SECTION 5.09.    **Further Assurances**. (a)  At its sole expense, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of such Loan Party, as the case may be, in the Loan Documents or to further evidence and more fully describe the collateral intended as security for the Obligations, or to correct any omissions in this Agreement or any other Loan Document, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement or any other Loan Document or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the sole discretion of the Administrative Agent, in connection therewith.  Each

Loan Party hereby authorizes the Administrative Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of such Loan Party as permitted by law. A carbon, photographic or other reproduction of any applicable Loan Document or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law, and in any financing statement the Administrative Agent may described the Collateral as "all assets" or words to similar effect.

(b)     Provide such cooperation, information and assistance, and prepare and supply the Lenders with such data regarding the performance by the Loan Parties of their obligations under the Loan Documents, as may be reasonably requested by the Lenders from time to time.

SECTION 5.10.     **Cash Management**. Maintain their cash management system as it existed prior to the Petition Date for the benefit of the entire DIP Facility, with any changes made pursuant to an order of the Bankruptcy Court except for any changes requested by the Lenders or permitted by the Lenders in their sole and absolute discretion.

SECTION 5.11.     **Milestones**. The Loan Parties shall comply with the following deadlines (each of which may be extended with the prior written consent of the Administrative Agent and the Lenders without further order of the Bankruptcy Court) (each, a "***Milestone***" and collectively, the "***Milestones***"):

(a)     If the sale of the Loan Parties' Temple Site assets shall occur pursuant to section 363 of the Bankruptcy Code:

(i)     the Bankruptcy Court shall have entered a final order approving bidding procedures (the form and substance of which shall be reasonably satisfactory to the Administrative Agent and the Lenders) governing the solicitation of bids for the purchase (and an auction) of the Loan Parties' Temple Site assets within 60 days after the Subsequent Petition Date; and

(ii)     the Bankruptcy Court shall have entered a final order approving the sale of the Loan Parties' Temple Site assets within 90 days after the Subsequent Petition Date.

(b)     If the sale of the Loan Parties' Temple Site assets shall occur pursuant to a chapter 11 plan:

(i)     the Loan Parties shall file a chapter 11 plan in form and substance reasonably satisfactory to the Administrative Agent and the Lenders, including providing that the Loans will be Paid in Full (the "***Plan***") and a disclosure statement for the Plan in form and substance reasonably satisfactory to the Administrative Agent and the Lenders (the "***Disclosure Statement***"), in each case, by the date that is no later than 30 days after the Subsequent Petition Date;

(ii)     the Disclosure Statement shall be approved by the Bankruptcy Court by the date that is no later than 60 days after the filing of a motion seeking approval of the Disclosure Statement; and

38

(iii)     the Bankruptcy Court shall have entered an order confirming the Plan by the date that is no later than 90 days after the Subsequent Petition Date.

SECTION 5.12.     **[Post-Closing Requirements**.  The Borrower shall, and shall cause each other Loan Party to, satisfy the requirements set forth on <u>Schedule 5.12</u> in the time periods set forth in said Schedule.  The parties acknowledge and agree that notwithstanding anything herein to the contrary, all conditions, representations, warranties and covenants of the Loan Documents with respect to the taking of such actions are qualified by the noncompletion of such actions until such time as they are completed or required to be completed in accordance with this <u>Section 5.12</u>.][3]

ARTICLE VI

*Negative Covenants*

Each Loan Party covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document have been paid in full, no Loan Party shall, nor shall they cause or permit any of the Subsidiaries to:

SECTION 6.01.     **Indebtedness**.  Incur, create, assume or permit to exist any Indebtedness, except:

(a)     Indebtedness created hereunder and under the other Loan Documents;

(b)     accounts payable and other accrued expenses, liabilities or other obligations to pay (for the deferred purchase price of assets or services) from time to time incurred in the ordinary course of business which are not greater than 90 days past the date of invoice or delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(c)     endorsements of negotiable instruments for collection in the ordinary course of business; and

(d)     Indebtedness outstanding on the Petition Date and disclosed to the Administrative Agent and the Lenders on <u>Schedule 6.01</u> attached hereto.

SECTION 6.02.     **Liens**.  Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests or other securities of any Person, including the Borrower or any Subsidiary) now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except:

(a)     any Lien created under the Loan Documents;

---

[3] <u>NTD</u>: Post-closing requirements to be determined.

(b)      any Liens existing on the applicable Petition Date and described on <u>Schedule 3.06</u> attached hereto; and

(c)      Liens granted to the Prepetition Secured Parties to the extent set forth in the any order addressing the use of the Prepetition Secured Parties' cash collateral on terms satisfactory to the Administrative Agent and the Lenders, which Liens shall include scheduled Liens in existence on the applicable Petition Date to the extent subordinated pursuant to the DIP Orders.

SECTION 6.03.      **Superpriority Claims**.   Create or permit to exist any other superpriority claim which is *pari passu* with or senior to the claims of the Lenders, except for the Carve-Out.

SECTION 6.04.      **Investments**.   make or permit to remain outstanding any Investments in or to any Person, other than (a) Investments in all of the Loan Parties in existence on the Petition Date and (b) Investments made with the prior written consent of the Administrative Agent and the Lenders.

SECTION 6.05.      **Mergers, Consolidations, Sales of Assets and Acquisitions**.  (a) Merge into or with or consolidate with any other Person, or sell, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to any other Person, or liquidate, consolidate or dissolve or divide.

(b)      Sell, transfer, assign or otherwise dispose of any assets outside of the ordinary course of business (including, without limitation, any sale and leaseback transaction or any disposition under Bankruptcy Code section 363) without the prior written consent of the Administrative Agent and the Lenders; *provided* that the sale of Loan Parties' Temple Site assets shall be permitted so long as the Obligations are Paid in Full in connection with such sale.

(c)      Discount or sell (with or without recourse) any of its notes receivable or accounts receivable.

SECTION 6.06.      **Restricted Payments; Restrictive Agreements**.  (a) Declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its equity holders or make any distribution of its assets to its equity holders.

(b)      Create, incur, assume or suffer to exist any contract, agreement or understanding (other than this Agreement or any other Loan Document) that in any way prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its assets in favor of the Administrative Agent or to secure the Obligations.

(c)      Make any payment with respect to prepetition Indebtedness, except as expressly provided in this Agreement or pursuant to orders entered upon pleadings in form and substance reasonably satisfactory to the Administrative Agent and the Lenders.

SECTION 6.07.      **Transactions With Affiliates**.   Enter into any transaction, including, without limitation, any purchase, sale, or lease or exchange of assets, with any Affiliate that is not another Loan Party, other than transactions or arrangements in place as of the Petition

Date (including contractual obligations in place at such time) or approved by the Bankruptcy Court pursuant to an order in form and substance reasonably satisfactory to the Administrative Agent and the Lenders.

SECTION 6.08.        **Nature of Business; Subsidiaries**.  (a)  Modify or alter in any material manner the nature and type of a Loan Party's business or the manner in which such business is conducted or its organizational documents, except as required by the Bankruptcy Code or in a manner that is not materially adverse to the interests of the Lenders in their capacities as such.

(b)        Make any change (i) to any Loan Party's legal name or in any trade name used to identify such Person in the conduct of its business or in the ownership of its assets, (ii) to the location of any Loan Party's chief executive office or principal place of business, (iii) to any Loan Party's corporate structure or in the jurisdiction in which such Loan Party is incorporated or formed, (iv) to any Loan Party's jurisdiction of organization or such Loan Party's organizational identification number in such jurisdiction of organization, and (v) to any Loan Party's federal taxpayer identification number, in each case without the prior written consent of the Administrative Agent and the Lenders.

(c)        Create or acquire any Subsidiaries or otherwise own the equity interests of any other Person other than another Loan Party.

SECTION 6.09.        **Amendments; Swap Agreements**.  (a)  Permit any amendment, supplement, waiver or other modification of the terms or provisions contained in any documentation relating to Indebtedness for borrowed money (other than with respect to the Obligations pursuant to the provisions of this Agreement).

(b)        Enter into any Swap Agreements.

SECTION 6.10.        **Subrogation**.  Assert any right of subrogation or contribution against any other Loan Party until all Paid in Full and the Commitments are terminated.

SECTION 6.11.        **Margin Regulations**.  Take any action which might cause any of the Loan Documents to violate (a) Regulations T, U or X or any other regulation of the Board or any successor Governmental Authority or (b) Section 7 of the Securities Exchange Act or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect.

SECTION 6.12.        **Anti-Corruption and AML Laws**.  Use, or cause its respective directors, officers, employees, Affiliates and agents to use, directly or indirectly, the proceeds of any Loans, or lend, contribute or otherwise make available such proceeds to any Subsidiary, other Affiliate, joint venture partner or other Person, (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or AML Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or involving any goods originating in or with a Sanctioned Person or Sanctioned Country, or (c) in any manner that would result in the violation of any Sanctions by any Person (including any Person participating in the transactions contemplated hereunder, whether as underwriter, advisor lender, investor or otherwise).

SECTION 6.13.    **ERISA Compliance**.  Create or maintain any plan subject to ERISA or incur any liability under ERISA.

SECTION 6.14.    **Environmental Matters**.  Violate or permit any of its assets to be in violation of, or do anything or permit anything to be done which will subject any such assets to any remedial work under any Environmental Laws, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to such assets.

SECTION 6.15.    **Accounting Changes**.  (a) Make or cause any change in the accounting treatment or reporting practices of such Loan Party, except as required by GAAP or (b) change the fiscal year of any Loan Party.

SECTION 6.16.    **New Accounts**.  Open or otherwise establish, or deposit, credit or otherwise transfer any cash receipts, securities, financial assets or any other property into, any deposit account, securities account or commodity account other than any deposit account, securities account or commodity account in which the Administrative Agent has been granted a first-priority perfected Lien and that, in each case, is subject to a Loan Document, and the Loan Parties shall have notified the Administrative Agent and the Lenders in writing no later than one Business Day after the opening or establishment of any such new account.

SECTION 6.17.    **Key Employee Plans**.  (a) Enter into any key employee retention plan and incentive plan, other than such plans in effect as of the Petition Date or (b) amend or modify any existing key employee retention plan and incentive plan, unless such plan, amendment or modification, as applicable, is satisfactory to the Administrative Agent and the Lenders.

SECTION 6.18.    **Bankruptcy Orders**.  (a)  Obtain or seek to obtain any stay from the Bankruptcy Court on the exercise of the Lenders' remedies hereunder or under any other Loan Document, except as specifically provided in the DIP Order, (b) seek to change or otherwise modify any DIP Order or other order in the Bankruptcy Court with respect to the DIP Facility or (c) without the consent of the Administrative Agent and the Lenders, propose, file, consent, solicit votes with respect to or support any chapter 11 plan or debtor in possession financing unless (i) such plan or financing would, on the date of effectiveness, pay in full in cash all Obligations and the loan commitments hereunder are terminated on such date of effectiveness or (ii) such plan is a Plan.

SECTION 6.19.    **Minimum Liquidity**.  Permit the Loan Parties to have, at any time, less than the Minimum Liquidity Amount.

SECTION 6.20.    **Variance**.  Commencing as of the first Business Day in the week that is the fifth week after the date that the Initial Borrowing Date, permit, as of the last day of any Variance Testing Period and measured on a rolling four week basis (each such four week period, a "***Cumulative Four-Week Period***"), the Loan Parties' average of the actual cash expenses and disbursements during such Cumulative Four-Week Period to be more than 110% of the projected cash expenses and disbursements for such Cumulative Four-Week Period, as set forth in the 13-Week Cash Flow Forecast (the "***Permitted Variance***"); *provided* that the cash expenses and disbursements considered for determining compliance with this covenant shall exclude

disbursements and expenses in respect of professional fees incurred in the Bankruptcy Cases during such Variance Testing Period; *provided* further, that the Loan Parties may carry forward budgeted but unused disbursements set forth in the 13-Week Cash Flow Forecast for a Variance Testing Period for use during any succeeding Variance Testing Period.

SECTION 6.21.    **Minimum Miner Availability**.  Permit fewer than 19,000 miners to be operational or to be available to be operational at any time, except if power in the surrounding area is generally affected.

ARTICLE VII

*Events of Default*

In case of the happening of any of the following events ("***Events of Default***"):

(a)     any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(b)     default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)     default shall be made in the payment of any interest on any Loan or any Fee or any other amount (other than an amount referred to in (b) above) due under any Loan Document, when and as the same shall become due and payable;

(d)     default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in this Agreement;

(e)     any Guarantee for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall deny in writing that it has any further liability under the Guarantee provided in this Agreement (other than as a result of the discharge of such Guarantor in accordance with the terms of the Loan Documents);

(f)     any security interest purported to be created by this Agreement or any other Loan Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid, perfected, (except as otherwise expressly provided in this Agreement or such other Loan Document) security interest in the securities, assets or properties covered thereby;

(g)     the applicable Loan Documents shall not have been executed and delivered by the Loan Parties, the Administrative Agent and the Lenders within three Business Days after the date of entry of the Interim Order (or shall not have been filed with, and approved by, the Bankruptcy Court within the times specified and otherwise in accordance with the Interim Order);

(h)     dismissal of the Bankruptcy Case or conversion of any Bankruptcy Case to a

43

Chapter 7 case;

(i)        appointment of a Chapter 11 trustee, a responsible officer or an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Loan Party in any Bankruptcy Case;

(j)        subject to the Carve Out, the Bankruptcy Court's granting of any superpriority claim or lien on the Collateral which is *pari passu* with or senior to the claims or liens of the Lenders in the Bankruptcy Cases;

(k)        after entry of the Final Order, (i) the entry of any final order in the Bankruptcy Case (A) surcharging any of the Collateral as to the Secured Parties under Section 506(c) of the Bankruptcy Code or otherwise, (B) resulting in the marshalling of any Collateral as to the Secured Parties, (C) precluding the attachment of Liens to any of the Collateral based on the "equities of the case" exception under section 552(b) of the Bankruptcy Code or (ii) the commencement of other actions by the Loan Parties adverse to the Lenders or their rights and remedies under the DIP Facility in the Bankruptcy Case;

(l)        failure of the Final Order to be entered within 30 days after entry of the Interim Order;

(m)        failure of the Interim Order or Final Order to be in full force and effect, including by the entry of an order reversing, amending, supplementing, staying for a period in excess of five days, vacating or otherwise modifying the Interim Order or Final Order in a manner that is adverse to the Administrative Agent or the Lenders;

(n)        failure of any Loan Party to comply with the terms of the applicable DIP Order;

(o)        entry of an order by the Bankruptcy Court terminating the use of cash collateral;

(p)        the payment by any Loan Party (by way of adequate protection or otherwise) of any principal or interest or other amount on account of any prepetition indebtedness or payables (other than as agreed herein or pursuant to the consent of the Administrative Agent and the Lenders);

(q)        the entry of an order or orders granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party or third parties to proceed against any assets of any Loan Party having a value, individually or in the aggregate, in excess of $1,000,000 or to permit other actions that would have a material adverse effect on any Loan Party or its estate;

(r)        the filing or confirmation of a chapter 11 plan that does not provide for termination of the Commitments under the DIP Facility and the Loan Parties' obligations under the Loan Documents be Paid in Full, or if any of the Loan Parties shall seek, support, or fail to contest in good faith the filing or confirmation of such a chapter 11 plan, unless, in each case, the obligations under the Loan Documents will be Paid in Full from the proceeds of the sale of Loan Parties' Temple Site assets pursuant to section 363 of the Bankruptcy Code;

(s)        an adverse judgment is entered in the Whinstone Litigation against any of the Loan

Parties;

(t)      the Rockdale Site shall not have lost power for more than 72 hours and shall not be at imminent risk of losing power for more than 72 hours, *provided* that the foregoing condition shall not constitute and Event of Default in each case where anyone of the following has occurred: (i) power in the surrounding area is generally affected; or (ii) power is lost during maintenance permitted under the New Hosting Service Agreement No. #R-5MW-006 between Whinstone US, Inc. and Rhodium JV LLC; or (iii) where Whinstone US, Inc. has caused, is generally responsible for, or generally responsible for maintenance of the systems leading to, the loss of power, and injunctive relief ordering the loss of power to cease has been obtained within three Business Days after the date power was first lost;

(u)      failure of any Loan Party to comply with any Milestones, as applicable; or

(v)      the occurrence of a DIP Termination Event (as defined in the Interim Order or Final Order, as applicable);

then, and in every such event and at any time thereafter during the continuance of such event, the Administrative Agent and the Lenders shall be permitted to exercise remedies on the terms and conditions set forth in the Interim Order or the Final Order, as applicable. All proceeds realized from the liquidation or other disposition of Collateral, or otherwise received after the Maturity Date, whether by acceleration or otherwise, shall be applied:

*first*, to payment or reimbursement of that portion of the Obligations constituting fees, expenses and indemnities payable to the Secured Parties;

*second*, to payment of (x) accrued and unpaid interest on the Loans and (y) other accrued and unpaid interest included in the Obligations;

*third*, to payment of principal outstanding on the Loans;

*fourth*, to any other Obligations; and

*fifth*, any excess, after all of the Obligations shall have been indefeasibly paid in full in cash, shall be held as required by the Bankruptcy Court and/or any other applicable law.

In furtherance of the rights, powers and remedies of the Secured Parties, on and after the occurrence of an Event of Default, and for so long as such Event of Default is uncured and continuing, each Loan Party hereby irrevocably appoints the Administrative Agent its true and lawful attorney, which appointment is coupled with an interest and is irrevocable, with full power of substitution, in the name of such Loan Party, or otherwise, for the sole use and benefit of the Administrative Agent, but at the Loan Parties' expense, to the extent permitted by applicable law, to exercise, at any time and from time to time during the continuance of an Event of Default, all or any of the following powers with respect to all or any of the Collateral: (i) to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due thereon or by virtue thereof, (ii) to settle, compromise, compound, prosecute or defend any action or proceeding with respect thereto, (iii) to sell, transfer, assign, seize or otherwise deal in or with the Collateral or the proceeds or avails thereof, as fully and effectually as if the Administrative Agent was the

45

absolute owner thereof, and (iv) to extend the time of payment of any or all thereof and to make any allowance and other adjustments with reference thereto; provided that the Administrative Agent shall give the Loan Parties at least 10 days' prior written notice of the time and place of any public sale or the time after which any private sale or other intended disposition of any of the Collateral is to be made.  Each Loan Party agrees that such notice constitutes "reasonable notification" within the meaning of Section 9-611 (or other section of similar content) of the relevant Uniform Commercial Code.

## ARTICLE VIII

### *The Administrative Agent; Etc*.

SECTION 8.01.    **Appointment and Authorization**.    Each Lender irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of the Loan Documents.  Each Lender acknowledges and agrees that the Administrative Agent shall not have any duties or responsibilities except those expressly set forth in the Loan Documents.  The Administrative Agent shall not have or be deemed to have any fiduciary relationship with any Lender or any other Person, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into the Loan Documents or otherwise exist against the Administrative Agent.  The use of the term "*agent*" in the Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.  The permissive authorizations, entitlements, powers and rights (including the right to request that the Borrower take an action or deliver a document and the exercise of remedies following an Event of Default) granted to the Administrative Agent herein shall not be construed as duties.  The Administrative Agent shall not have any responsibility for interest or income on any funds held by it hereunder and any funds so held shall be held un-invested pending distribution thereof.  Whether or not explicitly set forth therein, the rights, powers, protections, immunities and indemnities granted to the Administrative Agent herein shall apply to any document entered into by the Administrative Agent in connection with its role as Administrative Agent under the Loan Documents.  Except to the extent expressly provided otherwise herein, the Required Lenders shall have the right to direct the Administrative Agent in all matters concerning the Loan Documents.

SECTION 8.02.    **Delegation of Duties**.  The Administrative Agent may execute any and all of its duties and exercise its rights and powers under the Loan Documents by or through agents, sub-agents, employees or attorneys in fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the supervision, negligence or misconduct of any agent or attorney in fact that it selects with due care.  Any such delegation made shall not preclude the subsequent exercise of those rights and powers by the Administrative Agent, any revocation of such delegation or any subsequent delegation of any such rights, powers, authorities and discretions.

SECTION 8.03.    **Default; Collateral**.  (a)  Upon the occurrence and continuance of a Default or an Event of Default, the Required Lenders shall have the sole right to determine a course of action for the enforcement of the rights of the Lenders, and the Administrative Agent shall be entitled to refrain from taking any action (without incurring any liability to any Person for so refraining) unless and until the Administrative Agent shall have received instructions from the Required Lenders.  All rights of action under the Loan Documents and all right to the Collateral, if any, hereunder may be enforced by the Administrative Agent (at the direction of the Required Lenders) and any suit or proceeding instituted by the Administrative Agent in furtherance of such enforcement shall be brought in its name as the Administrative Agent without the necessity of joining as plaintiffs or defendants any Lender, and the recovery of any judgment shall be for the benefit of the Lenders subject to the fees, expenses and other amounts payable to the Administrative Agent.  In actions with respect to any Collateral or other property or assets of the Loan Parties, the Administrative Agent is acting for the benefit of each Lender.  Any and all agreements to subordinate (whether made heretofore or hereafter) other Indebtedness or obligations of the Loan Parties to the Loans or the Obligations shall be construed as being for the benefit of each Lender.

(b)    Each Lender authorizes and directs the Administrative Agent to enter into the Loan Documents to which it is a party on the date hereof on behalf of and for the benefit of the Lenders.

(c)    Except to the extent that the consent of such Lender is required under Section 10.08, each Lender agrees that any action taken by the Required Lenders in accordance with the provisions of the Loan Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized by and binding upon, all of the Lenders.

(d)    The Administrative Agent is authorized (but not obligated) on behalf of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time to take any action with respect to any property, Collateral or Loan Documents which may be necessary to create, perfect and maintain perfected Liens upon the Collateral and the properties granted pursuant to the Loan Documents.

(e)    The Administrative Agent shall not have any obligation whatsoever to any Person to assure that the Collateral exists or is owned (whether in fee or by leasehold) by the Person purporting to own it or is cared for, protected, or insured or has been encumbered or that the Liens granted to the Administrative Agent pursuant to the Loan Documents have been properly or sufficiently or lawfully created, perfected, protected or enforced, or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights granted or available to the Administrative Agent in any of the Loan Documents. The Administrative Agent shall not have any duty to (i) file or prepare any financing or continuation statements or record any documents or instruments in any public office for purposes of creating, perfecting or maintaining any Lien or security interest created under the Loan Documents; (ii) take any necessary steps to preserve rights against any parties with respect to any Collateral; or (iii) take any action to protect against any diminution in value of the Collateral.

(f)     In addition, the Lenders irrevocably authorize the Administrative Agent to release Liens upon the Collateral as otherwise contemplated herein and in the other Loan Documents if approved and authorized by the Lenders in accordance with <u>Section 10.08</u>.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority, and will direct the Administrative Agent, to release particular types or items of the Collateral pursuant to this Section and the Administrative Agent shall be entitled to conclusively rely, and shall be fully protected in so relying, upon the authorization of the Lenders.  In the absence of such authorization, the Administrative Agent shall be entitled to refrain from granting any release under this Section.

(g)     In furtherance of the authorizations set forth in this Section, each Lender irrevocably appoints the Administrative Agent as its attorney-in-fact, with full power of substitution, for and on behalf of and in the name of each such Lender to (i) enter into Loan Documents, (ii) take action with respect to the Collateral and Loan Documents to create, perfect, maintain and preserve the Administrative Agent's Liens, and (iii) execute instruments of release or to take other action necessary to release Liens or any Guarantor to the extent authorized by the Loan Documents.  This power of attorney shall be liberally construed so as to give the greatest latitude to the Administrative Agent's power, as attorney, relative to the matters described in this Section.  The powers and authorities herein conferred on the Administrative Agent may be exercised by the Administrative Agent through any Person who, at the time of the execution of a particular instrument, is an officer of the Administrative Agent (or any Person acting on behalf of the Administrative Agent pursuant to a valid power of attorney).  The power of attorney conferred by this Section to the Administrative Agent is granted for valuable consideration and is coupled with an interest and is irrevocable so long as any Obligations shall remain unpaid or the Lenders are obligated to make any Loan under the Loan Documents.

SECTION 8.04.     **Liability of Administrative Agent**.

(a)     Neither the Administrative Agent nor any of its Related Parties shall:

(i)     BE LIABLE FOR ANY ACTION TAKEN OR OMITTED TO BE TAKEN BY ANY OF THEM UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (EXCEPT FOR ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT IN CONNECTION WITH ITS DUTIES EXPRESSLY SET FORTH HEREIN AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NONAPPEALABLE JUDGMENT), or

(ii)     be responsible in any manner to any Person for any recital, statement, representation or warranty made by the Borrower, any Guarantor or any officer thereof, contained in any Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, any Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of any Loan Document, or for the creation, perfection or priority of any Liens purported to be created by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any Collateral, or to make any inquiry respecting the performance by any Loan Party of its obligations hereunder or

48

under any other Loan Document, or for any failure of any Loan Party party to any Loan Document to perform its obligations hereunder or thereunder.  The Administrative Agent shall not be under any obligation to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, any Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.

(b)     The Administrative Agent shall not be required to use, risk or advance its own funds or otherwise incur financial liability in the performance of any of its duties or the exercise of any of its rights and powers hereunder.  In no event shall the Administrative Agent be liable, directly or indirectly, for any special, indirect, punitive or consequential damages, even if the Administrative Agent has been advised of the possibility of such damages and regardless of the form of action.  The Administrative Agent shall not be responsible for delays or failures in performance resulting from acts beyond its control, including acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes, terrorist attacks or other disasters.

(c)     The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request or direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, to give such request or direction hereunder).  The Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing.  The Administrative Agent shall not be required to take any action that in its opinion may expose it to liability or that is contrary to any Loan Document or applicable law.

SECTION 8.05.     **Reliance by Administrative Agent**.

(a)     The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, facsimile, e-mail or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and shall be entitled to consult and seek advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent.  Delivery of reports, documents and other information to the Administrative Agent is for informational purposes only and the Administrative Agent's receipt of the foregoing shall not constitute constructive knowledge of any event or circumstance or any information contained therein or determinable from information contained therein. Information contained in notices, reports or other documents delivered to the Administrative Agent and other publicly available information shall not constitute actual or constructive knowledge. Knowledge of or notices or other documents delivered to the Administrative Agent in any capacity shall not constitute knowledge of or delivery to the Administrative Agent in any other capacity under the Loan Documents or to any affiliate or other division of the Administrative Agent.

(b)     Notwithstanding any provision of this Agreement or the other Loan Documents to the contrary, before taking or omitting any action to be taken or omitted by the Administrative Agent under the terms of the Loan Documents, the Administrative Agent may seek the written direction of the Lenders (which written direction may be in the form of an e-mail), and the

Administrative Agent is entitled to rely (and is fully protected in so relying) upon such direction. If the Administrative Agent requests such direction with respect to any action, the Administrative Agent shall be entitled to refrain from such action unless and until the Administrative Agent has received such direction, and the Administrative Agent shall not incur liability to any Person by reason of so refraining.  In the absence of an express statement in the Loan Documents regarding which Lenders shall direct in any circumstance, the direction of the Required Lenders shall apply and be sufficient for all purposes.  If the Administrative Agent so requests, it must first be indemnified to its satisfaction by the Lenders against any and all fees, losses, liabilities and expenses which may be incurred by the Administrative Agent by reason of taking or continuing to take, or omitting, any action directed by any Lender.  Any provision of this Agreement or the other Loan Documents authorizing the Administrative Agent to take any action does not obligate the Administrative Agent to take such action.

(c)     Each Lender that has funded its *pro rata* share of the Loans shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter sent by the Borrower or the Administrative Agent to such Lender for consent, approval, acceptance or satisfaction, or required hereunder to be consented to or approved by or acceptable or satisfactory to a Lender.  In determining compliance with any condition to the making of a Loan, the Administrative Agent may presume that such condition is satisfactory to each Lender unless the Administrative Agent has received written notice to the contrary from such Lender prior to the making of such Loan.

(d)     The Administrative Agent shall be entitled to rely upon advice of counsel concerning legal matters and such advice shall be full protection and authorization for any action taken by the Administrative Agent in good faith thereon.

(e)     If at any time the Administrative Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process (including orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of any Collateral), the Administrative Agent is authorized to comply therewith in any manner as it deems appropriate, and if the Administrative Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, the Administrative Agent shall not be liable to any of the parties hereto or to any other Person even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

(f)     In connection with the delivery of any information to the Administrative Agent by any other Person to be used in connection with the preparation or distribution of calculations or reports, the Administrative Agent is entitled to conclusively rely on the accuracy of any such information and shall not be required to investigate or reconfirm its accuracy and shall not be liable in any manner whatsoever for any errors, inaccuracies or incorrect information resulting from the use of this information.

(g)     If the Administrative Agent shall reasonably require any information to perform its duties under the Loan Documents, the Borrower shall, to the extent it has such information, provide such information promptly upon request.

(h)     Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under the Loan Documents, the Administrative Agent shall have all of the rights, immunities, indemnities and other protections granted to it under this Agreement (in addition to those that may be granted to it under the terms of such other agreement or agreements).

(i)     Not less than four Business Days (or such shorter period as may be agreed to by the Administrative Agent) prior to any payment, distribution or transfer of funds by the Administrative Agent to any Person under the Loan Documents, the payee shall provide to the Administrative Agent such documentation and information as may be requested by the Administrative Agent (unless such Person has previously provided the documentation or information, and so long as such documentation or information remains accurate and true).  The Administrative Agent shall not have any duty, obligation or liability to make any payment to any Person unless it has timely received such documentation and information with respect to such Person, which documentation and information shall be reasonably satisfactory to the Administrative Agent.

(j)     The Administrative Agent shall not be liable for any loss, including any loss of principal or interest, or for any breakage fees or penalties in connection with the purchase or liquidation of any investment made in accordance with the terms of the Loan Documents.

(k)     The Administrative Agent shall act as the withholding agent under this Agreement with respect to U.S. withholding only (and in no event shall the Administrative Agent have any duty, obligation or liability with respect to the withholding laws or requirements of any other country).  The Administrative Agent shall have the right to withhold amounts from any payments under the Loan Documents, and shall not be liable for such withholding, as required to comply with applicable law.   The Borrower and the Lenders, as applicable, shall provide to the Administrative Agent any additional IRS forms (or updated versions of any previously submitted IRS forms) or other documentation at such time or times required by applicable law or upon the reasonable request of the Administrative Agent as may be necessary to (i) determine the nature of the income and whether any tax or withholding obligations apply, (ii) reduce or eliminate the imposition of U.S. withholding taxes and (iii) permit the Administrative Agent to fulfill its tax reporting obligations under applicable law with respect to this Agreement or any amounts paid to the Lenders.  The Administrative Agent, both in its individual capacity and in its capacity as Administrative Agent, shall have no liability to the Borrower, the Lenders or any other Person in connection with any tax withholding amounts paid or withheld pursuant to applicable law arising from the Borrower's or a Lender's failure, as applicable, to timely provide an accurate, correct and complete IRS Form W-9, an appropriate IRS Form W-8 or such other documentation contemplated under this Agreement.  In the event any IRS form, certification or other documentation expires or becomes obsolete or inaccurate in any respect, the Borrower or any Lender shall promptly provide to the Administrative Agent an updated version of such form, certificate or other documentation or promptly notify the Administrative Agent in writing of its legal inability to do so.

(l)     The Lenders and any transferees or assignees after the Closing Date will be required to provide to the Administrative Agent or its agents all information, documentation or certifications reasonably requested by the Administrative Agent to permit the Administrative Agent to comply with its tax reporting obligations under applicable laws, including any applicable cost basis reporting obligations.

51

SECTION 8.06.     **Notice of Default**.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless a Responsible Officer of the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  The Administrative Agent shall promptly notify the Lenders of its receipt of any such notice.  The Administrative Agent shall take such action with respect to such Default or Event of Default as may be directed by the Required Lenders.

SECTION 8.07.     **Credit Decision; Disclosure of Information by Administrative Agent**.  Each Lender acknowledges that neither the Administrative Agent nor any Related Party of the Administrative Agent has made any representation or warranty to it, and that no act by the Administrative Agent or any Related Party thereof hereinafter taken shall be deemed to constitute any representation or warranty by the Administrative Agent or such Related Party to any Lender as to any matter, including whether the Administrative Agent or the Related Parties thereof have disclosed material information in their possession.  Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any Related Party thereof and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower, the Guarantors and their respective Affiliates, and all applicable bank or other regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder.  Each Lender also represents that it will, independently and without reliance upon the Administrative Agent or any Related Party thereof and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under the Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of the Administrative Agent or any Related Party of the Administrative Agent.

SECTION 8.08.     **Administrative Agent in Its Individual Capacity**.  The Administrative Agent and its Affiliates may make loans to, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with the parent entities of the Loan Parties and their respective Affiliates as though the Administrative Agent was not the Administrative Agent hereunder and without notice to or consent of the Lenders.  The Lenders acknowledge that, pursuant to such activities, the Administrative Agent or its Affiliates may receive information regarding the Borrower or its Affiliates (including information that may be subject to confidentiality obligations in favor of the Borrower or such Affiliate) and acknowledge that the Administrative Agent shall not be under any obligation to provide such information to them.  To the extent the Administrative Agent makes any portion of the Loans hereunder, the terms "Lender" and "Lenders" include the Administrative Agent in its individual capacity as such, and the Administrative Agent shall have the same rights

and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not the Administrative Agent.

SECTION 8.09.        **Successor Agent**.  The Administrative Agent may resign at any time upon 30 days' notice to the Lenders with a written copy of such notice to the Borrower.  If the Administrative Agent resigns under this Agreement, the Required Lenders shall appoint a successor agent.  Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent, the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the Loan Documents and the term "Administrative Agent" shall mean such successor agent and the retiring Administrative Agent's appointment, powers and duties as the Administrative Agent shall be terminated.  After any retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article VIII shall inure to the benefit of such retiring Administrative Agent, its sub-agents or attorneys in fact and such Administrative Agent's Related Parties as to any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was the Administrative Agent under this Agreement. If no successor agent has accepted appointment as the Administrative Agent by the date 30 days following the retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above; *provided* that in the case of any security held by the Administrative Agent on behalf of the Lenders under the Loan Documents, the retiring Administrative Agent shall continue to hold such security in a custodial capacity only until such time as a successor agent is appointed or deposit such security with a court of competent jurisdiction (at the expense of Lenders).  Any Person into which the Administrative Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Administrative Agent shall be a party, or any Person succeeding to the business of the Administrative Agent shall be the successor of the Administrative Agent without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto, except where an instrument of transfer or assignment is required by law to effect such succession.

SECTION 8.10.        **Proof of Claim**.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable or the Administrative Agent shall have made any demand on the Borrower) shall be entitled by intervention in such proceeding or otherwise:

(a)        at the direction of the Required Lenders, to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loan and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent pursuant to the terms of the Loan Documents) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same.

Any custodian, receiver, receiver-manager, monitor, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due to the Administrative Agent pursuant to the Loan Documents.  Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Loans or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

SECTION 8.11.      **Modifications to Article VIII**.  Except as otherwise expressly set forth, the provisions of this <u>Article VIII</u> solely govern the relationship among the Lenders and the Administrative Agent and do not apply to the Borrower or the other Loan Parties.  The provisions of this <u>Article VIII</u> may be modified without the Borrower's or any Loan Party's consent, but with notice thereafter to the Borrower, so long as such modifications do not alter any of the Borrower's rights or obligations under the Loan Documents or otherwise alter the economic terms of the Loans or the Loan Documents in any manner.

SECTION 8.12.      **Effectiveness of Article VIII**.  The parties hereto agree that the provisions of this <u>Article VIII</u> shall be deemed effective as of the Term Sheet Effective Date. Any actions taken or omitted to be taken by the Administrative Agent or the Lenders pursuant to the Term Sheet prior to the date hereof shall be deemed to have been taken or omitted to be taken under this Agreement.

ARTICLE IX

*Guarantee*

SECTION 9.01.      **The Guarantee Obligations Unconditional**.      Each of the Guarantors hereby guarantees on a joint and several basis, as a primary obligor and not as a surety to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest on the Loans made by the Lenders to the Borrower, and all other Obligations (including any Fees) from time to time owing to the Secured Parties by any Loan Party under any Loan Document (such obligations being herein collectively called the "***Guaranteed Obligations***"). The Guarantors hereby jointly and severally agree that if the Borrower shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.  The obligations of the Guarantors under <u>Section 9.01</u> shall constitute a guaranty of payment and to the fullest extent permitted by applicable requirements of law, are

54

absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Agreement or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantors (except for payment in full and expiration of the statute of limitations). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i)       at any time or from time to time, without notice to the Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)      any of the acts mentioned in any of the provisions of this Agreement or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)     the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(iv)     any Lien or security interest granted to, or in favor of any Lender or the Administrative Agent as security for any of the Guaranteed Obligations shall be released or impaired or fail to be perfected;

(v)      the release of the Guarantors;

(vi)     the failure of the Administrative Agent or any other Secured Party to assert any claim or demand or to exercise or enforce any right, power or remedy under the provisions of any Loan Document or otherwise;

(vii)    any rescission, waiver, amendment or modification of, increase in the Obligations with respect to, or any release from any of the terms or provisions of, any Loan Document or any other agreement, including with respect to any other Guarantor under this Agreement;

(viii)   any default, failure or delay, willful or otherwise, in the performance of the Obligations;

(ix)     any other act or omission that may or might in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations (other than contingent indemnification and expense reimbursement obligations for which no claim has been made));

55

(x)      any illegality, lack of validity or enforceability of any Obligation;

(xi)     any change in the corporate existence, structure or ownership of any Loan Party or any Subsidiary, or any bankruptcy, reorganization or other similar proceeding affecting any Loan Party, any Subsidiary or their respective assets or any resulting release or discharge of any Obligation;

(xii)    the existence of any claim, set-off or other rights that the Guarantors may have at any time against the Borrower, the Administrative Agent, any other Secured Party or any other Person, whether in connection herewith or any unrelated transactions;

(xiii)   any action permitted or authorized hereunder (except for termination or release of a Guarantor's obligations hereunder); or

(xiv)    any existence of or reliance on any representation by the Administrative Agent or any other Secured Party that might otherwise constitute a defense to, or a legal or equitable discharge of, the Borrower or any Guarantor or any other guarantor or surety.

(b)      The Guarantors hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto.

SECTION 9.04.      **Reinstatement**.  The obligations of the Guarantors under this Article IX shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

SECTION 9.04.      **Subrogation**.  The Guarantors hereby agree that until the payment and satisfaction in full in cash of all Guaranteed Obligations, it shall not assert any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of

56

its guarantee in Section 9.01 against the Borrower of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

SECTION 9.05.    **Remedies**.  The Guarantors agree that, as between the Guarantors and the Secured Parties, the obligations of the Borrower under this Agreement may be declared to be forthwith due and payable as provided in Section 7.01 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 7.01) for purposes of Section 9.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 9.01.

SECTION 9.06.    **Continuing Guarantee**.  The guarantee in this Article IX is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

ARTICLE X

*Miscellaneous*

SECTION 10.01.    **Notices; Electronic Communications**.    Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, or sent by e-mail, as follows:

(a)    if to the Loan Parties, to the Borrower at Rhodium Technologies LLC, [●],[4] Attention: Charles Topping (email: chucktopping@RHDM.com) and Morgan Soule (email: morgansoule@rhdm.com);

(b)    if to the Administrative Agent, to it at Galaxy Digital LLC, 300 Vesey Street, Floor 13, New York, New York 10280, Attention of Chris Ferraro (e-mail: chris.ferraro@galaxy.com and phone: (212) 499-0079), Max Bareiss (e-mail: Max.Bareiss@galaxy.com and phone: (247) 281-2409) and GDLenders (e-mail: GDLenders@galaxy.com); and

(c)    if to a Lender, to it at its address (or e-mail) set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender became a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by e-mail or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 10.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 10.01.

SECTION 10.02.    **Survival of Agreement**.    All covenants, agreements, representations and warranties made by the Loan Parties herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to any Loan Document shall be

---

[4] NTD: Rhodium to provide.

considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Lenders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under any Loan Document is outstanding and unpaid and so long as the Commitments have not been terminated.  The provisions of <u>Sections 2.12</u>, <u>2.16</u> and <u>9.05</u> shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of any Loan Document, or any investigation made by or on behalf of the Administrative Agent or any Lender.

SECTION 10.03.    **Binding Effect**.  This Agreement shall become effective when it shall have been executed by the Loan parties and the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

SECTION 10.04.    **Successors and Assigns**.  (a)  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party, and all covenants, promises and agreements by or on behalf of the Loan Parties, the Administrative Agent or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b)      Each Lender may assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it), with notice to the Borrower and the Administrative Agent (failure to provide or delay in providing such notice shall not invalidate such assignment); *provided* that (i) the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall be in an integral multiple of, and not less than, $1,000,000 (or, if less, the entire remaining amount of such Lender's Commitment or Loans of the relevant Class), (ii) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance and pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent), and (iii) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire (in which the assignee shall designate one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their respective Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including federal and state securities laws), information necessary to satisfy the Administrative Agent's "know your customer" requirements and all applicable tax forms.  Upon acceptance and recording pursuant to <u>clause (e)</u> of this Section, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning

58

Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of <u>Sections 2.12</u>, <u>2.16</u> and <u>9.05</u>, as well as to any Fees accrued for its account and not yet paid) subsidiaries.

(c)     By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that its Commitment, and the outstanding balances of its Loans, in each case without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in <u>clause (i)</u> above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of any Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is an Eligible Assignee legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "***Register***").  The entries in the Register shall be conclusive absent manifest error and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in <u>clause (b)</u> above, if applicable, the completion of the Administrative Agent's "know your customer" requirements and the written consent of the

59

Administrative Agent to such assignment and any applicable tax forms, the Administrative Agent shall (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register.  No assignment shall be effective unless it has been recorded in the Register as provided in this <u>clause (e)</u>.

(f)     Each Lender may without the consent of the Borrower or the Administrative Agent sell participations to Eligible Assignees in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating Person shall be entitled to the benefit of the cost protection provisions contained in <u>Sections 2.12</u> and <u>2.16</u> to the same extent as if they were Lenders (but, with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the participant acquired the applicable participation) and (iv) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Loan Parties relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers decreasing any fees payable to such participating Person hereunder or the amount of principal of or the rate at which interest is payable on the Loans in which such participating Person has an interest, extending any scheduled principal payment date or date fixed for the payment of interest on the Loans in which such participating Person has an interest, increasing or extending the Commitments in which such participating Person has an interest or releasing any Guarantor  or all or substantially all of the Collateral).  To the extent permitted by law, each participating other Person also shall be entitled to the benefits of <u>Section 10.06</u> as though it were a Lender, provided such participating other Person agrees to be subject to <u>Section 2.14</u> as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Loan Documents (the "***Participant Register***"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) and Proposed Section 1.163-5(b) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  The Administrative Agent (in its capacity as Administrative Agent) shall not have any responsibility for maintaining a Participant Register.

(g)     Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this <u>Section 10.04</u>, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; *provided* that, prior to any such disclosure of

60

information designated by the Borrower as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 10.16.

(h)     Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender; *provided* that no such assignment shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(i)     Notwithstanding anything to the contrary contained herein, any Lender (a "***Granting Lender***") may grant to a special purpose funding vehicle (an "***SPV***"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this Section 10.04, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and the Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

(j)     No Loan Party shall assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent and each Lender, and any attempted assignment without such consent shall be null and void.

SECTION 10.05.     **Expenses; Indemnity**.  (a)  The Loan Parties shall pay (i) all reasonable and documented pre- and post-petition costs and expenses incurred by the Administrative Agent and the Lenders and their respective Affiliates, including, without limitation, the fees, charges and disbursements of counsel and other outside consultants for the Administrative Agent and the Lenders, the reasonable travel, photocopy, mailing, courier, telephone and other

61

similar expenses and, in connection with the credit facility provided for herein, the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the Administrative Agent and the Lenders) of this Agreement and any other Loan Document and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all documented out-of-pocket costs, expenses, taxes, assessments and other charges incurred by the Administrative Agent and the Lenders in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any other Loan Document or any other document referred to therein, and (iii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and the Lenders, including the fees, charges and disbursements of any counsel for the Administrative Agent and the Lenders, in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, or in connection with the Loans made hereunder, including, without limitation, all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)     The Loan Parties shall indemnify the Administrative and the Lenders, their respective Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates (each such Person being called an "***Indemnitee***") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto or the parties to any other Loan Document of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or by any other Loan Document, (ii) the failure of any Loan Party to comply with the terms of this Agreement or any other Loan Document or with any governmental requirement, (iii) any inaccuracy of any representation or any breach of any warranty or covenant of any Loan Party set forth in this Agreement or any other Loan Document any instruments, documents or certifications delivered in connection therewith, (iv) any Loan or the use of the proceeds therefrom, (v) any other aspect of this Agreement or any other Loan Document, (vi) the operations of the business of the Loan Parties by the Loan Parties, (vii) any assertion that the Administrative Agent or the Lenders were not entitled to receive the proceeds received pursuant to this Agreement or any other Loan Document, the Interim Order or the Final Order, (viii) any Environmental Law applicable to the Loan Parties or any of their assets, or (ix) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, and such indemnity shall extend to each Indemnitee notwithstanding the concurrent negligence of every kind or character whatsoever, whether active or passive, whether an affirmative act or an omission, including without limitation, all types of negligent conduct identified in the restatement (second) of torts of one or more of the Indemnitees or by reason of strict liability imposed without fault on any one or more of the Indemnitees; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

62

(c)     All amounts due under this <u>Section 10.05</u> shall be due and payable upon written demand therefor, which shall include written documentation of such amounts, and shall bear interest at the Default Rate if not paid within 10 Business Days after the Borrower's receipt of any such written demand.

(d)     To the extent permitted by applicable law, each of the Loan Parties, the Administrative Agent and the Lenders shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.

(e)     The provisions of this <u>Section 10.05</u> shall survive, remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of any Loan Document, or any investigation made by or on behalf of the Administrative Agent or any Lender.

SECTION 10.06.     **Right of Setoff**.  If an Event of Default shall have occurred and be continuing, each Lender is authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of any Loan Party against any of and all the obligations of the such Loan Party now or hereafter existing under this Agreement and other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 10.07.     **Applicable Law**.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN THE OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICTS OF LAW PROVISIONS OF THE STATE OF NEW YORK OR OF ANY OTHER STATE.

SECTION 10.08.     **Waivers; Amendment**.     (a)     No failure or delay of the Administrative Agent or any Lender in exercising any power or right under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  Any reference in any Loan Document to the "continuing" nature of any Default or Event of Default

63

shall not be construed as establishing or otherwise indicating that the Borrower or any other Loan Party has the independent right to cure any such Default or Event of Default, but is rather presented merely for convenience should such Default or Event of Default be waived in accordance with the terms of the applicable Loan Documents.  No waiver of any provision of any Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by clause (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on any Loan Party in any case shall entitle such Loan Party to any other or further notice or demand in similar or other circumstances.

(b)     Other than pursuant to clause (c) below, neither this Agreement nor any provision hereof or of any Loan Document may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Loan Parties, the Administrative Agent and the Lenders

(c)     The Administrative Agent and the Borrower may amend any Loan Document to correct administrative errors or omissions, or to effect administrative changes that are not adverse to any Lender.  Notwithstanding anything to the contrary contained herein, such amendment shall become effective without any further consent of any other party to such Loan Document.

SECTION 10.09.     **Interest Rate Limitation**.  Notwithstanding anything herein to the contrary, if at any time the Interest Rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "***Charges***"), shall exceed the maximum lawful rate (the "***Maximum Rate***") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the federal funds rate to the date of repayment, shall have been received by such Lender.

SECTION 10.10.     **Entire Agreement**.  This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof.  Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 10.11.     **WAIVER OF JURY TRIAL**.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION

DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.11</u>.

SECTION 10.12.    **Severability**.  In the event any one or more of the provisions contained in any Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 10.13.    **Counterparts**.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in <u>Section 10.03</u>.  Delivery of an executed signature page to this Agreement by e-mail shall be as effective as delivery of a manually signed counterpart of this Agreement.  Each of the parties hereto agrees and acknowledges that (a) the transaction consisting of this Agreement may be conducted by electronic means, (b) it is such party's intent that, if such party signs this Agreement using an electronic signature, it is signing, adopting and accepting this Agreement and that signing this Agreement using an electronic signature is the legal equivalent of having placed its handwritten signature on this Agreement on paper and (c) it is being provided with an electronic or paper copy of this Agreement in a usable format.

SECTION 10.14.    **Headings**.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 10.15.    **Jurisdiction; Consent to Service of Process**. (a) Each Loan Party, Lender, and Agent irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court (without limiting any party's right to appeal any order of the Bankruptcy Court) to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court; *provided*, *however*, that if the Bankruptcy Cases have closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the

other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the Loan Parties or their respective properties in the courts of any jurisdiction.

(b)     Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in the Bankruptcy Court or any New York State or federal court.

(c)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 10.01</u>.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 10.16.     **Confidentiality.**  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a)(i) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors and consultants (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (ii) its financing sources and (iii) in the case of any Lender that is a fund or an account, any general partner or director, investor (including prospective investors), the direct or indirect limited partners, equityholders and members, in each case of such fund or account, (b) to the extent requested or required by any legal, judicial, governmental, administrative, regulatory or quasi-regulatory order, authority or process, (c)  in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (d) subject to an agreement containing provisions substantially the same as those of this <u>Section 10.16</u>, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under the Loan Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party or any of their respective obligations, (e) with the consent of the Borrower or (f) to the extent such Information becomes publicly available other than as a result of a breach of this <u>Section 10.16</u>.  For the purposes of this Section, "***Information***" shall mean all information received from the Loan Parties and related to the Loan Parties or their business, other than any such information that was available to the Administrative Agent or any Lender on a nonconfidential basis prior to its disclosure by any Loan Party; *provided* that, in the case of Information received from the Loan Parties after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this <u>Section 10.16</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

SECTION 10.17.     **Lender Action**.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, unless expressly provided for in any Loan Document, without the prior written consent of the Administrative Agent.   The provisions of this Section 10.17 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 10.18.     **USA PATRIOT Act Notice**.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of the Loan Parties and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Loan Parties in accordance with the USA PATRIOT Act.

[Signature Pages Follow]

4135-7274-5555.4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

RHODIUM TECHNOLOGIES LLC, as Borrower

By: _____
Name:
Title:

RHODIUM ENTERPRISES, INC., as Holdings

By: _____
Name:
Title:

[SUBSIDIARY GUARANTORS]

By: _____
Name:
Title:

GALAXY DIGITAL LLC, as Administrative Agent

By: _____
Name:
Title:

GALAXY DIGITAL QUALIFIED OPPORTUNITY ZONE BUSINESS LLC, as Lender

By: _____
Name:
Title:

[Signature Page to DIP Credit Agreement]

**Schedule 2.01**

Lenders and Commitments

| Lender | Initial Term Loan Commitment (as of the Term Sheet Effective Date) | Delayed Draw Term Loan Commitment (as of the Term Sheet Effective Date) |
|---|---|---|
| Galaxy Digital Qualified Opportunity Zone Business LLC | $15,000,000 | $15,000,000 |

**Schedule 3.06**

Existing Liens

| Debtor | Location of Filing | Date of Filing | Filing Number |
|---|---|---|---|
| Rhodium 30MW LLC | Texas Secretary of State | 8/23/2024 | 240048338830 |
| Rhodium 2.0 LLC | Texas Secretary of State | 7/20/2024 | 240042558757 |
| Rhodium 2.0 LLC | Texas Secretary of State | 7/24/2024 | 24-0042567646 |
| Rhodium 2.0 LLC | Texas Secretary of State | 7/22/2024 | 24-0042567767 |
| Rhodium 2.0 LLC | Texas Secretary of State | 7/21/2024 | 24-0042568415 |
| Rhodium 2.0 LLC | Texas Secretary of State | 7/22/2024 | 240042743187 |
| Rhodium 2.0 LLC | Texas Secretary of State | 7/22/2024 | 24-0042765767 |
| Rhodium 2.0 LLC | Texas Secretary of State | 7/23/2024 | 240042946374 |
| Rhodium 2.0 LLC | Texas Secretary of State | 7/24/2024 | 24-0043193521 |
| Rhodium 2.0 LLC | Texas Secretary of State | 7/24/2024 | 24-0043193763 |
| Rhodium 2.0 LLC | Texas Secretary of State | 7/25/2024 | 240043283995 |
| Rhodium 2.0 LLC | Texas Secretary of State | 8/4/2024 | 2400450550 |
| Rhodium 2.0 LLC | Texas Secretary of State | 7/28/2024 | 240044063578 |
| Rhodium 2.0 LLC | Texas Secretary of State | 7/28/2024 | 240044070061 |
| Rhodium 2.0 LLC | Texas Secretary of State | 7/30/2024 | 240044492322 |
| Rhodium 2.0 LLC | Texas Secretary of State | 8/22/2024 | 240048036027 |
| Rhodium 2.0 LLC | Texas Secretary of State | 8/22/2024 | 240048054168 |
| Rhodium 2.0 LLC | Texas Secretary of State | 8/23/2024 | 240048299098 |
| Rhodium Encore LLC | Texas Secretary of State | 7/22/2024 | 240043187281 |
| Rhodium Enterprises, Inc. | Texas Secretary of State | 7/26/2024 | 240043689379 |

| Rhodium Enterprises, Inc. | Delaware Secretary of State | 4/18/2024 | 2024 2574000 |
|---|---|---|---|
| Rhodium Renewables LLC | Delaware Secretary of State | 5/27/2022 | 2022 4498044 |
| Rhodium Renewables LLC | Delaware Secretary of State | 1/26/2023 | 2023 0701945 |
| Rhodium Renewables LLC | Delaware Secretary of State | 8/25/2022 | 2022 7126444 |
| Rhodium Technologies LLC | Delaware Secretary of State | 8/31/2021 | 2021 6925250 |
| Rhodium Technologies LLC | Delaware Secretary of State | 8/31/2021 | 2021 6925425 |

**Schedule 3.08**

Litigation

1.  On January 13, 2022, Rhodium was named as a defendant in a civil lawsuit alleging infringement of two patents and seeking compensatory and other damages.  The case is captioned *Midas Green Technologies, LLC v. Rhodium Enterprises, Inc. et al*., Civil Action Number 6:22-CV-00050-ADA, and is pending in the U.S. District Court for the Western District of Texas.

2.  Whinstone Litigation

3.  *Trine Mining, LLC, Cross The River, LLC and Elysium Mining, LLC v. Rhodium Enterprises, Inc.* (AAA Case No. 01-24-0005-8373)

**Schedule 6.01**

Existing Indebtedness[5]

---

[5] <u>NTD</u>: Rhodium to provide.

**Exhibit A**

Term Sheet

[Attached]

**Exhibit B**

Form of Notice of Borrowing

FORM OF NOTICE OF BORROWING

Date: _____, ____

To:     Galaxy Digital LLC
        [●]
        [●]
        Attn: [●]
        Email: [●]

Ladies and Gentlemen:

Reference is made to the Senior Secured Superpriority Debtor-in-Possession Loan and Security Agreement, dated as of September [●], 2024 (as amended, restated, extended, supplemented or otherwise modified from time to time, the "***Credit Agreement***"), by and among Rhodium Technologies LLC, a Delaware limited liability company (the "***Borrower***"), the other Loan Parties party thereto, the lenders party thereto (the "***Lenders***") and Galaxy Digital LLC, as administrative agent and collateral agent for the Lenders (the "***Administrative Agent***"). Capitalized terms used but not otherwise defined herein have the meanings assigned to them in the Credit Agreement.

The Borrower hereby requests a borrowing (a "***Borrowing***") of Delayed Draw Term Loans to be made on the terms set forth below:

(A)     Date of Borrowing, which is a business day (such
        date, the "***Proposed Borrowing Date***")                    _____

(B)     Principal amount of Borrowing                     $_____

(C)     Wire instructions for the Borrower's account:

        Bank:
        ABA Routing Transit Number:
        Account Number:
        Account Name:
        FFC:
        Reference:

The Borrower represents and warrants that the representations and warranties set forth in the Credit Agreement and in each other Loan Document are true and correct in all material respects

on and as of the Proposed Borrowing Date with the same effect as though made on and as of such date.

At the time of and immediately after the Proposed Borrowing Date, no Default or Event of Default has occurred and is continuing.

Immediately after giving effect to such Borrowing, the aggregate amount of all Loans made under the Credit Agreement (whether or not outstanding), including the Loans made as part of such Borrowing, does not exceed the aggregate used and unused Commitments of the Lenders.

The intended uses of the proceeds of the Borrowing, which shall be in accordance with the 13-Week Cash Flow Forecast, are set forth on Annex I attached hereto.

[The remainder of this page is intentionally left blank.]

**RHODIUM TECHNOLOGIES LLC**, as
Borrower

By:
_____
Name:
Title:

# ANNEX I

## Use of Proceeds

**Exhibit C**

Form of Perfection Certificate

[Attached]

**Exhibit D**

13-Week Cash Flow Forecast

[Attached]

**<u>Exhibit 2</u>**

**Approved Budget**

**Rhodium Enterprises**
**Illustrative Forecasted 13-Week Budget - Consolidated**

| Period | Forecast 1 | Forecast 2 | Forecast 3 | Forecast 4 | Forecast 5 | Forecast 6 | Forecast 7 | Forecast 8 | Forecast 9 | Forecast 10 | Forecast 11 | Forecast 12 | Forecast 13 | Total Weeks 1 - 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Starting: | 8/29/2024 | 9/2/2024 | 9/9/2024 | 9/16/2024 | 9/23/2024 | 9/30/2024 | 10/7/2024 | 10/14/2024 | 10/21/2024 | 10/28/2024 | 11/4/2024 | 11/11/2024 | 11/18/2024 | |
| Week Ending: | 9/1/2024 | 9/8/2024 | 9/15/2024 | 9/22/2024 | 9/29/2024 | 10/6/2024 | 10/13/2024 | 10/20/2024 | 10/27/2024 | 11/3/2024 | 11/10/2024 | 11/17/2024 | 11/24/2024 | |
| **_Operating Receipts_** | | | | | | | | | | | | | | |
| Bitcoin Mining Revenue | $ 720 | $ 1,260 | $ 1,260 | $ 1,260 | $ 1,260 | $ 1,260 | $ 1,260 | $ 1,260 | $ 1,260 | $ 1,260 | $ 1,260 | $ 1,260 | $ 1,260 | $ 15,840 |
| Energy Sales | - | - | 628 | - | - | - | - | 709 | - | - | - | 56 | - | 1,392 |
| Sale of Temple Facility | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | 903 | - | - | - | - | - | - | - | - | - | - | - | 903 |
| **Total Receipts** | $ 720 | $ 2,163 | $ 1,888 | $ 1,260 | $ 1,260 | $ 1,260 | $ 1,260 | $ 1,969 | $ 1,260 | $ 1,260 | $ 1,260 | $ 1,316 | $ 1,260 | $ 18,135 |
| **_Non-Restructuring Disbursements_** | | | | | | | | | | | | | | |
| Accounts Payable | (8) | - | (300) | - | - | - | - | (300) | - | - | - | (300) | - | (908) |
| Payroll & Benefits | (357) | - | (362) | - | - | (362) | - | (362) | - | (362) | - | (362) | - | (2,168) |
| Utilities | - | - | (5,159) | - | - | - | (1,200) | (3,225) | - | - | (1,200) | (3,225) | - | (14,008) |
| Lease at Temple Facility | - | (828) | - | (2,216) | - | (828) | - | - | - | - | (828) | - | - | (4,700) |
| Other Disbursements | (124) | (293) | (228) | (209) | - | (393) | - | - | (89) | (393) | (330) | (506) | (89) | (2,653) |
| **Total Non-Restructuring Disbursements** | $ (489) | $ (1,121) | $ (6,049) | $ (2,425) | $ - | $ (1,583) | $ (1,200) | $ (3,887) | $ (89) | $ (755) | $ (2,358) | $ (4,393) | $ (89) | $ (24,438) |
| **_Restructuring Disbursements_** | | | | | | | | | | | | | | |
| Professional Fees | - | (500) | (150) | - | (120) | (912) | - | (2,419) | (120) | (842) | - | (2,995) | - | (8,058) |
| Independent Director | - | (25) | - | - | - | - | - | (25) | - | - | (25) | - | - | (75) |
| DIP Facility Interest and Fees | - | (600) | - | - | - | (237) | - | - | - | (256) | - | (20) | - | (1,114) |
| United States Trustee | - | - | - | - | - | - | (114) | - | - | - | - | - | - | (114) |
| **Total Restructuring Disbursements** | $ - | $ (1,125) | $ (150) | $ - | $ (120) | $ (1,150) | $ (114) | $ (2,444) | $ (120) | $ (1,098) | $ (25) | $ (3,015) | $ - | $ (9,360) |
| **Total Disbursements** | $ (489) | $ (2,246) | $ (6,199) | $ (2,425) | $ (120) | $ (2,733) | $ (1,314) | $ (6,331) | $ (209) | $ (1,853) | $ (2,383) | $ (7,408) | $ (89) | $ (33,798) |
| **Net Cash Flow** | $ 231 | $ (84) | $ (4,311) | $ (1,165) | $ 1,140 | $ (1,473) | $ (54) | $ (4,362) | $ 1,051 | $ (593) | $ (1,123) | $ (6,092) | $ 1,171 | $ (15,663) |
| **_Cash Schedule_** | | | | | | | | | | | | | | |
| Beginning Cash Balance | $ 2,495 | $ 2,725 | $ 17,642 | $ 13,331 | $ 12,166 | $ 13,306 | $ 11,833 | $ 11,780 | $ 7,418 | $ 8,469 | $ 7,876 | $ 6,753 | $ 15,661 | $ 2,495 |
| Net Cash Flow | 231 | (84) | (4,311) | (1,165) | 1,140 | (1,473) | (54) | (4,362) | 1,051 | (593) | (1,123) | (6,092) | 1,171 | (15,663) |
| DIP Proceeds | - | 15,000 | - | - | - | - | - | - | - | - | - | 15,000 | - | 30,000 |
| **Ending Cash Balance** | $ 2,725 | $ 17,642 | $ 13,331 | $ 12,166 | $ 13,306 | $ 11,833 | $ 11,780 | $ 7,418 | $ 8,469 | $ 7,876 | $ 6,753 | $ 15,661 | $ 16,832 | $ 16,832 |