## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RHODIUM ENCORE LLC, *et al.*,[1] | § | Case No. 24-90448 (ARP) |
| | § | |
| Debtors. | § | |
| | § | (Jointly Administered) |
| | § | |

### DEBTORS' OMNIBUS OBJECTION TO CLAIMS PURSUANT TO BANKRUPTCY CODE SECTIONS 502(B), BANKRUPTCY RULE 3007, AND LOCAL RULE 3007-1 BECAUSE SAFE HOLDERS DO NOT HOLD CLAIMS

> **This is an objection to your claim. This objection asks the Court to disallow the claim that you filed in this bankruptcy case. If you do not file a response within 30 days after the objection was served on you, your claim may be disallowed without a hearing.**

Pursuant to section 502 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 3007-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules"), Rhodium Encore LLC, and its affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (these "Chapter 11 Cases"), hereby file this objection (the "Objection") to Proofs of Claim Nos. 11, 13, 18, 19, 20, 25, 26, 28, 32, 34, 35, 41, 42, 45, 46, 51,

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), Rhodium 30MW LLC (0263), Rhodium Enterprises, Inc. (6290), Rhodium Technologies LLC (3973), Rhodium Renewables LLC (0748), Air HPC LLC (0387), Rhodium Shared Services LLC (5868), Rhodium Ready Ventures LLC (8618), Rhodium Industries LLC (4771), Rhodium Encore Sub LLC (1064), Jordan HPC Sub LLC (0463), Rhodium 2.0 Sub LLC (5319), Rhodium 10MW Sub LLC (3827), Rhodium 30MW Sub LLC (4386), and Rhodium Renewables Sub LLC (9511). The mailing and service address of the Debtors in these Chapter 11 Cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005.

83, 84, 102, 107, 111, 149, 152, 183, 197, 198, 223, 224, and 231 (the "Disputed Claims").  In support of this Objection, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.      The Debtors object to the Disputed Claims—totaling $70,820,411.76 in asserted amount—because all of the purported claims are actually contingent equity interests that are not claims.

2.      The Disputed Claims emanate from simple agreements for future equity (the "SAFE Agreements") with Rhodium Enterprises, security instruments that provide for the SAFE Holders (defined below) to receive equity in Rhodium Enterprises upon the occurrence of certain events: equity financing or an initial public offering.  The SAFE Agreements alternatively provide that in the event of a change in voting control of Rhodium Enterprises or a liquidation or disposition of substantially all of Rhodium Enterprises' assets, the SAFE Agreements will "operate like standard Common Stock," meaning that in that event, SAFE Holders will receive payment of available proceeds—*after* payment of all "outstanding indebtedness and creditor claims" and on par with common equity.  Because the SAFE Agreements treat SAFE Holders the same as interest holders in all events, they do not possess claims.

3.      The SAFE Agreements do not create claims.  Instead, the SAFE Agreements provide the Holders only with contingent equity interests.  Even if the SAFE Holders could assert claims related to the SAFE Agreements, those claims are subordinated to all other general unsecured creditors pursuant to 11 U.S.C. § 510(b) and statutorily on par with common equity.

4.      Accordingly, the Debtors respectfully request that the Court disallow the Disputed Claims.

---

[2]   Capitalized terms that are not defined in the Preliminary Statement are defined in other sections of the Objection.

**RELIEF REQUESTED**

5.      By this Objection, the Debtors seek entry of an order (the "Proposed Order"):

(i)      disallowing each proof of claim identified on Schedule 1 to the Proposed Order (the "SAFE Claims") because each such proof of claim represents a contingent interest; and

(ii)     granting such other and further relief as the Court deems just and proper.

6.      In support of this Objection, the Debtors submit the *Declaration of Michael Robinson in Support of the Debtors' Omnibus Objection to Claims Pursuant to Bankruptcy Code Section 502(b), Bankruptcy Rule 3007, and Local Rule 3007-1* (the "Robinson Declaration"), attached hereto as **Exhibit A**.  This Objection complies in all respects with Local Rule 3007-1.

**JURISDICTION**

7.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the Court's entry of a final order in connection with this Objection.

8.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The bases for the relief requested are section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1.

**BACKGROUND**

A.      **The Bankruptcy Cases**

10.     On August 24 and August 29, 2024, each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The cases are jointly administered.

11.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   On

November 22, 2024, the U.S. Trustee appointed an official committee of unsecured creditors (the "Committee"). No trustee or examiner has been appointed in these Chapter 11 Cases.

12. On October 15, 2024, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, (II) Approving the Form of Proofs of Claim and the Manner of Filing, (III) Approving Notice of Bar Dates, and (IV) Granting Related Relief* (ECF No. 269), which the Court granted on October 18, 2024, setting November 22, 2024, as the general bar date for filing proofs of claim. The Debtors promptly served notice of the bar date on all creditors. *See* ECF No. 284.

13. Further details of the Debtors' business, capital structure, governing bodies, and the circumstances leading to the commencement of these Chapter 11 Cases are set forth in the *Declaration of David M. Dunn in Support of Chapter 11 Petitions and First Day Relief (*ECF No. 35).

**B.    The SAFE Agreements**

14. Between June 2, 2021, and October 19, 2021, to raise equity capital, Rhodium Enterprises, Inc. ("Rhodium Enterprises") entered into multiple SAFE Agreements[3] with certain investors (the "SAFE Holders" or "Investors") for a total of $87 million in aggregate. The SAFE Agreements specify the treatment of SAFE Holders' contingent interests in multiple scenarios. SAFE agreements became popular vehicles for investing in startup companies starting in 2013.[4] The website ycombinator.com, the first proponent of SAFE agreements, provides form SAFE agreements for the public's use. The SAFE Agreements here follow that general form but with

---

[3]    All terms not defined herein have the meaning ascribed to them in the SAFE Agreement attached hereto as Exhibit "2" to the Robinson Declaration.

[4]    https://www.ycombinator.com/documents.

very important differences, and a redline between the SAFE Agreements here and the form agreement found on ycombinator.com is attached to the Robinson Declaration as <u>Exhibit "3</u>".

15.     *First*, in an "Equity Financing or Listing Event" before termination of the SAFE Agreements, the SAFE automatically converts to: (i) in the case of Equity Financing, the number of shares of stock issued in the Equity Financing equal to the Purchase Amount divided by the applicable Conversion Price; or (ii) in the case of a Listing Event, the number of shares of Common Stock of Rhodium Enterprises equal to the Purchase Amount divided by the applicable Conversion Price.   SAFE Agreement § 1(a).   "Equity Financing" is a "bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Capital Stock at a fixed valuation …."   SAFE Agreement § 2.   A "Listing Event" is an initial public offering, an acquisition of Rhodium Enterprises by a special purpose acquisition company ("<u>SPAC</u>"), or if Rhodium Enterprises otherwise lists its common stock on a national securities exchange. *Id.*

16.     In other words, the SAFE Holders are only entitled to the treatment set forth in section 1(a) if Rhodium Enterprises sells its capital stock with the principal purpose of raising capital, or if Rhodium Enterprises lists its common stock for sale or is acquired by a SPAC.

17.     *Second*, if there is a "Liquidity Event" before termination of the SAFE Agreements, the Safe Holders will be entitled to receive a portion of proceeds due and payable to each Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "<u>Cash-Out Amount</u>") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "<u>Conversion Amount</u>"), in both cases subject to the Liquidation Priority.   SAFE Agreement

§ 1(b).  A "Liquidity Event" is a "Change of Control" other than a Listing Event, and a "Change of Control" is defined as:

> (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

18.     In other words, there is only a "Liquidity Event," entitling the SAFE Holders to the Cash-Out Amount or Conversion Amount, if there is: (i) a change in ownership of more than 50% of *Rhodium Enterprises* voting securities; (ii) a reorganization of *Rhodium Enterprises* **unless** holders of voting securities before the reorganization retain a majority of the voting power following the reorganization; or (iii) a disposition of substantially all of the assets of *Rhodium Enterprises*.[5]

19.     *Third*, if there is a "Dissolution Event," the SAFE Holders will be entitled (subject to the Liquidation Priority (defined below)) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to each Investor immediately prior to the consummation of the Dissolution Event.  SAFE Agreement § 1(c).  A "Dissolution Event" occurs upon the voluntary termination of operations, a general assignment for the benefit of Rhodium Enterprises' creditors,

---

[5]     Rhodium Enterprises is a holding company.  Its only assets are cash in three bank accounts, internet domains and websites, net operating losses, intercompany receivables, and the stock it holds in Rhodium Technologies, LLC. *See* ECF 687.  *See also Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *9, (Del. Ch. Sep. 18, 2014) (declining to read "substantially all of the assets" as inclusive of assets of subsidiaries where the contract did not so provide).

or "any other liquidation, dissolution, or winding up" of *Rhodium Enterprises* other than a Liquidity Event.

20.     The "Liquidation Priority" does not provide for a liquidation priority for the SAFE Holders, **but instead specifies that SAFE Holders have *no* priority**.  Specifically, the Liquidation Priority provides that in a Liquidity or Dissolution Event, the SAFE Agreement is "intended to operate like standard Common Stock," and states that each Investor's "right to receive the Cash-Out Amount is: (i) junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock); and (ii) on par with payments for other SAFEs, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other SAFEs, the applicable Proceeds will be distributed pro rata to the Investor and such other SAFEs in proportion to the full payments that would otherwise be due."  SAFE Agreement § 1(d).  The "Liquidation Priority" further specifies that each Investor's "right to receive its Conversion Amount is (A) *on par with payments for Common Stock and other Safes who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis*, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences)." *Id.*[6]

---

[6]  The Y Combinator form SAFE Agreement in contrast contains a definition of Liquidation Priority that *does* provide for a liquidation priority.  *See*  https://www.ycombinator.com/documents: "d)  **Liquidation Priority**.  In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock.  The Investor's right to receive its Cash-Out Amount is: (i) Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock); (ii) On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and (iii)   **Senior to payments for Common Stock**." (Emphasis added.)

21.     When comparing the SAFE Agreements at issue here with their online origins, the

*lack* of any priority over common stock becomes even more stark.

> (d)     **Liquidation Priority**. In a Liquidity Event or Dissolution Event, this Safe is intended to
> operate like standard ~~non-participating Preferred~~Common Stock. The Investor's right to receive its Cash-Out
> Amount is:
>
> (i)     Junior to payment of outstanding indebtedness and creditor claims, including
> contractual claims for payment and convertible promissory notes (to the extent such convertible promissory
> notes are not actually or notionally converted into Capital Stock); and
>
> (ii)     On par with payments for other Safes ~~and/or Preferred Stock~~, and if the applicable
> Proceeds are insufficient to permit full payments to the Investor and such other Safes ~~and/or Preferred Stock~~,
> the applicable Proceeds will be distributed pro rata to the Investor and such other Safes ~~and/or Preferred
> Stock~~ in proportion to the full payments that would otherwise be due~~; and~~.
>
> ~~(iii)     Senior to payments for Common Stock.~~

22.     Here, because Rhodium Enterprises has no preferred shares, there could be no

priority over common stock.  By its Certificate of Incorporation, REI can only issue common

shares.

> **FIFTH**: The total number of shares of all classes of stock which the Corporation shall have
> authority to issue is 400,000,100, comprised of the following classes (i) 400,000,000 shares of
> Class A Common Stock, $0.0001 par value per share ("**Class A Common Stock**"), and (ii) 100
> shares of Class B Common Stock, $0.0001 par value per share ("**Class B Common Stock**").

23.     Because any Liquidation Priority must relate to an authorized security, such as

preferred shares with a liquidation preference, the SAFEs cannot have any higher priority than

other Common Stock.  Tellingly, holders of Rhodium Enterprises' Common Stock never agreed

to have an equity instrument with a higher priority or liquidation priority given that, unlike some

SAFE structures, Rhodium Enterprises has no preferred stock.  In fact, in public filings, Rhodium

described the SAFE Agreements as follows:[7]

---

[7]     https://www.sec.gov/Archives/edgar/data/1874985/000121390022002442/fs12022a6_rhodium.htm.

**Rhodium Enterprises Inc.**
**Notes to Condensed Consolidated Financial Statements (unaudited)**
**(in thousands, except for miner amounts, share and per share amounts)**

**Note 11. Simple Agreement for Future Equity (cont.)**

The number of shares to be received by the SAFE Agreements investors was based on a 15% discount of the pricing in the triggering equity financing and includes a valuation cap for the overall enterprise value. In a liquidity or dissolution event, the investors' right to receive cash out is junior to payment of outstanding indebtedness and creditor claims and on par for other SAFE Agreements and common stock. The SAFE Agreements have no interest rate or maturity date, and the SAFE investors have no voting right prior to conversion.

As of September 30, 2021, the SAFE Agreements had not yet converted as a qualifying financing had not yet occurred. Pursuant to the guidance under ASC 480, *Distinguishing Liabilities from Equity*, the Company determined that the value of the SAFE Agreements should be recorded as a liability in the accompanying condensed consolidated balance sheets. For the nine months ended September 30, 2021, the Company recognized $(2,618), and $0 for the period from April 1, 2020 (inception) to September 30, 2020, which is recorded in SAFE valuation gain (loss) in the accompanying condensed consolidated statements of operations.

## C.    The Disputed Claims

24.    The chart below outlines the Disputed Claims:

| Claimant[8] | Claim Number | Asserted Claim Amount | Debtor Claim Asserted Against |
|---|---|---|---|
| Celsius Holdings US LLC | 11 (amended by Claim 111) | $50,000,000.00 | Rhodium Enterprises, Inc. |
| RH Fund III, a Series of Telegraph Treehouse, LP | 13 (amended by Claim 84) | $721,000.00 | Rhodium Enterprises, Inc. |
| Christopher McBee | 18 | $100,000.00 | Rhodium Enterprises, Inc. |
| BT Real Estate LLC | 19 | $50,000.00 | Rhodium Enterprises, Inc. |
| Alfred Murray Capital, LLC | 20 | $50,000.00 | Rhodium Enterprises, Inc. |
| Philip M. Fornaro Trust dated January 9, 2017 | 25 | $50,000.00 | Rhodium Enterprises, Inc. |
| Noble Crest Capital, LLC | 26 | $50,000.00 | Rhodium Enterprises, Inc. |
| Brad Weber | 28 | $140,000.00 | Rhodium Enterprises, Inc. |
| Proof Capital Special Situations Fund | 32 | $2,425,000.00 | Rhodium Enterprises, Inc. |

---

8    Mr. and Ms. Farrar, Infinite Mining, LLC, RH Fund III, a Series of Telegraph Treehouse, LP, and Thomas Lienhart have also asserted unliquidated claims based on alleged contract and/or tort causes of action.  Objecting to unliquidated claims is not necessary at this time, and the Debtors reserve the right to object to these claims at a later, appropriate time.

| Claimant[8] | Claim Number | Asserted Claim Amount | Debtor Claim Asserted Against |
|---|---|---|---|
| JWS QRP Holdings LLC | 34 | $75,000.00 | Rhodium Enterprises, Inc. |
| AnnMarie Fornaro Trust dated January 9, 2017 | 35 | $50,000.00 | Rhodium Enterprises, Inc. |
| Alexander Matthew Salvadori | 41 | $25,000.00 | Rhodium Enterprises, Inc. |
| Sean Michael Gilbert | 42 | $25,000.00 | Rhodium Enterprises, Inc. |
| Emil Stefkov | 46 | $3,529,411.76 | Rhodium Enterprises, Inc. |
| Pepper Grove Holdings Limited | 51 | $5,000,000.00 | Rhodium Enterprises, Inc. |
| James M Farrar and Adda Delgadillo Farrar | 83 (amended by Claim 149) | $160,000.00 | Rhodium Enterprises, Inc. |
| RH Fund III, a Series of Telegraph Treehouse, LP | 84 (amending Claim 13) | $721,000.00 | Rhodium Enterprises, Inc. |
| Liquid Mining Fund III, LLC | 102 | $1,620,000.00 | Rhodium Enterprises, Inc. |
| Ranger Private Investment Partners, L.P. | 107 | $3,000,000.00 | Rhodium Enterprises, Inc. |
| Celsius Holdings US LLC | 111 (amending Claim 11) | $50,000,000.00 | Rhodium Enterprises, Inc. |
| James M Farrar and Adda Delgadillo Farrar | 149 | $160,000.00 | Rhodium Enterprises, Inc. |
| Thomas Lienhart | 152 | $100,000.00 | Rhodium Enterprises, Inc. |
| Winchester Partners, L.P. | 183 | $1,500,000.00 | Rhodium Enterprises, Inc. |
| Infinite Mining, LLC (Infinite) | 197 | $200,000.00 | Rhodium Enterprises, Inc. |
| Infinite Mining, LLC (Infinite) | 198 | $1,450,000.00 | Rhodium Enterprises, Inc. |
| Ten R Ten, LLC | 223 | $50,000.00 | Rhodium Enterprises, Inc. |
| Magic Circle Trust | 224 | $150,000.00 | Rhodium Enterprises, Inc. |
| Jeffrey Smith | 231 | $300,000.00 | Rhodium Enterprises, Inc. |

25.     The Disputed Claims total $70,820,411.76.[9]  Claim No. 28, filed by Brad Weber, correctly notes that the SAFE Holders hold contingent equity interests, and do not hold claims. Mr. Weber asserted a claim for $140,000 but attached a "Statement of Contingent Equity Rights for Proof of Claim," explaining that "[d]ue to the bankruptcy filing, Rhodium has not completed an equity financing or liquidity event, meaning that the investment remains in the form of a contingent right to future equity or other recovery if any value is provided to similarly situated investors under this bankruptcy proceeding."  Mr. Weber further requests that his proof of claim "be recognized as an equity-based, contingent investment claim," and that ***"[g]iven the SAFE's structure, the investment should be included in any recovery or distribution allocated to equity holders or equity-like investments***, …."

26.     BRIC, on the other hand, cannot decide what kind of claim it has.  *See* Claim No. 111.  It asserts that a "Dissolution Event or a Liquidity Event either has occurred or may occur in connection with these cases. Celsius has either a current or contingent Claim." *Id.*[10]

27.     At the outset of these bankruptcy cases, BRIC conceded that, at a minimum, its treatment in these cases depends on the contours of whatever plan is ultimately approved in this proceeding.  BRIC acknowledged that it is an open question whether any such plan would result in a contingency that actually gives rise to any SAFE Holder's entitlement.  In September 2024, BRIC requested that the United States Trustee create an official "SAFE Committee," Ex. 1 to the Robinson Declaration, which the United States Trustee declined.  In that request, BRIC stated:

---

[9]     Seven of the SAFE Holders have formed an ad hoc group ("SAFE AHG") and retained counsel for the Blockchain Recovery Investment Consortium, LLC acting in its capacity as the Complex Asset Recovery Manager and Litigation Administrator for Celsius Holding LLC ("BRIC" or "Celsius").  ECF No. 500.

[10]    Time seems not to heal BRIC's understanding regarding its alleged claim.  In one of its latest filings, the SAFE AHG asserted having a "right to cash out amount" that is "no longer contingent" based on either a "Liquidity Event" or a "Dissolution Event."  *See* ECF No. 1080 ¶ 4.  Yet it failed to identify the "Liquidity Event" or its relevant contractual basis.

SAFEs occupy a unique position in Rhodium's capital structure. The SAFEs are material, non-executory agreements that entitle their holders to certain identified types of consideration upon the occurrence of certain identified events or transactions. Whether or not the Rhodium bankruptcy has resulted or will result in such a transaction – and which category of transaction – are questions that will need to be determined in these cases. It is possible, for example, that a plan of reorganization or liquidation in these cases would result in a "Liquidity Event" or a "Dissolution Event" within the meaning of the SAFEs. ***In those events, Celsius could be entitled to the $50 million Cash Out Amount, with a "liquidation priority" junior to "creditor claims," but senior to common stock. Other types of triggering transactions arguably could result in SAFE investors being entitled to receive common stock***. While the treatment that SAFEs will receive in any plan or other disposition of these cases is yet to be determined, it likely will depart materially from the treatment that would be afforded any other stakeholders in these cases, including secured creditors, general unsecured creditors (if Rhodium has any), and existing common stockholders.

Ex. 1 to the Robinson Declaration (emphases added and footnotes omitted).  The BRIC even conceded that it may ultimately "recover *pari passu* with common stock." *Id.* Of course, nothing in the SAFE Agreements provides for any priority for the SAFE Holders over common equity, nor do the SAFE Agreements give rise to a claim.

28. According to the Debtors' records, the SAFE Agreements emanated from negotiations with Celsius Core LLC represented by Akin Gump as counsel, who marked up the SAFE Agreements but did not change the definition of Liquidation Priority.  Ex. 1 of the *Declaration of Patricia B. Tomasco in Support of the Debtors' Omnibus Objection to Claims Pursuant to Bankruptcy Code Section 502(b), Bankruptcy Rule 3007, and Local Rule 3007-1* (the "Tomasco Declaration").

## **BASIS FOR RELIEF**

29. Section 502 of the Bankruptcy Code provides that: "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest … objects."  11 U.S.C. §502(a).  The proper filing of a proof of claim constitutes *prima facie* evidence of the claim's validity and amount.  *Matter of O'Connor*, 153 F.3d 258, 260 (5th Cir. 1998) (citing

Bankruptcy Rule 3001(f)).  A proof of claim loses the presumption of prima facie validity under Bankruptcy Rule 3001(f) if an objecting party refutes at least one of the allegations that are essential to the claim's legal sufficiency.  *See In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988) (holding "[if] evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to 'prove the validity of the claim by a preponderance of the evidence'").  Once such an allegation is refuted, the burden reverts to the claimant to prove the validity of its claim by a preponderance of the evidence.  *Id.*  Despite this shifting burden during the claim objection process, "the ultimate burden of proof always lies with the claimant." *Id.*

I.       **The SAFE Holders Do Not Have Claims**

30.       As set forth above, each of the Disputed Claims assert general unsecured creditors against Rhodium Enterprises based on contingent equity interests, namely, the entitlement to issuance of stock upon the occurrence of Equity Financing or a Listing Event.  The occurrence of a triggering event (a Cash-Out Amount or the Conversion Amount) simply provide for an allocation to those equity interests and are intended to operate like common stock in a liquidation.  Therefore, the SAFE Agreements are at best contingent equity interests that may or may not give rise to an entitlement to an equity dividend, rather than a "claim" against Rhodium Enterprises. The Disputed Claims should be disallowed.

31.       To start, a "claim" under section 101(5) of the Bankruptcy Code excludes equity interests from its ambit.[11]  *See In re Insilco Techs., Inc.*, 480 F.3d 212, 218 (3d Cir. 2007) ("[An equity interest] is not a claim at all"); *In re Hedged Invs.*, 84 F.3d 1267, 1272 (10th Cir. 1996) ("Simply put, an equity interest is not a claim against the debtor . . . .") (quotations omitted)).  That

---

[11]   The Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5).

is because "[e]quity investment brings not a right to payment, but a share of ownership in the debtor's assets…." *Insilco Techs.*, 480 F.3d at 218.

32.     The Bankruptcy Code defines an "equity security" to include not only a "share in a corporation," but also a "similar security," 11 U.S.C. § 101(16).   The Bankruptcy Code then enumerates 15 interests that are a "security," including a "residual clause" that covers "other claim[s] or interest[s] commonly known as 'security.'" 11 U.S.C. § 101(49)(A)(xiv); *In re Lehman Bros. Holdings Inc.,* 855 F.3d 459, 475 (2d Cir. 2017).[12]   The Fifth Circuit has interpreted section 101(49)(A)(xiv) to mean that a claim or interest is a security so long as it "'bear[s] hallmarks of interests commonly known as securities.'" *In re Linn Energy, L.L.C.*, 936 F.3d 334, 342 (5th Cir. 2019) (quoting *Lehman Bros. Holdings*, 855 F.3d at 475).   Those hallmarks include the ability to receive dividends, "risk and benefit expectations" similar to those of shareholders, and the potential to "'participate in firm profits.'" *Lehman Bros. Holdings*, 855 F.3d at 474 (holding that restricted stock units are "securities").

33.     Here, the SAFE Agreements create merely a contingent right to a "security" within the meaning of section 101(49)(A)(xiv) and because they are a "similar security [to a share]" within the meaning of section 101(16).   The SAFE Agreements explicitly state that, upon the happening of specified events, they are "intended to operate like standard Common Stock."  SAFE Agreement § 1(d), *In re Wash. Mut., Inc.*, 464 B.R. 656, 666 (Bankr. D. Del. 2012) (stating that courts consider the "intent of the parties" when determining whether an instrument is equity or debt).   They also provide that if Rhodium Enterprises pays a cash dividend to outstanding shares of Common Stock, it must pay a dividend to the Investors at the same time.   SAFE Agreement §

---

[12]     Section 101(49)(b) lists seven "items excluded from the definition of a security …; it does not include a residual clause." *Lehman Bros. Holdings*, 855 F.3d at 473.

5(c); *Lehman Bros. Holdings*, 855 F.3d at 467 (stating holders of restricted stock units received benefits "similar to" holders of common stock because, among other things, they were paid dividends).

34.      The SAFE Agreements further provide the Investors the ability to receive shares of stock if there is an "Equity Financing" or a "Listing Event."   SAFE Agreement § 1(a); *KIT digital, Inc. v. Invigor Grp. Ltd. (In re KIT digital, Inc.)*, 497 B.R. 170, 183 (Bankr. S.D.N.Y. 2013) (holding that a debtor's obligation to pay stock to a claimant is a security because the claimant bore the risk and benefits of fluctuations in the value of the stock); *Wash. Mut.*, 464 B.R. at 666 ("Finally, though the LTWs had no voting rights, they would have had such rights upon receiving their distribution of common stock.").  Moreover, the Agreements bear no maturity date.  SAFE Agreement § 1(e) (stating that the SAFE Agreement terminates upon the occurrence of Equity Financing, a Listing Event, Liquidity Event, or Dissolution Event); *Wash. Mut.*, 464 B.R. at 666 ("There was no fixed maturity date or right to payment of a fixed amount of principal or interest, suggesting that the LTWs are not debt.").  And even if there is a "Liquidity Event" or "Dissolution Event," the liquidation priority in the SAFE Agreement states that it is intended to operate the same as common stock.  SAFE Agreement § 1(d); *Wash. Mut.*, 464 B.R. at 666 (courts consider the "holder's priority in payment").  In other words, only if triggered, the SAFE Agreements then operate like stock.

35.      The Debtors searched and found no cases allowing claims against an estate by counterparties to SAFE Agreements.  Ex. 1 to the Robinson Declaration ("Indeed, based on a recent review, there are just 12 published cases in any context discussing SAFEs, and none determining SAFE priorities in bankruptcy.").  The few cases that discuss SAFE Agreements in the non-bankruptcy context confirm that while SAFE Agreements are "securities," they are

"nondebt" instruments that allow entities to "contribute capital" in exchange for future equity. *LifeVoxel Virginia SPV, LLC v. LifeVoxel.AI, Inc*., 622 F. Supp. 3d 935, 943 n.1 (S.D. Cal. 2022) ("SAFE Notes are a type of security which allow investors to contribute capital to a business entity that will convert into equity upon the occurrence of a future 'conversion' event specified in the SAFE Note."); *LifeVoxel Virginia SPV, LLC v. LifeVoxel.AI, Inc*., 2024 WL 5264872, at *1 (S.D. Cal. Dec. 30, 2024) (stating that SAFE Agreements are "nondebt convertible securities"). Likewise, the Securities and Exchange Commission ("SEC") classifies SAFE Agreements as "securities." *LifeVoxel*, 622 F. Supp. 3d at 943 n.1.[13]

36.     Additionally, bankruptcy courts frequently find that instruments, such as the SAFE Agreements, that have no interest rate and no maturity date, but instead have the right to receive dividends and upside potential after payment of debts, are equity instruments that do not give rise to claims under the Bankruptcy Code.[14]  This is true even when an instrument purports to be a

---

[13]     *See also* https://www.sec.gov/resources-small-businesses/cutting-through-jargon-z#SAFE ("A simple agreement for future equity (SAFE) is an agreement between a company and an investor in which the company promises to give the investor a future ownership interest in the company if certain triggering events occur, such as a future equity financing or an acquisition of the company.").

[14]     *See, e.g.*, *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 522 (5th Cir. 2004) (holding that warrants with redemption provisions were equity interests because the right to redeem stock is not guaranteed but rather conditioned upon events); *In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 235 (4th Cir. 2006) (finding that a transaction was a capital contribution rather than a loan because there was no fixed maturity date and no requirement to pay until the company became profitable); *Wash Mut.*, 464 B.R. at 666-67 (holding that litigation tracking warrants were equity, and not debt, because the holders' rights to receive stock were contingent on the financial solvency of the company, there was no fixed maturity date and no fixed interest); *In re Einstein/Noah Bagel Corp.*, 257 B.R. 499, 506-07 (Bankr. D. Ariz. 2000) (holding that put rights were an equity security rather than a claim because they only provided a mechanism to liquidate an otherwise illiquid investment, rather than guarantee a payment); *In re Revco D.S., Inc.*, 118 B.R. 468, at 474-75 (Bankr. N.D. Ohio 1990) (holding that redeemable preferred stockholders were not "creditors" within the meaning of the Uniform Fraudulent Transfer Act because the instruments lacked interest payments, and the rights to redeem the stock were dependent on the occurrence of triggering events); *In re Color Tile, Inc.*, 2000 WL 152129, at *4 (D. Del. Feb. 9, 2000) (holding that payments were not preferences because the payments were dividends rather than payments on an antecedent debt, because the underlying instrument represented equity, where it only provided for payment of dividends and stated that the interests of holders were junior to those of creditors); *Harbinger Cap. Partners Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 230 (Del. Ch. 2006) (holding that instrument was equity rather than debt because there was no guaranteed right to payment and distributions were tied to the value of the company's assets available for distribution after payment of claims of creditors).

claim, but has equity-like characteristics.  *See, e.g.*, *In re Lothian Oil Inc.*, 650 F.3d 539, 544 (5th Cir. 2011) (holding that instrument titled a "loan" was nevertheless equity because it did not have an interest rate, term of repayment, and maturity date, and included a royalty payment that depended on the success of the business).

37.     Based on the plain language of the SAFE Agreements, authority treating SAFEs as nondebt securities, and voluminous authority treating equity-like instruments as equity, the contingent interests set forth in the SAFE Agreement are contingent equity interests rather than a "claim."  *See*, *e.g.*, *In re Pine Lake Village Apartment Co.*, 21 B.R. 478, 480 (Bankr. S.D.N.Y. 1982) ("The limited partners' interests do not constitute 'claims' …. They are equity security holders …, holding equity securities …. Simply put, an equity interest is not a claim against the debtor for which the equity holder may assert a right to payment.").

38.     The SAFE AHG recently argued that they hold a non-contingent "right to cash out amount" based on either a "Liquidity Event" or a "Dissolution Event." *See* ECF No. 1080 ¶ 4.  But that argument fails because Cash-Out Amounts (and even Conversion Amount) are designed to operate like stock.

39.     At the outset, the SAFE Agreements explicitly state that: "[i]n a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard Common Stock."  SAFE Agreement § 1(d).

40.     Moreover, the "Liquidity Event" does not trigger a claim.  If there is a Liquidity Event, the SAFE Holders are to receive a portion of the proceeds of a qualifying transaction "***equal to the greater of***" the Cash-Out Amount or the Conversion Amount.  SAFE Agreement § 1(b). The Cash-Out Amount is the amount the SAFE Holder paid to Rhodium Enterprises.  The Conversion Amount, however, is calculated based on the value of common stock implied by the

triggering event.  In other words, if there is a "Liquidity Event," the SAFE Holders receive the upside potential of a valuable business, a quintessential feature of equity, not debt.  *Lehman Bros. Holdings*, 855 F.3d at 474 (RSUs deemed equity because, among other things, their value was tied to the value of common stock).

41.     The "Dissolution Event" likewise does not trigger a claim.  If there is a Dissolution Event, the SAFE Agreement provides that any payment is subject to the liquidation priority, which provides that the Cash-Out Amount is junior to payment of all "outstanding indebtedness and creditor claims," and that payments will be on par with common stock and pro rata with other SAFE Holders "if the applicable Proceeds are insufficient to permit full payments."  This mimics an interest, *i.e.*, only receiving pro rata payments after payment in full of creditor claims.  *Color Tile*, 2000 WL 15212, at *4 (holding that an instrument represented equity, where, among other things, it stated that the interests of holders were junior to those of creditors).

42.     In sum, there is no "right to payment"—which are payments "guaranteed at specific intervals or at a specific time or event."  *Carrieri*, 393 F.3d at 525.[15]  Instead, as discussed in detail above, if triggered, the SAFE Agreements operate exactly the same as stock, not a contingent *claim*.  And even if there was any doubt from the language of the SAFE Agreements (which there is not), Rhodium Enterprises has described the SAFE Agreements as providing rights that "convert into shares," the SAFE Agreements have "no interest rate or maturity date," and that the right to receive cash in a Liquidity or Dissolution Event is "junior to payment of outstanding indebtedness

---

[15]  Even if the SAFE Holders were provided a cash option (which they were not), courts will not elevate equity interests with some "debt-like qualities" to claims unless the trigger event occurs before the petition date, which has not happened here.  *Carrieri*, 464 B.R. 656, 667 (holding that "warrants with [cash] redemption provisions … are equity interests until their expiration (or until the right to receive a cash payment properly matures on or before the petition date)"); *Wash. Mut.*, 464 B.R. at 667 (holding that litigation tracking warrants were equity instruments even though they required a cash payment upon receipt of funds from a litigation because that event had not occurred before the petition date).

and creditor claims and on par for other SAFE Agreements and common stock." January 18, 2022 Amendment No. 6 to Form S-1 Filed by Rhodium Enterprises, Inc., at F-28.[16]

43.     Therefore, the plain language of the SAFE Agreements, SEC guidance, and the Bankruptcy Code's statutory framework point to SAFE Agreements constituting contingent equity interests, not claims.

**II.     To The Extent That The SAFE Holders Have Claims Against Rhodium Enterprises, Those Claims Are Subordinated To All Other General Unsecured Claims Under Section 510(b)**

44.     To the extent that the SAFE Holders assert damages against any of the Debtors in the nature of "litigation claims," such claims should be classified as claims arising from a purchase or sale of a security of the debtor, which fall within section 510(b) of the Bankruptcy Code, which states:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

45.     Section 510(b) requires the subordination of three distinct categories of claims: (1) a claim arising from rescission of a purchase or sale of a security of the debtor (the rescission category); (2) a claim for damages arising from the purchase or sale of a security of the debtor (the damages category); and (3) a claim for reimbursement or contribution allowed under 11 U.S.C. § 502 on account of either (1) or (2).  *In re SeaQuest Diving, LP*, 579 F.3d 411, 418 (5th Cir. 2009) (citing *In re Geneva Steel Co*., 281 F.3d 1173, 1177 (10th Cir. 2002)).

---

[16]    https://www.sec.gov/Archives/edgar/data/1874985/000121390022002442/fs12022a6_rhodium.htm.

46.     Claims in connection with the purchase of security, to wit, the SAFE Agreements, fall within the broad reach of section 510(b)'s language for claims "arising from" the purchase or sale of a security.  11 U.S.C. § 510(b); *see In re Worldcom, Inc*., 329 B.R. 10, 14 (Bankr. S.D.N.Y. 2005) ("So long as the nature of the damage or harm complained of by a shareholder can be said to result as a consequence of his having purchased or sold share of stock or other securities of the debtor, the claimant falls within the scope of Section 510(b)."); *see also In re MF Glob. Holdings, Ltd*, 2014 WL 3882363, at \*5 (Bankr. S.D.N.Y. Aug. 6, 2014) (noting that "courts have interpreted [§ 510(b)] broadly").

47.     For example, in *SeaQuest Diving*, a partnership filed for chapter 11 relief.  579 F.3d at 41.  A limited partner filed proof of claim, seeking to recover sums awarded by state court pursuant to settlement resolving a dispute between the limited partner and holders of other partnership interests.  The debtor sought to subordinate the claim.[17]  On appeal, the Fifth Circuit held that the claim had to be subordinated because it arose "from the rescission of a purchase or sale of a security of the debtor."  *See* 11 U.S.C. § 510(b).

48.     The court focused on the legislative intent behind section 510(b), which is premised upon the allocation of certain risks between investors and creditors.  579 F.3d at 420 (citing *In re Granite Partners, L.P*., 208 B.R. 332, 336 (Bankr. S.D.N.Y. 1997)).  The Fifth Circuit explained that "both investors and creditors accept the risk of enterprise insolvency, but to differing degrees, as reflected in the absolute priority rule."  *Id*. (citations omitted).  Further, "[w]hile the creditor anticipates repayment of a fixed debt, the investor anticipates a potentially unlimited share of future profits," and  "[i]n exchange for this 'unique right to participate in the profits,' the investor

---

[17]    While subordination generally requires an adversary proceeding, an adversary proceeding is not required, where a plan provides for such subordination.  Fed. R. Bankr. P. 7001(8).

risks the loss of his capital investment, which provides an 'equity cushion' for the repayment of creditors' claims." *Id*. (citing *Granite Partners*, 208 B.R. at 336). The court then contrasted the position of investors and creditors: "In contrast, investors alone bear the risk of illegality in the issuance of securities because it would be improper to reallocate this risk to creditors who (1) never bargained for an equity position in the debtor and (2) extended credit to the debtor in reliance on the equity cushion provided by the investors." *Id*. (quotations marks and citations omitted).

49.     The Fifth Circuit further pointed out that "[t]here is nothing in [this] analysis to suggest that Congress's concern with creditor expectations and equitable risk allocation was limited to cases of debtor fraud." *Id*. at 420-21 (quoting *In re Betacom of Phoenix, Inc*., 240 F.3d 823, 829 (9th Cir. 2001)). Instead, the court pointed out that "Congress's larger concern was the effort of disaffected stockholders to recapture their investments from the debtors, regardless of the exact nature of their claims." *Id*. at 421 (citing *Granite Partners*, 208 B.R. at 337). The Fifth Circuit stressed that "[i]n *Betacom*, the Ninth Circuit rejected the plaintiffs' argument that § 510(b) only applies to securities fraud claims" and "held that a claim arising from the debtor's failure to deliver stock pursuant to a merger agreement was subject to mandatory subordination." *Id*. (citing *Betacom* 240 F.3d at 828–29, 831–32). Again, the Fifth Circuit explained that "[b]y bargaining with the debtor to receive equity instead of debt, the plaintiffs entered the transaction with greater financial expectations than a creditor, and the unsecured creditors presumably relied on the plaintiffs' contribution to the equity pool when extending credit to the debtor." *Id*. (citations omitted). Therefore, "a claim arising from the purchase or sale of a security can include a claim predicated on post-issuance conduct, such as breach of contract," *Seaquest*, 579 F.3d at 421

(citations omitted), so long as there is "some nexus or causal relationship between the claim and the sale." *Id.*[18]

50.     Thus, under section 510(b) of the Bankruptcy Code, any potential SAFE Holders' claims arising from the SAFE Agreements are subordinated to other "all claims or interests that are senior to or equal to the claim or interest represented by such security, ***except that if such security is common stock, such claim shall have the same priority as common stock***."  11 U.S.C. § 510(b) (emphasis added);  *In re SeaQuest Diving*, 579 F.3d at 420-21.  And because the SAFE Holders' claims contractually can only be "common" equity, section 510(b) also dictates that they shall be treated *pari passu* with common stock in the Debtor Rhodium Enterprises only.

## Separate Contested Matters

51.     To the extent that a response is filed regarding any Disputed Claim identified in this Objection and the Debtors are unable to resolve the response, the objection by the Debtors to each such Disputed Claim asserted herein shall constitute a separate contested matter as contemplated by Bankruptcy Rule 9014.  Any order entered by the Court regarding an objection asserted in this Objection shall be deemed a separate order with respect to each such Disputed Claim.

## Reservation of Rights

52.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any

---

[18]   Other circuits have adopted the broad reading of the damages category adopted by the Ninth Circuit in *Betacom*. *See Betacom*, 240 F.3d at 830 (applying section 510(b) to a damages claim predicated on a "purported breach of contract in a merger agreement" because the claim was "one 'surrounding' the sale or purchase of a security of the debtor."); *In re Med Diversified, Inc.*, 461 F.3d 251, 256 (2d Cir. 2006) (a claim arising from breach of a stock exchange provision in a termination agreement was subject to mandatory subordination); *In re Telegroup, Inc.*, 281 F.3d 133, 136, 141-42 (3d Cir. 2002) (subordinating stockholder claims arising from failure to deliver stock); *Geneva Steel Co.*, 281 F.3d at 1180-81 (a claim arising from post-issuance fraud of the debtor, which caused an investor to hold rather than sell his securities, was subject to mandatory subordination).

party in interest's rights to dispute the amount of, basis for, or validity of any claim or to amend this Objection in any respect, (iii) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (vi) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## **Notice**

53.     Notice of this Objection will be provided to (i) the Office of the United States Trustee; (ii) counsel to the Committee; (iii) counsel to the SAFE AHG; (iv) all parties identified as notice parties in the Disputed Claims; (v) any other party that has requested notice pursuant to Bankruptcy Rule 2002; and (vi) any other party entitled to notice pursuant to Local Rule 9013-1(d).

WHEREFORE, the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Respectfully submitted this 19th day of May, 2025.

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*/s/  Patricia B. Tomasco*
Patricia B. Tomasco (SBN 01797600)
Cameron Kelly (SBN 24120936)
Alain Jaquet (*pro hac vice*)
Rachel Harrington (*pro hac vice*)
700 Louisiana Street, Suite 3900
Houston, Texas 77002
Telephone: 713-221-7000
Facsimile: 713-221-7100
Email: pattytomasco@quinnemanuel.com
Email: cameronkelly@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com
Email: rachelharrington@quinnemanuel.com

- and -

Eric Winston (*pro hac vice*)
Razmig Izakelian (*pro hac vice*)
Ben Roth (*pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213-443-3000
Facsimile: 213-443-3100
Email: ericwinston@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com

*Counsel to the Debtors and*
*Debtors-In-Possession*

**<u>Certificate of Service</u>**

I, Patricia B. Tomasco, hereby certify that on the 19th day of May, 2025, a copy of the foregoing Objection was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco
