# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RHODIUM ENCORE LLC, *et al.*,[1] | § | Case No. 24-90448 (ARP) |
| | § | |
| Debtors. | § | |
| | § | (Jointly Administered) |
| | § | |

## DEBTORS' OMNIBUS OBJECTION TO CERTAIN CLAIMS PURSUANT TO BANKRUPTCY CODE SECTIONS 502(B), BANKRUPTCY RULE 3007, AND LOCAL RULE 3007-1 BECAUSE CLAIMS HAVE BEEN SATISFIED AND BASED ON OTHER SUBSTANTIVE GROUNDS

> **This is an objection to your claim. This objection asks the Court to disallow the claim that you filed in this bankruptcy case. If you do not file a response within 30 days after the objection was served on you, your claim may be disallowed without a hearing.**

Pursuant to section 502 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rule[s]"), and rule 3007-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rule[s]"), Rhodium Encore LLC, and its affiliates, as debtors and debtors in possession (collectively, the "Debtors" or "Rhodium") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby file this objection (the "Objection") seeking disallowance of the Proofs of Claim Nos. 44; 81; 82; 84; 100; 101; 109; 113; 122; 123; 124; 126; 136; 139; 143; 149; 151; 152; 158; 159; 162; 164; 165; 166;

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), Rhodium 30MW LLC (0263), Rhodium Enterprises, Inc. (6290), Rhodium Technologies LLC (3973), Rhodium Renewables LLC (0748), Air HPC LLC (0387), Rhodium Shared Services LLC (5868), Rhodium Ready Ventures LLC (8618), Rhodium Industries LLC (4771), Rhodium Encore Sub LLC (1064), Jordan HPC Sub LLC (0463), Rhodium 2.0 Sub LLC (5319), Rhodium 10MW Sub LLC (3827), Rhodium 30MW Sub LLC (4386), and Rhodium Renewables Sub LLC (9511). The mailing and service address of the Debtors in these Chapter 11 Cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005.

167; 168; 169; 170; 171; 172; 173; 174; 175; 176; 177; 181; 187; 188; 189; 191; 192; 193; 197; 201; 202; 206; 207; 211; 212; 214; 215; and 216 (the "Claims").  In support of this Objection, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.     The individuals and entities that filed the Claims (collectively, the "Claimants") are early-stage, sophisticated investors who held secured debt, equity and/or contingent equity interests in the Debtors arising out of transactions occurring not later than September 2021.  These Claimants—in addition to seeking payment under the Rhodium 2.0 Notes (now paid in full) or the SAFEs (which are the subject of the SAFE Objection)—assert a miscellanea of derivative claims that belong to the Debtors' estates.  Indeed, at the core, Claimants seek compensation through the assertion of derivative claims to recoup their investments in Rhodium because, in their view, the Debtors' officers mismanaged the Debtors and advanced their personal interests at the expense of the Debtors.  That said, for those Claimants who assert causes of action for breach of fiduciary duty that allegedly occurred three years before Debtors' petition dates, these claims are time-barred.  Further, Claimants' allegations are so vague, speculative, conclusory, and factually disprovable that they cannot support the Claims.  Finally, each of the Claimants assert damages arising from their ownership of Class A shares in Rhodium Enterprises that must be subordinated to the level of common stock under section 510(b) of the Bankruptcy Code.  Accordingly, the Debtors respectfully request that the Court disallow the Claims in their entirety, or if and to the extent allowed, provide for their subordination *pari passu* with the Debtors' Class A shares.

---

[2]     Capitalized terms not otherwise defined in this section are defined in other sections of this Objection.

## RELIEF REQUESTED

2.      By this Objection, the Debtors seek entry of an order (the "Proposed Order") disallowing in their entirety the Claims identified on Schedule 1 to the Order.

3.      In support of this Objection, the Debtors submit the *Declaration Of Andrew Popescu In Support Of Debtors' Omnibus Objection To Claims Pursuant To Bankruptcy Code Section 502(B), Bankruptcy Rule 3007, And Local Rule 3007-1 Because Claims Have Been Satisfied And Based On Other Substantive Grounds* (the "Popescu Declaration").

## JURISDICTION

4.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the Court's entry of a final order in connection with this Objection.

5.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested are section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1.

## BACKGROUND

**A.      General Background Of The Chapter 11 Cases**

7.      On August 24 and August 29, 2024 (the "Petition Dates"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The cases are jointly administered.

8.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   On November 22, 2024, the U.S. Trustee appointed an official committee of unsecured creditors (the "Committee").  No trustee or examiner has been appointed in these Chapter 11 Cases.

9.      On October 15, 2024, the Debtors filed the *Emergency Motion Of Debtors For Entry Of An Order (I) Setting Bar Dates For Filing Proofs Of Claim, (II) Approving The Form Of Proofs Of Claim And The Manner Of Filing, (III) Approving Notice Of Bar Dates, And (IV) Granting Related Relief* (ECF No. 269), which the Court granted by entering the relating order on October 18, 2024 (the "Bar Date Order"), setting November 22, 2024, as the general bar date for filing proofs of claim.  The Debtors promptly served notice of the bar date on all creditors.  *See* ECF No. 284.

10.      Further details of the Debtors' business, capital structure, governing bodies, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration Of David M. Dunn In Support Of Chapter 11 Petitions And First Day Relief* (ECF No. 35).

**B.      Events Prior To The Chapter 11 Cases**

i.      Claimants Invest In Debtors' Notes And Equity

11.      Rhodium is a technology company that mined Bitcoin and was founded by Nathan Nichols, Chase Blackmon, Cameron Blackmon, and Nicholas Cerasuolo (the "Founders").  The Debtors operated out of a facility located in Rockdale, Texas (the "Rockdale Site") as well as a site in Temple, Texas (the "Temple Site").

12.      In April 2020, the Founders initially incorporated Rhodium 30MW LLC ("Rhodium 30MW") in Delaware.  Between October 2020 and January 2021, the Founders incorporated Jordan HPC LLC ("Jordan"), Rhodium 2.0 LLC ("Rhodium 2.0"), and Rhodium Encore LLC ("Rhodium Encore") in Delaware for the purpose of operating Debtors' Bitcoin mining business.[3]  Initially, (i) Rhodium JV LLC ("Rhodium JV") was the only equity holder of

---

[3]      Debtors Jordan, Rhodium 2.0, Rhodium 30MW and Rhodium Encore—along with Debtor Rhodium 10MW LLC, which was incorporated in Delaware in March 2021—are collectively defined as the "Operating Companies."

Rhodium 2.0, Rhodium 30MW, and Rhodium Encore; while (ii) Air HPC LLC ("Air") was the sole equity holder of Jordan.

13.     Between May 2020 and early 2021, the Debtors raised capital to fund the development of the Rockdale Site.  Twelve Claimants invested in three of Debtors' Operating Companies by acquiring equity and subscribing to certain secured promissory notes (the "Note[s]"), as further detailed in Table 1 below:

| Table 1:  Claimants' 2020-2021 Investments In The Operating Companies | | | | |
|---|---|---|---|---|
| Claimant Name | Investment Date (Approx.) | Issuing Debtor | Total Investment Amount | Type Of Investment |
| **Christopher Blackerby** | 11/19/2020 and 12/31/2020 | Jordan | $1,000,000 | • Class B Non-Voting Units<br>• Note (principal of $714,285.71) |
| | 1/21/2021 | Rhodium 2.0 | $750,000 | • Class B Non-Voting Units<br>• Note (principal of $525,000) |
| | 6/30/2020 | Rhodium 30MW | $1,000,000 | • Class B Non-Voting Units<br>• Note (principal of $967,742.00) |
| **Colin Hutchings** | 11/10/2020 | Jordan | $399,933.98 | • Class B Non-Voting Units<br>• Note (principal of $285,667.13) |
| | 1/21/2021 | Rhodium 2.0 | $100,000 | • Class B Non-Voting Units<br>• Note (principal of $70,000) |
| | 6/29/2020 | Rhodium 30MW | $300,000 | • Class B Non-Voting Units<br>• Note (principal of $290,323) |
| **Cross the River LLC** | 12/23/2020 | Jordan | $110,000 | • Class B Non-Voting Units<br>• Note (principal of $78,571.43) |
| **Elysium Mining, LLC** | 1/25/2021 | Rhodium 2.0 | $1,735,000 | • Class B Non-Voting Units<br>• Note (principal of $1,214,500) |
| **Gaurav Parikh 2020 Revocable Trust** | 1/19/2021 | Rhodium 2.0 | $620,000 | • Class B Non-Voting Units<br>• Note (principal of $434,000) |
| **James M. Farrar and Adda Delgadillo Farrar** | 1/21/2021 | Rhodium 2.0 | $150,000 | • Class B Non-Voting Units<br>• Note (principal of $105,000) |

| Table 1:  Claimants' 2020-2021 Investments In The Operating Companies | | | | |
|---|---|---|---|---|
| **Claimant Name** | **Investment Date (Approx.)** | **Issuing Debtor** | **Total Investment Amount** | **Type Of Investment** |
| **Liquid Mining Fund I, LLC** | 7/7/2020 and 8/20/2020 | Rhodium 30MW | $1,170,000 | • Class B Non-Voting Units<br>• Note (principal of $1,132,258) |
| | 11/10/2020 | Jordan | $750,000 | • Class B Non-Voting Units<br>• Note (principal of $535,714.29) |
| **RH Fund II, a Series of Telegraph Treehouse, LP** | 1/21/2021 | Rhodium 2.0 | $1,200,000 | • Class B Non-Voting Units<br>• Note (principal of $840,000) |
| **Shane M. Blackmon** | 1/16/2021 | Rhodium 2.0 | $1,500,000 | • Class B Non-Voting Units<br>• Note (principal of $1,050,000) |
| **Thomas Lienhart** | 1/24/2021 | Rhodium 2.0 | $150,000 | • Class B Non-Voting Units<br>• Note (principal of $105,000) |
| **Trine Mining LLC** | 5/26/2020 and 7/9/2020 | Rhodium 30MW | $1,301,430 | • Class B Non-Voting Units<br>• Note (principal of $1,259,448) |
| **Vida Kick LLC** | 11/10/2020 | Jordan | $200,000 | • Class B Non-Voting Units<br>• Note (principal of $142,857) |
| | 1/22/2021 | Rhodium 2.0 | $200,000 | • Class B Non-Voting Units<br>• Note (principal of $140,000) |

14.     In connection with the investments in Jordan, Rhodium 2.0 and Rhodium 30MW, the Debtors issued certain private placement memoranda (the "PPM[s]").  The PPMs disclaim, in capital and bold text, that "**NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM; ANY SUCH INFORMATION OR REPRESENTATIONS SHOULD NOT BE RELIED UPON**."

15.     The twelve Claimants invested in the relevant Operating Companies by entering the respective (i) subscription agreement (the "Subscription Agreement[s]"); (ii) joinder agreement

to bind the Claimant to the operating agreement of the relevant Operating Company (the "Operating Agreement[s]");[4] (iii) the Notes; and (iv) the security agreement relating to the Notes.

16.     The Operating Agreements of each Operating Company include a clause in which Claimants acknowledged and assumed the risks of their investments.[5]  Each of the Operating Agreements further provides that "[t]his Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter."

17.     Similarly, the Subscription Agreements that the Claimants entered in connection with their investments in Jordan and Rhodium 2.0 state that "[the] Subscription Agreement, the Joinder Agreement, Operating Agreement, Secured Promissory Note and Security Agreement contain the entire agreement of the parties with respect to the subject matter hereof and there are no representations, covenants or other agreements except as stated or referred to herein;" and (ii) the Subscription Agreements that the Claimants entered in connection with their investment in Rhodium 30MW state that "[the] Subscription Agreement, the Operating Agreement, Secured Promissory Note and Security Agreement contain the entire agreement of the parties with respect to the subject matter hereof and there are no representations, covenants or other agreements except as stated or referred to herein."[6]

---

[4]    The Operating Agreements of the Operating Companies were subject to Delaware law.

[5]    *See* Operating Agreements § 13.9 ("Each Member, by signing this Agreement, represents and warrants that such Member understands the risks of an investment in the Company and is aware that such Member could lose such Member's entire investment that is the subject of such Member's Membership Interest in the Company.").

[6]    *See*, *e.g.*, Claim 187 at 223; Claim 189 at 50.

       By entering into the Subscription Agreement, each Claimant represented, among other things, that: (i) the Claimant "has sufficient experience in business, financial and investment matters to be able to evaluate the risk involved in the purchases of the Securities subscribed for hereby and to make an informative investment decision with respect to such purchases"; and (ii) the Claimant "understands that all documents, records and books which the Subscriber has requested pertaining to this investment have been made available for inspection by the

    ii.    <u>The Debtors Pay The Outstanding Debt Under The Jordan And Rhodium 2.0 Notes</u>

18.    Between January 2021 and September 2021, the Debtors paid off—early—the outstanding amounts owed to six Claimants under the Notes issued by Jordan and Rhodium 30MW:

| Table 2: Satisfaction Of The Jordan And Rhodium 30MW Notes | | |
|---|---|---|
| **Claimant** | **Note's Issuer** | **Total Payment Amount (Principal And Interest) And Payment Dates** |
| **Christopher Blackerby** | Jordan | $878,571.42 (3/31/2021; 4/30/2021; 6/29/2021; 6/30/2021) |
| | Rhodium 30MW | $983,218.74 (1/26/2021; 3/31/2021; 6/30/2021; 9/10/2021) |
| **Colin Hutchings** | Jordan | $351,370.55 (3/31/2021; 4/30/2021; 6/29/2021; 6/30/2021) |
| | Rhodium 30MW | $294,966.04 (1/26/2021; 3/31/2021; 6/30/2021; 9/10/2021) |
| **Cross the River LLC** | Jordan | $96,642.84 (3/31/2021; 4/30/2021; 6/29/2021; 6/30/2021) |

---

[Claimant] and the [Claimant]'s attorney and/or accountant/tax advisor.  The [Claimant] has had a reasonable opportunity to ask questions of and receive information and answers from a person or persons acting on behalf of the [Operating Company] concerning the offering of the Securities and all such questions have been answered and all such information has been provided to the full satisfaction of the [Claimant]."  *See id.* at 219-21.

In the Subscription Agreement, each Claimant further represented that the Claimant was aware of and acknowledged that: (i) "the purchase of the Securities is a speculative investment which involves a high risk of loss by the [Claimant] of his, her or its entire investment"; (ii) "[t]he [Operating Company] may generate losses from time to time and/or have negative cash flow from time to time. Should the [Operating Company] fail to achieve its objectives in a timely manner, the [Claimant] should expect to lose his, her or its entire investment in the [Operating Company]"; (iii) "[t]he [Operating Company] is a start-up with no history of operations and there can be no assurance that the [Operating Company] can operate its business successfully"; (iv) "[t]he [Claimant] may experience immediate and substantial dilution of the value of the [equity investment] and, with respect to the loan evidenced by the Secured Promissory Note, the [Claimant] may experience subordination of the priority of [Claimant]'s security in the collateral to the [Operating Company's] future lenders"; and (v) "[t]he Bitcoin mining industry is highly competitive, and the [Operating Company] will encounter competition from other similar entities, which may have greater financial, technical, product development, and other resources."  *See id.* at 221-22.

The Subscription Agreement is "governed by and construed in accordance with the laws of the State of Texas as applicable to residents of that state executing contracts wholly to be performed in that state."  *See id.* at 223.

| Table 2: Satisfaction Of The Jordan And Rhodium 30MW Notes | | |
|---|---|---|
| **Claimant** | **Note's Issuer** | **Total Payment Amount (Principal And Interest) And Payment Dates** |
| **Liquid Mining Fund I, LLC** | Jordan | $658,928.58 (3/31/2021; 4/30/2021; 6/29/2021; 6/30/2021) |
| | Rhodium 30MW | $1,150,362.02 (1/26/2021; 3/31/2021; 6/30/2021; 9/10/2021) |
| **Trine Mining LLC** | Rhodium 30MW | $1,279,589.88 (1/26/2021; 3/31/2021; 6/30/2021; 9/10/2021) |
| **Vida Kick LLC** | Jordan | $175,714.27 (3/31/2021; 4/30/2021; 6/29/2021; 6/30/2021) |

iii.   The Rollup Transaction

19.   In early 2021, Rhodium's corporate structure consisted of the following:

- Founders' investment vehicle, non-Debtor Imperium Investments Holdings LLC ("Imperium"), owned the 99% of Rhodium Technologies LLC ("Rhodium Technologies"),[7] a Delaware limited liability company;

- Rhodium Technologies was the sole owner of Rhodium JV and Air;

- Rhodium JV owned various majority equity interests in four Operating Companies: Rhodium 10MW, Rhodium 2.0, Rhodium 30MW and Rhodium Encore; and

- Air owned 50% of Jordan, the fifth Operating Company.

20.   Between March and April 2021, Imperium sold a minor portion of its equity interests in Rhodium Technologies to various third-party investors, including a 0.4% equity interest to Liquid Mining Fund II, LLC ("LMF II") in exchange for $6,000,000.[8]

---

[7]   At that time, Rhodium Technologies was named Rhodium Enterprises LLC.

[8]   Initially, LMF II aimed to enter into a deal where the funds of its investment would flow to Rhodium. However, LMF II then bought a minority interest in Rhodium Technologies from Imperium.

21.     In April 2021, the Debtors formed Rhodium Enterprises, Inc. ("Rhodium Enterprises"), a Delaware corporation, to be the holding company of Rhodium Technologies and its Debtor subsidiaries upon completion of the "Rollup," a corporate reorganization that closed in late June 2021.  Through the Rollup, the ownership of the Operating Companies vested in a reorganized version of Rhodium Technologies, whose members would be (i) Rhodium Enterprises (approximately 38%); and (ii) Imperium (approximately 62%).

22.     As part of the Rollup, the Claimants holding equity in the Operating Companies and Rhodium Technologies agreed to exchange their respective equity interests with Class A Common Stock of Rhodium Enterprises.[9]  The Claimants did so by each entering into an exchange agreement with Rhodium Enterprises (the "Exchange Agreement").  The Exchange Agreement provides, among other things, that it "contains the entire agreement of the parties with respect to the subject matter hereof and there are no representations, covenants or other agreements except as stated or referred to herein."[10]  The Exchange Agreement further provides that "[e]xcept for the representations and warranties contained in this Section 4 [of the Exchange Agreement], neither [Rhodium Enterprises] nor any person on behalf of  [Rhodium Enterprises] makes any express or implied representation or warranty to the [Claimant], at law or in equity, in respect of  [Rhodium Enterprises], its operations, business, assets, liabilities, capitalization, condition or prospects, the Class A Shares or the transactions contemplated by the Exchange or this Agreement, and [Rhodium Enterprises] hereby disclaims any such representation or warranty."[11]

---

[9]     In advance of the Rollup, the Debtors made available a report prepared by Teknos Associates (the "Teknos Report"), which provided a valuation for Rhodium and indicated that a control premium was being applied.

[10]    *See*, *e.g.*, Claim 215 at 108.

[11]    *See*, *e.g.*, Claim 215 at 101.  By entering into the Exchange Agreement, each Claimant represented, among other things, that: (i) the Claimant "has sufficient experience in business, financial and investment matters to be able to evaluate the risk involved in the exchange of the Class B Units for the Class A Shares and to make an informative investment decision with respect to such exchange"; and (ii) the Claimant "understands that all documents, records and books which the [Claimant] has requested pertaining to the Exchange have been made available for inspection by the [Claimant] and the [Claimant]'s advisors. The [Claimant] has had a reasonable opportunity to

23. Following the Rollup and as of the petition dates, the Claimants were equity holders of Rhodium Enterprises and (most of all) secured creditors under the Rhodium 2.0 Notes, as follows:

| Table 3: Equity and Pre-Petition Debt Under The Rhodium 2.0 Notes Owed To Claimants | | |
|---|---|---|
| Claimant | No. of Shares in Rhodium Enterprises[12] | Pre-Petition Debt[13] |
| Christopher Blackerby | 2,447,491 (Class A Common Stock) | $525,000 |
| Colin Hutchings | 812,648 (Class A Common Stock) | $70,000 |
| Cross the River LLC | 143,285 (Class A Common Stock) | N/A |
| Elysium Mining, LLC | 718,456 (Class A Common Stock) | $1,229,967.32 |
| Gaurav Parikh 2020 Revocable Trust | 256,739 (Class A Common Stock) | $437,288.89 |

ask questions of and receive information and answers from a person or persons acting on behalf of the Company concerning the Exchange and all such questions have been answered and all such information has been provided to the full satisfaction of the [Claimant]." *See id.* at 98-100.

In the Exchange Agreement, Claimants further represented that they were aware of and acknowledged that: (i) "[t]he acquisition of the Series A Shares in the Exchange is a speculative investment which involves a high risk of loss by the [Claimant] of his, her or its entire investment"; (ii) "[t]he Company may generate losses from time to time and/or have negative cash flow from time to time" and "[s]hould the Company fail to achieve its objectives in a timely manner, the [Claimant] should expect to lose his, her or its entire investment in the Company"; (iii) [t]here can be no assurance that the Company can operate its business successfully"; (iv) "[t]he [Claimant] may experience immediate and substantial dilution of the value of the Class A Shares"; and (v) "[t]he industry in which the Company competes, Bitcoin mining, is highly competitive, and the Company will encounter competition from other similar entities, which may have greater financial, technical, product development, and other resources." *See id.* at 101-02.

The Exchange Agreement also provides for the following waiver (the "Waiver"): "The [Claimant] hereby waives any rights it may have or be entitled to exercise pursuant to the Operating Agreement for the Rhodium LLC [*i.e.*, the relevant Operating Company or Rhodium Technologies] with respect to the transactions contemplated by this Agreement and the Memorandum.  Upon consummation of the Exchange, the [Claimant] will cease for all purposes to be a member of the Rhodium LLC [*i.e.*, the relevant Operating Company or Rhodium Technologies]." *See id.* at 102.

The Exchange Agreement further provides: "This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to its principles of conflicts of law." *See id.* at 108.

[12] As reflected in the *Second Amended Equity List Of Rhodium Enterprises, Inc.* (ECF No. 1054).

[13] As reflected in the Exhibit to the *Order Amending the Final Cash Collateral Order to Authorize Final Payment to Prepetition Secured Lenders* (the "Payment Order") (ECF No. 1197).

| Table 3: Equity and Pre-Petition Debt Under The Rhodium 2.0 Notes Owed To Claimants | | |
|---|---|---|
| **Claimant** | **No. of Shares in Rhodium Enterprises[12]** | **Pre-Petition Debt[13]** |
| **James M. Farrar and Adda Delgadillo Farrar** | 62,114 (Class A Common Stock) | $106,283.89 |
| **Liquid Mining Fund I, LLC** | 1,953,108 (Class A Common Stock) | N/A |
| **Liquid Mining Fund II, LLC** | 784,593 (Class A Common Stock) | N/A |
| **RH Fund II, a Series of Telegraph Treehouse, LP** | 496,915 (Class A Common Stock) | $840,000 |
| **Shane M. Blackmon** | 621,144 (Class A Common Stock) | $1,051,518.90 |
| **Thomas Lienhart** | 62,114 (Class A Common Stock) | $106,107.69 |
| **Trine Mining LLC** | 1,085,823 (Class A Common Stock) | N/A |
| **Vida Kick LLC** | 343,338 (Class A Common Stock) | $140,000 |
| **Shares' Total: 9,787,768** | | **Pre-Petition Debt's Total: $4,506,166.69** |

24.     In addition, as of the petition dates, four Claimants (the Farrars, Infinite Mining, Lienhart, and the RH Fund III) were holders of contingent equity interests emanating from simple agreements for future equity (the "SAFE[s]") that they had executed with Rhodium Enterprises in September 2021.[14]

**C.     The Claims**

25.     Between November 19 and 22, 2024, the Claimants filed 52 Claims against the Debtors, cumulatively seeking over $139,000,000, as further detailed in the table below:

---

[14]     These four Claimants filed Claims 84, 149, 152, and 197 primarily seeking payments under the SAFEs.  In that respect, on May 19, 2025, the Debtors filed *Debtors' Omnibus Objection To Claims Pursuant To Bankruptcy Code Section 502(b), Bankruptcy Rule 3007, And Local Rule 3007-1 Because SAFE Holders Do Not Hold Claims* (the "SAFE Objection") (ECF No. 1126), seeking disallowance of the SAFE-related claims because all of the purported claims are contingent equity interests and not claims.  As mentioned in Section C below, through this Objection, the Debtors object to additional unliquidated damages that these Claimants sought in Claims 84, 149, 152, and 197.

| Table 4: The Claims | | | |
|---|---|---|---|
| **Claimant** | **Claim Number** | **Asserted Claim Amount** | **Debtor Claim Asserted Against** |
| **Christopher Blackerby** | 123; 158; 159; 164; 166; 168; 170; 171; 173; 174; 175; 181 | Not less than $99,642,943.68 (cumulatively) | Jordan (123); Rhodium 2.0 (170); Rhodium 30MW (164); Rhodium Enterprises (158, 168 and 174); Rhodium JV (166, 171 and 173); Rhodium Technologies (159, 175 and 181) |
| **Colin Hutchings** | 177; 201; 202 | Not less than $8,403,317.24 (cumulatively) | Rhodium 2.0 (177); Jordan (201); Rhodium Enterprises (202) |
| **Cross the River LLC** | 187; 191; 207; 211 | Unliquidated | Jordan (187); Rhodium Enterprises (207); Rhodium JV (191); Rhodium Technologies (211) |
| **Elysium Mining LLC / Elysium Mining, LLC** | 188; 193; 214; 216 | Not less than $4,919,869.28 (cumulatively) | Rhodium 2.0 (193); Rhodium Enterprises 214); Rhodium JV (188); Rhodium Technologies (216)[15] |
| **Gaurav Parikh 2020 Revocable Trust** | 82; 109; 162; 165 | Not less than $2,480,000 (cumulatively) | Rhodium 2.0 (82); Rhodium Enterprises (109); Rhodium JV (162); Rhodium Technologies (165) |
| **Infinite Mining, LLC** | 197 | Unliquidated (limitedly to the portion of Claim that is not already covered by ECF No. 1126) | Rhodium Enterprises |
| **James M. Farrar and Adda Delgadillo Farrar** | 149; 151 | Not less than $106,283.89 (151); Unliquidated (149) (limitedly to the portion of Claim 149 that is not already covered by ECF No. 1126) | Rhodium 2.0 (151); Rhodium Enterprises (149) |
| **Liquid Mining Fund I, LLC** | 122; 124; 126; 136 | Not less than $445,976 (cumulatively) | Jordan (122); Rhodium 30MW (136); Rhodium Enterprises (124); Rhodium Technologies (126) |

---

[15]  In connection with (i) Claim 188, the Claimant selected Rhodium JV and Rhodium Technologies as the relevant Debtors; (ii) Claims 193, the Claimant selected Rhodium 2.0 and Rhodium Technologies as the relevant Debtors; and (iii) Claim 214, the Claimant selected Rhodium Enterprises and Rhodium Technologies as the relevant Debtors.  The foregoing although (i) the Bar Date Order provided that "[e]ach proof of claim must clearly identify one specific Debtor against which it is asserted, including the specific case number" (ECF No. 284 ¶ 12(c)); and the form 410 requested to "[c]heck only one Debtor per claim form." Debtors' claims registers reflect the allocation of Claim 188 to Rhodium JV, Claim 193 to Rhodium 2.0 LLC, and Claim 214 to Rhodium Enterprises.

| Table 4: The Claims | | | |
|---|---|---|---|
| **Claimant** | **Claim Number** | **Asserted Claim Amount** | **Debtor Claim Asserted Against** |
| **Liquid Mining Fund II, LLC** | 100; 101 | Not less than $12,000,000 (cumulatively) | Rhodium Enterprises (101); Rhodium Technologies (100) |
| **RH Fund II, a Series of Telegraph Treehouse, LP** | 81 | Not less than $840,000 | Rhodium 2.0 |
| **RH Fund III, a Series of Telegraph Treehouse, LP** | 84 | Unliquidated (limitedly to the portion of Claim that is not already covered by ECF No. 1126) | Rhodium Enterprises |
| **Shane M. Blackmon** | 167; 169; 172; 176 | Not less than $4,206,075.60 (cumulatively) | Rhodium 2.0 (172); Rhodium Enterprises (176); Rhodium JV (169); Rhodium Technologies (167) |
| **Thomas Lienhart** | 44; 152 | $106,107.69 (44); Unliquidated (152) (limitedly to the portion of Claim 152 that is not already covered by ECF No. 1126) | Rhodium 2.0 (44); Rhodium Enterprises (152) |
| **Trine Mining LLC** | 189; 192; 206; 212; 215 | Unliquidated | Rhodium 30MW (192); Rhodium Enterprises (206); Rhodium JV (189); Rhodium Technologies (212 and 215) |
| **Vida Kick LLC** | 113; 139; 143 | Not less than $6,213,688.53 (cumulatively) | Jordan (113 and 143); Rhodium 2.0 (139) |
| **Total Claims: $139,364,261.91** | | | |

26.     In addition to seeking—where applicable—payments under the Rhodium 2.0 Notes that the Debtors have now paid in full (*see* Section D below) or under contingent equity interests, the Claimants assert a mixture of "litigation claims" arising from their investments in various

Rhodium entities.  Exhibit A, as well as Schedule 1 to the Order, provide additional details for the Claims.

### D.       Debtors Paid Claimants' Secured Claims

27.       On May 5, 2025, the Debtors filed *Debtors' Motion for Entry of an Order Authorizing the Debtors to Amend the Final Cash Collateral Order to Provide for Payment to Prepetition Secured Lender* (the "Payment Motion") (ECF No. 1056).  Through the Payment Motion, the Debtors sought the Court's authorization to pay approximately $50.96 million to the Debtors' prepetition secured lenders.  ECF No. 1056 ¶ 1.  The Payment Motion listed the secured creditors and the amounts that the Debtors would pay to them.  *Id.*, Ex. A.  None of the Claimants objected to the Payment Motion.

28.       On May 28, 2025, the Court entered the Payment Order.  Pursuant to the Payment Order, on May 29, 2025, and June 2, 2025, the Debtors paid amounts due under the Rhodium 2.0 Notes in full satisfaction of Claimants' secured claims (*see infra* Section II).

### BASIS FOR RELIEF

### I.       General Standard

29.       Section 502 of the Bankruptcy Code provides that: "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest … objects."  *See* 11 U.S.C. §502(a).  The proper filing of a proof of claim constitutes prima facie evidence of the claim's validity and amount.  *In re O'Connor*, 153 F.3d 258, 260 (5th Cir. 1998) (citing Bankruptcy Rule 3001(f)).  A proof of claim loses the presumption of prima facie validity under Bankruptcy Rule 3001(f) if an objecting party refutes at least one of the allegations that are essential to the claim's legal sufficiency.  *See In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988) (holding "[if] evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to 'prove the validity of the claim by a preponderance of the

evidence'" (citation omitted)).   Once such an allegation is refuted, the burden reverts to the claimant to prove the validity of its claim by a preponderance of the evidence.  *Id*.  Despite this shifting burden during the claim objection process, "[t]he ultimate burden of proof always rests upon the claimant."  *Id*.

## II.    To The Extent Claimants Had Secured Claims, Those Claims Have Been Satisfied

30.    Under the Payment Order, the Debtors paid off the Rhodium 2.0 Notes issued to the Claimants.[16]  Thus, none of the Claimants have secured claims relating to the Notes against any of the Debtors.  The table below details Debtors' payments in full satisfaction of the debt under the Rhodium 2.0 Notes.

| Table 5: Debtors' Payment Under The Rhodium 2.0 Notes | | | |
|---|---|---|---|
| **Claimant** | **Pre-Petition Debt[17]** | **Payment Date** | **Payment Amount** |
| Christopher Blackerby | $525,000 | 5/29/2025 | $534,015.42 |
| Colin Hutchings | $70,000 | 5/29/2025 | $71,202.06 |
| Elysium Mining, LLC | $1,229,967.32 | 5/29/2025 | $1,251,088.59 |
| Gaurav Parikh 2020 Revocable Trust | $437,288.89 | 5/29/2025 | $444,798.11 |
| James M. Farrar and Adda Delgadillo Farrar | $106,283.89 | 5/29/2025 | $108,109.02 |
| RH Fund II, a Series of Telegraph Treehouse, LP | $840,000 | 6/2/2025 | $854,424.67 |
| Shane M. Blackmon | $1,051,518.90 | 5/29/2025 | $1,069,575.82 |
| Thomas Lienhart | $106,107.69 | 5/29/2025 | $107,929.79 |
| Vida Kick LLC | $140,000 | 5/29/2025 | $142,404.11 |
| **Payments' Total: $4,583,547.59** | | | |

---

[16]    As mentioned in paragraph 18, in 2021, the Debtors already paid off the Jordan and Rhodium 30MW Notes issued to certain Claimants.

[17]    *See* n.13 above.

III. **For Claims Unrelated To The Payment Of The Notes, Claimants Have No Standing Because These Claims Are Property Of The Debtors' Estates**

31.     The filing of a chapter 11 petition creates an estate comprised of all the debtor's property, including "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Courts "interpret all legal or equitable interests broadly: The estate includes causes of action belonging to the debtor." *Torch Liquidating Tr. ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 386 (5th Cir. 2009) (citation and internal marks omitted); *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1274 (5th Cir. 1983).

32.     To set out an individual action, each Claimant must "demonstrate[] that [it] can prevail without showing an injury to the corporation," and courts evaluate the foregoing by "[l]ooking at the body of the complaint and considering the nature of the wrong alleged and the relief requested." *In re Dexterity Surgical, Inc.*, 365 B.R. 690, 696 (Bankr. S.D. Tex. 2007) (citing *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004)). Indeed, if a debtor raises a claim for its direct injury under the applicable law, then the cause of action belongs to the estate, not to a single creditor. *In re E.F. Hutton Southwest Properties II, Ltd.*, 103 B.R. 808, 812 (Bankr. N.D. Tex. 1989) ("If an action belongs to the estate, the trustee has the power and duty to prosecute the action for the benefit of all creditors and shareholders in the estate."); *In re Dexterity*, 365 B.R. at 699 (citing *In re E.F. Hutton*, 103 B.R. at 812).

33.     Here, the bulk of the causes of action at issue rely on the allegations that Rhodium's officers (i) mismanaged the Debtors causing an erosion of Claimants' investments in the Debtors; and (ii) used Rhodium as a tool to advance their personal interests, disregarding the corporate form, giving rise to an alter ego or veil piercing theory.[18] *See* Ex. C.

---

[18] *In re Garza*, 605 B.R. 817, 825 (Bankr. S.D. Tex. 2019) ("alter ego remedy applies when there is such an identity between a corporation and an individual that all separateness between the parties has ceased and a failure to disregard the corporate form would be unfair or unjust.").

34.     The Claims' causes of action for mismanagement, diversion of corporate opportunities, self-dealing, and related breaches of fiduciary duties by Rhodium's officers rely on harm that is common to Debtors' investors and creditors and therefore belong to the estate.  *See In re NC12, Inc.*, 478 B.R. 820, 835 (Bankr. S.D. Tex. 2012) ("Any claim for damages due to stripping or misappropriation of corporate assets belongs to the estate and may be asserted only by the Trustee."); *id.* at 836 ("The [fiduciary duty claims] are fundamentally derivative, predicated on injury to NC12, not on injury to individual Plaintiffs or Intervenors."); *Mitchell Excavators, Inc. by Mitchell v. Mitchell*, 734 F.2d 129, 131 (2d Cir. 1984) (the right to prosecute an action against a corporation's officers and directors "pass[es] to the estate created by the commencement of the bankruptcy proceeding.").[19]

35.     Courts in this Circuit hold that any cause of action based on alter ego or veil piercing theories belong to the Debtors and, as such, are "property of the estate" within the meaning of section 541(a)(1) of the Bankruptcy Code.  *In re S.I. Acquisition, Inc.*, 817 F.2d 1142, 1153 (5th Cir. 1987); *In re Packer*, 816 F.3d 87, 92 (5th Cir. 2016); *In re Moore*, 608 F.3d 253, 258-59 (5th Cir. 2010), *accord In re Schimmelpenninck*, 183 F.3d 347, 358 (5th Cir. 1999).

36.     Claimants' attempts to disguise their allegations otherwise cannot change the essence of their claim.  *See*, *e.g.*, *In re SemCrude L.P.*, 796 F.3d 310, 318 (3d Cir. 2015) ("[T]o the extent … Plaintiffs' [fraudulent inducement] claims are masked claims for a diminution in value of their … units as a result of [company's co-founder and executive]'s mismanagement, their

---

[19]     In prior litigation, certain Claimants have conceded that claims brought in the related complaint are derivative. *See Trine Mining, LLC et al. v. Nathan Nichols, et al.*, C.A. No. 2022-1029-PAF (Del. Ch.), Pls. Ans. Br. at 30-31.  In any event, the Debtors do not owe any fiduciary duties to the Claimants. *See*, *e.g.*, *In re Wayport, Inc. Litig.*, 76 A.3d 296, 322-23 (Del. Ch. 2013) ("Wayport is not liable for breach of fiduciary duty. As a corporate entity, Wayport did not owe fiduciary duties to its stockholders."); *Emerald Partners v. Berlin*, 1995 WL 600881, at *8 (Del. Ch. Sept. 22, 1995) (a corporation "owes no fiduciary duties to shareholders independently from its agents, and the corporation itself is not liable for a breach of fiduciary duties by its directors") (collecting cases), *aff'd in part, rev'd in part on other grounds*, 726 A.2d 1215 (Del. 1999).

claims are derivative of the claims released by the Litigation Trust." (citations omitted)); *Arent v. Distribution Scis., Inc.*, 975 F.2d 1370, 1373 (8th Cir. 1992) ("[T]he fact that plaintiffs framed the harm as a direct fraud did not permit them to go forward on a claim that was, at its core, derivative.").[20]

37.     Because the Claims assert causes of action belonging to the Debtors' estates, Claimants lack standing to assert them.  *See In re MortgageAmerica Corp.*, 714 F.2d at 1277; *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 315–16 (S.D. Tex. 2008) ("[D]ebtors in possession use § 544(b) as a conduit to assert state-law-based fraudulent transfer claims in bankruptcy.  In bringing the fraudulent transfer claims, the … debtor in possession is given the same avoiding powers that an unsecured creditor with an allowable claim might have under applicable law."); *Torch Liquidating*, 561 F.3d at 386.[21]

## IV.     Claims Are Time Barred

38.     Claimants' causes of action for breach of fiduciary duties and/or breach of contracts that are subject to Delaware law that Claimants brought against Jordan, Rhodium 2.0, Rhodium 30MW, and Rhodium JV for conduct predating August 24, 2021 (*i.e.*, three years from the commencement of their Chapter 11 Cases) are time-barred.[22]  Regarding Rhodium Enterprises and

---

[20]     *See also In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 91-92 (2d Cir. 2014) ("We are nonetheless wary of placing too much significance on the labels appellants attach to their complaints, lest they circumvent the Net Equity Decision by 'pleading around' the automatic stay.").

[21]     Even setting aside that their Claims belong to the estate, the Claimants would still lack standing to pursue their claims against Rhodium Enterprises.  Under Delaware law, "plaintiffs who seek to assert [derivative] breach of fiduciary duty claims . . . have [to be] persons to whom such fiduciary duties were owed, i.e., stockholders of the . . . corporation."  *In re SmileDirectClub, Inc. Derivative Litig.*, 2021 WL 2182827, at *7 (Del. Ch. May 28, 2021), *aff'd*, 270 A.3d 239 (Del. 2022).  Claimants did not become shareholders of Rhodium Enterprises until *after* the terms of the Rollup transaction were established.  *In re Match Grp., Inc. Derivative Litig.*, 2022 WL 3970159, at *14 (Del. Ch. Sept. 1, 2022) (dismissing plaintiff's derivative claims for lack of standing because they were not shareholders when the terms of the transaction at issue were established).

[22]     Delaware statutes of limitation apply to claims for breach of fiduciary duty (and any claim covered by the internal affairs doctrine) because (i) "when bankruptcy courts adjudicate state-law claims that do not implicate federal policy, they may … apply the choice-of-law rules of the forum in which they sit," *In re Noram Res., Inc.*, 2011 WL 5357895, at *5 (Bankr. S.D. Tex. Nov. 7, 2011); (ii) "[b]oth federal and Texas choice-of-law rules state that

Rhodium Technologies, the same types of causes of actions are time barred for conduct predating August 29, 2021 (*i.e.*, three years from the commencement of their Chapter 11 Cases).

39.     Delaware law provides that claims sounding in tort, such as breach of fiduciary duty and breach of contract, fall under a three-year statute of limitations.  Del. Code Ann. tit. 10, § 8106; *In re Coca-Cola Enters., Inc*., 2007 WL 3122370, at *5 (Del. Ch. Oct. 17, 2007), *aff'd sub nom. Int'l Bhd. Teamsters v. Coca-Cola Co*., 954 A.2d 910 (Del. 2008); *Ins. Co. of N. Am. v. NVF Co*, 2000 WL 305338, at *2 (Del. Super. Ct. Jan. 20, 2000).  A tort claim accrues at the time of the injury.  *Krahmer v. Christie's Inc.*, 903 A.2d 773, 778 (Del. Ch. 2006).  Similarly, a breach of contract claim accrues at the time of the breach.  *Ins. Co. of N. Am.*, 2000 WL 305338, at *3; *Gavin*, 2016 WL 1298964, at *8.  These accrual dates apply even if a plaintiff feels the harmful effects of the wrongful act much later, and even if the plaintiff is unaware of the wrong.  *In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *5.  *In re AMC Invs.*, LLC, 637 B.R. 43, 65 (Bankr. D. Del. 2022), *aff'd,* 656 B.R. 95 (D. Del. 2024) ("It is well-settled that a claim 'accrues at the

---

a corporation's internal affairs should be governed by the law of the state of incorporation," *id.* at *6; and (iii) "under the internal-affairs doctrine as applied in Texas, the law of the state where the limited liability company was formed supplies the controlling limitations period," Robert B. Gilbreath, *Texas Law Controls That Issue(?) Don't Bet on It*, 27 App. Advoc. 324, 326 (2014) (noting that "courts applying the common-law internal-affairs doctrine routinely hold that the law of the jurisdiction of formation supplies the controlling statute of limitations," and citing *100079 Canada, Inc. v. Steifel Labs, Inc.*, 954 F. Supp. 2d 1360, 1371 n.6 (S.D. Fla. 2013); *In re Direct Response Media, Inc.*, 466 B.R. 626, 646-47 (D. Del. 2012); *In re Mervyn's Holdings, LLC*, 426 B.R. 488, 502-03 (D. Del. 2010); *In re Norstan Apparel Shops, Inc.*, 367 B.R. 68, 80-82 (E.D.N.Y. 2007); *In re Verisign, Inc. Derivative Litig.*, 531 F. Supp. 2d 1173, 1214-15 (N.D. Cal. 2007); *In re Circle Y of Yoakum, Texas*, 354 B.R. 349, 359 (D. Del. 2006)).  *See also Pilepro, LLC v. Chang*, 152 F. Supp. 3d 659, 680 (W.D. Tex. 2016), *aff'd sub nom. PilePro, L.L.C. v. Heindl*, 676 F. App'x 341 (5th Cir. 2017) (applying Nevada statute of limitation in connection with breach of fiduciary duties predicated on a conspiracy to defraud because limited liability company was incorporated in Nevada and, "under the internal affairs doctrine, Nevada law governs [the] dispute.").

Regarding claims for breach of contract, courts can enforce the choice of law that the parties contractually agreed. *See*, *e.g.*, *Resol. Tr. Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) (citing *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941) and *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990) for the proposition that "the federal district court must look to the Texas choice of law rules," and noting that [u]nder the Texas rules, in those contract cases in which the parties have agreed to an enforceable choice of law clause, the law of the chosen state must be applied.").  Not only the Exchange Agreement, but also the Operating Agreements of the Operating Companies, as well as the operating agreement of Rhodium Technologies contractually provided for the application of Delaware law.

moment of the wrongful act ... not when the harmful effects of that act are felt.'"); *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 363845, at *6 (Del. Ch. Jan. 27, 2010), *aff'd*, 7 A.3d 485 (Del. 2010).

40.    In particular, Claimants allege breaches of fiduciary duties predating the Rollup that closed on June 30, 2021. *See* Exhibit A.[23]  Therefore, the related causes of actions accrued before these August 2021 dates, and the period to bring the causes of actions expired well before the petition dates in the Chapter 11 Cases.

## V.    On The Face Of Their Allegations, All Claims Sounding In Fraud Are Fatally Defective

41.    In any event, the Claims' causes of action for fraud must be disallowed as fatally defective.  Under Delaware law, "the elements of common law fraud are (1) a false representation of material fact made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or the representation was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiffs action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance."  *In re OSC 1 Liquidating Corp.*, 529 B.R. 825, 832 (Bankr. D. Del. 2015).  A fraud by non-disclosure cause of action requires showing an omission of a material fact in light of a duty to disclose; however, the claimant must still prove all the elements of fraud by affirmative misrepresentation, including fraudulent intent.  *In re Am. Bus. Fin. Servs.*, Inc., 471 B.R. 354, 373

---

[23]    *See*, *e.g.*, Claim 189 at 4-5 (stating, among other things, that "[The] claims include … damages due to gross mismanagement of the business before and after the consolidation and 'rollup transaction' …. The rollup transaction further failed to properly account for the contributory value of the assets Rhodium 30MW contributed to the entity.").

In addition, several Claimants made the same boilerplate allegation that "[a]fter the rollup transaction, Rhodium represented that [Claimant]'s shares were worth $..., whereas the value of the entire business was north of $2.5 billion," but various breaches of fiduciary duty (e.g., self-dealing) eroded the value of those shares.  It appears, however, that in April 2021 (and not after the closing of the Rollup in June 2021) the Debtors sent an email estimating the valuation of Rhodium to be more than $2.5 billion.

(Bankr. D. Del. 2012).  To plead fraudulent inducement, Claimant must allege the same elements as for a claim of fraud by misrepresentation or omission.  *See E.I. DuPont de Nemours & Co. v. Fl. Evergreen Foliage*, 744 A.2d 457, 461-62 (Del. 1999).[24]

42.     Fraud claims, even in the context of the claim allowance process, fall under the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure ("Rule[s]"), which requires that pleadings asserting fraudulent conduct "state with particularity the circumstances constituting the fraud."  Fed. R. Bankr. P. 9014 and 7009; Fed. R. Civ. P. 9(b); *In re GDC Technics, LLC*, 643 B.R. 417, 427 (Bankr. W. D. Tex. 2022) (applying Civil Rule 9(b) in connection with a claim objection and noting that, "[while] Rules 8(a)(2), 9(b), and 12(b)(6) are most commonly associated with federal civil procedure, they can apply in the bankruptcy claims allowance process.").

43.     Courts interpret Rule 9(b) as placing a burden on plaintiffs to detail facts that establish "the who, what, when, where, and how of a fraud."  *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719,724 (5th Cir.), *opinion modified on denial of reh'g*, 355 F.3d 356 (5th Cir.

---

[24]  Arguendo, if Texas law were to apply, to state a claim for fraud or fraudulent inducement, the Claimants must show that (i) Debtors made a false material misrepresentation; (ii) Debtors knew the representation was false when made or made it recklessly without knowledge of its truth; (iii) Debtors intended Claimants to act upon the representation; and (iv) Claimants actually and justifiably relied upon the representation, and thereby suffered injury.  *Simms v. Jones*, 879 F. Supp. 2d 595, 600-01 (N.D. Tex. 2012), *aff'd sub nom. Ibe v. Jones*, 836 F.3d 516 (5th Cir. 2016); *see also Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018) (stating that a fraudulent inducement claim "is a species of common-law fraud that shares the same basic elements.").  An omission may constitute fraud, but only when there is a duty to disclose the information at issue.  *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219-20 (Tex. 2019).  To establish fraud by non-disclosure, the Claimants must establish the following elements: (i) the Debtors deliberately failed to disclose material facts; (ii) the Debtors had a duty to disclose such facts to the Claimants; (iii) the Claimants were ignorant of the facts and did not have an equal opportunity to discover them; (iv) the Debtors intended the Claimants to act or refrain from acting based on the nondisclosure; and (v) the Claimants relied on the non-disclosure, which resulted in injury.  *Id.*  "In general, there is no duty to disclose without evidence of a confidential or fiduciary relationship.  *Id.* at 220.

The elements for fraud under Texas and Delaware laws appear to be substantially the same.  *See In re Legendary Field Exhibitions, LLC*, 2023 WL 7852657, at *25 (Bankr. W.D. Tex. Nov. 13, 2023) ("[T]he elements of fraudulent inducement are virtually the same. To prove fraudulent inducement in Delaware, just as in Texas, Plaintiffs must first properly allege all the elements of fraud …. [A] plaintiff must [further] demonstrate that they were deceived into entering a contract.").

2003).[25]  Courts also extend the requirements of Rule 9(b) beyond common law fraud claims to "claims sounding in fraud," including claims for breach of fiduciary duty that are "based on the same allegations as a fraud claim."[26]  Further, the standard set forth in Civil Rule 9(b) "must be met as to each Defendant, and it is "impermissible to make general allegations that lump all defendants together."  *In re Parkcentral Glob. Litig.*, 884 F.Supp.2d 464, 470-71 (N.D. Tex. 2012).[27]

---

[25]   *See also Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (Under Civil Rule 9(b), "articulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.") (holding that plaintiff did not meet the requirement of Civil Rule 9(b) regarding fraud claims because of the vagueness of its pleadings); *Rivers v. Bank of Am., N.A.*, 2016 WL 721047, at *6 (N.D. Tex. Jan. 27, 2016), *report and recommendation adopted*, 2016 WL 705147 (N.D. Tex. Feb. 23, 2016) (agreeing with defendants that plaintiff had not plead the "who, what, or when of the alleged fraud" through "boilerplate allegations.").

[26]   *Ingalls v. Edgewater Priv. Equity Fund III, L.P.*, 2005 WL 2647962, at *3-5 (S.D. Tex. Oct. 17, 2005) (noting that "[t]he Federal Rules of Civil Procedure require a plaintiff alleging fraud, or claims sounding in fraud, to comply with a heightened pleading standard," and applying Rule 9(b) to plaintiff's "breach of fiduciary duty claim [that] rest[ed] on an allegation of fraud" considering that plaintiff "contend[ed] that Defendants breached their fiduciary duty to [the company that went bankrupt] by defrauding it of money and business opportunities." (cleaned up)); *Neukranz v. Conestoga Settlement Servs., LLC*, 2022 WL 19518462, at *17 (N.D. Tex. Nov. 23, 2022), *report and recommendation adopted sub nom. Neukranz v. Conestoga Settlement, LLC*, 2023 WL 2555551 (N.D. Tex. Mar. 16, 2023) ("Courts in this circuit have applied the heightened pleading requirements of Rule 9(b) when the claim for breach of fiduciary duty is based on the same allegations as a fraud claim." (cleaned up)).

Based on the foregoing, Claimants' claims for breach of fiduciary duty are clearly subject to Rule 9.  *See, e.g.*, Claim 123 at 13, stating "After the rollup transaction, Rhodium represented that Blackerby's shares were worth $13,403,733.42 …. Most, if not all, of the entire value has been destroyed due to Rhodium's negligence, gross mismanagement, self-dealing, misrepresentations and omissions, and wasting corporate assets, among other malfeasance."  *See also* Claims 100 and 122 where, based on the same factual allegations, the Claimants assert fraud and breach of fiduciary duty claims.

[27]   *Ingalls*, 2005 WL 2647962, at *5 (quoting *Glaser v. Enzo Biochem, Inc.*, 303 F.Supp.2d 724, 734 (E.D. Va. 2003) (internal citation omitted), *aff'd in part and rev'd in part on other grounds*, 126 Fed. Appx. 593 (4th Cir. 2005) ("Furthermore, a complaint alleging fraud may not group the defendants together: Rule 9(b) requires that allegations of fraud need to be pled with specificity.... This specificity requires that 'at a minimum' for each alleged misstatement or omission, plaintiffs must plead specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false.... Group pleading fails to satisfy the requirement that the who, what, where, why, and when of the fraud be specified."); *see also In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 147 (S.D.N.Y. 2021) ("The failure to isolate the key allegations against each defendant supports dismissal ….").  Also, in the Fifth Circuit, group pleadings are not permitted under the Private Securities Litigation Reform Act.  *See, e.g.*, *Fin. Acquisition Partners LP v.* Blackwell, 440 F.3d 278, 287 (5th Cir. 2006).

44.     Here, Claimants' allegations do not support their claims for fraud and breach of fiduciary duty under Rule 9 or any other applicable standard that applies to the dismissal of claims.[28]

45.     First, the Claims fail to tie any specific Debtors (or other non-Debtor individual or corporate entities) to any alleged false statement regarding material information or failure to disclose it.   As shown in Exhibit A, most of the Claimants refer to vague and boilerplate "[m]isrepresentations and omissions," that were allegedly made by undetermined entities and individuals at undetermined times and locations, and for which a group of—equally vague and undistinguished—Debtors and non-Debtor individual and corporate entities should be liable across the board.  *See* Exhibit A at 1-8, 10-32, 41-56.  Similarly, Liquid Mining Fund I, LLP ("LMF I") and LMF II (collectively, "Liquid Mining") assert fraud claims based on an unquantified number of "material representations" and "material statements and representations" for which it is unclear who made them and when and where those occurred.  *See id.* at 34, 37.[29]

46.     Further, the Claims do not identify what statements they allege to be fraudulent, how those statements were false, and what specific facts should have been disclosed.  *See* Exhibit A at 1-8, 10-32, 41-56.  *See Steel Dust Recycling, LLC v. Robinson*, 667 F. Supp. 3d 511, 515 (S.D. Tex. 2023) ("Defendants do not identify any specific representations made by Plaintiffs or explain why they were known to be false at the time they were made."); *Baker v. Great N. Energy, Inc.*, 64 F. Supp. 3d 965, 975 (N.D. Tex. 2014) ("Without … more specificity as to the

---

[28]   For the avoidance of doubt, the Debtors deny all liability under any of the speculative, unsubstantiated and unproven inventory of causes of actions that the Claimants list in their Claims.  In that respect, the Debtors reserve all rights and defenses.

[29]   The same fatal vagueness characterizes Claimants' breach of fiduciary duty claims (as well as any other claims they might be asserting).

circumstances surrounding the purported omissions, the Court cannot reasonably find that Defendants were legally obligated to disclose.").[30]

47.     Moreover, most of the Claimants appear to allege that, in relation to the Rollup, "Rhodium" represented a certain valuation of their equity that was false because it later decreased due to unspecific and subsequent conduct of "Rhodium" and lower profitability of the business. *See* Ex. A at 1-8, 10-32, 41-56.  In similar fashion, Liquid Mining alleged fraud based on certain asserted business projections collectively made by "Rhodium and its principals," complaining that after its investment, "Rhodium did not operate or succeed in any way consistent with the … representations."  *See id*. at 38.  In addition to lacking the details required to establish fraud (as well as any other cause of action), the asserted fraudulent conduct reposed on events that occurred after the alleged misrepresentations were made.  And, most poignant here, a future failure to perform cannot prove fraudulent intent.  *See*, *e.g.*, *Edinburgh Holdings, Inc. v. Educ. Affiliates,*

---

[30]   Contrary to the other Claimants, Liquid Mining assert the reason why, in their view, certain alleged statements made in nebulous circumstances would have been false and/or misleading.  *See* Exhibit A at 32-40.  However, the factual assumptions based on which Liquid Mining has built their claims against the Debtors are wrong.  For example, Liquid Mining has incorrectly asserted that the Debtors had no binding, long-term energy contract with Whinstone regarding the Building D project.  *See*, *e.g.*, Claims 100 and 122.  To the contrary, in early January 2021, Rhodium JV and Whinstone had entered into a hosting agreement relating to the Building D, which should have provided an additional 100MW of power to the Debtors.  Further, to the extent that Liquid Mining (and other Claimants) assert misconduct based on alleged misrepresentations and omissions relating to Riot Platforms, Inc.'s acquisition of Whinstone US, Inc., the foregoing was a transaction that Riot announced publicly in early April 2021 and finalized in May 2021.  https://www.riotplatforms.com/riot-to-acquire-whinstone-creating-a-us-based-industry-leader-in-bitcoin-mining/;  https://www.riotplatforms.com/riot-blockchain-completes-acquisition-of-whinstone-us-creating-leading-north-american-bitcoin-mining-company/.  *See Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 563 (Tex. 2019) ("In an arm's length transaction, the party alleging fraud must have exercised ordinary care to protect its own interests and cannot blindly rely on the defendant's reputation, representations, or conduct where the plaintiff's knowledge, experience, and background warrant investigation" "[a]nd when a party fails to exercise such diligence, it is charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated." (citation and internal marks omitted)).

In addition, other Liquid Mining allegations are speculative and conclusory, and do not constitute a "license to base claims of fraud."  *Umbrella Inv. Grp., L.L.C. v. Wolters Kluwer Fin. Servs., Inc.*, 972 F.3d 710, 713 (5th Cir. 2020) (noting that "fraud pleadings may be based on information and belief," but "[a]ll the same, this luxury must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." (cleaned up)).  An example of the foregoing is LMF I asserting that unspecific "representations were false and/or materially misleading" because, upon information and belief, "[t]he purported IPO timeline and future expansion plans were speculative and unsupported."  *See* Claim 122 at 10.

*Inc.*, 2018 WL 2727542, at *12 (Del. Ch. June 6, 2018) (finding that plaintiffs' "conclusory allegation that [corporation] and [its manager] knew the statements were false when made because the [corporation's] Business Unit significantly missed its targeted revenues is legally insufficient to support a fraudulent inducement claim. The fact that actual performance falls short of forecasted performance does not buttress a fraud claim." (cleaned up)); *Stevanov v. O'Connor*, 2009 WL 1059640, at *12 (Del. Ch. Apr. 21, 2009) ("[I]f a speaker intended when she made a promise to perform it, but sometime later reneges, no action for fraud arises."); *Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391, at *8 (Del. Ch. July 20, 2010) ("Under Delaware law, a company's optimistic statements praising its own skills, experience, and resources are mere puffery and cannot form the basis for a fraud claim." (cleaned up)); *Wesdem, L.L.C. v. Illinois Tool Works, Inc.*, 70 F.4th 285, 292 (5th Cir. 2023) ("Fatally, [plaintiff]'s alleged facts do not support the inference that (i) [defendant's] representation was false and (ii) it knew it was false when made. The alleged misrepresentation was a promise of *future* performance, and in Texas, a promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." (cleaned up)).[31]

## VI.    Claimants Assert Damages That Must Be Subordinated Under Section 510(b)

48.    The Claims assert damages arising from their investment in the Class A shares of

---

[31]    Claims based on alleged misrepresentations and omissions relating to investments in the Operating Companies and the Rollup transaction are also precluded by the anti-reliance clauses in the Subscription Agreement, the Operating Agreements, and the Exchange Agreement entered by the Claimants, who are sophisticated parties. *See, e.g.*, *Purple Innovation, LLC v. Photon Interactive UK Ltd.*, 2025 WL 522464, at *3 (D. Del. Feb. 18, 2025); *In In re Neighbors Legacy Holdings, Inc.*, 645 B.R. 864, 890 (Bankr. S.D. Tex. 2022).  In addition, in connection with the Rollup transaction, the Claimants agreed to be bound by the Waiver included in the Exchange Agreement. *See supra* paragraph 22 n. 11.  Such Waiver was part of the consideration obtained by Rhodium in relation to the Rollup transaction—*i.e.*, following the exchange, Rhodium would not be constrained to litigate piecemeal claims brought by investors based on their prior investments in the Operating Companies and Rhodium Technologies; investors that agreed that "[u]pon consummation of the Exchange … cease[d] for *all purposes* to be members of" the respective Operating Companies and Rhodium Technologies, making a clean break with the past.  *See, e.g.*, Claim 189 at 102 (emphasis added).

Rhodium Enterprises mandating subordination under section 510(b) of the Bankruptcy Code.

49.     Through section 510(b), Congress envisioned "str[iking] [a balance] between the concerns of the average investor and the unsecured trade creditor who provides products and services necessary for the business to succeed and for the investor to earn profits." *In re PT-1 Commc'ns, Inc.*, 304 B.R. 601, 610 (Bankr. E.D.N.Y. 2004).  Accordingly, section 510(b) provides mandatory subordination for "damages arising from the purchase or sale of … a security" of the debtor or one of its affiliates.  *See In re SeaQuest Diving, LP*, 579 F.3d 411, 417-18 (5th Cir. 2009); *In re Del Biaggio*, 2013 WL 6073367, at *6 (N.D. Cal. Nov. 18, 2013), *aff'd,* 834 F.3d 1003 (9th Cir. 2016) ("The statute covers claims arising from the purchase or sale of a security of the debtor or of an affiliate of the debtor.") (citation and internal marks omitted); *In re VF Brands, Inc.*, 275 B.R. 725, 727 (Bankr. D. Del. 2002) (holding that "the language of section 510(b) applie[d] equally to claims arising from the purchase of the stock of an affiliate … of the debtor as it does to the purchase of stock of the debtor itself.").

50.     Under section 510(b), "the term 'security,' which is defined in section 101(49) of the Bankruptcy Code … include[s] stocks, bonds, and notes, among other instruments." *In re Lehman Bros. Inc.*, 519 B.R. 434, 442–43 (S.D.N.Y. 2014), *aff'd*, 808 F.3d 942 (2d Cir. 2015) (affirming subordination of various claims under the plain language of section 510(b)); 11 U.S.C. § 101(49); *see also In re Patriot Aviation Servs.*, Inc., 396 B.R. 780, 787 (Bankr. S.D. Fla. 2008) ("The unambiguous language of the statute specifically includes debt securities such as promissory notes.") (citations omitted); *In re Del Biaggio*, 2012 WL 5467754, at *3 (Bankr. N.D. Cal. Nov. 8, 2012), *aff'd*, 2013 WL 6073367 (N.D. Cal. Nov. 18, 2013), *aff'd*, 834 F.3d 1003 (9th Cir. 2016) ("[S]ection 510(a) applies to claims arising from the purchase or sale of …. a promissory note of the debtor or its affiliate.").

51.     For section 510(b) to apply, the claimant "need not to be an actual security holder." *In re Lehman Bros. Inc.*, 519 B.R. at 443; *see also In re Caprock Oil Tools, Inc.*, 585 B.R. 823, 828 (Bankr. S.D. Tex. 2018) (subordinating a former shareholder's claim for payments due under a shareholder agreement because the claim "arose from" debtor's prior election to redeem claimant's shares pursuant to the shareholder agreement).  Further, for the purpose of this statute, an exchange of securities constitutes a "sale or purchase." *See*, *e.g.*, *In re Baldwin United Corporation*, 52 B.R. 539, 540 n.1 (Bankr. S.D. Ohio 1985) (noting that an exchange of shares of debtor for shares of another company is a "sale or purchase" under section 510(b)).

52.     In the Fifth Circuit, "[a] claim (no matter how it is characterized by the claimant) arises from a securities transaction so long as the transaction is part of the causal link leading to the alleged injury." *In re Linn Energy, L.L.C.*, 936 F.3d 334, 344 (5th Cir. 2019) (quoting *In re Lehman Bros. Holdings Inc.*, 855 F.3d 459, 478 (2d Cir. 2017)) (internal marks omitted); *see also In re Med Diversified, Inc.*, 461 F.3d 251, 257-59 (2d Cir. 2006) (Section 510(b) applies to a claim that arises from a failed securities transaction even if the claimant never received stocks).  Moreover, in this Circuit, claims subject to subordination may also be "predicated on post-issuance conduct." *Linn Energy,* 936 F.3d at 344 (citation and internal marks omitted) (holding that a security transaction presents a casual nexus to the alleged injuries, regardless of whether the claims are based on conduct that took place prior or after the security transaction).

53.     Section 510(b) of the Bankruptcy Code "contains no restrictions limiting its application to certain types of claims." *In re Kaiser Grp. Int'l, Inc.*, 2001 WL 34368405, at *4 (D. Del. Nov. 29, 2001 (rejecting a construction of section 510(b) that disregarded the definition of "claim" under 11 U.S.C. § 101(5) and narrowed the express language of section 510(b)).  Indeed, courts have "applied [section 510(b)] broadly to subordinate claims arising in a "variety of

contexts," encompassing claims that are based on "torts or breach of contract claims." *See Lehman Bros. Inc.*, 519 B.R. at 442 (collecting cases). "Claims seeking compensation for fraud or breach of fiduciary duty are claims for damages and [also] fall within [section 510(b)]'s scope," including those claims that are "predicated on post-issuance conduct." *Linn Energy*, 936 F.3d at 342 (citations and internal marks omitted)*; see also In re Mid–Am. Waste Sys., Inc.*, 228 B.R. 816, 825 n.5 (Bankr. D. Del. 1999) (noting that section 510(b) covers securities law claims, but also claims that can "be based on other case law and statutory law dealing with fraudulent conduct generally, breach of fiduciary duty and similar types of misconduct."). Further, claims alleging waste and mismanagement are subordinated under section 510(b). *See In re Energy Conversion Devices, Inc.*, 528 B.R. 697, 705-06 (Bankr. E.D. Mich.), *aff'd sub nom. Murphy v. Madden*, 532 B.R. 286 (E.D. Mich. 2015), *aff'd* (Feb. 19, 2016). Moreover, courts have subordinated (i) claims based on alleged stock dilution—*see*, *e.g.*, *In re Pre-Press Graphics Co., Inc.*, 307 B.R. 65, 79 (N.D. Ill. 2004); as well as (ii) claims asserting a diminution or destruction of the value of the investment—*see*, *e.g.*, *In re Energy Conversion Devices, Inc.*, 528 B.R. at 705 (noting, *inter alia*, that "[f]rom the perspective of Section 510(b), it makes no difference whether the stockholder's loss in the value of his stock was caused by a pre-purchase fraud which induced his purchase, or a post-purchase fraud, embezzlement, looting, or other corporate misconduct which undermined the value of his stock.").

54.     Here, as shown in Exhibit A, section 510(b) requires mandatory subordination of the Claims. Indeed, the causes of action and damages asserted by Blackerby, Hutchings, Cross The River, Elysium Mining, Gaurav Parikh 2020 Revocable Trust, the Farrars, RH Fund II, Blackmon, Trine Mining, and Vida Kick:

- "[R]elate[] to [the Claimants'] investment in" equity and notes issues by one of the Debtors, and/or "relate[] [to their] investment in the … SAFE[s];"

- "[A]ris[e] out of [alleged] misrepresentations and omissions made during the procurement of the investment in" one of the Debtors; "continuing misrepresentations" in connection with the investment in the Debtors, including alleged "misrepresentations" "to induce [the Claimant] to sign Exchange Agreement" and became a shareholder of Rhodium Technologies;

- Derive from alleged "gross mismanagement of the business before and after the consolidation and 'rollup transaction', corporate waste, diversion of corporate opportunities, self-dealing, and related breaches of fiduciary duties in conducting the operations of [one of the Debtors] and the operation(s) of its successor(s);"

- Are allegedly "due to misrepresentations and self-dealing in the combination of [one of the Debtors] with other Rhodium entities and thereafter;" and

- Result from the alleged destruction of "[m]ost, if not all, of the entire value [of the Debtor in which the claimant has invested] due to Rhodium's negligence, gross mismanagement, self-dealing, misrepresentations and omissions, and wasting corporate assets, among other malfeasance."

*See* Ex. A at 1-8, 10-27, 31, 41-56.

55.    In connection with Claims 149, 152, and 197, the Farrars, Infinite Mining, and Lienhart allege that their causes of action and damages:

- "Relate[] [to the Claimants'] investment in the … SAFE[s]" issued by Rhodium Enterprises;

- Arise out of alleged "misrepresentations and omissions … designed to induce [the] investment in the … SAFE"; alleged "misrepresentation and omissions … regarding the control premium" in connection with the equity exchange that took place during the Rollup; and the alleged "continuation and reiteration of [other] misrepresentations" following the investments in the Debtors;

- Derive from alleged "mismanagement and breaches of fiduciary duties" relating to "Rhodium controll[ing] the terms of whether the … SAFE would be activated and actively work[ing] to prevent it from happening"; and the evaluation of Rhodium in connection with the Rollup; and

- Are the result of the "destr[uction] of Rhodium's value "due to Rhodium's negligence, gross mismanagement, self-dealing, misrepresentations and omissions, and wasting corporate assets, among other malfeasance."[32]

---

[32]    In connection with Claim 84, RH Fund III does not provide any details regarding its "notice of potential cause of actions" against "Rhodium" that "ar[ose] from Rhodium's malfeasance and wrongful conduct."  *See* Ex. A at 42.

*See* Ex. C at 28-32, 47-48.

56.     Similarly to the other Claimants, section 510(b) requires subordination of Liquid

Mining's Claims because they:

- Relate to (i) "LMF I's subscription to $1,170,000 with a promissory note of $1,132,258.00 and 3.77 Class B Non-Voting Units" in Rhodium 30MW; (ii) "LMF I subscrib][tion] to the Jordan HPC offering in the amount of $750,000 through a Subscription Agreement dated December 16, 2020, receiving a secured promissory note in the amount of $535,714.29 and acquired 2,142.86 Class B Non-Voting Units at a price of $100 per unit," (iii) "LMF I['s] exchange[] [of] its Class B Non-Voting Units in Rhodium 30MW LLC and Jordan HPC LLC for 976,159 shares of Class A Common Stock and 976,949 shares of Class A Common Stock in Rhodium Enterprises, Inc;"

- Relate further to "LMF II and Imperium enter[ing] into an Amendment to Membership Interest Purchase Agreement and related documents (collectively "Investment Agreement") through which LMF II paid $6,000,000 in exchange for 0.4% of the membership interests (the "Rhodium Shares") in Rhodium Technologies LLC;"

- Arise out of alleged "material misrepresentations and omissions" made to Liquid Mining, which "would not have agreed to relinquish its direct equity interests in Rhodium 30MW LLC and Jordan HPC LLC" if it had been aware of those;

- Arise out of alleged "material representations" and/or omissions of material facts "to induce LMF II's investment" in Rhodium Technologies' equity; and

- Allegedly, derive from Rhodium and the Rhodium Principals … "ma[king] misrepresentations to [Liquid Mining] and conceal[ing] material facts from [Liquid Mining]; defraud[ing] [Liquid Mining]; acted with reckless disregard for the truth to [Liquid Mining]; breach[ing] duties of loyalty and/or care and/or other fiduciary duties owed by Rhodium to [Liquid Mining]."

*See* Ex. A at 32-40.

### **Separate Contested Matters**

57.     To the extent that a response is filed regarding any Claim identified in this

Objection and the Debtors are unable to resolve the response, the objection by the Debtors to each

such Claim asserted herein shall constitute a separate contested matter as contemplated by

Bankruptcy Rule 9014. Any order entered by the Court regarding an objection asserted in this Objection shall be deemed a separate order with respect to each such Claim.

## Reservation Of Rights

58.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (vi) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Notice

59.     Notice of this Objection will be provided to (i) the Office of the United States Trustee; (ii) counsel to the Committee; (iii) counsel to the SAFE AHG; (iv) all parties identified as notice parties in the Claims; (v) any other party that has requested notice pursuant to Bankruptcy Rule 2002; and (vi) any other party entitled to notice pursuant to Local Rule 9013-1(d).

WHEREFORE, the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Respectfully submitted this 30th day of July, 2025.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

*/s/  Patricia B. Tomasco*
Patricia B. Tomasco (SBN 01797600)
Cameron Kelly (SBN 24120936)
Alain Jaquet (*pro hac vice*)
700 Louisiana Street, Suite 3900
Houston, Texas 77002
Telephone: 713-221-7000
Facsimile: 713-221-7100
Email: pattytomasco@quinnemanuel.com
Email: cameronkelly@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com

- and -

Eric Winston (*pro hac vice*)
Razmig Izakelian (*pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213-443-3000
Facsimile: 213-443-3100
Email: ericwinston@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com

*Counsel to the Debtors and*
*Debtors-In-Possession*

**<u>Certificate of Service</u>**

I, Patricia B. Tomasco, hereby certify that on the 30th day of July, 2025, a copy of the foregoing Claim Objection was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco
