United States Bankruptcy Court
Southern District of Texas

**ENTERED**

August 30, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATED BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 24-90448 |
| **RHODIUM ENCORE LLC**, *et al.*, | § | |
| Debtors. | § | **Jointly Administered** |
| | § | **CHAPTER 11** |

## MEMORANDUM OPINION OVERRULING DEBTORS' OMNIBUS OBJECTION AT ECF NO. 1126 TO THE SAFE PROOFS OF CLAIM[1]

### I.   BACKGROUND

On August 24, 2024, Rhodium Encore LLC and its affiliates (hereinafter "Debtors") filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code. (ECF No. 1). Non-governmental Proofs of Claims had to be filed by December 31, 2024. (ECF No. 134). Multiple entities and persons filed Proofs of Claims at Proof of Claim Nos. 11, 13, 18, 19, 20, 25, 26, 28, 32, 34, 35, 41, 42, 45, 46, 51, 83, 84, 102, 107, 111, 149, 152, 183, 197, 198, 223, 224, and 231 (hereinafter "the Disputed Claims") between October 25, 2024, and February 14, 2025. And on May 19, 2025, the Debtors filed "Debtors' Omnibus Objection to Claims Pursuant to Bankruptcy Code Sections 502(b), Bankruptcy Rule 3007, and Local Rule 3007-1 Because SAFE Holders Do Not Hold Claims to the Disputed Claims" (hereinafter "SAFE Claims Objection"). (ECF No. 1126). The Debtors argued that "the Disputed Claims—totaling

---

[1] Proofs of Claims at Proof of Claim Nos. 11, 13, 18, 19, 20, 25, 26, 28, 32, 34, 35, 41, 42, 45, 46, 51, 83, 84, 102, 107, 111, 149, 152, 183, 197, 198, 223, 224, and 231.

1 / 42

$70,820,411.76 in asserted amount . . . are actually contingent equity interests that are not claims."  (ECF No. 1126 at 2).

The Debtors stated that "[t]he Disputed Claims emanate from simple agreements for future equity (the 'SAFE Agreements') with Rhodium Enterprises, security instruments that provide for the SAFE Holders (defined below) to receive equity in Rhodium Enterprises upon the occurrence of certain events: equity financing or an initial public offering." (*Id.*) The Debtors explained that "[b]etween June 2, 2021, and October 19, 2021, to raise equity capital, Rhodium Enterprises, Inc. ('Rhodium Enterprises') entered into multiple SAFE Agreements with certain investors (the 'SAFE Holders' or 'Investors') for a total of $87 million in aggregate."[2] (*Id.* at 4). And that "[t]he SAFE Agreements specify the treatment of SAFE Holders' contingent interests in multiple scenarios. SAFE agreements became popular vehicles for investing in startup companies starting in 2013." (*Id.*). The Debtors explained that:

> The SAFE Agreements . . . provide that in the event of a change in voting control of Rhodium Enterprises or a liquidation or disposition of substantially all of Rhodium Enterprises' assets, the SAFE Agreements will "operate like standard Common Stock," meaning that in that event, SAFE Holders will receive payment of available proceeds—after payment of all "outstanding indebtedness and creditor claims" and on par with common equity. Because the SAFE Agreements treat SAFE Holders the same as interest holders in all events, they do not possess claims.

[*Id.* at 1]

The Debtors argued that "[t]he SAFE Agreements do not create claims. Instead, the SAFE Agreements provide the Holders only with contingent equity interests" and that "[e]ven if the SAFE Holders could assert

---

[2] This Memorandum will interchangeably refer to Rhodium Enterprises, Inc. as Rhodium Enterprises, as well as REI.

claims related to the SAFE Agreements, those claims are subordinated to all other general unsecured creditors pursuant to 11 U.S.C. § 510(b) and statutorily on par with common equity." (*Id.*) They "request that the Court disallow the Disputed Claims." (*Id.*).  Pointing to §1(d) of the SAFE Agreement, the Debtors argued:

> The "Liquidation Priority" does not provide for a liquidation priority for the SAFE Holders, but instead specifies that SAFE Holders have no priority. Specifically, the Liquidation Priority provides that in a Liquidity or Dissolution Event, the SAFE Agreement is "intended to operate like standard Common Stock," and states that each Investor's "right to receive the Cash-Out Amount is: (i) junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock); and (ii) on par with payments for other SAFEs, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other SAFEs, the applicable Proceeds will be distributed pro rata to the Investor and such other SAFEs in proportion to the full payments that would otherwise be due." SAFE Agreement § 1(d). The "Liquidation Priority" further specifies that each Investor's "right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent

> such payments are Cash-Out Amounts or similar liquidation preferences)." *Id.*

[*Id.* at 7].

To make their argument that the relevant SAFE Agreements do not provide a liquidation priority for SAFE Holders, the Debtors compared the relevant SAFE Agreements to a SAFE Agreement template online which they refer to as the Y Combinator form. (*Id.* at 7-8). The Debtors explain in a footnote:

> The Y Combinator form SAFE Agreement in contrast contains a definition of Liquidation Priority that does provide for a liquidation priority. *See* https://www.ycombinator.com/documents: "d) **Liquidation Priority**. In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock. The Investor's right to receive its Cash-Out Amount is: (i) Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock); (ii) On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and (iii) **Senior to payments for Common Stock**." (Emphasis added.)

[*Id.* at 7 n. 6]

The Debtors pointed to the fact that the Y Combinator form includes the words "non-participating Preferred Stock" as well as "Senior to payments for Common Stock." (*Id.* at 8). The Debtors argued that "because Rhodium Enterprises has no preferred shares, there could be no priority over common stock" and that "[b]y its Certificate of Incorporation, REI can only issue common shares." (*Id.*) Furthermore, the Debtors argued that "[b]ecause any Liquidation Priority must relate to an authorized security, such as preferred shares with a liquidation preference, the SAFEs cannot have any higher priority than other Common Stock" and that "[t]ellingly, holders of Rhodium Enterprises' Common Stock never agreed to have an equity instrument with a higher priority or liquidation priority given that, unlike some SAFE structures, Rhodium Enterprises has no preferred stock." (*Id.* at 8).

The Debtors argued that "the SAFE Agreements are at best contingent equity interests that may or may not give rise to an entitlement to an equity dividend, rather than a 'claim' against Rhodium Enterprises. The Disputed Claims should be disallowed." (*Id.* at 13). And that "[t]o start, a 'claim' under section 101(5) of the Bankruptcy Code excludes equity interests from its ambit." (*Id.* at 13). And explained that "[t]he Bankruptcy Code defines an 'equity security' to include not only a 'share in a corporation,' but also a 'similar security,' 11 U.S.C. § 101(16)" and that "[t]he Bankruptcy Code then enumerates 15 interests that are a 'security,' including a 'residual clause' that covers 'other claim[s] or interest[s] commonly known as 'security.'" (*Id.* at 14 (citing to 11 U.S.C. § 101(49)(A)(xiv); *In re Lehman Bros. Holdings Inc.*, 855 F.3d 459, 475 (2d Cir. 2017)). And the Debtors pointed to a Fifth Circuit decision where it stated:

> The residual clause provides that if a claimant's interest does not fit any of the specific examples provided in the Code and is not explicitly excluded from the definition of "security," it will be considered a security if it is any "other claim or interest commonly known as 'security.'" 11 U.S.C. §

> 101(49)(A)(xiv). We have noted the "broad"
> nature of the residual clause. *SeaQuest*, 579
> F.3d at 418. Under the Bankruptcy Code,
> interests are securities if they "bear
> hallmarks of interests commonly known as
> securities." *Lehman Bros.*, 855 F.3d at 475.

[*In re Linn Energy, L.L.C.*, 936 F.3d 334, 342 (5th Cir. 2019)].

In the case of *In re Lehman Brothers Holdings Inc.*, the Second Circuit
explained addressing restricted stock units that, "Indeed, these RSUs
bear many of the hallmark characteristics of a security. Like many
security holders, the RSU holders had limited voting rights and received
any declared dividends in the form of additional RSUs." *In re Lehman
Brothers Holdings Inc.,* 855 F.3d 459, 474 (2d Cir. 2017). Furthermore,
"And of most significance, they had the same risk and benefit
expectations as shareholders because the value of their RSUs was tied
to the value of Lehman Brothers' common stock" and that "[e]ach RSU
holder therefore had 'greater financial expectations than [a] creditor'
inasmuch as a 'creditor can only recoup her investment,' whereas an
RSU holder 'expect[ed] to participate in firm profits.'" (*Id.* (citing to
*Rombro v. Dufrayne* (*In re Med Diversified, Inc.*), 461 F.3d 251, 257 (2d
Cir. 2006)).

The Debtors argued, "Here, the SAFE Agreements create merely
a contingent right to a 'security' within the meaning of section
101(49)(A)(xiv) and because they are a 'similar security [to a share]'
within the meaning of section 101(16)."  (ECF No. 1126 at 14). They
argued that the SAFE Agreements "also provide that if Rhodium
Enterprises pays a cash dividend to outstanding shares of Common
Stock, it must pay a dividend to the Investors at the same time. SAFE
Agreement § 5(c) . . ." (*Id.* at 14-15).  And that "[t]he SAFE Agreements
further provide the Investors the ability to receive shares of stock if
there is an 'Equity Financing' or a 'Listing Event.' SAFE Agreement §
1(a) . . ." (Id.  at 15).  Furthermore:

> And even if there is a "Liquidity Event" or "Dissolution Event," the liquidation priority in the SAFE Agreement states that it is intended to operate the same as common stock. SAFE Agreement § 1(d); *Wash. Mut.*, 464 B.R. at 666 (courts consider the "holder's priority in payment"). In other words, only if triggered, the SAFE Agreements then operate like stock.

[*Id.* at 15]

The Debtors indicated that they "searched and found no cases allowing claims against an estate by counterparties to SAFE Agreements . . . The few cases that discuss SAFE Agreements in the non-bankruptcy context confirm that while SAFE Agreements are 'securities,' they are 'nondebt' instruments that allow entities to 'contribute capital' in exchange for future equity." (*Id.* at 15-16). The Debtors argued:

> Moreover, the "Liquidity Event" does not trigger a claim. If there is a Liquidity Event, the SAFE Holders are to receive a portion of the proceeds of a qualifying transaction "**equal to the greater of**" the Cash-Out Amount or the Conversion Amount. SAFE Agreement § 1(b). The Cash-Out Amount is the amount the SAFE Holder paid to Rhodium Enterprises. The Conversion Amount, however, is calculated based on the value of common stock implied by the triggering event. In other words, if there is a "Liquidity Event," the SAFE Holders receive the upside potential of a valuable business, a quintessential feature of equity, not debt. *Lehman Bros. Holdings*, 855 F.3d at 474 (RSUs deemed equity because, among other things, their value was tied to the value of common stock).

> The "Dissolution Event" likewise does not trigger a claim. If there is a Dissolution Event, the SAFE Agreement provides that any payment is subject to the liquidation priority, which provides that the Cash-Out Amount is junior to payment of all "outstanding indebtedness and creditor claims," and that payments will be on par with common stock and pro rata with other SAFE Holders "if the applicable Proceeds are insufficient to permit full payments." This mimics an interest, i.e., only receiving pro rata payments after payment in full of creditor claims. *Color Tile*, 2000 WL 15212[9], at *4 (holding that an instrument represented equity, where, among other things, it stated that the interests of holders were junior to those of creditors).

[*Id.* at 17-18]

Furthermore, the Debtors argued that "[t]o the extent that the SAFE Holders assert damages against any of the Debtors in the nature of 'litigation claims,' such claims should be classified as claims arising from a purchase or sale of a security of the debtor, which fall within section 510(b) of the Bankruptcy Code . . ." (*Id.* at 19). Section 510(b) states:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

[11 U.S.C. 510(b)]

The Debtors argued that the SAFE Agreements "fall within the broad reach of section 510(b)'s language for claims 'arising from' the purchase or sale of a security." (ECF No. 1126 at 20). The Debtors stated that:

> [U]nder section 510(b) of the Bankruptcy Code, any potential SAFE Holders' claims arising from the SAFE Agreements are subordinated to other "all claims or interests that are senior to or equal to the claim or interest represented by such security, **except that if such security is common stock, such claim shall have the same priority as common stock**." 11 U.S.C. § 510(b) (emphasis added); *In re SeaQuest Diving*, 579 F.3d at 420-21. And because the SAFE Holders' claims contractually can only be "common" equity, section 510(b) also dictates that they shall be treated *pari passu* with common stock in the Debtor Rhodium Enterprises only.

[*Id.* at 22 (emphasis in original)]

On May 22, 2025, DLT Data Center 1 LLP joined the Debtors' SAFE Claims Objection. (ECF No. 1171).

On June 18, 2025, one of the SAFE claimants with the largest claims, totaling at least $50 million,[3] Celsius Holdings US LLC (hereinafter "Celsius"), filed a response to the Debtors SAFE Claims Objection. (ECF No. 1299). Celsius argued that "[t]he Omnibus Objection argues that SAFE parties are not 'creditors' and do not have 'claims,' but largely ignore the definitions for those terms supplied by the Bankruptcy Code, which clearly encompass the SAFE parties'

---

[3] See Claim Number 111.

claims, both before and after the Whinstone Transaction."[4] (ECF No. 1299 at 3). Celsius argued:

> SAFE parties easily qualify as "creditors" within the meaning of the Bankruptcy Code, including after the recently consummated Whinstone Transaction. The term SAFE—Simple Agreement for Future Equity—is in some respects a misnomer. To be sure, the SAFEs are "agreements," and the SAFEs contemplate certain circumstances under which the SAFEs convert to shares in REI stock. However, the SAFEs also contemplate other circumstances under which the SAFE parties have the right to payment of the entire amount the SAFE holders paid to REI.

[ECF No. 1299 at 4]

In the SAFE Agreement[5] between Celsius and REI, if an Equity Financing event occurred, "this Safe will automatically convert into . . . the number of shares of stock issued in the Equity Financing equal to the Purchase Amount divided by the applicable Conversion Price" and in the case of a Listing Event, "this Safe will automatically convert into . . . the number of shares of Common Stock of the Company equal to the

---

[4] *See* ECF Nos. 880, 921, and 1298 for information regarding the Whinstone Transaction.

[5] Each entity or person entered into separate SAFE Agreements with Rhodium Enterprises, Inc., but for the purpose of this Memorandum, the differences between each one are not relevant when considering the relevant sections. The Debtors mentioned in a footnote that "Despite minor differences between the SAFE with Celsius Core and other SAFE Holders, those differences remain immaterial to the Claim Objection." (ECF No. 1351 at 14). This Memorandum will use the singular "SAFE Agreement" at times, but when it does, it is still referring to all relevant SAFE Agreements.

Purchase Amount divided by the applicable Conversion Price (such shares issued upon conversion in the case of clause (i) or clause (ii), **'Conversion Shares'**)." (ECF 1126-3 at 1) (emphasis in original). But as it regards a Liquidation Event or Dissolution Event:

> (b) **Liquidity Event**.  If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**"). If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, provided that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws . . .

> (c) **Dissolution Event**. If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

[ECF No. 1126-3 at 1-2 (emphasis in original)]

The SAFE Agreement provides a detailed explanation of the priority of the investors to the SAFE Agreement as connected to the rest of REI's business. It states:

> (d) **<u>Liquidation Priority</u>**. In a Liquidity Event or Dissolution Event, this SAFE is intended to operate like standard Common Stock. The Investor's right to receive its Cash-Out Amount is:
>
>> (i) Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock); and
>>
>> (ii) On par with payments for other Safes, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes in proportion to the full payments that would otherwise be due.
>
> The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

[*Id.* at 2 (emphasis in original)]

The SAFE Agreement defined Proceeds as "cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution." (*Id.* at 3)

Celsius pointed to the definition section of the United States Bankruptcy Code which defines "creditor" at 11 U.S.C. § 101(10) in part as "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." (ECF No. 1299 at 4.). Furthermore, 11 U.S.C. § 101(5)(A) defines "claim" as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." (ECF No. 1299 at 4). Celsius argued, "On the Petition Date, the SAFE holders' right to receive 'payment' of the Cash-Out Amount was still contingent, because there had not yet been a triggering event (there has been now, as discussed below)" and that "even on the Petition Date, the SAFE parties still were creditors within the plain meaning of the Bankruptcy Code."[6] (*Id.* at 4-5). Celsius argued that "SAFE parties were creditors even before the Whinstone Transaction triggered their right to the Cash-Out Amount." (*Id.* at 5). Celsius argued that SAFE Agreements are not equity, pointing to the definition of equity security at 11 U.S.C. § 101 (16) where it is defined as:

> **(A)** share in a corporation, whether or not transferable or denominated "stock", or similar security;
>
> **(B)** interest of a limited partner in a limited partnership; or

---

[6] Celsius cited to *In re JNL Funding Corp.*, 438 B.R. 356, 363 (Bankr. E.D.N.Y. 2010) ("[A] contingent right to payment constitutes a claim, and the holder of such a contingent right is a creditor.").

**(C)** warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph.

[ECF No. 1299 at 7-8]

Celsius argued that only via conversion can entities become stockholders under the SAFE Agreement. (ECF No. 1299 at 8). Furthermore, Celsius argued that "[a]s explained below, there will be no Listing Event in these cases; instead, the Whinstone Transaction constitutes a Liquidity Event or Dissolution Event, entitling SAFE holders to cash." (*Id.* at 8). Celsius argued that the Whinstone Transaction was a Dissolution Event. (*Id.* at 10). Celsius stated:

> The term "'Dissolution Event' includes "a voluntary termination of operations." The Whinstone Transaction undoubtedly terminated the Debtors operations, thus triggering the SAFE creditors' right to payment of the Cash-Out Amount. According to the First Day Decl., the company's operations formerly consisted exclusively of "mining digital currency assets ***utilizing Company owned-computer equipment (the miners***)." First Day Decl. at ¶ 62. On the Petition Date, the company had two mining operations—one located in Temple, Texas, and the other located in Rockdale, Texas. *Id.* The Debtors sold the Temple facility post-petition in a deal that closed on or around December 18, 2024. After closing, according to the Debtors' recently filed Disclosure Statement, "the Debtors installed the [company-owned] miners formerly housed at the Temple Site into the Rockdale Site"

(together with the miners already at Rockdale, the "**Mining Rigs**"). Thereafter, Rockdale became the Debtors' lone site for operations. *See Disclosure Statement for Joint Chapter 11 Plan of Rhodium Encore LLC and Its Affiliated Debtors* [Docket No. 1179] (the "**Disclosure Statement**"); see also Rhodium JV LLC et al. v. Whinstone US, Inc., Adv. Pro. No. 25-03047 [Docket No. 1] (the "**Complaint**"), at ¶ 3 (alleging on February 11, 2025 that "Rhodium is a bitcoin mining company that **operates at Whinstone's facility in Rockdale Texas**.") . . .

The Whinstone Transaction closed on April 28, 2025 (the "**Effective Date**"). On the Effective Date, all agreements between Whinstone and Rhodium, including the Power Contracts—without which "the Company could not exist"—were terminated. *See* Ex. E, April 28, 2025 Contract Termination Agreement, ¶ 1. Likewise, the Debtors sold to Whinstone all "property" located at Rockdale, including all of the company-owned Mining Rigs that the company admits were necessary for it to carry out its operations. *See* Ex. F, Purchase and Sale Agreement ¶ 2.1 (Debtors agreeing to "sell and convey the Property to Purchaser"); *id.* Annex 1- 3 (defining "Property" as "all tangible property, including all furniture, fixtures, and equipment located at the Debtors' hosted facility at Rockdale, Texas."). Finally, the Debtors specifically agreed "to vacate the Facility" at Rockdale within three days of the Closing, i.e. on or

before May 1, 2025. *Id.* at ¶ 3.8. There can be no serious doubt that the Whinstone Transaction resulted in a "voluntary termination of operations" and triggered the SAFEs right to receive the Cash-Out Amount.

[*Id.* at 10-12 (emphasis in original)]

Additionally, Celsius argued that the "[t]he Whinstone Transaction also constitutes a Liquidity Event, which likewise entitles SAFE parties to the Cash-Out Amount." (*Id.* at 12).  And explained that "[t]he SAFE defines 'Liquidity Event' as 'a Change of Control other than a Listing Event.' *Id.* at § 2. A 'Change of Control,' in turn, is defined to include 'a sale, lease or other disposition of all or substantially all of the assets of the Company,' among other things. *Id.*" (*Id.*).  Celsius argued that Delaware law applies and that under both a quantitative as well as qualitative test of the Whinstone Transaction, it qualifies as a Liquidity Event.  (*Id.* at 12-20). And argued that "[a]s discussed above, the Whinstone Transaction already has triggered the SAFEs' right to the Cash-Out Amount. But even if somehow it did not, inevitably these liquidating bankruptcy cases would constitute or result in a Dissolution Event." (*Id.* at 20).

Celsius argued that "[t]he SAFE creditors' right to payment of the Cash-Out Amount is senior to any recoveries to equity under the 'absolute priority rule.'"[7]  (*Id.* at 21).  Celsius argued that "to pay common stockholders ahead of SAFE creditors as contemplated by the PSA, the Debtors must subordinate the SAFEs' right to payment of the Cash-Out Amount down to the level of equity. They cannot do so."  (*Id.*). 11 U.S.C. 510 (a) states, "(a) A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." And Celsius argued that "[t]here is just one agreement that addresses the priority of SAFE

---

[7] Citing generally to *In re Eletson Holdings Inc.*, 664 B.R. 569 (Bankr. S.D.N.Y. 2024).

parties' right to the Cash-Out Amount—the SAFE agreement itself—and it provides just the opposite of what the Debtors contend." (ECF No. 1299 at 21). Celsius pointed to § 1(d) of the SAFE Agreement and stated that "[b]ased on the plain meaning of the SAFE, the SAFE parties are entitled to receive payment of the Cash-Out Amount before any 'payments for common stock.'" (*Id.* at 22). Celsius pointed to dictionary definitions of the word "preference" and stated:

> And that is the inescapable meaning of the final clause of 1(d), which provides expressly that the Conversion Amount and other "as converted to Common Stock" payments are "on par with" payments for Common Stock" and "junior" to payment of the "Cash-Out Amounts or similar liquidation preferences." *Id.* If the Conversion Amount has the same priority as Common Stock—is "on par with" Common Stock—and is "junior" to payments of the Cash-Out Amount, then "payments for Common Stock" must also be junior to the Cash-Out Amount. Moreover, if "Common Stock" were meant to recover "on par with" SAFEs receiving the Cash-Out Amount, it would have been included in the second paragraph 1(d), which expressly identifies investors that are "on par with" the Cash-Out Amount. Instead, the only reference to the priority of Common Stock is in the third paragraph [o]f 1(d), which expressly provides that Common Stock is on par with the Conversion Amount and other "as converted to Common Stock" recoveries, and junior to the Cash-Out Amount.

[*Id.* at 22-23].

Celsius also argued that "[t]he fact that the Cash-Out Amount must be paid ahead of Common Stock (and other 'as converted to Common Stock' recoveries like the Conversion Amount) also is the only interpretation that makes sense." (*Id.* at 23). And that "[a]part from contradicting the actual words in the SAFEs, it is meaningless to suggest that the SAFE creditors' entitlement to payment of $87 million in cash is 'on par with' 118 million shares of REI common stock." (*Id.* at 23-24). Celsius said, "In arguing against the plain meaning of the SAFE, the Conflicted Board relies primarily on words that **do not** appear anywhere in the SAFE agreements" and that "[a]ccording to the Conflicted Board, the Court should compare the SAFEs to documents available on the internet and conclude based on that extrinsic evidence that the SAFEs actually mean something different than what they say." (*Id.* at 25) (emphasis in original). Celsius argued under Delaware law, "As an initial matter, the Court cannot even consider the material offered by Debtors to construe the REI SAFEs unless the Debtors first demonstrate (without reference to extrinsic evidence) that the REI SAFEs are ambiguous." (*Id.* at 25-26). The United States District Court for the District of Delaware said, "'Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning,' without resorting to extrinsic evidence. We 'will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty.'" *In Prime Victor Int'l Ltd. v. Simulacra Corp.*, 682 F.Supp.3d. 428, 442 (D. Del. 2023) (internal citations omitted). Celsius argued that "[n]owhere in the Debtors' twenty-three-page Omnibus Objection do they argue that the SAFEs at issue in these cases are ambiguous." (ECF No. 1299 at 26).

Celsius argued that "even if the extrinsic materials on which Debtors rely could be considered, it would not help the Debtors carry their burden to prove the REI SAFE holders agreed to subordinate their right to payment of the Cash-Out Amount to the level of equity." (*Id.* at 27). Celsius argued that:

The Debtors focus primarily on the inclusion of a phrase in the REI SAFEs that is missing from the non-party SAFE document: "in a Liquidity Event or Dissolution Event, this SAFE is intended to operate like standard Common Stock." That phrase is general, of course, and does not specify how SAFEs are intended to operate like common stock. To be sure, SAFEs act like Common Stock in some ways. For example, in a liquidation or dissolution, SAFEs are entitled to residual assets of the Company. But the generic phrase focused on by Debtors says nothing about seniority of Cash-Out Amount payments. Certainly, it cannot be read in a manner that would contradict the specific language in the same paragraph providing expressly that payments to Common Stock, like payments of the Conversion Amount, are "junior to payments" of the "Cash-Out Amounts or similar liquidation preferences." *Ross v. Nissan of North America, Inc.*, 72[8] F.Supp.3d 841, 850-51 (M.D. Tenn. 2024) (declining to read a contract in a manner that "results in a contradiction" where the contract can be read in a manner that provides harmony among its terms).

[*Id.* at 27].

Celsius cited to the Delaware Supreme Court where the court explained:

"Delaware courts follow the maxim that the general does not detract from the specific." "This principle of contract interpretation dictates that 'where specific and general

> provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.' " "This principle 'can be thought of as reading the specific as an exception to the general, which allows a harmonizing of otherwise conflicting provision[s].' " Thus, we have recognized that "general terms of the contract must yield to more specific terms."

[*Thompson Street Cap. Partners IV, L.P. v. Sonova United States Hearing Instruments, LLC*, No. 166, 2024, 2025 WL 1213667, at *8 (Del. Apr. 28, 2025) (internal citations omitted)]

And argued that "in accordance with settled Delaware law, Section 1(d) should be read to provide that in a Liquidity Event or Dissolution Event SAFEs act like common stock except that payment of the Cash-Out Amount 'liquidation preference' must be paid before recoveries to 'junior' Common Stock." (ECF No. 1299 at 28) (internal citation omitted).

Celsius stated that "the Debtors argue that the SAFE claims are subordinated under Section 510(b). But that section of the Bankruptcy Code applies, in pertinent part, only to claims 'arising from rescission of a purchase or sale of a security of the debtor' or 'for damages arising from the purchase or sale of such a security.'" 11 U.S.C. 510(b)." (*Id.* at 29). And respond that the "[t]he SAFE parties' claims do not arise from the 'rescission' of anything, nor do the SAFE parties seek 'damages' of any kind. Rather, the SAFE parties assert that, based on post-petition events, the terms of the SAFE agreements require the estates to distribute payment of the Cash-Out Amounts ahead of payments to equity." (*Id.*). And argue that the cases the Debtors use are ones that involved recission or damages. (*Id.* at 30-32).

Liquid Mining Fund III, LLC, filed a Response and Joinder in Opposition to Debtor's Omnibus Objection to Claims and Request for Hearing. (ECF No. 1300). Additionally, Ranger Investment Partners, L.P. and Winchester Partners, L.P. filed a Response and Joinder in

Opposition to the Debtor's Omnibus Objection.   (ECF No. 1302).   At
ECF No. 1305, Several SAFE Claimants joined the SAFE Claimant
Response to Claim Objection at ECF Nos. 1299 and 1301. Proof Capital
Special Situations Fund also filed a joinder to the Response to the Claim
Objection at ECF Nos. 1299 and 1301.  (ECF No. 1306).  The Official
Committee of Unsecured Creditors joined the Response to the Claim
Objection at ECF Nos. 1299 and 1301 and provided further support.
(ECF No. 1308).

On June 24, 2025, the Debtors filed their reply. In addition to
reiterating their previous arguments, the Debtors went into detail
regarding the negotiations for the SAFE Agreements and said that "as
detailed above, the negotiations between Celsius Core and REI, which
led to the creation of the Celsius Core SAFE and formed the template
for all of the SAFEs that followed, demonstrate that the parties intended
the SAFEs to be equity interests."  (ECF No. 1351 at 14). The Debtors
also mentioned in a footnote that "[d]espite minor differences between
the SAFE with Celsius Core and other SAFE Holders, those differences
remain immaterial to the Claim Objection."  (*Id.*) Additionally, they
argued that "[b]oth Celsius US Holding and the Committee admit that
SAFE Holders do not have claims and that the real dispute is whether
SAFE Holders have some sort of preferred equity over common
stockholders."  (*Id.* at 16).  The Debtors argued that claiming that the
Whinstone Transaction is a Liquidity or Dissolution Event "ignores the
plain language of the parties' agreements, basic principles of corporate
law, and the parties' own communications"  and that "[t]he only party to
the SAFE is REI, and REI did not have a Liquidity Event or Dissolution
Event because REI was not a party to the Whinstone Transaction."  (*Id.*
at 20). Furthermore, the Debtors argued that:

> [T]he SAFE Holders rely on 8 Del. C. § 271
> and a body of inapplicable cases to argue that
> contractual language specifying the sale of
> REI's assets really includes the sale of non-
> REI assets as well. But this statute is limited

> by its own language and does not and cannot
> control contract interpretation. Section 271(c)
> states that "[f]or purposes of this section only,
> the property and assets of the corporation
> include the property and assets of any
> subsidiary of the corporation."

[*Id.* at 24]

And the Debtors further argued:

> The only plausible interpretation of the SAFE
> requires that, upon a triggering event, SAFE
> Holders convert to Class A Common Stock or,
> if they do not receive actual shares, receive an
> interest that will operate like Common Stock.
> The SAFE provides a formula for how to
> calculate payments to SAFE Holders vis-à-vis
> payments to common stock. Specifically,
> SAFE Holders should receive the number of
> shares of Common Stock equal to the
> Purchase Amount divided by the Liquidity
> Price. Ex. 2, SAFE Agreement § 2. Liquidity
> Price means the price per share equal to the
> $3 billion valuation cap divided by the
> Liquidity Capitalization, which includes all
> shares of Class A Common Stock, options,
> debt penny warrants, and all converting
> securities other than the SAFEs. *Id.*

[*Id.* at 31]

This Court held a hearing on the SAFE Claims Objection on July
2, 2025. The parties presented lengthy PowerPoint presentations at that
hearing which spanned over several hours. In the weeks following the
hearing, the parties submitted objections to each other's exhibits. (ECF
Nos. 1431, 1432, 1446, and 1447). And the Court ruled on the
admissibility of the exhibits on August 28, 2025 (ECF No. 1577).

## II.   JURISDICTION AND VENUE

28 U.S.C. § 1334(a) provides the District Courts with jurisdiction over this proceeding.  28 U.S.C. § 157(b)(1) states that "Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." This proceeding has been referred to this Court under General Order 2012-6 (May 24, 2012).  This Court has jurisdiction in this proceeding as it is a core proceeding which the Court can consider under 28 U.S.C. §§157(b)(2)(A) and (B).  The Court has constitutional authority to enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011).  And venue is proper under 28 U.S.C. §§ 1408 and 1409.

## III.   LEGAL STANDARD

At the outset, it is important to note that the SAFE Agreement states that, "All rights and obligations hereunder will be governed by the laws of the State of the State of Delaware, without regard to the conflicts of law provisions of such jurisdiction."  (ECF No. 1126-3 at 6).

Pursuant to Federal Rules of Bankruptcy Procedure Rule 3003(c)(2), "A creditor . . . whose claim . . . is not scheduled—or is scheduled as disputed, contingent, or unliquidated—must file a proof of claim . . . A creditor who fails to do so will not be treated as a creditor for that claim for voting and distribution." And under Rule 3007(d)(2)(G), "Subject to (e), objections to more than one claim may be joined in a single objection if . . .  the objections are based solely on grounds that the claims should be disallowed, in whole or in part, because they: are interests, not claims . . ." A "claim" is defined in part as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101 (5)(A). And an equity security is defined as:

> **(A)** share in a corporation, whether or not transferable or denominated "stock", or similar security;
>
> **(B)** interest of a limited partner in a limited partnership; or
>
> **(C)** warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph.

[11 U.S.C. § 101(16)]

As the Second Circuit stated in *Adler v. Lehman Bros. Holdings* (*In re Lehman Bros. Holdings*), "Those with 'claims' against a debtor are 'creditors,' *id.* § 101(10), and those with 'equity securities' of the debtor are 'equity security holders,' *id.* § 101 (17). Thus, an interest in an equity security is distinct from a claim to a right to payment or an equitable remedy." 855 F.3d 459, 470 (2d Cir. 2017) (internal citation omitted). Therefore, "Simply put, an equity interest is not a claim against the debtor for which the equity holder may assert a right to payment. Thus, under 11 U.S.C. § 501(a) a creditor may file a proof of claim and an equity security holder may file a proof of interest." *In re Pine Lake Village Apartment Co.*, 21 B.R. 478, 480 (Bankr. S.D.N.Y. 1982).

The Delaware Supreme Court has stated, "The question of whether or not the holder of a particular instrument is a stockholder or a creditor depends upon the terms of his contract." *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del. 1969). The United States Bankruptcy Court for the District of Delaware explained:

> Factors which courts consider in determining whether an instrument is equity include whether the holder's right is guaranteed, the name given to the instrument, the intent of the parties, the presence or absence of a fixed

> maturity date, the right to enforce payment of
> principal and interest, the presence or
> absence of voting rights, and the holder's
> priority in payment.

[*In re Washington Mut., Inc.*, 464 B.R. 656, 666 (Bankr. D. Del. 2012)][8]

The Fifth Circuit further explained about similar factors, "We have
always recognized, however, that the various factors are not equally
significant. 'The object of the inquiry is not to count factors, but to
evaluate them.'" *Slappey Drive Indus. Park v. United States,* 561 F.2d

---

[8] Similarly, the United States Bankruptcy Court for the District of
Delaware explained in 2000:

> Whether a security constitutes equity or debt
> depends on the interpretation of the contract
> between the corporation and the security
> holders. *See Wolfensohn v. Madison Fund,
> Inc.,* 253 A.2d 72, 75
> (Del.1969); *accord Drexler, supra,* at 17–5 n.
> 8. In interpreting the contract, courts consider
> numerous factors, including: (1) the name
> given to the instrument; (2) the intent of the
> parties; (3) the presence or absence of a fixed
> maturity date; (4) the right to enforce
> payment of principal and interest; (5) the
> presence or absence of voting rights; (6) the
> status of the contribution in relation to
> regular corporate contributors; and (7)
> certainty of payment in the event of the
> corporation's insolvency or
> liquidation. *See Slappey Drive Indus. Park v.
> United States,* 561 F.2d 572, 581–82 (5th
> Cir.1977); *Moore v. American Fin. & Secs.
> Co.,* 73 A.2d 47, 48 (Del.
> Ch.1950); *Drexler, supra,* at 17–5 n. 8.

[*In re Color Tile, Inc.*, No. 96-76 (HSB), 2000 WL 152129, at *4 (D. Del.
Feb. 9, 2000)]

572, 581 (5th Cir. 1977) (internal citation omitted). And "[e]ach case turns on its own facts; differing circumstances may bring different factors to the fore." *Id.* And "[g]enerally, shareholders place their money 'at the risk of the business' while lenders seek a more reliable return." *Id.* (internal citation omitted).  Furthermore:

> Contributors of capital undertake the risk because of the potential return, in the form of profits and enhanced value, on their underlying investment. Lenders, on the other hand, undertake a degree of risk because of the expectancy of timely repayment with interest. Because a lender unrelated to the corporation stands to earn only a fixed amount of interest, he usually is unwilling to bear a substantial risk of corporate failure or to commit his funds for a prolonged period. A person ordinarily would not advance funds likely to be repaid only if the venture is successful without demanding the potential enhanced return associated with an equity investment.

[*Id.* (internal citation omitted)]

As the Delaware Supreme Court has said, "The proper construction of any contract . . . is purely a question of law." *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) (citing to *Aetna Cas. and Sur. Co. v. Kenner*, Del. Supr., 570 A.2d 1172, 1174 (1990), overruled on other grounds *by Hurst v. Nationwide Mut. Ins. Co.*, 652 A.2d 10 (Del. 1995)).  It has explained that:

> "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." "We will read a contract as a whole and we will give each provision and term effect, so as not to

> render any part of the contract mere surplusage." We will not read a contract to render a provision or term "meaningless or illusory."

[*Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2020) (internal citation omitted)]

Furthermore, "When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions. On the contrary, when we may reasonably ascribe multiple and different interpretations to a contract, we will find that the contract is ambiguous." *Id.* at 1159-1160. And "[a]n unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract." *Id.* at 1160 (internal citation omitted). Furthermore, "A trial judge must review a contract for ambiguity through the lens of 'what a reasonable person in the position of the parties would have thought the contract meant.'" *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010) (internal citation omitted).

The Delaware Court of Chancery has noted, "The parol evidence rule is not a rule of evidence but one of substantive law." *McGrew v. Vanguard Corp.*, No. C.A. 5743, 1979 WL 4635, at *3 (Del. Ch. Sept. 25, 1979) (internal citation omitted).  And "[i]n general, under the parole evidence rule, if an agreement is considered 'fully integrated,' evidence of prior or contemporaneous discussions, documents, or other miscellaneous materials may not be used to either contradict or supplement the terms of the agreement.*" In re Ryckman Creek Res., LLC*, No. 16-10292 (KJC), 2018 WL 4178692, at *3 (Bankr. D. Del. Aug. 29, 2018). Total integration is defined as "[w]here the writing is intended to be final and complete . . . But where a writing is intended to be final but is in fact incomplete it is said to consist of a partial integration and although such a writing may not be contradicted by evidence of prior agreements, it may be supplemented by additional consistent evidence." *McGrew v. Vanguard Corp.*, No. C.A. 5743, 1979 WL 4635, at *3 (Del. Ch. Sept. 25, 1979).

The Supreme Court of Delaware has said, "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (internal citation omitted).  However, "[W]hen there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms."  *Id.* Additionally, "Contract language is not ambiguous simply because the parties disagree concerning its intended construction. The true test is what a reasonable person in the position of the parties would have thought it meant."  *Id.* at n.8 (internal citation omitted).   And "[i]n construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing."  (*Id.* at 1233).

## IV.   DISCUSSION

This Court commends the parties for their insightful and persuasive arguments on this issue of first impression. This Court spent a considerable amount of time evaluating the parties' positions and arguments, reviewing the exhibits, and extensively researching the issue. And for the reasons described below, this Court overrules the Debtors' SAFE Claims Objection. This Court finds that the SAFE Agreement provides a contingent claim to the investors and the parties who invested in REI are in fact creditors with contingent claims. The Court came to this finding upon consideration of the parties well thought out legal arguments, the SAFE Agreement, the exhibits, and the relevant case law.

### A.  Review of the SAFE Agreement

The SAFE Agreement begins with explaining that "in exchange for the payment by [the Investor] of [Amount in Dollars] (the '**Purchase Amount**') . . . Rhodium Enterprises, Inc., a Delaware corporation (the

'**Company**'), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below . . ." (ECF No. 1126-3 at 1) (emphasis in original). In Paragraph 1(a), the SAFE Agreement then proceeds to explain that in an Equity or Listing Event, the SAFE converts into specified stock. (*Id.*) Paragraph 1(b) and 1(c) explain the consequences of a Liquidity Event and Dissolution Event with REI.  (*Id.* at 1-2).  If REI experiences a Liquidity Event, defined as "a Change of Control other than a Listing Event," prior to the termination of the SAFE, then:

> [T]his Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**").

[*Id.* at 1-3].

And upon the occurrence of a Dissolution Event prior to the SAFE Agreement's termination, "[T]he Investor **will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount**, due and payable to the Investor immediately prior to the consummation of the Dissolution Event."  (*Id.* at 2) (emphasis added).

It is important to note at the outset that the terms of the SAFE Agreement described above appear to evidence a claim. As mentioned above 11 U.S.C. § 101(5)(A) defines "claim" as "**right to payment**, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, **contingent**, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." (emphasis added). The Bankruptcy Code considers a contingent right to payment as a claim. Here the SAFE Agreement, upon a Liquidity or Dissolution

Event, makes due and payable to an investor, the Purchase Amount/Cash-Out Amount. There can be scenarios in a Liquidity Event where the investor would receive the Conversion Amount instead if it was greater. Thus, it appears based on the plain language that the SAFE Agreement provides for a contingent claim under the Bankruptcy Code.

One paragraph of the SAFE Agreement which has culminated in substantial disagreement between the parties is the Liquidation Priority paragraph. Paragraph 1(d) states:

> (d) **Liquidation Priority**. In a Liquidity Event or Dissolution Event, this SAFE is intended to operate like standard Common Stock. The Investor's right to receive its Cash-Out Amount is:

>> (i) Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock); and

>> (ii) On par with payments for other Safes, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes in proportion to the full payments that would otherwise be due.

> The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to

the extent such payments are Cash-Out Amounts or similar liquidation preferences).

[ECF No. 1126-3 at 1-2 (emphasis in original)]

And Proceeds are defined in the SAFE Agreement as "cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution." (*Id.* at 3). As noted above, the Debtors argued that this paragraph demonstrates that the result of a Liquidity or Dissolution Event is an interest in equity and does not result in a claim. The Debtors point to the beginning sentence where it states, "In a Liquidity Event or Dissolution Event, this SAFE **is intended to operate like standard Common Stock**." (emphasis added). But Celsius argued that this paragraph 1(d) demonstrates that the SAFE Agreement investors' Cash-Out Amount is above that of Common Stock.

Both parties make good arguments about this paragraph, but when reflecting on caselaw relevant to Delaware contract interpretation, this Court agrees with Celsius on this issue. There are two interpretation principles which are relevant here. First, as the Delaware Supreme Court has previously explained:

> "Delaware courts follow the maxim that the general does not detract from the specific." "This principle of contract interpretation dictates that 'where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.' " "This principle 'can be thought of as reading the specific as an exception to the general, which allows a harmonizing of otherwise conflicting provision[s].' " Thus, we have recognized that "general terms of the contract must yield to more specific terms."

[*Thompson Street Cap. Partners IV, L.P. v. Sonova United States Hearing Instruments, LLC*, No. 166, 2024, 2025 WL 1213667, at *8 (Del. Apr. 28, 2025) (internal citation omitted)]

And second, "'We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.' We will not read a contract to render a provision or term 'meaningless or illusory.'" *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2020) (internal citation omitted). The language regarding the SAFE Agreement operating like common stock sounds more like an equity interest, but it is very general language without much explanation. The remaining parts of paragraph 1(d) are more specific and provide a different understanding. It explains that the Cash-Out Amount is "[j]unior to payment of outstanding indebtedness and creditor claims" and "[o]n par with payments for other Safes . . ." It also explains that the Conversion Amount is "on par with payments for Common Stock" but junior to payments of outstanding indebtedness and creditor claims as well as Cash-Out Amounts. When one considers that the title of the paragraph is Liquidation Priority and mentions the Conversion Amount as on par with Common Stock as well as being junior to Cash-Out Amounts, and then mentions that the Cash-Out Amount is junior to payments of outstanding indebtedness and creditor claims, the only reasonable conclusion is that the Cash-Out Amount is senior to Common Stock. Here the specific clauses override the undefined general language about the SAFE Agreement operating like Common Stock. Additionally, this Court would have to consider the remaining language about the Conversion Amount being on par with payments for Common Stock and junior to Cash-Out Amounts as superfluous if it found that the Common Stock language led to the conclusion which the Debtors seek. This paragraph 1(d) only strengthens the argument that the SAFE Agreement provides investors with a contingent claim as to the Cash-Out Amount.

It would be difficult to see how the SAFE Agreement's definition of the Cash-Out Amount as the Purchase Amount would make sense if

it was considered equity.  The Debtors have almost attempted to argue that the Cash-Out Amount could not be cash, but that would be very difficult given that the Purchase Amount is what the investors paid to REI, and that is cash.  At the hearing, counsel for the SAFE Claimants said, "They need to have the cash-out amount denominated something other than dollars. But they have a problem. The cash-out amount is denominated in dollars and it's [sic] crystal clear from the base of the agreement." (ECF No. 1434 at 82:21-24).  Debtors' counsel argued:

> And I think fundamentally what's happening here is that that distinction is being lost because of advocacy, sophistry, whatever you want to call it. And that is that we know under Delaware General Corporation Law, at the end of a corporation's life, if there are legally available funds, equity does get a distribution. And that right to a distribution, which mimics entirely the definition of proceeds under the SAFE Agreement, does not somehow create a claim.
>
> It is a right to a distribution as an equity holder.  And so what's being lost here is that we have a right to  payment, but that right to payment, the definition of proceeds, the triggering event being a dissolution event is exactly coextensive with what a shareholder could expect to get under  DGCL 281. And as such, the conflation of these two concepts by virtue of the SAFE instrument is what's driving, I think, a huge amount of misunderstanding, if not misrepresentation, by the stakeholders here.

[*Id.* at 108:20 to 109:11]

The Debtors appear to overlook the Liquidation Priority in paragraph 1(d) that gives SAFE claimants priority with Cash-Out Amounts over the Conversion Amount which is on par with Common Stock.

The Fifth Circuit has explained that "[g]enerally, shareholders place their money 'at the risk of the business' while lenders seek a more reliable return." *Slappey Drive Indus. Park v. United States,* 561 F.2d 572, 581 (5th Cir. 1977) (internal citation omitted). And that "[c]ontributors of capital undertake the risk because of the potential return, in the form of profits and enhanced value, on their underlying investment" while "[l]enders, on the other hand, undertake a degree of risk because of the expectancy of timely repayment with interest." *Id.* (internal citation omitted).  The SAFE Agreement here is not your typical instrument. It would be very difficult to compare the investors to a stockholder because while yes, if REI did well, the investors could receive enhanced value, they are different from stockholders in that they are to some extent protected in a Liquidity or Dissolution Event. When a stockholder invests in a company and the company starts a downward trajectory, the stockholder will only receive whatever the company is worth at the point that the stockholder decides to sell or at the point the company fails. Here, while a SAFE Agreement investor can see the potential fruits of the success of REI, at the same time the SAFE Agreement provides that in the situation of a Liquidity or Dissolution event, at a minimum, the investor will receive the Purchase Amount back (or its pro-rata share of any consideration after payment of all the creditors). That is wholly different from your typical stockholder.  The right to receive their Purchase Amount  further supports that the SAFE Agreement provides for a contingent claim given the inclusion of the paragraphs with regard to a Liquidity or Dissolution Event. While yes, a Liquidity Event or Dissolution Event may never happen when a SAFE Agreement such as this is entered, there is still the possibility, and that is the essence of the description of a contingent claim.

As counsel for the SAFE claimants said at the hearing regarding the SAFE Agreement, "[I]t is a contract. It is not a share of stock. It is not a stock certificate. It is not a share preferred stock. It's an agreement. SAFE contracts require different performances by the company, depending on contingent future events that are defined in the contracts." (ECF No. 1434 at 63:3-8).  And "SAFE parties were never

guaranteed that they would ever own stock, or otherwise participate in the upside of the company. (*Id.* at 64:4-6). However, "[T]he SAFEs also provide downside protection. Where a company dissolves, liquidates, or otherwise fails, as has happened here, the SAFE contract obligates the debtors to return to the SAFE counter party, the amount it invested in the form of a cash-out amount. That's the bargain." (*Id.* at 64:12-17).

The Debtors have also argued that if the investors have a higher priority than Common Stock, then the Common Stockholders would have needed to approve the SAFE Agreements. The Debtors appeared to argue that another category of stock would need to have been created pursuant to the Articles of Incorporation. But this appears to miss that the Cash-Out Amount is not equity, but instead a contingent claim, to be returned upon the occurrence of a Liquidity or Dissolution Event.

The SAFE Agreement states, "The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes . . ." and that "[h]owever, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time." (ECF No. 1126-3 at 5). Not having the ability to vote only further supports the concept of the investors having contingent claims. While potentially receiving a "Dividend Amount" may provide some support for the notion of an equity interest, that does not negate the reality that the SAFE Agreement provides a contingent claim which can potentially be paid out in cash.

A reasonable third party examining this SAFE Agreement would conclude that the investors have a contingent claim when entering into it. *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2020). As mentioned above, "When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions. On the contrary, when we may reasonably ascribe multiple and different interpretations to a contract, we will find that the contract is ambiguous." *Id.* And importantly, "Contract language is not

ambiguous simply because the parties disagree concerning its intended construction. The true test is what a reasonable person in the position of the parties would have thought it meant." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 n.8 (Del. 1997) (internal citation omitted). It is true that the parties here disagree regarding the contract, but a reasonable person reading it will find that the terms are clear and unambiguous. The Court commends the parties for their thoughtful arguments on the SAFE Agreement, but a neutral third party looking at the contract will see that the SAFE Agreement specifically provides for REI returning at a minimum the Purchase Amount (or its pro-rata share) to an investor in the case of a Liquidity or Dissolution Event. Any other reading of the SAFE Agreement would read the last sentence of 1(d) out of the paragraph.

This Court has reviewed cases where courts determined whether an agreement provided equity or debt. But none of the cases examine contracts similar to this SAFE Agreement. To start with, this Court did not find cases examining SAFE Agreements with the task this Court is dealt.  Courts have found litigation tracking warrants, shares of stock with redemption provisions, warrants with repurchase provisions, and preferred shares with redemption provisions to be equity and not debt. *See In re Washington Mut., Inc.*, 464 B.R. 656 (Bankr. D. Del. 2012), *Carrieri v. Jobs.com Inc.*, 393 F.3d 508 (5th Cir. 2004), and *In re Color Tile, Inc.*, No. 96-76 (HSB), 2000 WL 152129 (D. Del. Feb. 9, 2000). But none of these are remotely like the SAFE Agreement before this Court.

In the case of the Litigation Tracking Warrants, the United States Bankruptcy Court for the District of Delaware explained, "The original and Amended Warrant Agreements and the Registration Statements plainly state that the LTWs are warrants representing the right to purchase shares of common stock" and that "[a]ll of the Warrant Agreements and the Prospectuses confirmed that the LTW Holders would be entitled to exercise the warrant, and receive stock, only upon receipt of a recovery by the bank and regulatory approval allowing the

issuance of the stock." *In re Washington Mut., Inc.*, 464 B.R. 656, 660-661 (Bankr. D. Del. 2012). Furthermore, the court explained that:

> Section 4.2 provides in part that, in the event of a merger, the LTW Holders are entitled to "the number of shares of capital stock or other securities *or an amount of property*" to the same extent that "one share of Common Stock was exchanged for or converted into as a result of" the merger. (JX 1 at § 4.2(a) (emphasis added).)

[*Id.* at 661 n. 6 (emphasis in original)]

The court was looking at a very different scenario from the present issue before this Court. The Litigation Tracking Warrants were all about receiving stock connected to the outcome of litigation. The SAFE Agreements while they are called Simple Agreement for Future Equity are more than an agreement for potential equity but are also an agreement that if there is a Liquidity or Dissolution Event, the Purchase Amount (at a minimum) will be returned to the investor. And the merger provision connected to the Litigation Tracking Warrants is nowhere near as specific as language in the SAFE Agreement that the Purchase Amount will be returned in a Liquidity or Dissolution Event. Shares of stock with redemption provisions, warrants with repurchase provisions, and preferred shares with redemption provisions are all about stocks, very different from the SAFE Agreement which in essence states that if REI fails, the investors will receive their money back (or their pro-rata share) to the extent there are Proceeds subject to the Liquidation Priority in paragraph 1(d). *See Carrieri v. Jobs.com Inc.*, 393 F.3d 508 (5th Cir. 2004) and *In re Color Tile, Inc.*, No. 96-76 (HSB), 2000 WL 152129 (D. Del. Feb. 9, 2000). Cases finding agreements to be equity have not examined an agreement like the SAFE Agreement before this Court and the decisions finding those agreements to be equity are based on very different terms from those before this Court.

The Debtors request that this Court look at outside evidence in interpreting the SAFE Agreement, but this Court does not find the

SAFE Agreement to be ambiguous nor anything less than fully integrated. And as has been stated previously, "In general, under the parole evidence rule, if an agreement is considered 'fully integrated,' evidence of prior or contemporaneous discussions, documents, or other miscellaneous materials may not be used to either contradict or supplement the terms of the agreement." *In re Ryckman Creek Res., LLC*, No. 16-10292 (KJC), 2018 WL 4178692, at *3 (Bankr. D. Del. Aug. 29, 2018). As the Delaware Chancery Court has explained, "The factors to be assessed in ascertaining whether a contract is fully integrated include: 'whether the writing was carefully and formally drafted, whether the writing addresses the questions that would naturally arise out of the subject matter, and whether it expresses the final intentions of the parties.'" *Hynansky v. Vietri*, No. 14645-NC, 2003 WL 21976031, at *3 (Del. Ch. Aug. 7, 2003) (internal citation omitted). And "[u]nlike the restrictions imposed upon the court by the parol evidence rule when construing particular provisions of a contract, the court 'may consider extrinsic evidence to discern if [a] contract is completely or partially integrated.'" *Quantlab Grp. GP, LLC v. Eames*, No. CV 2018-0553-JRS, 2019 WL 1285037, at *4 (Del. Ch. Mar. 19, 2019) (internal citation omitted). Reviewing the SAFE Agreement, it appears to be carefully and formally drafted and appears to be the final intentions of the parties. Paragraph 5 which is the final paragraph of the SAFE Agreement includes many provisions which signal to this Court that it is an integrated agreement and carefully crafted. Paragraph 5(a) provides for instructions of how the SAFE Agreement can "be amended, waived, or modified," paragraph 5(d) provides information on transferability and assignability, paragraph 5(e) provides information on what happens when a provision is "held to be invalid, illegal or unenforceable," and paragraph 5(f) is a choice of law provision. The Debtors have failed to provide this Court with any evidence that the SAFE Agreement is not integrated.

It is important to note that even if the Court found the contract to be partially integrated and/or ambiguous, the evidence presented by the Debtors of the Y Combinator form or SAFE Agreement negotiation

emails and other documents, which the Court has reviewed, simply do not provide this Court with any substantial evidence that the SAFE Agreement does not provide for a contingent claim. When parties are emailing each other while writing a contract, they do not decipher every word they use in a similar way to when they are writing the actual contract. Email is a fast-paced form of communication, and the contract here is not in the email, but it is instead in the SAFE Agreement. And the Court does not find the Y Combinator form to be useful as it is only a template and cannot help the Court in its determination of this issue. Furthermore, the Y Combinator form referred to a situation where the company had preferred stock which is not present here. All this evidence cannot negate what is written within the four corners of the agreement.

### B. 11 U.S.C. § 510

11 U.S.C. 510 (a) states, "(a) A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." The only subordination agreement present here is paragraph 1(d), the Liquidation Priority paragraph, in the SAFE Agreement. Paragraph 1(d)(i) states that that "[t]he Investor's right to receive its Cash-Out Amount is: (i) Junior to payment of outstanding indebtedness and creditor claims . . ." And paragraph (1)(d) also states that "[t]he Investor's right to receive its Conversion Amount is . . . junior to" Cash-Out Amounts.

Furthermore, 11 U.S.C. § 510(b) is not applicable to this case. 11 U.S.C. § 510(b) states in part that "a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security . . ." And neither damages nor rescission is present here. As counsel for the SAFE claimants said at the hearing, "No one has ever sought to rescind a SAFE . . . It's exactly

the opposite. The SAFE parties are arguing that the SAFE contracts are valid and enforceable and should be enforced. And there is no claim for damages." (ECF No. 1434 at 85:18-22).[9]  And "[t]he SAFE parties are merely arguing . . . that they're creditors and that their right to payment of cash-out amount has to be satisfied before equity is entitled to annual [sic] recovery, exactly as the contracts provide." (ECF No. 1434 at 85:22-25).

C.  Has there been a Liquidity or Dissolution Event?

We do not reach the question of whether the Whinstone Transaction is a Liquidity or Dissolution Event. But it is important to note that the Amended Plan at ECF No. 1297 states:

> On the Effective Date, all Remaining Assets shall vest in the Wind Down Debtors or in a liquidating trust, as determined before the Effective Date by the Debtors, the Holders of Settling Common Interests, and the Transcend Parties. The Wind Down Debtors or the liquidating trust, as applicable, shall promptly liquidate all Remaining Assets following the Effective Date. The proceeds from the liquidation of the Remaining Assets shall be distributed in accordance with this Amended Plan.

[ECF No. 1297 at 33-34]

---

[9] No one is arguing that the SAFE's are executory contracts that the Debtors could reject to create a damage claim. In any event, here the SAFE Agreement investors have already fulfilled their obligations by paying the Purchase Amount. *See Matter of Falcon V, L.L.C.*, 44 F.4th 348, 352 (5th Cir. 2022) ("In other words, 'the test for an executory contract is whether, under the relevant state law governing the contract, each side has at least one material unperformed obligation as of the bankruptcy petition date.'") (internal citation omitted).

If the Amended Plan is confirmed, there will be a liquidation of REI. Therefore, even if one found that there is not currently a Liquidity or Dissolution Event, there certainly would be one in the event the Amended Plan is confirmed.

## V.    CONCLUSION[10]

For the reasons described above, this Court overrules the "Debtors' Omnibus Objection to Claims Pursuant to Bankruptcy Code Sections 502(b), Bankruptcy Rule 3007, and Local Rule 3007-1 Because SAFE Holders Do Not Hold Claims to the Disputed Claims." The SAFE Claimants have contingent claims.

The Debtors filed a Certificate of No Objection to their SAFE Claims Objection for which no response had been filed. (ECF No. 1309). The Court will hold a separate hearing to determine whether the objection should be sustained with respect to those Proofs of Claims.  A separate order will issue.

SIGNED 08/30/2025

Alfredo R Pérez
United States Bankruptcy Judge

---

[10] This opinion constitutes the findings of fact and conclusions of law required by Rule 7052 of the Rules of Bankruptcy Procedures.