## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RHODIUM ENCORE LLC, *et al.*,[1] | § | Case No. 24-90448 (ARP) |
| | § | |
| Debtors. | § | |
| | § | (Jointly Administered) |
| | § | |

### SPECIAL COMMITTEE'S OBJECTION TO LEHOTSKY KELLER COHN LLP'S SECOND AND FINAL APPLICATION FOR PAYMENT OF COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD AUGUST 28, 2024, THROUGH JUNE 30, 2025
(Relates to ECF No. 1560)

The Special Committee of the Board of Directors of Debtor Rhodium

Enterprises, Inc. (the "Special Committee") respectfully submits this objection (the

"Objection") to Lehotsky Keller Cohn LLP ("LKC")'s Second and Final Application

for Payment of Compensation and Reimbursement of Expenses for the Period of

August 28, 2024 through June 30, 2025 [ECF No. 1560] ("Fee Application").

### INTRODUCTION

1.      This Fee Application is not a normal, run-of-the-mill fee application.

The question is not whether LKC is entitled to fees for its services—it

unquestionably is.  The Debtors do not want to be unfair to LKC or to withhold

---

[1]   The Debtors in these Chapter 11 Cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), Rhodium 30MW LLC (0263), Rhodium Enterprises, Inc. (6290), Rhodium Technologies LLC (3973), Rhodium Renewables LLC (0748), Air HPC LLC (0387), Rhodium Shared Services LLC (5868), Rhodium Ready Ventures LLC (8618), Rhodium Industries LLC (4771), Rhodium Encore Sub LLC (1064), Jordan HPC Sub LLC (0463), Rhodium 2.0 Sub LLC (5319), Rhodium 10MW Sub LLC (3827), Rhodium 30MW Sub LLC (4386), and Rhodium Renewables Sub LLC (9511). The mailing and service address of the Debtors in these Chapter 11 Cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005.

payment of LKC's hourly fees or a success fee.  In fact, the Debtors are willing to pay LKC $600,000 now, if the Court will approve that payment at this time. Additionally, the Debtors expect (and planned) to discuss the issue of the success fee with LKC at the appropriate time, following the resolution between the Debtors and Whinstone of the allocation of settlement funds into two buckets: damages for claims asserted ("Damages Amount") and the purchase of Rhodium assets ("Asset Purchase Amount"). The problem is that LKC's desire to be paid *now* has resulted in LKC (1) creating an unnecessary risk around competing allocations; (2) causing the Debtors to incur legal fees to protect the estate; and (3) putting its own interests ahead of the clients' interests and its duties to the Debtors as their current counsel.

2.     This is a problem of LKC's own making, resulting from its continued push to obtain its fees despite protests from the Debtors that the fee discussion is not ripe.  The parties' dispute relates to the timing of the Fee Application and the success fee proposed by LKC that is predicated solely on irrelevant, privileged, pre-settlement discussions instead of the as-yet undetermined allocation of settlement proceeds.  LKC continues to pursue this Fee Application despite the Debtors' request to quash LKC's Rule 2004 discovery and the Debtors' request for an extension of time to respond to the Fee Application.  LKC does not provide a compelling reason why it opposes the Debtors' request to postpone the adjudication of the Fee Application to allow for the Debtors and Whinstone to properly allocate the settlement proceeds.  At best, LKC is forcing the issue so that LKC can receive payment now rather than later.  At worst, LKC is seeking to apply pressure on its

own clients, the Debtors, to leverage a favorable result.  Either way, LKC's actions have left the Debtors no other choice but to file this Objection.

3.     The Fee Application is premature and predicated on outdated and irrelevant evidence.  LKC's calculation of its success fee is based on internal, privileged information used to discuss the possibility of settlement with Whinstone, US, Inc. ("Whinstone") with the Board of Directors of Rhodium Enterprises, Inc. ("REI"). Those discussions were held long before the parties reached a settlement, and the terms of the settlement are different from those originally discussed internally under privilege.  [Declaration of Charles Topping ("Topping Decl."), attached hereto as Exhibit 1, at ¶ 3.]  Indeed, the settlement ultimately primarily reflected advice from the Debtors' Chapter 11 and restructuring professionals and input from the SAFE AHG on resolving matters with Whinstone through an asset sale.  The pre-mediation calculations and conversations have no relation to the calculation of a success fee and should be stricken from the record and disregarded.

4.     The Debtors also object to certain fees and expenses contained in the Fee Application, specifically those related to LKC's retention of an outside law firm (Porter Hedges LLP) in connection with the Amended Application to Employ Lehotsky Keller Cohn LLP as Special Litigation Counsel (ECF No. 835).  LKC's retention of Porter Hedges was not approved by the Court and should not be charged to the Debtors.  Similarly, the Debtors object to the Fee Application to the extent it seeks reimbursement for LKC's time spent working with Porter Hedges on

the updated retention application (as opposed to working with the Debtors or the Debtors' counsel).

5.     The fact that LKC has refused to postpone proceedings on the Fee Application also requires the Debtors to assert an affirmative claim for breach of fiduciary duty against LKC. The Debtors tried to avoid this path by seeking to extend the Debtors' time to object to the Fee Application to allow the Debtors the opportunity to investigate (and potentially resolve) any potential claims against LKC.  LKC strongly objected to that request.  If the Debtors do not assert this claim as part of this Objection, under Fifth Circuit precedent, the Debtors will be in danger of waiving it.  The Debtors seek damages, including legal fees, in connection with LKC's breaches, which include the filing of privileged information with the Court, the creation of a false audit trail with respect to the allocation of the settlement proceeds from the Whinstone litigation, and the pursuit of this Fee Application (including serving discovery on its own clients contrary to the rules of professional conduct) without any compelling reason to do so.

## BACKGROUND

6.     On May 16, 2023, the Debtors and LKC executed an engagement letter (the "Initial Engagement Letter") the purpose of which was to define LKC's representation of the Debtors in litigation with Whinstone.  [*See* ECF No. 835.]  The Initial Engagement Letter included discussion of a success fee to be paid to LKC (the "Success Fee"), in addition to discounted hourly rates, upon resolution of the Whinstone litigation.

7.     The potential Success Fee had three components, as follows:

The potential success fee has three components:

(a)    $600,000 if (i) the contracts at issue in the Matter (including those you seek to enforce) are not terminated and, if addressed by a court, your interpretation of key contractual provisions (as identified by the attached email dated on May, 16, 2023) is upheld or (ii) you are acquired by Whinstone or an affiliate, to be paid 30 days after settlement of the Matter, the closing of such acquisition, or a non-appealable final judgment;

(b)    5% of any recovered energy credits up to $5 million, and 1% of any additional recovered energy credits, to be paid 30 days after each monthly utilization by Rhodium; and

(c)    10% of any additional amounts not attributable to energy credits that you recover, including, but not limited to, compensatory damages, incidental or consequential damages, punitive or exemplary damages, civil fines, costs, and attorneys' fees, to be paid 30 days after settlement of the Matter or a non-appealable final judgment, provided, that in the case of a settlement, the amount on which the 10% success fee will be payable will be the amount that is net of any monetary concessions given to Whinstone or its affiliates.

8.      Following execution of the Initial Engagement Letter, LKC represented the Debtors in the ongoing litigation with Whinstone.

9.      On August 24, 2024, in connection with their Chapter 11 filing, the Debtors filed a Motion to Assume Certain Executory Contracts With Whinstone. [ECF No. 7].  On August 29, 2024, Debtors filed a Supplemental Motion to Assume Certain Executory Contracts With Whinstone.  [ECF No. 32.]

10.     Subsequently, on September 22, 2024, Debtors filed an Application for Order Authorizing the Retention and Employment of LKC as Special Litigation Counsel in connection with the ongoing Whinstone litigation. [ECF No. 173.]  On October 14, 2024, the Court entered an order authorizing Debtors to retain and employ LKC in connection with the ongoing litigation with Whinstone. [ECF No. 263.]  On the same day, the Court entered an Order granting the motion of the

Debtors to establish procedures for interim compensation and reimbursement of expenses for professionals. [ECF No. 264.]

11.     On February 10, 2025, LKC filed its First Interim Application for Payment of Compensation and Reimbursement of Expenses for the Period August 28, 2024, through November 30, 2024.  [ECF No. 765.]  The Court approved this first application on March 7, 2025, allowing and approving interim compensation and reimbursement of expenses to LKC in the amount of $1,986,727.00.  [ECF No. 836.]

12.     On February 11, 2025, the Debtors filed an adversary complaint against Whinstone and Riot Platforms, Inc. ("Riot"), seeking more than $300 million in damages plus exemplary damages, attorneys' fees, pre- and post-judgment interest, and an injunction against Whinstone and Riot.  [ECF No. 770.]

13.     Between February 19 and March 18, 2025, the Debtors and Whinstone engaged in a mediation relating to the disputes between the Debtors and Whinstone (the "Mediation") before Judge Mark X. Mullin, United States Bankruptcy Judge for the Northern District of Texas.  [Topping Decl. at ¶4.]

14.     In connection with preparations for the Mediation, the Board of Directors of REI, together those of its officers and professional advisors who routinely attend Board meetings, discussed strategy for the mediation and possible outcomes.  [Topping Decl. at ¶5.]  Those discussions, and the information shared during those discussions, were for the purpose of providing legal advice and formulating litigation strategy, including strategy for potentially settling the

6

litigation.  [Topping Decl. at ¶7.]  LKC participated in preparing the information for the Debtors relating to settlement strategy and rough numbers estimating the potential settlement amounts.  [Topping Decl. at ¶6.]  The rough numbers were included in a spreadsheet originally prepared, on information and belief, on or around February 11, 2025, by LKC in coordination with Kevin Hays, the CFO of REI, in order to facilitate discussions by the Board of Directors of REI concerning strategy and settlement authority for conducting settlement negotiations at the Mediation.  [Topping Decl. at ¶6.]  LKC disclosed the privileged information in its sealed Fee Application without obtaining permission from the Debtors.  [Topping Decl. at ¶8.]

15.     On or about March 4, 2025, the Debtors and LKC prepared a revised engagement letter (the "Revised Engagement Letter") to supersede the Initial Engagement Letter.  [ECF No. 835.]  Following the February 19, 2025, in-person mediation session, it appeared to be possible that the Debtors and Whinstone might reach a settlement involving both the affirmative case for damages and the sale to Whinstone of Rhodium assets in Rockdale.  [*See* ECF No. 1111-1 at ¶¶10-11.] Indeed, as the Mediation proceeded, it became clear that, due to outside factors impacting the Debtors' ability to reorganize, the best resolution of all outstanding issues with Whinstone would primarily involve an asset purchase.  The Debtors' Chapter 11 and restructuring professionals, along with the SAFE AHG, worked to negotiate a deal that was ultimately reflected in a Purchase and Sale Agreement (the "PSA").  The Revised Engagement Letter came about because of this potential

settlement, in order to clarify that the Debtors believed that LKC should still receive a success fee in this scenario and to provide the specific terms of the success fee.  [*See* ECF No. 1111-1 at ¶¶11-12.]

16.     On March 6, 2025, the Debtors filed an Amended Application to Employ LKC as Special Litigation Counsel based on the Revised Engagement Letter. [ECF No. 835.]  The application highlighted the difference between the Initial Engagement Letter signed on May 16, 2023 and the Revised Engagement Letter signed on March 4, 2025, including the addition of section (d) pertaining to the Success Fee, which provided:

> (d)     In addition to the fees listed in Sections (b) and (c), if you (or all or substantially all of the Rockdale assets) are acquired by Whinstone or an affiliate, in a transaction that resolves or otherwise terminates the Matter, the Client and Lehotsky Kelly Cohn LLP will determine in good faith the portion of the transaction value to the Client allocable to the energy credits and damages specified in Sections (b) and (c).  If the Client and Lehotsky Kelly Cohn LLP are unable to reach a resolution regarding the amount of fees payable under Sections (b) and (c), including with respect to the allocation of transaction value allocable to the energy credits and damages, such dispute shall be resolved by the bankruptcy court.

Thus, the Debtors and LKC agreed that, at the appropriate time (the conclusion of dealings with Whinstone), the Debtors and LKC would confer in good faith and make a determination as to what portion of the Damages Amount would be allocable to energy credits (Section (b)) and which portion would be allocable to other damages (Section (c)).

8

17.     The mediation was ultimately successful, resulting in a term sheet ("Term Sheet") that fully resolved all outstanding matters between the Debtors and Whinstone in the amount of $185 million, as follows:

| Settlement & Asset Purchase Payment | Following the Approval, Whinstone will promptly provide to Rhodium $185 million consisting of the following consideration: <br><br> • $129.9 million in cash; <br><br> • $6.1 million return of power security deposit; and <br><br> • $49 million in Riot stock (the "**Riot Stock**"), which will be priced using the last 10 trading days volume-weighted average price immediately prior to the date of the closing of the Settlement & Asset Purchase Transaction which, for the avoidance of doubt, shall not occur prior to the Approval (the "**Closing**"), and the Riot Stock will not be subject to any transfer restrictions. |
|---|---|

[ECF No. 880.]  Thus, the Term Sheet contemplated a transaction pursuant to which Whinstone paid consideration of $185 million consisting of as-yet undetermined combination of damages to settle outstanding legal claims and funds to purchase certain Rhodium assets pursuant to the PSA.

18.     On March 21, 2025, the Debtors filed an Emergency Motion for Entry of an Order (I) Approving Settlement Between Debtors and Whinstone; and (II) Authorizing the Use, Sale, or Lease of Certain Property of the Debtors' Estate Pursuant to 11 U.S.C. § 363.  [ECF No. 880.]  Among other things, the Debtors requested approval of the Term Sheet which would "effect a global settlement of all known and unknown claims amongst the Parties and other related parties and bring finality to the otherwise uncertain and burdensome litigation" and include "the sale and transfer of certain of the Debtors' assets located at Whinstone's Rockdale facility."  [ECF No. 880.]

19.     On April 8, 2025, the Court approved the Term Sheet and thus the settlement between the Debtors and Whinstone.  [ECF No. 921.]

20.     On July 8, 2025, following briefing and discovery, this Court entered an order granting debtors' application for an updated order authorizing the retention and employment of LKC as Special Litigation Counsel. [ECF No. 1418.]

21.     A month later, on August 7, 2025, LKC issued Rule 2004 requests to the Debtors seeking information related to the Whinstone settlement allocation and calculation of the Success Fee. [ECF No. 1515.]

22.     On August 13, 2025, counsel for the Special Committee sent LKC a letter objecting to the Rule 2004 requests and indicating that they were inappropriate for a number of reasons, including that negotiations on the settlement allocation were still ongoing and LKC was serving discovery on its current client in violation of several Model Rules of Professional Conduct and Texas Disciplinary Rules of Professional Conduct.[2]  [ECF No. 1529-2, at 3.]  The letter requested that LKC withdraw the discovery requests by 1:30 p.m. CT on August 14, 2025.

23.     LKC did not withdraw the discovery requests, thus forcing the Debtors to file a motion to quash LKC's Rule 2004 discovery (the "Motion to Quash"), which LKC opposed.  [ECF Nos. 1530, 1587, 1614.]

---

[2] The RPCs apply in federal court. *In re American Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992) (applying RPC in the 5th Circuit).

24.     On August 22, 2025, LKC filed the Fee Application. [ECF No. 1560.] In it, LKC seeks $11,419,448.50, the unpaid balance of which is $9,346,253.33. The majority of that amount is the purported Success Fee in the amount of $8,913,600; the remaining fees and expenses total $432,653.33, as set forth in the Fee Application. [ECF No. 1560.]

25.     On September 10, 2025, prior to the deadline for the Debtors to object to the Fee Application, the Special Committee filed its Emergency Motion for an Extension to File a Response to the Fee Application (the "Extension Motion"). [ECF No. 1626.] In the Extension Motion, the Special Committee argued, among other points, that, pursuant to *In re Intelogic Trace, Inc.*, 200 F.3d 382, 390 (5th Cir. 2000), the Special Committee was informing the Court of its concerns with respect to LKC's actions and requesting that the Court effectively stay the fee hearing and permit time for discovery and development of claims. The SAFE AHG filed a separate response joining in the Extension Motion on September 12, 2025. [ECF No. 1638.]

26.     On September 11, 2025, LKC opposed the Extension Motion. [ECF No. 1632.] On September 19, 2025, the Special Committee filed its reply brief in further support of the Extension Motion (the "Reply"). [ECF No. 1665.]

27.     At a status conference on September 24, 2025, this Court instructed the Special Committee to file its Objection to LKC's Final Fee Application before the status conference on October 2, 2025, despite the Special Committee's request for an

extension of time. The Court stated it would plan to set a hearing on the Fee
Objection during the status conference on October 2, 2025.

28.     Pursuant to the Court's directive, the Special Committee filed this
Objection on October 1, 2025.

## STANDARD OF REVIEW

29.     In considering a fee application from a party previously employed
under 11 U.S.C. § 327, the court has the ability to "award compensation that is less
than the amount of compensation that is requested." 11 U.S.C. §330(a)(2). The
bankruptcy court retains the ability to oversee and allow or disallow compensation
to an authorized professional even where the court already approved the terms of
employment. *See* 11 U.S.C. § 328(a) ("Notwithstanding such terms and conditions,
the court may allow compensation different from the compensation provided under
such terms and conditions after the conclusion of such employment, if such terms
and conditions prove to have been improvident in light of developments not capable
of being anticipated at the time of the fixing of such terms and conditions."); *see also*
*In re Coho Energy Inc.*, 395 F.3d 198, 204 (5th Cir. 2004) ("even if the bankruptcy
court acts to 'guarantee' attorney's fees, it reserves the power to alter them").

30.     In the Fifth Circuit, the lodestar method, the factors in *Johnson v.*
*Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), and 11 U.S.C.
§ 330 "form the framework that regulates the compensation of professionals
employed by the bankruptcy estate." *In re Pilgrim's Pride Corp.*, 690 F.3d 650, 656
(5th Cir. 2012) (as revised Aug. 14, 2012).

31.     Section 330 provides that a court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual, necessary services rendered [and] reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1).  Section 330 sets forth the criteria for the award of such compensation and reimbursement: (a) the time spent on such services; (b) the rates charged for such services; (c) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; (d) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; (e) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and (f) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.  11 U.S.C. § 330(a)(3).

32.     A court computes the "lodestar"— the method to determine whether fees are "reasonable"—by "multiplying the number of hours an attorney would reasonably spend for the same type of work by the prevailing hourly rate in the community."  *In re Cahill*, 428 F.3d 536, 540 (5th Cir. 2005) (citing *Shipes v. Trinity Indus.*, 987 F.2d 311, 319 (5th Cir. 1993)).  "A court then may adjust the lodestar up or down based on the factors contained in § 330 and its consideration of the twelve factors listed in [*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19

13

(5th Cir. 1974)].” *Id.* (citing *In re Fender*, 12 F.3d 480, 487 (5th Cir.1994)).  The bankruptcy court has “considerable discretion” in its application of the *Johnson* factors but “it must explain the weight given to each factor that it considers and how each factor affects its award.  *Id.* (additional citations omitted).

33.     The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the professional due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the professionals; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-19.

34.     A debtor holding claims against a third party seeking fees in a bankruptcy case must assert those claims in connection with the fee application or risk losing those claims pursuant to the doctrine of *res judicata*.  *See In re Intelogic Trace, Inc.*, 200 F.3d 382, 386–391 (5th Cir. 2000).

## **ARGUMENT**

**I.      The Special Committee respectfully requests that, before the Court considers the Objection, the Court rule on the Special Committee's Emergency Motion.**

35.     Contemporaneously with this Objection, the Special Committee filed an Emergency Motion demanding that LKC withdraw the privileged information

from its Fee Application and asking the Court to determine that the information cited by LKC is privileged and should be removed from the record.

36.     For the reasons discussed in the Emergency Motion, the Special Committee respectfully requests that the Court consider and decide the Emergency Motion before considering the Fee Application and this Objection.

**II.     Even if the information is not privileged, LKC's reliance on preliminary, internal, irrelevant settlement projections as the only support for its calculation of the Success Fee is absurd.**

37.     If the Court determines that the information in paragraphs 29-32 is not privileged and ultimately considers it as part of the Fee Application, the Court should find that the information is irrelevant and insufficient to serve as the basis for calculation of the Success Fee.  In the Fee Application, LKC refers repeatedly to information presented to the Rhodium Board of Directors prior to the Mediation as if that information was dispositive of the allocation question and a legitimate basis on which to calculate the Success Fee.  It is not.

38.     By LKC's own admission, it calculated the Success Fee by the numbers "it has in its possession" which was apparently limited to LKC's own pre-mediation settlement estimates.  [ECF No. 561 at ¶¶ 28-29.]  LKC asserts that it "relies on the numbers and analysis in the PowerPoint presentation that the Debtors prepared for the Debtors' Board of Directors in advance of the mediation with Whinstone."  [ECF No. 561 at ¶ 29.]

39.     Those estimates are just that—estimates.  One-sided, preliminary, estimated calculations of a settlement range are irrelevant to the determination of the Success Fee.  What *are* relevant are the Term Sheet and the PSA that resulted

from the Mediation and the information therein.  Indeed, throughout the course of the Mediation, which spanned weeks, it became apparent that due to the evolving nature of the restructuring plan and availability of financing, the best resolution of the Whinstone matters would involve an asset purchase.  The Debtors' Chapter 11 and restructuring advisors worked with the Debtors, the SAFE AHG, and Whinstone to come to an agreement on an asset purchase that would bring concrete value into the estate.

40.     The use of an estimate is also contrary to the parties' Revised Engagement Letter, which states that upon "a transaction that resolves or otherwise terminates the Matter," the Debtors and LKC "will determine in good faith the portion of the transaction value to the Client allocable to the energy credits and damages specified in Sections (b) and (c)."  [ECF No. 835.]  The Revised Engagement Letter thus contemplates that the *completed* transaction will guide the calculation of the Success Fee, *not* a preliminary estimate drawn up by LKC, particularly where Whinstone never saw or agreed to those numbers and no actual settlement was predicated upon them.

41.     The Court should disregard these estimates presented by LKC and deny the request for the Success Fee as calculated by LKC on the grounds that it is not supported in fact or consistent with the engagement letter.

16

III.     **The Fee Application is premature because the calculation of LKC's Success Fee cannot take place until the Debtors and Whinstone determine what portion of the Settlement Amount is the Damages Amount and what portion is the Asset Purchase Amount.**

42.     As the Special Committee has previously asserted in both the Motion to Quash and the Extension Motion, aside from being unsupported in fact, LKC's Fee Application is also premature. Calculation of the Success Fee (and even discussions between the Debtors and LKC regarding the amount of the Success Fee due to LKC) would be futile and improper *unless and until* the Debtors and Whinstone reach agreement on how, for tax purposes, to allocate the money paid by Whinstone to Debtors.

43.     The Success Fee can only be calculated after the Debtors and Whinstone determine how the settlement payment will be allocated as between a Damages Amount and an Asset Purchase Amount. Only after the parties (or this Court) make that determination can the Debtors and LKC engage in discussion of what portion of the Damages Amount is due to LKC as the Success Fee.

44.     As discussed in detail in the Special Committee's briefing on its Extension Motion, relying on information other than the actual allocation of the settlement payment, and specifically the Damages Amount, could expose the Debtors to avoidable tax liability and penalties that could arise from taking contradictory allocation positions.  The engagement letter expressly requires that the calculation of the Success Fee be *reasonable*, and LKC has a duty to its clients— the Debtors—not to take positions that would or could injure the estate.  Likewise, the Purchase and Sale Agreement ("PSA"), Internal Revenue Code, Treasury

17

Regulations require the allocations be accurate and consistent with the record. [Wheeler Decl. ¶¶ 5-24.] There should only be one set of operative facts governing the value allocated, and those facts must be accurate. [Wheeler Decl. ¶¶ 25-27.]

45.     In other briefing, LKC has attempted to present evidence to support the idea that the fee allocation negotiations between Debtors and LKC were intended to be wholly independent of the tax allocation negotiations with Whinstone, including by citing to testimony from the Debtors' General Counsel. [ECF No. 1632 at 8-9.]  But when taken in context, and as discussed in the Reply, the General Counsel's statements actually support the idea that the tax allocation will likely align closely with the allocation used to determine LKC's Success Fee. [ECF No. 1665 & Ex. 1.]

## IV.     The Debtors object to the request in the Fee Application for amounts related to LKC's retention of Porter Hedges.

46.     The Debtors also object to certain fees and expenses contained in the Fee Application related to LKC's retention of Porter Hedges to assist in its work pertaining to the amended retention application. [ECF No. 835.]  Specifically, the Debtors object to (1) reimbursement of Porter Hedges' professional services fees (in the amount of $200,100.98) and (2) reimbursement of LKC attorneys' time spent working with Porter Hedges on the retention application rather than working with the Debtors' counsel (in an unknown amount).

47.     Section 330 provides that a court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual, necessary services rendered [and] reimbursement for actual, necessary expenses."

11 U.S.C. § 330(a)(1).  Section 330 sets forth specific criteria for the award of such compensation and reimbursement, including: (a) the time spent on such services; (b) the rates charged for such services; (c) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; (d) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; (e) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and (f) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.  *See* 11 U.S.C. § 330(a)(3).

48.     LKC's retention of Porter Hedges was not approved by the Court and LKC has not made a showing that those expenses were "necessary" under Section 330.  Those services were performed for the benefit of LKC, *not* the Debtors. Additionally, the only detail LKC provides as to Porter Hedges' invoices is the monthly totals paid for "professional services."  This is not sufficient to meet the requirements of Section 330, which require the Court to review specific criteria, including among other things, the time spent by each professional, the professionals' qualifications, the applicable rates charged, and necessity of the expenses to the administration of the case.  LKC's request for reimbursement of funds paid to Porter Hedges should be disallowed.

49.    The Debtors also object to the Fee Application to the extent it seeks reimbursement for LKC's fees that reflect time spent working with Porter Hedges on the updated retention application (as opposed to working with the Debtors or the Debtors' counsel).  LKC has not made a showing as to why engaging Porter Hedges or billing for LKC professionals' work with Porter Hedges was necessary or beneficial to the estate in satisfaction of Section 330.  To the extent LKC professionals billed for time working with Porter Hedges as opposed to with the Debtors or the Debtors' outside counsel, those fees and expenses should be disallowed.

## V.    The Debtors hold and assert a claim against LKC for breach of fiduciary duty in connection with the Fee Application.

50.    *Res judicata* can and does bar a debtor's claims against a third party seeking fees in a bankruptcy case if those claims are not asserted in connection with the fee application.  *See In re Intelogic Trace, Inc.*, 200 F.3d at 386–391.

51.    Accordingly, as part of this Objection, the Debtors are required to assert, at a minimum, any affirmative claims against LKC related to the Fee Application and LKC's representation of the Debtors in this case.  *Id.*

52.    The Debtors assert a claim for breach of fiduciary duty against LKC arising out of the Fee Application and LKC's actions in conjunction with the Fee Application.

53.    The elements of a claim for breach of fiduciary duty are: "(1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex.

20

2017). A breach of fiduciary duty by attorneys "most often involves the attorney's failure to disclose conflicts of interest, failure to deliver funds belonging to the client, *placing personal interests over the client's interests*, improper use of client confidences, taking advantage of the client's trust, engaging in self-dealing, and making misrepresentations." *Goffney v. Rabson*, 56 S.W.3d 186, 193–194 (Tex. App.—Houston [14th Dist.] 2001, pet. denied. (emphasis added).

54. A fiduciary duty exists between a lawyer and his or her client as a matter of law. *Gen. Motors Acceptance Corp./Crenshaw, Dupree & Milam, L.L.P. v. Crenshaw, Dupree & Milam, L.L.P./Gen. Motors Acceptance Corp.*, 986 S.W.2d 632, 636 (Tex. App. 1998) (citations omitted). It is undisputed that Rhodium[3] engaged LKC and LKC's attorneys represented (and in fact still represent) the Debtors.

55. LKC breached its fiduciary duty by demanding fees before they are due—and by making that demand in such a manner that, if Rhodium acquiesced, would create substantial liability. Making the payment that LKC demands would cause Rhodium to breach the PSA and possibly violate the Internal Revenue Code and the Treasury Regulations thereunder. *See* ECF No. 1614 at ¶¶ 6-22. Moreover, by pressing the issue, LKC is putting the Debtors—its own *clients*—in a terrible situation as part of what looks like an effort to leverage a favorable result.

56. Further demonstrating its breach of fiduciary duty, LKC bases the

---

[3]The Rhodium entities which engaged LKC as counsel are Rhodium Encore LLC, Jordan HPC LLC, Rhodium JV LLC, Rhodium 2.0 LLC, Rhodium 10MW LLC, Rhodium 30MW LLC, Jordan HPC Sub LLC, Rhodium 2.0 Sub LLC, Rhodium 10MW Sub LLC, Rhodium 30MW Sub LLC, Rhodium Encore Sub LLC, Rhodium Enterprises, Inc., Rhodium Industries LLC, Rhodium Ready Ventures LLC, Rhodium Renewables LLC, Rhodium Renewables Sub LLC, Rhodium Shared Services LLC, and Rhodium Technologies LLC. *See* ECF No. 835.

amount of its current fee demand on preliminary, *projected* numbers, rather than waiting for the actual figures that would accurately shape its entitlement.  In this way, LKC is putting its interest in obtaining its fees ahead of the Debtors' interests and duties to the estate. *See Riverwalk Cy Hotel Partners Ltd. v. Akin Gump Strauss Hauer & Feld, LLP*, 391 S.W.3d 229, 236 (Tex. App. 2012) (reversing summary judgment for law firm where plaintiff client had alleged that its attorney "put its interest in collecting excessive legal fees above its client's interest").

57.     Texas law allows a breach of fiduciary duty claim to proceed in some circumstances without *any* actual damages. *Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999) ("a client need not prove actual damages in order to obtain forfeiture of an attorney's fee for the attorney's breach of fiduciary duty to the client"). Nevertheless, LKC caused damage to the Debtors, its clients, because, among other things, LKC shared the Debtors' privileged information without its consent and forced the Debtors to incur legal fees to respond to LKC's improper Rule 2004 discovery and engage in substantial motion practice related to the Fee Application.

58.     Additionally, LKC's Fee Application (and particularly its reliance on privileged, preliminary settlement discussions) could subject the Debtors to heightened scrutiny by the Internal Revenue Service or other parties based on the false narrative that there are multiple, conflicting allocations of the Whinstone settlement.

59.     Setting aside the fact that LKC's Fee Application is premature, even if it was not, LKC did not have to disclose the Debtors' privileged information in order

22

to make its application.  LKC could have asserted a right to fees based on its view of the Whinstone settlement rather than create a false audit trail that the Debtors now have to address.

## RESERVATION OF RIGHTS

60.    The Special Committee submits this Objection without prejudice to, and with a full reservation of the Special Committee's rights, claims, defenses and remedies, including the right to seek discovery pertaining to the Fee Application and this Objection; to amend, modify or supplement this Objection to raise additional objections; to object to and introduce evidence at any hearing relating to the Objection; and without in any way limiting any other rights of the Special Committee, as may be appropriate.

## CONCLUSION

For these reasons, the Special Committee respectfully requests that the Court deny LKC's Fee Application.

Respectfully submitted this 1st day of October, 2025.

BARNES & THORNBURG LLP

*/s/ Trace Schmeltz*
Vincent P. (Trace) Schmeltz III (pro hac vice)
One N. Wacker Drive, Suite 4400
Chicago, Illinois 60606
Telephone: 312-214-5602
Facsimile: 312-759-5646
Email

*Counsel for the Special Committee of the Board of Directors of Rhodium Enterprises, Inc.*

## **Certificate of Accuracy**

I, Vincent P. (Trace) Schmeltz III, hereby certify that the foregoing statements are true and accurate to the best of my knowledge. The statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Trace Schmeltz*
Vincent P. (Trace) Schmeltz III

## **Certificate of Service**

I, Vincent P. (Trace) Schmeltz III, hereby certify that on the 1st day of October, 2025, a copy of the foregoing Objection was served via the Clerk of the Court through the ECF system to the parties registered to receive such service.

*/s/ Trace Schmeltz*
Vincent P. (Trace) Schmeltz III