## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RHODIUM ENCORE LLC, *et al.*,[1] | § | Case No. 24-90448 (ARP) |
| | § | |
| Debtors. | § | |
| | § | (Jointly Administered) |
| | § | |

**DEBTORS' POST-HEARING BRIEF IN SUPPORT OF AMENDED OMNIBUS OBJECTION TO CLAIM NUMBERS 004, 062, AND 068-072 FILED BY MIDAS GREEN TECHNOLOGIES LLC AND RELATED MOTIONS (FOR SUMMARY JUDGMENT AND TO ESTIMATE, AND IN OPPOSITION TO <u>MOTION TO WITHDRAW THE REFERENCE</u>)**
(Relates to ECF Nos. 953, 954, 1069, 1413, 1483, 1484, 1485, 1486, 1522, 1523, 1534, 1535, 1579, 1655)

---

[1] The Debtors in these chapter 11 cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), Rhodium 30MW LLC (0263), Rhodium Enterprises, Inc. (6290), Rhodium Technologies LLC (3973), Rhodium Renewables LLC (0748), Air HPC LLC (0387), Rhodium Shared Services LLC (5868), Rhodium Ready Ventures LLC (8618), Rhodium Industries LLC (4771), Rhodium Encore Sub LLC (1064), Jordan HPC Sub LLC (0463), Rhodium 2.0 Sub LLC (5319), Rhodium 10MW Sub LLC (3827), Rhodium 30MW Sub LLC (4386), and Rhodium Renewables Sub LLC (9511). The mailing and service address of the Debtors in these chapter 11 cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..............................................................................................................1

ARGUMENT ...................................................................................................................2

    I.      Midas Failed to Prove Damages. ...........................................................2

    II.     Midas Failed to Prove Infringement. .....................................................4

          A.     Rhodium's tanks lacked the claimed "appliance slots." .............4

          B.     There is no evidence whatsoever that Rhodium's tanks dispensed dielectric fluid "substantially uniformly upwardly through each appliance slot.".....................................................................5

          C.     Rhodium's systems had no "secondary fluid circulation facility."..............6

          D.     Midas failed again to present any evidence whatsoever that Rhodium's systems had the claimed "control facility.".......................7

    III.    The Record Supports Estimation at Zero..................................................9

    IV.    Midas Waived Withdrawal of the Reference..........................................10

CONCLUSION.................................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Cont'l Airlines, Inc.*,
  57 B.R. 842 (Bankr. S.D. Tex. 1985) ......................................................................9

*Crown Packaging Tech., Inc. v. Rexam Bev. Can Co.*,
  559 F.3d 1308 (Fed. Cir. 2009)................................................................................7

*In re Electro-Mech. Indus., Inc.*,
  No. 07-36393, 2018 WL 6587299 (Bankr. S.D. Tex. Feb. 20, 2008) ....................10

*Gemalto S.A. v. HTC Corp.*,
  754 F.3d 1364 (Fed. Cir. 2014).................................................................................6

*In re Innovasystems, Inc.*,
  No. 11-36228-ABA, 2014 WL 7235527 (Bankr. D.N.J. Dec. 18, 2014) ...............10

*In re Kaplan*,
  186 B.R. 871 (Bankr. D.N.J. 1995) ........................................................................10

*LBF Travel Mgmt. Corp. v. DeRosa*,
  No. 20-CV-2404-MMA-SBC, 2024 WL 1298001 (S.D. Cal. Mar. 26, 2024),
  *opinion clarified*, 2025 WL 1088200 (S.D. Cal. Apr. 11, 2025)..............................3

*Lexington Ins. Co. v. ACE Am. Ins. Co.*,
  No. H-12-0531, 2014 WL 3406512 (S.D. Tex. July 7, 2014) ...................................2

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009).................................................................................2

*In re Mud King Prods., Inc.*,
  No. H-14-2316, 2015 WL 862319 (S.D. Tex. Feb. 27, 2015)...................................9

*In re Patrick Cudahy Inc.*,
  97 B.R. 489 (Bankr. E.D. Wis. 1989) .......................................................................9

*Rex Medical, L.P. v. Intuitive Surgical, Inc.*,
  No. 24-1072, 2025 WL 2799030 (Fed. Cir. Oct. 2, 2025).......................................2

*Syneron Med. Ltd. v. Invasix, Inc.*,
  No. 8:16-CV-00143, 2018 WL 4696969 (C.D. Cal. Aug. 27, 2018),
  *report & recommendation adopted*, 2018 WL 11351325 (C.D. Cal. Sept. 28,
  2018) ..........................................................................................................................3

*In re Wood*,
  825 F.2d 90 (5th Cir. 1987) ....................................................................................10

Debtors respectfully submit this post-hearing brief in support of their motions for summary judgment (ECF No. 1484, "MSJ") and estimation (ECF No. 1485, "MTE"), and in opposition to Midas Green Technologies LLC's ("Midas") motion to withdraw the reference (ECF No. 1579), which relate to Midas's proofs of claim and Debtors' objections thereto (ECF No. 954). The Court heard these motions on September 23-24, 2025. For the reasons set forth below, in Debtors' papers, and at the hearing, the Court should reject Midas's claim and decline to withdraw the reference.

## INTRODUCTION

1.     Midas filed proofs of claim in September and November 2024 totaling $25-43 million in alleged patent infringement damages but omitted that Midas had already dropped one patent and *lost* its claims on the other in district court in April 2024. Rhodium objected to Midas's invalid claims on multiple grounds, including claim preclusion. ECF Nos. 953, 1413. On July 8, the Court scheduled a full evidentiary hearing to resolve Midas' claims and specified that the parties would brief estimation and summary judgment, then appear for a full evidentiary hearing on August 22, 2025, ECF No. 1427, and later continued that hearing *sua sponte* to September 23, 2025. ECF No. 1526.

2.     Midas had 11 weeks' notice of the evidentiary hearing, four months to respond to Rhodium's objections, and three previous years to muster evidence of infringement and damages. But despite bearing the burden of proof on both issues and having notice of the Debtors' opposition to its untimely motion to withdraw the reference (which cites multiple authorities making clear that bankruptcy courts often address the merits of patent claims), Midas came to the September 23, 2025, hearing empty-handed—no exhibits, no witnesses, and no experts. Nothing.

3.      Midas's claims lack proof on both infringement and damages, and Midas needs both to win.  Although Rhodium could rest on Midas's failure to meet its burden, Rhodium introduced evidence that refutes both infringement and damages.  The Court should enter summary judgment for Rhodium and disallow Midas's claims in full.

4.      Further, the Court must deny Midas's motion to withdraw the reference, ECF No. 1579.   Rhodium's opposition at ECF No. 1655 shows that Midas engaged in cynical gamesmanship in a bid for yet more delay.  Midas moved to withdraw the reference on August 28, 2025, *after* the merits were briefed, *after* the date originally set for the evidentiary hearing, and more than *11 months after* it filed its first proof of claim.  Midas waived its bid to withdraw the reference.

## ARGUMENT

## I.      Midas Failed to Prove Damages.

5.      Infringement aside, Midas cannot recover more than nominal damages.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) ("The burden of proving damages falls on the patentee.").  Without proof, a patentee is entitled only to nominal recovery. *Rex Medical, L.P. v. Intuitive Surgical, Inc.*, No. 24-1072, 2025 WL 2799030 at *8 (Fed. Cir. Oct. 2, 2025) (affirming reduction of $10M award to $1: "[t]he record does not provide evidence from which the jury could find or infer a damages number"); ECF No. 1660-5 at 1-2.

6.      Rhodium's MSJ showed that Midas presented zero evidence of damages. (ECF No. 1660-4 at ¶¶ 66-69.)  Midas presented no counterargument, thereby conceding the issue.  *Lexington Ins. Co. v. ACE Am. Ins. Co.*, No. H-12-0531, 2014 WL 3406512, at *22 (S.D. Tex. July 7, 2014).

7.      At the hearing, Midas introduced no evidence to support its damages claims.  It mentioned its expert's report (9/23 Tr., 48:3-49:5), but expert reports are not evidence, and even if admitted, can only interpret evidence, not supply it.  (*See* ECF No. 1719 ("9/24 Tr.") at 6:8-18,

88:7-12, 89:3-5.)  Accordingly, Midas has not carried its burden to prove *any* damages.  *Lucent*, 580 F.3d at 1324.

8.      Midas argued that because the District Court did not exclude its expert's reasonable royalty, that opinion saves it from summary judgment.  (9/23 Tr., 46:6-16.)  Not so. Merely clearing the *Daubert* bar (admissibility) fails to establish the higher evidentiary standard sufficient to avoid summary judgment (lack of damages).  *Cf., e.g.*, *LBF Travel Mgmt. Corp. v. DeRosa*, No. 20-CV-2404-MMA-SBC, 2024 WL 1298001, at *5 (S.D. Cal. Mar. 26, 2024) (denying *Daubert* motion as to damages expert but granting summary judgment of no damages), *opinion clarified*, 2025 WL 1088200 (S.D. Cal. Apr. 11, 2025).

9.      Even reduced to $12.3 million, ECF No. 1580 at 9, Midas's claim lacks evidence. Midas's amended claim amount relies on its expert's hearsay, inadmissible opinions that cannot support its claims.  For example, Midas's expert's reasonable royalty calculations depend on his excluded lost profits figures (ECF No. 1660-13, 26:1-7, 26:24-27:1)—they even rely on the same schedules. (ECF No. 1660-21 at 13-15.)  No reasonable royalty estimate can rely on an excluded calculation of lost profits.  *Syneron Med. Ltd. v. Invasix, Inc.*, No. 8:16-CV-00143, 2018 WL 4696969, at *5 (C.D. Cal. Aug. 27, 2018), *report & recommendation adopted*, 2018 WL 11351325 (C.D. Cal. Sept. 28, 2018).

10.      Moreover, as briefed, the hypothetical negotiation for the royalty would have happened in 2020, but (i) Midas had no sales in 2020, and (ii) when it did make sales one and three years later, it made them at a discount, not at the inflated price its expert used.  (ECF No. 1660-19 at 16-17; 9/23 Tr., 33:19-34:8.)  Midas and its expert also ignored evidence of an offer that Midas made to license its technology at *less than half* the rate reflected in its damages calculation—which the prospective customer rejected as *too expensive*—and ignored competing non-infringing

3

technology. (ECF No. 1660-19 at 17-19; 9/23 Tr., 34:9-14.)  Therefore, Midas cannot recover anything other than $0 or $1.

## II.    Midas Failed to Prove Infringement.

### A.    Rhodium's tanks lacked the claimed "appliance slots."

11.    The asserted claims require a tank "adapted to immerse … a plurality of electrical appliances, ***each in a respective appliance slot*** distributed vertically along, and extending transverse to, a long wall of the tank."  ECF No. 1706 at 22 (quoting '457 Patent, claim 1 (emphasis added)). Rhodium's tanks had no slots. *See* ECF Nos. 1660-31, 1660-32 (photos).

12.    The testimony of Chase Blackmon, Rhodium's CEO and founder who designed the tanks, and Debtors' expert, Dr. Alfonso Ortega, confirmed that Debtors' tanks contained no slots: "[T]he Rhodium tanks … it's as shown [in ECF No. 1660-31.]  It's an empty tank.  There really is no such thing that one might identify as a slot." 9/23 Tr., 148:1-4.  The miners just "stand[] on the plate, and that's all there is … it's held down by it own weight. … [the tank] doesn't have any other appliance, it doesn't have any other things to hold the miner in place."  *Id.*, 148:14-24, discussing ECF No. 1660-32; *id.*, 68:19-22 (Blackmon, asked what "holds the miners in the tank": "Nothing.").

13.    Midas suggested that a slot could be merely a volume, like a parking space.  9/24 Tr., 13:19-14:2.  But that unsupported notion ignores the evidence: the "appliance slots" in Midas's patent refer to physical components of the tank, different from the appliances themselves, and "distributed vertically along" the tank's long wall. 9/23 Tr., 147:15-16; 9/24 Tr., 13:6-11, 15:3-14, 81:2-3.  The asserted patent refers to them as of "convention[al] design," it illustrates them with

bolt holes, and they are designed to "suspend the appliance."[2] 9/23 Tr., 146:5-147:21; ECF No. 1705 at 7.  Rhodium's tanks have nothing of the kind. 9/23 Tr., 148:14-24, 68:19-22; 9/24 Tr., 69:11-70:23.

**B.    There is no evidence whatsoever that Rhodium's tanks dispensed dielectric fluid "substantially uniformly upwardly through each appliance slot."**

14.    The asserted claims further require "a plenum, positioned adjacent the bottom of the tank, adapted to dispense the dielectric fluid ***substantially uniformly upwardly through each appliance slot***."  ECF No. 1706 at 29 (quoting '457 Patent, claim 1 (emphasis added)). Setting aside that Rhodium's tanks lacked slots, and thus could not dispense fluid "through each appliance slot," the fluid could *not* go substantially uniformly upwardly through each miner.  Rather, in Rhodium's tanks, the fluid had to pass through a base plate with distinct hole patterns that Mr. Blackmon designed to direct the dielectric fluid in a different and deliberately non-uniform manner. ECF No. 1660-31 (non-uniform hole pattern); *compare with* ECF No. 1660-20 at 39 (Fig. 8 of '457 Patent (depicting uniform hole pattern)).  Mr. Blackmon designed Rhodium's hole pattern to direct the flow of fluid to the hottest spots in each miner while impeding flow to relatively cool regions. 9/23 Tr., 73:24-74:4 ("Q: … [W]hat was it you were trying to achieve with this hole pattern design? A: I wanted to make sure that the fluid got specifically to the places where it needed to go, and didn't go in other places where we definitely did not want it to go … I wanted the fluid to go to the … most heat-generating components, largely are the hashboards of the machines themselves."); *id.* at 72:14-73:23 (testified that he designed hole pattern by mapping out heatsinks in miners and that "the bulk of the fluid" goes to "where 97% of the heat of the miner

---

2    As Dr. Ortega explained, the plain meaning of "appliance slot" to one of ordinary skill in the art is a "physical device … designed to allow the appliance to slide in or slip in or slot into a very particular place," "to hold the appliance in place," "to secure it …." 9/23 Tr., 145:17-22; 9/24 Tr., 14:5-15. "It's typically secured, for example, with bolts or other things that secure the appliance into its respective slot." *Id.*, 145:22-24; 9/24 Tr., 22:4-14 (slot is defined by physical hardware that suspends appliance and holds it in place); 25:5-9 (same).

gets generated"); *id.* at 75:5-13 (testified that this design cooled the miners effectively); *id.* at 63:20-25; *id.* at 69:16-22.

      **C.**      **Rhodium's systems had no "secondary fluid circulation facility."**

15.     Midas's asserted claims require two distinct circulation facilities: a primary circulation facility, and "a secondary fluid circulation facility adapted to extract heat from the dielectric fluid circulating in the primary circulation facility, and to dissipate to the environment the heat so extracted." *See* ECF No. 1706 at 25. The patent uses the terms "'circulation facility' and 'circulation loop' synonymously and interchangeably," *id.* at 26 (quoting '457 Patent (Col. 5, ll. 13-15; Col. 5, ll. 21-25; Col. 8, ll. 5-8; Col. 8, ll. 16-19)), as Midas has acknowledged, *id.* at 27 (quoting ECF No. 1522 at ¶ 66); *see also* 9/24 Tr., 32:7-33:7. And the Patent illustrates the invention only with two circulation loops, never one. *See, e.g.*, ECF No. 1705 (Fig. 12 with primary and secondary loops in red and blue).

16.     Rhodium's systems used only a single, long loop from the tanks, extending through multiple structures, to distant dry coolers, and back to the tanks. 9/23 Tr., 63:6-65:5. Midas concedes that Debtors had no second fluid loop, suggesting that the *air* blowing through the dry coolers sufficed as a "secondary circulation facility." Air could, at least theoretically, serve as the secondary "fluid," 9/23 Tr., 153:21-154:5, but that misses the point. Rhodium lacked the second circulation facility required by the claims because its systems did not *circulate* air in any circuit or closed system, such as a loop, they merely passed it through by blowing air across the single loop of dielectric fluid. 9/23 Tr., 154:6-18; 9/24 Tr., 31:23-33:7, 46:17-22.

17.     Rhodium's systems never satisfied this limitation under the doctrine of equivalents either. Any equivalence theory fails because Midas must, but did not, provide "particularized testimony and linking argument to show the equivalents" are insubstantially different from the claimed invention. *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1374 (Fed. Cir. 2014).

18.    In addition, an accused system generally is not insubstantially different unless it performs the same function, in the same way, with the same result, as the claimed invention. *Crown Packaging Tech., Inc. v. Rexam Bev. Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009).  That standard cannot be met here because the way Rhodium's systems operated and the results achieved are quite different. 9/23 Tr., (Blackmon) 61:21-25; 63:12-65:5; 75:14-76:10; (Ortega) 154:10-18; 9/24 Tr., 72:17-74:10; *see also* ECF No. 1706 at 28 (quoting '457 Patent, 8:47-54, explaining that "in all of the embodiments described herein, emphasis was placed on minimizing the total volume of the dielectric fluid circulating throughout each immersion module," and that to realize that goal, "the **key concept** … is to move the secondary fluid to the point of heat exchange with the primary fluid, rather than to move the primary fluid to the point of heat exchange with the secondary fluid"). Rhodium's single loop approach (which did what the patent criticized, by moving the dielectric fluid to the point of heat exchange rather than moving the secondary fluid) was indisputably substantially different, and not equivalent.  *See also* 9/23 Tr., (Blackmon) 61:21-25; 63:12-65:5; 75:14-76:10; (Ortega) 154:7-18; 9/24 Tr., 72:17-74:10.

### D.    Midas failed again to present any evidence whatsoever that Rhodium's systems had the claimed "control facility."

19.    Finally, as is law of the case, Rhodium's systems lack the claimed "control facility." ECF No. 1660-4 at ¶¶ 55-59; ECF No. 1660-5 at ¶ 26; ECF No. 1660-20 at 9-24; ECF No. 1660-24 at 1-5.

20.    The claimed "control facility" must be "adapted to coordinate the operation of the primary and secondary fluid circulation facilities as a function of the dielectric fluid temperature in the tank."  No device at Rhodium's Temple or Rockdale facilities coordinated what Midas identified as the "primary circulation facility"—the pumps and pipes that circulated the dielectric fluid, ECF No. 1660-13 at 33:16-17—and what it identified as the "secondary circulation facility,"

namely, the dry coolers.  ECF No. 1660-4 at ¶¶ 58, 62; 9/23 Tr., 155:23-156:2, 156:7-14.  In fact, as Mr. Blackmon testified, the pumps were ramped up manually and then run at a constant speed—they could not be adjusted automatically. 9/23 Tr., 76:5-77:7.  Thus, no device coordinated the primary facility even by itself, much less with the secondary circulation facility. 9/24 Tr., 63:2-4 (Ortega: cooling tower fan speed controller could not coordinate anything related to the primary facility).

21.     Nor did Rhodium's systems coordinate anything "as a function of the dielectric fluid temperature in the tank."  Neither the Temple nor the Rockdale facility had sensors or any other means of measuring the temperature of the dielectric fluid in the tank. 9/23 Tr., (Blackmon), 69:23-70:8, (Ortega) 155:23-156:6; 156:25-157:3.  Rhodium's systems at Temple could not measure the temperature of the dielectric fluid anywhere in the loop because none of the temperature sensors were wired in (and most were never installed).  9/23 Tr., (Blackmon) 79:7-80:21; 95:3-96:1 (system was non-functional and 90% uncompleted); 98:9-25 (Kelvion cooler could not adjust fan speed based on temperature); 9/24 Tr., (Ortega) 58:14-23; *see* ECF No. 1660-4 at 9-10.  Dr. Ortega testified that the fluid temperature at the locations where the temperature sensors would have been placed at Temple, and were placed at Rockdale, differed from the fluid temperature in the tank.  At Temple, the sensors, had they been installed, would have been at the Kelvion dry cooler (in another building), where the dielectric fluid temperature is different from the temperature in the tank.  9/24 Tr., 40:18-41:7; 41:16-20; *see also* 9/23 Tr., 101:11-16 ("largely" but not exactly the same due to factors such as the sun).  At Rockdale, the sensors were placed at the exit from the Guntner cooler, at which point the cooled fluid had a different temperature from that in the tank.  9/23 Tr., 82:24-83:18; 9/24 Tr., 42:3-10; 47:24-48:4; 48:10-24; 49:19-52:11.

22.     None of Midas's evidence or arguments comes remotely close to satisfying this limitation.  The District Court excluded most of Midas's theories. ECF No. 1660-13 at 18:6; ECF No. 1710.  Midas's arguments also lack coherence: The patent's claim language requires the control facility to be adapted to coordinate both circulation facilities, not the temperature of the dielectric fluid or the miners.  9/24 Tr., 77-9-14; 82:5-21.  Midas failed to explain and cannot show that changing the temperature of the dielectric fluid constitutes coordination of the fluid circulation facilities. *Id.* at 76:8-15.  As for the Restful API software, which shut down or rebooted the miners at a lower temperature when they overheated (9/24 Tr., 67:2-16, 9/23 Tr., 110:2-111:5), that also did not measure the tank fluid temperature—only the temperature inside the chip junction—and it could not use either temperature to coordinate the operation of even one circulation facility, much less both.  9/23 Tr., 128:13-21; 128:25-130-7; 9/24 Tr., 65:7-14; 67:2-24; 82:5-22.[3]

## III.     The Record Supports Estimation at Zero.

23.     Section 502(c) of the Bankruptcy Code creates "an affirmative, mandatory duty" to estimate contingent or unliquidated claim to avoid undue delay of a debtor's reorganization.  *In re Cont'l Airlines, Inc.*, 57 B.R. 842, 844 (Bankr. S.D. Tex. 1985).  If the value of Midas's Claims remain unresolved, the resolution of these cases could be delayed indefinitely, requiring estimation.  *See In re Mud King Prods., Inc.*, No. H-14-2316, 2015 WL 862319, at *4 (S.D. Tex. Feb. 27, 2015) (holding use of estimation process was proper where "no party is able to propose a meaningful plan of reorganization" until the value of the claim was determined); *In re Patrick*

---

[3]     Nor can the Restful API infringe under the doctrine of equivalents.  Named inventor Christopher Boyd testified that using the chip junction temperature was a substantially different, more expensive method than using the tank fluid temperature. ECF No. 1660-14, 007-008.  Moreover, reducing the heat entering the system by rebooting the miners is not cooling at all but a wholly different method of reducing the temperature of the dielectric fluid in the tank. 9/24 Tr., 74:21-75:17.  In any case, taking a step that merely impacts the dielectric fluid's flow characteristics fails to equate to coordinating a circulation facility. 9/24 Tr., 82:5-21; 77:9-14; 76:8-15.  These two methods represent completely different techniques.

*Cudahy Inc.*, 97 B.R. 489, 491 (Bankr. E.D. Wis. 1989). As outlined above, Midas failed to substantiate any damages (nor any infringement). This failing alone warrants estimation at zero.

24.    Because Midas previously litigated its claims, claim preclusion justifies estimation at zero. Even Midas admits that the District Court "indicat[ed] he was intending to grant summary judgment." 9/23 Tr., 43:19-20. Even without preclusion, this Court may determine that Midas's claim has no value. *In re Innovasystems, Inc.*, No. 11-36228-ABA, 2014 WL 7235527, at *8 (Bankr. D.N.J. Dec. 18, 2014); *In re Kaplan*, 186 B.R. 871, 874 (Bankr. D.N.J. 1995).

**IV.    Midas Waived Withdrawal of the Reference.**

25.    Midas's untimely motion to withdraw the reference must be denied. Midas believes that the Court has no authority to consider *any* patent law questions 9/23 Tr., 49:22-50:3. On the contrary—this Court has exclusive jurisdiction to decide all proofs of claim submitted in this case. *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987). Indeed, the adjudication of claim objections is one of the primary responsibilities of a bankruptcy judge. 9/23 Tr., 47: 22-24.

26.    Midas failed to show that its Claims require "substantial and material" consideration of federal statutes. *In re Electro-Mech. Indus., Inc.*, No. 07-36393, 2018 WL 6587299, at *3 (Bankr. S.D. Tex. Feb. 20, 2008). "Withdrawal of reference is not warranted, however, where it is a question of "straightforward application of a federal statute to a particular set of facts.'" *Id.* The determination of Midas's claims rest on simple questions with easy answers: Rhodium's tanks contain no appliance slots; the dielectric fluid in Rhodium's tanks does not flow uniformly upward; and Rhodium's tanks do not coordinate anything based on fluid temperature.

## CONCLUSION

27.    The Court should deny Midas' motion to withdraw the reference, enter summary judgment for Rhodium and dismiss Midas's claims. Alternatively, the Court should estimate Midas's claims at zero dollars.

## **RESERVATION OF RIGHTS**

28.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (vi) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

Respectfully submitted this 8th day of October, 2025.

        QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco (SBN 01797600)
Cameron Kelly (SBN 24120936)
Alain Jaquet (*pro hac vice*)
Rachel Harrington (*pro hac vice*)
700 Louisiana Street, Suite 3900
Houston, Texas 77002
Telephone: 713-221-7000
Facsimile: 713-221-7100
Email: pattytomasco@quinnemanuel.com
Email: cameronkelly@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com
Email: rachelharrington@quinnemanuel.com

- and -

Eric Winston (*pro hac vice*)
Razmig Izakelian (*pro hac vice*)
Ben Roth (*pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213-443-3000
Facsimile: 213-443-3100
Email: ericwinston@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com
Email: benroth@quinnemanuel.com

- and –

STRIS & MAHER LLP

Peter K. Stris
Elizabeth R. Brannen
17785 Center Court Dr N., Suite 600
Cerritos, CA 90703
Phone: (213) 995-6800
Fax: (213) 261-0299
pstris@stris.com
ebrannen@stris.com

*Counsel to the Debtors and*
*Debtors-In-Possession*

### Certificate of Service

I, Patricia B. Tomasco, hereby certify that on the 8th day of October, 2025, a copy of the foregoing Brief was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas and to Midas Green Technologies, LLC, c/o Joseph Thomas, 18101 Von Karman Avenue, Suite 230, Irvine, CA 92612, email jthomas@twtlaw.com.

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco

13