**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RHODIUM ENCORE LLC, *et al.*,[1] | § | Case No. 24-90448(ARP) |
| | § | |
| Debtors. | § | |
| | § | (Jointly Administered) |
| | § | |
| | § | |

**DECLARATION OF DAVID EATON IN SUPPORT OF PLAN CONFIRMATION**

David Eaton, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

**Background and Qualifications**

1.       I am an independent director of the board of directors (the "Enterprises Board") of Rhodium Enterprises, Inc. ("Rhodium Enterprises").  Specifically, I am one of the two members of the Special Committee of the Enterprises Board, which was formed on August 28, 2024 (the "Special Committee").

2.       I am a restructuring advisor with over four decades of experience in guiding companies through sophisticated financings, restructurings, and special situations.  Previously, I was a partner at the law firm Kirkland & Ellis, LLP as well as a Managing Director at PricewaterhouseCoopers Corporate Finance.  I regularly serve as an independent director to companies undergoing liability management and restructurings.

---

[1]      The Debtors in these chapter 11 cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), Rhodium 30MW LLC (0263), Rhodium Enterprises, Inc. (6290), Rhodium Technologies LLC (3973), Rhodium Renewables LLC (0748), Air HPC LLC (0387), Rhodium Shared Services LLC (5868), Rhodium Ready Ventures LLC (8618), Rhodium Industries LLC (4771), Rhodium Encore Sub LLC (1064), Jordan HPC Sub LLC (0463), Rhodium 2.0 Sub LLC (5319), Rhodium 10MW Sub LLC (3827), Rhodium 30MW Sub LLC (4386), and Rhodium Renewables Sub LLC (9511).  The mailing and service address of the Debtors in these chapter 11 cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005.

3.     In my capacity as a member of the Enterprises Board and the Special Committee, I am generally familiar with the Debtors' operations, business, financial affairs, and ongoing restructuring efforts, including, but not limited to, the *Second Amended Joint Chapter 11 Plan of Liquidation for Rhodium Encore LLC and its Affiliated Debtors Proposed by Debtors and Ad Hoc Group of SAFE Parties* [Docket No. 2062] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]

4.     Except as otherwise indicated herein, all facts in this declaration (the "Declaration") are based upon (i) my personal knowledge of the Debtors' operations; (ii) my discussions with other members of the Debtors' management team and advisors; and (iii) my review of relevant documents and information concerning the Debtors' operations. If called upon to testify, I could and would testify competently to the facts set forth herein.

## Plan Summary

5.     Based on my extensive and intimate involvement throughout the course of these Chapter 11 Cases, including in connection with the preparation of the Plan, I firmly believe that the Plan provides the Debtors and their creditors and their stakeholders the best possible recovery in light of the circumstances of these Chapter 11 Cases, the rulings of the Bankruptcy Court, and other applicable facts and considerations.

6.     The Debtors' extensive negotiations with their creditors and other parties-in-interest culminated in the proposed Plan, which achieves payment in full of all claims as allowed or compromised with a path to value for holders of equity interests.  The Plan achieves nearly

---

[2]     All terms not defined in the Declaration have the meaning given to them in the Plan, the *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Liquidation of Rhodium Encore LLC and Its Affiliated Debtors* [Docket No. 1832] (the "Disclosure Statement"), or *Debtors' Memorandum of Law in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Liquidation of Rhodium Encore LLC and its Affiliated Debtors*, which is contemporaneously filed herein.

universal acceptance.  Only one group of equity interests voted to reject the Plan, while all other major stakeholders support the Plan, as reflected in, among other things, the Plan Support Agreement filed on October 7, 2025, [Docket No. 1747] (the "Plan Support Agreement"), and the Settlement Stipulation among the Debtors (acting through the Special Committee), the SAFE AHG, the Transcend Group and the Other Encore Parties [Docket No. 2006] (the "Settlement Stipulation").[3]

7.      The Plan, among other things, (i) provides for payment in full of Administrative Expense Claims, Priority Tax Claims, all Secured Notes Claims, Priority Non-Tax Claims, Guaranteed Unsecured Claims, and General Unsecured Claims, in each case to the extent such Claims have not already been satisfied pursuant to orders of the Bankruptcy Court; (ii)  provides for the distribution of Cash to Holders of SAFE Claims and contemplates potential distributions to the Transcend Group (whose Allowed Claims are included in Class 5b) in accordance with agreements negotiated with the SAFE AHG and the Transcend Group, respectively; (iii) provides for any residual value after payment in full of the SAFE Claims, the SAFE Substantial Contribution Claim and the Transcend Claims in their negotiated amounts to be distributed to Holders of Common Interests; and (iv) designates a Plan Administrator in charge of directing the affairs of the Wind Down Debtor, which, in accordance with the Plan, will seek to maximize the value of the remaining assets for distribution to Holders of Allowed Claims and Interests, and pursue the orderly wind down the Debtors' affairs in accordance with the Plan.

8.      With respect to Debtors' Wind Down and the distributions under the Plan, (i) the Debtors, except for the Wind Down Debtor, will be dissolved pursuant to the Confirmation Order; (ii) the Debtors' assets (including all Remaining Assets and Retained Causes of Action) will vest

---

[3]   The Transcend Group and the Other Encore Claimants are defined in the Settlement Stipulation.

in the Wind Down Debtor; and (iii) after the Wind Down Debtor liquidates its assets, the Wind Down Debtor will distribute the net proceeds to Holders of Allowed Claims and Interests. Specifically, the Wind Down Debtor will continue in existence after the Effective Date to, among other things, (i) pursue the Retained Causes of Action for the benefit of Holders of Claims or Interests entitled to Distributions; (ii) wind down the Debtors' remaining businesses and affairs as expeditiously as reasonably possible and liquidate any Remaining Assets held by the Wind Down Debtor after the Effective Date; (iii) resolve any Disputed Claims; (iv) pay Allowed Claims or Interests; (v) file appropriate tax returns; and (vi) administer the Plan promptly and efficiently.

9.     Under the Plan, the Plan Administrator will manage the Wind Down Debtor. Among other things, the Plan Administrator will be charged with: (i) administering the implementation of the Plan, including the making of the Distributions contemplated by the Plan; (ii) liquidating any Remaining Assets; (iii) conducting an analysis of all remaining Claims and Interests and prosecuting objections thereto or settling or otherwise compromising such Claims and Interests, if necessary and appropriate; (iv) maintaining and administering the reserves in accordance with the terms of the Plan; (v) commencing, prosecuting, or settling Retained Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges in accordance therewith and paying all associated costs; (vi) paying Post-Effective Date Fees and Expenses; (vii) preparing and filing post-Effective Date operating reports; (viii) filing appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations; (ix) retaining such Professionals as are necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations; and (x) taking such actions as are necessary and reasonable to carry out the provisions of the Plan, including winding down the Wind Down Debtor's business affairs.

10.     In sum, the Plan (i) maximizes value of the Debtors' assets; (ii) provides for payment in full or payment of otherwise agreed-upon amounts to general unsecured creditors; (iii) implement negotiated settlements of claims asserted by the SAFE AHG, the Transcend Group, and the Other Encore Claimants; (iv) resolves the Estates' claims against the Founders in exchange of millions of dollars of new value; (v) compensates the SAFE AHG for its substantial contribution to the Debtors' chapter 11 cases; (vi) effectuates the orderly wind down of the Debtors; and, most importantly, (vii) complies with all of the requirements of section 1129 of the Bankruptcy Code. For these reasons, I believe that the Plan should be confirmed.

### The Disclosure Statement Should be Approved on a Final Basis

11.     I believe that the Disclosure Statement contains "adequate information" for creditors to evaluate the Plan.  The Disclosure Statement contains detailed information regarding, among other things: (i) the Plan; (ii) the Debtors' business; (iii) the Debtors' corporate and capital structure; (iv) the significant events leading to the commencement of these Chapter 11 Cases; (v) an overview of these Chapter 11 Cases, including significant settlements/agreements; (vi) federal tax consequences of the Plan; (vii) financial information and valuations that would be relevant to creditors' and interest holders' determination to accept or reject the Plan; (viii) a liquidation analysis setting forth the estimated return that Holders of Claims and Interests would receive in a hypothetical chapter 7 liquidation; and (ix) risk factors associated with the Plan.

12.     I have read the Disclosure Statement and had input into its preparation.  To the best of my knowledge, the Disclosure Statement is accurate and contains more than sufficient information to allow Holders of Claims and Interests to vote on the Plan.  I am not aware of any Holder of Claims or Interests that has an outstanding objection to approval of the Disclosure Statement on a final basis.

5

13. Following the Court's entry of the Disclosure Statement Order, I understand that the Debtors' Claims Agent solicited votes on the Plan consistent with the with solicitation materials approved by the Court. I further understand that the Plan Proponents did not solicit acceptances of the Plan from any Holder of a Claim or Interest before entry of the Disclosure Statement Order.

14. To the best of my knowledge, the Plan Proponents at all times took appropriate actions in relation to the solicitation of the Plan and that in compliance with the Disclosure Statement Order and section 1125 of the Bankruptcy Code.

15. Accordingly, the Disclosure Statement should be approved on final basis.

## The Plan Satisfies the Requirements of Confirmation

16. I am aware of the applicable standards under which a chapter 11 plan of liquidation may be confirmed. For the reasons detailed below, and with the consultation and guidance of the Debtors' advisors, I believe, to the best of my knowledge, that the Plan satisfies the applicable Bankruptcy Code requirements for confirmation of a plan. I have set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan and related documents.

### A. The Plan Fully Complies With The Applicable Provisions of the Bankruptcy Code – § 1129(a)(1)

17. I understand that section 1129(a)(1) of the Bankruptcy Code requires a chapter 11 plan to comply with all applicable provisions of the Bankruptcy Code including those that follow:

#### 1. Proper Classification of Claims and Interests – §§ 1122, 1123(a)(1)

18. I understand that sections 1122 and 1123(a)(1) of the Bankruptcy Code govern the manner in which a debtor classifies claims and interests. I believe that the Plan's classification of Claims and Interests satisfies the requirements of sections 1122 and 1123(a)(1) of the Bankruptcy

6

Code.  To my knowledge, Claims and Interests assigned to each specific Class are substantially similar to the other Claims and Interests in such Class.  The separate classification of Claims or Interests into the thirteen Classes created under the Plan is based on valid business, legal and factual reasons that justify such separation, and no unfair discrimination exists between or among Holders of Claims and Interests.  In particular, the Plan separately classifies the Claims and Interests because each Holder of such Claims or Interests may hold (or may have held) rights in the Estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience results from such classification.  I also believe that Article 3 of the Plan properly designates Classes of Claims and Interests.

19.     The Plan classifies separately Claims (rights to payment) and Interests (representing ownership in the Debtors).  With respect to Claims, the Plan differentiates between the three Classes of Secured Notes Claims, Priority Non-Tax Claims, and several classes of unsecured Claims. Regarding unsecured Claims, the Plan breaks out Guaranteed Unsecured Claims and General Unsecured Claims because they have differing potential legal rights.  General Unsecured Claims are classified differently from other unsecured Claims because they the Holders thereof have different rights against the Debtors on account of such Claims than the Holders of Priority Non-Tax Claims, SAFE Claims, Late-Filed Claims, Intercompany Claims, and Section 510(b) Claims.    The separate classification of the SAFE Claims at Rhodium Enterprise, in addition, is justified because the SAFE Claims are contractually subordinated to other general unsecured creditors of Rhodium Enterprises.  Transcend Claims have been classified under the Plan as General Unsecured Claims in a negotiated amount and with a negotiated treatment given that the Holders of such Claims also assert a general, non-secured right to payment from the Debtors' assets on account of their Claims.

Case 24-90448 Document 2074 Filed in TXSB on 12/01/25 Page 8 of 35

20.     Common Interests, Imperium Interests, and Intercompany Interests are also classified separately under the Plan. The breakdown of those Interests into separate classes is justified given that the Imperium Interests are presumed to accept the Plan as part of the agreement by Imperium and the Founders to their treatment under the Plan, and that Intercompany Interests receive no property under the Plan and are therefore deemed to reject. Common Interests, on the other hand, consist of all Class A Interests in Rhodium Enterprises, Inc., and were entitled to vote to accept or reject the Plan. The Common Interests will receive any Distributable Cash or proceeds from the disposition of Remaining Assets or Retained Causes of Action following the satisfaction of SAFE Claims and Transcend Claims in accordance with the Plan.

21.     Considering the foregoing, the Plan satisfies section 1122(a) and 1123(a)(1) of the Bankruptcy Code.

### 2.     Specification of Unimpaired Classes – § 1123(a)(2)

22.     I understand that Article 3 of the Plan identifies as Unimpaired the following nine Classes: (i) Class 1 (Rhodium 2.0 Secured Notes Claims); (ii) Class 2 (Rhodium Encore Secured Notes Claims); (iii) Class 3 (Rhodium Technologies Secured Notes Claims); (iv) Class 4 (Priority Non-Tax Claims); (v) Class 5a (Guaranteed Unsecured Claims); (vi) Class 5b (General Unsecured Claims); (vii) Class 7 (Late Filed Claims); (viii) Class 8 (Intercompany Claims); and (ix) Class 9 (Section 510(b) Claims). Therefore, the Plan satisfies section 1123(a)(2) of the Bankruptcy Code.

### 3.     Treatment of Impaired Classes – § 1123(a)(3)

23.     I understand that Article 3 of the Plan identifies as Impaired following four Classes, specifying their treatment: (i) Class 6 (SAFE Claims); (ii) (ii) Class 10 (Common Interests); (iii) Class 11 (Imperium Interests); and (iv) Class 12 (Intercompany Interests). I understand further that the Plan specifies the treatment of Claims or Interests in each of those Classes. Accordingly, the Plan satisfies section 1123(a)(3) of the Bankruptcy Code.

### 4. Equal Treatment of Similarly Situated Claims and Interests – § 1123(a)(4)

24.     I understand that section 1123(a)(4) of the Bankruptcy Code requires that the Plan provide the same rights and treatment to each Holder of Claims or Interests as other Holders of allowed Claims or Interests within such Holders' respective Class, except where the Holder of such Claim or Interest has agreed to a less favorable treatment. I believe that the Plan satisfies this requirement, as Article 4 of the Plan provides that Holders of Allowed Claims or Interests in a particular Class will receive the same treatment as other Holders in such Class, except to the extent that any such Holder agrees to less favorable treatment.

### 5. Adequate Means for Implementation – § 1123(a)(5)

25.     I understand that section 1123(a)(5) of the Bankruptcy Code requires that a chapter 11 plan provide adequate means for a plan's implementation. The Plan provides adequate means for implementation as required under section 1123(a)(5) of the Bankruptcy Code.

26.     Among other things, Article 4 of the Plan sets forth means of implementation such as (i) the settlement of Claims and Interests; (ii) the liquidation of the Debtors; (iii) the vesting of assets in the Wind Down Debtor; (iv) the appointment of the Plan Administrator; (v) the source of consideration for Plan distributions; (vi) the release of Liens; (vii) the cancellation of notes, instruments, certificates, licenses, and other documents; and (viii) the preservation of Retained Causes of Action.

### 6. Prohibition of Issuance of Non-Voting Stock – § 1123(a)(6)

27.     I understand that section 1123(a)(6) of the Bankruptcy Code requires that a debtor's organizational documents prohibit the issuance of nonvoting equity securities. I understand that no nonvoting securities will be issued under the Plan, and on or prior to the Effective Date, all but one of the Debtors will be dissolved. With respect to the Wind Down Debtor, I further understand

that no nonvoting stock will be issued.  Accordingly, the Plan complies with section 1123(a)(6) of the Bankruptcy Code.

### 7.        Selection of Officers and Directors – § 1123(a)(7)

28.     I understand that section 1123(a)(7) of the Bankruptcy Code requires that any provisions in the Plan with respect to the manner of selection of any director, officer, or trustee be consistent with the interests of creditors, equity holders, and public policy.  I believe that the Plan satisfies this requirement by providing that, on the Effective Date, the authority, power, and incumbency of the persons acting as directors and managers of the Debtors shall be deemed to have resigned, or shall otherwise cease to be a director or manager of the applicable Debtor, and the Plan Administrator direct the affairs of the Wind Down Debtor following the Effective Date. The Plan Proponents also filed the Plan Supplement, which provides the identity of the Plan Administrator [Docket No. 2001-2], and the agreement by which the Plan Administrator is to perform services for the Wind Down Debtor [Docket No. 2051-1].  Accordingly, I believe that the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

### 8.        Discretionary Contents of the Plan – § 1123(b)

29.     I understand that section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  I understand that pursuant to section 1123(b) of the Bankruptcy Code, among other things, a plan may: (i) impair or leave unimpaired any class of claims or interests; (ii) provide for the assumption or rejection of executory contracts and unexpired leases; (iii) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate, or the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest; or (iv) "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."

### a.      Impaired or Unimpaired Classes – § 1123(b)(1)

30.      The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Pursuant to Article 4 of the Plan, Classes 1, 2, 3, 4, 5a, 5b, 7, 8, and 9 are Unimpaired because I understand the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Classes.  On the other hand, Classes 6, 10, 11, and 12 are Impaired because the Plan modifies the rights of the Holders of Claims or Interests, as applicable, within such Classes as contemplated by section 1123(b)(1) of the Bankruptcy Code.

### b.      Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases – § 1123(b)(2)

31.      Article 8.1 of the Plan provides that, on the Effective Date, all Executory Contracts and Unexpired Leases that, as of the Effective Date, were not previously rejected, assumed, expired, terminated, the subject of a motion to assume filed by the Debtors on or before the Confirmation Date, or identified for assumption on the Schedule of Assumed Contracts included in the Plan Supplement, shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except to the extent set forth in the Plan.  Accordingly, the Plan complies with section 1123(b)(2) of the Bankruptcy Code.

### c.      Settlement of Claims or Interests – § 1123(b)(3)(A)

32.      The Plan provides for a general settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or resolved pursuant to the Plan.  In particular, the Plan provides for (i) the settlement of Claims held by the Debtors against Imperium and the Founders in connection with the D&O Insurance Settlement; (ii) the resolution of disputes with the Transcend Group and Other Encore Claimants, as set forth in the settlement stipulation with such parties [Docket No. 2006]; and (iii) the resolution of disputes regarding the treatment of the SAFE Claims including, without limitation, regarding the appeals related to the SAFE

11

Objection Order and SAFE AHG Substantial Contribution Claim.  As further discussed below, I believe that the compromises set forth in the Plan bring necessary closure to these and other matters addressed in the Plan, and permit the Debtors to avoid waste and maximize the value of the Debtors' Estates for the benefit of all parties in interest, and maximize recoveries for all Holders of Claims and Interests.  I further believe that the compromises embodied in the Plan are fair, equitable, and within the range of reasonableness.  Therefore, the Plan complies with section 1123(b)(3)(A) of the Bankruptcy Code.

### i.      The D&O Insurance Settlement

33.      I believe that the D&O Insurance Settlement is a vital component of the several interwoven settlements that underlie the Plan, as well as the result of a sound exercise of Debtors' business judgment.  The Plan provides for the settlement of the D&O Claims as part of a comprehensive resolution among the Debtors, Imperium, and the Founders, including (i) an $8.5 million payment from the insurance carriers that issued the Debtors directors' and officers' liability insurance policies; (ii) insurance reimbursement in favor of the Debtors' Estates of certain of the Special Committee's fees; (iii) insurance reimbursement directly to Imperium and the Founders of $1 million in costs incurred by those parties that might otherwise have come out of the Debtors' Estates; (iv) the costless Redemption (as defined below) of Imperium's Interests in RTL; (v) the resolution of the Debtors' claims against Imperium and the Founders,[4] and (vi) the settlement of Imperium's and the Founders' Claims against the Debtors.[5]  The D&O Insurance Settlement plays a key role in providing a near-term path to emerge from chapter 11 liquidation, allowing for

---

[4]    In contrast, any direct claims that may be held by third parties against Imperium and the Founders are unaffected by the D&O Insurance Settlement and the Plan.

[5]    In the Declaration, I will generally refer to all of these components of the resolution between the Debtors, the Founders and Imperium as the "D&O Insurance Settlement."

distributions to stakeholders more quickly, and avoiding years of potentially expensive, time-consuming and highly uncertain litigation while providing $8.5 million in new value to the Debtors and considerable tax savings.

34. The D&O Insurance Settlement allows RTL to redeem 100% of Imperium's majority equity interest in RTL for no incremental cost to the Estates and without the requirement for any cash payment or consideration (the "Redemption"). The Redemption results in more than $2 million in tax savings to the Debtors' estates. The Redemption also resolves Imperium's allegation that—because of its interest in RTL—Imperium should be entitled to the bulk of the Debtors' Distributable Cash (about 60%), which is currently held at RTL and totals over $100 million. By resolving Imperium's alleged entitlement to the bulk of the cash of RTL, the Redemption allows for the distribution of virtually all of the Debtors' Distributable Cash to Holders of Claims in Rhodium Enterprises in accordance with the Plan shortly after the Effective Date, preserving the payment priority of senior creditors.

35. The D&O Insurance Settlement also resolves the Debtors' interwoven relationships with Imperium and the Founders on favorable terms. Imperium and the Founders agree under the Plan to the disallowance of all but $1.8 million of their claims against the Debtors. That $1.8 million relates to Secured Notes Claims held by Imperium and certain of the Founders, which are part of classes of Claims that are entitled to full payment under the Plan. The D&O Insurance Settlement avoids lengthy litigation with a highly uncertain outcome in relation to the Debtors' claims against Imperium and the Founders, as well as in relation to the Founders' and Imperium's unliquidated claims against the Debtors. The D&O Insurance Settlement further prevents (i) enormous litigation costs to the Estates; and (ii) delays in distributions to Holders of Claims or

13

Interests.  This should allow for higher and more certain net recoveries to the Debtors' stakeholders in the near term.

36.     In the absence of the D&O Insurance Settlement, the Debtors would have been required to incur substantial up-front costs in litigating claims against Imperium and the Founders (and, potentially, the Debtors directors' and officers' liability insurers) only to face a speculative recovery after considerable delay.  The risk of that litigation and delay would have fallen on the Debtors' creditors and interest holders, who would have faced the potential of a much lesser recovery in the event the litigation were not successful, the prospect of no recovery to junior classes (i.e., classes of Claims and Interests with a recovery priority below the general unsecured claims and the SAFE Claims), and who would have received any recovery much later in any event. The time value of an early and certain settlement seems far more beneficial to the Estates than the speculative and expensive alternative.

37.     I am not aware of, and I do not believe there is, a viable alternative to the D&O Insurance Settlement that would achieve comparable results and support from the large majority of the major stakeholders in the Debtors' cases.

### ii.     The Transcend Settlement

38.     The Transcend Settlement (i) drives substantial additional value for the Estates by resolving the disputes identified in the Settlement Stipulation (which includes resolution of the Transcend Plan Objection and the Transcend Claim Objection); (ii) is eminently reasonable; and (iii) allows for the swift consummation of the Plan and resolution of these Chapter 11 Cases. Through the Transcend Settlement, the Debtors were able to build additional support for the Plan by resolving the only known significant potential objection to confirmation of the Plan.  I also note

that the SAFE AHG, the Debtors' largest creditor constituency, led the negotiation of the Transcend Settlement, which the SAFE AHG supports.

39.     Based on statements made by the Transcend Group and Other Encore Claimants, I believe that the Transcend Group likely would have continued to litigate vigorously in opposition to the Plan, would have appealed any order confirming the Plan, and likely would have continued to aggressively pursue the Claims asserted by the Transcend Group and the Other Encore Claimants against the Debtors. This would have prolonged these Chapter 11 Cases and further diminished the limited funds available for distribution to the Debtors' stakeholders, to the detriment of all parties.

40.     My understanding is that, among other things, the Transcend Settlement allows the Debtors' Estates to avoid (i) a minimum of not less than five Confirmation-related depositions that were scheduled to take place prior to the negotiating the Transcend Settlement; (ii) expensive document discovery; (iii) a much lengthier and more contested Confirmation Hearing; (iv) a likely appeal of Confirmation of the Plan and attendant protracted litigation; and (v) disputes regarding the various Claims asserted by the Transcend Group and Other Encore Claimants against the Debtors.  Avoiding these disputes and litigation will provide the Debtors' stakeholders a recovery more quickly and likely in a larger amount than would otherwise be the case.  I understand from the Debtors' advisors that the Transcend Settlement likely saved the Estates as much as $2 million or more in legal fees they otherwise would have incurred had the Transcend Settlement not been reached.

41.     I understand that the Transcend Settlement conveys a material benefit to the Debtors' estates and creditors, specifically the Rhodium Enterprises creditors, by freeing up value for distribution.  Indeed, the Transcend Group and the Other Encore Claimants have asserted

claims approximating $10 million against multiple Debtors other than Rhodium Enterprises, with the consequence that these claims would be structurally senior to Claims asserted against Rhodium Enterprises with respect to the assets of those subsidiary Debtors if successfully pursued.

42.     The Special Committee, the SAFE AHG, the Transcend Group, and the Other Encore Claimants negotiated the Transcend Settlement vigorously, in good faith and at arm's length.  To my understanding, all these parties agree that approval of the Plan is a significantly better outcome for all parties than any other alternative.

### iii.     SAFE AHG Substantial Contribution Claim

43.     The Special Committee, acting on behalf of the Debtors, has recognized the SAFE AHG's contributions to, among other things, the Rhodium D&O Claims. Typically, a creditors committee is involved in reviewing potential claims against insiders. For much of these cases, the UCC was representing creditors that would be paid in full, reducing the UCC's incentive to carry out such a review. The SAFE AHG acted like a creditors committee in many ways. Among other things, the SAFE AHG conducted a thorough investigation of the Rhodium D&O Claims, and provided useful input to the Special Committee concerning its investigation of the Rhodium D&O Claims and engaged with the Special Committee in connection with those claims. Among other things, the SAFE AHG raised questions that led to the Special Committee collecting documents from Imperium and advocated for the merits of tax-related and other claims, which the Special Committee eventually agreed could be asserted against the Founders. The SAFE AHG's committee-like input added significant value to the Special Committee's investigation.

44.     In addition, the SAFE AHG prepared detailed letters to the Special Committee concerning potential claims relating to alleged Founder misconduct, which the Special Committee submitted to the Debtors' insurance carriers to provide a notice of potentially covered claims.  As

is not uncommon in bankruptcy cases, the relationship between the SAFE AHG and the Special Committee in connection with discovery and other matters was not always without friction. Involvement of, and feedback from, the SAFE AHG was helpful to the process, however, and a factor in the conclusions reached by the Special Committee and the demand letter the Special Committee ultimately sent to the Founders claiming damages in excess of $75 million or more.

45.     The SAFE AHG also played a critical role at the Whinstone mediation on February 19, 2025.  Significantly, the SAFE AHG negotiated directly with Whinstone/Riot the primary terms of the settlement to which the Debtors ultimately agreed at the in-person mediation (though the Debtors ultimately managed to increase the consideration paid by Whinstone/Riot from the $177 million negotiated by the SAFE AHG to $185 million).  That settlement produced the cash that has been used to fund all distributions made to stakeholders to date and, along with the D&O Settlement, comprises the cash remaining for distribution under the Plan.

46.     The SAFE AHG also helped resolve issues concerning the proper allocation of the Debtors' assets among stakeholders, most notably the priority of the SAFE Claims versus other stakeholders, and the development and prosecution of the Plan. Indeed, the Debtors asked the Court to consider as a "gating" issue resolution of their objection to the SAFEs' claims, which they viewed as a necessary precondition to confirming a viable plan in these cases. The Court is no doubt familiar with the SAFE AHG's key role in litigating that dispute.

47.     Immediately after the Court ruled on the SAFE objection on August 30, 2025, the SAFE AHG and Special Committee began discussing how to achieve a swift and equitable exit from these cases, consistent with the Court's decision.  Thereafter, the Special Committee and the SAFE AHG together worked tirelessly to arrive at terms of a plan acceptable to key constituencies, and evaluating potential terms for settlement of the Rhodium D&O Claims.  The settlement

17

achieved with the SAFE AHG's participation increased value available for non-insider stakeholders by $13.2 million compared to the settlement embodied in the prior plan proposed by the Debtors.

48.     Once Plan terms were agreed, the SAFE AHG, through its counsel, was a plan co-proponent and, as a result, a drafter of all confirmation-related documents. After plan documents were initially filed, the SAFE AHG worked collaboratively with the Debtors and the Special Committee to update documents to address questions raised at the hearing for preliminary approval of the disclosure statement, to prepare the plan supplement and negotiate the document contained therein, and to otherwise prepare for Plan confirmation. As a result of the SAFE AHG's activities, the Plan Proponents were able to present the Court with plan related documents in an expedited manner, to the benefit of all estate stakeholders.

49.     The SAFE AHG has taken a primary role in settling objections raised by the Transcend Group.  In addition, the SAFE AHG agreed to fund the entirety of a $2.5 million professional fee escrow fund that was a condition of that deal.  Depending on other sources of value available post-emergence for distribution to stakeholders, the professional fee escrow will be distributed either to the Transcend Group or the SAFE AHG or both, with the SAFE AHG assuming 100% of the professional fee risk in order to get a deal with the Transcend Group across the finish line.  As referenced above, in so doing, the SAFE AHG saved at least an additional $2 million in likely estate-professional fees associated with what otherwise would have been a hotly contested confirmation, and perhaps more.

50.     More generally, the SAFE AHG undertook a variety of activities that ordinarily would be performed by a statutory committee, but were not.  This is no criticism of the UCC.  By order dated August 30, 2025, the Court determined that SAFE parties were creditors from the

beginning of these cases, including based on their contingent claims to the Cash Out Amount. Initially, however, SAFE parties were not scheduled as creditors, or recognized as such by the U.S. Trustee or the UCC. Moreover, the UCC was not formed until late November, 2024, and once the main terms of the Whinstone Transaction were negotiated in February, 2025, the UCC's only then-recognized constituents were guaranteed to be paid in full. The UCC therefore had little incentive to remain active in these cases for much of their duration. The SAFE AHG acted in a manner similar to that of an official committee and performed a variety of important tasks that would have been compensated by the estates in the first instance if undertaken by a statutory committee.

51.     These efforts and others, in the view of the Special Committee, substantially contributed to the advancement of the Debtors' cases and resulted in a demonstrable benefit to the Debtors' stakeholders and the advancement of a confirmable chapter 11 plan. The SAFE AHG also undertook significant efforts in negotiating and preparing the PSA, the Plan, and the Disclosure Statement, working with the Debtors and the Special Committee to pursue confirmation of the Plan as quickly as possible.

52.     For those reasons, the Special Committee agreed to include payment of the SAFE AHG Substantial Contribution Claim in the Plan. Based on the invoices provided to the Special Committee by the SAFE AHG, the SAFE AHG's counsel incurred fees that are actually substantially greater than the amount that will be reimbursed if the Plan is confirmed. Consistent with the terms of the Plan and the Plan Support Agreement, the SAFE AHG has provided the Special Committee with fee invoices. Those invoices demonstrate more than $11 million in fees incurred by counsel to the SAFE AHG in connection with the Debtors' chapter 11 cases through October 2025. The SAFE AHG estimates that its counsel's fees through confirmation will be approximately $12 million. As a compromise, and in a further effort to achieve a consensual Plan,

the SAFE AHG agreed to seek only $8.5 million of that amount and, as noted, later agreed to pay $2.5 million of the $8.5 million into escrow in order to resolve the Transcend Group objection. The Special Committee has reviewed the SAFE AHG's invoices, and is satisfied that they demonstrate that counsel to the SAFE AHG has incurred fees in connection with the SAFE AHG's contribution to the Debtors' chapter 11 cases that support and significantly exceed the $8.5 million amount of the proposed SAFE AHG Substantial Contribution Claim.

### d. Retention of Claims or Interests – § 1123(b)(3)(B)

53.     Article 10.8 of the Plan provides for the retention of various Retained Causes of Action as permitted by section 1123(b)(3)(B) of the Bankruptcy Code.  Accordingly, the Plan complies with section 1123(b)(3)(B) of the Bankruptcy Code.

### e. Provisions not Inconsistent with the Code – § 1123(b)(6)

54.     **Debtor Release**.  Article 10.5(a) of the Plan provides that the Debtors release Claims and Causes of Action against the Released Parties  (the "Debtor Release").  I believe that the Debtor Release, which is intertwined with the D&O Insurance Settlement, is a vital component of the Plan and the result of a sound exercise of Debtors' business judgment.

55.     The inclusion of the Debtor Release in the Plan avoids waste and litigation and it benefits all of the Debtors' stakeholders.  The Released Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, their efforts to negotiate and implement the Plan and fund the Plan's implementation.  The foregoing maximizes value for the benefit of all parties in interest in these Chapter 11 Cases.  In addition, the active participation of the Debtors' released directors, officers, employees and professionals, during both the prepetition negotiations and the course of these Chapter 11 Cases (and for many through their anticipated assistance in implementing the Plan and getting recoveries to Holders of Claims and

20

Interests as soon as possible) merit their inclusion as Released Parties for purposes of the Debtor Release.[6]

56.     For the foregoing reasons, the Debtor Release is justified, and reflects a sound exercise of the Debtors' business judgment.

57.     **Release of Imperium and the Founders.**  Article 10.5(b) of the Plan provides for a release by the Debtors and their Estates of Claims against Imperium and the Founders.  This release is an integral component of the D&O Insurance Settlement.  Absent such release, Imperium and the Founders would likely not have agreed to the D&O Insurance Settlement, as they would still be subject to defending extensive, costly litigation pursued by the Debtors after the Effective Date.

58.     Moreover, the insurance carriers that issued the Debtors' directors' and officers' liability insurance policies would have had no reason absent such release to contribute the $8.5 million being paid to the Debtors' Estates has part of the D&O Insurance Settlement.  Those carriers would also have had no incentive to agree to any of the other elements of the D&O Insurance Settlement in such circumstances.

59.     The release by the Debtors of causes of action against Imperium and the Founders does not affect claims that might be asserted against them by third parties.  It does, however, spare the Debtors' Estates substantial future litigation costs in exchange for value to be received under the D&O Insurance Settlement that can be distributed under the Plan in the near term.  Those reasons plus the others herein amply justify the release by the Debtors of claims against Imperium and the Founders, and that release should accordingly be approved.

---

[6]  I understand that the Plan Proponents have clarified that the Professionals representing the Special Committee are not Released Parties by virtue of being Related Parties to the Independent Directors.

60.     **Third-Party Releases.**  Article 10.5(c) of the Plan contains a third-party release, providing that each Releasing Party shall release any and all Causes of Action such parties could assert against the Debtors and other Released Parties (the "Third-Party Release," and together with the Debtor Release, the "Releases").  Here, the Third-Party Release is an integral component of the Plan, is the product of good faith and is a sound exercise of the Debtors' business judgment, and should be approved, for the reasons detailed below.

61.     The Third-Party Release is wholly consensual because the Plan offers all Holders of Claims and Interests—whether such Holders vote to accept, vote to reject, or abstain from voting or are otherwise not entitled to vote on the Plan because they are in an Unimpaired Class—an opportunity to opt out of the Third-Party Release.

62.     The Released Parties made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, marketing and selling the Debtors' assets and negotiating and implementing the Plan, which maximized value for the benefit of all parties in interest.

63.     The Third-Party Release was given for consideration as Holders of Claims are receiving a recovery under the Plan.  I also note that the Third-Party Release was extensively negotiated among the Plan Proponents and the bulk of the other major stakeholders in the Debtors' Chapter 11 Cases, and that all such stakeholders have consented to the Third-Party Release.

64.     Therefore, for the foregoing reasons, the Third-Party Release should be approved.

65.     **Exculpation**.  Section 10.6 of the Plan contains an exculpation provision, providing that each Exculpated Party shall have no liability for and be exculpated from any liability in respect of Claims, Interests, and Causes of Action arising between the Petition Date and the Effective Date out of acts or omissions in connection with these Chapter 11 Cases and certain related transactions,

except for acts or omissions that are found by a final court order to have been the product of actual fraud, willful misconduct, or gross negligence (the "Exculpation").

66.     In my opinion, the Exculpation should be approved because it is an integral part of the Plan and is a sound exercise of the Debtors' business judgment.  Specifically, the Exculpation provides necessary and customary protections to those parties in interest (whether estate fiduciaries or otherwise) who acted in good faith to facilitate the Debtors' liquidation, and whose efforts were and continue to be vital for the implementation of the Plan.  In fact, I do not believe that the Debtors could have developed the Plan without the support and contributions of the Exculpated Parties.  The Exculpation protects parties who have made substantial contributions to the Debtors' reorganization from collateral attacks related to their good faith acts or omissions in effecting the Debtors' successful conduct of the Chapter 11 Cases.  In that respect, the Exculpation is narrowly tailored, given that it contains appropriate limits in time and subject matter and excludes liability resulting from actual fraud, gross negligence, or willful misconduct, as a court may determine pursuant to a final order.

67.     Accordingly, for the foregoing reasons, the Exculpation should be approved in connection with the Confirmation of the Plan.

68.     **Injunction**.  The Plan contains a gatekeeper (Article 10.7) and general (Article 10.4) injunction (collectively, the "Injunction Provisions").  The gatekeeper injunction in Article 10.7 provides in summary that, before any Claim or Cause of Action is brought against a Released Party or Exculpated Party, the Court must (i) determine, after notice and a hearing, that such Claim or Cause of Action is colorable; and (ii) specifically authorize such person or entity to bring such Claim or Cause of Action.  I understand further that the general injunction provision in Article

10.4 of the Plan is a standard injunction provision that prevents the future assertion of Claims against the Released Parties that are addressed by the Plan.

69.     I believe that the Injunction Provisions are an essential component of the Plan. Among other things, they (i) provide certainty to the Debtors and Reorganized Debtors that the Plan will be enforceable in accordance with its terms; and (ii) enforce the Releases and the Exculpation.  In addition, the Injunction Provisions are critical to implementing the Plan because they permanently enjoin all Persons from commencing or continuing in any manner any Claim that was released or exculpated pursuant to the Releases and Exculpation.  I also believe that the Injunction Provisions are appropriately tailored to achieve the foregoing purposes.

70.     Accordingly, the Injunction Provisions should be approved in connection with the Confirmation of the Plan.

**B.     The Plan Proponents Complied with Solicitation Requirements of the Bankruptcy Code – § 1129(a)(2)**

71.     I understand that section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code and that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.

72.     As noted above, the Plan Proponents did not solicit votes on the Plan from Classes 1 (Rhodium 2.0 Secured Notes Claims), 2 (Rhodium Encore Secured Notes Claims), 3 (Rhodium Technologies Secured Notes Claims), 4 (Priority Non-Tax Claims), 5a (Guaranteed Unsecured Claims), 5b (General Unsecured Claims), 7 (Late Filed Claims), 8 (Intercompany Claims), and 9 (Section 510(b) Claims) because the Holders of Claims in those Classes are conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.  The Plan Proponents additionally did not solicit votes from the Holders of Intercompany Interests in Class 12 because

the Holders of such interests are not receiving or retaining any property under the Plan on account of their Interests and, accordingly, are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Moreover, the Transcend Group (whose Allowed Claims are in Class 5b) agreed in the Transcend Settlement to support the Plan and all of its terms.

73.     Conversely, I understand that the Plan Proponents solicited acceptances or rejections of the Plan from the Holders of Impaired Claims and Interests in the Voting Classes 6 (SAFE Claims), 10 (Common Interests), and 11 (Imperium Interests).

74.     Based on my review of the Voting Report,[7] which summarizes the voting process that concluded on November 21, 2025, I understand that the Plan Proponents solicited and tabulated votes to accept or reject the Plan in accordance with the customary solicitation procedures for chapter 11 plans of reorganization established in this district.

75.     Accordingly, I believe that the Plan complies with Sections 1125 and 1126 of the Bankruptcy Code.

### C.     The Debtors Proposed the Plan in Good Faith – § 1129(a)(3)

76.     I understand that section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be proposed in good faith and not by any means forbidden by law.

77.     As further detailed below, I believe that the Plan was proposed with integrity, good intentions, and with the goal of maximizing stakeholder recoveries. I additionally believe that, throughout these cases, the Debtors, the Debtors' board of directors (including the Independent Directors), and their senior management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents.

---

[7]     *See* Voting Report, contemporaneously filed herein.

78.     The Plan maximizes the value of potential recoveries available to Holders of Claims by implementing (i) reasonable settlements of claims; (ii) a prompt orderly wind down to distribute Cash to the Holders of Allowed Claims; and (iii) the liquidation and distribution of any proceeds of Remaining Assets to other Holders of Claims and Interests.

79.     From the outset of these Chapter 11 Cases, the Debtors have been forthright about the reasons they sought chapter 11 protection and have been unwavering in declaring and pursuing their objective of maximizing recoveries for Holders of Claims and Interests.  With the forefront objective of maximizing the said recoveries, the Plan is the product of negotiations between the Plan Proponents and then with multiple other parties, resulting in compromises with a majority of major stakeholders in the Debtors' Chapter 11 Cases that represent a good faith effort to maximize recoveries for all interested parties.  Relatedly, the Plan (including the settlements that it embodies) and Plan Documents were negotiated at arm's length among representatives of the Debtors and multiple groups with interests in the outcome.  That fact reinforces that the Plan was proposed with honesty and good intentions.

80.     The Plan—which provides full or consensually-negotiated recoveries to all Holders of Allowed Claims and payment to Holders of Allowed Common Interests to the extent any residual value remains—is fundamentally fair to parties in interest.  The overwhelming support for the Plan among the Debtors' major stakeholders, including the SAFE AHG, Imperium, the Founders, and the Transcend Group (as the Debtors' largest non-insider holder of equity Interests), provides clear evidence of the Plan's fairness to the parties-in-interest in these Chapter 11 Cases as a whole.

81.     Accordingly, I believe that the Plan was proposed in good faith and not by any means forbidden by law, and thus, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

**D.     Payment of Professional Fees and Expenses Are Subject to Court Approval - § 1129(a)(4)**

82.     I understand that section 1129(a)(4) of the Bankruptcy Code requires a court to approve certain fees and expenses that either a plan proponent, debtor, or person receiving property distributions under the plan has paid as reasonable.

83.     All payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Confirmation Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Court.  Article 2.2 of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than 45 days after the Effective Date for determination by the Court, after notice and a hearing, in accordance with the procedures established by the Court.

84.     Accordingly, I believe that the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

**E.     The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders – § 1129(a)(5)**

85.     I understand that section 1129(a)(5) of the Bankruptcy Code requires (i) that a plan proponent disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor, or a successor thereto, under a chapter 11 plan; (ii) that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and (iii) that a plan proponent disclose the identities or

27

affiliations of insiders to be employed or retained by the reorganized debtors as directors and officers and the nature of any compensation for such insider.

86.     I believe section 1129(a)(5) of the Bankruptcy Code is inapplicable in view of the following: (i) as set forth in Article 5.10 of the Plan, on the Effective Date, any remaining assets automatically transfer and vest in the Wind Down Debtor; (ii) under the Proposed Confirmation Order, the Debtors, other than the Wind Down Debtor, will be dissolved; (iii)  the Wind Down Debtor shall continue in existence after the Effective Date as the successor-in-interest to the Debtors and the Debtors' rights, title, and interest in any remaining assets; and (iv) the Wind Down Debtor shall be managed by the Plan Administrator.

87.      In the event that section 1129(a)(5) of the Bankruptcy Code is applicable to the Wind Down Debtor, this provision is satisfied because the Plan Supplement discloses the identity of the Plan Administrator.

88.     I understand that section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of any "insider" (as defined by section 101(31)) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.   After, among other things, effectuating final distributions pursuant to the Plan, the Wind Down Debtor will dissolve.  And section 1129(a)(5)(B) lacks relevance to the Plan, because no individual person shall serve as a director, officer, or voting trustee of a reorganized Debtor and no insider will be employed by the Debtors following the Effective Date.

89.     Considering all the foregoing, I believe that the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

**F.     The Plan Does Not Require Government Regulatory Approval – § 1129(a)(6)**

90.     I understand that confirmation is permitted only if a regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided

for in the Plan.  I have been informed that no such regulatory commission exists here. As such, section 1129(a)(6) is applicable to the Plan.

### G. The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code

91.     I understand that the Bankruptcy Code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan. I further understand that if any class of claims or interests rejects the plan, the plan must satisfy the "cramdown" requirements of section 1129(b) with respect to the claims or interests in that class.

92.     I understand that of the Impaired Classes entitled to vote, Classes 6 and 11 have voted to accept the Plan, while Class 10 voted to the rejected the Plan.  Class 12, which is Impaired, was not required to vote because the Holders of Intercompany Interests were deemed to reject the Plan.  Accordingly, it is my understanding that the Debtors do not satisfy section 1129(a)(8) of the Bankruptcy Code.   Nevertheless, I believe that the Debtors satisfy section 1129(b) of the Bankruptcy Code, because the Plan does not discriminate unfairly and is fair and equitable with respect to these rejecting Classes (as described in greater detail below).

### H. Priority Cash Payments – § 1129(a)(9)

93.     I understand that section 1129(a)(9) of the Bankruptcy Code generally requires that claims entitled to administrative priority must be paid in full in cash on the effective date or receive certain other specified treatment to which the Holder of such claim has agreed.

94.     The Plan satisfies section 1129(a)(9) for the following reasons.  Article 2.1 of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Expense Claim allowed on or prior to the Effective Date will receive payment in full in Cash no later than the Effective Date or the first business day that is 30 days after such Administrative Expense Claim becomes allowed.  Further, Article 4.4 of the Plan

satisfies section 1129(a)(9)(B) of the Bankruptcy Code because it provides that holders of the types of Claims specified by that section will receive either payment in full in Cash or such other treatment as to render such holders unimpaired.  In addition, Article 2.3 of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that holders of Allowed Priority Tax Claims will be treated in accordance with the terms set forth in that section.  Accordingly, the Plan fully complies with and satisfies all of the requirements of section 1129(a)(9) of the Bankruptcy Code.

### I.      At Least One Class of Impaired, Non-Insider Claims Accepted the Plan – § 1129(a)(10)

95.     I understand that the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider."

96.     I understand based on the Voting Report that Holders of SAFE Claims in Class 6—which is an Impaired Class entitled to vote on the Plan—voted to accept the Plan independent of any insiders' votes by more than one-half in number and two-thirds in amount.

97.     In accordance with the results contained in the Voting Report, I believe that the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

### J.      The Plan Is Feasible – § 1129(a)(11)

98.     I understand that section 1129(a)(11) of the Bankruptcy Code requires a court to determine that a chapter 11 plan is feasible, and that confirmation of such plan is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successors thereto) unless such liquidation or reorganization is proposed in the Plan.

99.     The Plan is a plan of liquidation for the Debtors.  When the Plan is fully implemented, the Debtors will have been dissolved and, by definition, no further liquidation or

financial organization of the Debtors will be necessary. Accordingly, to the extent section 1129(a)(11) is applicable to the Debtors, the Plan complies with and satisfies the requirements thereof.

**K.      All Statutory Fees Have Been or Will Be Paid – § 1129(a)(12)**

100.      I understand that section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930. I understand further that Article 2.D of the Plan provides that all fees and applicable interest payable pursuant to 28 U.S.C. § 1930 shall be paid. Accordingly, the Plan complies with the requirements of section 1129(a)(12).

**L.      No Remaining Retiree Benefits Obligations – § 1129(a)(13)**

101.      It is my understanding that section 1129(a)(13) of the Bankruptcy Code requires that any applicable retiree benefits will continue to be paid post effective date at the level established by agreement or by court order pursuant to section 1114 of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period which the debtor has obligated itself. To my knowledge, the Debtors do not have any obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code). Accordingly, I do not believe that section 1129(a)(13) of the Bankruptcy Code is applicable to these Chapter 11 Cases.

**M.      Sections 1129(a)(14)-(16) of the Bankruptcy Code Do Not Apply to the Plan**

102.      I understand that section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations. The Debtors are not subject to any domestic support obligations. Likewise, I understand that section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code. None of the Debtors is an "individual." Finally, I understand that section 1129(a)(16) of the Bankruptcy Code relates only to

31

nonprofit corporations or trusts. None of the Debtors is a nonprofit corporation or trust. Accordingly, sections 1129(a)(14)-(16) are inapplicable to the Plan.

> **N.    The Plan Satisfies the Requirements of Section 1129(b) of the Bankruptcy Code**

103.    I understand that if all applicable requirements of section 1129(a) of the Bankruptcy Code are satisfied, other than section 1129(a)(8), a plan may still be confirmed so long as the requirements set forth in section 1129(b) are satisfied.  Specifically, I understand that under section 1129(b), a plan may still be confirmed it does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes. As noted above, Class 6 (SAFE Claims), which is an Impaired Class of Claims entitled to vote on the Plan, voted in favor of the Plan.  Class 10 voted to reject the Plan (the "Rejecting Class").    In addition, Class 12 was deemed to reject the Plan.  Nonetheless, as further described below, I believe that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.

> **1.    The Plan Is Fair and Equitable – § 1129(b)(2)(C)**

104.    I understand that, under section 1129(b)(2) of the Bankruptcy Code, a Plan is considered "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority rule."

105.    I believe that the Plan is fair and equitable within the meaning of section 1129(b)(2)(C), although Class 10 (Common Interests) voted to reject the Plan and Class 12 (Intercompany Interests) is deemed to reject the Plan.  Specifically, the Plan is fair and equitable to Class 10 because no Holders of Interests in Classes that are junior to Class 10 will receive any property under the Plan on account of such junior Interests.  At the same time, the Plan is fair and

equitable regarding Class 12 because there is no Class that is junior to such Class, so that no junior Interest receives any property under the Plan on account of such Interest.

### 2. The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan – § 1129(b)(1)

106.    I understand that courts typically examine the facts and circumstances of a particular case to determine whether an "unfair discrimination" exists under a plan.  I also understand that, in general, a plan unfairly discriminates in violation of section 1129(b)(1) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.  Here, the Plan's treatment of Classes 10 (Common Interests) and 12 (Intercompany Interests) is proper because the Plan does not provide materially different treatment for Holders of Interests with similar legal rights.  As a result, I believe the Plan satisfies 1129(b)(1) of the Bankruptcy Code.

### O. The Plan Proponents Complied with Section 1129(d) of the Bankruptcy Code

107.    I am not aware of any party that has suggested that the Plan was filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act, or of any evidence that would support such a conclusion.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

### P. Modifications to the Plan

108.    I understand that section 1127(a) of the Bankruptcy Code provides that a plan proponent can modify its plan at any time before confirmation as long as the modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  I further understand that Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the

Court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.

109.     Following solicitation, the Debtors made certain minor modifications to the Confirmation Order that specify superseding Plan language to resolve formal and informal comments to the Plan by parties in interest (the "Modifications").  The Modifications are reflected in the Second Amended Joint Chapter 11 Plan of Liquidation for the Debtors that was filed with the Bankruptcy Court on November 30, 2025.

110.     The Modifications are either immaterial or do not materially and adversely affect the treatment of creditors and stakeholders.  Thus, the Modifications comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  I understand that the Transcend Group has been reclassified from Class 10 (Common Interests) to Class 5b (General Unsecured Claims) and are now deemed to accept the Plan by virtue of their agreement to a negotiated resolution of their Claims and adoption of the Plan Support Agreement by their Settlement Stipulation.  For voting purposes, this reclassification of the Transcend Group is not relevant for Class 10 (Common Interests), because such Class has already voted to reject the Plan.

111.     For the foregoing reasons, I believe that no additional solicitation or disclosure is required on account of the Modifications, which should be deemed accepted by all creditors that previously accepted the Plan.

**Q.     Good Cause Exists to Waive the Stay of the Confirmation Order.**

112.     I understand that certain Bankruptcy Rules provide for the stay of an order confirming a chapter 11 plan, but that such a stay may be waived upon court order after a showing of good cause.

113.     Here, I believe that good cause exists for the Confirmation Order being immediately effective upon its entry.  *First*, these Chapter 11 Cases and the related transactions transpired in

good faith and with a high degree of transparency and public dissemination of information. Second, the Debtors paid substantially all secured and general unsecured claims in full previously, so that the remaining unpaid creditors and interest holders are few and intimately familiar with these Chapter 11 Cases, the Plan, and the related transactions. *Third*, the Debtors, with the support of most of the other major stakeholders in these Chapter 11 Cases, seek to exit chapter 11, and commence distributions under the Plan, as soon as possible. *Fourth*, each day the Debtors remain in chapter 11 results in significant administrative and professional costs. *Fifth*, in view of (among other things) the requisite support by the Voting Classes, no parties will be prejudiced by waiver of the stay to facilitate the Debtors' swift emergence from chapter 11.  Accordingly, I believe that good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: December 1, 2025.

/s/ *David Eaton*
Independent Direct and Member
of the Special Committee of
Rhodium Enterprises, Inc.