**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RHODIUM ENCORE LLC, *et al.*,[1] | § | Case No. 24-90448(ARP) |
| | § | |
| Debtors. | § | |
| | § | (Jointly Administered) |
| | § | |

**PLAN PROPONENTS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION
OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION
OF RHODIUM ENCORE LLC AND ITS AFFILIATED DEBTORS**

---

[1] The Debtors in these chapter 11 cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), Rhodium 30MW LLC (0263), Rhodium Enterprises, Inc. (6290), Rhodium Technologies LLC (3973), Rhodium Renewables LLC (0748), Air HPC LLC (0387), Rhodium Shared Services LLC (5868), Rhodium Ready Ventures LLC (8618), Rhodium Industries LLC (4771), Rhodium Encore Sub LLC (1064), Jordan HPC Sub LLC (0463), Rhodium 2.0 Sub LLC (5319), Rhodium 10MW Sub LLC (3827), Rhodium 30MW Sub LLC (4386), and Rhodium Renewables Sub LLC (9511). The mailing and service address of the Debtors in these chapter 11 cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005. Citations to exhibits herein shall refer to the *Joint Exhibit List For Hearings Scheduled For December 3, 2025* filed at Docket No. 2077.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ..............................................................................................................3

I.    Case Background ...............................................................................................4

    A.    Procedural History .............................................................................4

    B.    The Wind Down.................................................................................10

    C.    The Plan Solicitation and Notification Process ...................................11

    D.    The Objections ...................................................................................13

II.    The Plan Proponents Complied with the Applicable Notice Requirements .....................14

    A.    The Plan Proponents Complied with Applicable Notice and Solicitation Requirements ...................................................................................14

    B.    Solicitation of the Plan Complied with Bankruptcy Code and was in Good Faith ...................................................................................14

III.    The Plan Is Confirmable Under 11 U.S.C. § 1129 ...................................................15

    A.    The Plan Complies with Applicable Provisions of the Bankruptcy Code  (§ 1129(a)(1)) ...................................................................................15

        1.    The Plan Satisfies Classification Requirements of Section 1122 of the Bankruptcy Code ...................................................................................16

        2.    The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code...................................................................................19

            (1)    Designation of Classes of Claims and Equity Interests (§ 1123(a)(1)) ...................................................................................19

            (2)    Specification of Unimpaired Class (§ 1123(a)(2))........................19

            (3)    Treatment of Impaired Classes (§ 1123(a)(3)).............................19

            (4)    Equal Treatment within Classes (§ 1123(a)(4))............................20

            (5)    Means for Implementation (§ 1123(a)(5)) ....................................20

            (6)    Issuance of Non-Voting Securities (§ 1123(a)(6))........................21

            (7)    Directors and Officers (§ 1123(a)(7)) ............................................21

         3.    The Plan Complies with Discretionary Provisions of Section 1123(b) of the Bankruptcy Code...................................................................................22

            (1)    The Settlement of Claims and Controversies Is Fair and Equitable and Should be Approved. ...................................................................................23

            (2)    The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code ........................31

4. The Plan Complies with Section 1123(d) of the Bankruptcy Code...........44

B. The Plan Proponents Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2))...........................................................................44

    1. The Debtors Are Proper Debtors and the Plan Proponents Are Proper Plan Proponents......................................................................45

    2. The Plan Proponents Complied with Section 1125 of the Bankruptcy Code........................................................................................45

    3. The Plan Proponents Complied with Section 1126 of the Bankruptcy Code........................................................................................47

C. The Plan Was Proposed in Good Faith (§ 1129(a)(3)) .............................................48

D. The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Is Subject to Court Approval (§ 1129(a)(4)) .........................................50

E. The SAFE AHG Substantial Contribution Claim Is Reasonable and Should Be Approved .........................................................................................................51

    1. Section 503(b) Authorizes Compensation for Substantial Contribution.........................................................................................51

    2. The SAFE AHG Has Played A Critical Role In These Cases .................52

        (1) Investigation of Claims Against the Founders..............................54

        (2) Negotiation of the Whinstone Transaction ...................................57

        (3) Intra-Stakeholder Settlement Efforts, Including Plan Mediation.....................................................................................60

        (4) Assisting with Proper Allocation of Value Among Stakeholders..................................................................................61

        (5) Negotiating Founder Settlement and Plan .....................................62

        (6) Activities Typically Associated With Statutory Committee..........63

        (7) Negotiating and Funding the Transcend Settlement.....................64

    3. The SAFE AHG's Activities Warrant Compensation ..............................64

    4. The Amount of the Substantial Contribution Claim Is Appropriate..........70

F. The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)) ......................................................................71

G. The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)) ............................................................................................................72

H. The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)) ............................................................................................................72

I. The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code .......................................................................75

ii

J.  The Plan Provides for Payment in Full of All Allowed Priority Claims  (§ 1129(a)(9)) ..................................................................................................76

K.  At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)) ..........................................................................................77

L.  The Plan Is Feasible (§ 1129(a)(11)) .....................................................77

M.  All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)) ............79

N.  No Remaining Retiree Benefits Obligations (§ 1129(a)(13)) ................79

O.  Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan .................79

P.  The Plan Satisfies the Requirements of Section 1129(b) of the Bankruptcy Code ........................................................................................80

    1.  The Plan Is Fair and Equitable (§ 1129(b)(2)(C)) .....................81

    2.  The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)) ..................................................................................82

Q.  The Plan Proponents Complied with Section 1129(d) of the Bankruptcy Code ........................................................................................83

R.  Modifications to the Plan ........................................................................83

S.  Good Cause Exists to Waive the Stay of the Confirmation Order ........84

CONCLUSION ..................................................................................................85

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*In re Accuride Corp.*,
  2010 WL 5093173 (Bankr. D. Del. Feb. 18, 2010) .................................................................88

*In re Adelphia Bus. Sols., Inc.*,
  341 B.R. 415 (Bankr. S.D.N.Y. 2003)....................................................................................81

*In re Adelphia Communications Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007)...............................................................................34, 76

*In re Age Refining, Inc.*,
  801 F.3d 530 (5th Cir. 2015) .............................................................................................29, 34

*In re Air Methods Corporation*,
  No. 23-90886 (MI) (Bankr. S.D. Tex. Dec. 6, 2023) (Docket No. 311) .................................44

*In re Allied Props., LLC*,
  2007 WL 1849017 (Bankr. S.D. Tex. June 25, 2007) ............................................................31

*In re Altera Infrastructure L.P.*,
  No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) (Docket No. 533)..................................41

*In re Ambanc La Mesa L.P.*,
  115 F.3d 650 (9th Cir. 1997) ................................................................................................83

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006).......................................................................................16, 17, 85

*In re Astria Health*,
  623 B.R. 793 (Bankr. E.D. Wash. 2021) ................................................................................41

*In re Avaya Inc.*,
  No. 23-90088 (DRJ) (Bankr. S.D. Tex. Mar. 22, 2023) (Docket No. 350) ............................44

*Matter of AWECO, Inc.*,
  725 F.2d 293 (5th Cir. 1984) ...........................................................................................28, 34

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)........................................................................................................76, 84

*In re Bayou Group, LLC*,
  431 B.R. 549 (Bankr. S.D.N.Y. 2010).................................................................................67, 73

*Berkeley Fed. Bank & Trust v. Sea Garden Motel and Apartments (In re Sea Garden Motel and Apartments)*,
195 B.R. 294 (D.N.J. 1996) ....................................................................................81

*In re Bigler LP*,
442 B.R. 537 (Bankr. S.D. Tex. 2010) ...........................................................34, 38

*In re Breitburn Energy Partners LP*,
582 B.R. 321 (Bankr. S.D.N.Y. 2018) ...................................................................21

*In re Broadway 401 LLC*,
2010 WL 2902755 (Bankr. D. Del. Mar. 16, 2010) ...............................................88

*In re Burns & Roe Enters., Inc.*,
2009 WL 438694 (D.N.J. Feb. 23, 2009) ..............................................................86

*Cadle Co. v. Mims (In re Moore)*,
608 F.3d 253 (5th Cir. 2010) .................................................................................34

*In re Cajun Elec. Power Coop., Inc*.,
119 F.3d 349 (5th Cir. 1997) ...........................................................................28, 53

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986) ....................................................................53

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010) ...................................................................42

*In re Chemtura Corp.*,
No. 09-11233 (REG) (Bankr. S.D.N.Y. Nov. 23, 2010) ........................................87

*In re Cineworld Grp. PLC*,
No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023) (Docket No. 1982).............44

*In re Cong. Sand & Gravel, LLC*,
2011 WL 3881020 (Bankr. N.D. Tex. Sept. 2, 2011).............................................86

*In re Core Sci., Inc.*,
No. 22-90341 (CML) (Bankr. S.D. Tex. Jan. 16, 2024) (Docket No. 1749)...........45

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex. 2009) ......................................................47, 76, 85

*In re Dana Corp*,
412 B.R. 53 (S.D.N.Y. 2018)..................................................................................21

*In re Davis Offshore, L.P.*,
644 F.3d 259 (5th Cir. 2011) .................................................................................41

*In re Deep Marine Holdings, Inc.*,
  2010 WL 5125278 (Bankr. S.D. Tex. June 2, 2010) ....................................................47

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...................................................................17

*In re Drug Fair Grp., Inc.*,
  2010 WL 3492994 (Bankr. D. Del. June 7, 2010) ...................................................88

*In re Eddington Thread Mfg. Co.*,
  181 B.R. 826 (Bankr. E.D. Pa. 1995) ...................................................................81

*In re Energy & Expl. Partners, Inc.*,
  No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) (Docket No. 730) ...........................38

*In re Energy Partners, Ltd.*,
  422 B.R. 68 (Bankr. S.D. Tex. 2009) .............................................67, 70, 71, 72

*In re Energy Partners, Ltd.*,
  2009 WL 2898876 (Bankr. S.D. Tex. Aug. 3, 2009)..................................................47

*In re Fieldwood Energy LLC*,
  2021 WL 2853151 (Bankr. S.D. Tex. June 25, 2021) ............................................41

*Fin. Sec. Assurance Inc. v. T-H New Orleans L.P. (In re T H New Orleans L.P.)*,
  116 F.3d 790 (5th Cir. 1997) ...................................................................51, 52, 81

*In re Gen. Homes Corp.*,
  134 B.R. 853 (Bankr. S.D. Tex. 1991) ...................................................................35

*In re Glob. Safety Textiles Holdings LLC*,
  2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) ............................................86

*In re Harborwalk, LP*,
  2010 WL 5116620 (Bankr. S.D. Tex. Oct. 25, 2010)...........................................47

*Harrington v. Purdue Pharma L. P.*,
  603 U.S. 204, 144 S. Ct. 2071, 219 L. Ed. 2d 721 (2024)....................................38

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe*
  *Enters., Ltd., II)*,
  994 F.2d 1160 (5th Cir. 1993) ...................................................................16, 81

*In re Highland Cap. Mgmt., L.P.*,
  132 F.4th 353 (5th Cir. 2025) ...................................................................44

*In re Highland Cap. Mgmt., L.P.*,
  2022 WL 270862 (N.D. Tex. Jan. 28, 2022) ...................................................36, 45

*In re Idearc, Inc.*,
    423 B.R. 138 (Bankr. N.D. Tex. 2009) ........................................................17, 31, 34, 85, 87

*In re J T Thorpe Co.*,
    308 B.R. 782 (Bankr. S.D. Tex. 2003), *aff'd*, 2004 WL 720263 (S.D. Tex.
    Mar. 3, 2004) ..............................................................................................................16, 41, 47

*In re Jackson Brewing Co.*,
    624 F.2d 599 (5th Cir. 1980) ..........................................................................................29, 34

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987) ................................................................................................17

*In re Jewish Memorial Hosp.*,
    13 B.R. 417 (Bankr. S.D.N.Y. 1981) ...................................................................................85

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993) ..........................................................................................17, 83

*Kane v. Johns-Manville*,
    843 F.2d at 649 ......................................................................................................................81

*In re Lakeside Glob. II, Ltd.*,
    116 B.R. 499 (Bankr. S.D. Tex. 1989) .................................................................................81

*In re LATAM Airlines Group SA*,
    2022 WL 2206829 (Bankr. S.D.N.Y June 18, 2022) ............................................................21

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004) .............................85

*In re Lincolnshire Campus, LLC*,
    441 B.R. 524 (Bankr. N.D. Tex. 2010) .................................................................................52

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
    150 F.3d 503 (5th Cir. 1998) ..........................................................................................47, 51

*In re Matter of DP Partners Ltd. P'ship*,
    106 F.3d 667 (5th Cir. 1997) ................................................................................................69

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*,
    354 B.R. 1 (D. Conn. 2006) ..................................................................................................81

*In re Mirant Corp.*,
    354 B.R. 113 (Bankr. N.D. Tex. 2006) ..............................................68, 69, 70, 71, 72, 74

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
    25 F.3d 1132 (2d Cir. 1994) .................................................................................................48

*In re Myers*,
    546 B.R. 363 (Bankr. S.D. Miss. 2016) .................................................................30

*NexPoint Advisors, L.P. v. Highland Capital Management (In re Highland Cap.
    Mgmt., L.P.)*,
    48 F.4th 419 (5th Cir. 2022) ...................................................................42, 44

*In re NII Holdings, Inc.*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015) ....................................................................34

*In re Oldco M. Corp.*,
    No. 09-13412 (MG) (Bankr. S.D.N.Y. Feb. 23, 2010) ..........................................87

*In re Party City Holdco Inc.*,
    No. 23-90005 (DRJ) (Bankr. S.D. Tex. Sept. 6, 2023) (Docket No. 1711)............44

*In re Pearl Res. LLC*,
    622 B.R. 236 (Bankr. S.D. Tex. 2020) .................................................................81

*In re Penton Bus. Media Holdings, Inc.*,
    No. 10-10689 (AJG) (Bankr. S.D.N.Y. Mar. 5, 2010) ..........................................87

*Phx. Mut. Life Ins. v. Greystone III Joint Venture (In re Greystone III Joint
    Venture)*,
    995 F.2d 1274 (5th Cir. 1991) ............................................................................17

*In re Plenty*,
    25-90105 (CML) (Bankr. S.D. Tex. May 15, 2025) (Docket No. 515)...................45

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968)............................................................................................34

*In re Prudential Energy Co.*,
    58 B.R. 857 (Bankr. S.D.N.Y. 1986) ....................................................................81

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000).................................................................................41

*In re R.L. Adkins Corp.*,
    505 B.R. 770 (Bankr. N.D. Tex. 2014) .................................................................69

*Republic Supply Co. v. Shoaf*,
    815 F.2d 1046 (5th Cir. 1987) ............................................................................38

*Rhodium JV LLC et al., v. Whinstone US Inc.*,
    Case No. 20-448 (Bankr. S.D. Tex.) .....................................................................61

*In re Roqumore,*
   393 B.R. 474 (Bankr. S.D. Tex. 2008) ...............................................................28, 34

*In re Sabine Oil & Gas Corp.,*
   555 B.R. 180 (Bankr. S.D.N.Y. 2016) ...........................................................................17

*In re Save Our Springs (S.O.S.) All., Inc.,*
   388 B.R. 202 (Bankr. W.D. Tex. 2008), *aff'd sub nom.*
   *In re Save Our Springs All., Inc.,*
   2009 WL 8637183 (W.D. Tex. Sept. 29, 2009), *aff'd sub nom.*
   *In re Save Our Springs (S.O.S.) All., Inc.,*
   632 F.3d 168 (5th Cir. 2011) ................................................................................83, 84

*In re Save Our Springs (S.O.S.) All., Inc.,*
   632 F.3d 168 (5th Cir. 2011) ................................................................................16, 83

*In re Serta Simmons Bedding, L.L.C.,*
   125 F. 4th 555 (5th Cir. 2024) .......................................................................................21

*In re Southcross Holdings, LP,*
   No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (Docket No. 191)..............................38

*In re Star Ambulance Serv., LLC,*
   540 B.R. 251 (Bankr. S.D. Tex. 2015) .........................................................................16, 81

*In re Sunguard AS New Holdings, LLC,*
   No. 22-90018 (DRJ) (Bankr. S.D. Tex. Oct. 17, 2022) (Docket No. 763)...........................41

*In re Talen Energy Supply, LLC,*
   No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) (Docket No. 1760) ....................41, 44

*In re TCI 2 Holdings, LLC,*
   428 B.R. 117 (Bankr. D.N.J. 2010) .............................................................................16

*In re Teton Energy Corp.,*
   2010 WL 2822056 (Bankr. D. Del. Jan. 20, 2010).........................................................88

*Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.),*
   844 F.2d 1142 (5th Cir.1988), *vacated on other grounds,*
   *Adams v. First Fin. Dev. Corp. (In re First Fin. Dev. Corp.),*
   960 F.2d 23 (5th Cir. 1992) ................................................................................51, 76

*In re The Container Store Grp., Inc.,*
   No. 24-90627 (ARP) (Bankr. S.D. Tex. April 7, 2025) (Docket No. 280)...........................45

*In re The New Power Co.,*
   2007 WL 7143077 (Bankr. N.D. Ga. 2007) .................................................................68

*In re Tribune Co.*,
 476 B.R. 843 (Bankr. D. Del. 2012), *aff'd as modified*,
 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part*,
 799 F.3d 272 (3d Cir. 2015)................................................................................17

*In re Trinity Fam. Prac. & Urgent Care PLLC*,
 661 B.R. 793 (Bankr. W.D. Tex. 2024)...............................................................51

*In re Tucker Freight Lines, Inc.*,
 62 B.R. 213 (Bankr. W.D. Mich. 1986)................................................................41

*In re Ultra Petroleum Corp.*,
 No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) (Docket No. 1324) ...........38

*In re Vill. at Camp Bowie I, L.P.*,
 710 F.3d 239 (5th Cir. 2013) ........................................................................51, 52

*In re Vitro S.A.B. de C.V.*,
 701 F.3d 1031 (5th Cir. 2012) ............................................................................38

*In re W.G.S.C. Enters., Inc.*,
 47 B.R. 53 (Bankr. N.D. Ga. 1985) .....................................................................72

*In re W.R. Grace & Co.*,
 729 F.3d 311 (3d Cir. 2013)..........................................................................21, 51

*In re W.T. Grant Co.*,
 699 F.2d 599 (2d Cir. 1983), *cert. denied*, 464 U.S. 822 (1983)...........................29

*In re Warren Res., Inc.*,
 No. 16-32760 (MI) (Bankr. S.D. Tex. Sept. 14, 2016) (Docket No. 352)..............39

*Whitney Bank v. SCC Kyle Partners, Ltd. (In re SCC Kyle Partners, Ltd.)*,
 518 B.R. 393 (W.D. Tex. 2014)...........................................................................81

*In re Wool Growers Cent. Storage Co.*,
 371 B.R. 768 (Bankr. N.D. Tex. 2007).................................................................38

## Rules/Statutes

11 U.S.C. § 101(31)...........................................................................................75

11 U.S.C. § 105(d)............................................................................................48

11 U.S.C. § 109(a)............................................................................................47

11 U.S.C. § 109(d)............................................................................................47

11 U.S.C. § 330.................................................................................................................73

11 U.S.C. § 365...........................................................................................................24, 46

11 U.S.C. § 365(f)............................................................................................................87

11 U.S.C. § 502(b)............................................................................................................10

11 U.S.C. § 503(b).......................................................................................54, 68, 69, 70, 79

11 U.S.C. § 507(a).......................................................................................................79, 82

11 U.S.C. § 524(e)............................................................................................................42

11 U.S.C. § 1103(c)..........................................................................................................42

11 U.S.C. § 1107(a)..........................................................................................................42

11 U.S.C. § 1114...............................................................................................................82

11 U.S.C. § 1121(a)..........................................................................................................47

11 U.S.C. § 1122..............................................................16, 17, 18, 19, 20, 45, 86

11 U.S.C. § 1123(a)........................................16, 20, 21, 22, 23, 24, 45, 86

11 U.S.C. § 1123(b).............................................23, 24, 25, 28, 33, 38, 45

11 U.S.C. § 1123(d)..........................................................................................................46

11 U.S.C. § 1125..........................................................................................15, 47, 48, 49

11 U.S.C. § 1125(a).......................................................................................................16, 48

11 U.S.C. § 1125(b)..........................................................................................................48

11 U.S.C. § 1125(b)............................................................................................................9

11 U.S.C. § 1125(e)...................................................................................................15, 41, 42

11 U.S.C. § 1126.........................................................................................12, 47, 49, 50

11 U.S.C. § 1126(c)..........................................................................................................50

11 U.S.C. § 1126(f)..........................................................................................................49

11 U.S.C. § 1126(g)..........................................................................................................50

11 U.S.C. § 1127...............................................................................................................87

11 U.S.C. § 1127(a) ........................................................................................................86

11 U.S.C. § 1129(a) ...................................................................................................16, 83

11 U.S.C. § 1129(a)(1) .......................................................................................16, 17, 45

11 U.S.C. § 1129(a)(3) .............................................................................................50, 52

11 U.S.C. § 1129(a)(4) ...................................................................................................53

11 U.S.C. § 1129(a)(5) .............................................................................................74, 75

11 U.S.C. § 1129(a)(6) ...................................................................................................75

11 U.S.C. § 1129(a)(7) .....................................................................................75, 76, 77

11 U.S.C. § 1129(a)(8) .....................................................................................78, 80, 83

11 U.S.C. § 1129(a)(9) .............................................................................................79, 80

11 U.S.C. § 1129(a)(10) .................................................................................................80

11 U.S.C. § 1129(a)(11) ...........................................................................................80, 81

11 U.S.C. § 1129(a)(12) .................................................................................................82

11 U.S.C. § 1129(a)(13) .................................................................................................82

11 U.S.C. § 1129(a)(14) ...........................................................................................82, 83

11 U.S.C. § 1129(a)(15) ...........................................................................................82, 83

11 U.S.C. § 1129(a)(16) .................................................................................................83

11 U.S.C. § 1129(b) .................................................................................21, 78, 83, 84, 85

11 U.S.C. § 1129(b)(1) .............................................................................................83, 85

11 U.S.C. § 1129(b)(2) .............................................................................................84, 85

11 U.S.C. § 1129(d) ........................................................................................................86

28 U.S.C. § 1930 .............................................................................................................82

## **Other Authorities**

Bankruptcy Rule 2019 ....................................................................................................55

Bankruptcy Rule 3007 ....................................................................................................10

Bankruptcy Rule 3017 ....................................................................................................47

Bankruptcy Rule 3018 ....................................................................................................47

Bankruptcy Rule 3019 ...............................................................................................86, 87

Bankruptcy Rule 3020 ...............................................................................................87, 88

Bankruptcy Rules 6004 ..................................................................................................87

Bankruptcy Rules 6006 ..................................................................................................87

Bankruptcy Rule 9019 .........................................................................................28, 29, 30

H.R. Rep. No. 95-595 (1977)..........................................................................................17

S. Rep. No. 95-989 (1978)..............................................................................................17

The above-captioned debtors (collectively, the "Debtors"), acting by and through the Special Committee of the Board of Directors of Debtor Rhodium Enterprises, Inc. (the "Special Committee"), and the Ad Hoc Group of SAFE Parties (the "SAFE AHG" and, together with the Debtors, the "Plan Proponents") hereby submit this memorandum of law (this "Memorandum") in support of confirmation of the *Second Amended Joint Chapter 11 Plan of Liquidation of Rhodium Encore LLC and Its Affiliated Debtors Proposed by Debtors and Ad Hoc Group of SAFE Parties* (Docket No. 2062) (as modified, amended, or supplemented from time to time, the "Plan"),[2] pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").  In support of confirmation of the Plan, the Plan Proponents respectfully state as follows:

## PRELIMINARY STATEMENT

1.      These chapter 11 cases featured challenges that required creative solutions.  As the Court is aware, among other things, these cases included a lengthy litigation with the Debtors' landlord Whinstone, a dispute between common stockholders and the SAFE Parties regarding the nature, treatment and priority of SAFE Claims, a lengthy investigation regarding alleged misconduct by the Founders in connection with various pre-petition actions, and multiple mediations including with respect to the Whinstone Settlement, the Debtors' exit strategy and the resolution of claims against Imperium and the Founders.  It is unquestionable that the parties to these cases did not always see eye to eye and that, at times, these cases were contentious.  However, through litigation and claim objections, settlements and asset sales, the Plan Proponents have put

---

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or the Proposed Confirmation Order (as defined herein), as applicable.

forth a Plan that provides for the payment in full of all claims as allowed or compromised with a path to value for holders of equity interests.

2.        Despite the often contested nature of these chapter 11 cases, the current Plan achieved nearly universal acceptance.  Only one group of equity interests voted to reject to the Plan.  All other major stakeholders support the Plan, as reflected in the Plan Support Agreement filed on October 7, 2025 (Docket No. 1747) (as may be amended and supplemented, the "Plan Support Agreement") by and among the Debtors, the Special Committee, the SAFE AHG, Imperium Investments Holdings, LLC and the Founders (collectively, the "Plan Support Parties"), and the Settlement Stipulation by and among the Debtors (acting through the Special Committee), the SAFE AHG, the Transcend Group and the Other Encore Claimants, each as defined in the Settlement Stipulation (defined herein).  The Transcend Group, which had intended to object to confirmation of the Plan, reached a negotiated settlement with the Plan Proponents prior to the objection deadline, which has resolved all of the Transcend Group's outstanding issues in the Debtors' Chapter 11 Cases.  Additionally, the Plan is supported by the Creditors' Committee.

3.        Accordingly, the only outstanding objections to the Plan are the limited objection submitted by one of the Debtors' former professionals, Lehotsky Keller & Cohn LLP, and a limited objection and reservation of rights submitted by one of the Debtors' former employees, Caleb VanZoeren, relating to the amount of Mr. VanZoeren's severance benefits.

4.        The Plan maximizes value of the Debtors' assets, provides for payment in full to general unsecured creditors (unless otherwise agreed), implements a negotiated settlement of claims asserted by the Holders of SAFE Claims and the Transcend Group, resolves the estates' claims against the Founders in exchange for millions of dollars of new value, compensates the SAFE AHG for its substantial contribution to these cases, effectuates the orderly wind down of

the Debtors, and most importantly, complies with all of the requirements of section 1129 of the Bankruptcy Code.  For these reasons, and as set forth more fully in this Memorandum, the Plan Proponents submit that the Plan should be confirmed.

## **ARGUMENT**

5.      This Memorandum contains two parts.  Part I provides the procedural history of the Plan and Disclosure Statement, the solicitation efforts and voting results, and a summary of the various Objections filed with respect to the Plan.  Part II establishes the Plan's compliance with each of the applicable requirements for Confirmation, including the discretionary contents of the Plan.  The Plan achieves results fully compliant with the Bankruptcy Code based on arms'-length negotiations spanning many months.  In further support of Confirmation of the Plan, the Plan Proponents have filed contemporaneously herewith:

- The *Certification of Jeffrey Miller Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the First Amended Joint Chapter 11 Plan of Liquidation for Rhodium Encore LLC and its Debtors Affiliates Proposed by Debtors and Ad Hoc Group of SAFE Parties* (Docket No. 2050) (the "Voting Declaration" or "Voting Report");

- the *Declaration of Michael Robinson in Support of Plan Confirmation* (Docket No. 2063) (the "Robinson Declaration"); and

- the *Declaration of David Eaton in Support of Plan Confirmation* (Docket No. 2074) (the "Eaton Declaration"); and

- the *Declaration of Mitchell Hurley in Support of Plan Confirmation* (Docket No. 2075) (the "Hurley Declaration" and together with the Voting Report, the Eaton Declaration, and the Robinson Declaration, the "Declarations").

6.      For the reasons stated herein, the Plan Proponents respectfully request that the Court find that the Plan satisfies all relevant requirements of the Bankruptcy Code and approve the Plan.

3

I.      **Case Background**

A.      **Procedural History**

7.      The Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas on August 24, 2024, and August 29, 2024 (collectively, the "Petition Date").

8.      On October 18, 2024, the Court entered the *Order (I) Setting Bar Dates for Filing Proofs of Claim, (II) Approving the Form of Proofs of Claim and the Manner of Filing, (III) Approving Notice of Bar Dates, and (IV) Granting Related Relief* (Docket No. 284) (the "Bar Date Order") establishing, among other things, November 22, 2024 at 5:00 p.m. (prevailing Central Time) as the deadline for all nongovernmental creditors or other parties in interest to file POCs (the "General Bar Date") and February 20, 2025 at 5:00 p.m. (prevailing Central Time) as the deadline for governmental units to file POCs against any of the Debtors (the "Governmental Bar Date").

9.      On May 14, 2025, the Court entered the *Corrected Order (I) Setting Bar Date for Filing Proofs of Interest, (II) Approving the Form of Proofs of Interest and the Manner of Filing, (III) Approving Notice of Bar Date, and (IV) Granting Related Relief* (Docket No. 1100) (the "Equity Interests Bar Date Order") establishing, among other things, June 20, 2025 at 5:00 p.m. (prevailing Central Time) as the deadline for all holders of interests in the Debtors to file proofs of interest.

10.     On October 7, 2025, the Plan Support Parties entered into, and filed, the Plan Support Agreement.  The Plan Support Agreement provided the construct of a plan of liquidation that provided for, among other things,

        a.      the payment of General Unsecured Claims in full on or about the Effective Date;

b.     the compromise of the SAFE Claims for less than their face amount, and the Plan Support Parties' agreement to support the allowance of an $8.5 million substantial contribution claim in favor of the SAFE AHG;

c.     the settlement of estate claims and causes of action against the Founders that included the payment of $8.5 million by the Debtors' insurers, and the Founders' agreement to waive alleged claims against the Debtors;

d.     the potential for a distribution of value to Debtor REI's Common Equity Holders; and

e.     the establishment of a Wind Down Debtor to assist with the liquidation of the Debtors' remaining estate assets in an efficient manner.

11.     On October 7, 2025, as contemplated by the Plan Support Agreement, the Plan Proponents filed the *Amended Joint Chapter 11 Plan of Liquidation for Rhodium Encore LLC and Its Affiliated Debtors Proposed By Debtors and Ad Hoc Group of SAFE Parties* (Docket No. 1750) and its accompanying *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Rhodium Encore LLC and Its Affiliated Debtors* (Docket No. 1751), each of which memorialized the terms of the Plan Support Agreement.

12.     On October 8, 2025, the Plan Proponents filed and served the *Emergency Motion of the Debtors and the Ad Hoc Group of SAFE Parties for Entry of an Order (A) Conditionally Approving the Adequacy of the Disclosure Statement; (B) Approving the Solicitation Procedures and Solicitation Packages; (C) Scheduling a Combined Hearing; (D) Establishing Procedures for Objecting to the Plan and Final Approval of the Disclosure Statement; (E) Approving the Form, Manner, and Sufficiency of Notice of the Combined Hearing; and (F) Granting Related Relief* (Docket No. 1752) (the "Disclosure Statement Motion"), which, among other things, scheduled a

hearing on the conditional approval of the Disclosure Statement for October 15, 2025 (the "Disclosure Statement Hearing").  On October 8, 2025, the Plan Proponents also filed a *Notice of Hearing* (Docket No. 1753), notifying parties in interest of the Disclosure Statement Hearing.  The Disclosure Statement Hearing was subsequently continued to October 20, 2025.

13.     On October 16, 2026, the Plan Proponents filed the *Notice of Filing of Liquidation Analysis Related to the Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of Rhodium Encore LLC and Its Affiliated Debtors* (Docket No. 1813) (the "Liquidation Analysis").  On October 19, 2025, the Plan Proponents filed amended versions of the Plan (Docket No. 1822) and Disclosure Statement (Docket No. 1822).  On November 30, 2025, the Plan Proponents filed the second amended Plan (Docket No. 2062).

14.     Finally, on October 21, 2025, the Plan Proponents filed an updated *Disclosure Statement for First Amended Joint Chapter 11 Plan of Liquidation of Rhodium Encore LLC and Its Affiliated Debtors* (Docket No. 1832) and the proposed order conditionally approving the Disclosure Statement (Docket No. 1833).

15.     On October 20, 2025, the Disclosure Statement Hearing was held and, on October 21, 2025, the Court entered the *Order (A) Conditionally Approving the Adequacy of the Disclosure Statement; (B) Approving the Solicitation Procedures and Solicitation Packages; (C) Scheduling a Combined Hearing; (D) Establishing Procedures for Objecting To The Plan And Final Approval of the Disclosure Statement; (E) Approving the Form, Manner, and Sufficiency of Notice of the Combined Hearing; and (F) Granting Related Relief* (Docket No. 1834) (the "Disclosure Statement Order"), which conditionally approved the Disclosure Statement, solicitation procedures, related notices, forms, and ballots for voting on the Plan.

16.     Beginning on or about October 24, 2025, (the "Solicitation Date"), the Plan Proponents caused the Solicitation Packages (as defined in the Disclosure Statement Order), notice of the Confirmation Hearing, and the deadline for objecting to confirmation of the Plan to be distributed in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Disclosure Statement Order, and the Solicitation Procedures, as evidenced by, among other things, the *Certificate of Notice* (Docket No. 1866 at pp. 160-62).

17.     On November 19, 2025, the Plan Proponents filed the *Notice of Filing of Plan Supplement for First Amended Joint Chapter 11 Plan of Liquidation for Rhodium Encore LLC and Its Affiliated Debtors Proposed by Debtors and Ad Hoc Group of SAFE Parties* (Docket No. 2001) (the "Plan Supplement"), which included: (a) Severance and Employment Contract Rejection Payments; (b) the identity of the Plan Administrator; (c) Schedule of Retained Causes of Action; (d) Schedule of Assumed Contracts; and (e) Schedule of Rejected Contracts.  On that same date, the Debtors also served notices of assumption on each of the counterparties to Executory Contracts and Unexpired Leases whose Executory Contracts or Unexpired Leases are being assumed pursuant to the Plan.  On November 26, 2025, the Plan Proponents filed the *Notice of Filing Second Plan Supplement for First Amended Joint Chapter 11 Plan of Liquidation for Rhodium Encore LLC and its Affiliated Debtors Proposed by Debtors and Ad Hoc Group of SAFE Parties* (Docket No. 2051), which included: (a) the form of Plan Administrator Agreement; and (b) the Wind Down Budget.

18.     The Plan, among other things:

- contemplates payment in full of Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims;

- provides for the distribution of Cash to Holders of General Unsecured Claims;

- provides for the distribution of negotiated amounts of Distributable Cash, after payment in full of General Unsecured Claims, to Holders of SAFE Claims[3] and the Transcend Group;

- provides for any residual value after payment of the negotiated amounts to the Holders of SAFE Claims and the Transcend Group to be distributed to Holders of Interests;

- provides for the settlement of certain claims and controversies, including the D&O Insurance Settlement and the Transcend Settlement (each as defined herein); and

- designates a Plan Administrator to maximize remaining asset value for further distribution and wind down the Debtors' affairs in accordance with the Plan.

19.     The Court set the deadlines (a) to file objections to the Plan, and (b) for all Holders of Claims and Interests entitled to vote on the Plan to cast their ballots for November 21, 2025, at 5:00 p.m., prevailing Central Time.  Only two limited objections to the Plan were timely received. On November 21, 2025, Lehotsky Keller Cohn LLP and individual creditor Caleb VanZoeren each filed a limited objection and reservation of rights with regard to the Plan.  As discussed further herein, both objections are without merit and should be overruled.

20.     Subsequent to the filing of the Plan, the SAFE AHG initiated and led discussions with the Transcend Group[4] and the Other Encore Claimants[5] in an effort to resolve alleged claims and objections to the proposed Plan regarding (i) the anti-dilutive warrants ("Warrants") owned

---

[3]  "SAFE Claim" means any Claim arising under or related to a SAFE held by a Person that is a party to any SAFE Agreement.

[4]  "Transcend Group" means Transcend Partners Legend Fund LLC; Valley High LP; GR Fairbairn Family Trust; Grant Fairbairn Revocable Trust; Nina Claire Fairbairn Revocable Trust; NCF Eagle Trust; GRF Tiger Trust; NC Fairbairn Family Trust; Malcolm P And Emily T Fairbairn 2021 Charitable Remainder Unitrust; Nina C Fairbairn Charitable Remainder Unitrust; Grant R Fairbairn Charitable Remainder Unitrust; Kintz Family Trust; Kingdom Trust, FBO Emily Fairbairn; Kingdom Trust FBO Malcolm Fairbairn; Malcolm Fairbairn; Emily Fairbairn; Nina Fairbairn; Grant Fairbairn; and Scott Kintz, each as members of the Transcend Group collectively, and each as a member of the Transcend Group individually.

[5]  "Other Encore Claimants" mean Richard Fullerton; Jerald And Melody Howe Weintraub Revocable Living Trust Dtd 02/05/98 As Amended; Wilkins-Duignan 2009 Revocable Trust; 345 Partners SPV2 LLC; and Jacob Rubin.

by certain members of the Transcend Group and claims related thereto, (ii) other claims asserted against the Debtors by the Transcend Group (together with Claims relating to the Warrants, the "Transcend Group Claims"), and (iii) claims for damages against the Debtors (the "Other Claims") asserted by the Other Encore Claimants.  On November 20, 2025, the SAFE AHG noticed the filing of the Settlement Stipulation (Docket No. 2006) resolving the Transend Group Claims and Other Claims (the "Transcend Settlement").

21.     Pursuant to the Transcend Settlement, among other things, (i) the Transcend Group withdrew *The Transcend Group's Objection to the Solicitation and the Conditional Approval of the Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Rhodium Encore LLC and its Affiliated Debtors* [Docket No. 1787] (the "Transcend Plan Objection"), (ii) the Transcend Group and the Other Encore Claimants agreed to forego numerous objections to the Plan and, instead, support the Plan and all of its terms, including allowance of the full $8.5 million amount of the SAFE AHG Substantial Contribution Claim provided in the Plan, (iii) the Debtors withdrew *the Second Omnibus Objection to Certain Claims Pursuant to Bankruptcy Code Sections 502(B), Bankruptcy Rule 3007, and Local Rule 3007-1 Because Claims Have Been Satisfied and Based on Other Substantive Grounds* [Docket No. 1764] (the "Transcend Claim Objection"), (iv) the Plan was amended to provide the Transcend Group an unsecured claim against Rhodium Enterprises, Inc. ("REI") allowed in Class 5b[6] in the amount of $10 million (the "Allowed Transcend Claim"), expressly subordinated to payment of the SAFE Claims and a portion of the SAFE AHG Substantial Contribution Claim, and (v) the Other Claims were withdrawn in their entirety.  In an effort to secure consent by all parties to the Transcend Settlement, the SAFE AHG also agreed that

---

[6]     A scrivener's error in the Settlement Stipulation stated that the Transcend Group would receive an Allowed Claim in Class 6, which consists of SAFE Claims.  The Allowed Transcend Claim is properly classified as a General Unsecured Claim in Class 5b.

$2.5 million of its $8.5 million Substantial Contribution Claim will be paid into escrow for release either to the Transcend Group or the SAFE AHG (or both) depending on recoveries available in connection with the Allowed Transcend Claim, as detailed in section 5.13 of the Plan.

22. The Disclosure Statement Order scheduled a hearing on final approval of the Disclosure Statement and on confirmation of the Plan for December 3, 2025 at 9:30 am (Prevailing Central Time). The Plan Proponents have submitted the *Proposed Order Confirming the Second Amended Joint Chapter 11 Plan of Liquidation of Rhodium Encore LLC and Its Affiliated Debtors* (Docket No. 2081) (the "<u>Proposed Confirmation Order</u>").

**B. The Wind Down**

23. The Plan Administrator shall direct the affairs of the Wind Down Debtor, which shall seek to maximize the value of remaining assets for distribution and pursue the orderly wind down of the Debtors in accordance with the Plan. Under the liquidation procedures described in Article VI of the Plan, the Wind Down Debtor will make distributions to Holders of Allowed Claims and Interests in accordance with the Plan. The Debtors, except for the Wind Down Debtor, will be dissolved pursuant to the Proposed Confirmation Order, and their assets, including all Remaining Assets and Retained Causes of Action, will vest in the Wind Down Debtor. After the Wind Down Debtor liquidates its assets, it will distribute the net proceeds to Holders of Allowed Claims and Interests in accordance with the Plan.

24. The Wind Down Debtor will continue in existence after the Effective Date for purposes of, *inter alia*, (1) preserving the Retained Causes of Action for the benefit of Holders of Allowed Claims or Allowed Interests entitled to Distributions, (2) winding down the Debtors' remaining businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind Down Debtor after the Effective Date, (3) resolving any Disputed Claims, (4) paying Allowed Claims or Interests, (5) filing appropriate tax returns, and (6) administering the

Plan promptly and efficiently. The Wind Down Debtor shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

25. The Wind Down Debtor will be managed by the Plan Administrator. Among other things, the Plan Administrator will be charged with: (a) administering the implementation of the Plan, including the making of the Distributions contemplated by the Plan; (b) conducting an analysis of any and all Disputed Claims and Interests and prosecuting objections thereto or settling or otherwise compromising such Disputed Claims and Interests, if necessary and appropriate; (c) maintaining and administering the reserves in accordance with the terms of the Plan; (d) commencing, prosecuting, or settling Retained Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges in accordance therewith and paying all associated costs; (e) paying Post-Effective Date fees and expenses; (f) abandoning any property constituting assets of the Wind Down Debtor that cannot be sold or otherwise disposed of for value and whose Distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Plan Administrator's reasonable judgment; (g) preparing and filing post-Effective Date operating reports; (h) filing appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations; (i) retaining such Professionals as are necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations; and (j) taking such actions as are necessary and reasonable to carry out the provisions of the Plan, including winding down the Wind Down Debtor's business affairs.

26. Following completion of the Plan Administrator's duties, the Plan Administrator will dissolve the Wind Down Debtor in accordance with the Plan.

**C.      The Plan Solicitation and Notification Process**

27. In compliance with the Bankruptcy Code, only Holders of Claims and Interests in Impaired Classes receiving or retaining property on account of such Claims or Interests were

entitled to vote on the Plan.[7]  Holders of Claims and Interests were not entitled to vote if their rights are Unimpaired or if they are not receiving or retaining any property under the Plan.  The following Classes of Claims were ***not*** entitled to vote on the Plan, and the Plan Proponents did not solicit votes from Holders of such Claims: Class 1 (Rhodium 2.0 Secured Notes Claims), Class 2 (Rhodium Encore Secured Notes Claims), Class 3 (Rhodium Technologies Secured Notes Claims), Class 4 (Priority Non-Tax Claims), Class 5a (Guaranteed Unsecured Claims), Class 5b (General Unsecured Claims), Class 7 (Late Filed Claims), Class 8 (Intercompany Claims), Class 9 (Section 510(b) Claims), and Class 12 (Intercompany Interests).

28.    The Plan Proponents solicited votes on the Plan from Holders of Claims and Interests in Class 6 (SAFE Claims), Class 10 (Common Interests), and Class 11 (Imperium Interests), which were entitled to vote to accept or reject the Plan (collectively, the "Voting Classes").

29.    The voting results, as reflected in the Voting Report, are summarized as follows:

| Class 6 (SAFE Claims) | | Result |
|---|---|---|
| Tabulated Ballots Received | 35 ($81,112,340.98) | Accept |
| Accept | 35 ($81,112,340.98) | |
| Reject | 0 ($0) | |
| **Class 10 (Common Interests)** | | **Result** |
| Tabulated Ballots Received | 49 (60,259,638 shares) | Reject |
| Accept | 27 (19,015,562 shares) | |
| Reject | 22 (41,244,075 shares) | |
| **Class 11 (Imperium Interests)** | | **Result** |

---

[7]    *See* 11 U.S.C. § 1126.

| Tabulated Ballots Received | 1 ($1.00) | Accept |
|---|---|---|
| Accept | 1 ($1.00) | |
| Reject | 0 ($0 | |

30.     The Plan promotes best interests of the Debtors, their Estates, and all parties in interest.  And as shown above, Holders of Claims agree: Classes 6 and 11 unanimously voted in favor of the Plan.  Holders of Interests in Class 10 voted to reject the Plan.

31.     The Plan Proponents strongly believe that the Plan complies with the best interests of its Estate and represents the best available alternative for all of its stakeholders.  The voting results demonstrate that the vast majority of stakeholders agree.  The transactions embodied in the Plan will maximize the value of the Estates and maximize recoveries to Holders of Claims and Interests.

**D.     The Objections**

32.     The deadline to file an objection to the Plan was November 21, 2025.  Only two parties filed limited objections to the Plan.

33.     On November 21, 2025, Lehotsky Keller Cohn LLP ("LKC") filed *Lehotsky Keller Cohn LLP's Limited Objection and Reservation of Rights* (Docket No. 2021) (the "LKC Objection"), by which LKC argued that the release and exculpation provisions contained in the Plan inhibit LKC's ability to assert claims and causes of action against the Debtors, the Special Committee and their respective counsel related to potential breaches of LKC's engagement agreement.

34.     On November 21, 2025, individual creditor Caleb VanZoeren ("VanZoeren") filed a *Limited Objection and Reservation of Rights Related to First Amended Joint Chapter 11 Plan of Liquidation For Rhodium Encore LLC and Its Affiliated Debtors Proposed By Debtors and Ad Hoc Group of SAFE Parties* (Docket No. 2011), by which VanZoeren objects that the $205,721.64

Severance Benefit contained in the Plan Supplement is incorrect.  VanZoeren filed a proof of claim (Proof of Claim No. 250) in the Chapter 11 Cases, relating to his employment agreement, in the amount of at least $265,000.  By his objection, VanZoeren argues that the amount owed to him on behalf of his claims is short by approximately $60,000 and objects to the Plan to the extent it purports to limit his claim to the amount set forth in the Plan Supplement.  As discussed further herein, VanZoeren's objection is not a proper objection to the Plan recognized by the Bankruptcy Code.

## II.   The Plan Proponents Complied with the Applicable Notice Requirements

### A.   The Plan Proponents Complied with Applicable Notice and Solicitation Requirements

35.     Aside from conditionally approving the Disclosure Statement, the Disclosure Statement Order granted relief regarding solicitation and noticing procedures and materials including, among other things: (a) approving solicitation and voting procedures with respect to the Plan, including (i) fixing the Record Date, (ii) approving the Solicitation Packages and procedures for distribution, (iii) approving the form of the Ballots and establishing procedures for voting, and (iv) approving procedures for vote tabulation; and (b) approving certain dates and deadlines with respect to the Plan and its confirmation.  The Plan Proponents have complied with the procedures and timeline approved by the Disclosure Statement Order.

### B.   Solicitation of the Plan Complied with Bankruptcy Code and was in Good Faith

36.     Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.

37.     As set forth in the Disclosure Statement and Disclosure Statement Motion, and as demonstrated by the Plan Proponents' compliance with the Disclosure Statement Order,[8] the Plan Proponents at all times took appropriate actions in connection with the solicitation of the Plan in compliance with section 1125 of the Bankruptcy Code.

38.     No party has credibly suggested that the Disclosure Statement failed to contain adequate information for creditors and interest holders voting on the Plan.  While the Transcend Group had raised certain objections to approval of the Disclosure Statement at the Disclosure Statement Hearing, those objections have been resolved through the Plan Proponents' settlement with the Transcend Group.  For the reasons set forth above, the Disclosure Statement, which was conditionally approved pursuant to the Disclosure Statement Order, satisfies the requirements of section 1125(a) of the Bankruptcy Code and should be approved on a final basis.

## III.     The Plan Is Confirmable Under 11 U.S.C. § 1129

### A.     The Plan Complies with Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1))

39.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  A chapter 11 plan can be confirmed if it satisfies section 1129 of the Bankruptcy Code by a preponderance of the evidence.[9]  This provision also encompasses and incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization,

---

[8]     *See generally*, Voting Report.

[9]     *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("[P]reponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.");  *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 119–20 (D. Del. 2006) (stating that a court must determine whether a plan meets the requirements of section 1129 in order to confirm such plan); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 plan has a reasonable probability of success, and is more than a visionary scheme." (internal quotations omitted)).

respectively.[10]  As explained below, the Plan complies with the requirements of sections 1122 and 1123 in all respects.

### 1. The Plan Satisfies Classification Requirements of Section 1122 of the Bankruptcy Code

40.      The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[11]

41.      A plan proponent has significant flexibility under section 1122(a) in classifying claims if there is reasonable basis to do so.[12]  Moreover, the requirement of substantial similarity[13] does not mean that claims or interests within a particular class must be identical or that all similarly situated claims must receive the same treatment under a plan.[14]

---

[10]   *See, e.g.*, *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 260 (Bankr. S.D. Tex. 2015) ("Courts interpret [section 1129(a)(1)] to mean that a plan must meet the requirements of Bankruptcy Code Sections 1122 and 1123.") (citing *In re Save Our Springs (S.O.S.) All., Inc.*, 632 F.3d 168, 174 (5th Cir. 2011)); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003), *aff'd*, 2004 WL 720263 (S.D. Tex. Mar. 3, 2004) ("The Plan complies with the applicable provisions of the Bankruptcy Code, including the requirements of Sections 1122 and 1123(a) and (b) of the Bankruptcy Code, thereby satisfying Section 1129(a)(1) of the Bankruptcy Code."); H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978).

[11]   11 U.S.C. § 1122(a).

[12]   *See In re Idearc, Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009)*; see Phx. Mut. Life Ins. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278 (5th Cir. 1991) ("'[S]ubstantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class."); *see also John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (explaining that a classification is proper as long as each class represents a voting interest "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) ("It remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case."); *In re Drexel Burnham Lambert Grp., Inc*., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

[13]   *Greystone III Joint Venture*, 995 F.2d at 1278; *Armstrong World Indus.*, 348 B.R. at 159.

[14]   *See In re WB Sanctuary Dev. Partners, LP*, WL 4402991, at *2 (Bankr. S.D. Tex. Aug. 18, 2011) ("[T]he designation of classes under the Plan is based upon the substantial similarity of all claims in

16

42.     The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into thirteen separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual way or based on other relevant criteria.[15]   Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

a.      Class 1: Rhodium 2.0 Secured Notes Claims;

b.      Class 2: Rhodium Encore Secured Notes Claims;

c.      Class 3: Rhodium Technologies Secured Notes Claims;

d.      Class 4: Priority Non-Tax Claims;

e.      Class 5a: Guaranteed Unsecured Claims;

f.      Class 5b: General Unsecured Claims;

g.      Class 6: SAFE Claims;

h.      Class 7: Late Filed Claims;

i.      Class 8: Intercompany Claims;

j.      Class 9: Section 510(b) Claims;

k.      Class 10: Common Interests;

l.      Class 11: Imperium Interests; and

m.      Class 12: Intercompany Interests.

---

each such class."); *In re Tribune Co.*, 476 B.R. 843, 854–55 (Bankr. D. Del. 2012), *aff'd as modified*, 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part*, 799 F.3d 272 (3d Cir. 2015); *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310 (Bankr. S.D.N.Y. 2016); *Drexel*, 138 B.R. at 757 ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar classes be grouped together, but merely that any groups be homogenous or share some attributes.") (citations omitted).

[15]   *See* Plan Art. III.

17

43.     Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.[16]  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[17]  Namely, the Plan separately classifies the Claims and Interests because each Holder of such Claims or Interests may hold (or may have held) rights in or against the Estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience results from such classification.

44.     The Plan does not classify dissimilar Claims and Interests together.  For example, debt and equity are classified separately and secured claims are classified separately from unsecured claims.  Holders of Guaranteed Unsecured Claims are classified separately from Holders of General Unsecured Claims due to the fact that such claims are entitled to payment from more than one entity.  And, at Debtor REI, the holders of SAFE Claims are classified separately from other unsecured creditors due to the fact that such claims are contractually subordinated to other general unsecured creditors.  Other aspects of the classification scheme recognize the different legal or factual nature of Claims or Interests.

45.     Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the distinctions among Classes are based on valid business, factual, and legal distinctions.  The Debtors submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code, and no party has asserted otherwise.

---

[16]    *See* Eaton Decl. ¶ 18.

[17]    *See id.*

2.     **The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code**

46.     Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must contain. The Plan satisfies each of these requirements.[18]

(1)     *Designation of Classes of Claims and Equity Interests (§ 1123(a)(1))*

47.     For the reasons set forth above, Article III of the Plan properly designates classes of Claims and Interests and thus satisfies the requirement of section 1122 of the Bankruptcy Code.[19]

(2)     *Specification of Unimpaired Class (§ 1123(a)(2))*

48.     Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."  The Plan meets this requirement by identifying in Article III the Classes that are Unimpaired: Class 1, Rhodium 2.0 Secured Notes Claims; Class 2, Rhodium Encore Secured Notes Claims; Class 3, Rhodium Technologies Secured Notes Claims; Class 4, Priority Non-Tax Claims; Class 5a, Guaranteed Unsecured Claims; Class 5b, General Unsecured Claims; Class 7, Late Filed Claims; Class 8, Intercompany Claims; and Class 9, Section 510(b) Claims.[20]

(3)     *Treatment of Impaired Classes (§ 1123(a)(3))*

49.     Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."  The Plan meets this

---

[18]     *See* 11 U.S.C. § 1123(a)(1)-(8).  Section 1123(a)(8) of the Bankruptcy Code is only applicable to individual debtors.

[19]     *See* Eaton Decl. ¶¶ 18-20.

[20]     *See* Plan Art. III; Eaton Decl. ¶ 22.

requirement by setting forth in Article III the treatment of each Class that is Impaired.[21] Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

(4)    <em>Equal Treatment within Classes (§ 1123(a)(4))</em>

50.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such holders' respective Class.[22]

51.    Section 1129(b) of the Bankruptcy Code requires only equality of treatment, not equality of result,[23] and the Plan treats Holders of Claims or Interests the same regardless of jurisdiction. In practice, the "key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the [approximately equal] opportunity" to recover.[24] As the Plan provides the same treatment for all Holders of Claims or Interests within each class, the Plan complies with section 1123(a)(4) of the Bankruptcy Code.

(5)    <em>Means for Implementation (§ 1123(a)(5))</em>

52.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation. The Plan satisfies this requirement because the Plan provides for

---

[21]    *See id*.

[22]    *See* Eaton Decl. ¶ 23.

[23]    The Fifth Circuit "adopts an objective approach to equal treatment," requiring that "class members receive[] settlements with [equal] effective values [as] their co-class members." *In re Serta Simmons Bedding, L.L.C.*, 125 F. 4th 555, 592 (5th Cir. 2024); *In re LATAM Airlines Group SA,* 2022 WL 2206829, at *35, (Bankr. S.D.N.Y June 18, 2022) (citing *In re Dana Corp*, 412 B.R. 53, 62 (S.D.N.Y. 2018)); *see also In re Breitburn Energy Partners LP*, 582 B.R. 321, 358 (Bankr. S.D.N.Y. 2018).

[24]    *In re Dana Corp.*, 412 B.R. at 62; *Serta*, 125 F. 4th at 592 (requiring "approximate equality" of recovery) (citing *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) ("What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims.")).

the means by which the Plan will be implemented.[25] Among other things, Article V of the Plan provides for:

    a.    the settlement of Claims and Interests;

    b.    liquidation of the Debtors;

    c.    transfer of assets to the Wind Down Debtor;

    d.    appointment of the Plan Administrator;

    e.    sources of consideration for Plan distributions;

    f.    release of Liens;

    g.    the cancellation of notes, instruments, certificates, licenses, and other documents; and

    h.    preservation of Retained Causes of Action.

53.    The Plan Proponents submit that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

### (6)    *Issuance of Non-Voting Securities (§ 1123(a)(6))*

54.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities. No nonvoting securities will be issued under the Plan, and on or prior to the Effective Date, all but one of the Debtors will be dissolved; with respect to the Wind Down Debtor, no nonvoting stock will be issued. Accordingly, the Plan complies with section 1123(a)(6) of the Bankruptcy Code.

### (7)    *Directors and Officers (§ 1123(a)(7))*

55.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."

---

[25]   *See* Eaton Decl. ¶¶ 25-26.

The Plan satisfies this requirement by providing that, on the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole director and the sole officer of the Wind Down Debtor and shall succeed to the powers of the Wind Down Debtor's managers, directors, and officers.  The Plan Proponents also filed the Plan Supplement, which provides the identity of the Plan Administrator.  Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

### 3.    The Plan Complies with Discretionary Provisions of Section 1123(b) of the Bankruptcy Code

56.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may: (a) modify, impair, or leave unimpaired any class of claims or interests; (b) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (c) provide for the assumption or rejection of executory contracts and unexpired leases; (d) provide for the sale of all or substantially all of the property of the Debtors' estates, and the distribution of the proceeds of such sale among holders of claims or interests; or (e) "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[26]

57.    The Plan satisfies section 1123(b) of the Bankruptcy Code.  Specifically, under Article IV of the Plan, Classes 1, 2, 3, 4, 5a, 5b, 7, 8 and 9 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Class.[27]

---

[26]    *See* 11 U.S.C. § 1123(b)(1)-(6).

[27]    *See* Plan Art. 4.

On the other hand, Classes 6, 10, 11, and 12 are Impaired because the Plan modifies the rights of the Holders of Claims and Interests within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.[28]

58.    In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article 8.1 of the Plan provides that, on the Effective Date, all Executory Contracts and Unexpired Leases that, as of the Effective Date, were not previously rejected, assumed, expired, terminated, the subject of a motion to assume filed by the Plan Proponents on or before the Confirmation Date, or identified for assumption on the Schedule of Assumed Contracts included in the Plan Supplement, shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except to the extent set forth in the Plan.[29]

59.    Finally, as discussed above, the Plan implements certain releases and exculpations, compromises claims and interests, and enjoins certain causes of action.  Each of these provisions conforms with prevailing case law because they (a) result from arm's-length negotiations, (b) emanated from the need to obtain the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and in the best interests of the Debtors, their estates, and these chapter 11 cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code.  Such provisions are discussed in turn below, but, in summary, satisfy the requirements of section 1123(b).

(1)    *The Settlement of Claims and Controversies Is Fair and Equitable and Should be Approved.*

60.    The Plan provides for the general settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or resolved pursuant to the Plan.  In

---

[28]    *See id.*

[29]    *See* Plan Art. 8.1.

particular, the Plan provides for the settlement of (a) all estate claims against the Founders as part of the D&O Insurance Settlement, (b) disputes with the Transcend Group and Other Encore Claimants, as set forth in the Transcend Settlement, and (c) disputes regarding the treatment of the SAFE Claims including, without limitation, regarding the appeals related to the SAFE Objection Order and SAFE AHG Substantial Contribution Claim.

61.     The compromises set forth in the Plan, and as discussed in further detail below, bring necessary closure to these and other matters addressed in the Plan and permit the Debtors to avoid waste and maximize the value of their Estates for the benefit of all parties in interest while maximizing recoveries for all Holders of Claims and Interests.[30]

(i)     <u>The D&O Settlement Is Reasonable</u>

62.     Prior to the Petition Date, numerous parties asserted potential direct and indirect claims and causes of action against the Founders.  In response, over the course of these Chapter 11 Cases, the Special Committee conducted an investigation of these potential claims.  In addition, during that investigation, the SAFE AHG sought and obtained information to conduct its own independent investigation regarding such claims.  The Transcend Group similarly investigated potential claims against Imperium and the Founders based on information available prepetition to the Transcend Group.  As a result of these investigations, and additional information brought to light regarding claims against the Founders by the SAFE AHG, numerous potential claims against the Founders were identified.  As a result, the Special Committee delivered a demand letter to the Debtors' insurers, which attached a demand letter prepared by the SAFE AHG detailing claims against the Founders.

---

[30]     *See* Eaton Decl. ¶ 32.

63. The claims against the Founders were ultimately mediated by the Special Committee, the Founders and the Debtors' insurance carriers, beginning on June 23, 2025 before Jed D. Melnick. Counsel for the Transcend Group also briefly participated in the mediation. The results of this mediation formed the foundation for the D&O Insurance Settlement, which is embodied in the Plan and provides a key pillar to the Plan's implementation. Specifically, the D&O Insurance Settlement, and the resolution of the claims of the Debtors' Estates against the Founders incorporated therein, is a critical element of the Plan and these chapter 11 cases for three interdependent reasons.

64. *First*, the D&O Insurance Settlement provides for an addition of $8.5 million in Rhodium D&O Proceeds before the Effective Date to the Debtors' Estates from the carriers that issued the Debtors' D&O Policies, plus the reimbursement of $1 million in direct costs to Imperium and the Founders, plus reimbursement to the Estates of up to $250,000 in fees incurred with the Special Committee's investigation, all while settling the Estates' direct claims against Imperium and the Founders. Any direct claims, including the Transcend Group, that may be held by third parties against Imperium and the Founders, meanwhile, are unaffected by the D&O Insurance Settlement and the Plan.

65. *Second*, even beyond the contribution of new value to the Estates, the D&O Insurance Settlement enables the redemption of Imperium's majority equity interest in Debtor Rhodium Technologies LLC ("RTL") for no cost to the estates. That redemption allows the Debtors' estates to achieve more than $2 million in tax savings. That redemption also resolves Imperium's allegation that its majority interest at RTL entitles it, and not Rhodium Enterprises, to the bulk of the Debtors' distributable cash about 60% of which is currently held at RTL and totals over $100 million. That redemption further resolves the assertions of the Transcend Group that

the exercise of their warrants would result in such majority interest being diluted by the issuance of additional RTL Units as a result of the exercise of the Transcend Group Warrants. The redemption of Imperium's equity interests in RTL under the Plan thus allows for the distribution of virtually all of the Debtors' distributable cash to Rhodium Enterprises' creditors and interest holders in accordance with the Plan.

66.     *Lastly*, the D&O Insurance Settlement permits the Debtors to resolve fully and finally their numerous interwoven relationships with Imperium and the Founders on favorable terms. Imperium and the Founders agree under the Plan to the disallowance of all but $1.8 million of their claims against the Debtors. Asserted unliquidated claims by the Founders against the Debtors include, but are not limited to those for the Estates' indemnification of costs related to the Debtors' Chapter 11 Cases and reimbursement for alleged tax liabilities, which the Debtors once estimated could equal as much as $18 million or more just related to tax liabilities claimed by the Founders. Those unliquidated claims, and the Debtors' claims against Imperium and the Founders, would doubtless be the subject of lengthy and expensive litigation absent the D&O Insurance Settlement and related agreements. Such litigation would have had an uncertain outcome but would have certainly resulted in enormous costs to the Estates while delaying distributions to the Debtors' creditors and interest holders for months, if not years. The D&O Insurance Settlement and the related settlements embodied in the Plan provide for a better outcome that affords certain recoveries to the Debtors' stakeholders in the near term.

67.     As discussed in greater detail *infra*, the involvement of the SAFE AHG in negotiating, and ultimately consenting to, the terms for the release of claims against the Founders contained in the Plan drove substantial additional value to the estates and non-SAFE stakeholders. As just one example, the settlement embodied in the current Plan will distribute approximately

$13 million *less* to Imperium and the Founders than was contemplated under the plan proposed in May of this year.  As a result, the current Plan *increases* asset value available for distribution to all other parties in interest by the same amount.  Without that $13 million in additional value driven by the SAFE AHG, these cases almost certainly would not have ended with solvent estates, with no chance of distribution of any kind to stakeholders with claims or interests junior to SAFE Claims.

68.    The benefits of the D&O Insurance Settlement clearly meet the standard for approval under section 1123(b)(3)(A) of the Bankruptcy Code.  That standard is the same as applied by courts under Rule 9019 of the Federal Rules of Bankruptcy Procedure, which provides that "[a] settlement may be approved only if it is "fair and equitable and in the best interest of the estate."[31]  The decision to accept or reject a settlement is within the discretion of the court.[32]  While a debtor-in-possession has the burden to show that approval of a settlement of warranted, the "burden is not high.  The [debtor-in-possession] need only show that his decision falls within the 'range of reasonable litigation alternatives.'"[33]

69.    Of particular relevance to the Debtors' cases, the Fifth Circuit has further articulated a three-prong test to determine whether a settlement under Rule 9019 is fair and equitable: "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise."[34]

---

[31]    *In re Cajun Elec. Power Coop., Inc*., 119 F.3d 349, 355 (5th Cir. 1997).

[32]    *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008) (citing *Matter of AWECO, Inc.*, 725 F.2d 293, 297 (5th Cir. 1984)).

[33]    *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 822 (1983).

[34]    *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).

The D&O Insurance Settlement on its face replaces years of potentially expensive, time-consuming litigation with over $8.5 million in new value to the estates, considerable tax savings, and the resolution of numerous interwoven disputes, including the Founders' contention that they are entitled to nearly 60% of all available cash based on their equity interests at RTL.  That result alone justifies approval of the settlement as part of the Plan.  The justification is enhanced when one considers that no viable alternative to the D&O Insurance Settlement has been or plausibly could be proposed that achieves comparable results and has the buy-in of numerous major stakeholders in the Debtors' cases.

70.     Moreover, the D&O Insurance Settlement unquestionably advances the Debtors' emergence from these chapter 11 cases and quicker distributions to creditors and interest holders. The Fifth Circuit has recognized that advancing the resolution of a debtor's estate may be an important factor justifying approval of a settlement.   For example, in *In re Age Refining, Inc.*, 801 F.3d 530, 540 (5th Cir. 2015), the Fifth Circuit upheld a bankruptcy court's approval of a settlement based in part on findings that: (a) the settlement agreement would "speed the full and fair closing of [the] estate, and a distribution to creditors"; (b) that "considering the costs of litigation, the unsecured creditors [would] probably receive more in [the settlement] than they would receive otherwise"; and (c) that "[d]istribution to unsecured creditors [would] certainly be sooner than if this matter [were] litigated."[35]  Those same considerations apply here.  The D&O Insurance Settlement is an indispensable component of the Plan and various related settlements contained therein, which collectively provide a near-term path to emergence from chapter 11,

---

[35]   *See also In re Myers*, 546 B.R. 363 (Bankr. S.D. Miss. 2016) (approving a settlement under Rule 9019 where the court found that the settlement would bring a long case to a close, avoid continued litigation costs and delay, and result in a full payment to unsecured creditors, making the settlement fair, equitable, and in the best interest of the estate).

liquidation of the Debtors' estates, and distributions to creditors and interest holders months, if not years, more quickly than any alternatives. The D&O Insurance Settlement should be approved as part of the Plan as a result.

(ii)    <u>The Transcend Settlement Is Reasonable</u>

71.    As discussed above, the SAFE AHG was indispensable in negotiating the Transcend Settlement, which drives substantial additional value for the estates. The Transcend Settlement, which resolves the disputes identified in the Settlement Stipulation, including the Transcend Plan Objection and the Transcend Claim Objection, is eminently reasonable and is crucial to the swift consummation of the Plan and resolution of these Chapter 11 Cases.

72.    As discussed above, settlements are favored in chapter 11 because they minimize litigation and expedite the administration of the bankruptcy case. Absent the Transcend Settlement, the Transcend Group and Other Encore Claimants made clear their intentions to object to and litigate their treatment under the Plan, the SAFE Settlement, the D&O Insurance Settlement, the allowance of the employee severance claims, the allowance of the LTIP Interests, and other issues with respect to classification and the Disclosure Statement. Specifically, prior to the memorialization of the Transcend Settlement, the Transcend Group had raised litigable disputes with respect to many Plan terms and had served comprehensive discovery requests on the Debtors, Special Committee, Imperium, and the SAFE AHG and scheduled at least five Confirmation-related depositions of the corporate representatives of the foregoing parties. Given the vigor with which the Transcend Group objected to the Plan, the Plan Proponents have no doubt that the Transcend Group would have continued the appeal of this Court's SAFE Objection Ruling and potentially appealed confirmation of the Plan and continued to pursue the various claims asserted by the Transcend Group and the Other Encore Claimants against the Debtors. These actions would

29

have had the effect of prolonging these already lengthy Chapter 11 Cases and further diminishing the limited funds available for distribution under the proposed Plan.

73.     Given the protracted and litigious nature of these Chapter 11 Cases, the Debtors' decision to enter into the Transcend Settlement cannot be said to "fall beneath the lowest point in the range of reasonableness."[36]  Not only is the Transcend Settlement, and the concessions made therein, supported by the Debtors' largest stakeholder constituency, the SAFE AHG, but the resolution of the disputes contained in the Settlement Stipulation enabled the Plan Proponents to build additional support for the Plan and will prevent the needless expense of additional discovery in connection with Confirmation of the Plan and the appeal of the SAFE Objection Order.  Among other things, the Transcend Settlement will allow the Debtors' estates to avoid (i) a minimum of not less than five Confirmation-related depositions that were scheduled to take place prior to the negotiating the Transcend Settlement, (ii) a contested final Disclosure Statement and Confirmation Hearing, (iii) protracted litigation related to the appeal of Confirmation of the Plan, if the proposed Plan is confirmed, (iv) developing and re-soliciting a new Plan were the Transcend Group to defeat final approval of the Disclosure Statement and Plan Confirmation, and (v) disputes regarding the various claims asserted by the Transcend Group and Other Encore Claimants against the Debtors, which in turn will provide the Debtors' stakeholders with a faster and larger recovery.  Indeed, the Plan Proponents estimate that the Transcend Settlement, coming when it did, may have saved the estates as much as $2 million or more in legal fees they otherwise would have incurred in addition

---

[36]     *In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009), *aff'd In re Idearc, Inc.*, 662 F.3d 315 (5th Cir. 2011) (citations omitted); *In re Allied Props., LLC*, 2007 WL 1849017, at *4-5 (Bankr. S.D. Tex. June 25, 2007) ("[t]he Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'").

to the tax savings associated with the dispute concerning the Transcend Group's Warrants and the settlement with the Founders.

74.     Additionally, to the extent that the Transcend Group and the Other Encore Claimants would have eventually been successful in asserting their claims—a hypothetical to which the Plan Proponents do not concede, but do attribute litigable risk—the Transcend Settlement conveys a substantial benefit to certain of the Debtors' creditors.  Specifically, various of the claims asserted by the Transcend Group and Other Encore Parties approximating $10 million are asserted against subsidiary Debtors, including but not limited to, Debtor Rhodium Encore LLC. If successfully pursued, these claims would be structurally senior to Claims asserted against Debtors RTL and REI.  In this regard, the Transcend Settlement conveys a material benefit to the Debtors' estates and the Debtors' creditors, specifically creditors of Debtors RTL and REI, by freeing up value for distribution.

75.     The Special Committee, acting on behalf of the Debtors, the SAFE AHG, the Transcend Group, and the Other Encore Claimants are all represented by experienced and competent counsel who vigorously negotiated the Transcend Settlement in good faith and at arm's length and agree that approval of the Plan is a significantly better outcome for all parties than the alternatives.  Accordingly, the Transcend Settlement represents a reasonable resolution of the issues raised in these Chapter 11 Cases, results in a Plan that is fair and equitable, consistent with the Bankruptcy Code, and is in the best interest of the Debtors' estates, and should therefore be approved by the Court.

      (2)    *The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code*

76.     The Plan includes certain releases, an exculpation provision, and injunction provisions.  These discretionary provisions achieve the value maximizing conclusion to these

chapter 11 cases and garner the necessary support for the terms of the Plan, are supported by the

Debtors and their key constituents, and comply with applicable precedent.[37]

(i)    <u>The Debtor Release Is Appropriate</u>

77.    Article 10.5(a) of the Plan provides for release by the Debtors of Claims and Causes

of Action against the Released Parties[38] (the "<u>Debtor Release</u>").  The Debtor Release forms a vital

component of the Plan, results from a sound exercise of the Debtors' business judgment, complies

with applicable Fifth Circuit law, and should be approved.

78.    Axiomatically, a debtor may settle or release its own claims in a chapter 11 plan in

consideration for concessions made by various stakeholders.[39]  As set forth in *AWECO*, 725 F.2d

at 298, courts in this Circuit grant releases that are (i) "fair and equitable" and (ii) "in the best

interests of the estate."[40]  The term "fair and equitable" means that senior interests are "entitled to

---

[37]   *See* Eaton Decl. ¶¶ 54-69.

[38]   Pursuant to the Plan, "Releasing Parties" means, collectively, and in each case solely in their capacity as such, (i) the Debtors; (ii) the Wind Down Debtor; (iii) the Creditors' Committee and its members (solely in their capacity as such); (v) the Holders of all Claims or Interests that vote, or are deemed, to accept the Plan and do not affirmatively opt out of granting the releases set forth herein; (vi) the Holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not affirmatively opt out of granting the releases set forth herein; (vii) the Holders of all Claims or Interests that vote, or are deemed, to reject the Plan and do not affirmatively opt out of granting the releases set forth herein; (viii) the Holders of all Claims and Interests whose votes to accept or reject the Plan were not solicited but were given notice of the opportunity to opt out of granting the releases set forth herein and did not opt out; (ix) current and former Affiliates of the Entities set forth in clauses (i) through (viii) of this definition, and (x) all Related Parties of the Entities set forth in this definition, solely to the extent such Related Party (a) would be obligated to grant a release under the principles of agency if it were so directed by an entity in clauses (i) through (viii), and (ii) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clauses (i) through (viii).  For the avoidance of doubt, no Entity shall be a Releasing Party if it affirmatively elects to opt out of the releases set forth in section 10.5(c) of the Plan. *See* Article 1.97 (definition of "Releasing Parties").

[39]   *See, e.g., In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (finding that a plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan").

[40]   *See Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010); *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968)).

full priority over junior ones."[41]  In determining whether releases meet the best interests of the estate test, the court need not conduct a "'mini-trial' [but] [r]ather . . . must 'apprise [itself] of the relevant facts and law so that [it] can make an informed and intelligent decision, and "the settlement need not be the best that the debtor could have obtained."[42]  Under this standard, the "court should instead 'canvass [*sic*] the [settled] issues [to] see whether the settlement falls below the lowest point in the range of reasonableness.'"[43]  Ultimately, courts afford debtors some discretion in determining for themselves the appropriateness of granting plan releases of estate causes of action.[44]

79.  As set forth herein, the Debtor Release should be approved because the Debtors reasonably exercised their business judgment, the Debtor Release meets the best interests of the estates test, and the Debtor Release satisfies the standards set forth in *AWECO,* as the settlement preserves the payment priority of senior creditors.

80.  Moreover, only one party (LKC) objected to the Debtor Releases.  That objection should be overruled because it misconstrues the scope of the Debtor Releases.  In the LKC Objection, LKC notes that it does not have any objections in principle to confirmation of the Plan and solely objects to the Plan's release and exculpation provisions.[45]  With respect to the Plan's releases, the LKC Objection asserts that the releases inhibit LKC's right to assert claims and causes

---

[41]  *AWECO*, 725 F.2d at 298.

[42]  *In re Age Refining, Inc*., 801 F.3d 530, 541 (5th Cir. 2015) (citations omitted); *In re NII Holdings, Inc.*, 536 B.R. 61, 99 (Bankr. S.D.N.Y. 2015) (quoting *In re Adelphia Communications Corp.*, 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007)).

[43]  *Idearc*, 423 B.R. at 182; *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008) ("The Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'").

[44]  *See In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("The court concludes that such a release is within the discretion of the Debtor.").

[45]  LKC Objection, ¶ 1.

of action against the Debtors, the Special Committee and their respective counsel related to post-petition breaches of LKC's March 2025 engagement letter, LKC's Success Fee, defamation and sanctions (the "LKC Disputes").[46]

81.     While the Plan Proponents do not concede that any of LKC's allegations are meritorious, the concern underlying LKC's objection to the Plan's release provision is nonetheless inaccurate.  As an initial matter, LKC is not a "Releasing Party" under the Plan, and the defined terms "Released Parties" and "Exculpated Parties" do not include counsel or other professionals of the Debtors or the Special Committee.  Even assuming solely for argument's sake that LKC may have any claims against those professionals, they would be unaffected by the release and injunction provisions cited by LKC in its objection.  Moreover, the LKC Claims against the Debtors are currently being litigated before the Bankruptcy Court wand will be subject to separate ruling.[47]

82.     The Court should approve the Debtor Release.  The inclusion of the Debtor Release avoids waste, litigation and benefits all of the Debtors' stakeholders.  Release of the Released Parties also conforms with applicable law and precedent.  The Released Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, their efforts to negotiate and implement the Plan and fund the Plan's implementation, which will maximize value for the benefit of all parties in interest.[48]  In addition, the active participation

---

[46]   *Id.*

[47]   Moreover, because LKC only has an administrative claim for fees, LKC's claims could not be impaired by any plan and LKC therefore does not have prudential standing to object to plan confirmation.  *See, e.g.*, *In re Highland Cap. Mgmt., L.P.*, 2022 WL 270862, at *2 (N.D. Tex. Jan. 28, 2022) ("Applying the prudential 'person aggrieved' test, the court holds that HCMFA lacks standing. HCMFA only has administrative claims. Appellants concede that these administrative claims will be paid under any circumstances.").

[48]   *See id.*

of the Debtors' released directors, officers, employees and professionals, both in prepetition negotiations and during the course of these chapter 11 cases—and for many through their anticipated assistance in implementing the Plan and getting recoveries to stakeholders as soon as possible—merit their inclusion as Released Parties for purposes of the Debtor Release.[49]

83.     For the foregoing reasons, the Debtors' agreement to provide the Debtor Release constitutes a sound exercise of the Debtors' business judgment and should be approved.

(ii)     The Third-Party Release Represents a Consensual Release

84.     Article 10.5(c) of the Plan provides that each Releasing Party[50] shall release any and all Causes of Action such parties could assert against the Debtors and other Released Parties (the "Third-Party Release," and together with the Debtor Release, the "Releases").  The Releasing Parties include: (i) the Debtors; (ii) the Wind Down Debtor; (iii) the Creditors' Committee and its members (solely in their capacity as such); (iv) the Holders of all Claims or Interests that vote, or are deemed, to accept the Plan and do not affirmatively opt out of granting the releases set forth in the Plan; (v) the Holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not affirmatively opt out of granting the releases set forth in the Plan; (vi) the Holders of all Claims or Interests that vote, or are deemed, to reject the Plan and do not affirmatively opt out of granting the releases set forth in the Plan; (vii) the Holders of all Claims and Interests whose votes to accept or reject the Plan were not solicited but were given notice of the opportunity to opt out of granting the releases set forth in the Plan and did not opt out; (viii) current and former Affiliates of the Entities set forth in clauses (i) through (vii) of this definition, and (ix) all Related Parties of the Entities set forth above in (ii) through

---

[49]     *See* Eaton Decl. ¶ 55.

[50]     For the definition of "Releasing Parties" *see* section 1.97 of the Plan.

(vii), solely to the extent such Related Party (a) would be obligated to grant a release under principles of agency if it were so directed by an entity in clauses (i) through (vii) above, and (b) may assert Claims or Causes of action on behalf of or in a derivative capacity by or through an entity in clauses (i) through (vii) above.  Past and present attorneys for the Debtors and Special Committee are specifically not included in the releases.  The Plan expressly provides that no entity shall be a Releasing Party if it affirmatively elects to opt out of the releases set forth in section 10.5(c) of the Plan.  The Third-Party Release thus meets the well-established criteria for a consensual release, consistent with established law, is integral to the Plan and therefore should be approved.

85.     Section 1123(b)(6) of the Bankruptcy Code provides that a chapter 11 plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[51]  A plan may include releases of third parties if such releases are being provided by parties that consented to such releases and received consideration in exchange therefor.[52]

86.     Here, the Third-Party Releases provided under the Plan are entirely consensual in that the Plan offers all Holders of Claims and Interests—whether such Holders vote to accept, vote to reject, or abstain from voting or are otherwise not entitled to vote on the Plan because they are

---

[51]   11 U.S.C. § 1123(b)(6).

[52]   *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 226, 144 S. Ct. 2071, 2087, 219 L. Ed. 2d 721 (2024) ("Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan.") (emphasis in original); *see Bigler*, 442 B.R. at 549; *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1059 (5th Cir. 2012) ("[A] non-consensual, non-debtor release through a bankruptcy proceeding[] is generally not available under United States law."); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) (acknowledging that Bankruptcy Code does not prohibit a non-debtor release "when it has been accepted and confirmed as an integral part of a plan of reorganization"); *In re Wool Growers Cent. Storage Co*., 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007) ("Most courts allow consensual nondebtor releases to be included in a plan." (citations omitted)).

in an Unimpaired Class—an opportunity to opt out of such Third-Party Release provided by the Plan.  Accordingly, the Third-Party Release represents a fully consensual release.[53]  In addition, as set forth in the Voting Report, 53 Holders of Claims or Interests with valid votes affirmatively opted out of the Third-Party Releases.

87.     In addition to being consensual, the Third-Party Release is substantively warranted for the Released Parties.  As discussed above, for months prior to the commencement of these chapter 11 cases and throughout the pendency of these chapter 11 cases, the Released Parties made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, efforts to market and sell the Debtors' assets and negotiate and implement the Plan, which maximized value for the benefit of all parties in interest.[54]

(iii)   The Court Should Approve the Debtors' Release of Imperium and the Founders

88.     Article 10.5(b) of the Plan provides for a release by the Debtors and their Estates of Claims against Imperium and the Founders.  This release is an integral component of the D&O Insurance Settlement.  Absent such release, Imperium and the Founders would likely not have

---

[53]  In determining whether such a release is consensual, courts in this Circuit have focused on two things—notice and opportunity to object—i.e., whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look over it, [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given."  *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) (Docket No. 730) (approving third-party releases as consensual, over objection of the U.S. Trustee, in light of sufficient notice and opportunity to object*); In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) (Docket No. 1324) (same); Conf. Hr'g Tr. at 42, *In re Southcross Holdings, LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (Docket No. 191) (finding that the debtors correctly characterized a release as consensual because debtors provided extensive notice of plan and confirmation hearing and no party specifically objected to plan's release provisions); *In re Warren Res., Inc.*, No. 16-32760 (MI) (Bankr. S.D. Tex. Sept. 14, 2016) (Docket No. 352) ("If there are third-party releases that are negotiated between the Debtor and third parties as part of their deal, that doesn't seem to me to really run afoul of anything.").

[54]  *See* Eaton Decl. ¶¶ 60-64.

37

agreed to the D&O Insurance Settlement, as they would still be subject to defending extensive, costly litigation pursued by the Debtors after the Effective Date.

89.     Moreover, the insurance carriers that issued the Debtors' directors' and officers' liability insurance policies would have had no reason absent such release to contribute the $8.5 million being paid to the Debtors' Estates has part of the D&O Insurance Settlement.  Those carriers would also have had no incentive to agree to any of the other elements of the D&O Insurance Settlement in such circumstances.

90.     The release by the Debtors of causes of action against Imperium and the Founders does not affect claims that might be asserted against them by third parties.  It does, however, spare the Debtors' Estates substantial future litigation costs in exchange for value to be received under the D&O Insurance Settlement that can be distributed under the Plan in the near term.  Those reasons plus the others herein amply justify the release by the Debtors of claims against Imperium and the Founders, and that release should accordingly be approved.

(iv)     <u>The Court Should Approve the Exculpation Provision</u>

91.     Article 10.6 of the Plan provides that each Exculpated Party[55] shall have no liability for and be exculpated from any liability in respect of Claims, Interests, and Causes of Action arising between the Petition Date and the Effective Date out of acts or omissions in connection with these Chapter 11 Cases and certain related transactions, except for acts or omissions that are found by a final court order to have been the product of actual fraud, willful misconduct, or gross negligence (the "<u>Exculpation</u>").  The Exculpation will help prevent collateral attacks against estate

---

[55]   Pursuant to the Plan, "Exculpated Parties" means, collectively, in each case in its capacity as such and to the maximum extent permitted by law: (i) the Debtors; (ii) the Creditors' Committee and each of its present and former members, each solely in its capacity as such (and as it relates to former members, solely with regard to the time period for which they served on the Creditors' Committee); and (iii) the Independent Directors.  *See* Plan, Art. 1.48.

fiduciaries or parties that have acted in good faith to help facilitate the Debtors' liquidation. The Exculpation forms an integral part of the Plan and otherwise satisfies the standards in this district. This provision provides necessary and customary protections to those parties in interest (whether estate fiduciaries or otherwise) whose efforts were and continue to be vital to implementing the Plan.[56]

92.    Exculpation provisions are "commonplace" and do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation between a releasing party against an Exculpated Party for acts arising out of the Debtors' restructuring.[57]

---

[56]    Section 1125(e) provides that any "person that solicits acceptance or rejection of a plan . . . or that participates, in good faith . . . in the offer, issuance, sale, or purchase of a security . . . under the plan, is not liable, on account of the solicitation or participation, for violation of" any applicable law governing securities or solicitation. 11 U.S.C. § 1125(e). Section 1125(e) of the Bankruptcy Code is understood to provide "a safe harbor for the disclosure and solicitation process of a bankruptcy." *In re Davis Offshore, L.P.*, 644 F.3d 259, 266 (5th Cir. 2011). Section 1125(e) is broadly applicable to any person involved in the solicitation process, regardless of whether such person is an estate fiduciary. *See In re Astria Health*, 623 B.R. 793, 800 (Bankr. E.D. Wash. 2021) ("Section 1125(e) limits the liability of a broad array of persons for acts related to soliciting votes for a plan – regardless whether the person is an estate fiduciary."); *In re Tucker Freight Lines, Inc.*, 62 B.R. 213, 216 (Bankr. W.D. Mich. 1986) ("[Section 1125(e)] confers immunity from violations of any law, rule or regulation covering the sale of securities upon *anyone* who in good faith solicits rejection of a plan." (emphasis added)).

[57]    *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision is "a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also*, *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) (Docket No. 1760) (approving the protection of the debtors, the directors, managers, and officers of any debtor entity, the parties to the restructuring support agreement, the Official Committee of Unsecured Creditors and its members, the DIP agent and DIP lenders, and certain settling parties, among others, pursuant to section 1125(e) of the Bankruptcy Code); *In re Altera Infrastructure L.P.*, No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) (Docket No. 533) (approving protection of the debtors' and certain other plan proponents' affiliates, directors, officers, members, managers, employees, and advisors pursuant to section 1125(e) of the Bankruptcy Code); *In re Sunguard AS New Holdings, LLC*, No. 22-90018 (DRJ) (Bankr. S.D. Tex. Oct. 17, 2022) (Docket No. 763) (approving of the debtors' and other plan proponents' affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys relating to the offer, issuance, sale, and purchase of securities offered and sold under the plan); *see also In re Fieldwood Energy LLC*, 2021 WL 2853151, *10 (Bankr. S.D. Tex. June 25, 2021) ("Debtors and their directors, officers, employees, members, agents, advisors, and professionals have acted in 'good faith'

93.     The Exculpation protects parties who have made substantial contributions to the Debtors' reorganization from collateral attacks related to their good faith acts or omissions in effecting the Debtors' successful conduct of the Chapter 11 Cases.[58]  Put simply, the Plan Proponents could not have developed the Plan without the support and contributions of the Exculpated Parties, which will be proven to the Court at the confirmation hearing.  Further, the exculpation contains appropriate limits in time and subject matter and excludes liability resulting from actual fraud, gross negligence, or willful misconduct, as a court may determine pursuant to a final order.[59]

94.     The Exculpation appropriately protects estate fiduciaries that have participated in the Debtors' restructuring in good faith, the exculpation of which is supported by express sources of authority within the Bankruptcy Code, including 11 U.S.C. §§ 524(e), 1107(a), and 1125(e). The Exculpation Provision also comports with Fifth Circuit precedent, including the Fifth Circuit's holding in *Highland Capital* and the terms of chapter 11 plans subsequently approved by this district.[60]

---

within the meaning of section 1125(e) of the Bankruptcy Code . . . in connection with all their respective activities relating to the solicitation of acceptances or rejections of the Plan and their participation in the activities . . . and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in . . . the Plan."); *J T Thorpe*, 308 B.R. at 782 , *aff'd*, 2004 WL 720263 (S.D. Tex. Mar. 3, 2004) ("Debtor transmitted the solicitation materials and solicited acceptances and rejections of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. Thus, the Debtor is entitled to the protections afforded by Section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in . . . the Plan.").

58     *See In re Chemtura Corp.*, 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) (recognizing that "exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decision makers in the chapter 11 case").

59     *See* Plan Art. 10.6.

60     *See NexPoint Advisors, L.P. v. Highland Capital Management (In re Highland Cap. Mgmt., L.P.),* 48 F.4th 419, 437-38 (5th Cir. 2022) ("*Highland I*") ("[O]ur precedent and § 524(e) require any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and

40

95.     As was the case with the Plan's release provisions, only one party objected to the Exculpation: LKC.   In the LKC Objection, LKC objects that Plan's exculpation provisions improperly exculpate claims and causes of action related to the March 2025 engagement letter, the Updated Retention Order and LKC's Fee Application (each as defined in the LKC Objection) because (i) those disputes arose during and in connection with these Chapter 11 Cases and (ii) the exculpation is not limited to claims and causes of action arising prepetition.[61]   However, LKC's objection to the exculpation provisions should be overruled because (i) the exculpation provisions explicitly carve out any acts or omissions that constitute actual fraud, willful misconduct or gross negligence and (ii) the issues raised by LKC are live disputes pending before this Court, and— based on currently available information—will be resolved prior to the Effective Date, when such exculpations become operative.   Moreover, the Debtors' and Special Committee's attorneys are not exculpated under the plain language of the definition of Exculpated Parties.

96.     Thus, the exculpation provision is consistent with applicable law and should be approved in connection with the Confirmation of the Plan.   *See* Plan § 1.48.

(v)     The Injunction Provision Is Appropriate

97.     Article 10 of the Plan contains a gatekeeper (section 10.7) and general (section 10.4) injunction (collectively, the "Injunction Provisions") necessary to preserve and enforce the releases and exculpation provisions in the Plan and are narrowly tailored to achieve that purpose. The Injunction Provisions are appropriate because they comply with the Bankruptcy Code and are necessary to implement and enforce the Plan.   The Injunction Provisions are integral to the Plan because, among other things, they (i) provide certainty that the Plan will be enforceable in

---

its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties . . .").

[61]     LKC Objection, ¶ 1.

accordance with its terms, and (ii) enforce the Debtor Releases, the Third-Party Releases, and the Exculpation Provision. Importantly, the Injunction Provisions implement the Plan by permanently enjoining all Persons from commencing or continuing in any manner any claim that was released or exculpated pursuant to such provisions.

98.     The Injunction Provisions include a "gatekeeper provision," which provides that, before any Claim or Cause of Action that arose or arises from or is related to any Covered Claim (as defined in the Plan) is brought against an Exculpated Party, the Court must (i) determine, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim against an Exculpated Party and is not a claim that was exculpated under the Plan, and (ii) specifically authorize such person or entity to bring such Claim or Cause of Action against the applicable Exculpated Party (the "Gatekeeper Provision"). The Gatekeeper Provision mirrors that authorized by the Fifth Circuit in *Highland I*, and similar provisions approved in this district.[62]  In *Highland I*, the Fifth Circuit approved a gatekeeping provision related to claims that were exculpated under the plan, and in *In re Highland Cap. Mgmt., L.P.*, 132 F.4th 353, 356 n.2 (5th Cir. 2025) ("*Highland II*"), it clarified that the scope of such a gatekeeper provision cannot be broader than the underlying claims that are exculpated.  *Highland I* and *II* both involved exculpation provisions,

---

[62]   *See Highland Cap.*, 48 F.4th at 439 ("Courts have long recognized bankruptcy courts can perform a gatekeeping function. . . . [W]e affirm the inclusion of the injunction and the gatekeeper provisions in the Plan."); *see also In re Air Methods Corporation,* No. 23-90886 (MI) (Bankr. S.D. Tex. Dec. 6, 2023) (Docket No. 311) (confirming chapter 11 plan that included an injunction and gatekeeper provision); *In re Party City Holdco Inc.*, No. 23-90005 (DRJ) (Bankr. S.D. Tex. Sept. 6, 2023) (Docket No. 1711) (same); *In re Cineworld Grp. PLC*, No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023) (Docket No. 1982) (same); *In re Avaya Inc.*, No. 23-90088 (DRJ) (Bankr. S.D. Tex. Mar. 22, 2023) (Docket No. 350) (same); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) (Docket No. 1760) (same).

which are inherently non-consensual.  Accordingly, these decisions should also support a gatekeeper provision to enforce a consensual release.[63]

99.    Bankruptcy courts in this district approve injunction provisions when they are essential to the Plan, necessary to implement the Plan and to preserve and enforce the discharge, release, and exculpation provisions of the Plan, and such injunctions are appropriately tailored to achieve these purposes.[64]

100.    These provisions are an integral component of the Plan, appropriate and necessary under the circumstances, consistent with the Bankruptcy Code, narrowly tailored, and compliant with the applicable case law and precedent in the Fifth Circuit, and, for the reasons set forth above, should be approved.

101.    The Plan Proponents submit that the discretionary provisions of the Plan conform to section 1123(b) of the Bankruptcy Code.  In light of the foregoing, because the Plan fully complies with section 1122 and 1123 of the Bankruptcy Code, the Plan Proponents submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

---

[63]    *See In re The Container Store Grp., Inc.*, No. 24-90627 (ARP) (Bankr. S.D. Tex. April 7, 2025) (Docket No. 280) ("[w]hile Highland *I* and *II* involve exculpation provisions, which are inherently non-consensual, this case involves a consensual release. Therefore, the *Highland Capital II* holding that the injunction be narrowed to include the same parties as the exculpation clause, should not have an impact on this case, where the parties entered a consensual release."); *In re Plenty*, 25-90105 (CML) (Bankr. S.D. Tex. May 15, 2025) (Docket No. 515) (confirming a plan that included injunction and gatekeeper provisions that covered third parties).

[64]    *See, e.g., In re Core Sci., Inc.*, No. 22-90341 (CML) (Bankr. S.D. Tex. Jan. 16, 2024) (Docket No. 1749).

43

4.      **The Plan Complies with Section 1123(d) of the Bankruptcy Code**

102.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."[65]

103.    The Plan complies with section 1123(d) of the Bankruptcy Code.  The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Leases to be assumed under the Plan by payment of the default amount, if any, on the Effective Date, subject to the limitations described in Article 8.1 of the Plan or in the Proposed Confirmation Order.[66]  In accordance with Article 8 of the Plan and section 365 of the Bankruptcy Code, the Debtors provided notice of the amount and timing of payment of any cure payments to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement.  Accordingly, the Plan satisfies the requirements of section 1123(d) of the Bankruptcy Code, and no party has asserted otherwise.

**B.      The Plan Proponents Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2))**

104.    Section 1129(a)(2) requires that plan proponents comply with the requirements of the Bankruptcy Code regarding solicitation of acceptances of a plan.[67]

105.    Courts interpret the "applicable provisions" of the Bankruptcy Code to principally encompass the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[68]

---

[65]    11 U.S.C. § 1123(d).

[66]    *See* Plan Art. 8.1.

[67]    11 U.S.C. § 1123(d)(2).

[68]    *See, e.g.*, *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 512 n.3 (5th Cir. 1998) (noting that section 1129(a)(2) includes requirement of compliance with section 1125); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) ("Bankruptcy courts

106.     Often, courts also consider whether the debtor "is a proper debtor under Section 109 of the Bankruptcy Code and a proper proponent of [a plan] under Section 1121(a) of the Bankruptcy Code."[69]  As set forth below, the Plan Proponents have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Claims, Noticing, and Solicitation Agent in accordance with the Disclosure Statement Order.

### 1.     The Debtors Are Proper Debtors and the Plan Proponents Are Proper Plan Proponents

107.     Under section 109(a) of the Bankruptcy Code, "a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor."[70]  Further, "a person that may be a debtor under chapter 7 of [the Bankruptcy Code, with exceptions not applicable here] . . . may be a debtor under chapter 11 . . . ."[71]  Because at the commencement of these cases, each of the Debtors possessed a domicile, a place of business, and property in the United States, and each is eligible for relief under chapter 7 of the Bankruptcy Code, each Debtor is a proper chapter 11 debtor.

### 2.     The Plan Proponents Complied with Section 1125 of the Bankruptcy Code

108.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is

---

limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125." (citation omitted)).

[69]     *J T Thorpe*, 308 B.R. at 786 (holding that debtor's compliance with sections 109, 1125, and 1126 satisfied requirements of section 1129(a)(2)); *see also Moody Nat'l*, 2010 WL 5116872, at *4 (same); *In re Harborwalk, LP*,  2010 WL 5116620, at *4 (Bankr. S.D. Tex. Oct. 25, 2010); *In re Energy Partners, Ltd.*, 2009 WL 2898876, at *6 (Bankr. S.D. Tex. Aug. 3, 2009); *In re Deep Marine Holdings, Inc.*, 2010 WL 5125278, at *5 (Bankr. S.D. Tex. June 2, 2010).

[70]     11 U.S.C. § 109(a).

[71]     11 U.S.C. § 109(d).

transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[72]  Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[73]

109.    The Plan Proponents satisfied section 1125 of the Bankruptcy Code here.  Before the Plan Proponents solicited votes on the Plan, the Court conditionally approved the Disclosure Statement in accordance with sections 1125(b) and 105(d)(2)(vi) of the Bankruptcy Code.[74]  The Court also approved the Solicitation Packages provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.[75]  As stated in the Voting Report, the Plan Proponents, through the Claims Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.[76]  The Plan Proponents also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class.  Here, the Plan Proponents caused the Disclosure Statement to be transmitted to all parties entitled to vote on the Plan.[77]

---

[72]    11 U.S.C. § 1125(b).

[73]    *See Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code requires that a debtor make a full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[74]    *See* Docket No. 1834.

[75]    *Id.*

[76]    *See* Voting Report ¶¶ 4-11; *see also* the Affidavit of Solicitation.

[77]    *See* Voting Report ¶¶ 4-11; *see also generally* Affidavit of Solicitation.

110.     Based on the foregoing, the Plan Proponents complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order, and no party has asserted otherwise.

### 3. The Plan Proponents Complied with Section 1126 of the Bankruptcy Code

111.     Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[78]  As noted above, the Plan Proponents did not solicit votes on the Plan from Classes 1 (Rhodium 2.0 Secured Notes Claims), 2 (Rhodium Encore Secured Notes Claims), 3 (Rhodium Technologies Secured Notes Claims), 4 (Priority Non-Tax Claims), 5a (Guaranteed Unsecured Claims), 5b (General Unsecured Claims), 7 (Late Filed Claims), 8 (Intercompany Claims), and 9 (Section 510(b) Claims)[79] because, pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in these Classes are conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.  The Plan Proponents additionally did not solicit votes from the Holders of Intercompany Interests in Class 12 because the Holders of such interests are not receiving or retaining any property under the Plan on account of their Interests and, accordingly, are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.[80]

112.     Accordingly, the Plan Proponents solicited votes only from Holders of Allowed Claims and Interests in the Voting Classes—6 (SAFE Claims), 10 (Common Interests), and 11 (Imperium Interests)—because each of these Classes is Impaired and entitled to receive a

---

[78]    *See* 11 U.S.C. § 1126.

[79]    *See* Plan, Art. 4.

[80]    *See id.*, Art. 4.13.

distribution under the Plan.[81]   With respect to the Voting Classes of Claims and Interests, section

1126(c) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors,
> other than any entity designated under subsection (e) of [section 1126], that hold at
> least two-thirds in amount and more than one-half in number of the allowed claims
> of such class held by creditors, other than any entity designated under subsection
> (e) of [section 1126], that have accepted or rejected such plan.[82]

113.   The Voting Report, summarized above, reflects the results of the voting process in

accordance with section 1126 of the Bankruptcy Code.[83]   Based on the foregoing, the Plan

Proponents submit that they have satisfied the requirements of section 1129(a)(2), and no party

has asserted otherwise.

### C.   The Plan Was Proposed in Good Faith (§ 1129(a)(3))

114.   Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be

"proposed in good faith and not by any means forbidden by law."[84]   Whether a plan has been

proposed in good faith is a factual inquiry and "must be viewed in light of the totality of the

circumstances…mindful of the purposes underlying the bankruptcy code."[85]

115.   The Fifth Circuit has observed that "[t]he bankruptcy judge is in the best position

to assess the good faith of the parties' proposals."[86]   To establish that a plan was proposed in good

---

[81]   *Id.*; *see generally* Affidavit of Solicitation.

[82]   11 U.S.C. § 1126(c).

[83]   *See generally* Voting Report, Exhibit A.

[84]   11 U.S.C. § 1129(a)(3).

[85]   *In re Vill. at Camp Bowie I, L.P.* , 710 F.3d 239, 247 (5th Cir. 2013) (internal citation omitted); *Fin. Sec. Assurance Inc. v. T-H New Orleans L.P. (In re T H New Orleans L.P.)*, 116 F.3d 790, 802 (5th Cir. 1997).

[86]   *In re Cajun Elec. Power Co-op., Inc*., 150 F.3d 503, 519 (5th Cir. 1998); *see also Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.),* 844 F.2d 1142, 1157 (5th Cir.1988) ("The determination of what is adequate information…is largely within the discretion of the bankruptcy court."), *vacated on other grounds, Adams v. First Fin. Dev. Corp. (In re First Fin. Dev. Corp.),* 960 F.2d 23 (5th Cir. 1992).

faith, a plan proponent must establish that the plan "[a] fosters a result consistent with the Bankruptcy Code's objectives; [b] has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and [c] exhibited a fundamental fairness in dealing with the creditors."[87]  Here, the Plan Proponents have met these factors.  The Plan was proposed with integrity, good intentions, and with the goal of maximizing stakeholder recoveries. Throughout these cases, the Debtors, the Debtors' board of directors (including the Independent Directors), and their senior management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents.

116.    First, the Plan fosters settlement and value maximization, a result consistent with the Bankruptcy Code's key objectives.[88]  The Plan maximizes the value of potential recoveries available to Holders of Claims by implementing reasonable settlements of Claims and Interests, an orderly wind down to distribute Cash to the Holders of Allowed Claims, and the liquidation and distribution of any remaining assets to other Holders of Claims and Interests.

117.    Second, the Plan Proponents proposed the Plan with honesty and good intentions. From the outset of these Chapter 11 Cases, the Plan Proponents have been forthright about the reasons they sought bankruptcy protection and have been unwavering in declaring and pursuing their objective of maximizing recoveries for Holders of Claims and Interests.[89]  With these objectives in the forefront, the Plan resulted from negotiations with multiple parties, leading to compromises with virtually all major stakeholders in the Debtors' Chapter 11 Cases and represents a good faith effort to maximize recoveries for all interested parties.

---

[87]    *In re Trinity Fam. Prac. & Urgent Care PLLC*, 661 B.R. 793, 814 (Bankr. W.D. Tex. 2024) (citing *W.R. Grace*, 475 B.R. at 87-88).

[88]    *Id*.

[89]    *See, e.g.*, First Day Declaration ¶¶ 12-13; Disclosure Statement Art. XI.

118.     Generally, "[w]here [a] plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied."[90]  As discussed herein, the Plan (including the settlements embodied therein) and Plan Documents were negotiated at arm's length among representatives of the Plan Proponents and multiple groups with interests in the outcome, and no evidence exists to the contrary.

119.     Third, virtually all major parties in interest in these Chapter 11 Cases support confirmation of the Plan.  That the Plan has garnered such significant support demonstrates that the Plan is fundamentally fair to parties in interest.[91]  Importantly, the Plan provides for recoveries in the full amount agreed to by Holders of SAFE Claims and a negotiated resolution to the Claims asserted by the Transcend Group.

> **D.     The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Is Subject to Court Approval (§ 1129(a)(4))**

120.     Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable.[92]  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[93]

---

[90]  *Vill. at Camp Bowie,* 710 F.3d at 247 (quoting *T–H New Orleans,* 116 F.3d at 802).

[91]  *See In re Lincolnshire Campus, LLC,* 441 B.R. 524, 530 (Bankr. N.D. Tex. 2010) (finding that a plan was proposed in good faith where it had the support of both the debtors and other major parties in interest).

[92]  11 U.S.C. § 1129(a)(4).

[93]  *See Cajun Elec. Power*, 150 F.3d at 513–14*; In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986)("[T]here must be a provision [in the plan] for review by the Court of any professional compensation.").

121.     The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.[94]  All payments made or to be made by the Debtors for services or for costs or expenses in connection with these chapter 11 cases prior to the Confirmation Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Court.[95]  Article 2.2 of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than 45 days after the Effective Date for determination by the Court, after notice and a hearing, in accordance with the procedures established by the Court.[96]  Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

**E.      The SAFE AHG Substantial Contribution Claim Is Reasonable and Should Be Approved**

**1.      Section 503(b) Authorizes Compensation for Substantial Contribution**

122.     The Plan Proponents respectfully submit that the Plan and all of its terms should be confirmed, including the Plan provision reimbursing the SAFE AHG for some of the fees incurred by its counsel in contributing to these cases.  Section 503(b) provides that administrative expenses "shall be allowed … for professional services rendered" on behalf of "a creditor … or a committee representing creditors … other than a [statutory committee] in making a substantial contribution in a case under Chapter 9 or 11 of this title."  *See* 11 U.S.C. § 503(b)(4) and (b)(3)(D).  The SAFE AHG believes virtually all of the fees incurred by its counsel are in respect of its substantial contribution to these cases, and thus are reimbursable under section 503(b).  However, as a compromise, and in a further effort to obtain a swift and largely consensual confirmation of the Plan, the SAFE AHG has agreed to a Plan that provides for recovery of only a portion of the fees

---

[94]     *See* Eaton Decl. ¶¶ 82-84.

[95]     *See* Plan, Art. II.

[96]     *Id.*

the SAFE AHG actually incurred, and to defer (and perhaps sacrifice) payment even of that reduced figure.[97]

123.    No party has objected to the SAFE AHG Substantial Contribution Claim.  Notably, moreover, each of the parties that were the most active in these cases, including the Debtors, the Special Committee, the Founders, and the Transcend Group (representatives of a substantial group of REI stockholders), actively supports the SAFE AHG Substantial Contribution Claim.  The Plan Proponents submit that confirmation of the Plan is appropriate, inclusive of the Plan's substantial contribution provision.

### 2.    The SAFE AHG Has Played A Critical Role In These Cases

124.    Counsel for the SAFE AHG has been active in these cases from nearly the beginning, petitioning the U.S. Trustee's office to form a committee of SAFE claimants by letter dated September 19, 2024, *see* Ex. 49, *Letter from Celsius Holdings US LLC to the U.S. Trustee* (Docket No. 1356-77), and organizing the SAFE AHG when the U.S. Trustee declined to do so. *See* Ex. 53 (Nov. 13, 2025 SAFE Engagement Agreement (redacted)); *Rule 2019 Statement of the Ad Hoc Group of SAFE Parties* (Docket No. 500) (initial SAFE 2019 statement).

125.    Ultimately, the SAFE AHG membership comprised more than 80% in amount of the nearly $87 million in SAFE Claims in these cases.  *See Third Supplemental Verified Statement of Ad Hoc Group of SAFE Parties Pursuant to Bankruptcy Rule 2019* (Docket No. 1346).  The Court ultimately determined that SAFE parties were creditors within the meaning of the

---

[97]    The SAFE AHG has supplied the Special Committee (and the Court) with invoices for its counsel through October 2025 that total more than $11 million, Eaton Decl. ¶ 52, and anticipates its fees through completion of the cases (including a busy November) will be in excess of $12 million.  *See* Hurley Decl. ¶ 10.  The SAFE AHG Substantial Contribution Claim is for $8.5 million.  To speed confirmation, the SAFE AHG agreed to pay $2.5 million of the SAFE AHG Substantial Contribution Claim into escrow, which will be released either to the Transcend Group or the SAFE AHG (or both), depending on the value of assets assumed by the Wind-Down Debtor.  *Id.*

Bankruptcy Code even as of the Petition Date, based on SAFE parties' then-contingent right to payment of the Cash Out Amount (as defined in the Simple Agreements for Future Equity to which each of the SAFE parties is a party).  *See The United States Trustee's Notice of Appointment of Committee of Unsecured Creditors* (Docket No. 488); *see also Memorandum Opinion Overruling Debtors' Omnibus Objection at ECF No. 1126 to the SAFE Proofs of Claim* (Docket No. 1592) at p. 28.

126.    However, SAFE parties were not originally scheduled as creditors by the Debtors, nor initially recognized as such by the U.S. Trustee (or the UCC) when the UCC was formed on November 22, 2024.  After notice that a UCC had been formed, counsel for the SAFE AHG again petitioned the U.S. Trustee, asking him by letter dated November 25, 2024 to add a SAFE party or parties to the UCC, but the U.S. Trustee again declined.  *See* Ex. 51, *Letter from the SAFE AHG to the U.S. Trustee* (Nov. 25, 2024).  It was not until many months later, on June 9, 2025, that the U.S. Trustee reconsidered its position, concluded that SAFE parties in fact are creditors, and added SAFE holder Infinite Mining, LLC to the reconstituted UCC.  *See The United States Trustee's Notice of Reconstitution of Committee of Unsecured Creditors* (Docket No. 1255).  By that time, to the extent even possible, it would have been costly and inefficient to seek to transfer to the UCC the role that SAFE AHG had undertaken in these cases for the preceding nine-plus months.

127.    Had the SAFE parties been classified as creditors from the outset of the Debtors' cases, activities carried out by the SAFE AHG likely would have been undertaken by the UCC at estate expense in the first instance, including because the SAFE parties are the Debtors' single largest class of unsecured creditors.  Notably, moreover, the UCC itself was not organized until late November 2024, and its incentive to remain active in the cases ended less than three months later, when the SAFE AHG negotiated the main terms of the Whinstone Settlement at the February

19, 2025 mediation (which guaranteed that the only creditors represented on the UCC would be paid in full and in cash).[98]  It was therefore appropriate for the SAFE AHG to act as an informal "creditors' committee."  *See* Eaton Decl. ¶ 50 ("the SAFE AHG undertook a variety of activities that ordinarily would be performed by a statutory committee" and "performed a variety of important tasks that would have been compensated by the estates in the first instance if undertaken by a statutory committee").  In that capacity, among other things, the SAFE AHG contributed substantially to these cases and greatly enhanced the value of the estates for non-insider recoveries, including stakeholders junior to SAFE Claims.   Some of the SAFE AHG's significant contributions supporting the SAFE AHG Substantial Contribution Claim are discussed below.

(1)  <em>Investigation of Claims Against the Founders</em>

128.   The non-insider parties to these chapter 11 cases have focused substantial attention from the outset on investigating potential claims against Imperium and the Founders, and the potential effect those claims might have on  the Founders' Interests held at RTL (through Imperium).  This focus specifically included the possible subordination of those Interests so that cash held at RTL could be distributed to REI in full.  If the claims against the Founders were not substantiated and/or were determined to be insufficient to warrant a subordination or other appropriate treatment of the Founders' interests at RTL, the Founders could have asserted an entitlement to close to 60% of the Debtors' cash and other assets off the top, leaving a relatively paltry sum to distribute to stakeholders at REI.  *See* Eaton Decl. ¶ 34.

129.   While the Special Committee also was investigating and exploring potential claims against Imperium and the Founders, it made sense for a creditor representative to engage in the

---

[98]   As discussed elsewhere, the terms negotiated by the SAFE AHG on February 19, 2025 would have resulted in at least $177 million in proceeds from Whinstone, far more than necessary to repay in full all stakeholders with claims senior to those of SAFE Claims.

necessary diligence as well.  For that reason, the SAFE AHG undertook from the outset of these cases its own investigation into potential claims against Imperium and the Founders.  In connection with that investigation, the SAFE AHG provided useful input to the Special Committee concerning its investigation of the Rhodium D&O Claims, and engaged with the Special Committee with respect to those claims.  *See* Eaton Decl. at ¶ 43.

130.    As is common in Chapter 11 cases, the relationship between the ad hoc group representing creditors (here, the SAFE creditors) on the one hand, and the Debtors and the Special Committee on the other, was not always without friction.  *See* Eaton Decl. ¶ 44.  The process by which the SAFE AHG obtained disclosure of information relating to claims against the Founders was therefore labor-intensive, requiring the exchange of information requests, meet-and-confers, and extensive correspondence spanning several months.  *See e.g.,* Ex. 54, *Letter from the SAFE AHG to the Debtors* (Docket No. 1079-15, Ex. N) (Oct. 8, 2024 information request), Ex. 55, *Letter from the SAFE AHG to Debtors* (Docket No. 1079-16, Ex. O) (Nov. 7, 2024 supplemental information request), Ex. 73,  *Email Chain between the SAFE AHG and the Special Committee* (Jan. 2025) (email exchanges concerning discovery requests); Ex. 64, *Letter from the SAFE AHG to the Debtors and Special Committee* (Docket No. 1079-17, Ex. P) (Jan. 27, 2025 letter from SAFE AHG identifying issues with productions); Ex. 60, *Letter from the SAFE AHG to Debtors and the Special Committee* (Apr. 5, 2025 letter from SAFE AHG identifying additional issues with productions).  Ultimately, the SAFE AHG obtained some 97,000 documents from the Debtors, the Special Committee and the Founders in connection with its investigation.

131.    The SAFE AHG also provided information to the Special Committee in connection with the Special Committee's investigation of claims against the Founders.  *See, e.g.,* Eaton Decl. ¶ 43.  For example, the SAFE AHG encouraged the Special Committee to expand its document

review to include obtaining and reviewing Imperium-domained emails and other communications that had not initially been provided to the Special Committee by the Debtors. *Id*.; Ex. 58, *Letter from the SAFE AHG to the Special Committee* (Jan. 21, 2025).

132.    In addition, throughout its investigation, the Special Committee invited the SAFE AHG to identify any claims and supporting evidence that it believed should be considered or pursued by the Special Committee.  In response, the SAFE AHG and the Special Committee engaged in numerous, robust discussions, with each providing written explanations for their positions respecting certain claims.  As just one example, the SAFE AHG prepared also prepared detailed letters to the Debtors and the Special Committee dated December 26, 2024 and January 10, 2025 (together the "SAFE Claims Letters") identifying claims against the Founders that the SAFE AHG believed had been established or warranted further investigation.  The SAFE Claims Letters were then submitted by the Debtors and the Special Committee to the Debtors' insurance carriers in connection with noticing potentially covered claims.  *See* Ex. 68, *Email with Notice of Claim from Claims Advocate to Rhodium's Insurance Carriers re: SAFE AHG Letters* (Docket No. 1493-1, Ex. A).  The carriers have since agreed to provide $8.5 million to the Debtors' Estates as part of the D&O Insurance Settlement.

133.    The SAFE AHG also interacted with the Special Committee throughout these cases to help develop and hone claims against the Founders.  For example, the SAFE AHG argued forcefully that the Founders had breached their fiduciary duties in connection with the transfer by the Debtors of cash to Imperium sufficient to pay the individual income tax liabilities of the Founders relating to the sale in 2021 of Imperium-owned RTL equity for about $33 million.  The SAFE AHG did not accept that the transfer was permitted by the Debtors' governing agreements, and certainly not to the extent it was used to pay income tax liabilities related to personal gains by

the Founders unrelated to the operations of the Debtors. Following months of back-and-forth, the Special Committee ultimately agreed that the claims identified by the SAFE AHG were colorable. *See, e.g.*, *Disclosure Statement for First Amended Joint Chapter 11 Plan of Liquidation of Rhodium Encore LLC and its Affiliated Debtors* (Docket No. 1832), at pp. 41-42.

134.    At the conclusion of its investigation, the Special Committee sent a demand letter to the Founders identifying a variety of claims developed in the course of the bankruptcy by the Special Committee and the SAFE AHG, and alleging that damages for the claims amounted to at least $75 million, even excluding damages associated with the Founders' alleged misappropriation of a so-called control premium in connection with the Roll-Up transaction. *See* Ex. 78, *Letter from the Special Committee to the Founders* (Docket No. 1246-8, Ex. H) at p. 22. The development of those claims, in which the SAFE AHG closely participated, helped drive the settlements embodied in the Plan (discussed in more detail below), which liberated virtually all proceeds of the Whinstone Settlement for distribution to non-insider stakeholders, including distributions to stakeholders junior to SAFE Claimants.

### (2)    *Negotiation of the Whinstone Transaction*

135.    The SAFE AHG also followed the Whinstone assumption litigation and pleadings closely. *See* Hurley Decl. ¶¶ 4-8. After the Court ruled in favor of the Debtors on Phase I, ██

████████████████████████████████████████████████████████████████

██████████     *See, e.g., id.* ¶ 5; *see also* Ex. 59 at p. 3, *Letter from the SAFE AHG to the Debtors* (Jan. 23, 2025 letter from M. Hurley to P. Tomasco) ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████     *see also* Ex. 106, *Email from the SAFE AHG to Province, Debtors, Imperium, and the Special Committee* (Feb.

6, 2025); *Agreed Mediation Order Appointing Judge Mark Mullin as Mediator* (Docket No. 767) (Feb. 11, 2025 agreed order appointing Judge Mark Mullin as mediator and identifying the SAFE AHG as a mediation party).

136.    The SAFE AHG viewed Rhodium's prospects as a going concern as untenable, including because the Debtors had been unable to identify exit financing on acceptable terms, lacked access to necessary funding to compete in the capital-intensive mining business, and were involved in continuing scorched-earth litigation with their landlord, a company upon which Rhodium also depended to supply the below-market power necessary to its survival. *See, e.g., Rhodium JV LLC et al., v. Whinstone US Inc.,* Case No. 20-448 (Bankr. S.D. Tex.) (Docket No. 770 at ¶ 3) (Debtors alleging that Whinstone's supply of cheap power to Rhodium pursuant to the Power Contracts was so "vital" that "the company could not exist without them"); *see also* June 4, 2025 Hr'g Tr. at 38:3 (Docket No. 1258) (Debtors' general counsel testifying that without Whinstone supplying inexpensive power, Rhodium would "no longer [be] able to operate in Rockdale," the Debtors' sole operating facility at the time of the Whinstone Transaction).





140.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████     That deal, in which the SAFE AHG played a leading role, drove the value that has since repaid all senior creditors, and will, if the Plan is approved, repay about 98% of the SAFE Claims, and provide the potential for millions in recoveries to stakeholders junior to SAFE Claims.

(3)    *Intra-Stakeholder Settlement Efforts, Including Plan Mediation*

141.    The SAFE AHG sought a negotiated resolution of disputes among competing stakeholders for the Debtors' assets from the beginning of these cases, ramping those efforts up even more after the Whinstone Settlement was negotiated at the end of February. The SAFE AHG, like the Debtors, the Special Committee, and other major stakeholders, participated in good faith in the plan mediation, which proceeded in-person over two days in Dallas before Judge Nelms. Among other things, ███████████████████████████████████████

███████████████████████████████ *See* Ex. 89, *Email Chain between the SAFE AHG, Special Committee, Transcend, and Other Creditors* (Apr. 2025). ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

(4)     *Assisting with Proper Allocation of Value Among Stakeholders*

142.    The SAFE AHG also contributed substantially to these cases by helping ensure the allocation of estate value in accordance with the Bankruptcy Code, including the absolute priority rule.  *See* Eaton Decl. ¶ 46.  Key questions in these cases included whether SAFE parties hold claims or interests, and the meaning of the provisions in the SAFE agreements providing for their priority in a liquidation.  Indeed, the Debtors argued that "the issue of whether the SAFEs are debt or equity should be a gating item for confirmation" because it "affects many, many of the decisions that need to be made in order to close out this case," including how to "appropriately categorize [SAFE] claim[s] prior to confirmation."  *See* May 27, 2025 Hr'g Tr. at 11:4-12:21 (Docket No. 1215); *see also* June 20, 2025 Hr'g Tr. at 5:24-6:1 (Docket No. 1359) (Debtors representing that "we have [] a consensus that the SAFE claim objection should [pre]cede further consideration of the Debtor's plan and disclosure statement"); *see also* Eaton Decl. ¶ 46.  Subsequently, with the parties' consent, the Court stayed other pending proceedings to allow the parties to focus on briefing and arguing the Debtors' objection to SAFE Claims, which was heard on July 2, 2025. *See Scheduling Order* (Docket No. 1316) at p. 2.

143.    As the Court later would observe, the Debtors' objection presented issues of first impression concerning the treatment of SAFE instruments in bankruptcy, requiring "considerable . . . time" evaluating arguments, numerous exhibits and the existing case law.  Memorandum Opinion Overruling Debtors' Omnibus Objection at ECF No. 1126 to the SAFE Proofs of Claim (Docket No. 1592) at p. 28.  The SAFE AHG likewise devoted substantial time and effort to exchanging disclosures with other parties, preparing the materials submitted to the Court, including reviewing and responding to extensive submissions by parties supporting the Debtors' objection.  The materials included, among other things, at least five memoranda of law, nearly 120 exhibits comprising thousands of pages, dozens of cases described by certain parties as pertinent

to the dispute, and the preparation of detailed demonstrative presentations and oral argument.  The Court determined the Debtors' objection by order dated August 30, 2025—in which the Court also "commend[ed] the parties for their insightful and persuasive arguments"—which broke the logjam, and led directly to the largely consensual Plan now under consideration.

(5)     *Negotiating Founder Settlement and Plan*

144.     Less than 24 hours after receiving the Court's ruling on the Debtors' objection to the SAFE Claims, the SAFE AHG sought a meeting with the Special Committee to arrange a swift exit for these cases.  The SAFE AHG, the Special Committee, the Debtors, and Imperium proceeded in the ensuing weeks to negotiate diligently to do just that.  *See* Eaton Decl. ¶ 47. Ultimately, the parties were able to negotiate a settlement in which Imperium agreed to a consensual redemption of its interest at RTL and thereby relinquished its claim to roughly 60% of the distributable cash at RTL—a concession worth about $60 million.  The settlement with Imperium and the Founders in the current Plan (proposed and supported by the SAFE AHG, among others) also made an additional $13 million (at least) available for distribution to non-Founder stakeholders, as compared to the agreement and Plan proposed by the Debtors and the Transcend Group earlier this year.  Without that additional value, SAFE Claims still would have been paid nearly in full, but stakeholders junior to SAFE parties would have received nothing.  Instead, and based in large part on the SAFE AHG's efforts, junior stakeholders stand to recover millions.

145.     Once Plan terms were agreed, the SAFE AHG, through its counsel, was an integral party in the preparation of all confirmation-related documents.  The SAFE AHG is a co-proponent of the agreed-upon Plan for the Debtors.  In that role, the SAFE AHG prepared first drafts of numerous documents, including certain plan solicitation materials and the confirmation order, and provided detailed comments to all plan and plan solicitation-related documents.  After plan documents were initially filed, the SAFE AHG worked collaboratively with the Debtors and the

Special Committee to update documents to address questions raised at the hearing for conditional approval of the disclosure statement, to prepare the Plan Supplement and negotiate the documents contained therein, and to otherwise prepare for Plan confirmation.  These efforts allowed the Plan Proponents to present the Court with plan-related documents in a manner that in turn allowed the Plan Proponents to pursue a swift path to confirmation of the Plan, to the benefit of all estate stakeholders.  *See* Eaton Decl. ¶ 48.

(6)    *Activities Typically Associated With Statutory Committee*

146.     As noted, the UCC had little incentive to engage in these cases for most of their duration, since it was only formed in late November 2024, and the constituents initially recognized as creditors were guaranteed to be repaid in full by as early as February 19, 2025.  The SAFE AHG's contributions to these cases include undertaking many activities that ordinarily would be associated with a statutory committee.  *See* Eaton Decl. ¶ 50.  For example, after the Debtors were unable to identify acceptable exit financing or reach agreement on a consensual plan of reorganization, the SAFE AHG sought permission from the Court to propose its own plan of liquidation, which it identified in broad strokes for consideration by other parties.  *See SAFE AHG Amended Emergency Motion to Terminate Exclusivity* (Docket No. 1246).  The SAFE AHG also partnered with common stockholders on a common interest basis in examining the terms of retention of LKC, including by opposing the Debtors' motion to amend the LKC retention order, and submitting post-hearing briefing requested by the Court.  While the Debtors' motion ultimately was granted, the SAFE AHG submits that its activities in coordination with equity holders helped ensure the terms of the retention received additional appropriate scrutiny.  The SAFE AHG was also active in reviewing and briefing late-filed claims submissions, and considering terms proposed by the Debtors in plans of reorganization proposed previously by the Debtors.  And of course, the

SAFE AHG was a key participant in discussions leading to the largely consensual plan (of which the SAFE AHG is a co-proponent) now before the Court.

(7)   <em>Negotiating and Funding the Transcend Settlement</em>

147.    At the hearing to approve the Disclosure Statement on a conditional basis, it was apparent that the sole remaining obstacle to a largely consensual plan confirmation were objections that representatives of certain equity groups indicated they planned to lodge relating to treatment of their warrant claims, as well as other aspects of the Plan.   The Transcend Group served comprehensive discovery on the SAFE AHG, Debtors and the Special Committee, setting up a contested confirmation process likely to increase costs to the estates by millions of dollars.  The SAFE AHG took a primary role in addressing and settling the objections raised by the Transcend Group.  <em>See</em> Eaton Decl. ¶ 49.  One term of the deal called for a $2.5 million escrow to be funded by professionals working for the Debtors and the SAFE AHG.  Ultimately, to get a deal done and avoid millions in additional costs to the estates, the SAFE AHG agreed to fund the escrow.  <em>See</em> Ex. 97, <em>Letter from the SAFE AHG to Debtors and the Special Committee</em> (Nov. 24, 2025).  As a result, the Transcend Group agreed to drop its objections and discovery relating to the Plan, and instead to join the SAFE AHG, Debtors, Special Committee and Imperium in supporting confirmation.  That deal by itself, spearheaded by the SAFE AHG, almost certainly saved the estates $2 million or more.  <em>See</em> Eaton Decl. at ¶ 49; <em>see also Settlement Stipulation</em> [Docket No. 2006], Ex. A.

<strong>3.      The SAFE AHG's Activities Warrant Compensation</strong>

148.    The Plan Proponents submit that allowance of the SAFE AHG Substantial Contribution Claim is warranted under prevailing law.  "[T]he thrust of 503(b)(4) should be to prevent a creditor or interest holder from suffering greater loss from a debtor's bankruptcy than do its peers where that loss resulted from expenditures by the applying party that benefited those very

64

peers." *See In re Energy Partners, Ltd.,* 422 B.R. 68, 85 (Bankr. S.D. Tex. 2009). Often, substantial contribution is awarded where "the creditor played a leadership role that normally would be expected of an estate-compensated professional, but was not so performed," or where a creditor "actively facilitated the negotiation and successful confirmation of the Chapter 11 plan or, in opposing a plan, brought about the confirmation of a more favorable plan." *In re Bayou Group, LLC*, 431 B.R. 549, 562 (Bankr. S.D.N.Y. 2010). ███████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████ The SAFE AHG Substantial Contribution Claim is materially less than the amounts incurred, but if granted, at least will mitigate the "greater loss" that creditor will suffer in comparison to its peers "from expenditures … that benefited those very peers." As discussed elsewhere, the SAFE AHG also facilitated confirmation of the improved Plan, and otherwise played a leadership role typical of a statutory committee.

149.    Other factors considered by courts in the Fifth Circuit likewise favor an award of substantial contribution to the SAFE AHG. *See, e.g., In re Mirant Corp.*, 354 B.R. 113, 132-33 (Bankr. N.D. Tex. 2006). First, while some courts have required showing a "benefit to the estate", the "statute … does not so require." *Id.* at 132. Rather, "the language chosen by Congress, 'substantial contribution in a case,' makes no reference to the estate, though certainly such language could have been crafted." *Id.* (citation omitted). Accordingly, it is appropriate for courts to "consider compensable under section 503(b) services that substantially contributed to the proper allocation of Debtors' value among stakeholders." *Id.; see also id.* at 136 (awarding fees to creditor who helped "allocate[] Debtors' value as Congress intended"); *In re The New Power Co.,* 2007 WL 7143077 at *8 (Bankr. N.D. Ga. 2007) (holding that substantial contribution award

appropriate where creditor aided "in the fair allocation of the Debtors' remaining value" to stakeholders even if it did not increase "the overall size of the estate").

150.    Second, while the SAFE AHG's activities in these cases increased value for distribution to non-insider stakeholders, including stakeholders junior to the SAFE claimants, the SAFE AHG Substantial Contribution Claims would be warranted even if the SAFE AHG were motivated only to benefit its own members and other SAFE parties.  *See In re Mirant,* 354 B.R. at 132-33.  In the Fifth Circuit, the presence of "selfish or shrewd motivations" is simply not relevant "in the determination whether the creditor has incurred actual and necessary expenses in making a substantial contribution in a case."  *See In re Matter of DP Partners Ltd. P'ship*, 106 F.3d 667, 673 (5th Cir. 1997).

151.    Third, the SAFE AHG at all times believed (and believes) that its activities would warrant compensation under Section 503(b).  While the SAFE AHG might have been incentivized to contribute to these cases even absent the expectation of reimbursement, this consideration merits little weight in the Fifth Circuit.   "[W]hether the applicant would have undertaken the same approach absent the expectation of compensation … should only be given moderate weight, as any party hoping to apply … under 503(b) must surely realize there is no guaranty of such an application being granted; they merely have a hope."  *See*, *In re R.L. Adkins Corp.*, 505 B.R. 770, 782 (Bankr. N.D. Tex. 2014); *see also In re Mirant,* 354 B.R. at 133 (refusing to place "much weight on this factor" including because all parties "act[] without any certainty—or even confidence—that they [will] be [] paid" under Section 503(b).

152.    Fourth, the benefit conferred through the SAFE AHG's substantial contribution clearly exceeds the cost that the Plan would assess against the estates.  *See In re Mirant,* 354 B.R. at 133.  Some of these benefits are easily assigned a dollar value.  For instance, as discussed above,

the insider settlement supported by the SAFE AHG reduces distributions to the Founders by $13.2 million compared to the plan previously proposed by the Debtors, allowing for distributions to stakeholders junior to SAFE parties.  The new Plan also eliminates the requirement that the estates indemnify insider tax-liabilities, an obligation that the Debtors previously estimated could cost the estates $18 million or more.  As noted above, the SAFE AHG also supported the D&O Insurance Settlement which adds another $8.5 million in cash for distribution to stakeholders.  And when the SAFE AHG took the lead in negotiating the settlement with the Transcend Group to drop its discovery and objection to the Plan, it likely saved the estates at least $2 million (and perhaps more) in additional professional fees associated with a contested confirmation fight.  *See* Eaton Decl. ¶ 49.

153.    Other contributions are equally important, even if less susceptible to a mathematical valuation.  While "the amount to be allowed" for a 503(b) claim "must be measured in dollars and cents" the "question of whether the estate has been benefited cannot be so narrowly confined," and should include "less readily calculable benefits."  *See In re Energy Partners*, 422 B.R. at 83.  Such benefits are clearly present here.  For example, the SAFE AHG's role in litigating the Debtors' objection to the SAFE Claims and allowing for the allocation of the Debtors' value "as Congress intended"—i.e., in accordance with the absolute priority rule and the Bankruptcy Code—is compensable.  *See, e.g., In re Mirant*, 354 B.R. at 132-33 (holding that courts "consider compensable under section 503(b) services that substantially contributed to the proper allocation of Debtors' value among stakeholders"); *In re Energy Partners*, 422 B.R. at 83 (awarding fees in part helping achieve one of the "pillars of bankruptcy" – "the satisfaction of valid claims against the state").

154.     Resolving that dispute, moreover, was necessary for the parties to move forward with any plan in these cases.  Indeed, the Debtors and other parties specifically argued for a stay of other activities until the SAFE objection could be resolved.  As it presented several issues of "first impression," disposition of the SAFE objection required extraordinary preparation, analysis and briefing by the parties involved, including the SAFE AHG, whose extensive submissions were joined by numerous other parties.  *See, e.g., Liquid Mining Fund III, LLC's Joinder in Opposition to Debtors' Omnibus Objection to Claims* (Docket No. 1300); *Response and Joinder of Ranger Investment Partners, L.P. and Winchester Partners, L.P. in Opposition to Debtors' Omnibus Objection* (Docket No. 1302); *SAFE Claimants' Joinder to SAFE Claimant Response to Claim Objection* (Docket No. 1305).  And as discussed in detail elsewhere, as soon as the objection was resolved, the SAFE AHG worked tirelessly with the Special Committee and others to craft the Plan before the Court, and played a key role in eliminating the Transcend Group objections, the litigation of which otherwise would likely have cost the estates millions in additional professional fees.  *See* Eaton Decl. ¶ 49.  These are compensable activities under the Bankruptcy Code.  *See In re Energy Partners*, 422 B.R. at 84 (rewarding creditor for helping accomplish confirmation "at great speed" by working to negotiate a consensual plan).

155.     In accordance with the Plan, the SAFE AHG has provided the Special Committee with copies of the invoices of the SAFE AHG's counsel, which demonstrate more than $11 million in fees incurred by counsel to the SAFE AHG in connection with the Debtors' chapter 11 cases, *see* Eaton Decl. ¶ 52, and the SAFE AHG estimates its fees through emergence will exceed $12 million.  *See* Hurley Decl. ¶ 10 .  The Special Committee has reviewed the SAFE AHG's invoices, which have been broken down into activity categories, *see* Ex. 107, and is satisfied that they demonstrate that counsel to the SAFE AHG has incurred fees in connection with the SAFE AHG's

contribution to the Debtors' chapter 11 cases that support and significantly exceed the $8.5 million amount of the proposed SAFE AHG Substantial Contribution Claim.  *See* Eaton Decl. ¶ 52.

156.   Fifth, the SAFE AHG's activities were not "duplicative of those undertaken by statutory fiduciaries."  *See In re Mirant,* 354 B.R. at 133-134.  As already explained, the UCC was incentivized to remain active in these cases for a relatively brief period of time, since it was formed only after some delay, and its recognized constituents became virtually certain to be paid in full less than three months later.  Moreover, because the UCC did not recognize SAFE parties as its constituents until very late in these cases, it had no reason to, and did not, engage substantially in the SAFE AHG's disputes with other parties concerning SAFE Claims and priorities.  In short, except for a brief period at the end of the proceedings, SAFE parties were not represented by any statutory fiduciary, rendering the SAFE AHG's participation in the cases absolutely critical.  *See In re W.G.S.C. Enters., Inc.*, 47 B.R. 53, 58 (Bankr. N.D. Ga. 1985) (granting 503(b) award to creditor for work done in the absence of an active creditors' committee).

157.   Sixth, every one of the SAFE claimants in these cases made its investment in 2021, approximately three years before Rhodium filed for bankruptcy.  This is not a circumstance, in other words, where SAFE creditors acquired their interests post-petition at a discount, and then made a substantial profit through the bankruptcy (a factor that sometimes tempers courts' willingness to grant substantial contribution).  *Compare In re Mirant*, 354 B.R. at 135 (holding that party who bought interest at a discount post-petition was "not such a sympathetic applicant" because "[i]t chose to become involved with a bankrupt entity" and then "expended funds to make that involvement profitable"); *with In re Energy Partners*, 422 B.R. at 86 ("The undersigned judge interprets the Fifth Circuit's language [in *DP Partners*] to mean that any profit motive of the applicant should ***not*** be a factor in assessing … substantial contribution ….) (emphasis in original).

69

Rather, each SAFE party paid the full face value of its SAFE instrument to the Debtors—collectively almost $87 million—long before these cases were filed.  The Plan will return most of that initial investment, but only after a multi-year delay, and at a loss.  The SAFE parties in these cases were victims of the Debtors' failure, not bankruptcy profiteers, and the SAFE AHG Substantial Contribution Claim should be granted in full.

### 4.    The Amount of the Substantial Contribution Claim Is Appropriate

158.    To the extent a substantial contribution has been established, the court must consider whether the fees of counsel "meet the remaining criteria of section 503(b)(4): that they are 'reasonable … based on the time, the nature, the extent, and the value of such services.'"  *See In re Bayou,* 431 B.R. at 566.  Since these terms are "similar to the terms used in Bankruptcy Code section 330," in general the "evaluation of the reasonableness of counsel fees and expenses under section 503(b)(4) should generally follow the approach used under section 330."  *Id.*  The one "exception is that, because the professional may not know that he or she will be submitting a fee expense request, the [c]ourt need not necessarily enforce time record requirements as strictly as with requests under section 330."  *Id.*

159.    The Plan Proponents submit that this standard is readily satisfied with respect to the SAFE AHG Substantial Contribution Claim.  The SAFE AHG has submitted detailed time records demonstrating that its counsel incurred fees greatly exceeding the $8.5 million nominal amount of the SAFE AHG Substantial Contribution claim.  The Special Committee has reviewed the SAFE AHG's time records, and the SAFE AHG's categorization of those records into fifteen discrete categories, and has concluded that the SAFE AHG has incurred materially greater than $8.5 million in connection with its contribution to these cases.  *See* Eaton Decl. ¶ 52.  Notably, moreover, in order to achieve a largely uncontested confirmation of the Plan, the SAFE AHG has

agreed to pay $2.5 million of the $8.5 million into a fee escrow for the potential benefit of stakeholders junior to SAFE claimants.

160.     As a result, if the Plan is confirmed, including the provision for the SAFE AHG Substantial Contribution Claim, the SAFE AHG will recover at most between approximately 50% and 70% of the fees it actually incurred in participating actively in and contributing to these cases. The Plan Proponents submit that the compensation included in the Plan for the SAFE AHG is more than fair under the circumstances.  *See, e.g. In re Mirant Corp.*, 354 B.R. at 138 (2006 decision granting substantial contribution claim in excess of $5.2 million to creditor who "played a central role in negotiating the term sheet which formed the basis of the Plan," and reimbursing all attorneys' fees incurred, and excluding only fees of expert witness who was neither an "attorney or accountant" as required by the statute).

**F.     The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5))**

161.     The Bankruptcy Code requires the plan proponent to disclose the affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[99]  Section 1129(a)(5)(A)(ii) further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[100]

162.     The Plan satisfies section 1129(a)(5).  As set forth in Article 5.10 of the Plan, on the Effective Date, any remaining assets automatically transfer and vest in the Wind Down Debtor. Pursuant to the Proposed Confirmation Order, the Debtors, other than the Wind Down Debtor, will be dissolved.  The Wind Down Debtor shall continue in existence after the Effective Date as the

---

[99]   11 U.S.C. § 1129(a)(5)(A)(i).

[100]   11 U.S.C. § 1129(a)(5)(A)(ii).

successor-in-interest to the Debtors and the Debtors' rights, title, and interest in any remaining assets.  The Wind Down Debtor shall be managed by the Plan Administrator.  As such, section 1129(a)(5) of the Bankruptcy Code is inapplicable to the Plan.  To the extent section 1129(a)(5) applies to the Wind Down Debtor, it will have satisfied the requirements of this provision by, among other things, disclosing the identity of the Plan Administrator in the Plan Supplement.[101]

163.    In addition, section 1129(a)(5)(B) also requires a plan proponent to disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[102]  After, among other things, effectuating final distributions pursuant to the Plan, the Wind Down Debtor will dissolve. Because no individual person shall serve as a director, officer, or voting trustee of a reorganized Debtor and no insider will be employed by the Debtors following the Effective Date,[103] section 1129(a)(5)(B) lacks relevance to the Plan, and no party has asserted otherwise.

### G.    The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6))

164.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan. Section 1129(a)(6) of the Bankruptcy Code lacks relevance to these chapter 11 cases, and no party has asserted otherwise.

### H.    The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7))

165.    Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests-

---

[101]  *See* Plan Supplement, Exhibit A.

[102]  11 U.S.C. § 1129(a)(5)(B).

[103]  *See* Article 8.5 of the Plan.

(A)    each holder of a claim or interest of such class-

(i)    has accepted the plan; or

(ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .[104]

166.    The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes.  The Plan Proponents satisfy the best interests test here through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[105]  As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests.  Here, all dissenting Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of the confirmation of the Plan as they would in a hypothetical chapter 7 liquidation, because all Holders of Claims are anticipated to receive full recovery other than the SAFE Claims and the Transcend Claims, which are receiving recoveries to which the Holders of those Claims have consented.  Holders of Interests would receive no value in a hypothetical liquidation, while under the Plan they are entitled to receive any residual value remaining after payment of the SAFE

---

[104]    11 U.S.C. § 1129(a)(7)(A); *see Cypresswood Land Partners,* 409 B.R. at 428 ("[A]ll holders of claims and interests in impaired classes must either vote to accept the Amended Plan or receive the same or more under the Amended Plan than they would in a Chapter 7 liquidation."); *Tex. Extrusion Corp.*, 844 F.2d at 1159 n.23 (5th Cir. 1988) (noting that a bankruptcy court is required to determine whether impaired claims would receive no less under a reorganization than through a liquidation).

[105]    *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *Century Glove*, 1993 WL 239489, at *7; *Adelphia*, 368 B.R. at 251 (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

Claims, the SAFE AHG Substantial Contribution Claim, and the Transcend Claim.[106] Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.

167.    To demonstrate compliance with section 1129(a)(7) of the Bankruptcy Code, the Plan Proponents, with the assistance of Province, the Debtors' restructuring advisors, prepared a liquidation analysis, which is attached to the Disclosure Statement as Exhibit C (the "Liquidation Analysis") and discussed at length in the Robinson Declaration.[107]   The Liquidation Analysis compares the projected range of recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.[108]   The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.[109]   The illustrative recoveries provided in the Liquidation Analysis are subject to potentially material change, including due to macroeconomic business conditions and legal rulings.[110]

168.    Based on the unaudited Liquidation Analysis and the assumptions included therein, the value of any distributions in a chapter 7 liquidation would be no greater than the value of distributions under the Plan.[111]   As a result, Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of confirmation of the Plan as they would recover through

---

[106]   *See* Robinson Decl. ¶¶ 18-19.

[107]   *See* Robinson Decl. ¶¶ 6-19.

[108]   *See id.*

[109]   *See id.*

[110]   *See id.* at ¶ 9 & n.3.

[111]   *See id.* at ¶¶ 17-21.

a hypothetical chapter 7 liquidation.[112]   Based on the recoveries set forth in the Liquidation Analysis, the Plan satisfies the best interests test as required by the Bankruptcy Code.

### I.      The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code

169.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  If any class of claims or interests rejects the plan, the plan must satisfy the requirements of section 1129(b) with respect to the claims or interests in that class.

170.    Here, the Plan satisfies either the voting requirements or the requirements of section 1129(b) with respect to each Class.  Of the Classes of Claims and Interests entitled to vote on the Plan, Class 6 (SAFE Claims), and Class 11 (Imperium Interests) voted overwhelmingly to accept the Plan.

171.    Classes 1 (Rhodium 2.0 Secured Notes Claims), 2 (Rhodium Encore Secured Notes Claims), 3 (Rhodium Technologies Secured Notes Claims), 4 (Priority Non-Tax Claims), 5a (Guaranteed Unsecured Claims), 5b (General Unsecured Claims), 7 (Late Filed Claims), 8 (Intercompany Claims), and 9 (Section 510(b) Claims) are unimpaired and presumed to accept the Plan.

172.    Class 10 (Common Interests) rejected the Plan and Class 12 (Intercompany Interests) is deemed to reject the Plan.  As discussed below, the Plan satisfies the requirements of section 1129(b) with respect to all Classes that are Impaired under but have not voted to accept the Plan.  Therefore, the Plan satisfies section 1129(a)(8) or otherwise satisfies the requirements of the Bankruptcy Code.

---

[112]   *See id.*

J.     **The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9))**

173.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code— administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[113]  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—i.e., priority tax claim—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

174.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  *First*, Article 2.1 of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Expense Claim allowed on or prior to the Effective Date will receive payment in full in Cash no later than the Effective Date or the first business day that is thirty (30) days after the date such Administrative Expense Claim becomes Allowed.  *Second*,

---

[113]   11 U.S.C. § 1129(a)(9)(A).

Article 4.4 of the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because it provides that holders of the types of Claims specified by 1129(a)(9)(B) shall receive either payment in full in Cash or such other treatment as to render such holders unimpaired. *Third*, Article 2.3 of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that holders of Allowed Priority Tax Claims will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

175.    The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.

**K.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10))**

176.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent that the Plan impairs a class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.

177.    As set forth above, Holders of Claims in Classes 6, which is an Impaired Class under the Plan, unanimously voted to accept the Plan independent of any insiders' votes.[114]  Thus, the Plan Proponents respectfully submit that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.

**L.    The Plan Is Feasible (§ 1129(a)(11))**

178.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that the Plan is feasible which means that "not likely to be followed by . . . liquidation, or the need for

---

[114]  *See* Voting Report, Exhibit A.

further financial reorganization."[115]  This requirement has been interpreted by courts in this district as requiring a determination that the Plan "has a reasonable probability of success."[116]  However, section 1129(a)(11) does not require the proponent(s) of a plan to guarantee the Plan's success.[117]  Importantly, the feasibility inquiry is "a peculiarly fact intensive and requires a case-by-case analysis, using as a backdrop the relatively low parameters articulated in the statute."[118]  A relatively low threshold of proof will satisfy the feasibility requirement."[119]

179.    The Plan is a plan of liquidation for the Debtors.   When the Plan is fully implemented, the Debtors will have been dissolved and, by definition, no further liquidation or financial reorganization of the Debtors will be necessary.   Accordingly, to the extent section 1129(a)(11) is applicable to the Debtors, the Plan complies with and satisfies the requirements thereof.

---

[115]   11 U.S.C. § 1129(a)(11); *T-H New Orleans*, 116 F.3d at 801 ("Section 1129(a)(11) codifies the feasibility requirement and requires that confirmation of the plan is not likely to be followed by liquidation . . . .").

[116]   *In re Lakeside Glob. II, Ltd*., 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (holding that feasibility "contemplates whether the debtor can realistically carry out its plan . . . and whether the plan offers a reasonable prospect of success and is workable").

[117]   *Briscoe Enters*., 994 F.2d at 1165–66 ("[T]he court need not require a guarantee of success . . . [o]nly a reasonable assurance of commercial viability is required."); *see Whitney Bank v. SCC Kyle Partners, Ltd. (In re SCC Kyle Partners, Ltd.)*, 518 B.R. 393, 406 (W.D. Tex. 2014) (Noting that the "mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required."); *In re Adelphia Bus. Sols., Inc.*, 341 B.R. 415, 421-22 (Bankr. S.D.N.Y. 2003) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success." Success need not be guaranteed.) (citing *Kane v. Johns-Manville*, 843 F.2d at 649); *Texaco*, 84 B.R. at 910 (plan is feasible if there is a "reasonable assurance of commercial viability"); *In re Prudential Energy Co*., 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) ("Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11).").

[118]   *In re Pearl Res. LLC*, 622 B.R. 236, 263 (Bankr. S.D. Tex. 2020); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995).

[119]   *In re Star Ambulance Serv., LLC,* 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015) (citing *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006)), *remanded*, 2008 WL 687266 (Bankr. D. Conn. Mar. 10, 2008)); *Berkeley Fed. Bank & Trust v. Sea Garden Motel and Apartments (In re Sea Garden Motel and Apartments)*, 195 B.R. 294, 304-05 (D.N.J. 1996).

### M.     All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12))

180.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

181.     The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article II.D of the Plan provides that all fees and applicable interest payable pursuant to 28 U.S.C. § 1930 shall be paid.  Accordingly, the Plan Proponents submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code, and no party has asserted otherwise.

### N.     No Remaining Retiree Benefits Obligations (§ 1129(a)(13))

182.     Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  The Debtors do not have any obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).  Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these chapter 11 cases, and no party has asserted otherwise.

### O.     Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan

183.     Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  Because the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.  Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, each of the

Debtors are a moneyed, business, or commercial corporation or trust, and therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of non-bankruptcy law, is not applicable to the chapter 11 cases. Accordingly, the Plan Proponents respectfully submit that the Plan is not subject to the requirements of section 1129(a)(14)-(16) of the Bankruptcy Code, and no party has asserted otherwise.

### P.   The Plan Satisfies the Requirements of Section 1129(b) of the Bankruptcy Code

184.    Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[120]

185.    As noted above, Classes 6 (SAFE Claims) and 11 (Imperium Interests) which are Impaired Classes of Claims or Interests entitled to vote on the Plan, have voted in favor of the Plan.  Class 10 voted to reject the Plan (the "Rejecting Class").  In addition, Class 12 was deemed

---

[120] *See In re Save Our Springs (S.O.S.) All., Inc.,* 388 B.R. 202, 245 (Bankr. W.D. Tex. 2008), *aff'd sub nom. In re Save Our Springs All., Inc.,* 2009 WL 8637183 (W.D. Tex. Sept. 29, 2009), *aff'd sub nom. In re Save Our Springs (S.O.S.) All., Inc.;* 632 F.3d 168 (5th Cir. 2011);  *In re John Hancock Mut. Life Ins. Co.,* 987 F.2d 154, 157 n.5 (3d Cir. 1993); *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("[T]he Plan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the Plan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the Plan.").

to reject the Plan.  Nonetheless, as set forth below, the Plan satisfies the requirements under section 1129(b) of the Bankruptcy Code, and no party has asserted otherwise.

### 1. The Plan Is Fair and Equitable (§ 1129(b)(2)(C))

186.    A plan meets the "fair and equitable" standard with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[121]  This requires that an impaired rejecting class of interests either receive or retain on account such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[122]

187.    Here, the Plan is fair and equitable within the meaning of section 1129(b) of the Bankruptcy Code.  Although Class 10 is an Impaired Class of interests that voted to reject the Plan, the Plan is fair and equitable as set forth in section 1129(b)(2)(C) because Holders of interests in Class 10 will receive distributions to the extent there are amounts available for equity Holders, after payment to General Unsecured Claims and SAFE Claims in full (subject to certain agreements made by the SAFE Claimants, the Transcend Group, and the Debtors).  Further, no Holders of interests in classes junior to Class 10 will receive any property under the plan on account of such junior interests.  Similarly, the Plan is fair and equitable with respect to Class 12

---

[121]  *See In re Save Our Springs (S.O.S.) All., Inc.*, 388 B.R. at 245; *LaSalle*, 526 U.S. at 441-42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

[122]  11 U.S.C. § 1129(b)(2)(C).

because there is no class junior to Class 12, and therefore, by definition, no junior classes can receive property under the plan on account of such interests.  Therefore, the Plan is "fair and equitable" with respect to Classes 10 and 12 pursuant to section 1129(b)(2)(C).

> **2.     The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1))**

188.    Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[123]  In general, a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[124]

189.    Here, the Plan's treatment of the non-accepting Impaired Classes (*i.e.*, the Common Interests and Intercompany Interests) is proper because it does not provide materially different treatment for interest holders with similar legal rights.  For the reasons set forth above, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.

---

[123]   *See Idearc,* 423 B.R. at 171; *In re Jewish Memorial Hosp.*, 13 B.R. 417, 420 (Bankr. S.D.N.Y. 1981) ("[T]he Bankruptcy Act does not establish inexorable rules for distribution that can never be deviated from in the interest of justice and equity.").

[124]   *In re Cypresswood Land Partners, I*, 409 B.R. 396, 434 (Bankr. S.D. Tex. 2009); *Armstrong World Indus.*, 348 B.R. at 121 ("[H]allmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.") (citing *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004)).

**Q.    The Plan Proponents Complied with Section 1129(d) of the Bankruptcy Code**

190.    The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act.[125]  No party has argued otherwise.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**R.    Modifications to the Plan**

191.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.  Interpreting Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[126]

192.    Following solicitation, the Plan Proponents made certain modifications to the Plan that resolve formal and informal comments to the Plan by parties in interest (the

---

[125]    *See* Eaton Decl. ¶ 107.

[126]    *See, e.g.*, *In re Cong. Sand & Gravel, LLC*, 2011 WL 3881020, at *3 (Bankr. N.D. Tex. Sept. 2, 2011) (allowing "immaterial modifications" to the Plan because they  "[did] not adversely affect any creditor or interest holder who has voted to accept the Plan."); *In re Glob. Safety Textiles Holdings LLC*, 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

"Modifications").[127]   The Modifications are contained in the Second Amended Plan.   The

Modifications are immaterial, provide clarification regarding the treatment of otherwise already

disclosed claims (i.e., those asserted by the Transcend Group), or otherwise do not affect the

treatment of creditors and stakeholders and thus comply with section 1127 of the Bankruptcy Code

and Bankruptcy Rule 3019.   Accordingly, the Plan Proponents submit that no additional

solicitation or disclosure is required on account of the Modifications, and that such Modifications

should be deemed accepted by all creditors that previously accepted the Plan.

### S.    Good Cause Exists to Waive the Stay of the Confirmation Order

193.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until

the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[128]

Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or

lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory

contract or unexpired lease under section 365(f) of the Bankruptcy Code.[129]   Each rule also permits

modification of the imposed stay upon court order.[130]

194.    The Plan Proponents submit that good cause exists for waiving and eliminating any

stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the

Confirmation Order will be effective immediately upon its entry.[131]   As noted above, these chapter

---

[127]   *See Proposed Confirmation Order* ¶ 6.

[128]   Fed. R. Bankr. P. 3020(e).

[129]   Fed. R. Bankr. P. 6004(h), 6006(d).

[130]   *Id.*

[131]   *See, e.g.*, *Idearc*, 423 B.R. at 158; *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. Nov. 23, 2010) (shortening the Bankruptcy Rule 3020(e) period due to the significant expense to the debtors' estates in delaying the effectiveness of the plan); *In re Penton Bus. Media Holdings, Inc.*, No. 10-10689 (AJG) (Bankr. S.D.N.Y. Mar. 5, 2010) (waiving the stay in Bankruptcy Rule 3020(e) in light of support for the plan by voting classes); *In re Oldco M. Corp.*, No. 09-13412 (MG) (Bankr. S.D.N.Y. Feb. 23, 2010) (waiving the stay imposed by Bankruptcy Rule 3020(e) to permit a distribution trustee to commence its duties as quickly as practicable); *In re Broadway 401 LLC*, 2010 WL 2902755, at *20

11 cases and the related transactions transpired in good faith and with a high degree of transparency and public dissemination of information.  Because the Debtors paid substantially all secured and general unsecured claims in full previously pursuant to the Payment Orders, the remaining unpaid creditors and interest holders are few and intimately familiar with these Cases, the Plan, and the related transactions.  The Plan Proponents sought with great effort to facilitate the Debtors' exit from chapter 11 as soon as possible.  Additionally, each day the Debtors remain in chapter 11 results in significant administrative and professional costs.

195.    In light of the requisite support by the Voting Classes, and the paucity of objections to confirmation, no parties will be prejudiced by waiver of the stay to facilitate the Debtors' swift emergence from chapter 11.  Accordingly, the Plan Proponents request a waiver of any stay imposed by the Bankruptcy Rules so that the Proposed Confirmation Order may be effective immediately upon its entry.

## CONCLUSION

196.    For all of the reasons set forth herein and in the Voting Report, the Robinson Declaration, the Eaton Declaration, and the Hurley Declaration, and as will be further shown at the Confirmation Hearing, the Plan Proponents respectfully request that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Proposed Confirmation Order, and granting such other and further relief as is just and proper.

*[Remainder of page intentionally left blank]*

---

(Bankr. D. Del. Mar. 16, 2010); *In re Drug Fair Grp., Inc*., 2010 WL 3492994, at *12 (Bankr. D. Del. June 7, 2010); *In re Accuride Corp*., 2010 WL 5093173, at *13 (Bankr. D. Del. Feb. 18, 2010); *In re Teton Energy Corp*., 2010 WL 2822056, at *23 (Bankr. D. Del. Jan. 20, 2010).

Respectfully submitted this 1st day of December, 2025.

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By: */s/ Sarah Link Schultz*
    Sarah Link Schultz (SBN 24033047; S.D. Tex. 30555)
    Elizabeth D. Scott (SBN 24059699; S.D. Tex. 2255287)
    Samantha Baham (SBN 24141349)
    2300 N. Field Street, Suite 1800
    Dallas, TX 75201-2481
    Telephone:  (214) 969-2800
    Email:  sschultz@akingump.com
    Email:  edscott@akingump.com
    Email:  sbaham@akingump.com

    - and -

    Mitchell P. Hurley (admitted *pro hac vice*)
    Kaila Zaharis
    One Bryant Park
    New York, NY 10036-6745
    Telephone:  (212) 872-1000
    Email:  mhurley@akingump.com
    Email:  kzaharis@akingump.com

    *Counsel to the SAFE AHG*

**BARNES & THORNBURG LLP**

By: */s/ Vincent P. (Trace)Schmeltz III*
    Vincent P. (Trace) Schmeltz III (*pro hac vice*)
    One N. Wacker Drive, Suite 4400
    Chicago, Illinois 60606
    Telephone: 312-214-5602
    Facsimile: 312-759-5646
    Email: tschmeltz@btlaw.com

    *Counsel for the Special Committee of the Board of Directors of Rhodium Enterprises, Inc.*

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

By: */s/ Patricia B. Tomasco*
    Patricia B. Tomasco (SBN 01797600)
    Cameron Kelly (SBN 24120936)
    Alain Jaquet (*pro hac vice*)
    700 Louisiana Street, Suite 3900
    Houston, Texas 77002
    Telephone: 713-221-7000
    Facsimile: 713-221-7100
    Email: pattytomasco@quinnemanuel.com
    Email: cameronkelly@quinnemanuel.com
    Email: alainjaquet@quinnemanuel.com

    - and -

    Eric Winston (*pro hac vice*)
    Razmig Izakelian (*pro hac vice*)
    865 S. Figueroa Street, 10th Floor
    Los Angeles, California 90017
    Telephone: 213-443-3000
    Facsimile: 213-443-3100
    Email: ericwinston@quinnemanuel.com
    Email: razmigizakelian@quinnemanuel.com

    *Counsel to the Debtors and Debtors-In-Possession*

**Certificate of Service**

I, Patricia B. Tomasco, hereby certify that on the 1st day of December, 2025, a copy of the foregoing Motion was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Patricia B. Tomasco
Patricia B. Tomasco