**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RHODIUM ENCORE LLC, *et al.*,[1] | § | Case No. 24-90448 (ARP) |
| | § | |
| Debtors. | § | |
| | § | (Jointly Administered) |
| | § | |

**BARNES & THORNBURG LLP'S RESPONSE TO LEHOTSKY KELLER COHN LLP'S**
**MOTION FOR SANCTIONS**
[Relates to ECF No. 2303]

Barnes & Thornburg LLP ("B&T") files this response ("Response") to Lehotsky Keller Cohn LLP's ("LKC") Motion for Sanctions against Barnes & Thornburg LLP, or, in the Alternative, for Payment of Fees and Expenses under Section 328 (ECF No. 2303). In support, B&T respectfully states as follows:

## INTRODUCTION

1.     LKC signed an engagement letter with Debtors that contemplated that the parties might not agree on LKC's success fee. In that event, the parties agreed that "**such dispute shall be resolved by the Bankruptcy Court**." ECF No. 835 at 15 (emphasis added). There was such a dispute, and this Court resolved it. But despite agreeing to submit fee disputes to this Court, LKC now cries foul, seeking sanctions against the Special Committee, and its counsel B&T, for

---

[1] Debtors in these chapter 11 cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), Rhodium 30MW LLC (0263), Rhodium Enterprises, Inc. (6290), Rhodium Technologies LLC (5868), Rhodium Ready Ventures LLC (8618), Rhodium Industries LLC (4771), Rhodium Encore Sub LLC (1064), Jordan HPC Sub LLC (0463), Rhodium 2.0 Sub LLC (5319), Rhodium 10MW Sub LLC (3827), Rhodium 30MW Sub LLC (4386), and Rhodium Renewables Sub LLC (9511). The mailing and service address of Debtors in these chapter 11 cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005.

their reasonable, good-faith dispute of LKC's success fee.[2]  If LKC wanted an engagement letter that required Debtors and the Special Committee to accept whatever success fee LKC desired, with no chance to dispute it or seek this Court's intervention, LKC could have bargained for one.  It did not.  Instead, LKC agreed to resolve fee disputes with this Court but would now sanction a party and its counsel for doing exactly that—resolving a reasonable fee dispute with this Court.

2.      And this fee dispute *was* reasonable.  The Special Committee and LKC disagreed on the initial value to use to calculate the success fee.  LKC argued for $100 million as the starting point, whereas the Special Committee believed $75 million was appropriate.  B&T advanced the Special Committee's position in good faith and with evidence in support.  *See, e.g.*, Ex. 1, Hearing Ex. 245.002 (showing midpoint of damages valuation at $75 million); *see also* ECF No. 1881 at 3 (Debtors valuing settlement of their claims at $75 million).  B&T did not file a frivolous claim against LKC, it did not make knowing misrepresentations to the Court, and it did not vexatiously multiply proceedings.  LKC's allegations are demonstrably false, and this Response shows as much.

3.      LKC's Motion is a clear attempt to circumvent the rule that costs incurred defending a fee application are not recoverable under 11 U.S.C. § 330(a)(1).  The U.S. Supreme Court established this rule in *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 124 (2015).  Rather than accept the rule from *ASARCO*, LKC seeks sanctions instead.  But sanctions are not warranted because B&T did not engage in bad faith or abuse the judicial process.  LKC's Motion should be denied.

---

[2] LKC has effectively conceded that the Debtors and the Special Committee are not different for purposes of the engagement letter because LKC argues that the Special Committee refused to negotiate the success fee in good faith, as the engagement letter requires.  *See* ECF No. 2303 at 5 ("The Special Committee Refuses to Negotiate LKC's Success Fee in Good Faith.").

## BACKGROUND

4.      For LKC to be entitled to sanctions, it must show that B&T engaged in "bad faith or willful abuse of the judicial process." *In re Moore*, 739 F.3d 724, 729 (5th Cir. 2014). Additionally, "the finding of bad faith must be supported by clear and convincing proof." *Id.* at 730 (cleaned up) (quoting *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001)). This is a "high threshold," *id.*, and the U.S. Supreme Court has advised that a district court's inherent power to sanction "must be exercised with restraint and discretion." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980). The Fifth Circuit has explained that this inherent authority "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir. 1990).

5.      LKC's Motion does not clear the high threshold required for sanctions. Far from presenting clear and convincing proof of B&T's bad faith or abuse of the judicial process, LKC simply disagrees with B&T's zealous advocacy on behalf of its client. The evidence reveals that with the client's full approval and backing, B&T advanced reasonable, good-faith arguments that LKC's fee application was premature and that LKC breached its fiduciary duty to the Debtors. LKC's Motion should be denied.

### A.      The Debtors Retain LKC

6.      In May 2023, the Debtors and LKC executed an engagement letter so that LKC could represent Debtors in litigation against Whinstone US, Inc. ("Whinstone"). ECF No. 835 at 9–12. Debtors are a bitcoin mining company that operated at Whinstone's facility in Rockdale, Texas. ECF No. 770 at ¶ 3. Whinstone contracted with Debtors to provide them power at a fixed, below-market price, but Riot, a competitor to the Debtors, purchased Whinstone shortly

afterwards.  *Id.* at ¶ 4.  When Debtors refused to renegotiate the power contracts, Riot and Whinstone withheld millions of dollars in energy credits.  *Id.* at ¶ 7.

7.      The engagement letter between Debtors and LKC provided for a variety of fees, including fixed, hourly, and a "potential success fee."  ECF No. 835 at 9–10.  In September 2024, as part of this bankruptcy proceeding, Debtors applied to retain LKC as special litigation counsel in connection with the ongoing Whinstone litigation.  *See* ECF No. 173.  The Court granted this application, but its order did not address the success fee.  *See* ECF Nos. 263, 264.

**B.      The Debtors Sue Whinstone and Revise LKC's Engagement Letter**

8.      In February 2025, the Debtors filed an adversary complaint against Whinstone and its parent company Riot Platforms, Inc. ("Riot"), seeking more than $300 million in damages.  *See* ECF No. 770.

9.      In February and March of 2025, the Debtors and Whinstone mediated their dispute before Judge Mark X. Mullin, United States Bankruptcy Judge for the Northern District of Texas.  *See* ECF No. 1732 at ¶ 13.  During this mediation, it became clear that Debtors and Whinstone were likely to reach a settlement *both* resolving Debtors' claims against Whinstone *and* consummating the sale to Whinstone of Debtors' assets in Rockdale (as well as its intangible assets like the power contracts).  ECF No. 1111-1 at ¶ 11.  However, the terms of the success fee outlined in the engagement letter between Debtors and LKC did not address this scenario.  *Id.*  The terms of the success fee outlined in the initial engagement letter contemplated a judgment on or settlement of Debtors' claims alone, not an additional amount for the sale of the Rockdale assets and power contracts.  *See* ECF No. 835 at 10.  Nevertheless, the parties believed LKC should still receive a success fee in the event of a global settlement.  ECF No. 1111-1 at ¶ 11.

10. Accordingly, in March 2025, Debtors and LKC signed a revised engagement letter ("Revised Engagement Letter") that superseded the one from May 2023. ECF No. 835 at 13–16. The Revised Engagement Letter outlined the terms of the success fee as follows:

> The potential success fee is calculated as follows:
>
> (a) $600,000 if (i) the Bankruptcy Court's order on Debtor's Motion to Assume is upheld in a non-appealable final judgment (or the appeal is dismissed), to be paid 30 days after such non-appealable final judgment (or dismissal) or (ii) you (or all or substantially all of the Rockdale assets) are acquired by Whinstone or an affiliate, to be paid 30 days after the closing of such acquisition;
>
> (b) 5% of any recovered energy credits up to $5 million, and 1% of any additional recovered energy credits, payable 30 days after each monthly utilization by Rhodium and subject to Bankruptcy Court approval; and
>
> (c) 10% of any additional damages not attributable to energy credits that you recover, including, but not limited to, compensatory damages, incidental or consequential damages, punitive or exemplary damages, civil fines, costs, and attorneys' fees, payable 30 days after settlement of the Matter or a non-appealable final judgment and subject to Bankruptcy Court approval, provided, that in the case of a settlement, the amount on which the 10% success fee will be payable will be the amount that is net of any monetary concessions given to Whinstone or its affiliates;
>
> (d) In relation to the fees listed in Sections (b) and (c), if you (or all or substantially all of the Rockdale assets) are acquired by Whinstone or an affiliate, in a transaction that resolves or otherwise terminates the Matter, the Client and Lehotsky Keller Cohn LLP will determine in good faith the portion of transaction value to the Client allocable to the energy credits and damages specified in Sections (b) and (c). If the Client and Lehotsky Keller Cohn LLP are unable to reach a resolution regarding the amount of fees payable under Sections (b) and (c), including with respect to the allocation of transaction value allocable to the energy credits and damages, such dispute shall be resolved by the Bankruptcy Court.

*Id.* at 14–15. Compared to the initial engagement letter, the Revised Engagement Letter made any payments under subsections (b) and (c) "subject to Bankruptcy Court approval." And the revised letter added subsection (d) entirely.

11. In the event Whinstone acquired "all or substantially all of the Rockdale assets" (as appeared likely during the mediation), subsection (d) required Debtors and LKC to determine in good faith the portion of any settlement with Whinstone that was allocable to energy credits and damages under subsections (b) and (c), respectively. This allocation necessarily required Debtors and LKC to determine the portion of the $185 million global settlement that corresponded to the Debtors' claims against Whinstone. This is because the amounts allocable to the energy credits and damages under subsections (b) and (c) had to stem from the amount for Debtors' claims, not

the amounts for the Rockdale assets or power contracts.  In other words, the Debtors and LKC had to agree on (1) how much of the settlement value was attributable to Debtors' claims as opposed to the tangible assets and (2) how much of the claims-value was allocable to energy credits versus other damages.

12.     Testimony from Charles Topping, the secretary and general counsel for Rhodium Enterprises, Inc. ("REI"), supported this two-step process.  He testified that in the event of a global settlement, "[i]t would be necessary to come up with an allocation as to what portion of that number is attributable to the assets and then what portion of that number would be attributable to the settlement of the -- the -- the claims."  ECF No. 1258 at 47.  "And with regard to the -- the number attributable to the settlement of the claims, it would then be necessary to come up with an allocation between Subparagraph (b), which deals with energy credits, and then Subparagraph (c), which deals with damages and other amounts."  *Id.*

13.     Per the last sentence of subsection (d), LKC also agreed that "[i]f [Debtors] and [LKC] are unable to reach a resolution regarding the amount of fees payable under Sections (b) and (c), including with respect to the allocation of transaction value allocable to the energy credits and damages, such dispute shall be resolved by the Bankruptcy Court."  ECF No. 835 at 14–15. Crucially, then, LKC agreed that it may not be able to agree with Debtors on the allocation of the global settlement and *would have to resolve the dispute with this Court*.

14.     Around the same time that the parties executed the Revised Engagement Letter, Debtors applied for an updated order authorizing them to continue to retain LKC as special litigation counsel under the terms of the Revised Engagement Letter.  *See* ECF No. 835 at ¶ 13. The Court later approved this application, though it made no determination as to the calculation of

6

LKC's success fee.  *See* ECF No. 1418.  In fact, the Court stated that "[t]he Ad Hoc Group and any other parties are always free to object to any future fee applications." *Id.* at 18.

### C.     The Settlement

15.     The mediation between Debtors and Whinstone was ultimately successful.  Debtors and Whinstone entered into a Compromise, Settlement and Release Agreement ("Settlement") and a Purchase and Sale Agreement ("PSA"), the material terms of which the Court approved on April 8, 2025.  ECF Nos. 921, 1530-2, 1530-3.  The PSA provided that Whinstone would pay Debtors $185 million in total.  ECF No. 1530-3 at 7.

16.     However, the parties did not determine which portion of the $185 million covered the claims versus the Rockdale assets or power contracts.  Under the PSA, the "Purchase Price" of $185 million was for "the Property," defined as "all tangible and certain intangible property" of Debtors.  *Id.* at 6–7.  The parties did not specify an amount corresponding to the Rockdale assets (tangible property) versus Debtors' claims (part of intangible property).

17.     Rather, the PSA provided that Debtors would prepare and deliver to Whinstone a copy of IRS Form 8594 allocating the $185 million among the tangible and intangible assets in accordance with § 1060 of the Internal Revenue Code.  *Id.* at 7–8.  This Form was deemed the "Allocation Statement." *Id.* at 7.  The Allocation Statement required Debtors to distribute the $185 million among seven classes of assets.[3]  In the case of an asset acquisition, the Internal Revenue Code requires an allocation in order to properly reflect the fair market value of the assets and to properly calculate the seller's gain or loss and the buyer's basis in the purchased assets.  *See* 26 U.S.C. § 1060(a).  Courts will make a similar allocation for settlement agreements if the parties to the agreement do not do so, in order to calculate the federal income tax liability on the settlement.

---

[3] Form 8594, Form 8594 (Rev. November 2021).

*See Bagley v. Commissioner of Internal Revenue*, 105 T.C. 396, 410 (1995) (U.S. Tax Court allocating $500,000 out of $1.5 million settlement to punitive damages for tax purposes), *aff'd*, 121 F.3d 393 (8th Cir. 1997).

18.     Notably, § III(2) of the Settlement specified that "[a]s a *condition* to entering into this Agreement, Debtors and Whinstone shall close the transactions contemplated by that [PSA] between Debtors (or their designees), as sellers, and Whinstone (or its designee), as purchaser, and approved by the Bankruptcy Court." ECF No. 1530-2 at 8 (emphasis added).  One such transaction was the Allocation Statement.[4]

19.     Under the PSA, Whinstone had 15 days upon receipt of the Allocation Statement to inform Debtors of any objections.  ECF No. 1530-3 at 7.  In the event Whinstone objected, the parties were obligated to "attempt in good faith to resolve any dispute."  ECF No. 1530-3 at 7.  If the parties couldn't, this Court would do so.  *Id.* at 7–8.  The parties agreed that "[t]he allocation as determined by such Allocation Statement . . . shall be binding on [Whinstone] and [the Debtors]."  *Id.* at 8.[5]  Additionally, the PSA commanded that the Debtors and Whinstone "shall take no reporting position inconsistent with such Allocation Statement on any tax return or in the course of any tax audit, tax review or tax litigation relating thereto or otherwise."  *Id.*

20.     B&T reasonably argued that the Allocation Statement had ramifications for the calculation of LKC's success fee.  The Revised Engagement Letter required the Debtors and LKC to allocate the portion of the $185 million attributable to the claims against Whinstone, and then again among energy credits and other damages.  Additionally, B&T reasonably believed that the

---

[4] Additionally, the Settlement clarified that its provisions encompassed "the documents required by the PSA," including the Allocation Statement.  ECF No. 1530-2 at 10.

[5] Under the applicable provision of the Internal Revenue Code, "[i]f in connection with an applicable asset acquisition, the transferee and transferor agree in writing as to the allocation of any consideration, or as to the fair market value of any of the assets, such agreement shall be binding on both the transferee and transferor."  26 U.S.C. § 1060(a).

Debtors could have subjected themselves to audit risk by taking one position in the tax allocation and a different one as to LKC's success fee. *See id.* at 8; Ex. 2, Dec. 11, 2025 Hearing Tr. at 8:4–7 ("I'm also satisfied that using $75 million gives us one set of operative facts for tax purposes, which I understand to be important in the face if there's ever an IRS audit.").

21.     Additionally, the Debtors and the Special Committee were concerned about paying overlapping success fees.  The Debtors received assistance from the investment bank B. Riley Financial in connection with the sale of the Debtors' business.  ECF No. 1530 at 7.  B. Riley was also entitled to a success fee from the Debtors, but B. Riley agreed to wait to negotiate its success fee until the parties finalized the Allocation Statement.  *Id.* at 8.

**D.     B&T Negotiates With LKC Over Its Success Fee, But LKC Does Not Entertain B&T's Range of Offers**

22.     After this Court approved the Settlement and PSA at the end of April, the parties began negotiating LKC's success fee.  LKC alleges that B&T, on behalf of the Special Committee, did not negotiate in good faith.  ECF No. 2303 at 5–6.  In reality, the evidence shows that B&T engaged in good faith, but LKC would not entertain the settlement offers presented by B&T.

23.     For example, at the end of May 2025, counsel for LKC reached out to Mr. Trace Schmeltz, counsel for the Special Committee and a partner at B&T, with an offer to settle LKC's success fee for $8.1 million.  Ex. 3, Hearing Ex. 201.007–08.  This offer used $100 million as its calculation starting point.  *Id.* at 201.008.  In response, Mr. Schmeltz countered with an offer of $3.8 million.  *Id.* at 201.007.  Mr. Schmeltz explained that "based on the current tax plan," meaning the Allocation Statement required under the PSA, the Debtors had allocated $75 million, not $100 million, to the value of their claims against Whinstone.  *Id.*  Of the $75 million, the Debtors and the Special Committee calculated $50 million in energy credits and the rest to other damages (as the Revised Engagement Letter required).  Adding the sums from subsections (a), (b), and (c), Mr.

Schmeltz arrived at $3.8 million as a counter. *Id.* Mr. Schmeltz even added, "**I think there is a number between our $3.8 million and your $8.1 million at which we can settle**." *Id.* (emphasis added).

24.     In response, counsel for LKC called the number "another low-ball offer" and indicated that LKC "[was] not countering at this time." *Id.* at 201.006–07. Mr. Schmeltz replied that LKC was at one point willing to accept $5.2 million, a figure that is closer to $3.8 than $8.1. *Id.* at 201.006. Counsel for LKC responded with an ultimatum: "If the Debtors want the negotiations to continue, they need to make an offer above $5.2 million." *Id.*

25.     Mr. Schmeltz responded that the $75 and $50 million figures came straight from the Debtors and their CFO, Kevin Hays. *Id.* at 201.005. By rejecting these figures, LKC was doubting its own client's valuations. *Id.* Mr. Schmeltz proposed making one more settlement offer over the phone, but negotiations broke down.

26.     This evidence shows that LKC's allegations about B&T failing to negotiate in good faith are simply untrue.

27.     Between May and July 2025, B&T continued to communicate with counsel for LKC regarding negotiations over the success fee. ECF No. 1530 at ¶ 20. Mr. Schmeltz explained that the Debtors were preparing an Allocation Statement that valued the settlement of Debtors' claim lower than LKC did. *Id.* LKC insisted that its allocation was proper, at which point B&T decided that fee discussions were no longer productive and should wait until the Allocation Statement was completed. *Id.* at ¶ 21. Additionally, when Debtors' counsel Patricia Tomasco reached out to counsel for LKC, the latter declined to negotiate the success fee without a draft of the Allocation Statement. *Id.* at ¶ 22; ECF No. 1530-1 at ¶ 13. In other words, counsel for LKC

admitted that the Allocation Statement was crucial to move forward with negotiations.  ECF No. 1530 at ¶ 34.

> **E.    LKC Propounds Discovery on Its Own Client, and LKC Publicly Files B&T's Private Response**

28.    On August 7, 2025, LKC served its First Set of Requests for Production and Interrogatories to Debtors pursuant to Bankruptcy Rule 2004.  ECF No. 1515.  Despite its continued representation of the Debtors, LKC signed these discovery requests itself, rather than have its own counsel sign the requests.  *Id.* at 2.

29.    Tellingly, LKC's discovery requests were broad, seeking a wide array of information related to the tax allocation.  *Id.* at 7.  LKC now calls the connection between the tax allocation and the success fee "a fiction" that was "invented by the Special Committee," yet LKC sought discovery on this very issue.  ECF No. 2303 at ¶ 6.  If the tax allocation was truly irrelevant and unconnected to the success fee, then there was no need to obtain discovery on the issue.  LKC's actions in this case belie its arguments for sanctions.

30.    On August 13, 2025, B&T, on behalf of the Special Committee, emailed a *private* letter to LKC and its counsel outlining the Special Committee's position that LKC's discovery requests were adverse to the interests of LKC's own clients, the Debtors, and that the requests constituted a breach of LKC's fiduciary duties to the Debtors.  *See* ECF No. 1529-2.  The letter demanded that LKC withdraw its discovery requests before 1:30 pm CT on August 14 or the Special Committee would move to quash the requests.  *Id.* at 4.

31.    The next day, LKC moved for a status conference on the discovery requests.  ECF No. 1529.  But as an exhibit to its motion, LKC attached and *publicly filed* LKC's letter from the previous day.  *See* ECF No. 1529-2.  LKC did not move to seal this filing.  LKC complains of the public filing of allegations of misconduct, but it only has itself to blame.

32.     Following LKC's lead of not sealing its filings, B&T, on behalf of the Special Committee, filed a motion to quash the discovery requests.  *See* ECF No. 1530.  B&T argued that the discovery requests were premature because the Debtors and Whinstone had not completed the Allocation Statement.  *Id.* at ¶ 31.  The Debtors and Whinstone had not agreed on the portion of the global settlement allocable to the claims.  Without this number, the Debtors and LKC could not determine how much of the claims were for energy credits versus other damages, per subsection (d) of the Revised Engagement Letter. ECF No. 835 at 14–15; *see also* ECF No. 1258 at 47; ECF No. 1530 at ¶ 33.

### F.     LKC Files Its Final Fee Application, and the Special Committee Objects

33.     On August 22, 2025, LKC filed its final fee application.  *See* ECF No. 1560.

34.     On September 10, 2025, the Special Committee moved to extend its time to file a response to LKC's fee application. *See* ECF No. 1626.  B&T sought additional time for the Special Committee because under Fifth Circuit precedent, all claims that the estate held against LKC had to be included in the objection to the fee application or else they were waived.  *See In re Intelogic Trace, Inc.*, 200 F.3d 382, 391 (5th Cir. 2000).  Additionally, B&T re-urged the argument that the fee application was premature.

35.     The Ad Hoc Group of SAFE Parties (set forth in ECF No. 1346) joined in on the Special Committee's request for an extension of time to file a response to LKC's fee application. *See* ECF No. 1638.  The Ad Hoc Group of SAFE Parties represented that it intended to "carefully assess LKC's fee request, including its request for an extraordinarily large success fee."[6]  ECF No. 1638 at 3.

---

[6] This Court later overruled Debtors' omnibus objection to the SAFE Proofs of Claim, effectively making the SAFE Claimants the largest creditor of the bankruptcy estate. *See* ECF No. 1592.

36.     On September 24, 2025, the Court instructed the Special Committee to file its objection to LKC's fee application before the status conference on October 2. On October 1, the Special Committee did so, again raising the prematurity argument because the tax allocation was not yet complete. ECF No. 1732 at ¶ 1. LKC alleges that this argument was "meritless," ECF No. 2303 at ¶ 7, but B&T presented the declaration of Mark "Christopher" Wheeler in support of it, *see* ECF No. 1732-1. Mr. Wheeler is a certified public accountant and managing director of a consulting firm that *counsel for Debtors* retained (not the Special Committee or B&T) to "assist[] with an analysis of the tax impact on the Debtors as a result of the [Whinstone] asset sale and other tax matters associated with the disposition of the Debtors assets." ECF No. 1732-1 at ¶ 2.

37.     Mr. Wheeler stated that the PSA between Debtors and Whinstone "requires attribution of revenue to each [Rhodium] entity based on (i) the specific assets sold by each entity, (ii) the specific Hosting Agreements held by each entity, providing for each entity to receive quantities of electricity from Whinstone at a fixed price of at least ten years, and (iii) the settlement of certain claims as asserted by each entity in the Debtors litigation with Whinstone." *Id.* at ¶ 7. Mr. Wheeler then analyzed the Allocation Statement provision of the PSA and its consequences for the Debtors and Whinstone. *See id.* at ¶¶ 8–19.

38.     Mr. Wheeler stated that in his professional opinion, "there should be one set of operative facts governing the value allocated, and the facts must be accurate." *Id.* at ¶ 25. "Under the PSA, if the parties cannot reach agreement as to the allocation of purchase price, the ultimate provision for relief is for the parties to litigate the matter." *Id.* at ¶ 26. Ultimately, then, "in order to ensure a single set of operative facts regarding the allocation of purchase price, **that agreement or conclusion from any litigation must occur first before Debtors negotiate with LKC**." *Id.* (emphasis added). Mr. Wheeler stated that, as a tax professional, he would be concerned "if there

13

were multiple sets of operative facts that such a circumstance could trigger an IRS or State income tax audit for the Debtors." *Id.* at ¶ 27.

39.     Mr. Wheeler's informed, expert opinion on this topic squarely placed in issue LKC's argument that B&T "invented a fiction" on behalf of the Special Committee.  While the Court ultimately granted LKC's fee application, ECF No. 2198, B&T presented a meritorious argument, in good faith, that was supported by expert testimony.

40.     As another part of its objection to LKC's fee application, the Special Committee argued that LKC based its success fee calculation on internal, privileged, and outdated information. ECF No. 1732 at ¶ 3.  Again, B&T advanced this argument on behalf of the Special Committee with a declaration of Mr. Topping, general counsel and secretary of REI, in support.  ECF No. 1732-2.

41.     Mr. Topping explained that LKC calculated its success fee using numbers from a spreadsheet that was originally prepared by LKC to facilitate discussions by the Board of Directors of REI at the mediation with Whinstone.  *Id.* at ¶ 6.  In other words, the numbers were outdated, and the Debtors had changed their position on many of the valuations that LKC relied on in its fee application.  Again, while the Court granted LKC's success fee, B&T took a reasonable, good-faith position at the instruction of its client.  That is not sanctionable conduct.

42.     Finally, B&T, on behalf of the Special Committee, asserted a claim for breach of fiduciary duty against LKC.  ECF No. 1732 at ¶¶ 50–59.  B&T argued that LKC's premature fee application could cause the Debtors "to breach the PSA and possibly violate the Internal Revenue Code and the Treasury Regulations thereunder." *Id.* at ¶ 55.  Once LKC filed its fee application, the Debtors and the Special Committee were faced with a difficult choice.  They reasonably believed that the fee was premature and could subject the Debtors to tax liability in the future.  And

14

they also understood that *res judicata* bars a debtor's claims against a third party when those claims are not asserted in objection to the third party's fee application. *See In re Intelogic Trace, Inc. (Osherow v. Ernst & Young, LLP)*, 200 F.3d 382, 386–91 (5th Cir. 2000). In fact, once it became clear that LKC intended to file its fee application, counsel for Debtors emailed B&T that "**We have to bring all counterclaims to preserve them.**" Ex. 4, 8/22/25 Emails from Counsel for Debtors (citing *Osherow v. Ernst & Young*) (emphasis added). B&T wanted to avoid the risk of waiving a claim that the Special Committee, Debtors, and counsel for Debtors endorsed and had evidence to support in the form of Mr. Wheeler's expert opinions.

43.    What's more, on September 4, 2025, weeks before B&T filed the Special Committee's claim against LKC, B&T communicated to counsel for LKC that they had to assert any claims in connection with the fee application. *See Intelogic*, 200 F.3d at 386–91. B&T and counsel for LKC spoke again on September 9, this time to try and extend the Special Committee's deadline to respond to the fee application, which may have avoided the need to file a counterclaim altogether. If the Debtors and Whinstone had reached an agreement on the tax allocation, or if the Court resolved any dispute between them, then LKC's fee application would no longer be premature. But counsel for LKC did not agree to this extension. Lastly, the day before filing the counterclaim, B&T again reached out to counsel for LKC to inform them of the claim. Ex. 5, Sept. 2025 Emails from Trace Schmeltz. At no point during any of these communications did counsel for LKC convey that B&T was engaging in sanctionable behavior.

44.    Not long after the Special Committee filed its objection, counsel for Debtors filed a Motion to Enforce the Purchase and Sale Agreement with Whinstone US, Inc. ECF No. 1881. The motion explained that under § 2.3 of the PSA, if the parties could not resolve their dispute over the Allocation Statement, this Court had to step in. *Id.* at ¶¶ 6–7. The Debtors and Whinstone

had been negotiating in good faith but had been unable to reach an agreement. *Id.* at ¶¶ 8–9. The Debtors therefore submitted their proposed allocations under the Allocation Statement to the Court. *Id.* at ¶ 11.

45. The Debtors' proposed allocation aligned with the Special Committee's position that LKC was using outdated, inflated numbers for its success fee. More specifically, the Debtors allocated $75 million of the $185 million Purchase Price to the settlement of claims. *Id.* This was consistent with the Special Committee's argument, advanced by B&T, that LKC's $100 million figure was too high of a starting point. *See* Ex. 3, Hearing Ex. 201.007. In short, LKC seeks to sanction B&T for taking a position that counsel for other parties also endorsed and presented to this Court.

**G.      The Special Committee, By Agreement, Withdraws Its Breach-of-Fiduciary-Duty Claim, and the Court Hears Evidence on the Fee Dispute Over Four Days**

46. On October 29, 2025, during the deposition of Mr. Topping, Mr. Schmeltz and counsel for LKC reached an agreement to withdraw the Special Committee's breach-of-fiduciary-duty claim. Ex. 6, 10/29/25 Topping Dep. Tr. at 52–53. This agreement addressed the dispute at LKC's first and only attempt to elicit deposition testimony on this topic. B&T filed a formal withdrawal with the Court a couple of days later. *See* ECF No. 1930. The Special Committee decided to withdraw its claim for trial purposes. LKC agreed to forgo discovery in exchange for the withdrawal, so the parties essentially narrowed the issues for trial. Ex. 7, Withdrawal Email ("As a result, I will forgo discovery into these issues, including deposing Mr. Topping.").

47. The Court then held hearings on the fee dispute over four days: November 3, December 3, December 11, and December 17, 2025.

48. At these hearings, B&T presented evidence that the Debtors' and the Special Committee's valuation of the claims settlement at $75 million was appropriate, as opposed to

LKC's $100 million figure.  Ex. 1, Hearing Ex. 245.001–08; Ex. 8, Nov. 3, 2025 Hearing Tr. at 122:3–124:22, 201:20–202:14; Ex. 9, Dec. 3, 2025 Hearing Tr. at 175:17–177:8, 178:2–180:4, 202:1–206:25; Ex. 2, Dec. 11, 2025 Hearing Tr. at 14:11–15:3.

49.     For example, Kevin Hays, the Debtors' Chief Financial Officer, testified that the starting point of $75 million for calculating LKC's success fee was in line with the presentation made to the Debtors' Board in March 2025, which occurred before any dispute arose over the success fee.  Ex. 9, Dec. 3, 2025 Hearing Tr. at 202:1–206:25.  And one of the Special Committee members, David Eaton, testified that $75 million was at the high end of a reasonable range to calculate the success fee but that the Special Committee nevertheless accepted it.  Ex. 2, Dec. 11, 2025 Hearing Tr. at 14:14–15:3.

50.     As to the prematurity argument, B&T elicited testimony from David Eaton, one of the members of the Special Committee, that for tax purposes, it was appropriate to use the same allocation in the Allocation Statement between the Debtors and Whinstone as in the calculation of the success fee.  *Id.* at 7:9–24.  Mr. Eaton stated, "I'm also satisfied that using $75 million gives us one set of operative facts for tax purposes, which I understand to be important in the face if there's ever an IRS audit."  *Id.* at 8:4–7.

51.     Additionally, Mr. Wheeler's testimony was consistent with his declaration that the tax allocation should happen before any calculation of LKC's success fee in order to avoid any audit risk to the Debtors.  *See* 1732-1 at 7.  Mr. Wheeler testified that it would not violate *the PSA* if the Debtors and Whinstone reached a different allocation in the Allocation Statement than the Debtors and LKC did for purposes of the success fee calculation.  Ex. 9, Dec. 3, 2025 Hearing Tr. at 119:24–120:2.  But Mr. Wheeler clarified that he was asked to advise only on "matters related to the *tax filings*," not on what constitutes a breach of the PSA.  *Id.* (emphasis added).  Moreover,

17

Mr. Wheeler never denied, retracted, or contradicted his earlier declaration that for tax purposes, the Allocation Statement should accord with the allocation made for LKC's success fee.

52.     After the four-day fee dispute hearing, the Court granted LKC's fee application. *See* ECF No. 2198. The Special Committee, the Ad Hoc Group of SAFE Parties, and GXD Labs, as Plan Administrator for the Wind-Down Debtor, appealed the Court's order. ECF Nos. 2213, 2214, 2275, 2276.

## LEGAL STANDARD

53.     The Fifth Circuit has "confined sanctions under the district court's inherent power to instances of bad faith or willful abuse of the judicial process." *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990); *see also In re Moore*, 739 F.3d 724, 729 (5th Cir. 2014). "Because of the potency of inherent powers and the limited control of their exercise, . . . they must be used with great restraint and caution." *Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996).

54.     "[B]efore imposing sanctions under its inherent power, a court must make a *specific* finding that the sanctioned party acted in 'bad faith.'" *Maguire Oil Co. v. City of Houston*, 143 F.3d 205, 209 (5th Cir. 1998). "Bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; … it contemplates a state of mind affirmatively operating with furtive design or ill will." *Miller v. Dunn*, 774 F. Supp. 3d 806, 818 (N.D. Tex. 2024) (quotations omitted). "And bad faith requires more than just meritless claims." *Id.* at 819. "[T]he finding of bad faith must be supported by clear and convincing proof." *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001).

55.     Additionally, under § 105(a) of the Bankruptcy Code, "a bankruptcy court can issue any order, including a civil contempt order, necessary or appropriate to carry out the provisions of

the bankruptcy code." *Matter of Terrebonne Fuel & Lube, Inc.*, 108 F.3d 609, 613 (5th Cir. 1997). Under § 105(a), however, the court "still must make a specific finding of bad faith." *In re Pastran*, 462 B.R. 201, 210 (Bankr. N.D. Tex. 2011) (quotations omitted).

56.     Lastly, LKC invokes 28 U.S.C. § 1927.  The Fifth Circuit has held that the terms "unreasonably" and "vexatiously" from § 1927 "require[] that there be evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court" to satisfy § 1927.  *Edwards v. Gen. Motors Corp.*, 153 F.3d 242, 246 (5th Cir. 1998).

## ARGUMENT

### A.     B&T did not file baseless claims or allegations against LKC

57.     The breach-of-fiduciary-duty claim that B&T brought on behalf of the Special Committee against LKC was neither baseless nor brought in bad faith.  Rather, as explained above, it was supported by expert testimony from Mr. Wheeler, who stated that an inconsistency between the Allocation Statement and the calculation of LKC's success fee could subject the Debtors to audit risk or tax liability.  ECF No. 1732-1 at 7.  And under binding Fifth Circuit precedent, B&T had to assert this claim in connection with the Special Committee's objection to LKC's fee dispute or waive it.  *See In re Intelogic Trace, Inc.*, 200 F.3d 382, 386–91 (5th Cir. 2000).  The Debtors, the Special Committee, and counsel for the Debtors all endorsed the claim and provided B&T with legal and factual evidence in support.

58.     LKC's allegation that B&T could not articulate any factual basis for this claim is simply inaccurate.  ECF No. 2303 at ¶ 65.  The claim itself outlines its factual basis: "LKC breached its fiduciary duty by demanding fees . . . in such a manner that, if Rhodium acquiesced, would create substantial liability."  ECF No. 1732 at ¶ 55.  During telephone conversations before the claim was filed, Mr. Schmeltz explained to counsel for LKC that he was *investigating* claims

19

against LKC based on its fee application.  Even the declaration from LKC's counsel bears this out: "During several previous meet-and-confer phone calls and correspondence, the Special Committee's counsel has not articulated any claim the Debtors may have against LKC **but indicated that the potential claims have to do with the filing of LKC's** *Second and Final Application for Payment of Compensation and Reimbursement of Expenses for the Period August 28, 2024 through June 30, 2025* (ECF No. 1560)."  ECF No. 1633-1 at 4, ¶ 8 (emphasis added).

59.    LKC's allegation that B&T filed the breach claim "publicly to defame LKC" is, again, inaccurate.  ECF No. 2303 at ¶ 65.  In fact, *LKC* was the first to file any allegation of misconduct into the public record.  As explained above, B&T sent LKC a *private* letter outlining the Special Committee's concerns of misconduct, and LKC turned around and filed that letter into the record.  *See* ECF No. 1529-2.  LKC complains of a problem of its own making.

60.    The cases that LKC cites to support its argument are easily distinguishable.  First, in *Deutsch v. Henry*, No. A-15-CV-1238-LY-ML, 2016 WL 7165993 (W.D. Tex. Dec. 7, 2016), *aff'd*, No. 1:15-CV-490-LY, 2017 WL 5652384 (W.D. Tex. Mar. 28, 2017), the plaintiff's lawyer called defense counsel racist, anti-Semitic, or schizophrenic in over 113 court filings, and that same lawyer filed fabricated evidence with the court.  *Id.* at *17–18.  B&T has done nothing of the sort.

61.    Second, in *Redd v. Fisher Controls*, 147 F.R.D. 128 (W.D. Tex. 1993), the court applied Rule 11, not its inherent authority, and the plaintiff's lawyer accused defense counsel of "hav[ing] resorted to Hitlerian rhetorical ploy called the 'Big Lie'" and of running up large fees and refusing to settle when it was in the client's best interest to do so.  *Id.* at 131–32.  The court found that "there is no question [the lawyer] performed no reasonable inquiry to ascertain the truth before signing his name to the document," *id.* at 132, but the same cannot be said of B&T.  B&T

20

supported its allegations with an expert declaration, *see* ECF No. 1732-1, and it did not act in bad faith.

62. Third, the case of *Olmstead v. Hoppe*, No. 5:19-CV-203, 2020 WL 1482324 (N.D. Tex. 2020) involved a pro se litigant who accused various attorneys and judges of criminal conspiracy. *Id.* at *1, *4–5. The litigant had done so in multiple cases, and the court issued a pre-filing injunction. The facts of *Olmstead* are nothing like this case.

63. Lastly, the case of *Matter of Carroll*, 850 F.3d 811 (5th Cir. 2017) involved repeated violations of court orders and does not apply here. The vexatious litigants in that case "spent *nearly fifteen years* scheming to retain assets and rebuff creditors through several bankruptcy cases they filed for themselves and entities they controlled." *In re Carroll*, No. 08-10756, 2016 WL 1084287, at *1 (Bankr. M.D. La. Mar. 17, 2016) (emphasis added), *aff'd sub nom. Carroll v. Abide*, No. 316CV00218JWDRLB, 2016 WL 4127768 (M.D. La. Aug. 2, 2016), *aff'd sub nom. Matter of Carroll,* 850 F.3d 811 (5th Cir. 2017). The litigants had been held in contempt on multiple occasions for failing to abide by the bankruptcy court's orders. *Id.* at *3–4. Ultimately, the court enjoined the litigants from filing further pleadings absent court approval, and it sanctioned them $49,432. *Id.* at *10.

64. As for LKC's allegations of "verbal abuse" during a deposition, the record reflects that LKC attorney Jonathan Cohn was not without blame. When asked about his history with multiple lawyers and witnesses in this case, Mr. Cohn launched into an *ad hominem* attack on Mr. Schmeltz. Ex. 10, Cohn Dep. Tr. at 406:13–408:10. The exchange between Mr. Schmeltz and Mr. Cohn serves as an example of two lawyers getting caught up in the heat of litigation, but it is not a proper basis for sanctions here. *See Tajonera v. Black Elk Energy Offshore Operations, LLC*,

No. CV 13-0366, 2015 WL 13533520, at *7 (E.D. La. Sept. 30, 2015) ("The question was improper, but not so much as to be sanctionable standing alone.").

65.      LKC has no evidence of B&T's bad faith, much less "clear and convincing proof" of the same. *Crowe*, 261 F.3d at 563. The "dishonest purpose or moral obliquity" that LKC attributes to B&T is unfounded. B&T had no reason to harass LKC or delay its success fee. LKC's complaint of "eight months of delay" is also off-base, as the Court did not even grant the updated retention order until July 8, 2025. ECF No. 1418. B&T owed a fiduciary duty to its own client to ensure it was not paying an unreasonably high fee, and B&T discharged that duty by presenting reasonable, good-faith arguments to the Court.

## B.      B&T Did Not Make Knowing Misrepresentations to the Court

66.      LKC contends that B&T somehow knew that the tax allocation between the Debtors and Whinstone was unrelated to the success fee calculation yet represented otherwise to the Court. This is incorrect for a number of reasons. First, LKC argues that Mr. Topping undercut B&T's position on this issue, but LKC mischaracterizes Mr. Topping's deposition testimony on this point. Mr. Topping testified that it was *possible* that Debtors and Whinstone reach one allocation and Debtors and LKC reach another, but that it was unlikely given the connection between the two. Ex. 11, 6/2/25 Topping Dep. Tr. at 80:14–20. This is consistent with the Special Committee's position and the arguments advanced by B&T. B&T contended that the calculation of LKC's success fee should happen after the completion of the Allocation Statement because of the tax implications of the latter. *See* ECF No. 1732-1 at 7. It was of course possible that the two allocations might diverge, but that divergence would open the Debtors up to audit risk. *See id.*; Ex. 2, Dec. 11, 2025 Hearing Tr. at 8:4–7.

22

67.     Second, LKC cites to a statement from *Debtors' counsel* in support of the argument that *B&T* made knowing misrepresentations to the Court.  ECF No. 2303 at ¶ 74.  B&T cannot be responsible for the statements of counsel for other parties.  No lawyer from B&T represented to the Court that the tax allocation was unconnected to LKC's success fee.  Counsel for the Debtors did not speak for B&T or the Special Committee on this issue, and in any event counsel for Debtors had already aligned with the Special Committee's position that the value of Debtors' claims was $75 million.  *See* ECF No. 1881 at ¶ 11.

68.     Lastly, LKC cites an amended declaration from Mr. Wheeler in which he explains that after discussions with Whinstone's tax advisors, the parties "agreed that the only item to be reported on Form 8594, Asset Acquisition Statement Under Section 1060, was the tangible assets." ECF No. 2303 at ¶ 74 (citing ECF No. 2140 at ¶ 10).  But, again, this is not inconsistent with B&T's representations.  As explained above, B&T reasonably believed that the valuation of the tangible assets had downstream effects on LKC's success fee.  *See supra* ¶¶ 11–12.  If, for example, the tangible assets were valued at $100 million, then LKC's $100 million valuation of the claims would be a non-starter (because only $85 million of the global settlement would remain).  B&T reasonably argued that the calculation of LKC's success fee was connected to the valuation of the tangible assets—as Mr. Wheeler's uncontradicted, unwithdrawn declaration made plain.  *See* ECF No. 1732-1 at ¶ 27; ECF No. 1258 at 47.

### C.     B&T Did Not Unreasonably and Vexatiously Multiply the Proceedings

69.     LKC charges B&T with refusing to negotiate LKC's success fee in good faith.  But as explained above, the evidence presented at trial shows otherwise.

70.     Between May 29, 2025 and July 31, 2025, B&T communicated with counsel for LKC, attempting to negotiate the success fee.  ECF 1530 at ¶ 20.  On May 31, 2025, in response

to a settlement offer from LKC, Mr. Schmeltz made a counteroffer.  Ex. 3, Hearing Ex. 201.007.  Mr. Schmeltz explained the logic behind this counteroffer and even represented, "**I think there is a number between our $3.8 million and your $8.1 million at which we can settle**."  *Id.* (emphasis added).  After some back and forth, counsel for LKC conveyed an ultimatum that "[i]f the Debtors want the negotiations to continue, they need to make an offer above $5.2 million."  *Id.* at 201.006.  Mr. Schmeltz responded that he was prepared to make one additional offer, but negotiations broke down thereafter.  LKC's accusation that through these negotiations B&T "abdicated its fiduciary duties to the Debtors and the estate" is false.  Negotiating in good faith to reach a reasonable settlement value with the client's approval is entirely appropriate.

71.    LKC makes much of an alleged comment from Mr. Schmeltz as to a "new master," referring to the SAFE Ad Hoc Group.  ECF No. 2303 at ¶ 26.  But in reality, Mr. Schmeltz was simply acknowledging the fact that the Debtors had to discharge their duties to all their stakeholders, including to the estate's largest creditor.  Indeed, as the subsequent Plan Support Agreement would reflect, the Debtors agreed to "not settle the dispute regarding Lehotsky Keller Cohn's accrued and unpaid fees and expenses without the consent of the SAFE AHG."  ECF No. 1747 at 6.

72.    Further, LKC's accusation of "scorched-earth litigation strategy" rings hollow when it is the one moving for sanctions.  And when LKC demanded over seven depositions and argued that the production of over 5,000 documents was not enough.  The evidence shows that B&T communicated regularly with counsel for LKC regarding the Special Committee's objection to the fee application.  Ex. 5, Sept. 2025 Emails from Trace Schmeltz (sending counsel for LKC draft of motion for extension of time to file objection); *see* also ECF No. 1529-2.  B&T told counsel for LKC of the risk of waiving counterclaims if they were not asserted in objection to the fee

24

application.  And B&T tried to extend the deadline to respond to the fee application and potentially obviate any claim of misconduct, but LKC refused.   B&T informed LKC of the Special Committee's incoming claim for breach of fiduciary duty before filing it.  Ex. 5, Sept. 2025 Emails from Trace Schmeltz.  This behavior does not constitute unreasonable and vexatious multiplication of proceedings.

### D.      The Court Should Not Award LKC Attorneys' Fees

73.      LKC has not shown that it is entitled to sanctions against B&T.  LKC has failed to offer "clear and convincing proof" of bad faith or willful abuse of the judicial process on B&T's part.  *See Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001).  "The standards for bad faith are necessarily stringent."  *Batson v. Neal Spelce Assocs.*, Inc., 805 F.2d 546, 550 (5th Cir. 1986).  "A party should not be penalized for maintaining an aggressive litigation posture."  *Id.*  That is precisely what LKC seeks to do here.

### E.      Section 328 Does Not Apply and Even If It Did, LKC Does Not Satisfy It

74.      In the alternative, LKC asks for additional compensation under 11 U.S.C. § 328(a).  LKC argues that the terms and conditions of its retention were "prove[n] to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."  11 U.S.C. § 328(a).

75.      First, § 328(a) does not even apply in this setting.  The plain language of the statute contemplates that the trustee or committee would engage a professional to render services *to the trustee or committee,* and not for themselves.  *See In re Boomerang Tube, Inc.*, 548 B.R. 69, 78 (Bankr. D. Del. 2016) ("[S]ection 328(a) permits only approval of fees or expenses for performing services for the Committee.").  LKC seeks fees solely for itself, not for any services performed for the Debtors.

76.     But even if § 328(a) applied, LKC could not satisfy its requirements.  The Fifth Circuit has explained that § 328(a) "creates a 'high hurdle' for a movant seeking to revise the terms governing a professional's compensation *ex post facto*."  *In re ASARCO, L.L.C.*, 702 F.3d 250, 258 (5th Cir. 2012).  "[T]he movant is tasked with the weightier burden of proving that the subsequent developments were *incapable* of being anticipated at the time the engagement was approved."  *Id.* (emphasis added).  "Likewise, before a court may revise a compensation agreement, it must explain with specificity why the subsequent developments were 'incapable of being foreseen.'"  *Id.* (quoting *In re Barron*, 325 F.3d 690, 693 (5th Cir. 2003)).

77.     LKC's Motion does not explain why it was *incapable* of foreseeing a fee dispute from the Special Committee.  LKC's position is ironic given that it signed an engagement letter that *explicitly stated* that fee disputes would be submitted to this Court for resolution.  *See* ECF No. 835 at 14–15.  LKC cannot claim to be surprised when such a dispute arises and is submitted to the Court, and the dispute certainly was not incapable of being foreseen.  LKC argues that the Special Committee "disregard[ed] . . . the terms approved in the Court's updated retention order," ECF No. 2303 at ¶ 83, but that is untrue.  As explained above, the Court's updated retention order expressly contemplated that fee disputes may arise in the future.  *See* ECF No. 1418 at 18.

## **CONCLUSION**

78.     For these reasons, B&T respectfully requests that the Court deny Lehotsky Keller Cohn LLP's Motion for Sanctions against Barnes & Thornburg LLP, or, in the Alternative, for Payment of Fees and Expenses under Section 328 (ECF No. 2303).

**BECK REDDEN LLP**

By: */s/ David J. Beck*
David J. Beck
State Bar No. 00000070
dbeck@beckredden.com
David T. Judd
State Bar No. 24149115
djudd@beckredden.com
1221 McKinney St., Suite 4500
Houston, Texas 77010-2010
(713) 951–3700
(713) 951–3720 – Fax

ATTORNEYS FOR BARNES &
THORNBURG LLP

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument was served upon counsel of record on March 6, 2026, in accordance with the Federal Rules of Civil Procedure.

*/s/ David J. Beck*

27