**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RHODIUM ENCORE LLC, et al., | § | Case No. 24-90448 (ARP) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |

**DAVID EATON AND SPENCER WELLS'S RESPONSE TO
LEHOTSKY KELLER COHN LLP'S MOTION FOR SANCTIONS AGAINST THE
SPECIAL COMMITTEE OF RHODIUM ENTERPRISES, INC.'S BOARD OF
DIRECTORS AND ITS COUNSEL BARNES & THORNBURG LLP, OR, IN THE
ALTERNATIVE, FOR PAYMENT OF FEES AND EXPENSES UNDER SECTION 328**

---

[1] Debtors in these chapter 11 cases and the last four digits of their corporate identification numbers are as follows: Rhodium Encore LLC (3974), Jordan HPC LLC (3683), Rhodium JV LLC (5323), Rhodium 2.0 LLC (1013), Rhodium 10MW LLC (4142), Rhodium 30MW LLC (0263), Rhodium Enterprises, Inc. (6290), Rhodium Technologies LLC (5868), Rhodium Ready Ventures LLC (8618), Rhodium Industries LLC (4771), Rhodium Encore Sub LLC (1064), Jordan HPC Sub LLC (0463), Rhodium 2.0 Sub LLC (5319), Rhodium 10MW Sub LLC (3827), Rhodium 30MW Sub LLC (4386), and Rhodium Renewables Sub LLC (9511). The mailing and service address of Debtors in these chapter 11 cases is 2617 Bissonnet Street, Suite 234, Houston, TX 77005.

**Page**

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................... 4

    A. The Debtors and LKC entered into a revised engagement letter that expressly contemplated the Debtors resolving their dispute with Whinstone through a sale of assets. ................................................................. 4

    B. The Debtors entered into a settlement agreement with Whinstone that included a sale and purchase of assets. ...................................................... 5

    C. The Debtors attempted to negotiate in good faith the amount of LKC's success fee. ................................................................................................ 6

    D. LKC filed its Fee Application. ...................................................................... 7

    E. The Special Committee, on the Debtors' behalf, raised reasonable objections to LKC's Fee Application. ........................................................... 8

    F. After certain payments to LKC, additional settlement negotiations, and a hearing, the Court approved LKC's Fee Application. ................................. 9

    G. LKC moved for sanctions and filed claims against the Special Committee. ........... 10

III. ARGUMENT ...................................................................................................... 10

    A. The Court cannot sanction the Special Committee under 28 U.S.C. § 1927 because the Special Committee is a represented party ............................................ 10

    B. LKC cannot meet the high bar for inherent-authority sanctions in the face of the Special Committee's good-faith conduct. ........................................... 11

        i. The Court exercises its inherent power to sanction litigants with restraint and discretion. ............................................................... 12

        ii. The Special Committee's objections to LKC's Fee Application were reasonable and made pursuant to the Debtors' statutory and contractual rights. ...................................................................... 14

            a. Objections to final fee applications are authorized under 11 U.S.C. § 330(a)(2) and routine. ................................................. 15

            b. LKC's revised engagement letter expressly contemplated judicial resolution of the amount of LKC's success fee. ........................... 16

            c. The Special Committee reasonably argued that LKC's success fee calculation was overstated because the Whinstone settlement was primarily an asset sale. ................................................... 17

            d. The Special Committee reasonably argued that LKC's Fee Application included unrecoverable fees for work performed by Porter Hedges. ...................................................................... 20

            e. The Special Committee reasonably argued that LKC's Fee Application was premature. ............................................................. 21

i

iii.    The Special Committee asserted a breach of fiduciary duty claim against LKC on the Debtors' behalf in good faith. ................................... 22

        a.    The Special Committee asserted the breach of fiduciary duty claim to avoid waiver after LKC refused to extend the Special Committee's time to object to LKC's Fee Application. ................ 22

        b.    The breach of fiduciary duty claim was colorable. ........................ 23

        c.    Federal and bankruptcy laws required the Special Committee to file the breach of fiduciary claim publicly. ................................... 25

iv.    The Special Committee's litigation conduct was routine and reasonable. ............................................................................................ 26

C.    *ASARCO* bars LKC's attempt to collect attorneys' fees and expenses for defending its Fee Application under 11 U.S.C. § 328. ............................................ 29

IV.    CONCLUSION ............................................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*,
     352 S.W.3d 445 (Tex. 2011)....................................................................................................15

*Baker Botts L.L.P. v. ASARCO LLC*,
     576 U.S. 121 (2015)..............................................................................14, 28, 29, 30, 31

*Barron & Newburger, P.C. v. Texas Skyline, Ltd. (In re Woerner)*,
     783 F.3d 266 (5th Cir. 2015) ...............................................................................................14

*Chambers v. NASCO, Inc.*,
     501 U.S. 32 (1991)....................................................................................................11, 12, 28

*Day v. Amoco Chemicals Corp.*,
     595 F. Supp. 1120 (S.D. Tex. 1984) ....................................................................................28

*Dean v. Riser*,
     240 F.3d 505 (5th Cir. 2001) ...............................................................................................23

*Elliott v. Tilton*,
     64 F.3d 213 (5th Cir. 1995) ..................................................................................................12

*First United Pentecostal Church of Beaumont v. Parker*,
     514 S.W.3d 214 (Tex. 2017)....................................................................................3, 22, 26

*Goodyear Tire & Rubber Co. v. Haeger*,
     581 U.S. 101 (2017).................................................................................................................10

*Hardt v. Reliance Std. Life Ins. Co.*,
     560 U.S. 242 (2010).................................................................................................................29

*In re ASARCO, L.L.C.*,
     702 F.3d 250 (5th Cir. 2012) ........................................................................................16, 30

*In re Boomerang Tube, Inc.*,
     548 B.R. 69 (Bankr. D. Del. 2016) .................................................................................29, 30

*In re Cano*,
     410 B.R. 506 (Bankr. S.D. Tex. 2009) ................................................................................28

*In re Cleveland Imaging & Surgical Hosp.*,
     L.L.C., 26 F.4th 285 (5th Cir. 2022)....................................................................................13

*In re Danner*,
2012 WL 3205242 (B.A.P. 9th Cir. July 31, 2012) ...................................................................29

*In re Digerati Technologies, Inc.*,
537 B.R. 317 (Bankr. S.D. Tex. 2015) ...................................................................................14

*In re Feldman*,
597 B.R. 448 (Bankr. E.D.N.Y. 2019)...................................................................................10

*In re Gen. Homes Corp.*,
181 B.R. 898 (Bankr. S.D. Tex. 1995) ...................................................................................24

*In re Haney*,
2022 WL 412809 (Bankr. N.D. Ala. Feb. 10, 2022) ..............................................................13

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*,
517 F.3d 220 (5th Cir. 2008) ...................................................................................................15

*In re Huepenbecker*,
546 B.R. 381 (Bankr. W.D. Mich. 2015)................................................................................28

*In re Intelogic Trace, Inc.*,
200 F.3d 382 (5th Cir. 2000) ...................................................................................................22

*In re King*,
546 B.R. 682 (Bankr. S.D. Tex. 2016) ...................................................................................26

*In re Moore*,
739 F.3d 724 (5th Cir. 2014) .............................................................................................11, 12

*In re N. Bay Gen. Hosp., Inc.*,
404 B.R. 429 (Bankr. S.D. Tex. 2009) ...................................................................................25

*In re Parsley*,
384 B.R. 138 (Bankr. S.D. Tex. 2008) ..............................................................................12, 24

*In re Prof'l Fee Matters Concerning Jackson Walker Law Firm*,
663 B.R. 335 (Bankr. S.D. Tex. 2024) ...................................................................................11

*In re Raocore Tech., LLC*,
2025 WL 828880 (Bankr. D.D.C. Feb. 20, 2025) ..................................................................29

*In re Rodriguez*,
652 B.R. 750 (Bankr. S.D. Tex. 2023) .........................................................................12, 14, 24

*In re Ruth*,
473 B.R. 152 (Bankr. S.D. Tex. 2012) ...................................................................................26

iv

*In re SkyPort Global Commc'ns, Inc.*,
  528 B.R. 297 (S.D. Tex. 2015) ..................................................................................11

*In re Vaughn*,
  660 B.R. 827 (Bankr. S.D. Ohio 2024).....................................................................28

*In re Yorkshire, LLC*,
  540 F.3d 328 (5th Cir. 2008) ....................................................................................13

*Matta v. May*,
  118 F.3d 410 (5th Cir. 1997) ....................................................................................10

*McCollum v. Jacobs Eng'g Grp., Inc.*,
  992 F. Supp. 2d 680 (S.D. Miss. 2014)......................................................................23

*Michael v. Boutwell*,
  138 F. Supp. 3d 761 (N.D. Miss. 2015)....................................................................12

*Miller v. Dunn*,
  774 F. Supp. 3d 806 (N.D. Tex. 2024), *aff'd sub nom.*, 2025 WL 3231718 (5th
  Cir. Nov. 19, 2025) ...................................................................................11, 12, 14, 21

*Pressey v. Patterson*,
  898 F.2d 1018 (5th Cir. 1990) ..................................................................................12

*Smith Int'l, Inc. v. Tex. Commerce Bank*,
  844 F.2d 1193 (5th Cir. 1988) ..................................................................................10

*United States v. Sutton*,
  786 F.2d 1305 (5th Cir. 1986) ..................................................................................12

*Walters v. Tenant Background Search*,
  849 F. App'x 476 (5th Cir. Mar. 12, 2021).............................................................26

**STATUTES**

11 U.S.C. § 328(a) ..........................................................................................................30

11 U.S.C. § 107(a) ..........................................................................................................24

11 U.S.C. § 327(a) ..........................................................................................................14

11 U.S.C. § 330(a)(1)(B) ...............................................................................................20

11 U.S.C. § 330(a)(2)...........................................................................................13, 14, 15

28 U.S.C. § 1927..............................................................................................................10

David Eaton and Spencer Wells, in their capacities as former members of the Special Committee of the Board of Directors of Rhodium Enterprises, Inc. (the "Special Committee"), one of the debtors in the above-captioned chapter 11 cases (collectively, the "Debtors" or "Rhodium"), file this response to the Motion for Sanctions [ECF No. 2303] (the "Motion") filed by Lehotsky Keller Cohn LLP ("LKC").

## I. INTRODUCTION

1. The Court should deny the Motion. The Special Committee at all times acted reasonably and in good faith in objecting to LKC's final fee application (the "Fee Application"), and did so in a manner consistent with its fiduciary duties.

2. This dispute arises out of the resolution of the Debtors' chapter 11 cases, which were funded primarily through a settlement between the Debtors and Whinstone U.S., Inc. ("Whinstone"), pursuant to which Whinstone acquired certain of the Debtors' assets and the Debtors and Whinstone settled their claims against one another. Mr. Eaton and Mr. Wells, in their capacities as former members of the Board of Directors of Rhodium, helped guide the Debtors through these chapter 11 cases, including overseeing negotiations of, and approving, the Debtors' settlement with Whinstone. Notably, all creditors were paid in full on their allowed secured and general unsecured claims, including post-petition interest—a rare outcome in bankruptcy proceedings. LKC served as special litigation counsel to the Debtors in their dispute with Whinstone.

3. Following the Whinstone settlement, LKC filed its Fee Application seeking approximately $11.5 million in total fees and expenses based on its interpretation of its revised engagement letter with the Debtors. That agreement—which this Court approved—includes a possible success fee turning on whether Rhodium was ultimately sold in a settlement, and on the amount of (i) any energy credits recovered by the Debtors from Whinstone, and (ii) any additional

1

damages recovered by the Debtors from Whinstone not attributable to energy credits.  The Debtors and LKC agreed that if Whinstone acquired the Debtors in a transaction that resolved the Debtors' dispute with Whinstone, the Debtors and LKC would negotiate in good faith the portion of the transaction value to the Debtors allocable to (i) the energy credits and (ii) the additional damages. The Debtors and LKC further agreed that if they were unable to agree on an allocation, this Court would resolve the dispute.  In its Fee Application, LKC asserted it was owed a success fee of approximately $8.9 million.

4.        The Debtors reached a different, reasonable calculation of LKC's success fee, and the Special Committee, acting on the Debtors' behalf solely due to a perceived conflict of the Debtors' bankruptcy counsel, filed an objection to LKC's Fee Application (the "Objection").  The Special Committee, in coordination with the Debtors' counsel and their officers and other directors, filed its Objection in the ordinary course of these chapter 11 cases, in an exercise of its fiduciary duties, pursuant to the Debtors' statutory authority to scrutinize and object to fee applications under 11 U.S.C. § 330, and in accordance with the dispute-resolution mechanism set forth in LKC's revised engagement letter.

5.        Following a four-day evidentiary hearing, the Court approved LKC's Fee Application and awarded LKC $11,671,994.33 for compensation and reimbursement of expenses. That order has been appealed.  ECF Nos. 2213 and 2214.  LKC now seeks an additional award of more than $1.5 million in attorneys' fees and expenses through its Motion.[2]

---

[2] LKC has also filed an adversary complaint and administrative expense claim seeking recovery of the same fees and expenses.  *See* ECF No. 2299, Adv. Proc. No. 26-3051.

6.      LKC's request for additional compensation is meritless under all three avenues LKC pursues: (i) sanctions under 28 U.S.C. § 1927; (ii) sanctions under the Court's inherent authority; and (iii) attorneys' fees and expenses under 11 U.S.C. § 328.

7.      *First*, LKC's request for sanctions against the Special Committee under Section 1927 fails at the start because that statute provides courts authority to sanction attorneys, not represented parties.  Because the Special Committee unquestionably is a represented party, the Court cannot sanction it under Section 1927.

8.      *Second*, LKC's request for sanctions under the Court's inherent authority is equally unmeritorious because the Special Committee acted in good faith throughout these chapter 11 cases, and LKC does not satisfy the demanding standard required to impose inherent-authority sanctions.  The Special Committee's objections to LKC's Fee Application were grounded in the Debtors' reasonable interpretation of LKC's revised engagement letter and a legitimate dispute over the calculation of LKC's success fee.  The Special Committee asserted a colorable breach of fiduciary duty claim against LKC on the Debtors' behalf in an abundance of caution to preserve it under Fifth Circuit precedent that requires parties to raise such claims in connection with fee applications.  And the Special Committee properly filed its objection publicly in compliance with federal law and 11 U.S.C. § 107, which establishes a strong presumption in favor of public access to court records.

9.      *Third*, LKC's request for additional compensation under 11 U.S.C. § 328 is barred by Supreme Court precedent that prohibits counsel retained by the bankruptcy estates from collecting attorneys' fees and expenses for defending their own fee applications.  The request under Section 328 also fails because LKC seeks compensation for anticipated services performed for itself.

3

10. The Special Committee exercised the Debtors' statutory and contractual rights—and fulfilled its fiduciary duties—by objecting to LKC's sizeable Fee Application and presenting the dispute to this Court for resolution, precisely as LKC's revised engagement letter contemplated and LKC agreed. The Court's ultimate approval of LKC's Fee Application, which the Special Committee does not seek to relitigate here, does not retroactively transform the Special Committee's good-faith conduct in connection with the success fee dispute into sanctionable behavior, and LKC cannot circumvent the Supreme Court's prohibition on counsel retained by the bankruptcy estates recovering "fees on fees" through its Motion. The Court should deny the Motion in its entirety.

## II.        FACTUAL BACKGROUND

**A.     The Debtors and LKC entered into a revised engagement letter that expressly contemplated the Debtors resolving their dispute with Whinstone through a sale of assets.**

11. Between February 19 and March 18, 2025, the Debtors and Whinstone engaged in mediation to resolve their dispute, including the claims that LKC had been retained to pursue on the Debtors' behalf. ECF No. 1732-2 ¶ 4. LKC participated in preparing information for the Debtors relating to settlement strategy and rough numbers estimating potential settlement amounts. *Id*. ¶ 6. However, while LKC attended initial mediation meetings, it was not present or actively involved in later settlement discussions between the Debtors and Whinstone, including the final settlement meetings where the parties ultimately achieved a resolution or discussed potential allocation of settlement funds. Ex. A, Nov. 3, 2025 Hr'g Tr. at 128:10–11, 129:20–130:2.

12. On March 4, the Debtors and LKC entered into a revised engagement letter, which this Court approved, describing a possible success fee turning on whether Rhodium was ultimately sold in a settlement, and on the amount of (i) any energy credits recovered by the Debtors from Whinstone, and (ii) any additional damages recovered by the Debtors from Whinstone not

4

attributable to energy credits.  ECF No. 835 at 15.  This agreement provided that if Whinstone acquired the Debtors in a transaction that resolved the Debtors' dispute with Whinstone, the Debtors and LKC would determine in good faith the portion of the transaction value allocable to the energy credits and damages.  *Id*.  Further, the agreement expressly provided that if the Debtors and LKC were unable to agree on an allocation, this Court would resolve the dispute:

> [I]f you (or all or substantially all of the Rockdale assets) are acquired by Whinstone or an affiliate, in a transaction that resolves or otherwise terminates the Matter, the Client and Lehotsky Keller Cohn LLP will determine in good faith the portion of the transaction value to the Client allocable to the energy credits and damages specified in Sections (b) and (c).  If the Client and Lehotsky Keller Cohn LLP are ***unable to reach a resolution*** regarding the amount of fees payable under Sections (b) and (c), including with respect to the allocation of transaction value allocable to the energy credits and damages, ***such dispute shall be resolved by the bankruptcy court.***

*Id*. at 15 (emphasis added).

**B.      The Debtors entered into a settlement agreement with Whinstone that included a sale and purchase of assets.**

13.      As the mediation process progressed, it became apparent that the best way to "provide a return" for both stakeholders and creditors was through an asset sale.  Ex. A, Nov. 3, 2025 Hr'g Tr. at 206:8–14.  The Debtors worked with the Ad Hoc Group of SAFE Parties (the "SAFE AHG") to negotiate a settlement agreement with Whinstone (the "Settlement Agreement"), which included a deal with Whinstone that was ultimately memorialized in a Purchase and Sale Agreement (the "PSA").  ECF Nos. 1530-2, 1732 ¶ 15.  LKC did not actively participate in this negotiation.  Ex. A Nov. 3, 2025 Hr'g Tr. at 128:10–11, 129:20–130:2.  Pursuant to the PSA, Whinstone acquired certain of the Debtors' assets, and the Debtors and Whinstone also settled their claims against one another.  *Id*. ¶ 17.

14.      Under the PSA, Whinstone agreed to pay the Debtors a "Purchase Price" of $185 million to buy the assets and resolve all claims.  ECF No. 1530-3 at 11–12.  However, the PSA did

not specify what portion of the Purchase Price was for the purchase of the assets (tangible assets) versus resolution of claims (intangible assets). *Id.* Instead, the PSA required the Debtors to prepare and deliver to Whinstone an IRS Form 8594 (an "Allocation Statement") allocating the $185 million among the tangible and intangible assets in accordance with Section 1060 of the Internal Revenue Code. *Id.* at 7–8.

15.     Pursuant to Section III(2) of the Settlement Agreement, "clos[ing] the transactions contemplated by that [PSA] between [the] Debtors . . . and Whinstone" was "a condition to entering into this Agreement." ECF No. 1530–2 at 8. This included the Allocation Statement. ECF No. 1530-3 at 6–7. The PSA anticipated this transaction taking weeks as it provided Whinstone 15 days to object to the Debtors' Allocation Statement. ECF No. 1530–3 at 7. In the event Whinstone were to object to the Allocation Statement, the parties were then required to "attempt in good faith to resolve any dispute." *Id.*

**C.     The Debtors attempted to negotiate in good faith the amount of LKC's success fee.**

16.     Following the Whinstone settlement, the Debtors engaged with LKC and attempted to agree on the amount of its success fee. Ex. A, Nov. 3, 2025 Hr'g Tr. at 24:7–10. However, while LKC's revised engagement letter required the parties to determine payment allocations in good faith, it did not provide "a real playbook" for doing so, which resulted in different, but reasonable, interpretations of the success fee. *Id.* at 23:8–13.

17.     In May 2025, LKC reached out to the Special Committee offering to settle the success fee for $8.1 million, using a $100 million starting point as the estimated gross amount attributed to settled claims against Whinstone under the Settlement Agreement before further allocation under LKC's revised engagement letter. Ex. B, Nov. 3, 2025 Hr'g Ex. 201.007–08. The Special Committee countered with $3.8 million, using a $75 million starting point as the

6

estimated value of the settled claims against Whinstone.  *Id*.  The Special Committee calculated $50 million for energy credits and allocated the rest as damages.  *Id*.

18.     Between May and July 2025, the Special Committee continued to try to negotiate the success fee with LKC, informing it that the Debtors were still preparing an Allocation Statement that would value the Debtors' claims lower than LKC's $100 million estimate.  ECF No. 1530 ¶ 20.  The parties also disputed the amounts attributable to the components of the gross estimated amount attributable to claims, including the value attributable to Winter Storm Uri and Building D claims, which LKC acknowledged were uncertain.  Ex. A, Nov. 3, 2025 Hr'g Tr. at 21:1–25; 116:19–117:3.

19.     Not content to wait until the Debtors harmonized the tax allocation with Whinstone, LKC propounded discovery against the Debtors, its own clients, under Rule 2004 of the Federal Rules of Bankruptcy Procedure on August 7.  ECF No. 1515.  LKC's discovery sought extensive information related to the tax allocation.  *Id*. at 7.

20.     On August 13, the Special Committee, on the Debtors' behalf, requested that LKC withdraw its discovery requests.  ECF No. 1529-2.  The next day, LKC moved for a status conference on its Rule 2004 discovery requests, ECF No. 1529, and the Special Committee moved to quash LKC's discovery requests.

**D.     LKC filed its Fee Application.**

21.     Approximately one week later, on August 22, LKC filed its Fee Application.  ECF No. 1560.  Based on its calculation of the success fee, LKC sought approximately $11.5 million

in fees and expenses—$8,913,600 for the success fee and $2,505,848.50 for discounted hourly fees.  *Id*. at 17.[3]

22.     The Debtors asked LKC to consent to an extension of their deadline to file objections to LKC's Fee Application because they had not yet finalized the Whinstone Purchase Price allocation.  ECF No. 1633-3 ¶ 22.  The Debtors informed LKC that the Debtors would be required to include a claim for breach of fiduciary duty in any objection to the Fee Application. ECF No. 1529-2 at 3.

23.     Because LKC refused the request, the Debtors filed an emergency motion for an extension of time on September 10.  ECF No. 1626.

**E.      The Special Committee, on the Debtors' behalf, raised reasonable objections to LKC's Fee Application.**

24.     After careful review of LKC's Fee Application, the Special Committee, acting on the Debtors' behalf solely due to a perceived conflict of the Debtors' counsel, filed its Objection to the Fee Application.  ECF No. 1732.  The Special Committee raised several objections to LKC's Fee Application, including: (i) LKC's success fee calculation was overstated because the Whinstone settlement was primarily an asset sale; (ii) the Fee Application included unrecoverable fees for work performed by Porter Hedges; and (iii) the Fee Application was premature.  *Id*. ¶¶ 35– 49.  The Special Committee also asserted a claim against LKC on the Debtors' behalf for breach of fiduciary duty, noting that it did so in an abundance of caution so as not to waive it.  *Id*. ¶¶ 50– 59.

---

[3] Altogether, the total amount represents a blended rate of almost $4,000 per hour, which is four times the average hourly rate of LKC professionals who worked on this matter.

**F.      After certain payments to LKC, additional settlement negotiations, and a hearing, the Court approved LKC's Fee Application.**

25.      While litigating the Fee Application, the Special Committee caused the Debtors to pay LKC $765,000 after determining what was "unequivocally due." Ex. C, Oct. 15, 2025 Hr'g Tr. at 16:10–15. After the Court suggested the Debtors could pay more, the Special Committee promptly caused the Debtors to pay LKC an additional $950,000 based on what the Special Committee could determine was a power credit. Ex. A, Nov. 3, 2025 Hr'g Tr. at 18:12–16.

26.      The Special Committee also continued negotiating with LKC in good faith to resolve its Fee Application in full. In November, the Special Committee offered to cause the Debtors to pay $7.1 million to LKC for the success fee to settle the dispute. Ex. D, Nov. 26, 2025 Email from Jon Cohn. LKC rejected this offer, and the Special Committee then offered $7.4 million for the success fee *and* agreed to pay the hourly fees and expenses of LKC and its counsel, Porter Hedges, to end the dispute. *Id*. However, LKC again rejected this offer and refused to continue with settlement negotiation. *Id*.

27.      With the hearing on LKC's Fee Application approaching, the Special Committee decided to withdraw the Debtors' breach of fiduciary duty claim against LKC to streamline discovery and limit the scope of the issues in dispute. Ex. E, Withdrawal Email.

28.      Ultimately, the parties could not agree on a success fee, so the issue was tried at a four-day evidentiary hearing. At the conclusion of the hearing, the Court approved LKC's Fee Application and awarded LKC $11,671,994.33 for compensation and reimbursement of expenses. ECF No. 2198. The Court directed the Debtors to disburse the unpaid amount of $7,630,460.98, which they did on January 14, 2026. ECF Nos. 2198 and 2268. The order was appealed. ECF Nos. 2213 and 2214.

9

**G.     LKC moved for sanctions and filed claims against the Special Committee.**

29.     Despite the Court's order approving LKC's Fee Application, the Debtors' payment to LKC of all unpaid amounts, and the Debtors' payment in full to all unsecured creditors, with post-petition interest, on February 13, 2026, LKC filed its Motion for Sanctions seeking an additional $1.5 million in fees and expenses in the form of sanctions against the Special Committee and its counsel.  Mot. ¶ 87.  In the alternative, LKC seeks additional attorneys' fees and expenses for defending its Fee Application.  *Id.* ¶¶ 82–86.[4]

### III.     ARGUMENT

**A.     The Court cannot sanction the Special Committee under 28 U.S.C. § 1927 because the Special Committee is a represented party.**

30.     Putting aside the fact that LKC has not identified any conduct warranting sanctions, LKC's request for sanctions against the Special Committee under 28 U.S.C. § 1927 fails at the outset because such sanctions are not available against a represented party like the Special Committee.  The Court should deny LKC's request under Section 1927 for this reason alone.

31.     By its terms, Section 1927 empowers courts to sanction only attorneys, not represented parties:

> Any ***attorney or other person admitted to conduct cases*** in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. 1927 (emphasis added).

---

[4] LKC has also filed an adversary proceeding and administrative claim.  *See* ECF No. 2305.  LKC is effectively seeking to recover the costs of defending its own Fee Application through three different mechanisms.

32.     Confirming this plain text, the Supreme Court has held that "sanctions under 28 U.S.C. § 1927 [may] address the wrongdoing of only [a party's] attorneys, rather than of [the party] itself."  *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, n.2 (2017).  Likewise, the Fifth Circuit has acknowledged that Section 1927 "does not apply to represented parties, but only to 'any attorney or other person admitted to conduct cases.'"  *Smith Int'l, Inc. v. Tex. Commerce Bank*, 844 F.2d 1193, 1197 (5th Cir. 1988); *see also Matta v. May*, 118 F.3d 410, 413–14 (5th Cir. 1997) ("§ 1927 sanctions are, by the section's plain terms, imposed only on offending attorneys; clients may not be ordered to pay such awards.").  And bankruptcy courts routinely refuse to sanction parties under Section 1927.  *See, e.g.*, *In re Feldman*, 597 B.R. 448, 466 (Bankr. E.D.N.Y. 2019) (denying sanctions motion against debtor in part because "a party represented by counsel, even if the party is an attorney, is not subject to sanctions under 28 U.S.C. § 1927").

33.     As it must, LKC acknowledges that the Special Committee is a represented party. Indeed, the first sentence of LKC's Motion states that LKC moves for sanctions against the Special Committee "and its counsel" (Mot. at 1), and LKC refers to "counsel for the Special Committee" throughout the remainder of its Motion (*id.* ¶¶ 30, 39, 50, 65, 76).

34.     Because sanctions against a represented party are unavailable under Section 1927, the Court should deny LKC's request for such sanctions against the Special Committee even before it reaches the merits of LKC's allegations.

**B.      LKC cannot meet the high bar for inherent-authority sanctions in the face of the Special Committee's good-faith conduct.**

35.     The Court should also deny LKC's request for sanctions under the Court's inherent authority because the Special Committee acted reasonably and in good faith in challenging LKC's Fee Application.  To meet its burden to show that inherent-authority sanctions are warranted, LKC must prove, by clear and convincing evidence, that the Special Committee either (i) acted in bad-

11

faith or (ii) willfully abused the judicial process. *In re Prof'l Fee Matters Concerning Jackson Walker Law Firm*, 663 B.R. 335, 346 (Bankr. S.D. Tex. 2024). LKC cannot make either showing because neither occurred.

> **i.      The Court exercises its inherent power to sanction litigants with restraint and discretion.**

36.     Federal courts have the inherent power "to sanction a litigant for bad-faith conduct." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 35 (1991). In particular, Section 105(a) of the Bankruptcy Code gives bankruptcy courts the ability to sanction "in conjunction with their inherent power to implement the Bankruptcy Code and prevent abuses of bankruptcy process." *In re SkyPort Global Commc'ns, Inc.*, 528 B.R. 297, 322 (S.D. Tex. 2015) (quotations omitted).

37.     Courts must, however, exercise their inherent power to sanction circumspectly. In this Circuit, a court may impose sanctions under its inherent authority only when it makes a specific finding of bad faith or willful abuse of judicial process supported by clear and convincing evidence. *In re Moore*, 739 F.3d 724, 729 (5th Cir. 2014). "Bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity." *Miller v. Dunn*, 774 F. Supp. 3d 806, 818 (N.D. Tex. 2024), *aff'd sub nom.*, 2025 WL 3231718, at *1 (5th Cir. Nov. 19, 2025) (citations and quotations omitted). Abuse of judicial process includes "maneuvers or schemes which would have the effect of undermining the integrity of the bankruptcy system." *In re Rodriguez*, 652 B.R. 750, 760 (Bankr. S.D. Tex. 2023). LKC, as the movant, "bears the burden to justify the exercise of the Court's inherent power to sanction." *Michael v. Boutwell*, 138 F. Supp. 3d 761, 784 (N.D. Miss. 2015).

38.     The Supreme Court "has cautioned that 'because of their very potency, inherent powers must be exercised with restraint and discretion.'" *Elliott v. Tilton*, 64 F.3d 213, 217 (5th Cir. 1995) (quoting *Chambers*, 501 U.S. at 44). Specifically, inherent powers granted by

12

Section 105 must "be exercised only in a manner consistent with the provisions of the Bankruptcy Code." *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986). Inherent powers do "not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *Id.*

39. Because a bankruptcy court's "discretion to impose sanctions under its inherent authority is limited," bad faith is judged by "necessarily stringent" standards. *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990). Bad faith "requires more than just meritless claims." *Miller v. Dunn*, 774 F. Supp. 3d 806, 819 (N.D. Tex. 2024), *aff'd*, 2025 WL 3231718 (5th Cir. Nov. 19, 2025). It requires (i) "a finding that the plaintiff filed [a] suit for purposes of harassment or delay, or for other improper reasons;" (ii) a "finding that the plaintiff filed a meritless lawsuit and withheld material evidence in support of a claim;" or (iii) "a finding that a party was delaying or disrupting the litigation or hampering enforcement of a court order." Miller,774 F. Supp. 3d at (quotations omitted). A "court's mere suspicions do not add up to clear and convincing evidence of . . . bad faith." *In re Moore*, 739 F.3d at 731; *see also In re Parsley*, 384 B.R. 138, 183 (Bankr. S.D. Tex. 2008) (refusing to impose sanctions because court could not find "clear and convincing evidence that the conduct . . . transcended from merely negligent bungling to full-blown bad faith").

40. Examples of bad-faith conduct that has warranted the rare imposition of inherent-authority sanctions on parties in bankruptcy cases include (i) surreptitiously filing bankruptcy petitions with the intent to harm interested parties, *In re Yorkshire, LLC*, 540 F.3d 328, 332 (5th Cir. 2008); (ii) misusing the bankruptcy court's filing system to file documents that attack others or vent personal grievances instead of presenting proper facts and legal arguments, *In re Haney*, 2022 WL 412809, at *24 (Bankr. N.D. Ala. Feb. 10, 2022); and (iii) knowingly violating a

13

bankruptcy court's confirmation order, *In re Cleveland Imaging & Surgical Hosp.*, L.L.C., 26 F.4th 285, 297 (5th Cir. 2022).  Nothing close to such circumstances occurred here.

**ii.      The Special Committee's objections to LKC's Fee Application were reasonable and made pursuant to the Debtors' statutory and contractual rights.**

41.      LKC portrays the Special Committee's Objection as a "malicious" "smear campaign" consisting of "baseless accusations," "frivolous" claims, "spurious attacks," "abusive tactics," and "vexatious litigation conduct."  Mot. at 1–4.  These characterizations ignore reality.

42.      The Special Committee, acting on the Debtors' behalf, raised substantive, good-faith arguments pursuant to the rights afforded to a debtor under Section 330 of the Bankruptcy Code and LKC's revised engagement letter.  Section 330 authorizes a bankruptcy court, "on its own motion or *on the motion of . . . any other party in interest*," to "award compensation that is less than the amount of compensation that is requested."  11 U.S.C. § 330(a)(2) (emphasis added).  Similarly, LKC's revised engagement letter provided that if the Debtors and LKC were unable to agree on the amount of LKC's success fee, this Court would resolve the dispute.  ECF No. 835 at 15.

43.      The Special Committee exercised the Debtors' statutory and contractual right—and its own fiduciary obligation—to scrutinize LKC's Fee Application.  It did not argue that LKC deserved nothing.  *See* ECF No. 1732 ¶ 1 (acknowledging that LKC was "unquestionably" entitled to fees for its services and offering to pay the undisputed $600,000 component of the success fee immediately).  Instead, it reasonably contended that LKC's calculation of its success fee was unsupported and premature based on the Special Committee's interpretation of LKC's revised engagement letter and the facts.  *See generally id*. at 14–22.  The Special Committee neither "conscious[ly]" committed "a wrong because of dishonest purpose or moral obliquity," *Miller*,

14

774 F. Supp. 3d at 818, nor did anything that might "undermin[e] the integrity of the bankruptcy system," *In re Rodriguez*, 652 B.R. at 760.

#### a.   Objections to final fee applications are authorized under 11 U.S.C. § 330(a)(2) and routine.

44.   The Bankruptcy Code provides a uniform scheme for retaining and compensating attorneys under 11 U.S.C. §§ 327–330. First, under Section 327(a), a debtor must obtain the bankruptcy court's approval to employ counsel. 11 U.S.C. § 327(a). Then, under Section 330(a)(1)(A), an attorney who has been retained and employed may request "reasonable compensation for actual, necessary services rendered." *Id.* § 330(a)(1)(A). Next, as noted above, the bankruptcy court may exercise its discretion, upon motion or *sua sponte*, to "award compensation that is less than the amount of compensation that is requested." *Id.* § 330(a)(2).

45.   Objections challenging the amount of compensation requested are not only expressly authorized under Section 330(a)(2) but common. *See, e.g.*, *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121 (2015) (debtors' parent company objected to fee application filed by debtors' counsel); *Barron & Newburger, P.C. v. Texas Skyline, Ltd. (In re Woerner)*, 783 F.3d 266 (5th Cir. 2015) (secured creditor objected to fees sought by debtor's counsel); *In re Digerati Technologies, Inc.*, 537 B.R. 317 (Bankr. S.D. Tex. 2015) (U.S. Trustee and creditors objected to debtor's counsel's fee application, resulting in reduction of fees requested by counsel). In addition, lump-sum settlements—as here—often give rise to disputes over contingency fees because such settlements often do not align neatly with the fee arrangements. *See, e.g.*, *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 233–35 (5th Cir. 2008) (dispute arose over allocation of a lump-sum settlement among individual attorneys representing clients on contingency fee basis in mass tort litigation); *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d

15

445, 449–52 (Tex. 2011) (dispute arose between client and attorney over scope of contingency fee arrangement following lump-sum settlement payment from complex oil and gas lawsuit).

46.     LKC's Motion proceeds from the false premise that the Special Committee's refusal to accept LKC's success fee calculation was an act of bad faith.  In reality, the Special Committee's Objection to LKC's Fee Application is the sort of motion expressly authorized by Section 330.  It was the *only* way—indeed, the mandated way—for the Special Committee to proceed given the inability to resolve the success fee dispute consensually.

47.     Granting LKC's request for sanctions would have material, process-chilling consequences beyond these cases.  If parties in interest face the prospect of being sanctioned for exercising their statutory right to challenge fee applications in good faith under Section 330(a)(2), debtors, fiduciaries, and other stakeholders may be deterred from raising objections to fee applications in future bankruptcy proceedings.  Independent directors who serve on special committees and bring decades of restructuring experience to bear in advising distressed companies would be particularly chilled, forced to weigh the risk of retaliatory sanctions against their fiduciary obligation to scrutinize professional fees on behalf of the estate.  Such a result would undermine the fee-review process that Congress established and that bankruptcy courts depend upon to protect the interests of debtors and their stakeholders.  The Court should decline LKC's invitation to employ the Court's inherent sanctions power in a manner that would discourage the very oversight that the Bankruptcy Code requires.

### b.     LKC's revised engagement letter expressly contemplated judicial resolution of the amount of LKC's success fee.

48.     On top of Section 330, LKC's own revised engagement letter expressly anticipated the possibility that the parties would be unable to agree on the amount of LKC's success fee, and provided that such a dispute would be resolved by this Court.  Section (d) of the letter provides in

16

relevant part: "If the Client and Lehotsky Keller Cohn LLP are unable to reach a resolution regarding the amount of fees payable under Sections (b) and (c), including with respect to the allocation of transaction value allocable to the energy credits and damages, *such dispute shall be resolved by the bankruptcy court*."  ECF No. 835 at 15 (emphasis added).  Rhodium's General Counsel, Charles Topping, testified that Section (d) was included "to make explicit the way in which the success fee would be determined in the event . . . there was a transaction that resulted in a sale of Rhodium's assets."  Ex. A, Nov. 3, 2025 Hr'g Tr. at 193:6–12.  Given that such language exists in LKC's approved retention and revised engagement letter, LKC has no basis to argue that a fee dispute was unforeseeable or the type of "subsequent developments [] *incapable* of being anticipated at the time the engagement was approved."  *In re ASARCO, L.L.C.*, 702 F.3d 250, 258 (5th Cir. 2012).

49.     The Special Committee's decision to object to LKC's Fee Application and present the parties' dispute regarding the amount of LKC's success fee to the Court was not unexpected or made in bad faith; it was contemplated by the parties and was the very dispute-resolution mechanism that their agreement established.  In accordance with LKC's revised engagement letter and in good faith, the Special Committee objected to only certain components of LKC's Fee Application and presented the Debtors' position to the Court for adjudication.  *See generally* ECF 1732 at 14–20.  LKC's revised engagement letter required good-faith negotiation followed by judicial resolution—precisely what occurred.

> **c.     The Special Committee reasonably argued that LKC's success fee calculation was overstated because the Whinstone settlement was primarily an asset sale.**

50.     The Special Committee substantively objected to LKC's Fee Application primarily on the ground that LKC's success fee calculation was inflated because it failed to account for the reality of the Whinstone settlement: the settlement was primarily a sale of assets, not a recovery

17

on the Debtors' litigation claims.  ECF No. 1732 ¶¶ 3, 15, 39, 42–45.  This position was reasonably based in fact.

51.     As these chapter 11 cases proceeded, it became clear that the best resolution for all stakeholders would involve an asset sale.  Rhodium's General Counsel testified that as the mediation between the Debtors and Whinstone progressed, "it started to become apparent to us that it would be very difficult to get exit financing on our terms.  At that point . . . what we saw as the best way to provide a return to our Stakeholders, provide a return to our Creditors was starting to emerge as the solution of an asset sale."  Ex. A, Nov. 3, 2025 Hr'g Tr. at 206:7–17.  The Debtors' restructuring advisors worked with Rhodium, the SAFE AHG, and Whinstone to come to an agreement on an asset sale that brought concrete value into the estates.  *See* ECF No. 1732 at 15–16.

52.     The Special Committee's contention that LKC's success fee calculation was exaggerated because the Whinstone settlement was primarily an asset sale was not manufactured. The Debtors' Settlement Agreement with Whinstone did not specify what part of the lump-sum payment corresponded with the sale of assets or recoveries on the Debtors' claims.  And LKC's revised engagement letter itself recognized the possibility that the Debtors' dispute with Whinstone would be resolved through a transaction in which Whinstone acquired all or substantially all of the Debtors' Rockdale assets, and that the Debtors and LKC would not be able to agree on LKC's resulting success fee.  ECF No. 835 at 15–16.

53.     The Special Committee's position also was supported by evidence.  The testimony of Rhodium's General Counsel quoted above supported the Special Committee's position that the nature of the transaction with Whinstone evolved from a litigation settlement into primarily an asset sale driven by the Debtors' restructuring circumstances (particularly, their inability to obtain

exit financing on acceptable terms)—a fact with direct implications for the allocation of the $185 million in transaction value and, in turn, the success fee calculation. The Debtors' Chief Financial Officer, Kevin Hays, also testified that the $75 million damages figure proposed by the Special Committee for calculating LKC's success fee was consistent with the presentation made to Rhodium's Board in March 2025—a presentation made well before any controversy arose over LKC's success fee—and that the same figure was used in the Debtors' proposed tax allocation to Whinstone. Ex. F, Dec. 3, 2025 Hr'g Tr. at 203:6–206:25.

54.     Mr. Eaton, one of the Special Committee members, explained that the $75 million allocation was, in his view, "at the very top end" of a reasonable range, but that the Special Committee accepted it because it served two important purposes: it "recognized the good work that LKC had done" by providing adequate compensation, and it "would comply with the contract" by producing a fee allocation consistent with the Debtors' proposed tax allocation to Whinstone. Ex. G, Dec. 11, 2025 Hr'g Tr. at 14:14–15:3. Mr. Eaton further noted that an "independent third-party valuation" had been conducted of the business assets sold to Whinstone, which came out at a range between $173 million and $207 million with a midpoint of $190 million, "which was in fact very close to what [the Debtors] had achieved in the final settlement." *Id*. at 14:2–7.

55.     In arguing that the Whinstone settlement was not driven primarily by the Debtors' litigation claims, the Special Committee legitimately contended that the preliminary settlement projections relied on by LKC to support its success fee calculation were just estimates, not final and binding settlement figures. ECF No. 1732 ¶¶ 37–41. Those pre-mediation projections were prepared by LKC itself, in coordination with the Debtors' CFO, to facilitate discussions by Rhodium's Board concerning strategy and settlement authority for conducting settlement negotiations. ECF No. 1732-2 ¶¶ 5–7. The projections were rough, risk-weighted estimates of

19

potential claim values. *Id.* They were used for settlement discussions "solely centered around the value of the business" and were never presented to or agreed upon by Whinstone or intended to serve as a binding allocation of settlement proceeds. *Id.* at 9:4–5; ECF No. 1732 ¶ 40. Mr. Eaton testified that "the data that was used [for settlement discussions] was created for much different purposes before it was transferred over to apply to the settlement of success fees, and I think it substantially overweigh[ed] the value of litigation claims." Ex. G, Dec. 11, 2025 Hr'g Tr. at 8:8–15. Indeed, Rhodium's General Counsel testified that the Board's estimate of damages moved from $100 million to $75 million as circumstances evolved, demonstrating the projection's preliminary nature. Ex. A, Nov. 3, 2025 Hr'g Tr. at 21:4–8.

56.     The Special Committee's argument that the Whinstone settlement was primarily an asset sale—and that the Debtors' preliminary, one-sided estimate of litigation damages was not a proper basis for calculating LKC's success fee—was a reasonable, good-faith position well within the bounds of legitimate advocacy. Because LKC was not present at or actively involved in the later settlement negotiations with Whinstone that ultimately resulted in a resolution, it had no way of knowing what allocations were discussed regarding potential litigation damages.

> **d.      The Special Committee reasonably argued that LKC's Fee Application included unrecoverable fees for work performed by Porter Hedges.**

57.     The Special Committee also objected to LKC's Fee Application on the ground that it included unrecoverable fees for work by LKC's counsel, Porter Hedges. ECF No. 1732 ¶¶ 46–49. This, too, was a reasonable objection.

58.     LKC's Fee Application presented $200,100.98 in Porter Hedges charges as lump-sum expense line items with no details regarding time, rates, qualifications, or the nature of the work performed. ECF No. 1560 at Ex. F. Because LKC never provided the underlying Porter Hedges invoices to the Debtors until the eve of trial, the Debtors could not assess whether the

20

expense was actual and necessary as dictated by Section 330.  As the Debtors' General Counsel testified: "[W]e had never received invoices . . . for the Porter Hedges amounts, so there was no way to determine if those amounts were reasonable."  Ex. A, Nov. 3, 2025 Hr'g Tr. at 190:18–21.

59.     Section 330 allows the bankruptcy court to award a professional retained under Section 327 "reimbursement for ***actual, necessary*** expenses."  11 U.S.C. § 330(a)(1)(B) (emphasis added).  LKC's bare-bones presentation of the Porter Hedges charges made it impossible for the Debtors to conduct this analysis, let alone determine whether such charges by Porter Hedges were necessary for the administration of the estate, and the Special Committee justifiably objected to the inclusion of these charges in LKC's Fee Application.

> **e.     The Special Committee reasonably argued that LKC's Fee Application was premature.**

60.     In addition to the substantive arguments discussed above, the Special Committee argued that LKC's Fee Application was premature.  ECF No. 1732 ¶¶ 42–45.  This position also was reasonable and supported by evidence.

61.     In support of this position, the Special Committee submitted a sworn declaration from the Debtors' tax advisor, Mark Wheeler, stating that the Whinstone transaction implicated six separate taxpayers and required attribution of revenue to each entity based on the specific assets sold, the hosting agreements held, and the settlement of claims asserted.  ECF No. 1732-1 ¶¶ 6–7.  Mr. Wheeler also testified that under the Internal Revenue Code and the PSA, the Debtors and Whinstone were required to allocate the Purchase Price using the residual method prescribed by 26 U.S.C. § 1060 and Treasury Regulations thereunder.  *Id.* ¶ 8.  He further testified that the allocation should ideally be resolved before negotiating with LKC to "ensure a single set of operative facts regarding the allocation of [the] purchase price."  *Id.* ¶¶ 26–27.  He also acknowledged that while reaching a different allocation for purposes of the LKC dispute would

21

not "violate the PSA," the tax filings "would have to be considered as well."  Ex. F, Dec. 3, 2025 Hr'g Tr. at 119:19–120:5.

62.    Supported by Mr. Wheeler's testimony, the Special Committee's position was straightforward:  Because the PSA required the allocations be "accurate and consistent with the record," it was reasonable to seek consistency between that allocation and the fee calculation before finalizing LKC's success fee.  ECF No. 1732 ¶ 44.  The Special Committee did not argue that the Court should never determine the amount of LKC's success fee or award LKC a success fee—only that the Court should wait to do so until the Debtors and Whinstone agreed on or otherwise resolved the tax allocation to achieve such objectives.

### iii.    The Special Committee asserted a breach of fiduciary duty claim against LKC on the Debtors' behalf in good faith.

63.    The record establishes that the breach of fiduciary claim asserted against LKC by the Special Committee on the Debtors' behalf was colorable and asserted to avoid waiver, not as a "malicious campaign of publicly attacking and defaming LKC."  Mot. at 1.  The Special Committee did not assert the claim "for purposes of harassment or delay, or for other improper reasons," and LKC does not even argue that the Special Committee "withheld material evidence" regarding the claim.  *Miller*, 774 F. Supp. 3d at 819.

#### a.    The Special Committee asserted the breach of fiduciary duty claim to avoid waiver after LKC refused to extend the Special Committee's time to object to LKC's Fee Application.

64.    The Special Committee's good faith in asserting a breach of fiduciary duty claim against LKC on the Debtors' behalf is demonstrated by its candor regarding the reason it asserted the claim.  In its Objection, the Special Committee stated: "*Res judicata* can and does bar a debtor's claims against a third party seeking fees in a bankruptcy case if those claims are not asserted in connection with the fee application.  Accordingly, as part of this Objection, the Special Committee

22

was required to assert, at a minimum, any affirmative claims against LKC related to the Fee Application and LKC's representation of the Debtors in this case." ECF No. 1732 ¶¶ 50–51 (citations omitted).

65.    Before asserting the breach of fiduciary duty claim, the Special Committee sought to extend the Debtors' time to object to LKC's Fee Application to allow for further investigation and potential negotiations. *Id*. ¶ 5. LKC, however, refused this request, leaving the Special Committee with no option but to assert the claim as part of its Objection to avoid waiver under Fifth Circuit precedent. Obj. ¶ 5; *see In re Intelogic Trace, Inc*., 200 F.3d 382, 386–391 (5th Cir. 2000) (holding that *res judicata* barred trustee's malpractice claims where they were not asserted in an objection to a fee application but they had arose from the same nucleus of operative facts).

66.    As the Special Committee's Objection made clear, it raised the breach of fiduciary duty claim out of an abundance of caution to preserve it—not for purposes of harassment or delay.

### b.    The breach of fiduciary duty claim was colorable.

67.    The breach of fiduciary duty claim asserted by the Special Committee against LKC was reasonably based in law and fact. The elements of such a claim under Texas law are (i) the existence of a fiduciary duty; (ii) breach of the duty; (iii) causation; and (iv) damages. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). The Special Committee alleged in good faith that (1) a "fiduciary duty exists between a lawyer and . . . client," and "Rhodium engaged LKC and LKC's attorneys represented . . . the Debtors;" (2) LKC breached its fiduciary duty to Rhodium by demanding fees "in such a manner that, if Rhodium acquiesced, would create substantial liability;" (3) "[m]aking the payment that LKC demand[ed] would cause Rhodium to breach the PSA and possibly violate the Internal Revenue Code and the Treasury Regulations thereunder;" and (4) "LKC caused damage to the Debtors" by "shar[ing] the Debtors'

23

privileged information without [their] consent," "forc[ing] the Debtors to incur legal fees," and "subject[ing] the Debtors to heightened scrutiny by the Internal Revenue Service or other parties." ECF No. 1732 ¶¶ 54–58.  These allegations were supported by the sworn declaration of Rhodium's General Counsel.  ECF No. 1732-2.

68.     LKC does not and cannot offer clear and convincing evidence that the Special Committee asserted the breach of fiduciary claim for an improper reason.  LKC claims that the Special Committee's counsel "admitted he could not articulate any factual basis" for the claim. Mot. ¶ 65 (citing ECF No. 1633 at 6).  Yet, in the very filing that LKC cites to support this statement, LKC conceded that the Special Committee's counsel explained that LKC's actions created "audit risk with the IRS."  ECF No. 1633 ¶ 14.

69.     LKC also asserts, without support, that the Special Committee later withdrew the claim "because it knew" the claim was "baseless."  Mot. ¶ 66.  But dismissal—let alone voluntary withdrawal—of a claim does "not establish that the . . . claim was frivolous, unreasonable, or groundless."  *Dean v. Riser*, 240 F.3d 505, 512 (5th Cir. 2001).  A party may decide to withdraw a claim "for reasons other than lack of merit."  *McCollum v. Jacobs Eng'g Grp., Inc.*, 992 F. Supp. 2d 680, 686 (S.D. Miss. 2014).  Here, the Special Committee withdrew the breach of fiduciary duty claim to streamline discovery and narrow the issues for the Court to resolve.  *Cf. In re Rodriguez*, 652 B.R. 750, 762 (Bankr. S.D. Tex. 2023) (sanctioning attorney where she "openly conceded that she had no basis asserting her numerous maritime law theories"); *In re Parsley*, 384 B.R. 138, 180 (Bankr. S.D. Tex. 2008) (finding attorney acted in bad faith because he misrepresented to the court that a motion "was a good motion" despite "clear and convincing evidence that [he] had actual knowledge of the inaccurate factual allegations" in the motion).

70.    The Special Committee filed a colorable claim for breach of fiduciary duty against LKC and later withdrew it for efficiency.  Relying solely on mischaracterized quotations and conclusory allegations, LKC offers no evidence that the Special Committee asserted the claim to harass LKC or for any other improper purpose.

          **c.**      **Federal and bankruptcy laws required the Special Committee to file the breach of fiduciary claim publicly.**

71.    LKC complains that "the Special Committee publicly filed [the] breach of fiduciary claim and refused to file it under seal."  Mot. ¶ 65.  But the Special Committee properly filed the claim publicly because nothing about it warranted sealing.

72.    "[F]ederal courts have long recognized the strong common law presumption in favor of public access to court proceedings and records."  *In re Gen. Homes Corp.*, 181 B.R. 898, 903 (Bankr. S.D. Tex. 1995).  This presumption is codified in Section 107 of the Bankruptcy Code, which provides that a paper filed in a bankruptcy case and the dockets of a bankruptcy court are public records.  11 U.S.C. § 107(a).  Section 107 permits the sealing of bankruptcy filings only in limited circumstances "to protect trade secrets or confidential research, development, or confidential information, or to protect a person with regard to a scandalous or defamatory matter."  *In re Gen. Homes Corp.*, 181 B.R. at 903.  "For a bankruptcy court to seal court records pursuant to its discretionary authority to limit public access to papers, the court must specifically find that the interest of secrecy outweighs the presumption in favor of access."  *In re N. Bay Gen. Hosp., Inc.*, 404 B.R. 429, 440 (Bankr. S.D. Tex. 2009).  In these very cases, the Court expressed concern about unnecessary sealing when addressing the Special Committee's motion for a protective order.  Ex. H, Oct. 30, 2025 Hr'g Tr. at 4:19–25 ("I'm not going to seal the entire hearing . . . . I'm going to only seal those portions of the hearing that need to be sealed.").

25

73.     Nothing in the Special Committee's Objection warranted sealing under Section 107(b).  The Objection merely laid out the nonconfidential, factual allegations necessary to assert a breach of fiduciary duty claim against LKC.  ECF No. 1732 ¶¶ 50–59.  LKC may have preferred that the Special Committee file the claim under seal, but that preference did not allow the Special Committee to do so.  "[A]greement of the parties, by itself, is not sufficient to trump the public's presumptive right of access."  *In re N. Bay Gen. Hosp., Inc.*, 404 B.R. at 441 (quotations omitted).

74.     If LKC believed the breach of fiduciary duty claim warranted sealing, it could have and should have moved the Court to place the claim under seal.  Likely recognizing that it could not meet its "burden of establishing [the] scandalous and defamatory character" of the claim, LKC never filed a motion to seal.  *Id.* at 440.  Even now, LKC offers no evidence to "demonstrate extraordinary circumstances and a compelling need to [have] obtain[ed] protection."  *Id.*

75.     Further, LKC was the first party to place materials regarding its conduct into the public record.  ECF No. 1529-2.  In good faith, the Special Committee sent LKC a private letter outlining its concerns, and LKC subsequently filed that same letter, and the Special Committee's draft objection to the Fee Application, with the Court.  *See generally* ECF No. 1529-2.

**iv.     The Special Committee's litigation conduct was routine and reasonable.**

76.     LKC's Motion is devoid—because none exists—of the clear and convincing evidence necessary to establish that the Special Committee engaged in "vexatious" litigation conduct.

77.     Vexatious conduct is "conduct that evidences bad faith, motive, or reckless disregard of the duty owed to the courts."  *In re Ruth*, 473 B.R. 152, 166 (Bankr. S.D. Tex. 2012) (omitted quotations).  It "implies not only that a litigant knew a position was unfounded, but that his purpose was to create trouble or expense for the opposing party."  *Walters v. Tenant*

26

*Background Search*, 849 F. App'x 476, 479 (5th Cir. Mar. 12, 2021).  In *In re Ruth*, the court denied a request for sanctions for alleged vexatious litigation conduct where the movants "ha[d] not provided evidence of any multiplicity of litigation or costs in their case," and the "filing of th[e] challenged claim ha[d] not led to extensive examinations or any court filings outside of the normal litigation process." *In re Ruth*, 473 B.R. at 167.

78.     Such is the case here.  LKC provides no evidence of "particular misconduct" required for the Court to make a finding of multiplicity of litigation or costs outside of the normal process for litigating final fee applications. *Id.* at 166.  The Special Committee's litigation conduct was not vexatious—it was routine and done in good faith.

79.     *First*, as explained, fee application objections are a routine aspect of bankruptcy practice and have minimal impact on case administration because "even if no objection ha[s] been lodged, th[e] Court has an independent duty to examine all fee requests made by counsel." *In re King*, 546 B.R. 682, 701 (Bankr. S.D. Tex. 2016).

80.     *Second*, as also explained, the Special Committee's objections to LKC's Fee Application and breach of fiduciary duty claim were reasonably based in law and fact. *Supra* § III(B)(ii)-(iii).

81.     *Third*, contrary to LKC's allegation that the Special Committee engaged in "discovery gamesmanship," Mot. ¶ 80, the Special Committee properly used the judicial process in good faith.  For example, when LKC served Rule 30(b)(6) topics, the Special Committee participated in the "iterative and cooperative" conferral process, discussing with LKC for more than a week about the 30(b)(6) representatives it was willing to produce, as well as the topics on which those representatives would testify. Ex. H, Oct. 30, 2025 Hr'g Tr. at 8:21–9:2, 10:21.  When LKC later sought to cover a topic "broader than [the Special Committee] anticipated based on

27

conferrals to date," the Special Committee "responded to that in turn to ensure that [LKC] g[o]t the discovery they need[ed]." *Id.* at 11:2–11.

82.     Further, when the Debtors refused to produce their Chief Executive Officer, Chase Blackmon, for deposition on the ground that LKC failed to provide adequate notice, the Special Committee proactively informed the Court of its intent not to produce the Debtors' CEO on that basis, underscoring its commitment to transparency rather than gamesmanship.  Ex. C, Oct. 15, 2025 Hr'g Tr. at 17:2–10.  As the Special Committee noted to the Court, difficulties in the discovery process arose because "it [was] just a little bit faster under the timeframe," not due to any deliberate obstruction.  Ex. H, Oct. 30, 2025 Hr'g Tr. at 11:11.

83.     ***Lastly***, the Special Committee continued to engage in good-faith negotiations to settle the success fee dispute without further litigation.  The Special Committee made two additional offers to settle the dispute during the litigation, one for $7.1 million for the success fee and another for $7.4 million for the success fee ***and*** the hourly fees and expenses of LKC and Porter Hedges.  Ex. D, Nov. 26, 2025 Email from Jon Cohn.  LKC rejected both offers and refused to continue in settlement negotiations.  *Id*.

84.     LKC points to no case law supporting imposing inherent-authority sanctions against the Special Committee.  The only three cases LKC cites that discuss courts sanctioning parties under their inherent authority for "vexatious" litigation conduct bear no resemblance to the circumstances here.  *See Chambers*, 501 U.S. at 56 (sanctioning party for acting "in defiance of [a] preliminary injunction" and ignoring "repeated timely warnings . . . from . . . the court that his conduct was sanctionable"); *In re Cano*, 410 B.R. 506, 555 (Bankr. S.D. Tex. 2009) (sanctioning party for "violat[ing] court orders confirming chapter 13 plans"); *Day v. Amoco Chemicals Corp.*, 595 F. Supp. 1120, 1122, 1126 (S.D. Tex. 1984) (stating that future sanctions may be proper

28

because the court had "granted defendant's motion to dismiss with prejudice on the ground that plaintiff's case was frivolous and malicious"). Because LKC offers no evidence of bad faith or vexatious litigation conduct by the Special Committee, the Court should deny LKC's request for inherent-authority sanctions.

C.   *ASARCO* **bars LKC's attempt to collect attorneys' fees and expenses for defending its Fee Application under 11 U.S.C. § 328.**

85.   The Court should deny LKC's alternative request for additional fees and expenses under 11 U.S.C. § 328 because it is a transparent attempt at circumventing the core principle in *Baker Botts L.L.P. v. ASARCO LLC*, in which the Supreme Court held that counsel retained by the bankruptcy estates cannot collect fees and expenses for defending their own fee applications. 576 U.S. at 135; *see also In re Vaughn*, 660 B.R. 827, 869 (Bankr. S.D. Ohio 2024) ("It is well-established that time spent defending a fee application is non-compensable."); *In re Huepenbecker*, 546 B.R. 381, 383 (Bankr. W.D. Mich. 2015) ("[B]ankruptcy courts may not award attorney fees to counsel employed by the bankruptcy estate for work performed in defending a fee application.").

86.   In *ASARCO*, the Supreme Court affirmed the Fifth Circuit's reversal of a bankruptcy court's award of attorneys' fees and expenses for the cost of defending the attorneys' own final fee application. *Id.* at 125. The Fifth Circuit reasoned that "the American Rule—the rule that each side must pay its own attorney's fees—applies absent explicit statutory . . . authority to the contrary," and that "the Code contains no statutory provision for the recovery of attorney fees for *defending* a fee application.'" *Id.* (quotations omitted). Agreeing with the Fifth Circuit, the Supreme Court held that Section 330(a)(1) of the Bankruptcy Code "does not permit bankruptcy courts to award compensation for such litigation" because it "does not explicitly override the American Rule with respect to fee-defense litigation." *Id.* at 135.

29

87.     LKC suggests that *ASARCO* is limited to the Section 330 context.  Mot. at 22 n.4. Not so.  The Supreme Court's reasoning in *ASARCO* applies equally to Section 328 because that provision does not explicitly "provid[e] for the recovery of attorney fees for *defending* a fee application."  *See ASARCO*, 576 U.S. at 126.  Other bankruptcy courts have so held.  *See, e.g.*, *In re Boomerang Tube, Inc.*, 548 B.R. 69, 72 (Bankr. D. Del. 2016) (denying request for approval of fee defense provision in retention applications of counsel because, "like section 330, [section 328] is not a specific and explicit statute which authorize[s] the award of a reasonable attorney's fee, fees, or litigation costs") (quotations omitted); *see also In re Danner*, 2012 WL 3205242, at *4 (B.A.P. 9th Cir. July 31, 2012) ("The operative words [of § 328(a)] are 'may' and 'reasonable.'"); *In re Raocore Tech., LLC*, 2025 WL 828880, at *4 (Bankr. D.D.C. Feb. 20, 2025) (quoting *Boomerang*) (addressing fees arrangements under Section 328 and noting that "[a]n engagement agreement is a contract 'subject to objection by other parties and is ultimately subject to approval (and modification) by the Court.'").[5]

88.     In addition to being barred by *ASARCO*, LKC's request for additional compensation under Section 328 is meritless because LKC seeks compensation for services performed for itself, not for the Debtors.  In *In re Boomerang Tube, Inc.*, the court noted that "section 328(a) permits only approval of fees or expenses for performing services for the" trustee

---

[5] Even if *ASARCO* were limited to Section 330, LKC's argument for additional compensation under Section 328 still flies directly in the face of the American Rule.  The "basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *ASARCO*, 135 S.Ct. at 2164 (quoting *Hardt v. Reliance Std. Life Ins. Co.*, 560 U.S. 242, 252–53 (2010)).  Any departure or exception to the American Rule must be "specific and explicit" and must "authorize the award of 'a reasonable attorney's fee,' 'fees,' or 'litigation costs,' and usually refer to a 'prevailing party' in the context of an 'adversarial action.'"  *Id*. at 2164.  Here, LKC's court-approved revised engagement letter does not expressly award either party its attorneys' fees or expenses incurred in litigating any such fee dispute—it only contemplates and provides a dispute resolution mechanism.

or a committee of creditors or equity security holders.  548 B.R. at 78.  Because "the expenses sought" in the retention applications before the court would have been "for services performed for the professionals, not for the [applicable] Committee," the court concluded that "the fee defense provision [in the applications was] not a reasonable term of employment for serving as Committee Counsel."  The same is true here.

89.     Further, Section 328 only permits a court to "allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments *not capable of being anticipated at the time of the fixing of such terms and conditions*."  11 U.S.C. 328(a) (emphasis added).  LKC has not met this "weightier burden of proving that the subsequent developments were incapable of being anticipated at the time the engagement was approved."  *In re ASARCO,* 702 F.3d at 258.  To the contrary, LKC bargained for the court-approved revised engagement letter, which explicitly stated that fee disputes would be submitted to the Court.  ECF No. 835 at 15.  LKC fails to explain why such a fee dispute was incapable of being anticipated, and the record shows just the opposite.

90.     Because *ASARCO* makes clear that counsel retained by the bankruptcy estates cannot collect fees and expenses for defending their own fee applications, and because LKC seeks compensation for anticipated services performed for itself, LKC is not entitled to additional compensation under Section 328.

## IV.     CONCLUSION

91.     For these reasons, the Special Committee respectfully asks that the Court deny the Motion.

Dated: March 6, 2026

Respectfully Submitted,

**BAKER BOTTS L.L.P.**

*/s/ Travis A. McRoberts*

Thomas E. O'Brien (TX 24046543)
Travis A. McRoberts (TX 24088040)
Kevin Chiu (TX 24019723)
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone: (214) 953-6500
Email: tom.obrien@bakerbotts.com
        travis.mcroberts@bakerbotts.com
        kevin.chiu@bakerbotts.com

-and-

Matthew G. Sheridan (TX 24088404)
910 Louisiana Street
Houston, Texas 77002-4995
Telephone: (713) 229-1568
Email: matthew.sheridan@bakerbotts.com

*Counsel for David L. Eaton and Spencer Wells*

32

33

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on March 6, 2026, a true and correct copy of the

foregoing document was served on all parties requesting service via the Court's ECF system.


*/s/ Travis A. McRoberts*
Travis A. McRoberts

33